EXHIBIT -15

1  MICHELLE B. HEVERLY, Bar No. 178660
   MICHAEL W. WARREN, Bar No. 223642
2  LITTLER MENDELSON
   A Professional Corporation
3  50 West San Fernando Street, 14th Floor
   San Jose, CA 95113.2303
4  Telephone:    408.998.4150
   Facsimile:    408.288.5686
5
   Attorneys for Defendant
6  NETVERSANT – NATIONAL, INC., PETER
   WAINWRIGHT
7

ENDORSED FILED

COUNT                    CO

May 0 0 2007

GOR                      CLERK
BY: _____
         Deputy Clerk

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SAN FRANCISCO

| | |
|---|---|
| 10  MICHAEL CAVA, | Case No. CGC-06-453469 |
| 11           Plaintiff, | **DECLARATION OF MICHELLE B. HEVERLY IN SUPPORT OF DEFENDANT NETVERSANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION** |
| 12       v. | |
| 13  NETVERSANT – NATIONAL, INC., a Delaware corporation, dba NETVERSANT – SAN FRANCISCO, aka NETVERSANT; PETER WAINWRIGHT, an individual; and Does 1 through 40, inclusive, | |
| 14 | |
| 15 | Date:    May 23, 2007 |
| 16           Defendants. | Time:    9:30 a.m. Dept:    301 Judge:   Hon. Peter Busch |
| 17 | |
| 18 | |

19        I, Michelle B. Heverly, hereby declare and state as follows:

20        1.    I am an attorney licensed to practice law before the courts of the State of

21  California. I am a shareholder at the law firm of Littler Mendelson, a Professional Corporation, and

22  am counsel of record for Defendants NetVersant – National, Inc., and Peter Wainwright (hereafter

23  "Defendants") in the above-referenced matter. I have personal knowledge of the facts set forth

24  herein and, if called as a witness, could competently testify thereto.

25        2.    Defendant NetVersant's Motion for Summary Judgment And/Or Summary

26  Adjudication makes reference to portions of certain deposition transcripts and other documents,

27  copies of which are attached hereto as set forth below.

28              a.    Attached hereto as Exhibit A is a true and accurate copy of the

LITTLER MENDELSON
· · · · · · · · · · ·
· West San Fernando Street
14th Floor
San Jose, CA 95113 2303
408 998 4150

CASE NO. CGC-06-453469

DECLARATION OF MICHELLE B. HEVERLY

1  relevant pages from the deposition transcript of Michael Cava, dated January 4, 2007. A true and

2  accurate copy of the relevant exhibits to this transcript are attached following the testimony.

3              b.      Attached hereto as Exhibit B is a true and accurate copy of the relevant

4  pages from deposition transcript of Peter Wainwright, dated November 28, 2006. A true and

5  accurate copy of the relevant exhibits to this transcript are attached following the testimony.

6         I hereby declare under penalty of perjury, under the laws of the State of California,

7  that the foregoing is true and correct, and that this Declaration was executed on March 8, 2007 at

8  San Jose, California.

9

10

11                                 MICHELLE B. HEVERLY

12  Firmwide:82147069.1 037665.1017

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
50 West San Fernando Street
14th Floor
San Jose, CA 95113-2303
408.998.4150

DECLARATION OF MICHELLE B. HEVERLY

# EXHIBIT – A

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

UNLIMITED JURISDICTION


MICHAEL CAVA,

                    Plaintiff(s),

            vs.                        CASE NO: CGC-06-453469

NETVERSANT-NATIONAL, INC.,

a Delaware corporation, dba

NETVERSANT-SAN FRANCISCO, aka

NETVERSANT; PETER WAINWRIGHT,

an individual; and DOES 1

through 40, inclusive,

                    Defendant(s).       CERTIFIED COPY

_____/


DEPOSITION OF MICHAEL CAVA

VOLUME I


DATE:          Thursday, January 4, 2007

TIME:          10:13 A.M.

LOCATION:      LITTLER MENDELSON
               50 West San Fernando Street
               14th Floor
               San Jose, CA 95113-2303

REPORTER:      Patricia Hope Sales, CRR
               CSR License Number C-4423

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:18:28 | 1 | case? |
| 10:18:29 | 2 | A.   No. |
| 10:18:29 | 3 | Q.   Have you ever before been a defendant in a |
| 10:18:31 | 4 | case? |
| 10:18:32 | 5 | A.   No. |
| 10:18:34 | 6 | Q.   When did you first consult an attorney in |
| 10:18:36 | 7 | connection with anything to do with your employment at |
| 10:18:39 | 8 | NetVersant? |
| 10:18:41 | 9 | A.   After I was terminated. |
| 10:18:48 | 10 | Q.   Was Mr. Fotouhi or Mr. Iannitelli the first |
| 10:18:53 | 11 | attorney that you contacted? |
| 10:18:55 | 12 | A.   Yes. |
| 10:19:02 | 13 | Q.   Why did you first contact an attorney? |
| 10:19:06 | 14 | A.   I felt like I had been treated unfairly.  I was |
| 10:19:13 | 15 | disabled, and they knew I was disabled. |
| 10:19:19 | 16 | Q.   Any other reason? |
| 10:19:21 | 17 | A.   Not that I can think of. |
| 10:19:28 | 18 | Q.   At the time of your termination, what was your |
| 10:19:31 | 19 | disability? |
| 10:19:33 | 20 | A.   Anxiety, depression, stress, ADD/ADHD, back |
| 10:19:40 | 21 | pain. |
| 10:19:46 | 22 | Q.   Anything else? |
| 10:19:47 | 23 | A.   Not that I can think of. |
| 10:19:50 | 24 | Q.   At the time of your termination, were you |
| 10:19:52 | 25 | seeing any physicians or health care providers for any |

Page 12

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:19:55 | 1 | of these conditions? |
| 10:19:57 | 2 | A.   Yes. |
| 10:19:57 | 3 | Q.   Who were you seeing? |
| 10:19:58 | 4 | A.   Dr. Okamura. |
| 10:20:02 | 5 | Q.   Anyone else? |
| 10:20:03 | 6 | A.   A chiropractor for the back pain. |
| 10:20:06 | 7 | Q.   What's your chiropractor's name? |
| 10:20:08 | 8 | A.   Dr. John Daniels. |
| 10:20:13 | 9 | Q.   Where is he located? |
| 10:20:17 | 10 | A.   San Leandro. |
| 10:20:18 | 11 | Q.   Do you know his address? |
| 10:20:22 | 12 | A.   Bancroft.  I don't know the exact street |
| 10:20:25 | 13 | address. |
| 10:20:26 | 14 | Q.   Do you know his phone number? |
| 10:20:29 | 15 | A.   (510) 351-0628. |
| 10:20:33 | 16 | Q.   351- -- |
| 10:20:35 | 17 | A.   Yes. |
| 10:20:35 | 18 | Q.   -- -0628? |
| 10:20:38 | 19 | A.   (Nods head.) |
| 10:20:38 | 20 | Q.   Were you seeing any other health care providers |
| 10:20:40 | 21 | at that time? |
| 10:20:43 | 22 | A.   Psychologists and social workers through the |
| 10:20:46 | 23 | hospitals where my son was being treated. |
| 10:20:50 | 24 | Q.   Was that for your own conditions or just to |
| 10:20:53 | 25 | deal with your son's treatment? |

Page 13

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. .20:56 | 1 | A.   Mostly for issues surrounding my son's |
| 10:21:00 | 2 | treatment. |
| 10:21:10 | 3 | Q.   Did you ever discuss with a psychologist or |
| 10:21:13 | 4 | social worker at the hospital your own anxiety or other |
| 10:21:19 | 5 | mental disorders? |
| 10:21:22 | 6 | A.   I -- I'm not sure.  Anxiety, at least. |
| 10:21:26 | 7 | Q.   Who was it that you spoke to at the hospital? |
| 10:21:32 | 8 | A.   Dr. Dina Hankin at Oakland Children's. |
| 10:21:38 | 9 | Q.   Dina Hankin? |
| 10:21:39 | 10 | A.   Um-hmm. |
| 10:21:40 | 11 | Q.   H-a-n-k-i-n? |
| 10:21:42 | 12 | A.   H-a-n-k-i-n, yes. |
| 10:21:50 | 13 | Q.   Anyone else? |
| 1  .1:54 | 14 | A.   Various social workers that I can't name |
| 10:21:58 | 15 | offhand. |
| 10:21:59 | 16 | Q.   All at Oakland Children's Hospital? |
| 10:22:01 | 17 | A.   Oakland Children's and Lucile Packard. |
| 10:22:11 | 18 | Q.   At the time of your termination, were you |
| 10:22:13 | 19 | seeing any other health care providers for anything |
| 10:22:15 | 20 | having to do with your claimed disabilities? |
| 10:22:21 | 21 | A.   At St. Jude, I had talked to health care |
| 10:22:27 | 22 | providers there. |
| 10:22:32 | 23 | Q.   Anyone else in California? |
| 10:22:35 | 24 | A.   Not that I can think of. |
| 10:22:37 | 25 | Q.   Since the time of your termination, have you |

Page 14

DEPONENT:  MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 10:22:39 | 1 | seen any different health care providers for any of |
| 10:22:42 | 2 | these symptoms? |
| 10:22:44 | 3 | A.  Yes. |
| 10:22:44 | 4 | Q.  Who else? |
| 10:22:48 | 5 | A.  Susann Green.  She's a psychologist. |
| 10:22:56 | 6 | Q.  Where is she located? |
| 10:22:58 | 7 | A.  San -- sorry.  Danville. |
| 10:23:01 | 8 | Q.  Do you know her address? |
| 10:23:04 | 9 | A.  She's on San Ramon Valley Road.  I don't know |
| 10:23:08 | 10 | the exact street address. |
| 10:23:10 | 11 | Q.  Do you know her phone number? |
| 10:23:12 | 12 | A.  No. |
| 10:23:15 | 13 | Q.  Okay.  Anyone else? |
| 1  .3:15 | 14 | A.  Dr. Andrew Krompier. |
| 10:23:19 | 15 | Q.  Do you want to spell that last name? |
| 10:23:21 | 16 | A.  K-r-o-m-p-i-e-r. |
| 10:23:24 | 17 | Q.  And where is he located? |
| 10:23:26 | 18 | A.  San Ramon. |
| 10:23:29 | 19 | Q.  Do you know what street? |
| 10:23:31 | 20 | A.  I believe Norris Canyon. |
| 10:23:34 | 21 | Q.  What kind of a doctor is he? |
| 10:23:37 | 22 | A.  Psychiatrist. |
| 10:23:42 | 23 | Q.  Anyone else? |
| 10:23:43 | 24 | A.  Not that I can think of. |
| 10:23:54 | 25 | Q.  Okay.  What is your date of birth? |

Page 15

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| ⸦ 23:55 | 1 | A.  August 19th, 1971. |
| 10:24:02 | 2 | Q.  And you are married, correct? |
| 10:24:06 | 3 | A.  Yes. |
| 10:24:06 | 4 | Q.  And you have one son? |
| 10:24:09 | 5 | A.  Yes. |
| 10:24:09 | 6 | Q.  How old is he now? |
| 10:24:11 | 7 | A.  He just turned three. |
| 10:24:21 | 8 | Q.  And you're still living in San Ramon? |
| 10:24:24 | 9 | A.  Danville. |
| 10:24:24 | 10 | Q.  Danville?  Still living in Danville? |
| 10:24:28 | 11 | A.  Yes. |
| 10:24:28 | 12 | Q.  Any plans to move in the near future? |
| 10:24:30 | 13 | A.  No. |
| ⸦ .4:38 | 14 | Q.  I'd like to just ask you a few questions about |
| 10:24:40 | 15 | your education. |
| 10:24:41 | 16 | So starting from high school, where did you |
| 10:24:43 | 17 | graduate from high school? |
| 10:24:45 | 18 | A.  College Park High School in Pleasant Hill. |
| 10:24:49 | 19 | Q.  Did you go to college? |
| 10:24:50 | 20 | A.  Yes. |
| 10:24:50 | 21 | Q.  Where did you go? |
| 10:24:51 | 22 | A.  Graduated from Cal State Hayward.  I guess now |
| 10:24:56 | 23 | it's called Cal State East Bay. |
| 10:24:58 | 24 | Q.  What year? |
| 10:24:59 | 25 | A.  1994. |

Page 16

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. 25:01 | 1 | Q.   And what kind of degree did you get? |
| 10:25:04 | 2 | A.   Business administration, with an option in |
| 10:25:08 | 3 | marketing. |
| 10:25:11 | 4 | Q.   Did you attend any other college or university |
| 10:25:14 | 5 | after Cal State Hayward? |
| 10:25:15 | 6 | A.   I did some graduate work there. |
| 10:25:19 | 7 | Q.   Did you get any other degrees? |
| 10:25:21 | 8 | A.   No. |
| 10:25:27 | 9 | Q.   Have you taken any other courses or got any |
| 10:25:29 | 10 | other certificates or anything since the time of your |
| 10:25:32 | 11 | graduation? |
| 10:25:32 | 12 | A.   Just professionally. |
| 10:25:37 | 13 | Q.   Those are -- when you say "professionally," |
| 1   .5:39 | 14 | those are like the Nortel training courses -- |
| 10:25:42 | 15 | A.   Yes. |
| 10:25:42 | 16 | Q.   -- things like that? |
| 10:25:49 | 17 | A.   (Nods head.) |
| 10:25:49 | 18 | Q.   After graduating from college what was your |
| 10:25:51 | 19 | first job? |
| 10:25:55 | 20 | A.   Working in the warehouse at Sysco Food |
| 10:26:00 | 21 | Service. |
| 10:26:00 | 22 | Q.   How long did you work there? |
| 10:26:03 | 23 | A.   About five months. |
| 10:26:09 | 24 | Q.   Okay.   What was your next position? |
| 10:26:10 | 25 | A.   I was in sales. |

Page 17

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:26:12 | 1 | Q.  For? |
| 10:26:13 | 2 | A.  Allnet Communications. |
| 10:26:19 | 3 | Q.  How long did you work there? |
| 10:26:22 | 4 | A.  About a year, thirteen months. |
| 10:26:29 | 5 | Q.  What does Allnet Communications sell? |
| 10:26:32 | 6 | A.  Network services. |
| 10:26:41 | 7 | Q.  Why did you leave AllNet? |
| 10:26:43 | 8 | A.  To get into a better career. |
| 10:26:46 | 9 | Q.  And what was your next position? |
| 10:26:48 | 10 | A.  I was working at Controlled Warehousing. |
| 10:26:53 | 11 | Q.  What does Controlled Warehousing do? |
| 10:26:58 | 12 | A.  Distribution mainly of food. |
| 10:26:59 | 13 | Q.  And what was your position? |
| 10:27:01 | 14 | A.  Various -- various positions. |
| 10:27:07 | 15 | Q.  Did you do any sales for them? |
| 10:27:10 | 16 | A.  Some marketing work, not really sales. |
| 10:27:14 | 17 | Q.  How long did you work there? |
| 10:27:16 | 18 | A.  Oh, I don't recall.  A year or two. |
| 10:27:26 | 19 | Q.  What was your next position? |
| 10:27:29 | 20 | A.  GTE Communications. |
| 10:27:31 | 21 | Q.  And why did you leave Controlled Warehousing? |
| 10:27:35 | 22 | A.  To get back into sales in telecom. |
| 10:27:38 | 23 | Q.  Have you ever been terminated from any position |
| 10:27:41 | 24 | other than NetVersant? |
| 10:27:43 | 25 | A.  Never -- never been fired. |

Page 18

TALTY COURT REPORTERS, INC.  408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  27:45 | 1 | Q.    Ever been asked to resign from any position? |
| 10:27:49 | 2 | A.    I was laid off once. |
| 10:27:53 | 3 | Q.    What company were you laid off from? |
| 10:27:54 | 4 | A.    Allnet had been acquired by Frontier |
| 10:28:10 | 5 | Communications, I believe. |
| 10:28:11 | 6 | Q.    Were you the only person laid off at the |
| 10:28:13 | 7 | time? |
| 10:28:13 | 8 | A.    No, it was a reduction in force. |
| 10:28:16 | 9 | Q.    Okay.  You were at GTE Communications.  What |
| 10:28:18 | 10 | was your position there? |
| 10:28:19 | 11 | A.    I was in sales. |
| 10:28:22 | 12 | Q.    What did GTE Communications sell? |
| 10:28:25 | 13 | A.    It was also network services. |
| 1  8:32 | 14 | Q.    How long did you work there? |
| 10:28:35 | 15 | A.    About five months. |
| 10:28:37 | 16 | Q.    And why did you leave? |
| 10:28:39 | 17 | A.    Had an opportunity to get into Nortel equipment |
| 10:28:43 | 18 | sales, working with larger customers with some |
| 10:28:47 | 19 | coworkers. |
| 10:28:51 | 20 | Q.    What was your next position? |
| 10:28:53 | 21 | A.    At Shared Technologies.  I was there for about |
| 10:28:58 | 22 | five and a half years. |
| 10:29:07 | 23 | Q.    And what was your job title at Shared |
| 10:29:10 | 24 | Technologies? |
| 10:29:11 | 25 | A.    Sales, account executive. |

Page 19

TALTY COURT REPORTERS, INC.  408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT: MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:29:14 | 1 | Q. Did you hold the same position for the whole |
| 10:29:16 | 2 | time you were there? |
| 10:29:17 | 3 | A. Yes, other than promotions in -- in level. |
| 10:29:21 | 4 | Q. At Shared Technologies did you have a |
| 10:29:23 | 5 | geographic region or assigned accounts or territory? |
| 10:29:29 | 6 | A. The whole United States, and both recruited and |
| 10:29:38 | 7 | assigned accounts. |
| 10:29:52 | 8 | Q. What -- did you have a base salary at Shared |
| 10:29:56 | 9 | Technologies? |
| 10:29:56 | 10 | A. Yes. |
| 10:29:56 | 11 | Q. What was your base salary when you left? |
| 10:29:58 | 12 | A. Sixty-five thousand. |
| 10:30:01 | 13 | Q. Did you also earn commissions? |
| 10:30:06 | 14 | A. Yes. |
| 10:30:06 | 15 | Q. Do you recall how your commissions were |
| 10:30:07 | 16 | calculated? |
| 10:30:08 | 17 | A. It -- it changed over time. |
| 10:30:11 | 18 | Q. Okay. At the time of your termination? |
| 10:30:16 | 19 | A. Not exactly. |
| 10:30:19 | 20 | Q. Was it a percentage of sales of some sort? |
| 10:30:26 | 21 | A. Yes. |
| 10:30:26 | 22 | Q. How much did you earn in your last year of |
| 10:30:29 | 23 | employment there in commissions? |
| 10:30:32 | 24 | A. I don't remember exactly. |
| 10:30:34 | 25 | Q. Approximately? |

Page 20

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:30:37 | 1 | A.   Oh, I can tell you over five years. |
| 10:30:40 | 2 | Q.   Okay. |
| 10:30:40 | 3 | A.   Between a hundred and twenty-something thousand |
| 10:30:43 | 4 | and a hundred and eighty thousand. |
| 10:30:45 | 5 | Q.   Is that your total compensation or is that how |
| 10:30:48 | 6 | much in commissions you earned? |
| 10:30:50 | 7 | A.   That's total compensation. |
| 10:30:51 | 8 | Q.   So total compensation ranged between a hundred |
| 10:30:54 | 9 | and twenty and a hundred and eighty thousand per |
| 10:30:57 | 10 | year? |
| 10:30:57 | 11 | A.   A hundred and twenty and change, and a hundred |
| 10:30:59 | 12 | and eighty thousand. |
| 10:31:07 | 13 | Q.   Where is Shared Technologies located? |
| 10:31:10 | 14 | A.   The office I worked out of was in Hayward. |
| 10:31:16 | 15 | Q.   Why did you leave Shared Technologies? |
| 10:31:19 | 16 | A.   To pursue what I thought was a better |
| 10:31:22 | 17 | opportunity.  I had been recruited by a customer, and |
| 10:31:29 | 18 | had been recruited by NetVersant along the way. |
| 10:31:33 | 19 | Q.   What customer recruited you? |
| 10:31:36 | 20 | A.   Kathleen Arceo of Maximus had called me. |
| 10:31:41 | 21 | Q.   To work for Maximus? |
| 10:31:43 | 22 | A.   To be her account rep at NetVersant.  Her rep |
| 10:31:48 | 23 | had left the company. |
| 10:32:00 | 24 | Q.   And that rep was Jennifer Forrest? |
| 10:32:05 | 25 | A.   Yes. |

Page 21

TALTY COURT REPORTERS, INC.  408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:  MICHAEL CAVA    1-4-07

```
10:32:05   1      Q.   Before coming to NetVersant, did you know
10:32:08   2  Kathleen Arceo?
10:32:09   3      A.   Yes.
10:32:09   4      Q.   How did you know her?
10:32:10   5      A.   She had been a customer of Shared Technologies
10:32:13   6  when I was there; not my customer.
10:32:14   7           I had also known her through the user group for
10:32:19   8  at least five years.
10:32:24   9      Q.   Did Kathleen Arceo tell you anything about the
10:32:27  10  job at NetVersant, how much it would pay or what the
10:32:29  11  terms were or anything?
10:32:40  12      A.   No.
10:32:41  13      Q.   And you said you were recruited by somebody at
10:32:44  14  NetVersant?
10:32:46  15      A.   (Nods head.)
10:32:46  16      Q.   Who was that?
10:32:46  17      A.   I had been actually back in about 2001 by one
10:32:51  18  of the founders of a precursor of NetVersant, Bill
10:32:55  19  Freeman.
10:32:56  20      Q.   Bill Freeman?
10:32:57  21      A.   Bill Freeman.  He was one of the founders of
10:32:59  22  United Telecom.
10:33:06  23      Q.   Obviously in 2001 you didn't take a job with
10:33:08  24  them.
10:33:09  25      A.   No.
```

Page 22

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. 33:10 | 1 | Q.   All right.  In 2004 were you recruited by |
| 10:33:13 | 2 | anybody? |
| 10:33:14 | 3 | A.   After Kathleen, I then called Jennifer Forrest |
| 10:33:20 | 4 | to find out what she thought. |
| 10:33:24 | 5 | Q.   Did you know Jennifer Forrest before making the |
| 10:33:27 | 6 | phone call? |
| 10:33:28 | 7 | A.   Yes. |
| 10:33:28 | 8 | Q.   How did you know her? |
| 10:33:30 | 9 | A.   Through the user group, various conferences. |
| 10:33:39 | 10 | Q.   What did she tell you about the job? |
| 10:33:43 | 11 | A.   That there was a good Nortel distributor; that |
| 10:33:49 | 12 | she had made a very good amount of money there. |
| 10:33:51 | 13 | Q.   Anything else? |
| 1  3:55 | 14 | A.   That she was moving on to real estate sales. |
| 10:34:00 | 15 | Q.   Did she tell you why she was leaving? |
| 10:34:03 | 16 | A.   Not exactly. |
| 10:34:08 | 17 | Q.   What did she tell you about why she was |
| 10:34:10 | 18 | leaving? |
| 10:34:11 | 19 | A.   Really just that it was time to move on to |
| 10:34:15 | 20 | something different, that she loved real estate. |
| 10:34:26 | 21 | Q.   Did she tell you anything else about the job at |
| 10:34:29 | 22 | NetVersant; the compensation, the terms, anything? |
| 10:34:31 | 23 | A.   A little bit; that she was earning about two |
| 10:34:34 | 24 | hundred thousand a year; that she had a very large base |
| 10:34:37 | 25 | of customers, over a million dollars a year in |

Page 23

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ 34:43 | 1 | recurring maintenance. |
| 10:34:47 | 2 | Q.  Anything else that you can recall? |
| 10:34:51 | 3 | A.  She offered to put a call in to Scott Landis, |
| 10:34:56 | 4 | the president of the NetVersant voice division. |
| 10:35:05 | 5 | Q.  And did you have just one conversation with |
| 10:35:07 | 6 | Jennifer Forrest? |
| 10:35:08 | 7 | A.  Yes, that I can recall. |
| 10:35:10 | 8 | Q.  All right.  Anything else you can recall from |
| 10:35:12 | 9 | that conversation? |
| 10:35:12 | 10 | A.  Not at this time. |
| 10:35:14 | 11 | Q.  All right.  Then what was the next thing that |
| 10:35:17 | 12 | happened? |
| 10:35:17 | 13 | A.  I was contacted by Scott Landis, I believe.  I |
| 1  .5:23 | 14 | may have contacted him.  I don't remember for sure. |
| 10:35:30 | 15 | Q.  And what did you -- did you have a telephone |
| 10:35:33 | 16 | conversation or an in-person meeting with Mr. Landis? |
| 10:35:35 | 17 | A.  Yes.  There was a series of telephone calls and |
| 10:35:38 | 18 | e-mails, and we arranged an interview at the NetVersant |
| 10:35:44 | 19 | office in South San Francisco. |
| 10:35:51 | 20 | Q.  What did Mr. Landis tell you about the job |
| 10:35:54 | 21 | before the interview? |
| 10:35:58 | 22 | A.  Oh.  Just that Jennifer Forrest was -- or had |
| 10:36:02 | 23 | left, and they had -- they only had one sales |
| 10:36:07 | 24 | representative in the Sacramento area; she had a lot of |
| 10:36:11 | 25 | accounts that needed to be taken over, and the rep up |

Page 24

DEPONENT:  MICHAEL CAVA    1-4-07

10:36:16  1  there couldn't handle them all, so they had a sales

10:36:19  2  engineer filling in named Jeff Cotter.

10:36:31  3      Q.   Anything else?  Did he tell you anything about

10:36:34  4  the compensation during those calls?

10:36:36  5      A.   Quite a -- or during the -- the interviews.  I

10:36:38  6  mean I'm kind of putting that all together, but we went

10:36:42  7  extensively through the compensation plan.

10:36:44  8      Q.   Okay.  I'm just talking about before the

10:36:46  9  interview, can you recall whether or not in the

10:36:47 10  telephone calls he asked you anything -- told you

10:36:49 11  anything about the compensation?

10:36:51 12      A.   No, we -- that wasn't during the phone call.

10:36:57 13      Q.   Okay.  During the telephone call or calls

10:6:59 14  that -- or e-mail exchanges that you had with him, did

10:37:02 15  he tell you what the specific accounts would be that

10:37:04 16  need to be taken over?

10:37:05 17      A.   Not during the phone call.

10:37:09 18      Q.   All right.  And then you say he arranged for an

10:37:11 19  interview?

10:37:12 20      A.   Yes.

10:37:13 21      Q.   Did you have just one interview?

10:37:18 22      A.   I don't remember if it was one or two on site.

10:37:23 23  A number of follow-up phone calls afterwards.

10:37:32 24      Q.   Okay.  And during the first interview that you

10:37:34 25  can remember, who was present?

Page 25

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:37:36 | 1 | A.   Scott Landis and Peter Wainwright. |
| 10:37:39 | 2 | Q.   And you said that was at the NetVersant offices |
| 10:37:42 | 3 | in South San Francisco? |
| 10:37:43 | 4 | A.   Yes. |
| 10:37:46 | 5 | Q.   How long did the interview last? |
| 10:37:49 | 6 | A.   Maybe an hour or two. |
| 10:38:01 | 7 | Q.   Tell me what you can remember from that |
| 10:38:03 | 8 | interview. |
| 10:38:07 | 9 | A.   They expressed to me that Jennifer had left, |
| 10:38:11 | 10 | and that her accounts needed to be covered. |
| 10:38:17 | 11 | I was told I would be taking over most of the |
| 10:38:19 | 12 | Sacramento area accounts that she had handled. |
| 10:38:25 | 13 | MR. IANNITELLI:  Excuse me, Counsel.  Can you |
| 10:38:27 | 14 | ask your client not to mouth out words?  You know, my |
| 10:38:32 | 15 | client is nervous enough as it is. |
| 10:38:35 | 16 | MS. HEVERLY:  Okay. |
| 10:38:35 | 17 | MR. IANNITELLI:  Thank you. |
| 10:38:36 | 18 | MS. HEVERLY:  I didn't know he was mouthing out |
| 10:38:38 | 19 | words. |
| 10:38:39 | 20 | THE WITNESS:  Yes, he has been. |
| 10:38:42 | 21 | MR. WAINWRIGHT:  I'm just stretching my mouth |
| 10:38:43 | 22 | here. |
| 10:38:43 | 23 | BY MS. HEVERLY: |
| 10:38:43 | 24 | Q.   Okay.  Sorry.  Go on. |
| 10:38:45 | 25 | What -- I was asking what you could recall that |

Page 26

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 38:47 | 1 | was discussed during the interview, and you said that |
| 10:38:48 | 2 | Jennifer had left and you would be taking over most of |
| 10:38:51 | 3 | her accounts. |
| 10:38:51 | 4 | A.   No.   Actually, they were very interested on |
| 10:38:54 | 5 | what I had worked on along the way.  We had a number of |
| 10:38:57 | 6 | accounts in common, accounts that I had competed with |
| 10:39:02 | 7 | them and -- and won along the way. |
| 10:39:06 | 8 | Q.   Anything else? |
| 10:39:09 | 9 | A.   We -- we ran through how compensation and quota |
| 10:39:13 | 10 | achievement works. |
| 10:39:19 | 11 | Q.   Anything else? |
| 10:39:25 | 12 | A.   That I would be working out of the Sacramento |
| 10:39:27 | 13 | office, reporting to Peter. |
| 9:33 | 14 | Q.   Anything else you recall discussed? |
| 10:39:39 | 15 | A.   Not that I can think of that's relevant right |
| 10:39:41 | 16 | now. |
| 10:39:42 | 17 | Q.   Did they give you an offer during the first |
| 10:39:45 | 18 | interview? |
| 10:39:45 | 19 | A.   No. |
| 10:39:51 | 20 | Q.   How did you get the employment offer? |
| 10:39:54 | 21 | A.   I received it within a couple weeks after that |
| 10:39:57 | 22 | first interview. |
| 10:39:59 | 23 | Q.   Was it the letter that you received or did you |
| 10:40:01 | 24 | get a telephone call first? |
| 10:40:05 | 25 | A.   I don't remember for sure.  It was clear that |

Page 27

DEPONENT:  MICHAEL CAVA    1-4-07

10:40:09  1  it was coming before the letter came.

10:40:11  2      Q.   You said you may have had a second interview.

10:40:14  3  Do you recall now having had the second interview?

10:40:18  4      A.   I don't remember.

10:40:19  5      Q.   And you also said that you had some follow-up

10:40:21  6  telephone calls.  Do you remember how many telephone

10:40:24  7  calls you had after the interview, before you got the

10:40:27  8  offer?

10:40:28  9      A.   At least two or three.

10:40:29  10     Q.   Who did you have the calls with?

10:40:30  11     A.   With Peter.

10:40:31  12     Q.   What did you discuss during the calls?

10:40:35  13     A.   Mainly compensation.  I wanted to make sure

10:0:39  14  that the quota was achievable there.

10:40:41  15          I was leaving a very good position with a very

10:40:44  16  large base of customers that were built up.  It's very

10:40:47  17  hard to leave accounts -- or to leave companies in my

10:40:51  18  business.  You have no show stability.  I expressed

10:40:55  19  this.

10:40:55  20          I expressed that it takes a while to build up

10:40:58  21  accounts.

10:41:02  22     Q.   What did Mr. Wainwright say when you expressed

10:41:05  23  your concern that it would take a while to build up

10:41:09  24  accounts?

10:41:10  25     A.   Understood -- I think Peter has a good

Page 28

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:43:32 | 1 | A.   Distributes and installs and maintains Nortel |
| 10:43:35 | 2 | equipment. |
| 10:43:40 | 3 | Q.   Where is Telenet located? |
| 10:43:42 | 4 | A.   Cupertino. |
| 10:43:46 | 5 | Q.   What's your job title there? |
| 10:43:48 | 6 | A.   Sales. |
| 10:43:52 | 7 | Q.   So somebody at Telenet asked you about going |
| 10:43:54 | 8 | back to Shared Technologies? |
| 10:43:56 | 9 | A.   Well, he was at Shared Technologies at the |
| 10:43:58 | 10 | time.  He wasn't in a position, but was possibly going |
| 10:44:01 | 11 | to go into management there. |
| 10:44:07 | 12 | Q.   Okay. |
| 10:44:07 | 13 | A.   Nothing ever -- nothing ever serious. |
| 10:44:16 | 14 | Q.   Okay.  So going back to the -- the interview |
| 10:44:18 | 15 | with Mr. Landis or Peter Wainwright, and including the |
| 10:44:24 | 16 | phone calls -- let's sort of lump them together from |
| 10:44:26 | 17 | the interview to the offer period, all the discussions |
| 10:44:29 | 18 | that you had -- during that -- those discussions did |
| 10:44:31 | 19 | they tell you what your job title would be? |
| 10:44:34 | 20 | A.   Yes. |
| 10:44:34 | 21 | Q.   What did they tell you? |
| 10:44:36 | 22 | A.   That I would be in sales; I would be both |
| 10:44:39 | 23 | managing existing accounts and pursuing new accounts. |
| 10:44:48 | 24 | Q.   Did they tell you how much time you should be |
| 10:44:51 | 25 | spending pursuing new accounts versus managing existing |

Page 31

DEPONENT:  MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 10:44:55 | 1 | accounts? |
| 10:45:00 | 2 | A.   No. |
| 10:45:00 | 3 | Q.   Did they tell you how many new accounts they |
| 10:45:04 | 4 | expected you to bring in? |
| 10:45:07 | 5 | A.   No. |
| 10:45:07 | 6 | Q.   Did they tell you how many existing accounts |
| 10:45:11 | 7 | they would be giving you? |
| 10:45:13 | 8 | A.   Most of Jennifer Forrest's Sacramento |
| 10:45:16 | 9 | accounts. |
| 10:45:24 | 10 | Q.   Did they tell you which specific accounts |
| 10:45:26 | 11 | they'd be giving you? |
| 10:45:28 | 12 | A.   No, they didn't, but I was aware of what most |
| 10:45:30 | 13 | of those were. |
| 10:45:39 | 14 | Q.   Now, you said they told you they would be |
| 10:45:41 | 15 | giving you "most."  Did you have any idea what |
| 10:45:43 | 16 | percentage?  Fifty percent?  Seventy-five percent? |
| 10:45:46 | 17 | A.   They expressed that the only other sales rep up |
| 10:45:48 | 18 | there was extremely busy already. |
| 10:45:53 | 19 | Q.   Did they ever define it in a percentage? |
| 10:45:55 | 20 | A.   Every account I named they answered "yes" to. |
| 10:46:00 | 21 | Q.   What accounts did you name? |
| 10:46:05 | 22 | A.   Gallo and Maximus for sure. |
| 10:46:09 | 23 | Q.   Any others? |
| 10:46:11 | 24 | A.   VSP. |
| 10:46:16 | 25 | Q.   Anyone else? |

Page 32

DEPONENT:  MICHAEL CAVA   1-4-07

```
i  46:19    1      A.   Not that I can think of specifically.  It
10:46:21    2  was -- it was much more than that, though.  It was very
10:46:24    3  clearly expressed that it was much more than that.
10:46:27    4      Q.   But you said they didn't tell you which
10:46:29    5  specific accounts you would get.
10:46:33    6      A.   "Most" was a good promise to me.
10:46:43    7      Q.   Did they tell you how accounts were normally
10:46:45    8  assigned at NetVersant?
10:46:48    9      A.   They were -- I mean when people left, they were
10:46:51   10  reassigned to different reps.  Most of the reps there
10:46:57   11  had -- have -- have many accounts assigned.
10:47:04   12          MS. HEVERLY:  Maybe we should stop for a
10:47:05   13  second.
 .7:06   14          THE WITNESS:  Yeah.
10:47:25   15          (Discussion off the record.)
10:47:26   16          THE VIDEOGRAPHER:  Shall we go off record?
10:47:27   17          MS. HEVERLY:  Yeah.
10:47:30   18          THE VIDEOGRAPHER:  And we are off record at
10:47:32   19  10:46.
10:53:04   20          (Recess.)
10:53:04   21          THE VIDEOGRAPHER:  We are back on the record at
10:53:06   22  10:52.
10:53:09   23  BY MS. HEVERLY:
10:53:09   24      Q.   All right.  Before we took our little break, we
10:53:12   25  were talking about the interview, and I think your
```

Page 33

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:53:15 | 1 | testimony was that although they didn't tell you what |
| 10:53:19 | 2 | specific accounts you'd be getting, you generally had |
| 10:53:21 | 3 | the impression that you'd be getting most of Jennifer |
| 10:53:24 | 4 | Forrest's accounts when you started; is that correct? |
| 10:53:26 | 5 | A.   Not generally.  They stated it was most. |
| 10:53:30 | 6 | Q.   Okay.  And at the time of your interview -- or |
| 10:53:34 | 7 | excuse me. |
| 10:53:34 | 8 | At the time you were working for Shared |
| 10:53:36 | 9 | Technologies, you were making a |
| 10:53:37 | 10 | sixty-five-thousand-dollar base, correct? |
| 10:53:39 | 11 | A.   Yes. |
| 10:53:39 | 12 | Q.   Did you tell Peter Wainwright and Scott Landis |
| 10:53:42 | 13 | that you were making a seventy-five-thousand-dollar |
| 10:53:44 | 14 | base? |
| 10:53:45 | 15 | A.   No. |
| 10:53:45 | 16 | Q.   Did you tell them during the interviews that |
| 10:53:47 | 17 | you needed a higher base than what they were |
| 10:53:49 | 18 | offering? |
| 10:53:52 | 19 | A.   No.  I was concerned about the accounts and the |
| 10:53:53 | 20 | commissions off of the accounts.  We discussed that in |
| 10:53:56 | 21 | depth. |
| 10:53:58 | 22 | Q.   Did they tell you what size any of the accounts |
| 10:54:01 | 23 | were that Jennifer Forrest had, you know, what kind of |
| 10:54:04 | 24 | volume they were bringing in? |
| 10:54:06 | 25 | A.   I had -- I had knew from Jennifer, I also knew |

Page 34

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. 54:09 | 1 | from being in the business and talking to many of those |
| 10:54:12 | 2 | customers.  Jennifer had stated it was over a million |
| 10:54:17 | 3 | dollars in recurring maintenance. |
| 10:54:36 | 4 | Q.   Did they tell you how long you would keep those |
| 10:54:38 | 5 | accounts if they were given to you? |
| 10:54:42 | 6 | A.   As long as I was doing a good job was my |
| 10:54:45 | 7 | impression, though they didn't particularly state it. |
| 10:54:47 | 8 | Q.   Did they tell you that they could never be |
| 10:54:49 | 9 | taken away? |
| 10:54:50 | 10 | A.   No.  They didn't say that. |
| 10:54:58 | 11 | Q.   Did they discuss at all the compensation plan |
| 10:55:01 | 12 | other than you said they would -- let me back up. |
| 10:55:03 | 13 | Did they tell you what base salary you'd be |
| 1. 5:05 | 14 | getting at NetVersant? |
| 10:55:07 | 15 | A.   They discussed sixty-five thousand. |
| 10:55:09 | 16 | Q.   Did they tell you what the compensation plan |
| 10:55:12 | 17 | would be? |
| 10:55:13 | 18 | A.   Yes. |
| 10:55:13 | 19 | Q.   What did they tell you about the commissions |
| 10:55:15 | 20 | you could earn? |
| 10:55:20 | 21 | A.   They talked about on maintenance that it would |
| 10:55:25 | 22 | be what equaled -- through a complicated formula, what |
| 10:55:28 | 23 | equaled about four point eight percent of the money |
| 10:55:32 | 24 | billed out to the customer on a maintenance account, |
| 10:55:35 | 25 | monthly, for the life of the account. |

Page 35

DEPONENT:  MICHAEL CAVA    1-4-07

10:55:40   1    Q.   Okay.  Anything else that they told you about

10:55:42   2   the commission plan?

10:55:44   3    A.   That it was margin based on equipment as well.

10:55:50   4   We discussed that -- because not every company is this

10:55:53   5   way on renewals, that they paid on renewals as well.

10:55:57   6        How quota achievement was attained, that you

10:56:00   7   could -- that you would get gross profit achievement

10:56:04   8   for the -- for the length of the contract that you

10:56:06   9   sold.  If it was a one-year, you'd get one year's

10:56:09  10   revenue credit; if it was five years, you'd get five

10:56:11  11   years' revenue credit.  At the end of the five years

10:56:13  12   when it renewed, you would get the revenue credit all

10:56:16  13   over again.

10:56:19  14        I was very interested.  I wanted to make sure

10:56:21  15   it was achievable.

10:56:22  16    Q.   Did they tell you how much you could earn per

10:56:25  17   year in commissions?

10:56:27  18    A.   Oh, absolutely.  I mean -- well, they -- they

10:56:30  19   had mentioned at one point -- I don't remember when --

10:56:34  20   that one rep had made over nine hundred thousand

10:56:37  21   dollars in one year.

10:56:45  22    Q.   But did they tell you how much you could expect

10:56:47  23   to earn, say, in your first year there?

10:56:50  24    A.   No, I mean other than the -- I knew that there

10:56:52  25   was a million dollars in recurring maintenance, all of

Page 36

DEPONENT:   MICHAEL CAVA    1-4-07

10:56:55  1 the sales to those accounts, and -- and, you know, a

10:57:02  2 number of the projects that were going on with -- with

10:57:04  3 Maximus at the time.

10:57:08  4        And that we also discussed where certain

10:57:12  5 contracts were in the queue.  Maximus Folsom, for

10:57:17  6 example, one of the largest sites, was actually coming

10:57:20  7 off of warranty; it had just been installed new.  So I

10:57:24  8 was promised I would get to go renew that.

10:57:28  9    Q.    You promised (sic) you would get to renew it.

10:57:30 10 Do you mean you promised (sic) you would get the

10:57:32 11 opportunity to try to renew it, or was it a

10:57:35 12 guarantee?

10:57:35 13    A.    The opportunity to renew it.  They were coming

10:57:40 14 off of warranty.  It's typical that you then go sign a

10:57:44 15 maintenance contract after.

10:57:46 16    Q.    Now, when you said you knew that Jennifer

10:57:47 17 Forrest -- or Jennifer Forrest had told you that she

10:57:50 18 had a million dollars in recurring maintenance, how

10:57:53 19 much did you equate that to in compensation per year if

10:57:57 20 you --

10:57:58 21    A.    Well --

10:57:58 22    Q.    -- started working there?

10:57:59 23    A.    -- I did the math that, you know, four point

10:58:02 24 eight percent of a million dollars is, you know,

10:58:05 25 forty-eight thousand just in maintenance, plus what you

Page 37

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:58:08 | 1 | add on to that for equipment sales, new sales. |
| 10:58:16 | 2 | Q.   So how much did you expect to earn in your |
| 10:58:18 | 3 | first full year at NetVersant? |
| 10:58:20 | 4 | A.   I had hoped to achieve two hundred thousand.   I |
| 10:58:27 | 5 | wouldn't have gone there for less money. |
| 10:58:33 | 6 | Q.   No one promised you that you would make two |
| 10:58:36 | 7 | hundred thousand, did they? |
| 10:58:37 | 8 | A.   Nobody ever promises what you are going to earn |
| 10:58:40 | 9 | in sales. |
| 10:58:53 | 10 | Q.   When you started at NetVersant did you |
| 10:58:55 | 11 | understand your employment was -- would be at-will? |
| 10:59:00 | 12 | A.   That wasn't discussed. |
| 10:59:05 | 13 | Q.   Wasn't discussed during the interviews? |
| 1  9:08 | 14 | A.   No. |
| 10:59:08 | 15 | Q.   Do you understand what "at-will employment" |
| 10:59:09 | 16 | is? |
| 10:59:10 | 17 | A.   I do now.   At the time I thought it was |
| 10:59:13 | 18 | something entirely different. |
| 10:59:16 | 19 | Q.   What did you think it was at the time? |
| 10:59:19 | 20 | A.   At the time I thought it was that you can leave |
| 10:59:24 | 21 | at any time, you are not tied in where you have to be |
| 10:59:29 | 22 | there for two years; as long as you are doing your job, |
| 10:59:31 | 23 | you don't do something illegal, or you are achieving |
| 10:59:34 | 24 | your numbers, that you have a job, is the way I thought |
| 10:59:37 | 25 | it worked. |

Page 38

DEPONENT:  MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 59:44 | 1 | MS. HEVERLY:  All right.  Let's mark as Exhibit |
| 10:59:46 | 2 | Number 1 an application for employment dated 5-6-04. |
| 11:00:10 | 3 | (Exhibit marked for identification: |
| 11:00:10 | 4 | Deposition Exhibit Number 1.) |
| 11:00:12 | 5 | THE WITNESS:  Thank you. |
| 11:00:38 | 6 | (Reviewing document(s).) |
| 11:00:38 | 7 | BY MS. HEVERLY: |
| 11:00:38 | 8 | Q.   Have you had a chance to look at this, look |
| 11:00:40 | 9 | this over? |
| 11:00:41 | 10 | A.   Briefly. |
| 11:00:42 | 11 | Q.   Okay.  Is this your handwriting on the |
| 11:00:43 | 12 | document? |
| 11:00:44 | 13 | A.   Yes. |
| 10:44 | 14 | Q.   And if you flip to page two, at the bottom |
| 11:00:46 | 15 | there is a signature.  Is that your signature? |
| 11:00:49 | 16 | A.   Yes. |
| 11:00:49 | 17 | Q.   And on the -- the last page is a resume.  Did |
| 11:00:54 | 18 | you prepare the resume? |
| 11:00:56 | 19 | A.   Yes. |
| 11:00:56 | 20 | Q.   Did you provide it to NetVersant with the |
| 11:01:00 | 21 | employment application or at the time you applied? |
| 11:01:03 | 22 | A.   I believe I had sent it over before, before |
| 11:01:06 | 23 | then.  I don't remember for sure. |
| 11:01:14 | 24 | Q.   As you look through this application, is |
| 11:01:16 | 25 | everything on here correct? |

Page 39

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:01:22 | 1 | A.   I believe so. |
| 11:01:25 | 2 | Q.   If you look at the second page, there is -- |
| 11:01:28 | 3 | there is a box where it says "Acknowledgment" and some |
| 11:01:30 | 4 | writing.  Did you read it before you signed it? |
| 11:01:34 | 5 | A.   I don't recall. |
| 11:01:39 | 6 | Q.   If you look five paragraphs down, starts with, |
| 11:01:43 | 7 | "I understand that in the absence of a specific |
| 11:01:46 | 8 | contract or agreement," et cetera, "employees are hired |
| 11:01:51 | 9 | on an at-will basis, and either the employee or the |
| 11:01:54 | 10 | company may terminate the employment relationship at |
| 11:01:57 | 11 | any time with or without cause and or without notice." |
| 11:02:01 | 12 | Did anyone tell you that would not apply to |
| 11:02:03 | 13 | you? |
| 11:02:05 | 14 | A.   I have no -- it wasn't discussed.  I may have |
| 11:02:08 | 15 | done this during the interview.  I -- I don't |
| 11:02:11 | 16 | remember. |
| 11:02:11 | 17 | Q.   After you started employment, did anybody |
| 11:02:14 | 18 | discuss the nature of your employment, whether you |
| 11:02:18 | 19 | could be terminated at any time or whether you had a |
| 11:02:20 | 20 | guarantee? |
| 11:02:21 | 21 | A.   I -- I believed the case to be that as long as |
| 11:02:25 | 22 | I achieve my numbers, I would have a job.  I -- it was |
| 11:02:30 | 23 | implied. |
| 11:02:32 | 24 | Q.   It was implied from what? |
| 11:02:36 | 25 | A.   Quota achievement is what you are judged on in |

Page 40

TALTY COURT REPORTERS, INC.   408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:  MICHAEL CAVA   1-4-07

J2:39   1  sales.

11:02:41   2     Q.   But no one ever told you anything that led you

11:02:44   3  to believe that; is that correct?

11:02:46   4     A.   I -- from everybody I talked to, it -- it

11:02:49   5  seemed to be fine.

11:02:51   6     Q.   Who did you talk to that told you that?

11:02:54   7     A.   I don't remember.

11:02:55   8     Q.   Did Mr. Wainwright ever tell you that your

11:02:58   9  employment would be anything other than at-will?

11:03:00  10     ·A.   I didn't discuss that it was at-will or not

11:03:03  11  at-will.

11:03:03  12     Q.   Did Mr. Landis ever tell you anything that

11:03:05  13  would lead you to believe your employment was anything

3:07  14  other than at-will?

11:03:09  15     A.   At-will was never discussed.

11:03:13  16     Q.   Did you ever get any employment agreements that

11:03:17  17  said your employment was not at-will?

11:03:21  18     A.   I -- nothing was done either way on that.

11:03:27  19        MS. HEVERLY:   Mark as Exhibit Number 2 is a

11:03:30  20  two-page offer letter dated May 12th, 2004.

11:03:34  21        MR. IANNITELLI:   Thank you.

11:03:48  22        (Exhibit marked for identification:

11:03:48  23        Deposition Exhibit Number 2.)

11:04:22  24        THE WITNESS:   (Reviewing document(s).)

11:04:22  25        Oh, looking at the dates, I would like to

Page 41

DEPONENT:   MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| ⊥  J4:24 | 1 | clarify. |
| 11:04:25 | 2 | I did do that application at the time of the |
| 11:04:27 | 3 | interview. |
| 11:04:28 | 4 | BY MS. HEVERLY: |
| 11:04:28 | 5 | Q.  Okay. |
| 11:04:28 | 6 | A.  So it was in a hurry. |
| 11:04:33 | 7 | Q.  Okay.  Have you had a chance to look at this |
| 11:04:34 | 8 | letter? |
| 11:04:35 | 9 | A.  Briefly. |
| 11:04:39 | 10 | Q.  Okay.  Do you recall receiving it on or around |
| 11:04:40 | 11 | May 12th? |
| 11:04:42 | 12 | A.  Yeah, shortly after that I believe to be the |
| 11:04:45 | 13 | date. |
| ⊥  ⼰4:45 | 14 | Q.  If you flip to the second page, is that your |
| 11:04:48 | 15 | signature on the signature line? |
| 11:04:49 | 16 | A.  Yes. |
| 11:04:50 | 17 | Q.  Did you read the document before you signed |
| 11:04:52 | 18 | it? |
| 11:04:55 | 19 | A.  Yes. |
| 11:04:55 | 20 | Q.  Is there anything in the letter that was not an |
| 11:04:59 | 21 | accurate reflection of what your employment offer was? |
| 11:05:04 | 22 | A.  Not that I can see. |
| 11:05:06 | 23 | Q.  After receiving the letter did you have any |
| 11:05:09 | 24 | conversations with anyone that modified any of the |
| 11:05:11 | 25 | terms of the offer? |

Page 42

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:05:14 | 1 | A.    Just more clarifications on the comp plan. |
| 11:05:19 | 2 | Q.    Okay.  Anything else? |
| 11:05:24 | 3 | A.    No. |
| 11:05:24 | 4 | Q.    You understood when you started working at |
| 11:05:26 | 5 | NetVersant that the terms contained in the offer letter |
| 11:05:28 | 6 | were the terms of your employment; is that correct? |
| 11:05:34 | 7 | A.    Yes. |
| 11:05:34 | 8 | Q.    It says in here that your start date would be |
| 11:05:36 | 9 | June 7th, 2004.  Do you recall if you started on or |
| 11:05:40 | 10 | about June 7th, 2004? |
| 11:05:42 | 11 | A.    I believe I did. |
| 11:05:50 | 12 | Q.    At the time you started, did you receive any |
| 11:05:53 | 13 | orientation or initial training from anyone? |
| 11:05:57 | 14 | A.    Just a -- a series of documents and a handbook. |
| 11:06:00 | 15 | Q.    Who gave you the documents and the handbook? |
| 11:06:04 | 16 | A.    Joanna Cotter. |
| 11:06:06 | 17 | Q.    Did you meet with Ms. Cotter in person? |
| 11:06:08 | 18 | A.    Yes.  I -- that may have been the first day of |
| 11:06:12 | 19 | work that I did that.  I don't remember. |
| 11:06:13 | 20 | Q.    All right.  Did Ms. Cotter tell you anything |
| 11:06:16 | 21 | about employment at the company? |
| 11:06:18 | 22 | A.    She -- she went through a series of items. |
| 11:06:24 | 23 | Q.    She gave you an employee handbook, you said? |
| 11:06:27 | 24 | A.    Yes. |
| 11:06:27 | 25 | Q.    Did you read the handbook? |

Page  43

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  J6:29 | 1 | A.   I glanced through it at a later date. |
| 11:06:36 | 2 | MS. HEVERLY:   Let's mark as Exhibit Number 3 a |
| 11:06:38 | 3 | handbook acknowledgment dated 6-2-04. |
| 11:06:56 | 4 | (Exhibit marked for identification: |
| 11:06:56 | 5 | Deposition Exhibit Number 3.) |
| 11:07:42 | 6 | THE WITNESS:   (Reviewing document(s).) |
| 11:07:42 | 7 | BY MS. HEVERLY: |
| 11:07:42 | 8 | Q.   Is that your signature on the line that says |
| 11:07:44 | 9 | "Employee signature"? |
| 11:07:45 | 10 | A.   Yes. |
| 11:07:45 | 11 | Q.   And is that your printed name below it? |
| 11:07:48 | 12 | A.   Yes. |
| 11:07:48 | 13 | Q.   Did you print your name there? |
| 7:50 | 14 | A.   Yes. |
| 11:07:50 | 15 | Q.   Okay.  Did you review this acknowledgment |
| 11:07:52 | 16 | agreement before signing it? |
| 11:07:55 | 17 | A.   I think so. |
| 11:07:57 | 18 | Q.   Okay.  In the fourth bullet point it says, "I |
| 11:08:01 | 19 | understand that terms and conditions of employment may |
| 11:08:02 | 20 | be modified at the discretion of the company, with or |
| 11:08:06 | 21 | without cause or notice at any time." |
| 11:08:09 | 22 | Did you understand that to be the case? |
| 11:08:10 | 23 | A.   I had a different understanding of at-will -- |
| 11:08:14 | 24 | Q.   Okay. |
| 11:08:14 | 25 | A.   -- but -- |

Page 44

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:08:14 | 1 | Q.   Other than at-will, I'm talking about the |
| 11:08:17 | 2 | other -- because this says except at-will, terms and |
| 11:08:20 | 3 | conditions may be modified at any time. |
| 11:08:22 | 4 | Did you understand that to be the case? |
| 11:08:24 | 5 | A.   Standard -- it looks like standard language to |
| 11:08:25 | 6 | me. |
| 11:08:26 | 7 | Q.   Okay.  Did anybody tell you anything that |
| 11:08:28 | 8 | modified this? |
| 11:08:29 | 9 | A.   The promises of accounts.  I mean -- and -- and |
| 11:08:32 | 10 | the compensation along the way.  I mean -- (pause). |
| 11:08:35 | 11 | Q.   Did anybody tell you that your compensation |
| 11:08:37 | 12 | could never be changed? |
| 11:08:39 | 13 | A.   We had discussed this -- this was a particular |
| 1  8:43 | 14 | area that I did drill down on.  When you sold a |
| 11:08:46 | 15 | maintenance contract, let's say it was for five years, |
| 11:08:48 | 16 | you continued to get paid over five years on that |
| 11:08:51 | 17 | maintenance contract, and they would not change it |
| 11:08:54 | 18 | retroactively. |
| 11:08:55 | 19 | So if you sold a maintenance contract in 2005 |
| 11:08:58 | 20 | for five years, in 2009 you'd still be getting paid the |
| 11:09:02 | 21 | same commission in 2009 off of that.  But if you sold |
| 11:09:07 | 22 | something in 2006, for example, it could be an entirely |
| 11:09:10 | 23 | different comp plan.  I was very aware of that. |
| 11:09:14 | 24 | Q.   All right.  So they told you that the comp plan |
| 11:09:16 | 25 | could change, correct? |

Page 45

DEPONENT:  MICHAEL CAVA    1-4-07

11:09:17  1    A.    Could change for anything sold new, but
11:09:19  2  anything that you sold already would -- would not
11:09:21  3  change.
11:09:22  4    Q.    Okay.  And did they tell you whether or not
11:09:23  5  your base compensation could ever change?
11:09:28  6    A.    Yes.
11:09:28  7    Q.    Yes, it could change?
11:09:30  8    A.    Absolutely.
11:09:31  9        My understanding was that there was a formula,
11:09:33  10  and base salary was -- or I was -- I was directly told
11:09:36  11  that base salary was tied to -- to quota.  Everybody
11:09:41  12  had the same quota based on base salary.  I believe it
11:09:45  13  was nine times base salary, if I recall correctly.
11:09:50  14    Q.    So if your quota went up, your base comp would
11:09:56  15  go up?
11:09:57  16    A.    Yes.
11:09:57  17    Q.    And if your quota went down, your base comp
11:10:03  18  would go down?
11:10:12  19    A.    Yes.
11:10:12  20    Q.    And, again, you just testified that you had a
11:10:14  21  different understanding of what "at-will" was.
11:10:17  22        Did Ms. Cotter tell you anything that changed
11:10:20  23  your understanding of what "at-will" was?
11:10:22  24    A.    I don't recall discussing at-will.
11:10:35  25        MS. HEVERLY:  Let's mark as number 4 an

Page 46

DEPONENT:   MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 10:37 | 1 | antiharassment discrimination policy dated 6-2-04. |
| 11:11:02 | 2 | (Exhibit marked for identification: |
| 11:11:02 | 3 | Deposition Exhibit Number 4.) |
| 11:11:38 | 4 | THE WITNESS:  (Reviewing document(s).) |
| 11:11:38 | 5 | BY MS. HEVERLY: |
| 11:11:38 | 6 | Q.  Okay.  Is that your signature at the bottom of |
| 11:11:40 | 7 | this document? |
| 11:11:40 | 8 | A.  Yes. |
| 11:11:40 | 9 | Q.  And there is a handprinted name.  Did you print |
| 11:11:43 | 10 | your name there? |
| 11:11:45 | 11 | A.  Yes. |
| 11:11:45 | 12 | Q.  All right.  Do you recall receiving this policy |
| 11:11:46 | 13 | on or about June 2nd, 2004? |
| 1:50 | 14 | A.  I -- I believe so. |
| 11:11:53 | 15 | Q.  All right.  In the middle of this policy it |
| 11:11:54 | 16 | says that any employee who believes he or she is being |
| 11:11:58 | 17 | discriminated against should immediately report to the |
| 11:12:02 | 18 | manager of human resource -- human resources. |
| 11:12:05 | 19 | Did you understand that you should report any |
| 11:12:07 | 20 | complaints of harassment or discrimination? |
| 11:12:10 | 21 | A.  Yes. |
| 11:12:10 | 22 | Q.  Did anybody tell you that this policy did not |
| 11:12:12 | 23 | apply to you? |
| 11:12:13 | 24 | A.  No. |
| 11:12:20 | 25 | MS. HEVERLY:  Let's mark as number 5 now the |

Page 47

DEPONENT:  MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 12:23 | 1 | 2004 compensation plan. |
| 11:12:41 | 2 | (Exhibit marked for identification: |
| 11:12:41 | 3 | Deposition Exhibit Number 5.) |
| 11:13:16 | 4 | THE WITNESS:  (Reviewing document(s).) |
| 11:13:16 | 5 | BY MS. HEVERLY: |
| 11:13:16 | 6 | Q.   Okay.  Have you seen this document before? |
| 11:13:18 | 7 | A.   Yes. |
| 11:13:18 | 8 | Q.   Did you receive this document on or about June |
| 11:13:20 | 9 | 7th, 2004? |
| 11:13:23 | 10 | A.   Then, and I -- I did receive it before then |
| 11:13:26 | 11 | also. |
| 11:13:26 | 12 | Q.   Okay. |
| 11:13:27 | 13 | A.   Or at least had read it before then. |
| 3:29 | 14 | Q.   And on page six of the agreement is a |
| 11:13:31 | 15 | signature.  Is that your signature? |
| 11:13:34 | 16 | A.   Yes. |
| 11:13:34 | 17 | Q.   And then on the addendum, which is the last |
| 11:13:36 | 18 | page, there is another signature.  Is that also your |
| 11:13:39 | 19 | signature? |
| 11:13:39 | 20 | A.   Yes. |
| 11:13:40 | 21 | Q.   On the first page there is some handwriting |
| 11:13:43 | 22 | near the top.  "Five eighty-five" is crossed out and |
| 11:13:48 | 23 | there is another number written in. |
| 11:13:49 | 24 | Do you know whose handwriting that is? |
| 11:13:51 | 25 | A.   I'm not sure.  It's not mine. |

Page 48

DEPONENT:  MICHAEL CAVA    1-4-07

13:53    1    Q.  Okay.  Do you know if that change was made
11:13:54    2  before or after you signed?

11:13:55    3    A.  I believe it was made before.

11:13:56    4    Q.  Okay.  And do you know why the quota was
11:13:58    5  changed?

11:13:59    6    A.  I was only there part of a year, and so that
11:14:01    7  would reflect the time I was there.

11:14:07    8    Q.  Okay.  Did you understand that this was the
11:14:10    9  compensation plan that applied to your employment at
11:14:12   10  NetVersant?

11:14:13   11    A.  Yes.

11:14:13   12    Q.  Did anybody tell you that any of the terms in
11:14:16   13  the agreement did not apply to you?

4:19   14    A.  No.

11:14:20   15    Q.  While you were there, were you aware whether
11:14:23   16  any of the terms changed?

11:14:27   17    A.  In 2005, but not during this.  Not that I'm
11:14:33   18  aware of.

11:14:34   19    Q.  Okay.  Were you ever given another compensation
11:14:36   20  plan?

11:14:37   21    A.  In 2005.

11:14:38   22    Q.  You were given a compensation plan in 2005?

11:14:41   23    A.  Um-hmm.  Yes.

11:14:45   24    Q.  Okay.  Other than the plan changing from year
11:14:47   25  to year -- and I understand that the 2005 plan may have

Page 49

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:14:50 | 1 | been different -- did anybody modify the 2004 plan? |
| 11:14:54 | 2 | A.   Not that I'm aware of. |
| 11:14:59 | 3 | Q.   Okay. |
| 11:14:59 | 4 | A.   Other than that addendum on the back, and I |
| 11:15:01 | 5 | believe I signed that in the beginning. |
| 11:15:02 | 6 | Q.   In the "Definition" sections at the top, there |
| 11:15:06 | 7 | is one that says "Assigned accounts."  It says, |
| 11:15:08 | 8 | "Customer accounts that have been assigned to you in |
| 11:15:10 | 9 | writing by the EVP of sales and business development." |
| 11:15:14 | 10 | Did you ever receive any assigned accounts? |
| 11:15:17 | 11 | A.   Yes. |
| 11:15:17 | 12 | Q.   What accounts did you receive? |
| 11:15:20 | 13 | A.   Maximus and Gallo in the beginning. |
| 11:15:23 | 14 | Q.   Any others? |
| 11:15:25 | 15 | A.   At some point Gallo was taken away and I was |
| 11:15:29 | 16 | assigned some others. |
| 11:15:33 | 17 | Q.   So when you first started, the only two |
| 11:15:35 | 18 | accounts that were assigned to you were Maximus and |
| 11:15:39 | 19 | Gallo? |
| 11:15:39 | 20 | A.   To my dismay, yes. |
| 11:15:46 | 21 | Q.   Were they assigned to you in writing? |
| 11:15:58 | 22 | A.   No. |
| 11:15:58 | 23 | Q.   Okay.  You said to your dismay.  What did you |
| 11:16:00 | 24 | mean by that? |
| 11:16:01 | 25 | A.   I was expecting to get many more accounts like |

Page 50

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_.16:06 | 1 | I had been promised during the interview. |
| 11:16:13 | 2 | Q.   So when you only got two, what did you do? |
| 11:16:18 | 3 | A.   I tried to bring it up with Peter. |
| 11:16:25 | 4 | Q.   What did you say to him? |
| 11:16:29 | 5 | A.   "Why am I not handling more accounts?" |
| 11:16:33 | 6 | Q.   What did -- what was his response? |
| 11:16:38 | 7 | A.   "I'm assigning them to other reps." |
| 11:16:42 | 8 | Q.   Did you bring it up to anyone other than |
| 11:16:45 | 9 | Peter? |
| 11:16:46 | 10 | A.   Not at that time. |
| 11:16:47 | 11 | Q.   Why not? |
| 11:16:48 | 12 | A.   Peter was my manager. |
| 11:16:54 | 13 | Q.   At the time when you brought it up to Peter, |
| 1 .6:56 | 14 | did you say, "Hey, you promised me more accounts"? |
| 11:17:00 | 15 | A.   I -- I -- yeah, exactly. |
| 11:17:03 | 16 | Q.   And what was his response? |
| 11:17:07 | 17 | A.   "I'm assigning them to other -- other reps." |
| 11:17:10 | 18 | Q.   Did he deny having made you the promise? |
| 11:17:13 | 19 | A.   It -- it -- it was a very brief conversation. |
| 11:17:17 | 20 | Q.   Was it an in-person conversation? |
| 11:17:19 | 21 | A.   Yes. |
| 11:17:26 | 22 | Q.   And then you said later Gallo was taken away, |
| 11:17:29 | 23 | correct? |
| 11:17:29 | 24 | A.   Yes. |
| 11:17:32 | 25 | Q.   Who took it away from you? |

Page 51

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:17:34 | 1 | A.   Peter. |
| 11:17:35 | 2 | Q.   Did he tell you why? |
| 11:17:42 | 3 | A.   At the time, a little background on it -- |
| 11:17:48 | 4 | MR. IANNITELLI:  Mike, just answer the |
| 11:17:49 | 5 | question -- |
| 11:17:51 | 6 | THE WITNESS:  Okay. |
| 11:17:51 | 7 | MR. IANNITELLI:  -- as posed. |
| 11:17:53 | 8 | THE WITNESS:  Not -- not really.  I never got a |
| 11:17:55 | 9 | full explanation. |
| 11:17:56 | 10 | BY MS. HEVERLY: |
| 11:17:56 | 11 | Q.   Did he give you a partial explanation, or what |
| 11:17:59 | 12 | did he say? |
| 11:18:00 | 13 | A.   Assigning it to another rep. |
| 11:18:05 | 14 | Q.   That's it? |
| 11:18:07 | 15 | A.   Pretty much. |
| 11:18:09 | 16 | Q.   Did you have any understanding of why it was |
| 11:18:11 | 17 | being taken away? |
| 11:18:14 | 18 | A.   The customer had been working with Jeff Cotter, |
| 11:18:20 | 19 | the sales engineer, on some major projects, including a |
| 11:18:25 | 20 | call center, upgrade and redesign; very involved, |
| 11:18:30 | 21 | complicated project.  They had been working with Jeff |
| 11:18:34 | 22 | for months on it.  And he was going to be going off on |
| 11:18:37 | 23 | vacation and had sent an e-mail saying, "Hey, Mike is |
| 11:18:42 | 24 | your rep and -- and, you know, coordinate with him." |
| 11:18:45 | 25 | They were concerned that there was not a proper |

Page 52

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. 18:47 | 1 | transition, that I was just being thrown into it |
| 11:18:51 | 2 | without having the full history. |
| 11:18:56 | 3 | Q.  So was it your understanding that they asked to |
| 11:18:58 | 4 | keep Jeff Cotter as their rep? |
| 11:19:00 | 5 | A.  They just -- my understanding is they just |
| 11:19:02 | 6 | wanted a transition. |
| 11:19:06 | 7 | Q.  What did that mean? |
| 11:19:08 | 8 | A.  That Jeff would still be involved because he |
| 11:19:12 | 9 | had so much history on this project. |
| 11:19:22 | 10 | Q.  Do you know if that's what happened, that Jeff |
| 11:19:24 | 11 | kept the account? |
| 11:19:28 | 12 | A.  No. |
| 11:19:28 | 13 | Q.  Who took the account over, to your knowledge? |
| 1. .9:29 | 14 | A.  Peter assigned it to I believe John Cubiburu. |
| 11:19:41 | 15 | Q.  Did you ever question why? |
| 11:19:43 | 16 | A.  Yes. |
| 11:19:43 | 17 | Q.  Who did you ask? |
| 11:19:45 | 18 | A.  Peter. |
| 11:19:45 | 19 | Q.  And what did he say? |
| 11:19:48 | 20 | A.  "It's my decision." |
| 11:19:52 | 21 | Q.  Did you ever complain to anyone else? |
| 11:19:55 | 22 | A.  No.  I -- at a later date. |
| 11:20:01 | 23 | Q.  When? |
| 11:20:03 | 24 | A.  In August of -- |
| 11:20:05 | 25 | Q.  August of -- |

Page 53

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1 | 0:05 | 1 |

1  _0:05   1    A.   -- 2005.

11:20:06   2    Q.   -- 2005?

11:20:07   3         Sorry.  I didn't mean to talk over you.  But

11:20:09   4  August of 2005?

11:20:16   5    A.   Yes.

11:20:16   6    Q.   When was it taken away from you?

11:20:20   7    A.   I don't recall the exact date.

11:20:21   8    Q.   Shortly after you started?

11:20:23   9    A.   Maybe within, yeah, a month or two.  Probably a

11:20:30  10  month.

11:20:31  11    Q.   So it was probably sometime in July of 2004,

11:20:36  12  and you didn't complain to anyone other than Peter

11:20:38  13  until August of 2005, correct?

1   0:41  14    A.   I -- no, I complained to Peter at the time --

11:20:43  15    Q.   Right.  But --

11:20:45  16    A.   -- but nobody else.

11:20:46  17    Q.   I said other than Peter, you didn't complain to

11:20:51  18  anyone else until August of 2005?

11:20:52  19    A.   No.

11:20:52  20    Q.   Any reason why you waited so long?

11:20:54  21    A.   Peter was my manager.  I -- I needed to work

11:20:58  22  with Peter.

11:21:02  23    Q.   Okay.  So then as of July of 2004, you were

11:21:05  24  only assigned one account, Maximus?

11:21:08  25    A.   I was re- -- I was assigned some other accounts

Page 54

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 21:12 | 1 | that weren't as much revenue. |
| 11:21:16 | 2 | Q.   Do you recall what accounts you were |
| 11:21:18 | 3 | assigned? |
| 11:21:21 | 4 | A.   Markstein Beverage, E.A. Consulting, Hansen |
| 11:21:30 | 5 | Information Technologies -- actually, I take that back. |
| 11:21:32 | 6 | I think I already had that.  I don't remember exactly |
| 11:21:34 | 7 | when that was assigned. |
| 11:21:37 | 8 | Apple Computer, and a time materials -- a time |
| 11:21:44 | 9 | and materials account that wasn't on maintenance, the |
| 11:21:46 | 10 | U.S. -- there was a U.S. federal court in Sacramento. |
| 11:21:54 | 11 | Q.   Any other accounts that you were assigned? |
| 11:21:56 | 12 | A.   Not that I can recall at this time. |
| 11:21:59 | 13 | Q.   And do you recall when you were assigned these |
| .2:01 | 14 | accounts? |
| 11:22:01 | 15 | A.   Shortly after Gallo was taken away. |
| 11:22:04 | 16 | Q.   Do you know whether all of these were Jennifer |
| 11:22:06 | 17 | Forrest's former accounts? |
| 11:22:09 | 18 | A.   I'm not sure.  I know some of them were. |
| 11:22:26 | 19 | Q.   So as of approximately August 1st, 2004 you had |
| 11:22:30 | 20 | been assigned six accounts, Maximus and then these five |
| 11:22:33 | 21 | you just mentioned? |
| 11:22:35 | 22 | A.   I'm not sure.  I'm not sure of the full list of |
| 11:22:41 | 23 | what was reassigned. |
| 11:22:42 | 24 | Q.   So there may have been others? |
| 11:22:44 | 25 | A.   That's -- that's pretty much it. |

Page 55

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  24:09 | 1 | recollection as to when you were assigned Hansen? |
| 11:24:12 | 2 | A.   Probably a commission statement. |
| 11:24:21 | 3 | Q.   Okay.  You indicated a little earlier that you |
| 11:24:23 | 4 | thought you were be getting -- going to be getting more |
| 11:24:25 | 5 | accounts. |
| 11:24:26 | 6 | Which of Jennifer Forrest's accounts did you |
| 11:24:29 | 7 | think you were getting that you didn't get? |
| 11:24:32 | 8 | A.   Oh, she had so many.  Citibank, CDA, VSP -- |
| 11:24:42 | 9 | Q.   CDA? |
| 11:24:42 | 10 | A.   Yes. |
| 11:24:44 | 11 | Q.   Okay. |
| 11:24:44 | 12 | A.   VSP. |
| 11:24:48 | 13 | Q.   Any others? |
| 1  .4:49 | 14 | A.   Teichert. |
| 11:24:51 | 15 | Q.   Do you want to spell that? |
| 11:24:52 | 16 | A.   T-e-i-c-h-e-r-t. |
| 11:25:00 | 17 | Q.   Okay.  Any others you can think of? |
| 11:25:03 | 18 | A.   Not offhand right now. |
| 11:25:05 | 19 | Q.   And so you had some expectation that you'd be |
| 11:25:08 | 20 | getting these accounts when you started, correct? |
| 11:25:11 | 21 | A.   Yes. |
| 11:25:11 | 22 | Q.   And when you started and you weren't assigned |
| 11:25:14 | 23 | them, you asked Peter Wainwright why not; is that |
| 11:25:19 | 24 | correct? |
| 11:25:19 | 25 | A.   Yes. |

Page 57

TALTY COURT REPORTERS, INC.   408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:25:19 | 1 | Q.   And what did he say? |
| 11:25:21 | 2 | A.   "I have chosen to assign them to other reps." |
| 11:25:34 | 3 | Q.   Okay.  Did you do anything else other than have |
| 11:25:36 | 4 | that one conversation with Peter? |
| 11:25:39 | 5 | A.   No. |
| 11:25:42 | 6 | Q.   Did you start looking for a new job? |
| 11:25:44 | 7 | A.   No. |
| 11:25:45 | 8 | Q.   At the time when you weren't assigned these |
| 11:25:47 | 9 | accounts, you must have realized you weren't going to |
| 11:25:49 | 10 | earn as much as you thought you were going to earn; |
| 11:25:55 | 11 | isn't that true? |
| 11:25:55 | 12 | A.   Yes. |
| 11:25:55 | 13 | Q.   Okay.  And did you do anything about that? |
| 11:25:57 | 14 | A.   No. |
| 11:26:01 | 15 | Q.   With the accounts that you had been given, did |
| 11:26:03 | 16 | you have any expectations of what you could earn in |
| 11:26:06 | 17 | your first year there? |
| 11:26:10 | 18 | A.   It depended on what projects came up.  Maximus |
| 11:26:14 | 19 | was going to be a very large part of that. |
| 11:26:23 | 20 | Q.   And you -- you testified earlier that you |
| 11:26:25 | 21 | understood part of your job was to get new accounts, |
| 11:26:30 | 22 | correct? |
| 11:26:30 | 23 | A.   Yes. |
| 11:26:30 | 24 | Q.   Did you have any -- did anyone ever tell you |
| 11:26:32 | 25 | how much time you should spend getting new accounts? |

Page 58

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. .6:34 | 1 | A.    No. |
| 11:26:36 | 2 | Q.    Did you have any understanding of how much time |
| 11:26:38 | 3 | you should be spending getting new accounts? |
| 11:26:41 | 4 | A.    No.  As much time as possible, but to work and |
| 11:26:45 | 5 | keep the existing customers happy. |
| 11:26:52 | 6 | Q.    And when you started, how much time did you |
| 11:26:54 | 7 | spend seeking out new accounts? |
| 11:26:58 | 8 | A.    Every chance I had.  Maximus ended up being |
| 11:27:03 | 9 | quite a bit of work. |
| 11:27:07 | 10 | Q.    Can you give me an estimation percentage, did |
| 11:27:10 | 11 | you spend fifty percent of your time getting new work, |
| 11:27:12 | 12 | twenty-five percent, seventy-five percent? |
| 11:27:15 | 13 | A.    I don't recall exactly.  It varied day to day, |
| 1   7:18 | 14 | week to week. |
| 11:27:23 | 15 | Q.    Approximately how many hours a week did you |
| 11:27:25 | 16 | work from the time you started until November of 2004? |
| 11:27:29 | 17 | A.    Oh, at least forty. |
| 11:27:32 | 18 | Q.    Can you estimate how many hours a week you |
| 11:27:35 | 19 | spent getting new business? |
| 11:27:38 | 20 | A.    I'm not -- I don't know how much of that was |
| 11:27:40 | 21 | getting new business. |
| 11:27:43 | 22 | Q.    Did you have any regular sales meetings? |
| 11:27:47 | 23 | A.    Yes. |
| 11:27:47 | 24 | Q.    How often? |
| 11:27:49 | 25 | A.    Oh, there was a regional meeting once a month |

Page 59

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:29:13 | 1 | Q.    And what's your understanding of what a sales |
| 11:29:16 | 2 | funnel is? |
| 11:29:16 | 3 | A.    That would be opportunities you are working on |
| 11:29:18 | 4 | with both new and existing customers, both maintenance |
| 11:29:23 | 5 | and -- and projects. |
| 11:29:30 | 6 | Q.    Did you have any understanding of what the size |
| 11:29:31 | 7 | of your sales funnel should be? |
| 11:29:35 | 8 | A.    Yes. |
| 11:29:35 | 9 | Q.    What was that? |
| 11:29:37 | 10 | A.    There was various statements made along the |
| 11:29:39 | 11 | way.  I -- I don't remember.  If you showed me |
| 11:29:48 | 12 | something, I'm sure I could verify it. |
| 11:29:51 | 13 | Q.    Do you recall ever being told that your sales |
| 1   9:53 | 14 | funnel should be four times your quota? |
| 11:29:56 | 15 | A.    That -- that sounds right. |
| 11:29:59 | 16 | Q.    Do you recall who told you that? |
| 11:30:03 | 17 | A.    Either Peter or Robert Palmer, or both. |
| 11:30:15 | 18 | Q.    Did you understand fairly shortly after you |
| 11:30:17 | 19 | started that that should be what your funnel is -- that |
| 11:30:20 | 20 | that is what your funnel should be? |
| 11:30:21 | 21 | A.    I understood that that's what I needed to work |
| 11:30:24 | 22 | towards.  There was no expectation that that would |
| 11:30:27 | 23 | happen immediately. |
| 11:30:37 | 24 | Q.    Did you have any expectation of how long it |
| 11:30:40 | 25 | would take you to get there? |

Page 61

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:30:42 | 1 | A.    No. |
| 11:30:44 | 2 | Q.    Did anybody ever tell you how long it would |
| 11:30:46 | 3 | take you to get fully ramped up? |
| 11:30:49 | 4 | A.    No. |
| 11:30:57 | 5 | Q.    During the period of June to November when you |
| 11:31:01 | 6 | first started working at NetVersant, did anybody tell |
| 11:31:04 | 7 | you that you weren't at the required funnel number? |
| 11:31:13 | 8 | A.    No. |
| 11:31:14 | 9 | Q.    At any time during those first few months of |
| 11:31:17 | 10 | employment did your funnel number ever reach four times |
| 11:31:20 | 11 | quota? |
| 11:31:22 | 12 | A.    I'm not sure.  I know there was millions of |
| 11:31:29 | 13 | dollars in there. |
| 11:31:34 | 14 | Q.    Did you ever do reports, weekly or monthly |
| 11:31:38 | 15 | reports, indicating what your funnel was? |
| 11:31:40 | 16 | A.    They were required, yes. |
| 11:31:41 | 17 | Q.    How often? |
| 11:31:44 | 18 | A.    At least once a month. |
| 11:31:48 | 19 | Q.    Who did you submit the reports to? |
| 11:31:51 | 20 | A.    To Peter or to Megan Riordan, or to Robert, or |
| 11:31:58 | 21 | to all three at times. |
| 11:32:13 | 22 | Q.    Did any of the three of them ever tell you that |
| 11:32:15 | 23 | your report wasn't good enough or you needed to work on |
| 11:32:18 | 24 | improving it? |
| 11:32:19 | 25 | A.    No, not -- not before November.  Not before |

Page 62

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:34:06 | 1 | June 2004; is that correct? |
| 11:34:08 | 2 | A.   It looks correct. |
| 11:34:12 | 3 | Q.   So this is the first month that you started, |
| 11:34:17 | 4 | correct? |
| 11:34:17 | 5 | A.   Yes. |
| 11:34:17 | 6 | Q.   And you will see that at the first month you |
| 11:34:21 | 7 | started, your year-to-date performance was three |
| 11:34:27 | 8 | hundred and fifty-eight thousand -- |
| 11:34:28 | 9 | A.   Yes. |
| 11:34:28 | 10 | Q.   -- and some change? |
| 11:34:30 | 11 | So that's -- those are all the sales that you |
| 11:34:33 | 12 | were given when you started, correct? |
| 11:34:35 | 13 | A.   I -- I wouldn't say just given. |
| 1  4:39 | 14 | Q.   Okay.  What would you say? |
| 11:34:41 | 15 | A.   They were negotiated in my interview process. |
| 11:34:47 | 16 | I was recruited by a customer that represented a good |
| 11:34:50 | 17 | part of that revenue.  I was told I would get to go |
| 11:34:56 | 18 | sign a maintenance contract when that customer was -- |
| 11:34:59 | 19 | one of the customers was coming off of warranty. |
| 11:35:04 | 20 | Q.   Okay.  Well, let me put it this way:  Other |
| 11:35:06 | 21 | than just negotiating your employment, you didn't do |
| 11:35:08 | 22 | anything to generate these sales yourself, correct? |
| 11:35:11 | 23 | A.   I -- I don't believe that's true. |
| 11:35:13 | 24 | Q.   And what did you do? |
| 11:35:14 | 25 | A.   Quotes needed to be provided to customers, |

Page 64

TALTY COURT REPORTERS, INC.   408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:35:18 | 1 | bookings submitted, engineering requests. |
| 11:35:24 | 2 |    Q.   Okay.  So this is -- this is June, remember, |
| 11:35:26 | 3 | the first month of your employment. |
| 11:35:28 | 4 |         What did you do to generate sales in the first |
| 11:35:30 | 5 | month of your employment? |
| 11:35:32 | 6 |    A.   Everything I just discussed. |
| 11:35:37 | 7 |    Q.   How much of this three hundred fifty-eight |
| 11:35:40 | 8 | thousand then came from work that you did personally as |
| 11:35:43 | 9 | opposed to work that had been done by Jennifer Forrest |
| 11:35:45 | 10 | or somebody else? |
| 11:35:47 | 11 |    A.   I'm not sure. |
| 11:35:49 | 12 |    Q.   Can you give me your best estimation? |
| 11:35:57 | 13 |    A.   A good part of that revenue came from the |
| 1:6:01 | 14 | Maximus maintenance contract. |
| 11:36:05 | 15 |    Q.   More than fifty percent? |
| 11:36:08 | 16 |    A.   I'm sure. |
| 11:36:08 | 17 |    Q.   More than seventy-five percent? |
| 11:36:11 | 18 |    A.   I'm not sure.  Probably. |
| 11:36:38 | 19 |       MS. HEVERLY:  Mark as Exhibit Number 8 a |
| 11:36:40 | 20 | one-page document dated 10-12-04. |
| 11:37:00 | 21 |         (Exhibit marked for identification: |
| 11:37:00 | 22 |         Deposition Exhibit Number 8.) |
| 11:37:28 | 23 |       THE WITNESS:  (Reviewing document(s).) |
| 11:37:28 | 24 |       MS. HEVERLY:  And, again, just for the record, |
| 11:37:30 | 25 | I cut and paste two pages together so that you could |

Page 65

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ .8:58 | 1 | Q.   During the first few months you worked at |
| 11:39:01 | 2 | NetVersant, from June to November, how many new |
| 11:39:05 | 3 | accounts did you get? |
| 11:39:09 | 4 | A.   Oh, I -- I'm not sure what you mean by "new." |
| 11:39:16 | 5 | Q.   Well, I understand that you were given, and we |
| 11:39:19 | 6 | already talked about the list of accounts that you got |
| 11:39:21 | 7 | when you started working and that you got shortly |
| 11:39:23 | 8 | thereafter in July. |
| 11:39:25 | 9 | A.   I would disagree with the statement "given," |
| 11:39:27 | 10 | but -- |
| 11:39:29 | 11 | Q.   Okay.  However you want to phrase it, you |
| 11:39:30 | 12 | didn't go out and cold call and find the customers; the |
| 11:39:34 | 13 | customers were assigned to you when you started, |
| 1    3:37 | 14 | correct? |
| 11:39:37 | 15 | A.   The customers were assigned some of the |
| 11:39:39 | 16 | business, yes. |
| 11:39:42 | 17 | Q.   Okay. |
| 11:39:42 | 18 | A.   But that -- it wasn't just all assigned.  I |
| 11:39:44 | 19 | mean there was new projects, new applications, new |
| 11:39:49 | 20 | upgrades, new locations for these customers. |
| 11:39:53 | 21 | Q.   Okay.  So I understand that you may have sold |
| 11:39:54 | 22 | some new business to the existing accounts, but what |
| 11:39:57 | 23 | I'm really asking is what new accounts did you bring to |
| 11:40:00 | 24 | the company? |
| 11:40:02 | 25 | A.   I -- I had brought in at least one, and many |

Page 67

TALTY COURT REPORTERS, INC.  408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ :0:07 | 1 | were getting close to coming in. |
| 11:40:09 | 2 | Q.   What new account did you bring in? |
| 11:40:14 | 3 | A.   I had -- I had signed a small deal with |
| 11:40:16 | 4 | American Red Cross that was supposed to turn into more. |
| 11:40:21 | 5 | Q.   Do you know what the value of the deal with |
| 11:40:22 | 6 | American Red Cross was? |
| 11:40:24 | 7 | A.   Oh, it -- it was -- it was small. |
| 11:40:28 | 8 | Q.   Small -- |
| 11:40:30 | 9 | A.   Hundreds of dollars, probably. |
| 11:40:36 | 10 | Q.   And you said there were several other that were |
| 11:40:38 | 11 | in process? |
| 11:40:40 | 12 | A.   Yes. |
| 11:40:40 | 13 | Q.   Which ones were in process? |
| 1  ):44 | 14 | A.   Millions of dollars in quotes for Maximus; new |
| 11:40:48 | 15 | locations, new locations that NetVersant was not |
| 11:40:51 | 16 | maintaining. |
| 11:40:52 | 17 | Q.   Okay.  And, again, I'm just focusing on new |
| 11:40:54 | 18 | accounts. |
| 11:40:55 | 19 | A.   GC Wallace. |
| 11:41:00 | 20 | Q.   Okay.  Anyone else? |
| 11:41:03 | 21 | A.   I'm sure there was others.  I can't recall |
| 11:41:05 | 22 | right now. |
| 11:41:06 | 23 | Q.   Anything that would refresh your |
| 11:41:12 | 24 | recollection? |
| 11:41:12 | 25 | A.   Oh, a -- a funnel. |

Page 68

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ :2:38 | 1 | Q.   Is there sort of a common time frame that it |
| 11:42:40 | 2 | takes? |
| 11:42:41 | 3 | A.   Oh, I -- I can't say that there is a |
| 11:42:46 | 4 | particular -- it takes a while to ramp up. |
| 11:42:51 | 5 | Q.   That's what I'm trying to figure out, though. |
| 11:42:54 | 6 | What's "a while"? |
| 11:42:55 | 7 | A.   I would say -- |
| 11:42:55 | 8 | Q.   A month? |
| 11:42:56 | 9 | A.   I would say -- |
| 11:42:56 | 10 | Q.   Three months? |
| 11:42:56 | 11 | A.   -- six months is pretty common in my |
| 11:43:00 | 12 | experience. |
| 11:43:01 | 13 | Q.   So you worked for almost six months before |
| 1  3:10 | 14 | going out on leave.  Were you pretty close to being |
| 11:43:13 | 15 | fully ramped up at the time you left? |
| 11:43:15 | 16 | A.   I -- I don't think I was there six months yet. |
| 11:43:18 | 17 | I think it was under five. |
| 11:43:20 | 18 | Q.   Okay.  Well, if you started on June 7th, you |
| 11:43:23 | 19 | had almost all of June, July, August, September and |
| 11:43:26 | 20 | October, that's five, and you left in early November -- |
| 11:43:29 | 21 | A.   November 1st, and I started on June 7th, so |
| 11:43:32 | 22 | that would be four months and three weeks -- |
| 11:43:34 | 23 | Q.   Okay. |
| 11:43:34 | 24 | A.   -- I would say. |
| 11:43:35 | 25 | Q.   So almost five months.  Were you almost ramped |

Page 70