DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. .3:37 | 1 | up? |
| 11:43:38 | 2 | A.  Yes. |
| 11:43:42 | 3 | MS. HEVERLY:  Let's take just a couple-minute |
| 11:44:09 | 4 | break.  I need to get another document. |
| 11:44:13 | 5 | THE VIDEOGRAPHER:  We are off the record at |
| 11:44:15 | 6 | 11:43. |
| 11:53:40 | 7 | (Recess.) |
| 11:53:41 | 8 | THE VIDEOGRAPHER:  We are back on the record at |
| 11:53:43 | 9 | 11:53. |
| 11:53:46 | 10 | MS. HEVERLY:  I have given the court reporter |
| 11:53:48 | 11 | another document to mark as Exhibit Number 9.  It's the |
| 11:53:50 | 12 | complaint filed in the action. |
| 11:54:08 | 13 | (Exhibit marked for identification: |
| 1  4:08 | 14 | Deposition Exhibit Number 9.) |
| 11:54:11 | 15 | BY MS. HEVERLY: |
| 11:54:11 | 16 | Q.  Have you seen this document before? |
| 11:54:13 | 17 | A.  (Reviewing document(s).) |
| 11:54:13 | 18 | Yes. |
| 11:54:13 | 19 | Q.  Okay.  Do you want a couple minutes to look at |
| 11:54:15 | 20 | it? |
| 11:54:18 | 21 | A.  I -- yes. |
| 11:54:19 | 22 | Q.  Okay. |
| 11:54:37 | 23 | A.  (Reviewing document(s).) |
| 11:54:37 | 24 | Okay. |
| 11:54:38 | 25 | Q.  This is the complaint that you filed to start |

Page 71

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. ,4:40 | 1 | this lawsuit.  Did you review it before it was filed? |
| 11:54:43 | 2 | A.   Yes. |
| 11:54:45 | 3 | Q.   Okay.  I want to ask you a couple questions |
| 11:54:46 | 4 | about some of the claims in it. |
| 11:54:49 | 5 | On page seven, the third cause of action is |
| 11:54:52 | 6 | brought against NetVersant and Peter Wainwright, and |
| 11:54:57 | 7 | it's for harassment. |
| 11:54:58 | 8 | What did Mr. Wainwright do to harass you? |
| 11:55:01 | 9 | A.   Oh, he -- he obviously didn't want me there |
| 11:55:07 | 10 | after I was off and disabled. |
| 11:55:10 | 11 | He made promises to reassign accounts that I |
| 11:55:16 | 12 | had worked out with reps and he told me he would work |
| 11:55:19 | 13 | it out and then didn't. |
| 1   5:20 | 14 | He expected unreasonable funnels right away. |
| 11:55:27 | 15 | He was rude and abusive in private meetings. |
| 11:55:37 | 16 | Q.   Anything else? |
| 11:55:40 | 17 | A.   I -- that's all I'm thinking of right now. |
| 11:55:43 | 18 | Q.   Did anyone else at NetVersant harass you? |
| 11:55:54 | 19 | A.   No. |
| 11:55:54 | 20 | Q.   Did he ever make any comments to you about your |
| 11:55:59 | 21 | disability? |
| 11:56:08 | 22 | A.   Not in particular. |
| 11:56:09 | 23 | Q.   Did he ever make any jokes about being disabled |
| 11:56:13 | 24 | or people with disabilities? |
| 11:56:17 | 25 | A.   Not in front of me. |

Page 72

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ ᴗ6:20 | 1 | Q.   Did you ever learn about any jokes he made to |
| 11:56:23 | 2 | anyone else outside your presence? |
| 11:56:27 | 3 | A.   Yes. |
| 11:56:27 | 4 | Q.   What did you learn of? |
| 11:56:29 | 5 | A.   He accused me of going off of the deep end, and |
| 11:56:40 | 6 | making a spooky phone call. |
| 11:56:44 | 7 | Q.   When did you learn of that? |
| 11:56:46 | 8 | A.   Recently. |
| 11:56:47 | 9 | Q.   You learned about that in connection with this |
| 11:56:49 | 10 | lawsuit, correct? |
| 11:56:50 | 11 | A.   Yes. |
| 11:56:50 | 12 | Q.   You didn't know that at the time you were |
| 11:56:52 | 13 | employed there? |
| 1  6:53 | 14 | A.   I did not know that at the time. |
| 11:56:55 | 15 | Q.   Okay.  At the time you were employed, there did |
| 11:56:57 | 16 | you learn of any jokes or comments that Mr. Wainwright |
| 11:57:00 | 17 | had made outside your presence about your disability? |
| 11:57:07 | 18 | A.   No. |
| 11:57:07 | 19 | Q.   Okay.  So he -- you said that he made promises |
| 11:57:10 | 20 | to reassign you accounts.  Was that in August when you |
| 11:57:17 | 21 | came back, or in January when you came back, or both? |
| 11:57:20 | 22 | A.   It was in February when I was off, early |
| 11:57:26 | 23 | February.  We discussed transition of accounts, and the |
| 11:57:32 | 24 | agreement that was made on two accounts in particular, |
| 11:57:35 | 25 | Maximus and Hansen, was that if the reps were willing |

Page 73

DEPONENT:  MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 1. 57:38 | 1 | to, they would be reassigned to me after, which they |
| 11:57:42 | 2 | agreed to.  And I believe they talked to Peter about |
| 11:57:46 | 3 | that after. |
| 11:57:50 | 4 | And then when I came back on August 1st, after |
| 11:57:54 | 5 | receiving the first e-mail that I was not going to |
| 11:57:57 | 6 | receive accounts back, I went and sat down with him, |
| 11:58:01 | 7 | and he made it sound like I might possibly -- that I |
| 11:58:05 | 8 | would receive those back. |
| 11:58:06 | 9 | Q.   In August you are saying? |
| 11:58:08 | 10 | A.   Or Maximus in particular, yes. |
| 11:58:12 | 11 | Q.   And then you also said that he expected an |
| 11:58:15 | 12 | unreasonable funnel; is that correct? |
| 11:58:18 | 13 | A.   Yes. |
| 1  8:18 | 14 | Q.   Was that in -- in January when you came back, |
| 11:58:21 | 15 | or in August, or both? |
| 11:58:22 | 16 | A.   That would have been in August mainly. |
| 11:58:31 | 17 | Not "mainly."  Yes. |
| 11:58:35 | 18 | Q.   Okay.  And you said he was rude and abusive in |
| 11:58:38 | 19 | meetings.  What did you mean by that? |
| 11:58:41 | 20 | A.   Oh, called my performance underwhelming, raised |
| 11:58:48 | 21 | his voice at me, made it clear I couldn't be counted |
| 11:58:58 | 22 | on. |
| 11:58:58 | 23 | Q.   What?  Say that again? |
| 11:59:00 | 24 | A.   I couldn't be counted on because of the time I |
| 11:59:03 | 25 | was off. |

Page 74

DEPONENT:   MICHAEL CAVA    1-4-07

12:00:34   1  had no objection to it, which was Kevin Bryant.  And

12:00:40   2  then on the -- on August 3rd he ruled that in fact that

12:00:43   3  was not going to happen.

12:00:47   4      Q.   Okay.  So it happened on August 1st, 2nd and

12:00:50   5  3rd?

12:00:50   6      A.   Yes.

12:00:53   7      Q.   And it sounds like all of the stuff is

12:00:56   8  work-related stuff; is that correct?

12:00:58   9          I mean all of the things that you complain of

12:01:00  10  are work things; is that correct?

12:01:03  11      A.   Yes.

12:01:03  12      Q.   He didn't do anything to you outside of work?

12:01:06  13      A.   No.

1   1:06  14      Q.   He never touched you inappropriately?

12:01:11  15      A.   No.

12:01:11  16      Q.   You already testified he never made any jokes

12:01:13  17  to you or any vulgar or offensive comments?

12:01:17  18      A.   No, just other than being demeaning about my

12:01:20  19  abilities and my performance.

12:01:22  20      Q.   Okay.  Did he say anything to you that was

12:01:24  21  offensive because of your disability?

12:01:28  22      A.   Not at the time.

12:01:30  23      Q.   At any time?

12:01:34  24      A.   I -- I don't know if I'd call it that.

12:01:39  25      Q.   Okay.  And at the time we are talking about,

Page 76

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 12:01:42 | 1 | which is the first part of August, were the |
| 12:01:45 | 2 | disabilities you were suffering the ones that you |
| 12:01:47 | 3 | listed earlier:   Anxiety, depression, stress, ADD/ADHD |
| 12:01:53 | 4 | and back pain? |
| 12:01:54 | 5 | A.   Yes. |
| 12:01:54 | 6 | Q.   Had you told Mr. Wainwright that you were |
| 12:01:58 | 7 | suffering from those disabilities? |
| 12:02:01 | 8 | A.   No, I had told Joanna Cotter that I was having |
| 12:02:06 | 9 | emotional problems.   We had talked quite a bit -- |
| 12:02:13 | 10 | Q.   Did you ever tell any -- |
| 12:02:16 | 11 | A.   -- during this -- |
| 12:02:16 | 12 | Q.   All right.   I'm sorry. |
| 12:02:18 | 13 | A.   I'm sorry.   Yeah.   No.   During -- throughout |
| 1.  2:19 | 14 | the whole -- the whole time. |
| 12:02:20 | 15 | Q.   Did you ever tell anyone at NetVersant that you |
| 12:02:22 | 16 | were having back problems? |
| 12:02:25 | 17 | A.   I'm sure I commented on it from time to time. |
| 12:02:27 | 18 | Q.   Okay.   Did you ever tell Mr. Wainwright or |
| 12:02:29 | 19 | Ms. Cotter that you were having back problems? |
| 12:02:33 | 20 | A.   I remember discussing back pain with both of |
| 12:02:37 | 21 | them at different times. |
| 12:02:39 | 22 | Q.   Did you ever tell anyone at NetVersant that you |
| 12:02:41 | 23 | had ADD? |
| 12:02:43 | 24 | A.   No. |
| 12:02:44 | 25 | Q.   Did you ever tell anyone at NetVersant that you |

Page 77

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ _2:47 | 1 | had ADHD? |
| 12:02:52 | 2 | A.   No. |
| 12:02:53 | 3 | Q.   Did you ever tell anyone at NetVersant that you |
| 12:02:55 | 4 | were suffering from anxiety? |
| 12:02:59 | 5 | A.   I would have worded it more along the lines of |
| 12:03:02 | 6 | "stress." |
| 12:03:04 | 7 | Q.   Did you ever tell anyone at NetVersant that you |
| 12:03:06 | 8 | were disabled? |
| 12:03:08 | 9 | A.   Yes. |
| 12:03:08 | 10 | Q.   Who did you tell? |
| 12:03:10 | 11 | A.   Joanna Cotter -- |
| 12:03:12 | 12 | Q.   What did you tell -- |
| 12:03:15 | 13 | A.   -- Esther -- |
| 1   3:13 | 14 | Q.   -- her? |
| 12:03:16 | 15 | A.   -- Gloria. |
| 12:03:16 | 16 | Q.   Sorry to interrupt you. |
| 12:03:19 | 17 | Joanna Cotter and Esther Gloria.  Anyone else? |
| 12:03:23 | 18 | A.   That would have -- that would have probably |
| 12:03:24 | 19 | been it. |
| 12:03:25 | 20 | Q.   What did you tell them? |
| 12:03:29 | 21 | A.   That my doctor had ordered disability.  I had |
| 12:03:35 | 22 | sent numerous notes along the way.  They had |
| 12:03:38 | 23 | acknowledged that they had received those. |
| 12:03:49 | 24 | Q.   Did you ever tell them any specifics of your |
| 12:03:51 | 25 | condition? |

Page 78

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ _0:46 | 1 | sent them to Joanna. |
| 12:10:48 | 2 | Q.   Did you ever tell Mr. Wainwright that you were |
| 12:10:50 | 3 | suffering from a disability? |
| 12:10:53 | 4 | A.   I told him I was -- that my doctor had ordered |
| 12:10:58 | 5 | disability. |
| 12:10:59 | 6 | Q.   When did you tell him that? |
| 12:11:05 | 7 | A.   At some time after January 26th when I went out |
| 12:11:07 | 8 | on disability. |
| 12:11:08 | 9 | Q.   Did you tell him that in a telephone conference |
| 12:11:11 | 10 | or in person? |
| 12:11:12 | 11 | A.   Oh, I'm sure it was a telephone conference. |
| 12:11:17 | 12 | Q.   What was his response when you told him that? |
| 12:11:22 | 13 | A.   He didn't seem unsupportive, and he was |
| 1_ 1:28 | 14 | concerned about the accounts that I was assigned, and |
| 12:11:34 | 15 | having those covered. |
| 12:11:36 | 16 | Most of it was surrounded around -- around |
| 12:11:38 | 17 | business.  He really didn't ask much about disability |
| 12:11:43 | 18 | or anything going on with my son. |
| 12:11:45 | 19 | Q.   Did you tell him at the time what your |
| 12:11:47 | 20 | disability was? |
| 12:11:49 | 21 | A.   Just that I was disabled, or I was off on |
| 12:11:52 | 22 | disability. |
| 12:11:55 | 23 | Q.   Did you tell him whether it was for your own |
| 12:11:57 | 24 | disability or to care for your son? |
| 12:12:00 | 25 | A.   I had always expressed that it was my |

Page 84

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. .3:23 | 1 | Q.    Did she tell you who she told? |
| 12:13:25 | 2 | A.    I know she had let Peter and Scott know. |
| 12:13:36 | 3 | I know she had let Esther know because I |
| 12:13:39 | 4 | received a letter from Esther. |
| 12:13:49 | 5 | Q.    At the time when you went out on the second |
| 12:13:51 | 6 | leave in early August of 2005, did you have any |
| 12:13:53 | 7 | conversations with Mr. Wainwright about why you were |
| 12:13:56 | 8 | leaving? |
| 12:13:58 | 9 | A.    I'm sorry.  Can you rephrase that, ask that |
| 12:14:00 | 10 | again? |
| 12:14:01 | 11 | Q.    Well, it's my understanding that you came back |
| 12:14:03 | 12 | to work in early August 2005, worked for a few days, |
| 12:14:06 | 13 | and then went out on a second leave of absence, |
| 1   4:11 | 14 | correct? |
| 12:14:11 | 15 | A.    Yes. |
| 12:14:11 | 16 | Q.    And the second leave of absence was for your |
| 12:14:13 | 17 | own disability, correct? |
| 12:14:15 | 18 | A.    Yes. |
| 12:14:15 | 19 | Q.    Did you tell -- have any conversations with |
| 12:14:16 | 20 | Mr. Wainwright about why you were going out on leave at |
| 12:14:19 | 21 | that time? |
| 12:14:20 | 22 | A.    No, I -- I let Joanna Cotter know. |
| 12:14:25 | 23 | Q.    Did you talk to anyone else at NetVersant about |
| 12:14:29 | 24 | why you were taking a leave at that time? |
| 12:14:32 | 25 | A.    Yes.  Joanna had asked that I talk with Scott |

Page 86

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. 7:55 | 1 | Q.  Okay. |
| 12:17:55 | 2 | A.  NetVersant did not respond, as far as I know. |
| 12:18:04 | 3 | Q.  Do you know why NetVersant didn't respond? |
| 12:18:08 | 4 | A.  I'm not sure.  I -- I'm not sure.  I would just |
| 12:18:15 | 5 | be speculating. |
| 12:18:24 | 6 | MS. HEVERLY:  Okay.  Let's mark as number 11 a |
| 12:18:27 | 7 | one-page e-mail dated November 10th, 2004. |
| 12:18:46 | 8 | (Exhibit marked for identification: |
| 12:18:46 | 9 | Deposition Exhibit Number 11.) |
| 12:19:03 | 10 | THE WITNESS:  (Reviewing document(s).) |
| 12:19:03 | 11 | BY MS. HEVERLY: |
| 12:19:03 | 12 | Q.  Again, you produced this document to us in |
| 12:19:05 | 13 | discovery, and I'm just curious what the significance |
| 1  9:08 | 14 | is. |
| 12:19:10 | 15 | A.  I just -- when I had to go out on leave, I |
| 12:19:14 | 16 | continued to work as hard as I could, and tried to make |
| 12:19:19 | 17 | sure there was a transition on the accounts I was |
| 12:19:21 | 18 | working on, had some very good opportunities with these |
| 12:19:25 | 19 | accounts. |
| 12:19:25 | 20 | And Kevin Bryant and Sean Lemoine, who worked |
| 12:19:28 | 21 | for Kevin, were agreeing to work on -- on some of these |
| 12:19:34 | 22 | opportunities, and we would split them when I was back. |
| 12:19:37 | 23 | Q.  And you were out on leave from early November |
| 12:19:39 | 24 | of 2004 to mid January 2005 the first time, correct? |
| 12:19:44 | 25 | A.  Yes. |

Page 89

TALTY COURT REPORTERS, INC.  408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:  MICHAEL CAVA    1-4-07

1. 9:44    1    Q.    How much work did you do during that period?

12:19:48    2    A.    Oh, it -- it's kind of a blur.  I took every

12:19:53    3    phone call, I returned every e-mail that I could.  I

12:19:57    4    took calls in the hospital, in the ICU.  I returned

12:20:03    5    e-mails at 3:00 A.M. if I had to.

12:20:05    6         I answered any questions to make sure that

12:20:08    7    nothing fell down.

12:20:09    8    Q.    Okay.  But how many hours per week or per day

12:20:12    9    were you working on average?

12:20:15    10    A.    Oh, I -- I don't know.  Whenever needed.

12:20:21    11    Whenever something had to be done or there was a

12:20:23    12    question about something I had done.

12:20:25    13    Q.    Were you doing some kind of work every day?

1    0:30    14    A.    I -- I tried to when I could.  There was

12:20:32    15    some -- sometimes we were at the hospital twenty-four

12:20:35    16    hours a day, so -- (pause).

12:20:57    17    Q.    When Gallo Wines was reassigned to a different

12:21:01    18    account representative, did you think that that was

12:21:04    19    inappropriate?

12:21:08    20    A.    I thought it was unfair.

12:21:15    21    Q.    Did you think it violated your employment

12:21:18    22    contract?

12:21:18    23    A.    I thought so.

12:21:19    24    Q.    Did you do anything about it?

12:21:21    25    A.    Just talked to Peter.

Page 90

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. .1:34 | 1 | Q.   I just asked you if you thought it violated |
| 12:21:36 | 2 | your employment contract and you said you thought it |
| 12:21:38 | 3 | did. |
| 12:21:38 | 4 | What employment contract did you have with the |
| 12:21:41 | 5 | company? |
| 12:21:42 | 6 | A.   I just had an agreement with -- with Peter and |
| 12:21:44 | 7 | Scott of what I was going to be assigned. |
| 12:21:47 | 8 | Q.   So just the oral agreement that you had made |
| 12:21:49 | 9 | with them during the interview process; is that |
| 12:21:54 | 10 | correct? |
| 12:21:54 | 11 | A.   Yes. |
| 12:21:54 | 12 | Q.   Those terms were never reduced to a writing? |
| 12:21:57 | 13 | A.   No. |
| 1   2:21 | 14 | Q.   So at some point your son became ill, |
| 12:22:25 | 15 | correct? |
| 12:22:25 | 16 | A.   Yes. |
| 12:22:25 | 17 | Q.   When did he first become ill? |
| 12:22:27 | 18 | A.   He was diagnosed with a brain tumor on November |
| 12:22:30 | 19 | 1st, 2004. |
| 12:22:34 | 20 | Q.   And when did you first go out on leave?  Was it |
| 12:22:41 | 21 | the same day? |
| 12:22:42 | 22 | A.   Yeah, that night I -- when I got home from the |
| 12:22:45 | 23 | hospital, I -- I informed everybody I needed to be out. |
| 12:22:52 | 24 | Q.   How did you tell people you needed to be out? |
| 12:22:55 | 25 | A.   It was -- I believe it was 1:00 A.M., |

Page 91

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  .2:58 | 1 | sometime -- or in the early morning.  Nobody was going |
| 12:23:01 | 2 | to be there.  I sent an e-mail. |
| 12:23:03 | 3 | Q.   Did you talk to anyone in person either that |
| 12:23:05 | 4 | day or the next day? |
| 12:23:06 | 5 | A.   The next day I did. |
| 12:23:08 | 6 | Q.   Who did you talk to the next day? |
| 12:23:10 | 7 | A.   Joanna Cotter and a number of other account |
| 12:23:13 | 8 | reps there, people that I worked with.  Everybody was |
| 12:23:21 | 9 | very concerned. |
| 12:23:24 | 10 | Q.   What did they tell you about whether you could |
| 12:23:28 | 11 | take time off? |
| 12:23:30 | 12 | A.   Oh, at that time on -- on the early days, it |
| 12:23:36 | 13 | wasn't even questioned.  I offered to go off on leave |
| 1  3:39 | 14 | right away. |
| 12:23:41 | 15 | Q.   Did anyone ever discourage you from taking |
| 12:23:43 | 16 | leave? |
| 12:23:44 | 17 | A.   Not -- not until a little bit later. |
| 12:23:48 | 18 | Q.   Okay.  But at that time in early November |
| 12:23:50 | 19 | nobody did? |
| 12:23:52 | 20 | A.   No. |
| 12:23:53 | 21 | Q.   Did you ever submit any paperwork for a formal |
| 12:24:00 | 22 | leave of absence? |
| 12:24:00 | 23 | A.   Other than the e-mails at that point?  It was |
| 12:24:03 | 24 | all by e-mail. |
| 12:24:04 | 25 | Q.   Okay. |

Page 92

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1.  .4:04 | 1 | A.  And -- and verbal.  But mostly e-mail. |
| 12:24:06 | 2 | Q.  Did anyone ever ask you for verification of |
| 12:24:09 | 3 | your son's illness, from a doctor's note or anything? |
| 12:24:16 | 4 | A.  No. |
| 12:24:16 | 5 | Q.  You were paid your full salary for the first |
| 12:24:19 | 6 | portion of leave, correct? |
| 12:24:21 | 7 | A.  Yes. |
| 12:24:21 | 8 | Q.  Were you paid your full salary from November |
| 12:24:24 | 9 | 1st until January 2005 when you came back? |
| 12:24:28 | 10 | A.  Yes, I believe until January 17th. |
| 12:24:41 | 11 | MS. HEVERLY:  This is probably a decent time to |
| 12:24:43 | 12 | break since we are almost out of tape. |
| 12:24:49 | 13 | THE VIDEOGRAPHER:  We are off -- we are off the |
| 1   4:52 | 14 | record at 12:24, and this is the end of media number |
| 12:24:59 | 15 | one. |
| 13:26:41 | 16 | (Lunch recess.) |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Page 93

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  6:41 | 1 | <u>Afternoon Session</u>                                    1:25 P.M. |
| 13:26:41 | 2 | THE VIDEOGRAPHER:  We are now on the record at |
| 13:26:43 | 3 | 1:25 P.M.  This is the beginning of tape number two in |
| 13:26:47 | 4 | the deposition of Michael Cava on January 4th, 2007. |
| 13:26:54 | 5 | BY MS. HEVERLY: |
| 13:26:54 | 6 | Q.   When you were interviewing with Mr. Landis and |
| 13:26:59 | 7 | Mr. Wainwright, do you recall asking them for a |
| 13:27:01 | 8 | seventy-five-thousand-dollar base compensation? |
| 13:27:03 | 9 | A.   I don't remember that.  I -- I'm not sure.  I |
| 13:27:07 | 10 | don't remember that. |
| 13:27:09 | 11 | Q.   Do you recall asking for any specific dollar |
| 13:27:11 | 12 | amount of base compensation? |
| 13:27:13 | 13 | A.   I remember -- the way I remember it was that |
| 1   7:15 | 14 | they had said it's sixty-five thousand, and I said that |
| 13:27:19 | 15 | was fine, is the way I remember it. |
| 13:27:23 | 16 | Q.   When we broke we were talking about your first |
| 13:27:26 | 17 | period of leave of absence, which was from November 1st |
| 13:27:30 | 18 | through January 15th, 2005, correct? |
| 13:27:33 | 19 | A.   Yes. |
| 13:27:33 | 20 | Q.   And -- |
| 13:27:34 | 21 | A.   January 17th -- |
| 13:27:35 | 22 | Q.   Okay. |
| 13:27:36 | 23 | A.   -- was my first day back. |
| 13:27:37 | 24 | Q.   And nobody told you you couldn't take leave |
| 13:27:42 | 25 | during that period, correct? |

Page 94

DEPONENT:   MICHAEL CAVA     1-4-07

| | | |
|---|---|---|
| 1. .7:44 | 1 | A.   No. |
| 13:27:45 | 2 | Q.   And nobody at the company hassled you for |
| 13:27:47 | 3 | taking leave during that period; is that correct? |
| 13:27:52 | 4 | A.   I mean Joanna had told me that -- I mean she |
| 13:27:58 | 5 | had expressed that -- that I could only take a certain |
| 13:28:00 | 6 | amount of time off, that I wasn't eligible for family |
| 13:28:03 | 7 | leave. |
| 13:28:03 | 8 | Q.   How much time did she tell you you could take |
| 13:28:06 | 9 | off? |
| 13:28:07 | 10 | A.   I don't remember exactly.  I was feeling quite |
| 13:28:13 | 11 | a bit of pressure to get back to work myself for |
| 13:28:19 | 12 | the -- (pause). |
| 13:28:20 | 13 | Q.   Did anyone tell you you had to come back on the |
| 1   3:22 | 14 | 17th? |
| 13:28:24 | 15 | A.   I -- I know they had approved through January |
| 13:28:31 | 16 | 15th. |
| 13:28:31 | 17 | Q.   Did you ask to take leave beyond the 15th |
| 13:28:34 | 18 | before you came back? |
| 13:28:36 | 19 | A.   No. |
| 13:28:57 | 20 | MS. HEVERLY:  Let's mark -- what number are we |
| 13:28:59 | 21 | on?  I'm sorry. |
| 13:29:01 | 22 | THE REPORTER:  12. |
| 13:29:01 | 23 | MS. HEVERLY:  -- as number 12 a one-page letter |
| 13:29:04 | 24 | dated December 9th, 2004. |
| 13:29:24 | 25 | (Exhibit marked for identification: |

Page 95

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  9:24 | 1 | Deposition Exhibit Number 12.) |
| 13:29:27 | 2 | THE WITNESS:   (Reviewing document(s).) |
| 13:29:42 | 3 | BY MS. HEVERLY: |
| 13:29:42 | 4 | Q.   Do you recall receiving this letter in early |
| 13:29:43 | 5 | December 2004? |
| 13:29:44 | 6 | A.   I do. |
| 13:29:45 | 7 | Q.   Okay.  And it says in the letter that you |
| 13:29:46 | 8 | requested a personal leave without pay from December |
| 13:29:48 | 9 | 13th to January 12th, 2005. |
| 13:29:51 | 10 | Is that correct that you had requested a |
| 13:29:52 | 11 | personal leave without pay? |
| 13:29:53 | 12 | A.   I did.  I actually had requested to go off |
| 13:29:56 | 13 | without pay from the very beginning.  But, yes, I -- I |
| 1  0:01 | 14 | had requested that. |
| 13:30:02 | 15 | Q.   Okay.  And then it says your request was |
| 13:30:05 | 16 | approved.  Is that also accurate that they approved |
| 13:30:07 | 17 | your request? |
| 13:30:08 | 18 | A.   They had approved it, and then it was modified |
| 13:30:13 | 19 | to -- to be where it was with pay, actually.  That |
| 13:30:18 | 20 | wasn't my decision.  That was -- I believe that was |
| 13:30:21 | 21 | Scott Landis or Rob Macchi or somebody. |
| 13:30:26 | 22 | Q.   Okay.  And then it says that you would have to |
| 13:30:28 | 23 | continue pay (sic) your contribution for your health |
| 13:30:31 | 24 | insurance benefits, and that it was due on December |
| 13:30:33 | 25 | 15th, 2004. |

Page 96

DEPONENT:  MICHAEL CAVA    1-4-07

```
1   0:34   1        Did you in fact pay that, or because the leave
13:30:36   2  was paid, did you not have to pay it?
13:30:40   3     A.   They informed me not to pay that, that it was
13:30:42   4  just being taken out of the regular paycheck.
13:30:46   5     Q.   And your health insurance benefits were
13:30:49   6  continued through the whole period of the leave; is
13:30:52   7  that correct?
13:30:52   8     A.   They were -- they were interrupted at some
13:30:56   9  points, I don't remember when, but they -- it was at
13:31:00  10  least retroactively covered when -- when there was
13:31:03  11  periods of lapse.
13:31:05  12     Q.   Was it interrupted at all during that first
13:31:07  13  period of leave from December 2004 to January 2005?
1   1:12  14     A.   I don't remember the exact dates.
13:31:14  15     Q.   So you came back to work January 17th; is that
13:31:17  16  correct?
13:31:17  17     A.   Yes.
13:31:17  18     Q.   Did you report back to the South San Francisco
13:31:19  19  office?
13:31:20  20     A.   I did.
13:31:21  21     Q.   Did you meet with anybody when you came back?
13:31:25  22     A.   I did meet with Peter that day.  I had -- I had
13:31:30  23  been talking to a number of other reps in the office
13:31:32  24  that morning.
13:31:33  25     Q.   Did you request the meeting with Mr. Wainwright
```

Page 97

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1   1:35 | 1 | or did he request it? |
| 13:31:37 | 2 | A.   I requested it after I received an e-mail from |
| 13:31:41 | 3 | him. |
| 13:31:43 | 4 | Q.   What did the e-mail say? |
| 13:31:47 | 5 | A.   I'm -- I'm trying to remember.  I'm not a |
| 13:31:50 | 6 | hundred percent sure what was the 17th and the 18th.  I |
| 13:31:53 | 7 | apologize. |
| 13:31:55 | 8 | Q.   Okay.  But you do recall on one of those two |
| 13:31:57 | 9 | days getting an e-mail -- |
| 13:31:59 | 10 | A.   Yes. |
| 13:31:59 | 11 | Q.   -- from Mr. Wainwright? |
| 13:32:00 | 12 | A.   Yes. |
| 13:32:00 | 13 | Q.   You don't recall what the e-mail said? |
| 1   2:02 | 14 | A.   Well, there was a performance improvement plan. |
| 13:32:05 | 15 | I -- I don't remember which day it was.  And I was -- I |
| 13:32:08 | 16 | was upset about it and I wanted to go talk to him. |
| 13:32:11 | 17 | Q.   So then the -- the sequence of things as you |
| 13:32:16 | 18 | recall is you came back to work, you received an e-mail |
| 13:32:18 | 19 | from Mr. Wainwright that you saw as a performance |
| 13:32:21 | 20 | improvement plan, and then you met with him |
| 13:32:24 | 21 | afterwards? |
| 13:32:24 | 22 | A.   Yes. |
| 13:32:24 | 23 | Q.   Before receiving the e-mail had you had any |
| 13:32:27 | 24 | meetings with Mr. Wainwright? |
| 13:32:28 | 25 | A.   We had talked casually. |

Page 98

DEPONENT:  MICHAEL CAVA    1-4-07

1.   5:46      1  revenue.

13:35:47    2      Q.   But he didn't give you any particular time

13:35:48    3  frame?  He didn't say "next month," "next year," "next

13:35:52    4  week"?

13:35:53    5      A.   It was really clear that I needed to do it

13:35:55    6  right away or I wouldn't have a job.

13:36:01    7      Q.   All right.  Now, going back to January when you

13:36:03    8  came back from your leave, you got this -- this e-mail.

13:36:07    9  What did you do when you received it?

13:36:10   10      A.   I was upset, and I went in and talked to Peter,

13:36:14   11  which at that time we -- we had a closed-door meeting.

13:36:18   12      Q.   What about this e-mail was upsetting to you?

13:36:22   13      A.   I had been doing a good job; I was over quota.

1    5:26   14  And I had been off for a period of time, which I was

13:36:29   15  willing to go off without pay.  I was grateful that the

13:36:32   16  company paid me, but I would have been off without pay.

13:36:36   17          And I was upset that I was being accountable

13:36:39   18  for revenue during that time.  And I just -- I thought

13:36:44   19  it was very unfair.  I had -- it had not been conveyed

13:36:47   20  to me that I was doing a bad job.

13:36:49   21      Q.   What in the e-mail led you to believe that you

13:36:51   22  were being held accountable for revenue during the

13:36:54   23  period you were on leave?

13:36:55   24      A.   I was put on a performance improvement plan

13:36:57   25  based on my 2004 results.  I was off dealing with my

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ _7:01 | 1 | son in 2004. |
| 13:37:04 | 2 | Q.   Prior to going out on leave, so prior to |
| 13:37:07 | 3 | November 1st of 2004, had you been meeting all of the |
| 13:37:11 | 4 | expectations of your job? |
| 13:37:13 | 5 | A.   Yeah, absolutely. |
| 13:37:14 | 6 | Q.   You had a funnel of four times quota at that |
| 13:37:16 | 7 | time? |
| 13:37:16 | 8 | A.   I believe I did. |
| 13:37:22 | 9 | Q.   Okay. |
| 13:37:22 | 10 | A.   I had -- I had millions of dollars in proposals |
| 13:37:25 | 11 | out there. |
| 13:37:30 | 12 | Q.   And did you have new sales of a hundred and |
| 13:37:32 | 13 | fifty to two hundred dollars per month -- two hundred |
| 1   7:34 | 14 | thousand per month? |
| 13:37:36 | 15 | A.   That was a new thing that had never been |
| 13:37:39 | 16 | mentioned to me before, before that day. |
| 13:37:44 | 17 | Q.   In the first paragraph of the e-mail it says, |
| 13:37:46 | 18 | "The required run" -- "run rate of fifty K of GPM per |
| 13:37:51 | 19 | month."  What does that mean to you? |
| 13:37:54 | 20 | A.   That I had to bring in fifty thousand of gross |
| 13:37:57 | 21 | profit per month. |
| 13:37:59 | 22 | Q.   Did you understand before this e-mail that that |
| 13:38:02 | 23 | was an expectation? |
| 13:38:05 | 24 | A.   Yes, and I had been doing it. |
| 13:38:07 | 25 | Q.   So prior to your leave you had been bringing in |

Page 102

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  39:41 | 1 | itself. |
| 13:39:41 | 2 | THE WITNESS:  It says "new sales." |
| 13:39:47 | 3 | It also mentions further down that he's |
| 13:39:52 | 4 | unhappy -- I mean I'm paraphrasing, but he's unhappy |
| 13:39:55 | 5 | that I have been achieving revenue off of existing |
| 13:39:59 | 6 | accounts. |
| 13:40:02 | 7 | BY MS. HEVERLY: |
| 13:40:02 | 8 | Q.  But you understood that you were supposed to |
| 13:40:04 | 9 | bring in new business as well as get business from |
| 13:40:07 | 10 | existing accounts, didn't you? |
| 13:40:09 | 11 | A.  And I was working very diligently on that. |
| 13:40:11 | 12 | Q.  And as of the time you went out on leave on |
| 13:40:13 | 13 | November 4th, you hadn't gotten any new business other |
| 1  0:15 | 14 | than a very small sale for a couple hundred dollars? |
| 13:40:17 | 15 | A.  I was on track to bring in a good deal of |
| 13:40:21 | 16 | business.  I had quoted a good deal of business. |
| 13:40:23 | 17 | Q.  But all of it was from existing accounts, |
| 13:40:26 | 18 | correct? |
| 13:40:26 | 19 | A.  No, I had quoted much new business; it just |
| 13:40:29 | 20 | hadn't closed yet. |
| 13:40:34 | 21 | Q.  And I apologize if I asked you this before, but |
| 13:40:37 | 22 | I don't recall, what -- what clients or what accounts |
| 13:40:39 | 23 | had you quoted new business for that hadn't closed yet? |
| 13:40:44 | 24 | A.  Oh, I had -- I had met with a number of |
| 13:40:46 | 25 | customers.  I had -- I don't recall when I responded to |

Page 104

DEPONENT:  MICHAEL CAVA    1-4-07

1_ .0:49    1  the RFP for AOL's maintenance that later resulted in a

13:40:54    2  win for NetVersant.

13:40:58    3       I was -- I was talking with most of my previous

13:41:02    4  customers at Shared Technologies.

13:41:04    5    Q.   But none of them ever translated into business

13:41:07    6  for NetVersant, correct?

13:41:08    7    A.   I -- it would have.  It hadn't yet.

13:41:19    8    Q.   So what in this e-mail was a new expectation

13:41:22    9  that you were -- had -- had not been given before?

13:41:26   10    A.   That it -- that it was unacceptable that I was

13:41:29   11  generating revenue off of existing accounts.  I -- it's

13:41:35   12  never -- it had never been stated to me before that I

13:41:38   13  was expected to bring in that much new business.

1   1:41   14    Q.   Is that the only thing that's a new expectation

13:41:44   15  in this e-mail?

13:41:45   16    A.   It had never been conveyed to me that I was

13:41:47   17  doing a bad job.

13:41:49   18    Q.   Okay.  Anything else that's a new expectation

13:41:51   19  or a new communication?

13:41:55   20    A.   I felt -- I felt singled out.  I -- I was the

13:41:59   21  only person over quota to be put on a plan.

13:42:03   22    Q.   Do you know whether any other account

13:42:05   23  executives were given the same expectations?

13:42:08   24    A.   I don't know, but I would seriously doubt it.

13:42:13   25  I have never heard of that in the business.

Page 105

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1 .3:21 | 1 | MS. HEVERLY:  All right.  Let's mark as |
| 13:43:22 | 2 | Exhibit -- |
| 13:43:23 | 3 | BY MS. HEVERLY: |
| 13:43:23 | 4 | Q.  Oh, well, let's talk about I guess first the |
| 13:43:25 | 5 | meeting with Mr. Wainwright. |
| 13:43:26 | 6 | So you had a meeting with Mr. Wainwright after |
| 13:43:28 | 7 | receiving the e-mail; is that correct? |
| 13:43:30 | 8 | A.  Yes. |
| 13:43:30 | 9 | Q.  Was it the same day or the next day? |
| 13:43:33 | 10 | A.  I'm pretty sure it was immediately after I |
| 13:43:35 | 11 | received it. |
| 13:43:35 | 12 | Q.  Was it in person? |
| 13:43:38 | 13 | A.  Yes. |
| 1  3:38 | 14 | Q.  What did you discuss? |
| 13:43:39 | 15 | A.  And -- and after seeing this.  So it was the |
| 13:43:41 | 16 | Tuesday, the 18th, that the meeting happened. |
| 13:43:44 | 17 | Q.  Okay.  Was it in Mr. Wainwright's office? |
| 13:43:47 | 18 | A.  Yes. |
| 13:43:47 | 19 | Q.  What did you discuss? |
| 13:43:50 | 20 | A.  That this was unfair; that I had been off; that |
| 13:43:55 | 21 | I had hit my numbers the year before. |
| 13:44:00 | 22 | Q.  What did he say? |
| 13:44:03 | 23 | A.  He expressed that I needed to bring in new |
| 13:44:09 | 24 | revenue, and that it wasn't acceptable that that was |
| 13:44:12 | 25 | coming off of existing accounts, even if it was new |

Page 107

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ .4:16 | 1 | opportunities in existing accounts. |
| 13:44:18 | 2 | He expressed I was doing a poor job, which was |
| 13:44:21 | 3 | shocking to me because I had never been told that |
| 13:44:23 | 4 | before. |
| 13:44:27 | 5 | Q.   But expressing that you needed to bring in new |
| 13:44:31 | 6 | accounts wasn't a new message, was it? |
| 13:44:33 | 7 | A.   I was working on new accounts.   No.   I mean -- |
| 13:44:37 | 8 | (pause). |
| 13:44:37 | 9 | Q.   So you just didn't -- you just hadn't been told |
| 13:44:40 | 10 | that you were doing a poor job; is that correct? |
| 13:44:42 | 11 | A.   That I -- I hadn't been told that I was doing a |
| 13:44:45 | 12 | poor job or that -- yeah, that I was doing anything |
| 13:44:48 | 13 | wrong up until then. |
| 1  4:52 | 14 | Q.   Okay.   What else was discussed during that |
| 13:44:53 | 15 | meeting? |
| 13:45:02 | 16 | A.   I don't know. |
| 13:45:06 | 17 | MS. HEVERLY:   Let me go try to stop that noise. |
| 13:45:08 | 18 | Hold on. |
| 13:45:28 | 19 | (Discussion off the record.) |
| 13:45:28 | 20 | THE VIDEOGRAPHER:   Shall I go off record? |
| 13:45:30 | 21 | MS. HEVERLY:   Yeah. |
| 13:45:30 | 22 | THE VIDEOGRAPHER:   We are off the record at |
| 13:45:32 | 23 | 1:44. |
| 13:46:01 | 24 | (Discussion off the record.) |
| 13:46:02 | 25 | THE VIDEOGRAPHER:   We're back on the record at |

Page 108

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ _0:26 | 1 | me in the office.  You could hear it behind closed |
| 13:50:29 | 2 | doors. |
| 13:50:30 | 3 | Q.   Did you approach her or did she approach you? |
| 13:50:33 | 4 | A.   She approached me. |
| 13:50:34 | 5 | Q.   What did she say? |
| 13:50:37 | 6 | A.   "Don't -- don't be offended by it," you know. |
| 13:50:40 | 7 | "It's" -- you know, "Peter -- Peter is Peter," type of |
| 13:50:46 | 8 | thing. |
| 13:50:47 | 9 | I'm paraphrasing.  I mean it was a, "Hey, look, |
| 13:50:52 | 10 | you know, just don't worry about it.  Let's just work, |
| 13:50:54 | 11 | and we all support you here." |
| 13:50:57 | 12 | Q.   And what did you say to her? |
| 13:50:58 | 13 | A.   I appreciated it.  I didn't realize anybody |
| 1   1:00 | 14 | heard it through the door. |
| 13:51:02 | 15 | Q.   Is that how you took it as well, that it was |
| 13:51:05 | 16 | just Peter being Peter? |
| 13:51:08 | 17 | A.   That's a comment that I had heard before. |
| 13:51:15 | 18 | Q.   Did you talk to anyone else about the meeting |
| 13:51:17 | 19 | the day that it happened? |
| 13:51:18 | 20 | A.   No. |
| 13:51:25 | 21 | Oh, I -- I take that back.  I'm sorry. |
| 13:51:26 | 22 | I did -- when I left the office, I did contact |
| 13:51:30 | 23 | Joanna Cotter, who was copied on the performance |
| 13:51:32 | 24 | improvement plan. |
| 13:51:37 | 25 | Q.   You talked to her over the telephone? |

Page 113

TALTY COURT REPORTERS, INC.   408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ _1:38 | 1 | A.    Yes.   I called her from my cell phone on my way |
| 13:51:43 | 2 | home that afternoon. |
| 13:51:45 | 3 | Q.    What did you and Ms. Cotter talk about? |
| 13:51:50 | 4 | A.    I -- I was very upset about this performance |
| 13:51:52 | 5 | improvement plan, and, you know, I wanted to know what |
| 13:51:58 | 6 | to do and why this was happening. |
| 13:52:00 | 7 | Q.    What did she tell you? |
| 13:52:01 | 8 | A.    She had no explanation for it.   She seemed |
| 13:52:06 | 9 | shaken by it, that it didn't seem appropriate.   And she |
| 13:52:10 | 10 | just kept encouraging me to call Scott Landis. |
| 13:52:14 | 11 | Q.    Did she tell you it was inappropriate? |
| 13:52:16 | 12 | A.    No, she -- but she was -- I could tell she was |
| 13:52:19 | 13 | upset. |
| 1  2:22 | 14 | Q.    And she told you to call Mr. Landis? |
| 13:52:29 | 15 | A.    Yes. |
| 13:52:29 | 16 | Q.    How long was your conversation with Ms. Cotter? |
| 13:52:32 | 17 | A.    Maybe ten minutes.   I don't remember. |
| 13:52:37 | 18 | Q.    Anything else that you discussed during that |
| 13:52:39 | 19 | conversation? |
| 13:52:39 | 20 | A.    No.   It was really just all surrounding that. |
| 13:52:44 | 21 | Q.    All right. |
| 13:52:45 | 22 | A.    It was a -- it was a complete shock. |
| 13:52:47 | 23 | Q.    Is your cell phone -- or at the time was your |
| 13:52:49 | 24 | cell phone provided by NetVersant? |
| 13:52:51 | 25 | A.    No.   It's my personal. |

Page 114

DEPONENT:   MICHAEL CAVA    1-4-07

```
1  2:53    1    Q.   Did they pay for the phone bills?

13:52:55   2    A.   They -- there was an offer to.  I never

13:52:58   3  submitted any receipts for it.

13:53:08   4    Q.   Why not?

13:53:12   5    A.   I just hadn't gotten around to it when I was

13:53:16   6  there.

13:53:18   7    Q.   Okay.  So you called Ms. Cotter on your way

13:53:21   8  home.  Did you talk to anyone else that evening?

13:53:25   9    A.   I had talked to Scott Landis.

13:53:26  10    Q.   You talked to Scott Landis as you were driving

13:53:29  11  home as well?

13:53:30  12    A.   I believe it was that day.  It could have been

13:53:31  13  the next day.  I believe it was that day.

1  3:33   14    Q.   What did you say to Mr. Landis?

13:53:36  15    A.   "Why is this happening?  I -- I -- this seems

13:53:39  16  unfair.  I hit my numbers last year.  I have -- you

13:53:42  17  know, I want to -- I really want this job to work out;

13:53:46  18  I want to do a good job here.  I feel like you guys

13:53:49  19  were supportive of me through what was going on with my

13:53:53  20  son.  And it just doesn't seem fair."

13:53:58  21         He -- he assured me I had nothing to worry

13:54:01  22  about, that I wasn't on a performance improvement

13:54:04  23  plan.

13:54:06  24    Q.   Was this a telephone conference you had with

13:54:09  25  Mr. Landis?
```

Page 115

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1   .4:10 | 1 | A.   Yes. |
| 13:54:10 | 2 | Q.   How long did that last? |
| 13:54:12 | 3 | A.   Maybe fifteen minutes. |
| 13:54:22 | 4 | Q.   Okay.  He said you had nothing to worry about. |
| 13:54:24 | 5 | What else did he say? |
| 13:54:26 | 6 | A.   I -- I wanted to get clarification on that.  I |
| 13:54:31 | 7 | wanted something in writing rescinding it because it |
| 13:54:36 | 8 | was -- it was formally in writing.  And he just kept |
| 13:54:39 | 9 | expressing, "Hey, look, you have got nothing to worry |
| 13:54:43 | 10 | about.  Don't worry about it.  You are doing a good |
| 13:54:45 | 11 | job.  And you are not in danger for your job here.  And |
| 13:54:52 | 12 | we want you to be here." |
| 13:54:54 | 13 | Q.   Anything else you can recall him saying? |
| 1   4:56 | 14 | A.   It just kind of kept going back and forth on |
| 13:54:59 | 15 | that issue.  And then finally he said that he was not |
| 13:55:04 | 16 | going to go against his VP of sales, and -- but, you |
| 13:55:07 | 17 | know, so he wasn't going to do something in -- in |
| 13:55:10 | 18 | writing, but that I had nothing to worry about. |
| 13:55:15 | 19 | Q.   Did the plan -- other than upsetting you |
| 13:55:19 | 20 | perhaps, did the plan cause any negative consequences? |
| 13:55:25 | 21 | A.   You know, it was what it was, and I just |
| 13:55:30 | 22 | decided to -- to deal with it, try to do the best job I |
| 13:55:35 | 23 | could like I had done in the past. |
| 13:55:36 | 24 | Q.   Did you lose any pay because of it? |
| 13:55:40 | 25 | A.   No. |

Page 116

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1.  5:50 | 1 | Q.  So you talked to Mr. Landis that evening, you |
| 13:55:54 | 2 | think, or perhaps the next day? |
| 13:55:55 | 3 | A.  Yes. |
| 13:55:55 | 4 | Q.  Did you talk to anyone else the next day about |
| 13:55:57 | 5 | the issue? |
| 13:56:00 | 6 | A.  Not that I can recall.  I may have talked to |
| 13:56:02 | 7 | Joanna one more time about the contents of that call. |
| 13:56:05 | 8 | I don't recall. |
| 13:56:06 | 9 | Q.  And then the next day you went out on leave; is |
| 13:56:10 | 10 | that correct? |
| 13:56:10 | 11 | A.  No. |
| 13:56:11 | 12 | Q.  What -- what happened next? |
| 13:56:12 | 13 | A.  I actually went out on leave on January 26th. |
| 1   6:16 | 14 | I continued to try to get back engaged with my |
| 13:56:20 | 15 | customers, work with the other reps that had been |
| 13:56:23 | 16 | filling in on the accounts, get caught up with what was |
| 13:56:25 | 17 | going on.  And -- |
| 13:56:27 | 18 | Q.  So you continued to work until January 26th? |
| 13:56:29 | 19 | A.  Yes.  And I reached out to accounts that I had |
| 13:56:32 | 20 | been working with, new opportunities. |
| 13:56:35 | 21 | MS. HEVERLY:  Let's mark as Exhibit 14 a |
| 13:56:39 | 22 | one-page doctor's note from Neil Okamura. |
| 13:56:59 | 23 | (Exhibit marked for identification: |
| 13:56:59 | 24 | Deposition Exhibit Number 14.) |
| 13:57:14 | 25 | THE WITNESS:  (Reviewing document(s).) |

Page 117

TALTY COURT REPORTERS, INC.  408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. ᴐ7:14 | 1 | BY MS. HEVERLY: |
| 13:57:14 | 2 | Q.   Have you seen this note before? |
| 13:57:16 | 3 | A.   Yes. |
| 13:57:16 | 4 | Q.   So this note says -- I think it says |
| 13:57:18 | 5 | "Disability form signed on 1-19-05."  Is that |
| 13:57:21 | 6 | incorrect? |
| 13:57:21 | 7 | A.   It does say that, and I believe -- |
| 13:57:27 | 8 | MR. IANNITELLI:  Just wait until she's asked |
| 13:57:27 | 9 | it. |
| 13:57:27 | 10 | THE WITNESS:  Okay. |
| 13:57:27 | 11 | BY MS. HEVERLY: |
| 13:57:28 | 12 | Q.   Is that incorrect? |
| 13:57:28 | 13 | A.   No, that's -- that's correct. |
| 1  7:29 | 14 | Q.   I see. |
| 13:57:30 | 15 | A.   I don't know if it was issued on 1-19, but it |
| 13:57:34 | 16 | does say that. |
| 13:57:35 | 17 | Q.   You did not go out on leave on the 19th? |
| 13:57:38 | 18 | A.   No, I did not. |
| 13:57:38 | 19 | Q.   You worked until the 26th? |
| 13:57:41 | 20 | A.   Yes. |
| 13:57:41 | 21 | Q.   And then you went out on leave starting the |
| 13:57:42 | 22 | 26th or starting the 27th? |
| 13:57:46 | 23 | A.   I guess technically the 27th.  The 26th I |
| 13:57:52 | 24 | probably -- I mean the afternoon of the 26th is when I |
| 13:57:55 | 25 | had to stop working. |

Page 118

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1   ,0:40 | 1 | Q.   At Stanford? |
| 14:00:48 | 2 | A.   Yes. |
| 14:00:48 | 3 | Q.   Okay.  So you went to see Dr. Okamura on the |
| 14:00:51 | 4 | 19th.  And did you ask him to put you on disability at |
| 14:00:55 | 5 | that time? |
| 14:00:56 | 6 | A.   I -- I told him what my symptoms were, what I |
| 14:01:00 | 7 | was having trouble with, and he recommended it. |
| 14:01:03 | 8 | Q.   He recommended what? |
| 14:01:04 | 9 | A.   To go off on disability. |
| 14:01:06 | 10 | I had -- I mean I was just having -- I was |
| 14:01:09 | 11 | having major coping problems.  My -- I had found out my |
| 14:01:12 | 12 | son had residual tumor that we had all thought was all |
| 14:01:16 | 13 | gone.  He had just started chemotherapy that was making |
| 1   1:19 | 14 | him very, very sick.  It was -- it was very -- very |
| 14:01:22 | 15 | devastating time. |
| 14:01:23 | 16 | Q.   So he recommended that you go off work on the |
| 14:01:25 | 17 | 19th, but then you continued working for another week; |
| 14:01:29 | 18 | is that correct? |
| 14:01:29 | 19 | A.   I went against his orders and tried to keep |
| 14:01:31 | 20 | working.  I wanted everything to work out. |
| 14:01:32 | 21 | Q.   So you worked until the 26th and then what |
| 14:01:35 | 22 | happened on the 26th that caused you to not work? |
| 14:01:37 | 23 | A.   My son was having severe reactions with the |
| 14:01:41 | 24 | chemotherapy, and he almost died that day. |
| 14:01:44 | 25 | Q.   So you had an incident with your son that |

Page 121

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  1:48 | 1 | caused even more stress, right? |
| 14:01:49 | 2 | A.   We had to rush him to the hospital.  He was -- |
| 14:01:52 | 3 | he was admitted to the hospital immediately.  He was |
| 14:01:55 | 4 | vomiting out of control.  His blood counts, his white |
| 14:01:58 | 5 | blood cell counts, had gone zero. |
| 14:02:01 | 6 | Q.   So I thought -- correct me if I'm wrong, and |
| 14:02:03 | 7 | I'm not trying to be difficult, but I thought you said |
| 14:02:05 | 8 | on the 19th he was still in the hospital at Stanford. |
| 14:02:07 | 9 | Did he get out of the hospital then at some |
| 14:02:09 | 10 | point? |
| 14:02:09 | 11 | A.   He got out on the -- I believe it was the |
| 14:02:12 | 12 | 21st. |
| 14:02:14 | 13 | Q.   Okay.  And then on the 26th he had to be |
| 1  2:16 | 14 | readmitted? |
| 14:02:18 | 15 | A.   Yes. |
| 14:02:18 | 16 | Q.   Okay.  And so then starting the 26th you asked |
| 14:02:20 | 17 | for another leave of absence, correct? |
| 14:02:23 | 18 | A.   Yes.  I submitted the -- I believe it was |
| 14:02:26 | 19 | either the 26th or the 27th I submitted the -- the |
| 14:02:29 | 20 | paperwork to Joanna. |
| 14:02:46 | 21 | Q.   How did you submit them? |
| 14:02:50 | 22 | A.   I don't remember if I faxed it or scanned it |
| 14:02:52 | 23 | and e-mailed it. |
| 14:02:54 | 24 | Q.   Okay.  And did you get any response from |
| 14:02:56 | 25 | Ms. Cotter or anyone else? |

Page 122

DEPONENT:   MICHAEL CAVA    1-4-07

1  ⌐2:58   1     A.   Yes.

14:03:00   2     Q.   What was the response?

14:03:01   3     A.   She inquired to the nature of it.  She was

14:03:06   4  concerned that maybe that it was work-related because

14:03:10   5  of what had happened a week before, and I expressed no,

14:03:16   6  that it wasn't; these are my -- my own personal issues,

14:03:19   7  I'm having trouble coping with what's going on, and my

14:03:25   8  doctor had recommended I go out on disability.

14:03:28   9     Q.   Okay.  And then what else did she say, if

14:03:30  10  anything?

14:03:33  11     A.   She expressed that I wasn't -- I wasn't

14:03:38  12  protected because I wasn't eligible for family leave.

14:03:45  13     Q.   Did you know what that meant?

1   3:48  14     A.   That -- that it meant that, according to her,

14:03:50  15  that I could lose my job.

14:03:59  16     Q.   Okay.  Did you -- did she say anything else to

14:04:01  17  you at that time?

14:04:02  18     A.   No.  I mean she -- she, you know, expressed

14:04:10  19  sympathy for what I was going through.  She was always

14:04:12  20  very sympathetic.

14:04:17  21     Q.   Did she tell you whether or not NetVersant

14:04:20  22  would grant the leave you requested?

14:04:23  23     A.   I don't remember for sure.  I -- I believe -- I

14:04:27  24  believe she had to check.  I'm not sure.

14:04:30  25     Q.   Okay.  At some point did you find out whether

Page 123

DEPONENT: MICHAEL CAVA 1-4-07

```
1  J4:32   1   or not your leave was being granted?
14:04:34   2      A.   Yes, I did find out it was.
14:04:36   3      Q.   Do you recall how you found out it was being
14:04:38   4   granted?
14:04:38   5      A.   I mean it wasn't -- I mean it wasn't a leave.
14:04:41   6   I was off on disability, so -- I was -- I was told that
14:04:44   7   I wasn't going to be terminated.
14:04:48   8      Q.   Okay.  But they gave you a leave of absence to
14:04:49   9   deal with your disability, correct?
14:04:51  10           MR. IANNITELLI:  Calls for speculation.
14:04:53  11           THE WITNESS:  I -- I don't think it was a leave
14:04:57  12   of absence.
14:04:57  13   BY MS. HEVERLY:
1  4:57   14      Q.   What was it, then?
14:05:00  15      A.   I -- I don't know.  I was off on disability.
14:05:04  16      Q.   But it wasn't a disability leave of absence?
14:05:08  17      A.   My doctor recommended I would -- I guess that's
14:05:11  18   what you call it.  I -- I'm not a doctor.  I don't
14:05:14  19   know.
14:05:14  20      Q.   So it was time off from work to take care of
14:05:17  21   your disability, correct?
14:05:19  22      A.   My -- my doctor recommended that I could not
14:05:21  23   work at that time.
14:05:22  24      Q.   And NetVersant allowed you to take the time off
14:05:25  25   work -- from work, correct?
```

Page 124

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  5:26 | 1 | A.   They did not terminate me. |
| 14:05:28 | 2 | Q.   Did they stop paying you your salary at that |
| 14:05:33 | 3 | time? |
| 14:05:33 | 4 | A.   Yes. |
| 14:05:33 | 5 | Q.   Did they continue your health insurance |
| 14:05:36 | 6 | benefits? |
| 14:05:37 | 7 | A.   They -- if I recall correctly, they -- yeah, I |
| 14:05:45 | 8 | believe I just had to -- I had to write a check for the |
| 14:05:48 | 9 | part that would be deducted out of my -- my paycheck. |
| 14:05:58 | 10 | Q.   Do you know if that continued for the whole |
| 14:06:00 | 11 | period from January to August, whether they continued |
| 14:06:04 | 12 | to pay the employer's share of the health insurance? |
| 14:06:09 | 13 | A.   Yes, I -- I believe they did. |
| 1   6:23 | 14 | Q.   Did you have any communications with Peter |
| 14:06:26 | 15 | Wain- -- Peter Wainwright about your disability leave |
| 14:06:28 | 16 | in January 2005? |
| 14:06:33 | 17 | A.   Just that I was off on disability leave. |
| 14:06:36 | 18 | Q.   You actually -- |
| 14:06:38 | 19 | A.   And -- |
| 14:06:37 | 20 | Q.   -- talked to him about that? |
| 14:06:39 | 21 | A.   Yes.  We -- we had to make arrangements for the |
| 14:06:41 | 22 | customers. |
| 14:06:43 | 23 | Q.   Did you tell him what your disability was? |
| 14:06:48 | 24 | A.   Just that it was stress-related surrounding my |
| 14:06:52 | 25 | son. |

Page 125

DEPONENT:  MICHAEL CAVA    1-4-07

1  6:56   1      Q.   Anything else?

14:06:58   2      A.   No.  I mean most of the discussion was always

14:07:00   3   just about business, and arrangements for the

14:07:03   4   customers, who was going to cover them.

14:07:07   5      Q.   And the original expectation, as we saw from

14:07:11   6   that note, was that you come back on April 15th, 2005?

14:07:14   7           Or maybe it was April 19th.  April 19th, 2005.

14:07:19   8           Was that your original understanding of how

14:07:21   9   long the leave would be?

14:07:24   10     A.   I -- I -- we didn't know at that point.  My --

14:07:30   11   my belief is that I think that's all the doctor can

14:07:34   12   write for at that point.

14:07:36   13     Q.   At the time were you seeing any other

1   7:38   14   doctors -- aside from potentially talking to counselors

14:07:41   15   or social workers, or whatever at the hospital, were

14:07:43   16   you seeing any doctors specifically for your

14:07:46   17   condition?

14:07:46   18     A.   No, just Dr. Okamura.

14:07:48   19     Q.   And was Dr. Okamura prescribing any medication

14:07:52   20   to you at that time?

14:07:53   21     A.   Yes, had been, and continued to, and changed

14:07:55   22   that medication over time.

14:08:00   23     Q.   How often did you see Dr. Okamura from January

14:08:04   24   19th to April 19th, 2005?

14:08:07   25     A.   I don't recall.  Regularly.

Page 126

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  ,8:12 | 1 | Q.   Did you return to work on April 19th, 2005? |
| 14:08:16 | 2 | A.   No. |
| 14:08:17 | 3 | Q.   What happened on April 19th? |
| 14:08:21 | 4 | A.   Dr. Okamura extended it. |
| 14:08:24 | 5 | Q.   For how long? |
| 14:08:27 | 6 | A.   I don't recall.  There was a -- there was more |
| 14:08:31 | 7 | than one continuance. |
| 14:08:40 | 8 | MS. HEVERLY:  Are we on 15? |
| 14:08:41 | 9 | Okay.  I'll mark as number 15 a two-page e-mail |
| 14:08:44 | 10 | dated April 11th, 2005. |
| 14:09:02 | 11 | (Exhibit marked for identification: |
| 14:09:02 | 12 | Deposition Exhibit Number 15.) |
| 14:09:21 | 13 | THE WITNESS:  (Reviewing document(s).) |
| 1  9:21 | 14 | BY MS. HEVERLY: |
| 14:09:21 | 15 | Q.   Is this an e-mail you sent to Ms. Cotter on or |
| 14:09:24 | 16 | around April 11th, 2005? |
| 14:09:26 | 17 | A.   Yes. |
| 14:09:28 | 18 | Q.   So I see from the attached note it says he |
| 14:09:32 | 19 | extended it to June 19th, 2005. |
| 14:09:35 | 20 | A.   Yes. |
| 14:09:35 | 21 | Q.   Did you have any discussions with Ms. Cotter |
| 14:09:36 | 22 | around this time about your disability extension? |
| 14:09:42 | 23 | A.   I don't recall exactly the content of it, but, |
| 14:09:45 | 24 | yes, I mean I -- I let her know and we talked about it. |
| 14:09:48 | 25 | Q.   Did she tell you whether or not NetVersant was |

Page 127

DEPONENT:   MICHAEL CAVA    1-4-07

```
1  _0:48    1    A.   May 15th -- or May -- sorry.  May -- May 17th,
14:10:54    2  I think.  I -- I'm not sure.  Sometime in May.
14:11:24    3    Q.   Okay.  And then it's -- I think I just asked
14:11:27    4  you this:  At some point it got extended again,
14:11:30    5  correct?
14:11:30    6    A.   Yes.
14:11:30    7    Q.   To August 1st, 2005; is that correct?
14:11:33    8    A.   I -- that -- that sounds correct.  It could
14:11:36    9  have been July 30th or 31st.
14:11:42   10         MS. HEVERLY:  All right.  Let's mark as number
14:11:43   11  16 a two-page e-mail dated July 29th, 2005.
14:12:05   12         (Exhibit marked for identification:
14:12:05   13         Deposition Exhibit Number 16.)
1   2:07   14         THE WITNESS:  (Reviewing document(s).)
14:12:10   15         (Whereupon, Mr. Wainwright exited
14:12:13   16         the conference room.)
14:12:14   17  BY MS. HEVERLY:
14:12:14   18    Q.   Do you recall seeing Dr. Okamura on or around
14:12:16   19  July 29th, 2005?
14:12:18   20    A.   Yes.
14:12:19   21    Q.   And did he tell you that he thought you were
14:12:21   22  ready to go back to work?
14:12:23   23    A.   He issued a release.  I -- I requested that I
14:12:27   24  needed to.  I was on the last -- yeah, he did sign a
14:12:34   25  release.
```

Page 129

DEPONENT:  MICHAEL CAVA   1-4-07

```
 1  .2:36   1    Q.   You started to say you were on the last --

14:12:42   2    A.   It -- it wasn't relevant to your question.

14:12:44   3 Sorry.

14:12:51   4    Q.   Okay.  Was there any particular reason why you

14:12:53   5 requested for him to release you to work -- to go back

14:12:55   6 to work on the 29th?

14:12:57   7    A.   In June when it was extended again, Joanna had

14:13:01   8 expressed that if I was gone more than six months, they

14:13:06   9 could terminate me no matter what; that -- and that it

14:13:11  10 said that in the employee handbook.

14:13:23  11    Q.   Is that the first time you had heard that you

14:13:26  12 could be terminated after six months?

14:13:28  13    A.   Yes.  I mean the last time I had heard that I

 1   3:31  14 could be terminated was at the beginning.

14:13:35  15    Q.   Can you explain that?  You heard you'd be

14:13:37  16 terminated at the beginning of what?

14:13:39  17    A.   Oh, when I first went out on disability, I was

14:13:42  18 informed by Joanna that I could be terminated because I

14:13:45  19 wasn't eligible for family leave.

14:13:47  20    Q.   Oh, because you didn't have any job

14:13:49  21 protection?

14:13:50  22    A.   Yeah, when I was off on disability, it didn't

14:13:52  23 matter.

14:13:53  24    Q.   Okay.  And then she told you in June when your

14:13:55  25 leave was extended that you -- that the policy was
```

Page 130

DEPONENT:   MICHAEL CAVA    1-4-07

1   3:58   1  after six months of leave you could be terminated,
14:14:01   2  correct?
14:14:01   3      A.   That my job was in jeopardy, she was going to
14:14:04   4  check.
14:14:06   5      Q.   Okay.  And did she check and get back to you?
14:14:07   6      A.   Yes.  I was -- at that point we knew when we
14:14:10   7  were going to be back from radiation and -- and
14:14:14   8  treatment at St. Jude, and so I had promised I would
14:14:18   9  get back to work on that -- on -- on August 1st.
14:14:28  10      Q.   And as of August 1st you had already been out
14:14:31  11  on leave for more than six months, correct?
14:14:38  12      A.   I guess, yes, six months.  Would have been a
14:14:40  13  few days past six months.
1   4:48  14      Q.   Plus you had had the leave the three months
14:14:52  15  prior to that?
14:14:53  16          I mean you were out on leave essentially from
14:14:56  17  November 1st of 2004, correct, with only a week or two
14:15:00  18  back at work?
14:15:02  19          MR. IANNITELLI:  Lacks foundation, misstates
14:15:03  20  testimony.
14:15:04  21          Go ahead.  You can answer.
14:15:07  22          THE WITNESS:  Okay.
14:15:07  23          I -- I don't know what you would call it that I
14:15:11  24  was out.  I was on pay.  I was still coordinating with
14:15:16  25  reps, returning some customers calls, providing

Page 131

DEPONENT:  MICHAEL CAVA    1-4-07

```
1  .5:19    1  documentation on quotes that were done along the way,
14:15:22    2  taking phone calls from reps.
14:15:24    3  BY MS. HEVERLY:
14:15:24    4     Q.   So you didn't count that time as being off
14:15:26    5  work?
14:15:30    6     A.   I -- I'm not an expert in what is and what
14:15:33    7  isn't time off work.
14:15:37    8     Q.   Well, it's not real -- doesn't really call for
14:15:39    9  an expert opinion.  Were you working or were you not
14:15:41   10  working?
14:15:43   11     A.   I was supplying information as needed.  I was
14:15:46   12  on call and available when they needed me.
14:15:48   13     Q.   Were you working full time?
1   5:49   14     A.   No.
14:15:49   15     Q.   Were you working fifty percent time?
14:15:51   16     A.   No.
14:15:52   17     Q.   What percent time were you working?
14:15:55   18          MR. IANNITELLI:  I think that's been asked and
14:16:00   19  answered.  He doesn't --
14:16:00   20          THE WITNESS:  I'm not sure.
14:16:01   21          MR. IANNITELLI:  -- know.
14:16:03   22  BY MS. HEVERLY:
14:16:03   23     Q.   Okay.  So in June she told you you could be
14:16:07   24  terminated after six months, and at that point you
14:16:09   25  promised to come back August 1st, correct?
```

Page 132

DEPONENT:   MICHAEL CAVA    1-4-07

```
1   6:11    1      A.   Yes.

14:16:11    2      Q.   So is it fair to say then you went to your

14:16:16    3  doctor and asked him to release you to return to work?

14:16:20    4      A.   Yes.

14:16:24    5           (Whereupon, Mr. Wainwright returned

14:16:25    6           to the conference room.)

14:16:25    7  BY MS. HEVERLY:

14:16:25    8      Q.   Now, this -- the last part of your leave, from

14:16:27    9  May 17th to August 1st, were you off work to care for

14:16:30   10  your son or were you off work because of your own

14:16:32   11  disability?

14:16:33   12      A.   No, I was still on disability.

14:16:35   13      Q.   And were you receiving disability benefits at

1   6:37   14  the same -- at -- during that period?

14:16:44   15      A.   I was -- I'm trying to remember.  I'm -- I'm

14:16:47   16  sorry.  I don't -- I don't recall the exact dates.

14:16:53   17      Q.   Well, did you get any disability benefits

14:16:55   18  during any part of your leave from January to August?

14:16:58   19      A.   I started getting disability -- I started

14:17:04   20  getting disability on January 26th, and it continued

14:17:08   21  through the end of July.  And then it started again on

14:17:15   22  August 3rd.

14:17:17   23      Q.   And were the disability benefits that you

14:17:20   24  received from the State of California or through a

14:17:23   25  private plan, or both?
```

Page 133

DEPONENT:  MICHAEL CAVA    1-4-07

1  7:24    1      A.    Just from the State.

14:17:33    2      Q.    Do you recall how much you were receiving per

14:17:35    3   week or per month in disability benefits?

14:17:40    4      A.    I think it was -- it was eight hundred

14:17:42    5   something dollars a week, I think.

14:17:52    6      Q.    And did you have fill out paperwork to receive

14:17:54    7   those benefits?

14:17:58    8      A.    Yes.  Or my doctor had to fill out paperwork.

14:18:02    9   We both had to fill out paperwork.

14:18:12    10      Q.    Okay.  So you were released to come back to

14:18:14    11   work August 1st.  Did you in fact return to work on

14:18:17    12   August 1st?

14:18:19    13      A.    Yes.

1  8:19    14      Q.    What did you do on your first day back to

14:18:21    15   work?

14:18:22    16      A.    Went to the South San Francisco office.

14:18:27    17      Q.    Did you meet with anybody?

14:18:31    18      A.    Yes.  I -- I had talked to a number of reps

14:18:34    19   around there on my first day back, and had met with

14:18:41    20   Peter at some point during the day.

14:18:45    21      Q.    What did you meet with Peter about?

14:18:47    22      A.    I had been informed that I wasn't receiving any

14:18:50    23   of my accounts back even though he was aware that I had

14:18:54    24   made an arrangement with him back in February, and with

14:18:58    25   the other sales reps, Kevin Bryant and Pat McCarthy.

Page 134

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  .1:05 | 1 | that I would be back then, no. |
| 14:21:08 | 2 | Q.   Okay.   Did you give anybody any expectation |
| 14:21:11 | 3 | whether or not you'd come back on the 19th? |
| 14:21:14 | 4 | A.   No.   Nor was one asked for. |
| 14:21:19 | 5 | Q.   Did Mr. Wainwright ever put a limit on this |
| 14:21:22 | 6 | deal?   In other words, did he say, "If you are out for |
| 14:21:24 | 7 | four months, I'll make this deal, but if you are out |
| 14:21:26 | 8 | for six, I won't"? |
| 14:21:27 | 9 | A.   No. |
| 14:21:28 | 10 | Q.   Did you ever talk at all about the length of |
| 14:21:30 | 11 | the leave during this conversation? |
| 14:21:31 | 12 | A.   No. |
| 14:21:41 | 13 | Q.   So if I have it right, Mr. Wainwright said to |
| 1   1:43 | 14 | you you could keep Maximum (sic) -- Maximus and Hansen |
| 14:21:46 | 15 | provided that the other sales reps agreed to this |
| 14:21:49 | 16 | arrangement? |
| 14:21:50 | 17 | A.   Yes. |
| 14:21:50 | 18 | Q.   Then did you then have a follow-up conversation |
| 14:21:52 | 19 | with the other sales reps? |
| 14:21:54 | 20 | A.   Yes. |
| 14:21:54 | 21 | Q.   And -- and they did agree? |
| 14:21:56 | 22 | A.   Absolutely.   Very, very willingly. |
| 14:21:59 | 23 | Q.   Did you ever go back to Mr. Wainwright and tell |
| 14:22:01 | 24 | him, "Look, I talked to Kevin and Pat and they |
| 14:22:04 | 25 | agreed"? |

TALTY COURT REPORTERS, INC.   408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:   MICHAEL CAVA    1-4-07

```
1  .2:05   1    A.   Yes.

14:22:05   2    Q.   Was that also a telephone conference?

14:22:08   3    A.   Yes.

14:22:10   4    Q.   Is there anything in writing memorializing this

14:22:13   5  agreement?

14:22:18   6    A.   Other than the e-mail from Peter on August 1st

14:22:21   7  stating that he understands that I had that

14:22:24   8  arrangement, no, I don't think there is anything beyond

14:22:26   9  that.

14:22:30  10    Q.   Okay.  At the time, though, there was no

14:22:31  11  writing?

14:22:34  12    A.   I don't -- I don't know.  I don't believe so.

14:22:36  13    Q.   Did you take any notes of any of these

1   2:39  14  conversations?

14:22:43  15    A.   No.

14:22:43  16    Q.   Did you -- when you talked to Kevin and Pat

14:22:46  17  about helping you out, was there agreement that you

14:22:49  18  would split any revenue during the time that you were

14:22:51  19  out on leave?

14:22:52  20    A.   They were going to take any revenue that came

14:22:54  21  in while I was out, and then when I came back, I would

14:22:58  22  take the accounts back over.

14:23:02  23    Q.   All right.  So August 1st when you came back,

14:23:09  24  you said you had -- you have a meeting with Peter

14:23:13  25  Wainwright about your accounts?
```

Page 138

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1 3:15 | 1 | A.   About that, and just my continued employment. |
| 14:23:18 | 2 | I had -- I had gotten an e-mail from him about |
| 14:23:23 | 3 | expectations that it seemed like he wanted me to have |
| 14:23:27 | 4 | immediate results, yet I had no accounts.  I felt like |
| 14:23:33 | 5 | it was unrealistic and that he was trying to get rid of |
| 14:23:36 | 6 | me -- |
| 14:23:39 | 7 | MS. HEVERLY:  Let's mark -- |
| 14:23:38 | 8 | THE WITNESS:   -- at that point. |
| 14:23:40 | 9 | MS. HEVERLY:  Let's mark as Exhibit 17 a |
| 14:23:42 | 10 | one-page e-mail dated August 3rd, 2005. |
| 14:23:45 | 11 | MR. IANNITELLI:  Michelle, when you have a |
| 14:23:46 | 12 | chance, let me know when -- a good time to break.  I'd |
| 14:23:48 | 13 | like to use the restroom. |
| 1 3:50 | 14 | MS. HEVERLY:  Sure.  We can do it now if you |
| 14:23:51 | 15 | want to. |
| 14:23:51 | 16 | MR. IANNITELLI:  Up to you.  I'd just -- soon |
| 14:23:55 | 17 | I'd like to go. |
| 14:23:56 | 18 | MS. HEVERLY:  Okay.  Let's do it now before we |
| 14:23:58 | 19 | get into this document. |
| 14:23:59 | 20 | MR. IANNITELLI:  Okay.  Thank you. |
| 14:23:59 | 21 | THE VIDEOGRAPHER:  All right.  We are going off |
| 14:24:00 | 22 | the record at 2:23. |
| 14:36:15 | 23 | (Marked question indexed.) |
| 14:36:15 | 24 | (Exhibit marked for identification: |
| 14:36:15 | 25 | Deposition Exhibit Number 17.) |

Page 139

DEPONENT:    MICHAEL CAVA    1-4-07

1    9:18    1        By the end of the meeting he had -- he had

14:39:20    2    expressed that he would talk to the other reps, and if

14:39:23    3    they were willing to, I might get the accounts back,

14:39:29    4    particularly Maximus; not Hansen, just Maximus.  That's

14:39:33    5    all the discussion was about.  But that he needed to

14:39:38    6    talk to -- to Kevin Bryant about it.

14:39:41    7        Q.    Now, is this meeting that you are talking about

14:39:42    8    now the one that you also told me about earlier where

14:39:45    9    he was rude and abusive, or was that a different

14:39:49    10    meeting?

14:39:50    11        A.    I don't -- I don't recall.

14:39:53    12        Q.    Okay.  Do you recall the first conversation on

14:39:54    13    August 1st, 2005 whether he was rude or abusive?

1    9:59    14        A.    I don't remember whether it was August 1st or

14:40:01    15    August 2nd.

14:40:02    16        Q.    All right.  Do you recall whether in the first

14:40:04    17    conversation on August 1st Mr. Wainwright raised his

14:40:07    18    voice to you?

14:40:10    19        A.    I believe that was the meeting.

14:40:15    20        Q.    Then following the meeting you received the

14:40:16    21    e-mail on the bottom of this page, the one dated August

14:40:18    22    1st at 10:24 A.M.; is that correct?

14:40:21    23        A.    No, that would have been -- the meeting was

14:40:23    24    after 10:24.

14:40:24    25        Q.    Okay.  So you got the e-mail first and then had

Page 143

DEPONENT:   MICHAEL CAVA    1-4-07

1  .9:21    1    A.    He expected me to get ramped up quickly.

14:49:26    2    Q.    Did he tell you what "quickly" meant?

14:49:29    3    A.    He didn't define it.  He -- he didn't define

14:49:36    4  it, but it was very clear to me that it was expected

14:49:40    5  immediately.

14:49:41    6        He also expresses in here that I had a clean

14:49:44    7  slate, which I really didn't have.

14:49:46    8    Q.    Why didn't you think you had a clean slate?

14:49:49    9    A.    Well, I thought I did.  That's what Scott

14:49:51   10  Landis has promised me in January.  That's what Peter

14:49:54   11  says in this e-mail.  But I never was really taken off

14:49:59   12  plan.

14:50:01   13    Q.    Why do you say that?

1   0:04   14    A.    I have definitely had that confirmed since this

14:50:07   15  all happened.

14:50:08   16    Q.    Who told you you were still on a plan?

14:50:11   17    A.    If you look at Peter's e-mails internally that

14:50:15   18  have been provided in discovery, it states that I am on

14:50:17   19  a performance improvement plan, when he said that I

14:50:21   20  was -- wasn't doing a good job and that I had left a

14:50:26   21  spooky message for him.

14:50:28   22    Q.    Okay.  At the time, though -- I understand you

14:50:29   23  might have learned something through the progress of

14:50:31   24  the lawsuit, through discovery.

14:50:32   25        At the time did anyone tell you that you were

Page 152

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. 0:34 | 1 | still on a performance plan? |
| 14:50:35 | 2 | A. Well, he said I'm on a -- he said I'm on a |
| 14:50:38 | 3 | clean slate, but at the same time he's coming down on |
| 14:50:40 | 4 | me that I have to provide pretty constant updates on |
| 14:50:44 | 5 | funnels and so on here. And that's not the -- the |
| 14:50:48 | 6 | usual. |
| 14:50:50 | 7 | That's -- I was singled out because -- and he |
| 14:50:52 | 8 | made it clear, because of my time off. I was off too |
| 14:50:55 | 9 | long; I couldn't be counted on. |
| 14:50:57 | 10 | Q. What were you singled out for? |
| 14:50:59 | 11 | A. For being out for so long on disability. |
| 14:51:01 | 12 | Q. No, no. I mean what -- what requirements was |
| 14:51:03 | 13 | he putting on you that were singling you out? |
| 1  1:07 | 14 | A. Very constant reporting here, immediate ramp-up |
| 14:51:11 | 15 | on -- on funnel that wasn't expected of anybody else |
| 14:51:14 | 16 | there. |
| 14:51:15 | 17 | Q. Okay. But, again, the e-mail doesn't say |
| 14:51:17 | 18 | "immediate." |
| 14:51:17 | 19 | A. It's -- it's implied. I mean it was expressed. |
| 14:51:20 | 20 | The intent was very clear in our meetings. |
| 14:51:21 | 21 | Q. All right. But you just told me that he didn't |
| 14:51:23 | 22 | tell you that you had to have immediate ramp-up. |
| 14:51:25 | 23 | A. It was implied that I had to do this as soon as |
| 14:51:29 | 24 | possible. |
| 14:51:37 | 25 | Q. And then you just said that you had to do |

Page 153

DEPONENT:   MICHAEL CAVA    1-4-07

```
1   ,4:54    1  whether or not you were provided with a compensation
14:54:55    2  plan for 2005?
14:54:56    3      A.   I had -- I have -- I had had a copy at some
14:54:59    4  point.  I mean I had seen it; I don't know when.
14:55:05    5      Q.   Okay.  So you got -- you had that conversation
14:55:07    6  with Kevin Bryant, then you got this e-mail on August
14:55:12    7  3rd, correct?
14:55:13    8      A.   Yes.
14:55:13    9      Q.   And what was the next conversation you had with
14:55:15   10  anybody about the accounts?
14:55:19   11      A.   I -- at that point I had a complete breakdown.
14:55:24   12  The walls were closing in; I was having trouble
14:55:26   13  breathing.  I left the office at that point.
1   5:28   14      Q.   After receiving this e-mail --
14:55:30   15      A.   Yes.
14:55:30   16      Q.   -- on August 3rd you left the office?
14:55:32   17      A.   Yes, I -- I -- it was really obvious I was
14:55:35   18  being forced out of there, and that because I had been
14:55:38   19  off for my disability, that I had no place there.
14:55:41   20      Q.   How was it obvious that you were being forced
14:55:44   21  out?
14:55:44   22      A.   I was expected to generate immediate results in
14:55:47   23  a business that takes a long time to generate business.
14:55:51   24  And I wasn't going to get any of the business that I
14:55:53   25  had quoted along the way.
```

Page 157

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ J0:03 | 1 | Q.   Okay.  That was "did not," right? |
| 15:00:04 | 2 | A.   No, I -- I did. |
| 15:00:04 | 3 | Q.   You did.  Okay.  I thought you were saying |
| 15:00:06 | 4 | "didn't." |
| 15:00:10 | 5 | Okay.  So you went straight to the doctor in |
| 15:00:11 | 6 | the afternoon of the 3rd, correct? |
| 15:00:14 | 7 | A.   Yes. |
| 15:00:18 | 8 | MS. HEVERLY:  Let's mark as number 18 (sic) a |
| 15:00:21 | 9 | two-page e-mail dated August 4th, 2005. |
| 15:00:37 | 10 | THE REPORTER:  That's 19. |
| 15:00:37 | 11 | MS. HEVERLY:  Thank you. |
| 15:00:39 | 12 | (Exhibit marked for identification: |
| 15:00:39 | 13 | Deposition Exhibit Number 19.) |
| 1  0:51 | 14 | THE WITNESS:  (Reviewing document(s).) |
| 15:00:51 | 15 | BY MS. HEVERLY: |
| 15:00:51 | 16 | Q.   So attached to this e-mail is a doctor's note. |
| 15:00:54 | 17 | Is this a note you got from your physician on the 3rd |
| 15:00:57 | 18 | of August? |
| 15:00:58 | 19 | A.   Yes. |
| 15:01:01 | 20 | Q.   At that time did -- did Dr. Okamura tell you |
| 15:01:05 | 21 | how much time you needed off, or is it sort of |
| 15:01:09 | 22 | open-ended?  Did he give you an end date? |
| 15:01:12 | 23 | A.   No, I was having a very severe stress |
| 15:01:13 | 24 | reaction. |
| 15:01:14 | 25 | Q.   All right.  And -- |

Page 161

DEPONENT:  MICHAEL CAVA    1-4-07

15:01:15  1    A.    At the time I couldn't think straight.  He --
15:01:18  2  he -- it was very clear that I was having a really,
15:01:22  3  really big problem at that point.
15:01:25  4        He -- he prescribed a very heavy drug at that
15:01:28  5  point, in fact.
15:01:29  6    Q.    Okay.  And did you have -- personally have any
15:01:32  7  expectation as to how long you'd be off work at that
15:01:35  8  point?
15:01:35  9    A.    No.  I did not know.
15:01:37  10    Q.    So you forwarded the doctor's note to
15:01:39  11  Ms. Cotter via e-mail, correct?
15:01:43  12    A.    Yes.
15:01:43  13    Q.    Did you have any conversations with her?
15:01:45  14    A.    Yes, I -- I did that morning of August 4th.  I
15:01:50  15  had not slept all night the night before because I had
15:01:53  16  had a very bad reaction to the drug they put me on.
15:01:56  17    Q.    What did you talk to Ms. Cotter about on the
15:01:59  18  4th?
15:02:01  19    A.    That I was still disabled, I wasn't ready to
15:02:06  20  return to work, I had tried.  I needed some more time
15:02:10  21  to deal with my issues with my son.
15:02:12  22        She had inquired, as she had before on a
15:02:15  23  different occasion, she wanted to make sure it wasn't
15:02:17  24  work-related, which I expressed it wasn't.  This was
15:02:21  25  all my issues that I had to deal with surrounding my

Page 162

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| ι  ,9:19 | 1 | I was exploring.  I didn't have many choices at that |
| 15:09:22 | 2 | point. |
| 15:09:23 | 3 | Q.  And she said no.  So then what was the end |
| 15:09:25 | 4 | result?  That you just were terminated? |
| 15:09:28 | 5 | A.  I would -- that I would get back to her with my |
| 15:09:31 | 6 | choice. |
| 15:09:31 | 7 | Q.  And did you get back to her? |
| 15:09:33 | 8 | A.  I did the next day. |
| 15:09:38 | 9 | Q.  And what did you tell her the next day? |
| 15:09:40 | 10 | A.  "I'm not going to resign." |
| 15:09:58 | 11 | Q.  When you had the conversation with her where |
| 15:09:59 | 12 | you told her that you weren't going to resign, did you |
| 15:10:02 | 13 | ask her to send a letter indicating the cause of your |
| ] 0:04 | 14 | termination? |
| 15:10:07 | 15 | A.  Yes. |
| 15:10:07 | 16 | Q.  And you asked her that the letter say, "Due to |
| 15:10:10 | 17 | your inability to perform your duties"? |
| 15:10:12 | 18 | A.  No, and that's not what she expressed why I was |
| 15:10:15 | 19 | being terminated at the time. |
| 15:10:16 | 20 | Q.  Okay.  What did you ask for the letter to |
| 15:10:18 | 21 | say? |
| 15:10:18 | 22 | A.  I asked for it to state why I was being |
| 15:10:20 | 23 | terminated, is all I asked for. |
| 15:10:22 | 24 | Q.  What did she tell you at the time was -- |
| 15:10:26 | 25 | A.  She said it was because I had been off for more |

Page 168

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. .0:28 | 1 | than six months, I wasn't eligible for any leave or |
| 15:10:31 | 2 | protection at that point, and I could be terminated |
| 15:10:33 | 3 | because of the employee handbook. |
| 15:10:43 | 4 | When the letter came, it was a surprise. |
| 15:10:49 | 5 | Q.   Did you tell her you had no hard feelings and |
| 15:10:52 | 6 | that you understood the decision? |
| 15:10:55 | 7 | A.   I was trying to be polite.  Joanna had been |
| 15:10:59 | 8 | polite with me along the way.  I was very upset. |
| 15:11:02 | 9 | Q.   So it's true you told her you had no hard |
| 15:11:04 | 10 | feelings and understood the decision? |
| 15:11:08 | 11 | A.   I was trying to be polite for somebody I |
| 15:11:10 | 12 | thought was a good person. |
| 15:11:13 | 13 | Q.   Okay.  It's just a "yes" or "no" question.  Did |
| 1  1:14 | 14 | you tell her that? |
| 15:11:15 | 15 | A.   I did tell her that. |
| 15:11:22 | 16 | MS. HEVERLY:  Sorry.  What number?  20? |
| 15:11:24 | 17 | MR. IANNITELLI:  20. |
| 15:11:25 | 18 | MS. HEVERLY:  Number 20 is a one-page letter |
| 15:11:26 | 19 | dated August 5th, 2005. |
| 15:11:48 | 20 | (Exhibit marked for identification: |
| 15:11:48 | 21 | Deposition Exhibit Number 20.) |
| 15:11:54 | 22 | THE WITNESS:  (Reviewing document(s).) |
| 15:11:54 | 23 | BY MS. HEVERLY: |
| 15:11:54 | 24 | Q.   Did you receive this letter on or shortly after |
| 15:11:57 | 25 | August 5th, 2005? |

Page 169