DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 15:16:13 | 1 | for you for November 2004; is that accurate, or seem |
| 15:16:18 | 2 | accurate to you? |
| 15:16:21 | 3 | I don't know why the date is on the second |
| 15:16:23 | 4 | page, but -- |
| 15:16:24 | 5 | A.   Yeah, that's what I was looking for. |
| 15:16:26 | 6 | Q.   On the top right it says "7 November 2004." |
| 15:16:30 | 7 | A.   That -- that seems correct. |
| 15:16:33 | 8 | Q.   Okay.  And if I'm reading this correctly, on |
| 15:16:37 | 9 | the first page it says the accrued GOP is roughly four |
| 15:16:42 | 10 | hundred and thirteen thousand? |
| 15:16:46 | 11 | A.   Yes. |
| 15:16:46 | 12 | Q.   Okay.  How much of that four hundred and |
| 15:16:48 | 13 | thirteen thousand was attributable to Maximus? |
| 15:16:52 | 14 | A.   Oh, I -- I don't know.  It spells it out in |
| 15:16:55 | 15 | here.  I would need a calculator. |
| 15:16:58 | 16 | Q.   Okay.  And as I understand it, there was a |
| 15:17:00 | 17 | maintenance contract with Maximus that was worth |
| 15:17:03 | 18 | roughly two hundred ninety-five thousand dollars; is |
| 15:17:07 | 19 | that correct? |
| 15:17:07 | 20 | A.   Probably. |
| 15:17:08 | 21 | Q.   Okay.  Did you get that maintenance contract |
| 15:17:11 | 22 | signed? |
| 15:17:14 | 23 | A.   No. |
| 15:17:14 | 24 | Q.   Who did? |
| 15:17:17 | 25 | A.   We found out that it had been signed before I |

Page 173

DEPONENT:  MICHAEL CAVA    1-4-07

15:17:21　1　was there, after investigation.

15:17:26　2　　Q.　So somebody else had gotten the contract signed

15:17:28　3　and you got credit for it; is that correct?

15:17:31　4　　A.　I had been told to go price a maintenance

15:17:35　5　contract, which I -- I went and did, and actually sent

15:17:40　6　to Peter for approval, "Hey, what do we need to do

15:17:44　7　here?"

15:17:45　8　　　　　I also at the same time was searching records.

15:17:48　9　　　　　And -- and before I started there, I was, you

15:17:50　10　know, also told to go -- that I was going to be doing

15:17:53　11　this when I started.

15:17:55　12　　　　　I went and started investigating, with the help

15:17:57　13　of Megan Riordan, and pulled the customer files, and

1  8:01　14　there was a contract in there that nobody knew about

15:18:04　15　that had already been signed.  The customer didn't know

15:18:07　16　about it, either.

15:18:08　17　　　　　So we all met, at least Megan Riordan, myself,

15:18:14　18　Peter and Rey Torres -- I -- there may have been one

15:18:18　19　more.  It might have been John Romero also.  And we

15:18:22　20　made a -- a group decision, you know, mainly Peter

15:18:25　21　and -- and John Romero, that, "Hey, let's use this

15:18:30　22　contract."

15:18:31　23　　Q.　So if I understand correctly, before you

15:18:34　24　started working at NetVersant, somebody else had gotten

15:18:38　25　a customer to sign a maintenance contract for two

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. 8:41 | 1 | hundred ninety-five thousand, correct? |
| 15:18:43 | 2 | A.    Yes. |
| 15:18:44 | 3 | Q.    And do you know if that was Jennifer Forrest? |
| 15:18:47 | 4 | A.    Yes. |
| 15:18:47 | 5 | Q.    Okay.  And when you started, then you got |
| 15:18:50 | 6 | credit for it? |
| 15:18:52 | 7 | A.    That was Peter and John's decision, not mine. |
| 15:18:55 | 8 | Q.    Okay.  So of the four hundred and thirteen |
| 15:18:59 | 9 | thousand, only a hundred and eighteen thousand of it is |
| 15:19:02 | 10 | really work that you did, correct? |
| 15:19:05 | 11 | A.    I did quite a bit of work on that.  Nobody even |
| 15:19:08 | 12 | knew about that contract. |
| 15:19:10 | 13 | Q.    I'm sorry.  I don't understand what that means. |
| 1   9:12 | 14 | A.    Nobody -- |
| 15:19:13 | 15 | MR. IANNITELLI:  Can you -- |
| 15:19:14 | 16 | THE WITNESS:  I -- I did quite a bit of work on |
| 15:19:18 | 17 | that contract.  The customer didn't know about it; they |
| 15:19:19 | 18 | had to be informed about it. |
| 15:19:21 | 19 | They had to then agree to it.  They weren't |
| 15:19:23 | 20 | sure they were going to agree to it.  It had to go |
| 15:19:27 | 21 | through review up at a either VP or CIO level. |
| 15:19:32 | 22 | Packages had to be put together on it. |
| 15:19:34 | 23 | There was -- there was quite a bit involvement |
| 15:19:35 | 24 | in it, actually. |
| 15:19:37 | 25 | / / / |

Page 175

DEPONENT:   MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 1   9:37 | 1 | BY MS. HEVERLY: |
| 15:19:37 | 2 | Q.   But the customer had signed it before you even |
| 15:19:41 | 3 | started working, correct? |
| 15:19:42 | 4 | A.   Yes. |
| 15:19:42 | 5 | Q.   And Mr. Wainwright did not have to give you |
| 15:19:44 | 6 | credit for that, correct? |
| 15:19:49 | 7 | A.   It had not been recognized as revenue in the |
| 15:19:52 | 8 | company.  So for the division to take revenue, it had |
| 15:19:55 | 9 | to be -- it had to be booked, and it was under my name, |
| 15:19:59 | 10 | and Peter got credit for it also. |
| 15:20:01 | 11 | Q.   But he could have given credit to anybody, |
| 15:20:04 | 12 | correct? |
| 15:20:04 | 13 | MR. IANNITELLI:   Calls for speculation. |
| 1   0:06 | 14 | BY MS. HEVERLY: |
| 15:20:06 | 15 | Q.   If you know. |
| 15:20:07 | 16 | A.   The account was in my name.  I was managing it. |
| 15:20:10 | 17 | I'm the one that found it. |
| 15:20:12 | 18 | Q.   You are the one that found what? |
| 15:20:13 | 19 | A.   I was the one that found the contract existed. |
| 15:20:23 | 20 | Q.   But if you take out the two hundred ninety-five |
| 15:20:25 | 21 | thousand, you certainly weren't meeting your quota, |
| 15:20:28 | 22 | were you? |
| 15:20:29 | 23 | A.   Still very good production for a new |
| 15:20:31 | 24 | employee. |
| 15:20:34 | 25 | Q.   Your quota was three hundred and fifty-eight |

Page 176

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 15:20:38 | 1 | thousand? |
| 15:20:38 | 2 | A.    Three hundred and forty-one thousand. |
| 15:20:41 | 3 | Q.    Okay.  And so you were only at a hundred and |
| 15:20:43 | 4 | eighteen thousand, correct? |
| 15:20:44 | 5 | A.    Through November 1st, which -- at which time I |
| 15:20:47 | 6 | offered to go off on unpaid leave, but the company |
| 15:20:51 | 7 | declined to take. |
| 15:20:55 | 8 | Q.    How much in commissions did you earn in 2004, |
| 15:20:58 | 9 | do you know? |
| 15:20:58 | 10 | A.    I don't recall. |
| 15:20:59 | 11 | Q.    Approximately? |
| 15:21:01 | 12 | A.    A few thousand dollars, from -- from |
| 15:21:06 | 13 | NetVersant. |
| 1  1:06 | 14 | Q.    So that was significantly less than you had |
| 15:21:09 | 15 | earned at your prior company, correct? |
| 15:21:11 | 16 | A.    Absolutely. |
| 15:21:12 | 17 | Q.    At that time did you take any steps to change |
| 15:21:14 | 18 | employment or find a new job? |
| 15:21:16 | 19 | A.    No.  I was -- I was going to make this job |
| 15:21:19 | 20 | work.  I really wanted to be there.  It was a great |
| 15:21:26 | 21 | opportunity. |
| 15:21:33 | 22 | Q.    I want to go through some of the other |
| 15:21:36 | 23 | allegations in your complaint. |
| 15:21:37 | 24 | I asked you before who harassed you, and you |
| 15:21:41 | 25 | said Peter Wainwright and nobody else, correct? |

Page 177

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1: :1:45 | 1 | A.   Yes. |
| 15:21:45 | 2 | Q.   And then what I didn't ask you was who at |
| 15:21:50 | 3 | NetVersant beside Peter Wainwright engaged in conduct |
| 15:21:54 | 4 | that you thought was intended to cause you emotional |
| 15:22:01 | 5 | distress, if anyone? |
| 15:22:03 | 6 | A.   I don't feel like anyone. |
| 15:22:10 | 7 | Q.   Okay.  So one of your contentions is that you |
| 15:22:13 | 8 | were discriminated against.  Who do you feel |
| 15:22:16 | 9 | discriminated against you? |
| 15:22:18 | 10 | A.   Peter and -- and other people in the company, |
| 15:22:23 | 11 | by letting me go. |
| 15:22:27 | 12 | Q.   Aside from your termination, is there anything |
| 15:22:29 | 13 | else you thought that was discriminatory? |
| 1   2:35 | 14 | A.   I didn't think it was reasonable to have that |
| 15:22:39 | 15 | six-month limit.  I just needed time.  I wanted to be |
| 15:22:43 | 16 | back there.  I wanted to do a good job. |
| 15:22:47 | 17 | Q.   Do you know whether the six-month limit was |
| 15:22:49 | 18 | applied to employees regardless of the reason for their |
| 15:22:52 | 19 | time off? |
| 15:22:53 | 20 | A.   I'm not aware of what other employees have gone |
| 15:22:56 | 21 | through on that. |
| 15:22:57 | 22 | Q.   Do you know whether any other employee has been |
| 15:22:59 | 23 | terminated for being off for more than six months? |
| 15:23:02 | 24 | A.   I'm not aware. |
| 15:23:06 | 25 | Q.   Okay.  Is there anything else that anyone at |

Page 178

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. 3:08 | 1 | NetVersant did to you that you thought was |
| 15:23:11 | 2 | discriminatory? |
| 15:23:13 | 3 | A.    Not that I can think of. |
| 15:23:17 | 4 | Q.    In your complaint you complain that you were |
| 15:23:22 | 5 | discriminated against because defendants didn't |
| 15:23:24 | 6 | accommodate your disability. |
| 15:23:26 | 7 | Did you ever ask for any type of accommodation |
| 15:23:29 | 8 | other than a leave of absence? |
| 15:23:31 | 9 | A.    Oh, I -- I offered to take a pay cut to be able |
| 15:23:35 | 10 | to stay there.  I wanted to make it work. |
| 15:23:38 | 11 | I offered to partner with other reps to do |
| 15:23:42 | 12 | whatever.  I was -- I would have done anything to make |
| 15:23:45 | 13 | it work. |
| 1  3:49 | 14 | Q.    Is it fair to say that from the period of |
| 15:23:53 | 15 | June -- excuse me -- January 19th to August 1st you |
| 15:23:59 | 16 | were unable to perform any of your duties? |
| 15:24:03 | 17 | MR. IANNITELLI:   Calls for speculation, lacks |
| 15:24:05 | 18 | foundation. |
| 15:24:06 | 19 | Go ahead. |
| 15:24:06 | 20 | BY MS. HEVERLY: |
| 15:24:06 | 21 | Q.    I'm just asking for your opinion. |
| 15:24:09 | 22 | A.    I -- I couldn't function, you know.  I mean |
| 15:24:14 | 23 | I -- I partially helped out when I could.  When |
| 15:24:19 | 24 | somebody called me with a question, I made myself |
| 15:24:21 | 25 | available.  But I couldn't have done more than brief |

Page 179

DEPONENT:   MICHAEL CAVA    1-4-07

```
1. .4:25    1  periods of that.
15:24:29    2     Q.   Is there any part of your job that you could
15:24:31    3  have done during that period on a consistent basis?
15:24:38    4     A.   I don't believe so.  Not -- not until August.
15:24:44    5     Q.   And then, again, starting on August 4th, or
15:24:47    6  maybe the afternoon of August 3rd, is it your opinion
15:24:50    7  that you were totally disabled and unable to work?
15:24:56    8     A.   I was at that point.  I thought I could go back
15:24:58    9  on August 1st.  The afternoon of August 3rd, it was
15:25:02   10  really clear I couldn't yet.
15:25:04   11     Q.   Is there any part of your job that you could
15:25:07   12  have done on August 3rd?
15:25:11   13     A.   Not on August 3rd, but shortly thereafter.
1   5:15   14     Q.   When could you have come back to work?
15:25:23   15     A.   It's hard to say.
15:25:26   16     Q.   Well, were you ever released by your doctor to
15:25:29   17  go back to work?
15:25:31   18     A.   I believe -- I -- I was on disability until
15:25:38   19  December 26th, but I -- I was -- I was pursuing other
15:25:42   20  opportunities before that.
15:25:44   21     Q.   Did you receive disability benefits through
15:25:48   22  12-26-05?
15:25:49   23     A.   I did.
15:25:53   24     Q.   But you were not totally disabled during that
15:25:55   25  period?
```

Page 180

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. .5:59 | 1 | MR. IANNITELLI:  That again calls for |
| 15:26:00 | 2 | speculation. |
| 15:26:01 | 3 | But if you can answer. |
| 15:26:03 | 4 | THE WITNESS:  That's what my doctor said. |
| 15:26:06 | 5 | BY MS. HEVERLY: |
| 15:26:06 | 6 | Q.  Okay.  But I'm just asking in your opinion were |
| 15:26:07 | 7 | you totally disabled between August 3rd and December |
| 15:26:10 | 8 | 26th or could you have gone back to work? |
| 15:26:14 | 9 | A.  My doctor said I should be off, and I listened |
| 15:26:19 | 10 | to him.  And I went through quite a bit of treatment |
| 15:26:22 | 11 | during that time. |
| 15:26:30 | 12 | Q.  Is there anything that NetVersant could have |
| 15:26:33 | 13 | done in January to allow you to be able to work at that |
| 1   5:41 | 14 | time? |
| 15:26:41 | 15 | A.  No. |
| 15:26:42 | 16 | MR. IANNITELLI:  Vague as to time.  But -- |
| 15:26:45 | 17 | BY MS. HEVERLY: |
| 15:26:45 | 18 | Q.  At that time, in January. |
| 15:26:48 | 19 | MR. IANNITELLI:  And calls for speculation as |
| 15:26:48 | 20 | well. |
| 15:26:48 | 21 | Go ahead. |
| 15:26:49 | 22 | BY MS. HEVERLY: |
| 15:26:49 | 23 | Q.  Is there anything NetVersant could have done to |
| 15:26:52 | 24 | allow you to work in August, on August 3rd or August |
| 15:26:58 | 25 | 4th of 2005? |

Page 181

| | | |
|---|---|---|
| 1  .7:00 | 1 | A.   I believe so. |
| 15:27:00 | 2 | Q.   What could they have done? |
| 15:27:01 | 3 | A.   If I would have not been harassed and treated |
| 15:27:04 | 4 | unfairly, and just been given some understanding, a |
| 15:27:10 | 5 | little compassion, just a little time to get going -- |
| 15:27:12 | 6 | you can't do this overnight; nobody comes into a |
| 15:27:16 | 7 | company with what I do right now and can make things |
| 15:27:19 | 8 | happen overnight -- I could have performed very well, |
| 15:27:21 | 9 | and I have performed very well since -- in this |
| 15:27:24 | 10 | industry. |
| 15:27:26 | 11 | Q.   But you said before that it wasn't |
| 15:27:28 | 12 | work-related, the stress you were suffering.  Are you |
| 15:27:31 | 13 | saying that it was now? |
| 1  7:32 | 14 | A.   My stress was what it was because of my |
| 15:27:36 | 15 | personal issues.  If I had -- if I had just had an |
| 15:27:41 | 16 | accommodative situation, it could have been very |
| 15:27:43 | 17 | different. |
| 15:27:44 | 18 | Q.   What could they have done? |
| 15:27:47 | 19 | MR. IANNITELLI:  Calls for speculation. |
| 15:27:48 | 20 | But go ahead. |
| 15:27:51 | 21 | THE WITNESS:  Oh, I -- I mean allowed me to |
| 15:27:54 | 22 | partner with people, put me in a different position, |
| 15:27:58 | 23 | put me in a different division. |
| 15:28:01 | 24 | I would -- I would have done anything to make |
| 15:28:02 | 25 | it work.  I wanted things to work out there long term. |

Page 182

DEPONENT:   MICHAEL CAVA   1-4-07

1  8:06   1  BY MS. HEVERLY:

15:28:06   2      Q.   Did you ever ask for a different position?

15:28:07   3      A.   No, I offered -- I offered the pay cut to be

15:28:12   4  able to have some time.

15:28:13   5      Q.   Did you ever ask to work in a different

15:28:16   6  division?

15:28:16   7      A.   No, I wasn't given the opportunity to.  When I

15:28:19   8  went off on disability again, and informed Joanna and

15:28:24   9  Scott of what happened to me, I was given two choices

15:28:27  10  immediately after.  They wouldn't even listen to what

15:28:30  11  was going on.

15:28:33  12      Q.   Did you ever tell either Joanna Cotter or Scott

15:28:36  13  Landis that if they did something different, you might

1   3:40  14  be able to work?

15:28:41  15      A.   I wasn't even given the chance to get to that.

15:28:45  16  The conversation was cut short.  I was -- Scott was

15:28:47  17  going to get off the phone at that point.  There was no

15:28:50  18  offer to even continue the conversation or to listen to

15:28:53  19  my concerns.

15:28:54  20      Q.   Okay.  But in your opinion at that point you

15:28:56  21  couldn't have worked anyway?

15:28:58  22      A.   Not that week or day, but soon thereafter.

15:29:02  23      Q.   How soon?

15:29:06  24      A.   It's hard -- it's hard to say.  It didn't

15:29:08  25  happen.  I mean if I had been given a chance, I would

Page 183

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ _9:12 | 1 | have tried to make it work. |
| 15:29:16 | 2 | I wanted to be back there badly.  I tried |
| 15:29:19 | 3 | everything I could to get back there the times I went |
| 15:29:22 | 4 | back, and make it work.  And I have been very |
| 15:29:32 | 5 | successful at doing it since then. |
| 15:29:34 | 6 | MR. IANNITELLI:  You have answered the |
| 15:29:35 | 7 | question. |
| 15:29:44 | 8 | Michelle? |
| 15:29:46 | 9 | MS. HEVERLY:  Yeah. |
| 15:29:44 | 10 | MR. IANNITELLI:  Could we take a quick break so |
| 15:29:47 | 11 | I can -- |
| 15:29:47 | 12 | MS. HEVERLY:  Sure.  Go ahead. |
| 15:29:47 | 13 | MR. IANNITELLI:  I have a tentative.  I got a |
| 1   9:50 | 14 | voicemail on. |
| 15:29:52 | 15 | MS. HEVERLY:  Okay.  Let's take a break. |
| 15:29:53 | 16 | MR. IANNITELLI:  It's only going to take like a |
| 15:29:55 | 17 | second or two. |
| 15:29:57 | 18 | MS. HEVERLY:  That's okay.  We'll take a break |
| 15:29:58 | 19 | for everyone. |
| 15:30:00 | 20 | THE VIDEOGRAPHER:  We are off the record at |
| 15:30:01 | 21 | 3:29.  And this is the end of media three -- media two |
| 15:30:05 | 22 | in the case of Cava. |
| 15:38:40 | 23 | (Recess.) |
| 15:38:55 | 24 | THE VIDEOGRAPHER:  We are on -- this is media |
| 15:38:59 | 25 | three, and we are back on the record in the Cava |

Page 184

DEPONENT:  MICHAEL CAVA    1-4-07

```
1   3:14    1  wouldn't listen.
15:43:15   2      Q.   Then did he tell you the decision had already
15:43:18   3  been made?
15:43:18   4      A.   He -- he made the decision on the spot.  That
15:43:21   5  was my two choices.
15:43:32   6      Q.   Okay.  Your next claim is breach of contract.
15:43:36   7  And it says that as a condition of your employment, you
15:43:39   8  had an agreement that you would receive ongoing
15:43:42   9  accounts.
15:43:44  10          Is that the agreement that you made before you
15:43:46  11  started work?
15:43:47  12      A.   Before I started work, and during work when I
15:43:51  13  went off on disability.
1   3:54  14      Q.   The first time in February?
15:43:58  15      A.   No.  When I came back in August, not honoring
15:44:02  16  the agreement I had made to take back over accounts.
15:44:05  17      Q.   Right.  No, I'm asking you what the agreements
15:44:08  18  are.
15:44:08  19          So as I understand your testimony from today,
15:44:10  20  the first agreement that you claim was made prior to
15:44:15  21  your hire.
15:44:17  22      A.   Yes.
15:44:17  23      Q.   And that was that you would receive most of
15:44:19  24  Jennifer Forrest's accounts?
15:44:21  25      A.   Yes.
```

Page 189

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. .4:21 | 1 | Q.   And then the second agreement was made in |
| 15:44:23 | 2 | Jan- -- in February of 2005 -- |
| 15:44:26 | 3 | A.   Yes. |
| 15:44:26 | 4 | Q.   -- when you agreed that you would get back |
| 15:44:31 | 5 | Maximus and Hansen, correct? |
| 15:44:33 | 6 | A.   There was that, and then there was one |
| 15:44:36 | 7 | additional. |
| 15:44:38 | 8 | In my first few days of work in June, I had -- |
| 15:44:42 | 9 | Kathleen Arceo of Maximus had let me know that we were |
| 15:44:47 | 10 | going down to the international user group conference |
| 15:44:51 | 11 | in Los Angeles.  And Kathleen wasn't going, but she -- |
| 15:44:55 | 12 | she informed me, "Hey, look out for Health Net.  They |
| 15:44:58 | 13 | are going to be at this, and their maintenance contract |
| 1   5:00 | 14 | is coming up; you should try to pursue this." |
| 15:45:04 | 15 | I went and told Peter about this conversation, |
| 15:45:07 | 16 | what was going on, that they were there, we should |
| 15:45:10 | 17 | invite them to dinner, we were doing an event at |
| 15:45:13 | 18 | this -- at this user group, and he gave me permission |
| 15:45:16 | 19 | that I would get to work on the account. |
| 15:45:18 | 20 | Q.   When was that?  In June of 2004? |
| 15:45:19 | 21 | A.   That was in June of 2004. |
| 15:45:24 | 22 | Q.   So he gave you permission to invite them to |
| 15:45:27 | 23 | dinner or -- |
| 15:45:29 | 24 | A.   Invite them to dinner -- |
| 15:45:30 | 25 | Q.   -- do what they needed to do? |

Page 190

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1 | .5:30 | 1 |
| 15:45:31 | 2 | |

1 .5:30   1    A.   -- work the account.  I -- (pause).

15:45:31  2    Q.   Did you in fact take them to dinner?

15:45:33  3    A.   Yes.  I sat by them with -- with two of my

15:45:37  4    previous customers from Shared Technologies.

15:45:44  5    Q.   Okay.  And then at some point something

15:45:45  6    happened to Health Net, I take it?

15:45:49  7    A.   At some point I was talking about it in the

15:45:51  8    office, and another rep claimed they were working on

15:45:53  9    it, and Peter ruled in that rep's favor.  I tried to go

15:45:57  10   talk to Peter about it; he wouldn't -- he wouldn't

15:46:00  11   budge or listen.

15:46:01  12   Q.   Do you know whether the -- the other rep was

15:46:02  13   working on Health Net prior to June of 2004?

1  6:06   14   A.   I'm not sure.

15:46:07  15   Q.   Do you know if the other rep was at this

15:46:09  16   conference?

15:46:09  17   A.   He was not.

15:46:13  18   Q.   Do you know how much work the other rep had

15:46:14  19   done on the account?

15:46:17  20   A.   I did -- that would be before I was there, so

15:46:19  21   I'm not sure.

15:46:33  22   Q.   Okay.  The next claim that you have is

15:46:38  23   essentially the same, although it's titled

15:46:40  24   "misrepresentation."  And it says that defendants

15:46:43  25   essentially promised that you would receive certain --

Page 191

DEPONENT:   MICHAEL CAVA    1-4-07

```
 ᴊ1:00   1 otherwise.  I'm just speculating right now.

15:51:03   2    Q.   Okay.  How about the promise to give you most

15:51:05   3 of Jennifer Forrest's accounts?  Do you have any

15:51:08   4 evidence that would suggest that the promise wasn't

15:51:10   5 true at the time it was made?

15:51:11   6    A.   I believed it to be the case.

15:51:16   7    Q.   Okay.  Do you have any evidence that would

15:51:19   8 suggest it wasn't true?

15:51:20   9         MR. IANNITELLI:  Listen to her question --

15:51:21  10         THE WITNESS:  I'm sorry.

15:51:22  11         MR. IANNITELLI:  -- and focus on the question.

15:51:23  12 BY MS. HEVERLY:

15:51:23  13    Q.   Let me explain it this way.  Sometimes somebody

  1:26   14 makes a promise and they never intend to fulfill it.

15:51:28  15 They say, "I'll sell -- I'll sell you my car for a

15:51:31  16 dollar," they never -- and they're never going to

15:51:32  17 follow through with their promise.

15:51:33  18         Sometimes people make promises that they intend

15:51:35  19 to fulfill, and then for whatever reason they change

15:51:39  20 their mind.  I tell you I'm going to sell you my car

15:51:42  21 for ten thousand dollars, then I get a better offer for

15:51:44  22 twelve and so I don't follow through with my promise.

15:51:47  23         So what I'm asking you is whether you have any

15:51:49  24 evidence that would suggest that the promise that

15:51:51  25 Mr. Landis and Mr. Wainwright made about giving you all
```

Page 196

DEPONENT:   MICHAEL CAVA    1-4-07

1 ,1:53    1  the accounts they never intended to fill at the time as

15:51:57   2  opposed to having changed their mind at the later date.

15:52:00   3     A.   I -- I just have -- I -- I have no indication

15:52:04   4  either way.  I -- I don't -- I don't know what Peter is

15:52:06   5  thinking.

15:52:09   6     Q.   Okay.  And then the same question with respect

15:52:11   7  to the -- the Health Net issue:  When he gave you

15:52:14   8  permission to work on the account, do you have any

15:52:17   9  indication or have you learned anything that would lead

15:52:20  10  you to believe that he never intended that promise to

15:52:22  11  be true?

15:52:25  12     A.   I -- I'm not sure.  I -- I don't know.  I mean

15:52:29  13  maybe he just wanted to pursue the customer there and I

1   2:33  14  had the information at the time.  I -- I don't know.

15:52:42  15          The other rep had been there a number of

15:52:44  16  years.

15:52:48  17     Q.   Okay.  The next cause of action in your

15:52:51  18  complaint is called "breach of the covenant in good

15:52:54  19  faith and fair dealing."  And you claim that defendants

15:52:58  20  acted in bad faith to stop you from performing your end

15:53:02  21  of the bargain, your end of the agreement.

15:53:05  22          What did they do?

15:53:08  23     A.   Ruled against me on working on accounts; took

15:53:11  24  away the accounts they agreed to have me cover; made me

15:53:14  25  the only rep in the company without assigned accounts,

Page 197

DEPONENT:  MICHAEL CAVA    1-4-07

<u>CERTIFICATE</u>

I, Patricia Hope Sales, a Certified Shorthand
Reporter, License Number 4423, hereby certify that the
witness in the foregoing deposition, MICHAEL CAVA, was
duly sworn by me to tell the truth in the
above-entitled cause; that said deposition was taken at
the time and place therein named; that the testimony of
said witness was reported by me, a disinterested
person, to the best of my ability, and was thereafter
transcribed by means of computer-aided transcription
under my direction and supervision.

IN WITNESS WHEREOF, I have hereunto set my hand.

Date:  <u>January 17, 2007</u>    _Patricia Hope Sales_

Signing of the deposition by the deponent was
waived by stipulation at the time of the taking of the
deposition.             _____

The deponent personally appeared on the _____ day
of_____, _____ and upon said date read and
signed the deposition. _____

Upon completion of the transcript of the
deposition, the deponent was notified that it was ready
for signature, but did not sign said deposition for the
following reason:

Date: _____    _____

Page 213


**NetVersant**
*network solutions for an e-world*

**Application for Employment**

PLEASE PRINT

## Personal

| First Name | Middle Initial | Last Name | Social Security No. | Date |
|---|---|---|---|---|
| Michael | G. | Cava | 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 | 5/6/04 |

| Address | City, State, Zip | Telephone |
|---|---|---|
| 14 Pinewood Dr. ~~Danville CA~~ | Danville CA 94506 | 925-648-3490 |

| Are you less than 18 years of age? If yes, a work permit may be required. | If hired, can you provide proof of identity and legal authorization to work in the U.S.? | Have you ever applied to this organization before? |
|---|---|---|
| ☐ Yes ☒ No | ☒ Yes ☐ No | ☐ Yes ☒ No |

| Have you ever been employed by our organization before? | If yes, give dates of employment | Are you available to work overtime, or a flexible work schedule? |
|---|---|---|
| ☐ Yes ☒ No | | ☒ Yes ☐ No |

Have you ever been convicted of a crime, felony or misdemeanor, or are you out on bail or on your own recognizance pending trial for such an offense?**
☐ Yes ☒ No

If yes, state location, date and description. (An affirmative response or a conviction will not necessarily disqualify you from the position for which you have applied.)

| Has your Driver's License been revoked or suspended in the last three years? | Driver's License No. | Expiration Date |
|---|---|---|
| ☐ Yes ☒ No | A1259877 | 3/19/08 |

| In case of emergency, please notify: | Address | Telephone |
|---|---|---|
| Suzanne Cava (wife) | 14 Pinewood Dr. Danville CA 94506 | 925-648-3490 |

## Employment Interests

| Position desired or area of interest | Date available | Pay expected |
|---|---|---|
| Sales | 2 weeks from offer | Negotiable |

| Type of employment you are seeking | Shifts you can work |
|---|---|
| ☒ Full Time ☐ Part Time ☐ Temporary ☐ Summer | ☒ Day ☐ Swing ☐ Night |

How were you referred to NetVersant?
_many employees and customers through negotiation_

Name of referral source
_Jerry for Forrest, Bill Friend, Ramlan Friend_

## Education, Skills, Awards

| Name, city and state of school or institution | Major | Units completed Grade average | Degrees and/or diplomas |
|---|---|---|---|
| High School  College Park, Pleasant Hill, CA | All | 3.3 | yes |
| College  CSU Hayward, CA | BS Business | 2.4 | yes |
| Other | | | |

| Honors/Awards Received | Professional certificates or licenses held | Are you taking any educational courses presently? |
|---|---|---|
| | | ☐ Yes ☒ No |

Additional Information

PENGAD 800-631-6989
DEPOSITION
EXHIBIT
I-4-07 Cava

## References List people we may contact who are qualified to evaluate your capabilities. No relatives please.

| Name | Telephone | Occupation | Years Known |
|---|---|---|---|
| John Carolla | (925) 989-4563 | Sales - Co-worker | 3 |
| Rebel Pallotti | (661) 454-6863 | Sales - Former manager | 5 |
| ~~Jennifer Forrest~~ | ~~(   ) 7 7-3149~~ | ~~Former department manager~~ | 4 |

**A conviction includes a plea, verdict or finding of guilt, regardless of whether sentence was imposed by the court. (You may exclude those convictions which have been judicially sealed, expunged or statutorily eradicated. You may also exclude a misdemeanor conviction for which probation has been successfully completed or otherwise discharged and the case has been judicially dismissed.)

## Employment History

Give employment history, listing current or most recent employer first. Show unemployed or self-employed periods and indicate dates and comment on each period. Include part-time or summer work. You may use extra sheets for additional information. A resume may be used to supplement (but not replace) this information.

| Company Name (Current or Last) | Telephone | Job Title | Dates: From - To |
|---|---|---|---|
| Shared Technologies | 510) 266-6800 | Sales | 10/98 - current |
| Address | City, State, Zip | | Rate of Pay |
| 20949 Cabot Blvd | Hayward, CA 94545 | | 122-180K (last four year |
| Supervisor's Name and Title | | Reason for Leaving | |
| Judy Vandorne | | looking for better Company & opportunity | |
| Description of duties | | | |
| Sales | | | |

| Company Name (Current or Last) (Now | Telephone Office closed | Job Title | Dates: From - To |
|---|---|---|---|
| GTE Communication/verizn) | | Sales | 5/98 - 10/98 |
| Address | City, State, Zip | | Rate of Pay |
| 1111 Broadway | Oakland, CA 94607 | | Avg 46K / mo |
| Supervisor's Name and Title | | Reason for Leaving | |
| John Bustamante | | Better opportunity | |
| Description of duties | | | |
| Sales | | | |

| Company Name (Current or Last) | Telephone (Company Sold) | Job Title | Dates: From - To |
|---|---|---|---|
| Controlled Warehousing | (510) 489-7090 | Manager Business development | |
| Address | City, State, Zip | | Rate of Pay |
| 20955 Sn Clemente | Hayward CA 94544 | | 4K / mo |
| Supervisor's Name and Title | | Reason for Leaving | |
| Mike Ivancich | | Better Job | |
| Description of duties | | | |
| Business Development, Management | | | |

## Acknowledgement

I give the Employer the right to investigate all references and to secure additional information about me. I also authorize the companies, schools, or persons named above to give any information regarding my employment, character and qualifications. I hereby release said companies, schools, or persons, from all liability for any damage related to issuing this information.

I understand that the Employer is an equal opportunity employer. The Employer does not discriminate in employment and no question on this application is used for the purpose of limiting or excluding my consideration for employment on a basis prohibited by local, state or federal law.

This application is current for only sixty (60) days. At the conclusion of this time, if I have not heard from the Employer and still wish to be considered for employment, it will be necessary for me to fill out a new application.

I also understand that should I be employed by the Employer, I will be required, in accordance with the Immigration Reform Control Act of 1986 (IRCA), to provide on my first day of employment documents providing proof of my identity and employment eligibility status. I acknowledge that this verification is a condition of employment and that failure to comply will void my offer of employment.

I understand that, in the absence of a specific contract or agreement signed by the President of the Company, employees are hired on an at will basis, and either the employee or the Company may terminate the employment relationship at any time with or without cause and with or without notice. The Employer's only obligation upon termination for any reason or no reason will be to pay salary or wages due and owing at that time.

I understand that, should I be employed by the Employer, I may be required to sign an agreement which protects the Employer's confidential information: conflicts of patent disclosures, assignments, and copying; and, other job related acknowledgments. I understand that it is a condition of my employment that I sign such agreements. If I refuse to sign, I acknowledge that the offer of employment to me will be revoked.

I understand that the Employer's place of business is a drug-free environment and that weapons of any kind are strictly prohibited.

I have read and understand the provisions outlined above and affirm that the information is complete and true. I understand that any misrepresentation or omission of fact contained in this application is cause for rejection or immediate termination if I should become employed.

NOTE TO MARYLAND APPLICANTS:

Under Maryland law, an employer may not require or demand, as a condition of employment, prospective employment, or continued employment, that an individual submit to or take a lie detector or similar test. An employer who violates this law is guilty of a misdemeanor and subject to a fine not exceeding $100.

_____
Applicant Signature

5/6/04
Date

HR-001 (5/00)

# MICHAEL G. CAVA

14 Pinewood Place, Danville, California  94506 • Home (925) 648-3490 • Cellular (510) 821-3680

## OBJECTIVE

To provide innovative converged enterprise solutions and support services by capitalizing on my extensive marketplace experience as a team member of a leading National Nortel Networks Authorized Partner.

## PROFESSIONAL EXPERIENCE

Oct 1998-Present    **Shared Technologies** - Hayward, CA
**NATIONAL ACCOUNT EXECUTIVE**
Developed and managed Mid to Large Enterprise customers converged communications environments.  Personally managed all aspects of the customers experience from account acquisition through ongoing support. Consistent over-achievement of quota including three circle of excellence awards, and was number one through three in California for the sales stack ranking achievement in all five full years of employment.  Branch sales grew by well over 1000% during my tenure of employment.

## EDUCATION

1989-1994    **California State University at Hayward** - Hayward, CA
Bachelor of Science Degree in Business Administration with an option in Marketing Management.  Earned 80% of tuition while in college. Completed several Post Graduate level courses in the MBA program.

## CERTIFICATIONS AND MEMBERSHIPS

2003    **19 Nortel Networks Qualified Sales Professional Certifications -**
More than double the amount of any other Account Executive within the Shared Technologies organization.  Complete list provided upon request.

2000 - Present    **NCINNMUG / INNUA -**
Provided extensive involvement and support of local user group since its re-establishment in 2000. Attended almost all local, regional, and international meetings and conferences.

## REFERENCES

Proudly provided upon request.

D00078



*network solutions for an e-world*

May 12, 2004

Mr. Michael G. Cava
14 Pinewood Place
Danville, CA 94506



Dear Mr. Cava,

It is our pleasure to extend this employment offer to you for the position of "Account Executive." This letter will briefly outline your compensation and benefits associated with this offer.

Your base pay will be $2,500 per paycheck ($65,000 annually). NetVersant San Francisco's commission is outlined on the Account Manager Compensation Plan attached.

The details of your health, life, and 401(k) benefits, including eligibility requirements, will be offered and available to you as for all employees of NetVersant San Francisco. Company equipment and other necessary tools to assist you in your position will also be available to you upon your projected start date of June 7, 2004.

As a NetVersant San Francisco employee, you will be expected to comply with the Company's policies and procedures, sign and acknowledge in writing that you have read the Company's Handbook, the Business Practices Policy, which among other things prohibits the unauthorized use or disclosure of NetVersant San Francisco's proprietary information. By making this offer, NetVersant San Francisco does not wish to receive or obtain the benefit of any trade secrets or confidential information of any of your former employers. Accordingly, NetVersant San Francisco cautions you not to disclose any trade secrets or confidential information of any former employer to anyone at NetVersant San Francisco, nor to use any such trade secrets or confidential information for the benefit of NetVersant San Francisco. NetVersant San Francisco further cautions you not to bring with you any original or copies of papers, documents, notes, or other materials, whether stored electronically or otherwise, which belong to any former employer or which contain any trade secrets or confidential information of any former employer.

Employment with NetVersant San Francisco has an introductory period of 90 days. This introductory period does not mean that employment can only be terminated for cause. At the end of this period, both parties will evaluate your position at NetVersant San

**NetVersant**
*network solutions for an e-world*

Mr. Michael G. Cava
May 12, 2004
Page 2

Francisco to either continue or terminate the relationship. Employment with NetVersant San Francisco is at-will. This means that either you or NetVersant San Francisco may, at any time and with or without cause, terminate the employment relationship. The employment terms in this letter supersede any other agreements or promises made to you by anyone, whether oral or written. As required by law, this offer is subject to satisfactory proof of your right to work in the United States, a drug and substance testing, and a satisfactory background check.

Please sign and date this letter, and return it to me at a suitable time if you wish to accept employment at NetVersant San Francisco under the terms described in this letter. This offer of employment will expire at 12:00 a.m. on May 14, 2004.

We look forward to a mutually rewarding working relationship.

Sincerely,

Peter Wainwright
Vice President - Sales
NetVersant

\* \* \*

Agreed and Accepted:

Dated: 5/14/04        Signature: _____
                                  MICHAEL G. CAVA

PW:jnt
Attachment – Account Executive Annual Compensation Plan

D00082

# HANDBOOK ACKNOWLEDGMENT AGREEMENT

This Employee Handbook is an important document intended to help you become acquainted with NetVersant. This Handbook will serve as a guide; it is not the final word in all cases. Individual circumstances may call for individual attention.

Because the general business atmosphere of NetVersant and economic conditions are always changing, the contents of this Handbook may be changed at any time at the discretion of the Company. No changes in any benefit, policy or rule will be made without due consideration of the mutual advantages, disadvantages, benefits and responsibilities such changes will have on you as an employee and the Company.

Please read the following statements and sign below to indicate your receipt and acknowledgement of the NetVersant Employee Handbook.

- I have received and read a copy of the Employee Handbook. I understand that the policies, rules and benefits described in it are subject to change at the sole discretion of NetVersant at any time.

- I further understand that my employment and compensation with NetVersant is "at will" and that my employment can be terminated with or without cause, and with or without notice, at any time, either by myself or NetVersant, regardless of the length of my employment.

- I understand that no contract of employment other than "at will" has been expressed or implied, and that no circumstances arising out of my employment will alter my "at will" employment relationship unless expressed in writing, with the understanding specifically set forth and signed by myself and the Chairman and Chief Executive Officer of NetVersant.

- I further understand that with the exception of employment at will, terms and conditions of my employment with the Company may be modified at the sole discretion of the Company with or without cause or notice at any time. No implied contract concerning any employment-related decision or term or condition of employment can be established by any other statement, conduct, policy, or practice. Examples of the types of terms and conditions of employment that are within the sole discretion of the Company include, but are not limited to, the following: promotion; demotion; transfers; hiring decisions; compensation; benefits; qualifications; discipline; layoff or recall; rules; hours and schedules; work assignments; job duties and responsibilities; production standards; subcontracting; reduction, cessation, or expansion of operations; sale, relocation, merger, or consolidation of operations; determinations concerning the use of equipment, methods, or facilities; or any other terms and conditions that the Company may determine to be necessary for the safe, efficient, and economic operation of its business.

- I am aware that during the course of my employment confidential information will be made available to me, i.e., customer lists, pricing policies and other related information. I understand that this information is critical to the success of NetVersant and must not be disseminated or used outside of NetVersant's premises. In the event of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.

- I understand that my signature below indicates that I have read and understand the above statements and have received a copy of the NetVersant Employee Handbook.

_Michel Cava_
**Employee Signature**

_6/2/04_
**Date**

_Michael Cava_
**Employee Printed Name**

_559 - 85 - 2897_
**Social Security Number**

*Give signed original copy of this acknowledgement form to the Human Resources Department for inclusion in your personnel file.*


DEPOSITION
EXHIBIT
3
PENGAD 800-631-6989
1-4-07 Cava

D00070

# *Anti-Harassment/Anti-Discrimination/Anti-Retaliation Policy*

NetVersant is committed to providing a businesslike and professional work environment that is free of harassment, discrimination, and retaliation. NetVersant's policy prohibits sexual harassment and harassment, discrimination or retaliation based on race, religion, creed, color, national origin, sex, gender, disability, ancestry, marital status, age, veteran status or any other basis protected by federal, state or local law or ordinance or regulation. All such harassment is a serious violation of Company policy and may be unlawful. Our policy applies to all persons involved in the operation of the Company and prohibits harassment by any employee of the Company or by any person doing business with or for NetVersant.

## Examples of Misconduct

Prohibited harassment, discrimination, and retaliation includes, but is not limited to, the following behaviors:

- Verbal conduct such as epithets, derogatory jokes or comments, slurs or unwanted sexual advances;
- Visual conduct such as derogatory and/or sexually-oriented posters, photography, cartoons, drawings or gestures;
- Physical conduct such as assault, unwanted touching, blocking normal movement or interfering with work because of sex, race or any other protected basis;
- Threats and demands to submit to sexual requests as a condition of continued employment, or to avoid some other loss, and offers of employment benefits in return for sexual favors; and
- Retaliation for having reported, threatened to report, or participated in an investigation of harassment or discrimination.

Disciplinary action, up to and including termination, may be taken against any employee engaging in inappropriate conduct in violation of this policy. Disciplinary action may also be taken against any employee who in bad faith makes a false or dishonest claim of harassment or discrimination. Any manager who has knowledge of such behavior yet fails to take appropriate action is also subject to discipline.

## Reporting Complaints

Any employee who believes he or she is being discriminated against or harassed based on any of the grounds stated above should report it immediately to his or her manager or to Human Resources. The Company will investigate the complaint, make a written determination of its conclusion and, when appropriate, prepare a plan of action to correct the problem and prevent its reoccurrence. The Company shall inform the complaining employee of its determination.

## Non-Retaliation

Under no circumstances will an employee be penalized for reporting what the employee believes in good faith to be harassment under this policy. If you believe that you are being retaliated against for bringing a complaint of harassment or discrimination, or participating in an investigation of harassment or discrimination, you should report such conduct immediately to your manager or to Human Resources. Any manager who retaliates against an employee for making a complaint shall be subject to disciplinary action up to and including termination.

If you have questions about this policy, please contact your manager or Human Resources. The success of our policy depends, in significant part, upon the understanding and cooperation of all our employees. Therefore, we ask you to sign the following acknowledgement:

I, _Michael Cava_ , have carefully read the above policy and understand and acknowledge it applies to me both in my present capacity and in any future position I may hold with the Company.

_Michael Cra_    _6/2/04_
Employee Signature/Date

HR-007 (5/23/01)



DEPOSITION
EXHIBIT 
4
r-4-07 Cava

PENGAD 800-631-6989

D00069



CP⁶/¹⁰

### ACCOUNT EXECUTIVE
### 2004 COMPENSATION PLAN

| | | |
|---|---|---|
| Company: NetVersant - San Francisco | Effective Date: | June 1, 2004 |
| Employee Name: Michael G. Cava | Base Salary: | $5,416 / month ✓ |
| Single Signature Bidding Limit: | $0 | GOP Quota: $ 341,250  $585,000 / year |
| Dual Signature Bidding Limit: | $0 | GOP Budget: | $0 / year |
| Expense Budget: | $150 / month | | |

This Account Executive 2004 Compensation Plan (the "Plan") is designed to motivate and award your attainment of prescribed sales goals.

1.  **Definitions.**

"Accrued Sales Commissions" means Sales Commissions calculated based on GOP.

"Approved Jobs" means jobs performed for your Assigned Accounts which (i) have commenced (i.e. products and/or services have been provided for which an invoice may be issued) *during* the Plan Year and (ii) have been designated in writing by the EVP - Sales & Business Development as eligible for you to receive Sales Commissions pursuant to this Plan.

"Assigned Accounts" means customer accounts that have been assigned to you in writing by the EVP - Sales & Business Development.

"Base Salary" means your base compensation as set forth above, which may be adjusted from time to time by the Company at its sole discretion.

"Collected GOP" means GOP generated from *completed* Approved Jobs for which full and final payment has been *received* by the Company (including any retainage amounts) for the Plan Year. GOP generated from Approved Jobs that are completed and/or for which final payment is received following the end of the Plan Year will be included in the calculation of Sales Commissions under this Plan.

"Earned Sales Commissions" means Sales Commissions calculated based on Collected GOP.

"GOP" means Gross Operating Profit, defined as total revenues generated from Approved Jobs, less all direct and indirect operating costs, as allocated to the Approved Jobs by the Company for the Plan Year.

"GOP Budget" means the minimum GOP (in the amount set forth above) that you are expected to generate from Approved Jobs for the Plan Year.

"GOP Margin" means the percentage derived by dividing GOP by revenues generated from Approved Jobs, as recognized in the books and records of the Company for the Plan Year. GOP Margin is calculated in accordance with the Company's standard financial accounting methodology.

"GOP Quota" means the level of GOP (in the amount set forth above) that must be generated from Approved Jobs for the Plan Year in order to trigger increased levels of Sales Commissions as provided herein. The GOP Quota will be prorated in the event your entry into this Plan occurs after the first day of any given Plan Year.



DEPOSITION EXHIBIT 5
PENGAD 800-631-6989
H-407 Cava



"Maintenance Contract" means an agreement between the Company and an Assigned Account to provide maintenance services, on or for a system installed by the Company, for a predetermined fixed lump sum or periodic fee.

"Plan Year" means the period from January 1, 2004 through December 31, 2004.

"Qualified Company Referral Opportunities" means sales opportunities that are referred from one NetVersant company to another, that do not involve competitive pricing and of which the referral recipient was unaware prior to the referral.

"Qualified Service Line Referral Opportunities" means sales opportunities that are referred from one service line to another within the same NetVersant company, that do not involve competitive pricing and of which the referral recipient was unaware prior to the referral.

"Sales Commissions" means the amount derived by multiplying the applicable "GOP Commission Percentage" (set forth in the table below) by the Collected GOP recognized by the Company. The Company reserves the right, at the sole discretion of the EVP - Sales & Business Development, to advance a portion of Sales Commissions that have accrued for jobs that are of extended duration for which progress payments have been received by the Company (see paragraph 3 below). The applicable GOP Commission Percentage is based on (i) the *aggregate* GOP Margin generated by *all* Approved Jobs and (ii) the amount of Collected GOP for the Plan Year. The "Aggregate GOP Margin" shall be calculated by dividing the total amount of GOP by the total amount of revenues recognized in the books and records of the Company for all Approved Jobs for the Plan Year.

| Aggregate GOP Margin | GOP Commission Percentage (% of Collected GOP) | | |
|---|---|---|---|
| | Less than or equal to GOP Quota | Greater than GOP Quota and less than or equal to 110% of GOP Quota | Greater than 110% of GOP Quota |
| Equal to or Greater than 40% | 9% | 22% | 25% |
| 35% to 39% | 8% | 20% | 22% |
| 30% to 34% | 7% | 14% | 16% |
| 25% to 29% | 6% | 12% | 14% |
| 20% to 24% | 4% | 10% | 12% |
| 15% to 19% | 2% | 5% | 7% |
| Less than 15% * | 0% | 0% | 0% |

\*   In the event the Aggregate GOP Margin is less than 15%, Sales Commissions may be paid only when circumstances warrant at the sole discretion of the EVP - Sales & Business Development.

D00053



The GOP Commission Percentage will increase (as set forth in the table above) when the Collected GOP exceeds the GOP Quota and again when the Collected GOP exceeds 110% of the GOP Quota. Such increases will be retroactive to *all* Collected GOP for the Plan Year.

Sales Commissions are subject to increase or reduction based on the number of days invoiced amounts remain outstanding as set forth below:

| Invoice Aging | Commission Adjustment |
|---|---|
| 0 – 45 days | Increases Commission Due by 10% |
| 46 – 60 days | 0% |
| 61 – 90 days | Decreases Commission Due by 10% |
| 91 - 120 days | Decreases Commission Due by 25% |
| 121 - 150 days | Decreases Commission Due by 50% |
| More than 150 days | Decreases Commission Due by 75% |

**2.**     **Sales Commission Settlements.**  You will be provided a "Commissions Statement" for your Assigned Accounts on a monthly basis, which calculates Earned Sales Commissions from the beginning of the Plan Year through the end of the then-preceding month ("Cumulative Earned Commissions"). The Commissions Statement will also include a calculation of Accrued Sales Commissions for such period. Each month, you will be paid an amount equal to the Cumulative Earned Commissions *minus* all Sales Commission payments previously made to you under this Plan.  Earned Sales Commissions are paid monthly following recognition in the books and records of the Company; typically within two payroll cycles following closing of the Company's monthly financial statements.  The calculation of Accrued Sales Commissions is provided for informational purposes only; no Sales Commissions will be paid on Accrued Sales Commissions. **Sales Commissions are not Earned and no right to receive such Sales Commissions shall exist until the associated job is completed and the Company has received full and final payment for the associated products and/or services (including any retainage amounts).**

**3.**     **Commission Advances.**  The Company reserves the right, with the written approval of the EVP - Sales & Business Development, to advance a portion of Accrued Sales Commissions that have not been *earned* (i.e. full and final payment has not been *received* by the Company (including any retainage amounts) for large jobs (greater than $250,000 in revenues) that are of extended duration (greater than three months) for which progress payments (including nonrefundable deposit amounts) are made by the customers ("Unearned Advances").  Unearned Advances are subject to repayment to the Company in the event the associated Sales Commissions are not subsequently *earned*.  To the extent such Sales Commissions are not earned prior to your termination from employment with the Company, you hereby authorize the Company to deduct from your final paycheck an amount equal to the *lesser* of (i) your Unearned Advances or (ii) the maximum amount permitted by law (see paragraph 15 below).

**4.**     **Commissions on Customer Financing Leases.**  From time to time customers may elect to finance the purchase of products and/or services utilizing a leasing arrangement established by the Company with one or more leasing companies.  You will be paid an amount equal to 50% of any lease origination fees paid by leasing companies to the Company with respect to sales to Approved Jobs (the "Lease Commissions").  Lease Commissions shall be paid on the first full pay period after the Company receives payment of the applicable lease origination fees and shall be in addition to Sales Commissions for which you would be entitled hereunder for the associated sale. The Lease Commission rate of 50% is

- 3 -

D00054



subject to change from time to time, on a prospective basis, at the sole discretion of the Company, with or without notice.

**5.    Commissions on Maintenance Contracts.** Commissions on Maintenance Contracts shall be Earned at the *later* to occur of (i) when the Company receives payment for the applicable products and/or services or (ii) when the revenues and income for the applicable products and/or services are recorded in the books and records of the Company. For example, if the Company receives payment in advance for 12 months of maintenance services, Sales Commissions will be Earned ratably during the 12 month period as the revenues and income are recorded in the books and records of the Company. Sales Commissions for Maintenance Contracts shall be calculated utilizing a predetermined GOP Margin of 40%, subject to change from time to time, on a prospective basis, at the sole discretion of the Company, with or without notice.

**6.    Commission Plan Transition.** Payments received from Assigned Accounts during the Plan Year that are, or have been, included in the calculation of sales commissions or other incentive compensation under a prior plan or arrangement will not be included the calculation of GOP under this Plan.

**7.    Referral Fees.**

    **(a)    Company.** You will be eligible for a referral fee ("Referral Fee") for referring Qualified Company Referral Opportunities to other NetVersant companies who then are awarded the work. The Referral Fee will be equal to up to 1% of the total revenues generated by the each subject job and shall be paid to you after the job has been completed and full and final payment has been received. The maximum Referral Fee for each Qualified Referral Opportunity is $30,000 per year. The Referral Fee percentage shall be determined on a case-by-case basis by the EVP - Sales & Business Development responsible for of the referring company. Sales Commissions for jobs you sell after receiving a Qualified Company Referral Opportunity from another NetVersant company will be reduced by the Referral Fee paid to the applicable sales representative from the referring company. An Inter-Company Referral Form, in the form of Exhibit A hereto, must be completed for all Qualified Company Referral Opportunities and must be signed by both the referring and accepting sales representatives and respective company Presidents.

    **(b)    Service Line.** You will be eligible for a Referral Fee for referring Qualified Service Line Referral Opportunities from one service line to other with the Company who then is awarded the work. The Referral Fee will be equal to up to 1% of the total revenues generated by the each subject job and shall be paid to you after the job has been completed and full and final payment has been received. The maximum Referral Fee for each Qualified Service Line Referral Opportunity is $30,000 per year. The Referral Fee percentage shall be determined on a case-by-case basis by the Company President. Sales Commissions for jobs you sell after receiving a Qualified Service Line Referral Opportunity will be reduced by the Referral Fee paid to the referring sales representative. A Service Line Referral Form, in the form of Exhibit B hereto, must be completed for all Qualified Service Line Referral Opportunities and must be signed by both the referring and accepting sales representatives and the Company President.

**8.    Minimum Performance Standards.** You are required to maintain a minimum performance standard equal to your assigned GOP Budget. Your GOP Budget attainment will be reviewed on a monthly basis, which may be the basis for adjustment to Base Salary.

**9.    Top Performer Recognition.** In addition to any Sales Commissions payable under this Plan, you are eligible to receive a benefit reserved for the highest producing Account Executives of the NetVersant Solutions' affiliated companies during the Plan Year, pursuant to a program established by NetVersant Solutions, at its sole discretion.

D00055



10.     **Auto Expenses.** Unless modified by the EVP - Sales & Business Development in writing, it is the policy of the Company to provide reimbursement for on-the-job use of your personal (i.e. non Company-provided) vehicle on a per mile basis at the rate established by Internal Revenue Service guidelines. No additional reimbursement of vehicle-related expenses is permitted (e.g. fuel, maintenance and repair). Vehicle mileage must be documented in an Expense Report submitted on a monthly basis in accordance with Company policy.

11.     **Expense Budget.** Your monthly Expense Budget is shown above. The Expense Budget is used to cover customer development business expenses such as meals, entertainment, and outings. You are required to submit a monthly Expense Report itemizing all current expenses. You are expected to manage your selling expenses within this assigned budget to achieve the greatest positive impact at the least cost.

12.     **Signature Bidding Limits.** You are authorized to sign quotations up to the Single Signature Bidding Limit ("SSBL") listed above. All quotations in excess of your SSBL and up to the Dual Signature Bidding Limit ("DSBL") listed above require a second signature from your Sales Manager prior to the quotation being presented or communicated to the customer. All quotations in excess of the DSBL require the signature of the EVP – Sales & Business Development.

13.     **Errors or Omissions.** If as a result of your errors or omissions an Approved Job is negatively financially impacted, the amount of such negative financial impact may be deducted from your Sales Commission, Lease Commission and/or Referral Fee otherwise payable to you under this Plan. The determination of errors or omissions and associated negative financial impact will be made at the sole discretion of the Company.

14.     **At Will Employment:** The Company is an at-will employer, which therefore allows either you or the Company the right to terminate your employment at any time, with or without cause. This Plan is not an employment agreement or a promise of future employment.

15.     **Termination of Employment.** In the event your employment is terminated for any reason by you or the Company, your final Commission Settlement will be from the first day of the then-current month through the date of your termination of employment. **Only Sales Commissions that have been *Earned* (i.e. GOP generated from *completed* Approved Jobs for which full and final payment has been *received* by the Company (including any retainage amounts)) through the date of termination will be paid to you.** You will not be entitled to, and will not be paid *any* Sales Commissions, Lease Commissions or Referral Fees with respect to outstanding quotations, proposals, contracts or sales that are booked, completed, invoiced or paid *after* the termination date of your employment. In the event Unearned Advances are outstanding on the date of termination of your employment, you hereby authorize the Company to deduct from your final paycheck an amount equal to the *lesser* of (i) your Unearned Advances or (ii) the maximum amount permitted by law.

16.     **Confidential Relationship.** You understand and acknowledge that in conjunction with your employment with the Company you will be exposed to confidential and proprietary information of the Company, including, but not limited to, customer lists, pricing methodology, technical data, sales materials and financial information. You agree that while you are employed by the Company and for a period of 12 months thereafter you will not disclose any such information to any third party without the express written consent of the President of the Company or otherwise use such information except on behalf of and pursuant to your employment with the Company. Because of the difficulty of measuring economic losses to the Company as a result of a breach of the foregoing, and because of the immediate and irreparable damage that could be caused to the Company for which it would have no other adequate

D00056



remedy, you agree that the foregoing may be enforced by the Company in the event of your breach, by appropriate injunctions and restraining orders.

**17.    Nonsolicitation.**  As an express condition to your participation in this Plan, you agree to not, during the period of your employment with the Company, and for a period of 12 months immediately following the termination of your employment, directly or indirectly, for yourself or on behalf of or in conjunction with any other person, company, partnership, corporation or business of whatever nature (a) call upon any person who is, at that time, an employee of the Company for the purpose or with the intent of enticing such employee away from or out of the employ of the Company; or (b) call upon any person or entity which is, at that time, or which has been, within the 12-month period prior to that time, a customer of the Company for the purpose of soliciting or selling products or services in direct competition with the Company.  Because of the difficulty of measuring economic losses to the Company as a result of a breach of the foregoing covenants, and because of the immediate and irreparable damage that could be caused to the Company for which it would have no other adequate remedy, you agree that the foregoing covenants may be enforced by the Company by appropriate injunctions and restraining orders.

**18.    Plan Subject to Change.**  This Plan is subject to change from time to time at the sole discretion of the Company, with or without notice.

**19.    Complete Agreement.**  This Plan sets forth the entire agreement of the parties hereto relating to your compensation and supersedes any other agreements or understandings, written or oral, between the Company and you with respect to this Plan.  By signing below, you acknowledge that there are no oral representations, understandings or agreements between you and the Company or any of its officers, directors or representatives covering the subject matter of this Plan.  This is the final, complete and exclusive statement and expression of the agreement between you and the Company with respect to this Plan, and it cannot be varied, contradicted or supplemented by evidence of any prior or contemporaneous oral or written agreements.

Reviewed and Accepted as of the Effective Date shown above:

**Company:**

By: _____          By: _____
    William L. Fiedler                           Robert E. (Rob) Macchi
    Secretary & General Counsel                  EVP – Sales & Business Development

**Employee:**

Name: _Michael G. Cava_

AcctExecutive 2004 v05.1                                Rev 14.4

D00057



**ADDENDUM 1 TO THE
ACCOUNT EXECUTIVE 2004 COMPENSATION PLAN**
* * * *
**MAINTENANCE CONTRACTS**

This Addendum 1 ("Addendum 1") to the Account Executive 2004 Compensation Plan agreement between NetVersant – San Francisco, Inc. (the "Company") and the undersigned employee (the "Agreement") is executed effective as of the Effective Date of the Agreement. Capitalized terms not defined herein shall have the meaning given to them in the Agreement.

1. All GOP generated from Maintenance Contracts that commence (i.e. products and /or services have been provided for which an invoice may be issued) *during* the 2004 Plan Year will be credited to the GOP Quota and GOP Budget for the 2004 Plan Year, notwithstanding when the GOP is recorded on the books and records of the Company. For example: If a three-year Maintenance Contract commences during 2004, all GOP generated by such contract during its three-year term will be credited to the GOP Quota and GOP Budget for the *2004 Plan Year* as and when it is recorded on the books and records of the Company.

2. All GOP generated from Maintenance Contracts that commence *prior* to the 2004 Plan Year (i.e. prior to January 1, 2004) will be credited to the GOP Quota and GOP Budget for the 2003 Plan Year, notwithstanding when the GOP is recorded on the books and records of the Company. Sales Commissions associated with such prior year Maintenance Contracts will be calculated and paid in accordance with the compensation plan applicable to such Maintenance Contracts.

3. GOP Commission Percentage for Maintenance Contracts is fixed at 12% of Collected GOP for the 2004 Plan Year, notwithstanding the level of GOP generated for the 2004 Plan Year. Sales Commissions will be Earned in accordance with paragraph 5 of the Agreement and be payable in accordance with paragraph 2 of the Agreement. Provision in the Agreement for increase or reduction of Sales Commissions based on the number of days invoiced amounts remain outstanding shall not apply to Maintenance Contracts.

4. Except as otherwise provided herein, this Addendum 1 is subject to all of the other terms and conditions of the Agreement, which are incorporated into this Addendum 1 by this reference.

Reviewed and Accepted as of the Effective Date:

**Company:**
By: _____            By: _____
    William L. Fiedler                     Robert E. (Rob) Macchi
    Secretary & General Counsel            EVP – Sales & Business Development

**Employee:**
_____

Name: Michael G. Cava

AcctEx 2004 Addendum1 01                              Rev 1-04

D00051

**Michael Cava**

| | |
|---|---|
| **From:** | Peter Wainwright |
| **Sent:** | Wednesday, July 07, 2004 5:00 PM |
| **To:** | Michael Cava |
| **Cc:** | Rey Torres; John Romero |
| **Subject:** | New Accounts assigned to you |

Apple Computer (61c in Folsom)
EA Consulting
Markstein Beverage
US District Court (T&M)
US Probation
US Wireless

Check into workflow and talk to Romero re EA, contact customers

FYI I have assigned Gallo to somebody else

1



DEPOSITION
EXHIBIT 68
68
8-14-07 Cava
PENGAD 800-631-6989

MC 0068

NetVersant
Accrued Ranking Report 2004
June

| Salesperson Name | Division | Hire Date | Sales Annual Margin Quota | % of Annual Margin | % of YTD Margin | YTD Margin Perf. | Average Margin% |
|---|---|---|---|---|---|---|---|
| Bryant, Mr. Kevin | SSF | 3/1/1998 | $ 585,000.00 | 185% | 464% | $ 1,357,037.44 | 41% |
| Joshi, Mr. Nick | SSF | 7/1/2000 | $ 495,000.00 | 179% | 424% | $ 1,050,335.87 | 46% |
| Low, Mr. Thomas | SSF | 9/4/2001 | $ 450,000.00 | 133% | 474% | $ 1,067,079.84 | 37% |
| Cubiburu, Mr. John | SSF | 8/25/1999 | $ 585,000.00 | 117% | 234% | $ 684,908.69 | 40% |
| Planas, Mr. Mike | SSF | 1/3/2000 | $ 585,000.00 | 113% | 241% | $ 703,764.73 | 44% |
| Cava, Mr. Michael G | SAC | 6/7/2004 | $ 341,250.00 | 105% | 210% | $ 358,894.62 | 39% |
| Claeys, Mrs. Michelle M | LA | 7/16/2001 | $ 585,000.00 | 96% | 193% | $ 563,569.38 | 34% |
| Kawadier, Mrs. Marcy A | SSF | 1/6/2003 | $ 585,000.00 | 84% | 187% | $ 489,887.94 | 32% |
| McCarthy, Ms. Kathryn Patricia | SAC | 5/19/2003 | $ 585,000.00 | 75% | 149% | $ 436,804.24 | 35% |
| Candia, Mrs. Marion V | LA | 1/6/2003 | $ 585,000.00 | 47% | 94% | $ 276,142.28 | 41% |
| Savely, Ms. Hope A | SEATTLE | 1/12/2004 | $ 585,000.00 | 38% | 76% | $ 223,268.52 | 36% |
| Waarvik, Ms. Karen M | PORTLAND | 1/19/2004 | $ 585,000.00 | 18% | 36% | $ 106,502.23 | 34% |
| Pizzoli, Mr. Michael P | SSF | 9/2/2003 | $ 585,000.00 | 15% | 31% | $ 89,914.11 | 38% |

MC 0045

MC 0046

DEPOSITION EXHIBIT
7
1-4-07 Cava
PENGAD 800-631-6989

#7



**NetVersant**
*network solutions for an e-world*

December 9, 2004

Mr. Michael Cava
14 Pinewood Place
Danville, CA 94506

Dear Michael:

On December 8, 2004, you requested a Personal Leave without pay beginning December 13, 2004 with a return date of January 12, 2005.  Your request was approved.  As with other requested leaves, you are required to continue your current contribution to the payment of benefits. Your payment of $535.84 ($267.92 x 2 pay periods = $535.84) is due on or about December 15, 2004.  Please send the payment directly to me for processing.

If you have any questions, please contact me.  We look forward to you return.

Regards,

Joanna Cotter
NetVersant San Francisco

JTC/dbh
cc:    Scott Landis
       Peter Wainwright
       File



DEPOSITION EXHIBIT
12
1-4-07 Cava

REDACTED

| | |
|---|---|
| **From:** | Peter Wainwright [pwainwright@netversant.com] |
| **Sent:** | Tuesday, January 18, 2005 3:43 PM |
| **To:** | Michael Cava |
| **Cc:** | Joanna Cotter; Robert Palmer |
| **Subject:** | Performance Expectations / Improvement Plan |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Michael,

Netversant is looking forward to your renewed sales contributions now that you have rejoined the operation. As your contributions prior to your family leave were not tracking with our sales expectations, this notification is to make it clear what level of performance we are expecting. As you have had several months on the job at Netversant and years in the local business selling the equipment we market, we are going to expect you to achieve "on track" results in terms of funnel and bookings from this point on. As the proven "funnel" is set at 4 X the quota for any given period, we expect that you deliver this ratio of qualified opportunities for the month, quarter and rolling 12 Month window. Based on a required run rate of 50K of GPM per month this will translate to new sales of 150K to 200K per Month on an ongoing basis (depending on job margin)

In order to achieve these results. This 4X1 ration means that a qualified funnel of 200K GPM / 800K +/- sales per month, 600K GM / 2.4M Sales per rolling 3 month period (Quarter) and 2.4 M GPM and 9.6 M Sales for a rolling 12 month period. Booked sales expectations are 50K of GPM per month, 150K per quarter and 600K from now on a rolling 12 month window. Maintenance of these funnel and new booking results are required from this point on for you to continue in your current position.

As Netversant has given you some installed base accounts and they have produced virtually all of your GPM to date, it is important that you understand that our expectation is for the above performance requirements to be achieved by new business that is developed by you.

In order to track your results we will need the following deliverables in hard and soft copy (Via email) delivered to me:

Funnel in attached format delivered and updated by the 15th and 1st of each month

Set appointment with me and review funnel and ongoing status : win/loss/slip/abandon on or around the 1st and 15th of each Month (depending on schedules and weekends)

Using this tool we will track your progress towards meeting the above mandatory funnel development and sales results. Opportunities entered into the funnel need to be realistic in terms of events, volume detailed and close dates. Accuracy of forecast will be tracked and evaluated. Please put a space between each month so we can total the funnel. For deals beyond 6 months in the future please indicate quarter anticipated in the Month column. If there are any questions regarding the format, please let me know. I will go out of my way to make myself available to support your sales efforts, please let me know where I can help. We wish you well in meeting the required performance deliverables indicated in this performance improvement plan.

<<NorCal Oppertunity Work Sheet Review.xls>>



DEPOSITION EXHIBIT

13

1-4-07 Cava

PENGAD 800-631-6989

D00129

*Peter Wainwright*
*VP Sales Telephony*
*Netversant*
<<Peter Wainwright.vcf>>

| AE | Customer Opportunity | Month | Revenue | GP % | Critical Success Factors |
|----|---------------------|-------|---------|------|--------------------------|
| Cava | | | | | |

D00131

D00132

D0013:

DEA # _____

**NEIL OKAMURA, D.O.**
Primary Care / Internal Medicine
5201 Norris Canyon Road • Suite 230
San Ramon, CA 94583
925-244-9355   Fax: 925-244-0726
CA Lic No. 20A6156

NAME _CNA Michael_ _____

ADDRESS_____ DATE _1/27/05_

℞ (Please Print)

disability form
signed off
on 1/19/05

with possible end
4/19/05

☐ LABEL

REFILL _____ TIMES   PRN   NR

☐ DO NOT SUBSTITUTE _____ — D.O
TO INSURE BRAND NAME DISPENSING
CHECK AND INITIAL BOX

1-OCY-03                    TAN631006_V20087912 11_00_34015_0001



REDACTED

| | |
|---|---|
| **From:** | Cava02@aol.com |
| **Sent:** | Friday, July 29, 2005 11:05 AM |
| **To:** | Joanna Cotter |
| **Subject:** | Return to Work Note |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Joanna,

As promised, attached is the Doctor's note with a return to work authorization.

I really do appreciate your help and support through my son's treatment. I look forward to seeing you next week.

Thank you,

Mike Cava



DEPOSITION
EXHIBIT (ohs
16
1-4-07  Cava

D0013!

D00136



**Return to Work**

_R. H. ___ CNA_ has been
under my care and will be able to return to
work on _7/31/01_ under
the following conditions: _7/31/01 - 9/1/..._
___ No Restrictions
___ Light Duty
___ Restricted Duty _____

_____              ®ULTRACET

D0009(

Joanna Cotter

| | |
|---|---|
| **From:** | Peter Wainwright |
| **Sent:** | Wednesday, August 03, 2005 3:02 PM |
| **To:** | Michael Cava |
| **Subject:** | FW: Account Assignments |

Michael,

To reaffirm our discussion of yesterday, we are starting you off with a clean slate in terms of your employment status. You will be expected to develop a funnel of 4 X your Monthly, Quarterly and Annual quota of Qualified prospects (same as anybody else). We expect good progress in the development of this funnel and in the closing of business in the third quarter. Your progress will be closely monitored. You need to demonstrate that you can find customers and close the business.

As you did not develop and close any accounts in the Months that you were working before, we do not have any accounts to return to you per my offer below. For the few accounts that we were able to give you when you started ( that were available due to the departure of a sales person), these have been reassigned. While it was reasonable for a rep to act as a "caretaker" for a short period (and I understand that you had that offer), it is not fair to take an account away after somebody worked it for 8 months. This permanent assignment is my decision and is part of my responsibility to manage who is assigned to what accounts. Account assignment is the responsibility of Netversant management.

At the time of your hire it was made clear that your job was to develop new customers and build a base that you could keep. You are under the same charter as the other 3 new people in the region. There is no guarantee that any accounts will be handed to you. If some do pop up in the future, they will be divided fairly among the sales reps. You need to focus 100% of your time to prove you can develop a funnel of good business and close it. We wish you well in succeeding at this task and the entire management team is here to assist upon your request.

I am checking on the status of a 2005 compensation plan for you. You can assume that your annualized quota will be based on 9 X your base salary ($65,000 x 9 = $585,000 of Gross Margin) as this is the same for all the Salary plus commission sales team.

If you have any questions please let me know.

Good Selling!

| | |
|---|---|
| **From:** | Peter Wainwright |
| **Sent:** | Monday, August 01, 2005 10:24 AM |
| **To:** | Michael Cava |
| **Subject:** | Account Assignments |

As the accounts that you were working on were reassigned during your absence, I want to make sure that you get back any that you personally developed. Please prepare a list on any accounts that you developed and signed as a customer of Netversant. We can look at any developmental accounts that you feel you have special positioning in, that other reps are currently working, and (possibly) team you with the rep that has been working the account. For accounts that you did not develop (sign as a customer) but were assigned to you, these have been reassigned. For the purpose of account management stability and fairness to the reps that have been managing them in the interim, these will remain as they are assigned. If you have any questions let me know and I am happy to look at the categories of accounts indicated above.



DEPOSITION
EXHIBIT
17
1-4-07  Cava
PENGAD 800-631-6989

1

D00050

REDACTED

| | |
|---|---|
| **From:** | Cava02@aol.com |
| **Sent:** | Thursday, August 04, 2005 8:09 AM |
| **To:** | Joanna Cotter |
| **Subject:** | Continued Leave |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Joanna,

After returning to work for the last few days, I have realized that I was not quite ready to return to work, and my physician agreed.

Please do call with any questions or concerns so we can discuss this further. I plan on talking to Scott Landis this afternoon as well when he gets back in the office after 1 PM.

I truly appreciate all the help and support you have provided.

Thank you,

Michael Cava
925-648-3490 Home



DEPOSITION
EXHIBIT ph3
19
1-4-07    Cava
PENGAD 800-631-6989

DEA #: ................................    CA Lic. # 20A6158

NEIL OKAMURA, D.O.
Primary Care / Internal Medicine
3201 Norris Canyon Road
Suite 290
San Ramon, CA 94583
925-244-9365  Fax: 925-244-9726

NAME  *Michael Cross*

ADDRESS ....................    DATE  *8-3-05*

℞  (Please Print)

*To attorney Concern*
*Michael Needs Time*
*off work. Further*
*phone call.*

☐ LABEL

REFILL ............. TIMES

☐ DO NOT SUBSTITUTE    D.O.

TO INSURE BRAND NAME DISPENSING,
"WRITE AND INITIAL BOX."



**NetVersant**
network solutions for an e-world

August 5, 2005

Mr. Michael Cava
14 Pinewood Place
Danville, CA 94506

Dear Mr. Cava:

The letter is to inform you of your separation with NetVersant as of August 5, 2005. The cause for your termination is due to your inability to perform your duties as an Account Executive.

You will have received your final check for wages paid from August 1 through August 3, 2005. You do not have any vacation accrued and therefore no further pay is due to you. Under federal and state guidelines, COBRA will be mailed to you in a separate cover.

Should you have any questions, please call me at (916) 286-3301.

Sincerely,

Joanna Cotter
Human Resources Director

Cc:     Personnel File
        Peter Wainwright – VP Sales



NetVersant - Sacramento
1820 Tribute Road, Suite A • Sacramento, CA 95815 • 916-286-3300 • Fax 916-286-3399

D0004

AcCnt Executive: Cava, Mr. Michael S

|  | Collected * |  |
|---|---|---|
| GDP Quota | Collected GDP | Collected GDP Quota % |
| 341,250.00 | 22,180.58 | 6 |

| Typ | Number | Customer | Revenue | Margin % | Com % | Cost | Commission | GDP | Paid | Balance | Comm GDP | Collected | Accrued GDP | Quota % | Margin % | Aging | Margin % Com % | Run Reduction | Age % Commission |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prject | 121.3-12323 | MAXIMUS, INC. | 4,800.00 | 39 | 8 | 3,241.07 | 2,338.38 | 1,658.93 | 1,658.93 | 934.29 | 4,800.00 |  | 35 |  | 39 | 22 | 132.71 | 143.99 |
| Prject | 121.3-34554 | MAXIMUS, INC. | 3,400.00 |  |  | 2,000.00 |  | 1,900.00 | 1,900.00 | 1,900.00 | 3,400.00 |  |  |  |  |  | 172.20 | 173.20 |
| Prject | 121.3-13324 | HANSEN INFORMATION S | 1,320.00 |  |  | 948.29 | 373.32 | 386.68 | 386.68 | 386.68 | 1,320.00 |  |  |  |  |  | 46.94 | 51.63 |
| Prject | 121.31361NMCB | HANSEN INFORMATION H | 1,708.65 |  |  | 1,049.19 | 659.46 | 659.46 | 659.46 |  |  |  |  |  |  |  | 83.94 | 89.52 |
| Prject | 121.31361NMCB | APPLE COMPUTER | 1,589.60 |  |  | 2,616.00 | 1,046.40 | 1,046.40 | 1,046.40 | 1,962.00 |  |  |  |  |  |  | 29.53 | 125.57 |
| Prject | 121.3147NMCB | EA CONSULTING | 915.80 |  |  | 389.32 | 526.68 | 526.68 | 526.68 | 1,330.00 |  |  |  |  |  |  | 40.35 | 46.35 |
| Prject | 121.3147NMCB | MARKSTEEL BEVERAGES M | 24,865.00 |  |  | 14,865.00 | 9,910.03 | 9,910.03 | 9,910.03 |  |  |  |  |  |  | 1,189.20 | 1,189.20 |
| Prject | 121.32019NMCB | MAXIMUS, INC. | 1,330.00 |  |  | 803.32 | 526.68 | 526.68 | 526.68 | 1,330.00 |  |  |  |  |  |  | 15.12 |
| order | 10016 | US DISTRICT COURT | 290.00 |  |  | 114.76 | 175.24 | 175.24 | 175.24 | 290.00 |  | 80 |  | 36 |  | 14.02 | 15.42 |
| order | 10121 | HANSEN INFORMATION S | 95.00 |  |  | 57.38 | 37.62 | 37.62 | 37.62 | 95.00 |  |  |  |  |  | 1.50 | 1.66 |
| order | 10175 | MAXIMUS, INC. | 47.50 |  |  | 28.69 | 18.81 | 18.81 | 18.81 | 47.50 |  |  |  |  |  | 1.50 | 1.66 |
| order | 10176 | MAXIMUS, INC. | 47.50 |  |  | 28.69 | 18.81 | 18.81 | 18.81 | 47.50 |  |  |  |  |  | 1.50 | 1.66 |
| order | 10265 | HANSEN INFORMATION S | 47.50 |  |  | 28.69 | 18.81 | 18.81 | 18.81 | 47.50 |  |  |  |  |  | 1.50 | 1.66 |
| order | 10291 | HANSEN INFORMATION S | 47.50 |  |  | 28.69 | 18.81 | 18.81 | 18.81 | 47.50 |  |  |  |  |  | 1.50 | 1.66 |
| order | 10324 | HANSEN INFORMATION S | 47.50 |  |  | 28.69 | 18.81 | 18.81 | 18.81 | 47.50 |  |  |  |  |  | 1.50 | 1.66 |
| order | 3097 | HANSEN INFORMATION S | 47.50 |  |  | 28.69 | 18.81 | 18.81 | 18.81 | 47.50 |  |  |  |  |  | 1.50 | 1.66 |
| order | 9143 | CONSLER & ASSOCIAT 3 | 1,235.00 |  |  | 745.34 | 489.66 | 489.66 | 489.66 | 1,235.00 |  |  |  |  |  | 55.68 | 61.25 |
| order | 9145 | MAXIMUS, INC. | 1,757.50 |  |  | 1,061.63 | 695.37 | 695.37 | 695.37 | 1,757.50 |  |  |  |  |  | 39.12 | 47.62 |
| order | 9147 | HSR INSURANCE SERV M | 290.00 |  |  | 114.76 | 175.24 | 175.24 | 175.24 | 0.00 |  |  |  |  |  | 14.02 | 43.04 |
| order | 9151 | MAXIMUS, INC. | 285.00 |  |  | 172.14 | 112.86 | 112.86 | 112.86 | 285.00 |  |  |  |  |  | 9.03 | 9.93 |
| order | 9171 | E J GALLO WINERY | 142.50 |  |  | 86.07 | 56.43 | 56.43 | 56.43 | 142.50 |  |  |  |  |  | 4.51 | 4.97 |
| order | 9172 | MARKSTEEL BEVERAGE S | 47.50 |  |  | 28.69 | 18.81 | 18.81 | 18.81 | 47.50 |  |  |  |  |  | 1.50 | 1.66 |
| order | 9215 | MAXIMUS, INC. | 190.00 |  |  | 114.76 | 75.24 | 75.24 | 75.24 | 190.00 |  |  |  |  |  | 6.02 | 5.42 |
| order | 9223 | E J GALLO WINERY | 47.50 |  |  | 28.69 | 18.81 | 18.81 | 18.81 | 47.50 |  |  |  |  |  | 1.50 | 1.66 |
| order | 9225 | HSR INSURANCE SERV M | 5,702.23 |  |  | 3,601.80 | 2,100.43 | 2,100.43 | 2,100.43 | 5,702.23 |  | 37 |  | 31 |  | 188.33 | 184.84 |
| order | 9403 | E J GALLO WINERY | 47.50 |  |  | 28.69 | 18.81 | 18.81 | 18.81 | 47.50 |  |  |  |  |  | 1.50 | 1.66 |
| order | 9428 | HANSEN INFORMATION S | 285.00 |  |  | 172.14 | 112.86 | 112.86 | 112.86 | 0.00 |  |  |  |  |  | 2.58 | 9.93 |
| order | 3447 | MAXIMUS, INC. | 70.00 |  |  | 37.72 | 32.28 | 32.28 | 32.28 | 0.00 |  |  |  |  |  | 2.58 | 2.58 |
| order | 3495 | MAXIMUS, INC. | 190.00 |  |  | 114.76 | 75.24 | 75.24 | 75.24 | 190.00 |  |  |  |  |  | 6.02 | 6.62 |
| order | 9574 | MARKSTEEL BEVERAGE S | 285.00 |  |  | 172.14 | 112.86 | 112.86 | 112.86 | 285.00 |  |  |  |  |  | 9.03 | 9.93 |
| order | 9574 | MARKSTEEL BEVERAGE S | 95.00 |  |  | 57.38 | 37.62 | 37.62 | 37.62 | 95.00 |  |  |  |  |  | 3.01 | 3.31 |
| order | 9631 | HANSEN INFORMATION S | 1,995.00 |  |  | 1,204.98 | 790.02 | 790.02 | 790.02 | 1,995.00 |  |  |  |  |  | 63.30 | 69.32 |
| order | 9634 | HANSEN INFORMATION S | 404.05 |  |  | 301.76 | 102.29 | 102.29 | 102.29 | 404.05 |  |  |  |  |  | 8.18 | 9.00 |
| order | 9655 | AMERICAN RED CROSS | 47.50 |  |  | 28.69 | 18.81 | 18.81 | 18.81 | 47.50 |  |  |  |  |  | 1.50 | 1.66 |
| order | 9132 | HANSEN INFORMATION S | 47.50 |  |  | 28.69 | 18.81 | 18.81 | 18.81 | 47.50 |  |  |  |  |  | 1.50 | 1.66 |
| order | 9849 | MAXIMUS, INC. | 570.00 |  |  | 344.28 | 225.72 | 225.72 | 225.72 | 570.00 |  |  |  |  |  | 18.06 | 18.06 |
| order | 9850 | HANSEN INFORMATION S | 47.50 |  |  | 28.69 | 18.81 | 18.81 | 18.81 | 47.50 |  |  |  |  |  | 1.50 | 1.66 |

| Collected GDP | Commission | YTD GDP | Paid | Balance | Accrued GDP | Potential Commission |
|---|---|---|---|---|---|---|
| 22,180.58 | 2,338.38 | 1,424.09 | 914.29 | 413,243.46 | 413,243.46 | 50,971.76 |

Job: S - Standard
H - Maintenance

* Subject to change based on YTD aggregate totals and future job performance.
** For performance evaluation and accounting purposes only. Does not represent earned commission.

DEPOSITION EXHIBIT 21
1-4-07 Cava
MC 0090

Account Executive: Cava, Mr. Michael G

| Type | Number | Customer | Revenue | Cost | GDP | Comm GDP | Collected | Margin % | Margin Weight Aging | Weight Comm % | Raw Reduction | Age $ Reduction | Potential Commission |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Collected *** | | | | | | | | | | | | | |
| C Other | 9831 | HANSEN INFORMATION S | 142.50 | 56.43 | 56.43 | 56.43 | 142.50 | 40 | | | 4.51 | -10 | 4.97 |
| **Collected *** | | | 56,242.60 | 34,067.02 | 22,180.59 | 22,180.59 | 31,570.53 | 40 | 28 | 8 | 2,285.71 | | 2,338.38 |
| **Accrued *** | | | | | | | | | | | | | |
| Project | 121.3-32537 | MAXIMUS, INC. | 4,800.00 | 3,141.07 | 1,658.93 | 1,658.93 | 1,400.00 | 35 | 25 | | 364.96 | -10 | 601.46 |
| Project | 121.3-34554 | MAXIMUS, INC. | 3,400.00 | 2,000.31 | 1,400.00 | 1,400.00 | 1,400.00 | 41 | 23 | | 308.00 | -10 | 338.80 |
| Project | 121.3-35024 | MAXIMUS, INC. | 1,400.00 | 803.31 | 596.69 | 596.69 | 1,320.03 | 42 | 23 | | 129.07 | -10 | 141.98 |
| Project | 121.3135ANCH | MAXIMUS, INC. | 948.29 | 568.97 | 379.32 | 379.32 | 2,844.87 | 40 | 23 | | 83.38 | -10 | 91.98 |
| Project | 121.3135ANCH | HANSEN INFORMATION M | 16,120.93 | 9,672.56 | 6,448.37 | 6,448.37 | 2,844.87 | 40 | 22 | | 731.80 | -10 | 773.80 |
| Project | 121.3135ANCH | APPLE COMPUTER M | 1,748.65 | 1,049.19 | 699.46 | 699.46 | 0.00 | 40 | 22 | | 83.94 | -10 | 83.94 |
| Project | 121.3135ANCH | APPLE COMPUTER M | 1,744.65 | 1,046.99 | 697.66 | 697.66 | 0.00 | 40 | 22 | | 83.94 | -10 | 83.94 |
| Project | 121.3135ANCH | HANSEN BEVERAGE M | 3,235.65 | 1,642.85 | 1,592.80 | 1,592.80 | 1,982.00 | 31 | 12 | | 175.57 | -10 | 921.29 |
| Project | 121.3144ANCH | DA CONSULTING M | 5,232.00 | 3,139.20 | 2,092.80 | 2,092.80 | 1,982.00 | 40 | 12 | | 175.13 | -10 | 123.57 |
| Project | 121.3201ANCH | MARKSTEIN BEVERAGE M | 635.80 | 389.48 | 246.32 | 246.32 | 1,947.40 | 38 | 12 | | 236.47 | -10 | 236.47 |
| Project | 121.3201ANCH | MARKSTEIN BEVERAGE M | 4,926.40 | 2,955.84 | 1,970.56 | 1,970.56 | 1,970.56 | 40 | 12 | | 236.47 | -10 | 236.47 |
| Project | 121.3201ANCH | MARKSTEIN BEVERAGE M | 130,710.00 | 78,426.00 | 52,284.00 | 52,284.00 | 52,284.00 | 40 | 12 | | 6,274.08 | -10 | 6,274.08 |
| Project | 121.3201ANCH | MARKSTEIN BEVERAGE M | 24,775.00 | 14,865.05 | 9,910.03 | 9,910.03 | 9,910.03 | 40 | 12 | | 1,189.20 | -10 | 1,189.20 |
| Project | 121.3161ANCH | MAXIMUS, INC. M | 796,612.66 | 477,967.02 | 318,645.06 | 318,645.06 | 0.00 | 40 | 12 | | 38,237.41 | -10 | 38,237.41 |
| Order | 10033 | MAXIMUS, INC. S | 1,330.00 | 803.31 | 526.98 | 526.98 | 1,330.00 | 39 | 14 | | 18.55 | -10 | 42.41 |
| Order | 10046 | US DISTRICT COURT S | 93.00 | 55.38 | 37.62 | 37.62 | 0.00 | 40 | 29 | | 8.28 | -10 | 9.10 |
| Order | 10121 | HANSEN INFORMATION S | 93.00 | 57.38 | 37.62 | 37.62 | 47.50 | 40 | 26 | | 4.14 | -10 | 4.55 |
| Order | 10175 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 47.50 | 40 | 25 | | 4.14 | -10 | 4.55 |
| Order | 10176 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 47.50 | 40 | 23 | | 4.14 | -10 | 4.55 |
| Order | 10177 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 47.50 | 40 | 22 | | 4.14 | -10 | 4.55 |
| Order | 10285 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 47.50 | 40 | 22 | | 4.14 | -10 | 4.55 |
| Order | 10291 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 0.00 | 40 | 22 | | 4.14 | -10 | 4.55 |
| Order | 10281 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 0.00 | 40 | 22 | | 4.14 | -10 | 4.55 |
| Order | 10324 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 0.00 | 40 | 22 | | 4.14 | -10 | 4.55 |
| Order | 10404 | PAYMES, INC. S | 47.50 | 28.69 | 18.81 | 18.81 | 0.00 | 40 | 22 | | 4.14 | -10 | 4.55 |
| Order | 10404 | HANSEN INFORMATION S | 57.38 | 28.69 | 18.81 | 18.81 | 0.00 | 40 | 22 | | 4.14 | -10 | 4.55 |
| Order | 10428 | HANSEN INFORMATION S | 93.00 | 55.38 | 37.62 | 37.62 | 0.00 | 40 | 22 | | 8.28 | -10 | 8.28 |
| Order | 10452 | MAXIMUS, INC. S | 2,385.00 | 1,519.74 | 865.26 | 865.26 | 0.00 | 40 | 22 | | 190.36 | -10 | 190.36 |
| Order | 10452 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 0.00 | 40 | 22 | | 4.14 | -10 | 4.55 |
| Order | 10532 | HANSEN INFORMATION S | 190.01 | 114.76 | 75.24 | 75.24 | 0.00 | 40 | 22 | | 16.55 | -10 | 16.53 |
| Order | 10550 | HANSEN BEVERAGE S | 290.00 | 114.76 | 75.24 | 75.24 | 290.00 | 40 | 13 | | 24.83 | -10 | 27.31 |
| Order | 10634 | E & J GALLO WINERY S | 285.00 | 172.14 | 112.86 | 112.86 | 285.00 | 40 | 22 | | 12.41 | -10 | 12.41 |
| Order | 10672 | E & J GALLO WINERY S | 23.75 | 14.35 | 9.40 | 9.40 | 0.00 | 40 | 22 | | 2.07 | -10 | 2.07 |
| Order | 10698 | HANSEN INFORMATION S | 2,331.50 | 1,291.05 | 846.45 | 846.45 | 0.00 | 40 | 22 | | 186.22 | -10 | 186.22 |
| Order | 10699 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 47.50 | 40 | 22 | | 4.14 | -10 | 4.55 |
| Order | 9097 | GENSLER & ASSOCIAT S | 47.50 | 28.69 | 18.81 | 18.81 | 47.50 | 40 | 22 | | 4.14 | -10 | 4.55 |
| Order | 9111 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 1,235.00 | 40 | 22 | | 4.14 | -10 | 4.55 |
| Order | 9145 | MAXIMUS, INC. S | 1,235.00 | 739.94 | 695.97 | 695.97 | 1,757.30 | 40 | 22 | | 107.59 | -10 | 118.35 |
| Order | 9147 | HOM INSURANCE SERV S | 1,225.00 | 695.97 | 695.97 | 695.97 | 0.00 | 40 | 22 | | 152.11 | -10 | 168.44 |
| Order | 9151 | MAXIMUS, INC. S | 290.00 | 745.94 | 175.37 | 175.37 | 285.00 | 40 | 13 | | 38.55 | -10 | 34.32 |
| Order | 9152 | E & J GALLO WINERY S | 285.00 | 172.14 | 112.86 | 112.86 | 285.00 | 40 | 22 | | 12.41 | -10 | 27.31 |
| Order | 9171 | E & J GALLO WINERY S | 285.00 | 172.14 | 112.86 | 112.86 | 285.00 | 40 | 22 | | 12.41 | -10 | 12.41 |
| Order | 9172 | MARKSTEIN BEVERAGE S | 142.50 | 86.01 | 56.43 | 56.43 | 142.50 | 40 | 22 | | 4.14 | -10 | 4.55 |
| Order | 9215 | MAXIMUS, INC. | 47.50 | 28.69 | 18.81 | 18.81 | 47.50 | 34 | 22 | | 4.14 | -10 | 4.55 |

* Subject to change based on YTD aggregate totals and future job performance.
* For performance evaluation and accounting purposes only. Does not represent earned commission.

Job: S = Standard
M = Maintenance

Case 4:07-cv-03224-SBA    Document 1-11    Filed 06/19/2007    Page 51 of 52

MC 0091

Company: 121 WVSF (US)
Region: NOV-2004

ACCOM Executive: Cava, Mr. Michael G

WV 2004 Account Executive Commission Report

Page:

Report Date: 01-NOV-2004 11:01:23 AM
16 of    153

ACCTG **

| Type | Number | Customer | Revenue | Cost | GDP | Comm GDP | Collected | Margin % | Weight Aging Comm | Age % Raw Reduction | Potential Commission |
|------|--------|----------|--------:|-----:|----:|---------:|----------:|---------:|------------------:|-------------------:|---------------------:|
| Order | 9223 | E J GALLO WINERY S | 190.00 | 114.76 | 75.24 | 75.24 | 190.00 | 40 | 72 | 16.55 | 14.90 |
| Order | 9255 | BUR INSURANCE SERV S | 47.50 | 28.69 | 18.81 | 18.81 | 47.50 | 39 | 28 | 4.14 | 4.55 |
| Order | 9403 | E J GALLO WINERY S | 5,702.23 | 3,601.80 | 2,100.43 | 2,100.43 | 5,702.23 | 37 | 34 | 462.09 | 508.30 |
| Order | 9428 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 47.50 | 22 | 11 | 24.63 | 4.55 |
| Order | 9447 | MAXIMOS, INC. S | 285.00 | 172.14 | 112.86 | 112.86 | 0.00 | 46 | 22 | 24.63 | 27.31 |
| Order | 9495 | MAXIMOS, INC. S | 70.00 | 37.72 | 32.28 | 32.28 | 70.00 | 24 | 22 | 7.10 | 7.10 |
| Order | 9574 | MARKETTEN BEVERAGE S | 190.00 | 75.24 | 75.24 | 75.24 | 190.00 | 24 | 51 | 16.55 | 18.21 |
| Order | 9513 | MARKETTEN BEVERAGE S | 285.00 | 172.14 | 112.86 | 112.86 | 285.00 | 41 | 22 | 24.83 | 27.31 |
| Order | 9934 | HANSEN INFORMATION S | 95.00 | 57.38 | 37.62 | 37.62 | 95.00 | 23 | 22 | 8.28 | 9.10 |
| Order | 9654 | MAXIMOS, INC. S | 1,995.00 | 1,204.98 | 790.02 | 790.02 | 1,995.00 | 23 | 33 | 173.80 | 191.18 |
| Order | 9192 | AMERICAN RED CROSS S | 404.05 | 301.76 | 102.29 | 102.29 | 404.05 | 28 | 29 | 22.50 | 24.75 |
| Order | 9655 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 47.50 | 28 | 22 | 4.14 | 4.55 |
| Order | 9848 | MAXIMOS, INC. S | 570.00 | 344.28 | 225.72 | 225.72 | 570.00 | 46 | 22 | 49.66 | 47.66 |
| Order | 9849 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 47.50 | 28 | 0 | 4.14 | 4.55 |
| Order | 9850 | HANSEN INFORMATION S | 47.50 | 28.69 | 18.81 | 18.81 | 47.50 | 22 | 22 | 4.14 | 4.55 |
| Order | 9851 | HANSEN INFORMATION S | 142.50 | 86.07 | 56.43 | 56.43 | 142.50 | 28 | 22 | 12.41 | 13.66 |

| | | | 1,033,948.49 | 620,705.03 | 413,243.46 | 413,243.46 | 38,224.82 | | | 50,971.52 | 50,971.75 |

MC 0092