# EXHIBIT – B

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   COUNTY OF SAN FRANCISCO

3                UNLIMITED CIVIL JURISDICTION

4

5   MICHAEL CAVA,                    )
                                     )
6                    Plaintiff,      )
    vs.                              ) Case No.:  CGC-06-453469
7                                    )
    NETVERSANT-NATIONAL, INC., a     )
8   Delaware corporation, dba        )
    NETVERSANT-SAN FRANCISCO aka     )
9   NETVERSANT; PETER WAINWRIGHT,    )
    an individual; and DOES 1        )
10  through 40, inclusive,           )
                                     )
11                   Defendants.     )
    _____)

12

13

14

15          **DEPOSITION OF PETER WAINWRIGHT**

16            Tuesday, November 28, 2006

17

18

19                  CERTIFIED
20                    COPY

21

22

23                      ROBERT BARNES ASSOCIATES
                     CERTIFIED SHORTHAND REPORTERS
24  Reported by:         760 Market Street, Suite 844
    Jennifer L. Yang      San Francisco, CA 94102
25  CSR No. 12367            (415) 788-7191

| | | |
|---|---|---|
| 1 | and acquisitions and so on, but I've basically had four jobs | 10:17:23 |
| 2 | in the last 25 years that were in this business.  The last | 10:17:27 |
| 3 | 22 years have been in sales management, since 1984. | 10:17:32 |
| 4 | Q    Can you, if you would, please identify for me -- | 10:17:45 |
| 5 | and I know you said the companies have merged and so forth | 10:17:47 |
| 6 | and so on, but could you identify your employers in the | 10:17:51 |
| 7 | telecommunication business since you started in that | 10:17:54 |
| 8 | business? | 10:17:57 |
| 9 | A    Yes, I could. | 10:17:57 |
| 10 | Nortel, and it's in 1981 I was hired as a sales | 10:17:58 |
| 11 | executive -- they were called Northern Telecom at the | 10:18:04 |
| 12 | time -- and in 1984 I was promoted to run the Pacific | 10:18:09 |
| 13 | Telephone account on their Enterprise equipment and | 10:18:14 |
| 14 | established an account team supporting the phone company | 10:18:24 |
| 15 | sales, and in about -- I haven't looked at my resume lately. | 10:18:27 |
| 16 | Q    That's okay. | 10:18:39 |
| 17 | A    I'd say around 1989, the phone company and Nortel | 10:18:39 |
| 18 | formed a joint venture, and I went to work for that joint | 10:18:43 |
| 19 | venture from Nortel and was a regional sales manager for | 10:18:48 |
| 20 | what was called PacTel Meridian Systems, which was the joint | 10:18:56 |
| 21 | venture, and ran the new systems sales business for them in | 10:19:00 |
| 22 | Northern California, and sometime after that -- lost track | 10:19:09 |
| 23 | the dates, so a couple years -- Nortel became the sole owner | 10:19:17 |
| 24 | of that enterprise. | 10:19:22 |
| 25 | Went back to Nortel and, in the late '90s, Williams | 10:19:24 |

| | | |
|---|---|---|
| 1 | Communications, which was a company out of Tulsa -- so | 10:19:34 |
| 2 | natural gas company -- purchased Nortel's direct sales group | 10:19:38 |
| 3 | out here and I retained my position as regional sales | 10:19:46 |
| 4 | manager and the company was called Williams Communications | 10:19:50 |
| 5 | Systems, and in the year 2000 I went from Williams to become | 10:19:56 |
| 6 | the Vice President of Sales for NetVersant, so I've been | 10:20:07 |
| 7 | there for six years or so. | 10:20:12 |
| 8 | Q    You've had that same title since 2000 at | 10:20:14 |
| 9 | NetVersant? | 10:20:18 |
| 10 | A    Correct. | 10:20:19 |
| 11 | Q    Okay. | 10:20:20 |
| 12 | A    They were called United Telecom when I went to | 10:20:21 |
| 13 | work for them, but they were acquired fairly shortly | 10:20:24 |
| 14 | afterwards by NetVersant.  But I had -- I was hired by | 10:20:27 |
| 15 | United Telecom as the Vice President of Sales.  I retained | 10:20:32 |
| 16 | that title when NetVersant acquired us. | 10:20:36 |
| 17 | Q    If you can clarify something for me -- I'll try to | 10:20:48 |
| 18 | do it with the documents.  Maybe you can be of some | 10:20:50 |
| 19 | assistance -- in reviewing some of the documents there's | 10:20:54 |
| 20 | references to, for example, various NetVersant entities. | 10:20:56 |
| 21 | Who is your employer? | 10:21:00 |
| 22 | A    The enterprise is my employer at part of | 10:21:02 |
| 23 | NetVersant.  They're called NetVersant National dba | 10:21:07 |
| 24 | NetVersant San Francisco, which is the group that handles | 10:21:12 |
| 25 | the Nortel telephony sales. | 10:21:18 |

| | | |
|---|---|---|
| 1 | Q    T-e-l-e-p-h-o-n-y. | 10:21:27 |
| 2 | A    Correct. | 10:21:32 |
| 3 | Q    And what's the -- what's the name of the entity | 10:21:33 |
| 4 | that's based out of Texas? | 10:21:36 |
| 5 | A    NetVersant Solutions, I believe, the parent | 10:21:41 |
| 6 | company, and NetVersant National is set up, and the reason | 10:21:45 |
| 7 | we're part of them, they have business licenses in, I think, | 10:21:50 |
| 8 | 50 states. | 10:21:53 |
| 9 | Q    Do you know whether NetVersant National is a | 10:21:55 |
| 10 | corporation in and of itself? | 10:21:58 |
| 11 | A    I believe -- oh, NetVersant National?  Yes, I | 10:22:00 |
| 12 | think they're all considered corporations.  I'm not an | 10:22:02 |
| 13 | expert on their legal structures. | 10:22:06 |
| 14 | Q    Fair enough.  Again, you can only answer to the | 10:22:08 |
| 15 | best of your knowledge.  Again, I'm entitled to your best | 10:22:10 |
| 16 | estimate. | 10:22:13 |
| 17 | A    Right. | 10:22:14 |
| 18 | They're set up as corporations.  NetVersant was | 10:22:14 |
| 19 | established through the acquisition of 20-some companies and | 10:22:17 |
| 20 | the national corporation was formed to handle the | 10:22:23 |
| 21 | cross-state business. | 10:22:31 |
| 22 | A lot of the companies were more local, especially | 10:22:32 |
| 23 | cabling-focus companies, and they retained their title: | 10:22:36 |
| 24 | NetVersant Texas or NetVersant what-have-you. | 10:22:39 |
| 25 | Q    Okay.  Who's your immediate supervisor presently? | 10:22:45 |

ROBERT BARNES ASSOCIATES - (415) 788-7191

| | | | |
|---|---|---|---|
| 1 | A | Rob Macchi. | 10:22:49 |
| 2 | Q | What's his -- | 10:22:51 |
| 3 | A | He's a Vice President of Sales, Senior Vice | 10:22:52 |
| 4 | President of Sales. | | 10:22:55 |
| 5 | Q | For NetVersant National? | 10:22:58 |
| 6 | A | Correct. | 10:23:00 |
| 7 | Q | Okay. And who does he report to? | 10:23:01 |
| 8 | A | The CEO, Scott Portal. | 10:23:04 |
| 9 | Q | Repeat that last name, please. | 10:23:07 |
| 10 | A | Fordham -- F-o-r-d-h-a-m. | 10:23:09 |
| 11 | Q | And Scott Fordham is a CEO of NetVersant National? | 10:23:13 |
| 12 | A | He's a CEO of NetVersant everything. | 10:23:18 |
| 13 | Q | So he's based out of Texas? | 10:23:20 |
| 14 | A | Right. And Rob, Rob actually lives in Seattle. | 10:23:22 |
| 15 | Q | Do you know who Rob's employer is, whether it's | 10:23:27 |
| 16 | National or whether it's Solutions, so to speak? | | 10:23:30 |
| 17 | A | I can't comment on that. I don't know. | 10:23:35 |
| 18 | Q | Okay. But that is your immediate supervisor? | 10:23:37 |
| 19 | A | Correct. | 10:23:41 |
| 20 | We have the one NetVersant and they have their various | | 10:23:42 |
| 21 | reasons for being historically, or whatever, legally | | 10:23:46 |
| 22 | incorporated here and there, but that's not my department. | | 10:23:49 |
| 23 | Q | So my confusion wasn't -- anyway. | 10:23:54 |
| 24 | Who was your predecessor supervisor prior to Macchi, if | | 10:23:58 |
| 25 | there was one? | | 10:24:02 |

| | | |
|---|---|---|
| 1 | get involved in marketing, vendor management, a few other | 10:25:52 |
| 2 | things, so I do a variety of things. | 10:25:56 |
| 3 | Q    Going back to sales management, are there | 10:25:59 |
| 4 | intermediaries between you and the salespeople? | 10:26:02 |
| 5 | A    There are parallel people and, as we're growing | 10:26:07 |
| 6 | the business, there is a intermediary now who is becoming | 10:26:13 |
| 7 | the sales manager in Southern California.  She was a sales | 10:26:18 |
| 8 | rep, now she's taking over sales management responsibility | 10:26:23 |
| 9 | and building a team of sales reps. | 10:26:27 |
| 10 | Over the past few years there have been times when I | 10:26:29 |
| 11 | had a sales manager in Southern California with reps | 10:26:33 |
| 12 | directly reporting to them, so I was second level. | 10:26:36 |
| 13 | Q    They, in turn, would report to you? | 10:26:40 |
| 14 | A    Correct. | 10:26:42 |
| 15 | Q    When you say there are parallels, referring to | 10:26:42 |
| 16 | other regions of the country? | 10:26:45 |
| 17 | A    No.  NetVersant sells a variety of products -- | 10:26:48 |
| 18 | cabling, security products for door badge readers, door | 10:26:52 |
| 19 | access, that kind of thing -- and in each region they have | 10:26:58 |
| 20 | something called a marketing sales director -- MSD -- and | 10:27:01 |
| 21 | they're responsible for all lines of business and | 10:27:07 |
| 22 | encouraging cross-selling between the various reps who | 10:27:09 |
| 23 | handle the lines of business. | 10:27:14 |
| 24 | My people handle telephony equipment.  My people | 10:27:15 |
| 25 | generally don't sell cabling or security products, and the | 10:27:21 |

| | | |
|---|---|---|
| 1 | MSD for each region that they're in, they're responsible for | 10:27:24 |
| 2 | promoting the sales of all of those, and the reps in each | 10:27:27 |
| 3 | region have a dotted-line report to them. | 10:27:30 |
| 4 | Q    But in the telephony department, you're | 10:27:34 |
| 5 | essentially the sales manager, so to speak? | 10:27:36 |
| 6 | A    Functionally, yes.  Although if you go to other | 10:27:39 |
| 7 | parts of the country, because of my role as the V.P. of | 10:27:41 |
| 8 | Sales for the national group, there are a quite a number of | 10:27:45 |
| 9 | reps who sell the equipment that I would be functionally | 10:27:49 |
| 10 | supporting, but they would be reporting to somebody else, | 10:27:53 |
| 11 | so -- so it depends on the region. | 10:27:55 |
| 12 | Like I said, I wear a number of hats. | 10:27:59 |
| 13 | Q    Your region is, again, Northern California, | 10:28:01 |
| 14 | Southern California and Nevada? | 10:28:02 |
| 15 | A    I handle the whole country for the Nortel | 10:28:06 |
| 16 | Telephony Group, but in those regions you just mentioned, I | 10:28:08 |
| 17 | have sales reps that directly report to me or through a | 10:28:13 |
| 18 | sales manager. | 10:28:17 |
| 19 | Q    And the other regions there are sales managers? | 10:28:18 |
| 20 | A    Yes, there are, or MSDs, the marketing sales | 10:28:21 |
| 21 | directors, and those people may be selling other things, | 10:28:24 |
| 22 | like security, but if they run into a opportunity for the | 10:28:28 |
| 23 | products that I handle, I specialize in, I would be tasked | 10:28:32 |
| 24 | with supporting them.  Eager to do it.  Would get credit for | 10:28:35 |
| 25 | their sales, etcetera. | 10:28:39 |

| | | |
|---|---|---|
| 1 | so I can't comment on the details -- but he was tasked with | 10:31:31 |
| 2 | getting all products sold within his region, and his region | 10:31:34 |
| 3 | was Southern and Northern California, but he was down in | 10:31:38 |
| 4 | Southern California and he was up here now and then. | 10:31:41 |
| 5 | Q    Did you -- again, just trying to understand.  I'm | 10:31:44 |
| 6 | not trying to argue with you -- did you consider Palmer to | 10:31:46 |
| 7 | be, in part, Cava's supervisor? | 10:31:49 |
| 8 | A    No.  That was -- he was reporting to me when he | 10:31:53 |
| 9 | was hired and it continued that way.  I was considered his | 10:31:57 |
| 10 | direct supervisor. | 10:32:01 |
| 11 | Q    You were considered and you considered yourself | 10:32:02 |
| 12 | his direct supervisor throughout his employment at the | 10:32:03 |
| 13 | company? | 10:32:06 |
| 14 | A    That's correct. | 10:32:07 |
| 15 | Q    Have you -- let's focus on NetVersant alone -- | 10:32:10 |
| 16 | have you previously been involved in litigation involving | 10:32:13 |
| 17 | employment matter? | 10:32:18 |
| 18 | A    Never.  In the last 28 years, and 24 years in | 10:32:20 |
| 19 | sales management, this is my first time, and I've had | 10:32:23 |
| 20 | literally dozens of salespeople work for me.  Never had a | 10:32:25 |
| 21 | complaint or any litigation. | 10:32:29 |
| 22 | Q    Okay.  Do you recall at some point in time | 10:32:31 |
| 23 | conducting an interview of Mike Cava? | 10:32:43 |
| 24 | A    Yes, I did. | 10:32:46 |
| 25 | Q    Do you recall -- again, I know time's passed and | 10:32:48 |

| | | |
|---|---|---|
| 1 | the role, it's kind of like an insurance practice where you | 10:37:3 |
| 2 | go find customers, you get them signed up as customers of | 10:37:3 |
| 3 | ours, get an agreement signed, and then, at that point, | 10:37:4 |
| 4 | manage the accounts so you can build up your empire. | 10:37:4 |
| 5 | Most people start with zero in terms of customer base. | 10:37:4 |
| 6 | They're expected to go find them and they build up their | 10:37:5 |
| 7 | portfolio of customers and grow that business and keep | 10:37:5 |
| 8 | adding more and make a living like that, basically building | 10:38:0 |
| 9 | up your own company. | 10:38:0 |
| 10 | That's the model that I've been using for years and | 10:38:0 |
| 11 | it's been -- I've been successful. | 10:38:0 |
| 12 | Q    Going back to my question, you said you were | 10:38:1 |
| 13 | looking for somebody to be a business -- business | 10:38:1 |
| 14 | development; is that correct? | 10:38:1 |
| 15 | A    Correct. | 10:38:1 |
| 16 | Q    All right.  Was Mike replacing anybody? | 10:38:1 |
| 17 | A    And Mike actually touted that he could bring in | 10:38:1 |
| 18 | companies like AOL, things like that, that he had great | 10:38:2 |
| 19 | relationships with. | 10:38:2 |
| 20 | Q    Okay.  Was Mike replacing anybody or was he an | 10:38:3 |
| 21 | addition to your team? | 10:38:3 |
| 22 | A    Somebody had left and there's not a one-for-one | 10:38:3 |
| 23 | replacement model that we have.  I need to keep appropriate | 10:38:4 |
| 24 | staffing levels, and somebody had left some time before | 10:38:4 |
| 25 | he -- he started -- and we had actually, during that period, | 10:38:4 |

| | | |
|---|---|---|
| 1 | very little turnover, but when she left, she had a number of | 10:38:5 |
| 2 | accounts that I distributed between various reps to look | 10:39:0( |
| 3 | after, and in the interview process I indicated to him "Hey, | 10:39:0 |
| 4 | you know, it's really good timing because there's a handful | 10:39:0 |
| 5 | of good accounts I can give you to get you started and you | 10:39:1 |
| 6 | can see, you know, in addition to the ones that you'd been | 10:39:1 |
| 7 | expected to bring in yourself." | 10:39:1 |
| 8 | Q    Was that person Jennifer Forrest? | 10:39:21 |
| 9 | A    That's correct. | 10:39:24 |
| 10 | Q    And how long had Jennifer been employed by | 10:39:25 |
| 11 | NetVersant? | 10:39:27 |
| 12 | A    Probably about three or four years. | 10:39:29 |
| 13 | She'd been very successful, yeah, in bringing in all | 10:39:32 |
| 14 | new business.  She started with zero accounts and built all | 10:39:35 |
| 15 | of the accounts up by finding them and developing them | 10:39:38 |
| 16 | herself.  She was given them. | 10:39:41 |
| 17 | Q    At the time was Maximus not one of the accounts, | 10:39:44 |
| 18 | one of the more significant accounts that Jennifer was | 10:39:47 |
| 19 | account executiving, so to speak, or maintaining? | 10:39:51 |
| 20 | A    That's an account she found and established as a | 10:39:53 |
| 21 | customer with NetVersant; that's correct. | 10:39:57 |
| 22 | Q    It's your recollection that's an account Jennifer | 10:39:59 |
| 23 | landed herself? | 10:40:01 |
| 24 | A    Yes, it is.  In fact, she had sold them the | 10:40:02 |
| 25 | maintenance contract for one site, new system for another | 10:40:06 |

| | | |
|---|---|---|
| 1 | worthwhile than the training, but yeah. | 10:43:5 |
| 2 | Q    You say he indicated to you that he had had | 10:43:5 |
| 3 | contacts of customers that seemed appealing to you. | 10:43:5 |
| 4 | Did you ever find out, again, whether sales closed or | 10:44:0 |
| 5 | not, did you ever find out whether he lied to you about | 10:44:0 |
| 6 | whether he had those contacts? | 10:44:0 |
| 7 | A    Well, I went on a number of sales calls with him | 10:44:0 |
| 8 | with contacts that he had at these accounts -- which, um, | 10:44:0 |
| 9 | they weren't -- they weren't very high-level contacts I'd | 10:44:1 |
| 10 | say -- and unfortunately, none of the places that I went | 10:44:1 |
| 11 | with to him turned into deals while he was there. | 10:44:2 |
| 12 | Q    While he was -- some of them turn into deals after | 10:44:2 |
| 13 | he was gone? | 10:44:3 |
| 14 | A    I believe we got maybe one, but it's not -- it was | 10:44:34 |
| 15 | an account we'd been chasing for years anyway. | 10:44:37 |
| 16 | He gave us an entre which was not a unique entre -- | 10:44:41 |
| 17 | somebody we had met with before -- but I didn't determine | 10:44:45 |
| 18 | any special relationship or, you know, loyalty or what have | 10:44:50 |
| 19 | you to Cava versus, you know, who had been in there before. | 10:44:53 |
| 20 | He had cleared some accounts at the chase to go pursue, | 10:44:58 |
| 21 | and I said, "Yeah, great.  Go for it." | 10:45:02 |
| 22 | In our employment discussion, we went over some | 10:45:05 |
| 23 | accounts that would be good prospecting ones for him because | 10:45:08 |
| 24 | he clearly understood his job was to go get new business. | 10:45:11 |
| 25 | Q    Okay.  In terms of -- in terms of your, in that | 10:45:15 |

| | | |
|---|---|---|
| 1 | first interview, your relaying to Mike as to what your | 10:45:28 |
| 2 | expectations of him were, what do you recall relaying to | 10:45:31 |
| 3 | him?  That, if he were to be employed by NetVersant, you | 10:45:34 |
| 4 | would expect him to what? | 10:45:39 |
| 5 | A    Go bring us business.  Go find business, good | 10:45:40 |
| 6 | business, good margin, good terms, develop happy customers | 10:45:43 |
| 7 | and develop revenue out of those customers. | 10:45:49 |
| 8 | Q    So you expected him, essentially -- is it fair to | 10:45:53 |
| 9 | say -- I don't want to put words in your mouth -- did you | 10:45:55 |
| 10 | expect him to devote 100 percent of his time in identifying | 10:45:57 |
| 11 | and bringing in new customers? | 10:46:03 |
| 12 | A    I expected him to spend a large percentage of his | 10:46:05 |
| 13 | time identifying and bringing in new customers and I was | 10:46:09 |
| 14 | made clear. | 10:46:13 |
| 15 | Also, I indicated that, because a rep had left, there | 10:46:13 |
| 16 | were some accounts of hers -- not all of them -- that he was | 10:46:18 |
| 17 | going to get to help him get started, which was a real bonus | 10:46:21 |
| 18 | and very unusual, which is a good thing.  It was kind of a | 10:46:25 |
| 19 | carrot to look at there. | 10:46:27 |
| 20 | And really, the account manager's job, you don't spend | 10:46:32 |
| 21 | 100 percent of your time chasing new business because | 10:46:38 |
| 22 | there's a lot of other things you do -- you do paperwork, | 10:46:41 |
| 23 | you're processing orders, you're filling out reports, you're | 10:46:43 |
| 24 | looking after accounts you already have -- and the longer | 10:46:47 |
| 25 | you've been there, the more time you spend looking after | 10:46:50 |

| | | |
|---|---|---|
| 1 | accounts that you developed versus finding new business. | 10:46:5: |
| 2 | So the account reps who have been there a long time | 10:46:5: |
| 3 | probably spend 10 percent of their time chasing new business | 10:46:5: |
| 4 | and 90 percent with old business where our brand new rep is | 10:47:0: |
| 5 | probably closer to 100 percent new business, so -- | 10:47:0: |
| 6 | Q    Is it fair to say that, following up on what you | 10:47:0: |
| 7 | said, that an account executive or salesperson or what have | 10:47:1: |
| 8 | you, once a sale closed, then that -- their involvement with | 10:47:1: |
| 9 | that customer isn't done, correct? | 10:47:2: |
| 10 | A    Correct. | 10:47:2: |
| 11 | There are, like I said, the idea is to develop a base | 10:47:2: |
| 12 | of accounts and nurture them and grow their business. | 10:47:3: |
| 13 | That's what they're expected to do.  That's the best model. | 10:47:3: |
| 14 | Other companies will transition that to an installed | 10:47:3: |
| 15 | base group.  My preferred model has been to keep them so | 10:47:4: |
| 16 | they get to build up their own company. | 10:47:4: |
| 17 | I clearly expressed to him at the time of hire that | 10:47:4: |
| 18 | he'd be getting a couple accounts, but that wasn't going to | 10:47:5: |
| 19 | be enough to live off.  He needed to go find some business, | 10:47:5: |
| 20 | too. | 10:47:5: |
| 21 | Q    You expected him, at least, to devote most of his | 10:47:5: |
| 22 | time -- | 10:48:0: |
| 23 | A    A good amount. | 10:48:0: |
| 24 | Q    -- identifying and bringing in new business? | 10:48:0: |
| 25 | A    Correct. | 10:48:0: |

| | | |
|---|---|---|
| 1 | A     About what? | 10:49:29 |
| 2 | Q     Just do you recall anything else that was | 10:49:30 |
| 3 | discussed aside from what we've talked about right now? | 10:49:33 |
| 4 | A     That covered the general meeting.  Yeah. | 10:49:35 |
| 5 | Q     Did he tell you anything about his family? | 10:49:37 |
| 6 | A     No, not that I recall. | 10:49:39 |
| 7 | Q     Subsequent to -- well, did -- did you extend a job | 10:49:46 |
| 8 | offer to Mike at that interview? | 10:49:51 |
| 9 | A     No.  I don't extend job offers.  I -- H.R. does. | 10:49:53 |
| 10 | That's where the letter comes from.  They generate a job | 10:49:57 |
| 11 | offer generally, even though I might sign the letter, but | 10:50:01 |
| 12 | I'm -- they go through a background check and drug test, | 10:50:04 |
| 13 | that type of thing, and that's when the offer letter goes | 10:50:09 |
| 14 | out.  It's not generated by me. | 10:50:13 |
| 15 | Q     At some point -- let me backtrack here. | 10:50:15 |
| 16 | Was the decision to hire or not hire Mike your | 10:50:19 |
| 17 | decision? | 10:50:22 |
| 18 | A     Scott Landis and I discussed it, but as my | 10:50:24 |
| 19 | ultimate decision, yeah, to hire him, yeah. | 10:50:29 |
| 20 | Q     As between you and Landis.  In other words, the | 10:50:31 |
| 21 | power was yours to exercise or not. | 10:50:34 |
| 22 | A     Right.  It's nice to consult Landis, but yeah. | 10:50:37 |
| 23 | Q     Did you at some point make the decision to extend | 10:50:40 |
| 24 | Mike an offer? | 10:50:43 |
| 25 | A     Yes, and I pushed it through H.R. and got it | 10:50:45 |

| | | |
|---|---|---|
| 1 | approved and then an offer letter was generated, yeah. | 10:50:4 |
| 2 | Q    Do you recall when, in relation to the interview, | 10:50:5 |
| 3 | you indicated to H.R. to make an offer letter to him? | 10:50:5 |
| 4 | A    Oh, fairly soon afterwards.  I mean within the | 10:51:0 |
| 5 | next week or so, thereabouts. | 10:51:0 |
| 6 | But the intrigue, too, was, on him being at another big | 10:51:0 |
| 7 | reseller, was hopefully he'd have good contacts there, and | 10:51:1 |
| 8 | customers, and could bring them over, too. | 10:51:1 |
| 9 | Unfortunately, we didn't see any of them come over | 10:51:1 |
| 10 | either. | 10:51:2 |
| 11 | Q    Did he ever promise you that he'd bring customers | 10:51:2 |
| 12 | from his prior employ? | 10:51:2 |
| 13 | A    Certainly talked about various accounts, yeah. | 10:51:2 |
| 14 | Q    Did he actually tell you that he would bring | 10:51:31 |
| 15 | certain accounts over from his former employer? | 10:51:32 |
| 16 | A    Certainly mentioned accounts that we'd be looking | 10:51:34 |
| 17 | to try to convert to us, yes. | 10:51:37 |
| 18 | Q    He looked at them as possible; he didn't assure | 10:51:39 |
| 19 | you of accounts he would bring over, did he? | 10:51:42 |
| 20 | A    It would be hard to assure somebody of somebody | 10:51:46 |
| 21 | else's actions, but certainly dangled that carrot in front | 10:51:47 |
| 22 | of me about XYZ accounts, these are ones he's plugged into | 10:51:52 |
| 23 | or knows about great deal and they love him and so on. | 10:51:58 |
| 24 | Q    I'll go through this later. | 10:52:01 |
| 25 | MR. FOTOUHI:  Let's mark as Exhibit 1. | 10:52:11 |

```
 1        (Plaintiff's Exhibit No. 1 marked for identification.)      10:52:33

 2        Q    Here you go, sir.                                       10:52:34

 3        A    Great.                                                  10:52:36

 4        Q    I've put in front of you a document entitled           10:52:36

 5   "NetVersant New Hire/Rehire Form."                               10:52:39

 6        Have you seen that document before?                         10:52:42

 7        A    No, I haven't actually seen this document.  Looks      10:52:44

 8   like an H.R. form.                                               10:52:47

 9        Q    Have you ever -- you've never seen this form?          10:52:48

10        A    I don't recall seeing it, but, you know, it looks      10:52:51

11   like one of our forms.                                           10:52:54

12        Q    Okay.  It's got Michael's Cava's name on there as      10:52:55

13   the employee information, correct, at the top?                   10:53:00

14        A    Says Michael Cava, correct.                            10:53:04

15        Q    Type of hire.  The "X" mark replacement hire has       10:53:06

16   been checked.  Do you see that?                                  10:53:11

17        A    I see that, yeah.                                      10:53:13

18        Q    And the replacement employee is listed as Jennifer    10:53:14

19   Forrest, correct?                                                10:53:16

20        A    Replace the slot as opposed to replace managing       10:53:19

21   her accounts.  It doesn't say that, but yeah.                    10:53:24

22        Q    Says the name of employee being replaced, correct?    10:53:26

23        A    Right.  We authorized so many employees, and that     10:53:29

24   slot was being filled by Mr. Cava.                              10:53:33

25        Q    And the hire date is listed as June 7, 2004?          10:53:36
```

```
 1        A    That's what it says.                          10:53:40

 2        Q    So sometime -- would it be fair to say sometime  10:53:42

 3   within a month of June 7, 2004, you interviewed Mr. Cava?  10:53:45

 4        Again, I'm not trying to put words in your mouth.    10:53:50

 5        A    I don't recall.  That's about right, I suppose.  10:53:52

 6        Q    Fair estimation?                               10:53:55

 7        A    Fair.  I mean I don't recall if he had some delay  10:53:57

 8   between the time, you know, we had said "Hey, do you want a  10:54:01

 9   job here?" and he could start or something.              10:54:05

10        He probably had to give some notice.  I don't know.  10:54:06

11   Within a few months, you know?                           10:54:09

12        Q    And his classification or job title is listed as  10:54:11

13   Account Executive, correct?                              10:54:16

14        A    That's what it says, yeah.  That's our normal  10:54:18

15   title.                                                   10:54:20

16        Q    The rest of the form provides for his pay and his  10:54:20

17   employee type?                                           10:54:25

18        A    Correct.                                       10:54:26

19        Q    You expected him to be a full-time employee,   10:54:27

20   correct?                                                 10:54:29

21        A    Right.  All the salespeople are full-time      10:54:30

22   employees.                                               10:54:32

23        Q    Starting salary of $65,000 a year?             10:54:33

24        A    Correct.                                       10:54:36

25        Q    Plus commission?                               10:54:36
```

| | | |
|---|---|---|
| 1 | A    Correct. | 10:54:3 |
| 2 | Q    And see at the bottom, says "Recommended by Peter | 10:54:4 |
| 3 | Wainwright, Scott Landis." So do you recall at some point | 10:54:4 |
| 4 | prior to June 3, 2004, relaying to H.R. that this is an | 10:54:5 |
| 5 | employee you wanted to hire? | 10:54:5 |
| 6 | A    Yes, I did. | 10:54:5 |
| 7 | Q    Okay, thanks. | 10:54:5 |
| 8 | A    And the reason I wouldn't see that form is H.R., | 10:55:0 |
| 9 | Joanna Cotter, is in Sacramento. This type of form she'd be | 10:55:0 |
| 10 | processing in the back office without me necessarily seeing | 10:55:0 |
| 11 | it. | 10:55:1 |
| 12 | Q    Fair enough. | 10:55:1 |
| 13 | Where was your office physically in? | 10:55:1 |
| 14 | A    South San Francisco. | 10:55:1 |
| 15 | Q    Did you also have an office in Sacramento? | 10:55:1 |
| 16 | A    Personally, no. I did go there occasionally. | 10:55:1 |
| 17 | NetVersant has an office there, which is where H.R. was. | 10:55:2 |
| 18 | Q    Okay. | 10:55:2 |
| 19 | MR. FOTOUHI:    Exhibit 2. | 10:55:3 |
| 20 | (Plaintiff's Exhibit No. 2 marked for identification.) | 10:55:32 |
| 21 | Q    Let me show you a document that's been marked as | 10:55:45 |
| 22 | Exhibit 2. | 10:55:47 |
| 23 | A    Uh-huh. | 10:55:48 |
| 24 | Q    For the record, it's a May 12, 2004, letter -- | 10:55:49 |
| 25 | A    Um-hum. | 10:55:52 |

| | |
|---|---|
| 1 | Q    At the end of his 90th day of employment, did you | 11:00:47 |
| 2 | perform a evaluation of Mike Cava's abilities to determine | 11:00:51 |
| 3 | whether or not he should continue employment with you or | 11:00:55 |
| 4 | not? | 11:00:57 |
| 5 | A    A formal evaluation with him?  That was your | 11:00:58 |
| 6 | question?  No, I did not. | 11:01:01 |
| 7 | Q    Did you perform an informal evaluation with him as | 11:01:03 |
| 8 | to whether or not his employment with NetVersant should | 11:01:06 |
| 9 | continue? | 11:01:08 |
| 10 | A    We had discussions as to his performance and | 11:01:09 |
| 11 | expectations on an ongoing basis.  I either individually or | 11:01:12 |
| 12 | as a group because it was repeated frequently in sales | 11:01:17 |
| 13 | meetings as to what expectations are in terms of funnel | 11:01:22 |
| 14 | development, you know, new business development, you know, | 11:01:26 |
| 15 | pipelines, that type of stuff. | 11:01:28 |
| 16 | Q    Let's just, again -- | 11:01:30 |
| 17 | A    We had discussed his pipeline, you know, that | 11:01:32 |
| 18 | seemed like there weren't a lot of new things showing up on | 11:01:35 |
| 19 | it, so I'm sure we discussed that at length because a, um, | 11:01:39 |
| 20 | they put out forecasts.  In other words, they develop | 11:01:43 |
| 21 | forecasts -- "This is what I'm going to get over the next | 11:01:46 |
| 22 | period" -- and we, I'm sure, discussed those from time to | 11:01:49 |
| 23 | time. | 11:01:53 |
| 24 | Q    My question again, sir, is:  At the 90th day of | 11:01:55 |
| 25 | Mike Cava's employment -- | 11:01:59 |

ROBERT BARNES ASSOCIATES - (415) 788-7191

```
 1    a multiple-year plan, and the way -- this is how we credit    11:32:0
 2    people -- is say you sell a five-year plan in 2004.  You're   11:32:0
 3    going to get the credit for it against your quota in 2004.    11:32:1
 4    You're going to get paid in 2005, 2006, etcetera, as time     11:32:1
 5    goes by.  You're not going to get credit in these ensuing     11:32:2
 6    years because it was booked under that whole plan.            11:32:2
 7         Q    In other words, the quota credit would be year      11:32:2
 8    one?                                                          11:32:2
 9         A    Correct.                                            11:32:28
10         Q    Okay.                                               11:32:29
11         Paragraph eight, if you would please review.            11:32:29
12              (Whereupon, there was a pause.)                     11:32:31
13         A    Okay.                                               11:32:45
14         Q    Says:                                               11:32:48
15              "You're required to maintain a minimum performance  11:32:48
16              standard equal to your assigned GOP budget."        11:32:51
17         Going back to page one, Mike Cava's assigned GOP budget  11:32:54
18    quota was $341,250, correct?                                  11:33:02
19         A    That's what it says, yeah.                          11:33:08
20         Q    It was initially 585,000?                           11:33:09
21         A    Right.                                              11:33:11
22         Q    But it was altered to reflect the fact that he      11:33:12
23    started on June 7?                                            11:33:15
24         A    Right.  We prorated it, as is typical, based on     11:33:16
25    the number of months in the year.  We're on an annual plan.  11:33:19
```

| | | |
|---|---|---|
| 1 | Q    Says: | 11:33:2: |
| 2 | "Your GOP budget attainment will be reviewed on a | 11:33:2: |
| 3 | monthly basis which may be the basis for | 11:33:2' |
| 4 | adjustment to base salary." | 11:33:2! |
| 5 | A    Right. | 11:33:3: |
| 6 | Q    Back in 2004, did you, on a monthly basis, review | 11:33:3: |
| 7 | GOP attainment with your account executives? | 11:33:3! |
| 8 | A    I reviewed their forecasts and performance. | 11:33:3! |
| 9 | Q    Did you -- | 11:33:4: |
| 10 | A    We usually do forecasts every couple weeks or so. | 11:33:4 |
| 11 | Q    Let's talk about -- forget about forecasts.  Let's | 11:33:4! |
| 12 | talk about attainment. | 11:33:5: |
| 13 | Back in 2004, did you, on a monthly basis, review | 11:33:5: |
| 14 | attainment with your account executives on a monthly basis? | 11:33:5! |
| 15 | A    For executives that are well over their quota, | 11:34:01 |
| 16 | there's no reason to do that.  It would be more of an | 11:34:06 |
| 17 | exception thing, if somebody was struggling, not keeping on | 11:34:09 |
| 18 | track.  That's what this language is aimed at. | 11:34:14 |
| 19 | Q    Did you, in 2004 time period, from June to | 11:34:16 |
| 20 | November, on a monthly basis, review Mike Cava's attainment? | 11:34:21 |
| 21 | A    We had discussions of his performance, but on a | 11:34:27 |
| 22 | monthly basis on a particular date, no.  But we did have | 11:34:31 |
| 23 | numerous discussions. | 11:34:40 |
| 24 | Q    We'll get to those discussions. | 11:34:41 |
| 25 | Did you review, in 2004, Mike Cava's attainment at any | 11:34:44 |

| | |
|---|---|
| 1 | point, GOP attainment? | 11:34:5. |
| 2 |     A    We had discussions about his performance, yes. | 11:34:5 |
| 3 |     Q    Okay. | 11:34:5. |
| 4 |     A    GOP attainment would be a big part of it. | 11:35:0 |
| 5 |     Q    Did you, at any point -- we'll get to your | 11:35:0. |

1   point, GOP attainment?                                       11:34:5.

2        A    We had discussions about his performance, yes.    11:34:5

3        Q    Okay.                                             11:34:5.

4        A    GOP attainment would be a big part of it.          11:35:0(

5        Q    Did you, at any point -- we'll get to your        11:35:0.

6   criticism of Mike in a minute.  Did you, at any point,       11:35:0

7   indicate to him that he was below GOP?                       11:35:08

8        A    I indicated to him that we expected him to develop 11:35:1

9   some new accounts and all the business that he was credited  11:35:1

10   with were deals that we gave him and he was expected to go   11:35:2

11   find some new deals, so we did have several discussions      11:35:2

12   about that during the period he was there.                  11:35:3

13        Q    Do you recall whether or not, at any point that he 11:35:3

14   was there, Mike Cava was below his GOP quota?               11:35:3

15        A    He certainly was until we gave him a deal for     11:35:4

16   295,000 for a maintenance contract that was signed prior to  11:35:4

17   his achievement, and then that put him up, so it wouldn't    11:35:4

18   have been possible to review that with him because we gave   11:35:5

19   him quota retirement based on a deal that was signed prior   11:35:5

20   to his employment, so, you know, it was us being nice and    11:35:5

21   that put him up to his quota level, but it was not a deal he  11:36:0.

22   brought in, so I had concern about his performance based on  11:36:0

23   deals that he brought in.                                   11:36:1

24        Q    At any point in 2004 did you ever express your    11:36:1

25   concern to Mike Cava in writing about his performance?      11:36:1

| | | |
|---|---|---|
| 1 | Maximus account? | 11:37:2? |
| 2 | A    We gave him quite a number of accounts. | 11:37:3( |
| 3 | Q    You say you gave him a $290,000 account.  Are you | 11:37:3? |
| 4 | referring to the Maximus? | 11:37:3? |
| 5 | A    Maximus.  The 290,000 was a maintenance contract | 11:37:3? |
| 6 | that had been signed prior to his employment, and what we | 11:37:3? |
| 7 | did is, instead of just letting him have the revenue as it | 11:37:4? |
| 8 | came in, we actually gave him credit for booking it even | 11:37:48 |
| 9 | though it was assigned prior to his employment and he had no | 11:37:5? |
| 10 | participation in getting it signed. | 11:37:5? |
| 11 | Q    Okay.  Who had participation in getting it signed? | 11:37:5? |
| 12 | A    Jennifer Forrest was the account executive.  She | 11:37:5? |
| 13 | sold it at the time that the initial sale was made. | 11:38:0? |
| 14 | Q    And do you have a recollection as to whether or | 11:38:0? |
| 15 | not Jennifer Forrest was -- her quota was credited with the | 11:38:08 |
| 16 | maintenance contract at the time she sold it? | 11:38:13 |
| 17 | A    I don't think so because, first of all, she | 11:38:16 |
| 18 | wouldn't have gotten any money because it wouldn't have even | 11:38:20 |
| 19 | started for a year and she was well over quota. | 11:38:23 |
| 20 | She was already in turbo.  I don't know that she was. | 11:38:26 |
| 21 | I doubt that she was because it really wasn't appropriate | 11:38:27 |
| 22 | yet. | 11:38:30 |
| 23 | The first year you get a year of maintenance, and then | 11:38:31 |
| 24 | after that they're on a maintenance contract or not.  It was | 11:38:33 |
| 25 | a thing that was starting in year two. | 11:38:36 |

1      Q    So although Jennifer sold it, you don't believe          11:38:3

2    she received quota credit for the maintenance contract?          11:38:4

3      A    I think that she probably didn't, although it            11:38:4

4    would have been irrelevant if she had.                          11:38:4

5         As far as maybe, there may have been some subtle thing,    11:38:5

6    but there was no business involved.  She would have gotten      11:38:5

7    no commission on it.                                            11:38:5

8      Q    Because the commission wouldn't have kicked in           11:38:5

9    until year two, correct?                                        11:38:5

10     A    Right.  As we collected money for it because we          11:39:0

11   collected no money on it until year two.                        11:39:0

12     Q    Now, as part of being handed or gifted the Maximus       11:39:0

13   account, was Mike also assigned with the duties of being the    11:39:0

14   account executive for that account?                             11:39:1

15     A    That's correct.                                          11:39:1

16     Q    In other words, he was the designated point person      11:39:1

17   that the account needed to go to if they had any issues?        11:39:1

18     A    That's correct.                                          11:39:2

19     Q    And Kathleen Areco -- let me be specific here.  Is       11:39:2

20   this $295,000 gift, so to speak, was this something that was    11:39:2

21   under the provence of Kathleen Areco?                           11:39:3

22     A    No.                                                      11:39:3

23     Q    No.  Who was it under?                                   11:39:3

24     A    I don't recall who signed the contract -- I've got      11:39:4

25   a copy of it back at the office -- but she was the telecom      11:39:4

| | | |
|---|---|---|
| 1 | administrator, and it was signed, I believe, by the same | 11:39:46 |
| 2 | person who signed the original agreement, and actually, | 11:39:50 |
| 3 | Kathleen started with Maximus, I believe, after we had sold | 11:39:52 |
| 4 | the system, so she came from another customer of ours. | 11:39:58 |
| 5 | Q    Now, from June to November, do you recall having | 11:40:04 |
| 6 | any one-on-one meetings with Mike about your concerns in | 11:40:08 |
| 7 | terms of his new sales? | 11:40:12 |
| 8 | A    Yes.  We discussed concerns about new sales when | 11:40:14 |
| 9 | we went over forecasts. | 11:40:16 |
| 10 | Q    When is the first time you recall, subsequent to | 11:40:18 |
| 11 | June of 2004, that you had a one-on-one meeting with Mike | 11:40:21 |
| 12 | Cava in which your concern as to his new sales was an issue? | 11:40:26 |
| 13 | A    That would have been starting about month four | 11:40:33 |
| 14 | because you give people some lead time to get things going, | 11:40:36 |
| 15 | and when I saw nothing coming in, starting with month four, | 11:40:41 |
| 16 | I was starting to review the funnel, which is, because we | 11:40:45 |
| 17 | hadn't seen any business, "Okay, you haven't brought any | 11:40:49 |
| 18 | business in in addition to what we gave you, so let's see | 11:40:51 |
| 19 | what you have going.  What are you working on?  When's it | 11:40:55 |
| 20 | going to happen?  What's the qualities of it, etcetera," and | 11:40:59 |
| 21 | I participated in a number of calls with prospects that he | 11:41:00 |
| 22 | was hoping that might produce some business. | 11:41:06 |
| 23 | Q    So is it your -- | 11:41:09 |
| 24 | A    I was familiar with the accounts. | 11:41:11 |
| 25 | Q    All right. | 11:41:12 |

| | | |
|---|---|---|
| 1 | But you say you started month four.  Is it because you | 11:41:1 |
| 2 | wanted to give him an opportunity the first three months to | 11:41:1 |
| 3 | get comfortable and essentially pursue some leads? | 11:41:2 |
| 4 | A    Sure. | 11:41:2 |
| 5 | Q    And you expected new sales to come in the door | 11:41:2 |
| 6 | month four? | 11:41:2 |
| 7 | A    That's typical.  I've seen very good reps bring in | 11:41:2 |
| 8 | business sooner, especially who brought in business from | 11:41:3 |
| 9 | elsewhere, but for the first 90 days in sales, that's a good | 11:41:3 |
| 10 | period to let them get ramped up.  You want to start seeing | 11:41:3 |
| 11 | some business coming in or a good backlog of strong | 11:41:4 |
| 12 | prospects or both. | 11:41:4 |
| 13 | Q    And -- | 11:41:5 |
| 14 | A    Preferably both. | 11:41:5 |
| 15 | Q    And it is customarily and traditionally been your | 11:41:5 |
| 16 | practice that if a sales representative has not brought in | 11:41:5 |
| 17 | new sales or does not have prospects of new sales in month | 11:42:0 |
| 18 | four, that raises a concern for you? | 11:42:0 |
| 19 | A    That would raise a concern. | 11:42:0 |
| 20 | Q    So again, so it's your recollection that the first | 11:42:0 |
| 21 | time that you raised your concerns about new sales to Mike | 11:42:1 |
| 22 | Cava was in month four of his employment with NetVersant? | 11:42:1 |
| 23 | A    That sounds about right, yeah. | 11:42:2 |
| 24 | Q    If he started in June -- June, July, August -- so | 11:42:2 |
| 25 | you would have had -- expressed your concerns in September | 11:42:2 |

1    '04?                                                                11:42:2

2        A    September/October, yes, that time frame.                   11:42:3

3        Q    Do you specifically, as you sit here today, recall         11:42:3

4    having a one-on-one meeting with him in September or October        11:42:3

5    of '04, expressing your concern about new sales?                    11:42:3

6        A    We do a, generally, a monthly review of prospects.         11:42:4

7    I like to get my prospects for the month early in that              11:42:4

8    month, and I was on a continuous review of, at that point,          11:42:5

9    of "Hey, what do you have going?  We need to get some               11:42:5

10   business in.  That's your job."                                     11:43:0

11       Q    My question is:  Do you, as you sit here today, do         11:43:0

12   you specifically recall having a one-on-one meeting with            11:43:0

13   Mike Cava in September or October of '04 in which you               11:43:0

14   expressed your concern about his prospect?                          11:43:1

15       A    We discussed his funnel and -- yes.                        11:43:1

16       Q    Okay.  Do you recall whether was that in September         11:43:1

17   or October?                                                         11:43:1

18       A    I would expect both because we review prospects            11:43:2

19   monthly.                                                            11:43:2

20       Q    And what was discussed at that meeting?                    11:43:2

21       A    Discussed the quality of the prospects and the            11:43:2

22   need to get business.                                               11:43:3

23       Q    And did you give Mike any guidance in that                 11:43:3

24   meeting?                                                            11:43:3

25       A    I try to give ongoing guidance to where to go,             11:43:3

```
 1   what to look for, and how are we doing with this account and    11:43:3
 2   that account he had been working on.  We discussed strategy     11:43:4
 3   and we do it informally quite often, too, where if you're       11:43:4
 4   going out on a call with him or saying how is XYZ company        11:43:5
 5   going.                                                          11:43:5
 6       Q    Did you express your concern about Mike's             11:43:5
 7   abilities to anybody else at NetVersant prior to November of    11:43:5
 8   '04?                                                            11:44:0
 9       A    Hard to timestamp that.  I certainly would have       11:44:1
10   had discussions with certainly Scott Landis at minimum.         11:44:1
11       Q    So again, the reason I'm picking November of '04,     11:44:1
12   obviously, is when Mike left or took the time away from          11:44:1
13   work.                                                           11:44:2
14       Prior to him leaving to care for his child, did you --      11:44:2
15   do you specifically recall having discussions with Scott        11:44:2
16   Landis about your concerns in terms of Mike's sales             11:44:3
17   abilities?                                                      11:44:3
18       A    I don't remember a specific instance.  I'm sure we    11:44:3
19   had discussions, and I, personally, had concern as to his       11:44:4
20   progress based on lack of any performance for new business      11:44:4
21   and the quality of the funnel that I was seeing.                11:44:5
22       Q    Okay.  Do you recall having more than one meeting     11:44:5
23   with him about your concerns or just the one meeting?           11:44:5
24            MS. HEVERLY:  Objection, vague, meaning "with         11:45:0
25   him".  Landis or Cava?                                          11:45:0
```

| | | |
|---|---|---|
| 1 | MR. FOTOUHI:  With Mike Cava. | 11:45:0: |
| 2 | THE WITNESS:  Like I said, when we review the | 11:45:0! |
| 3 | funnel, that's when I had those discussions. | 11:45:1] |
| 4 | BY MR. FOTOUHI: | 11:45:1: |
| 5 | Q    All right.  Let me ask you another way. | 11:45:1: |
| 6 | How many times do you recall reviewing the funnel with | 11:45:1! |
| 7 | Mike Cava between September and November of '04? | 11:45:18 |
| 8 | A    Generally do it monthly, so I would expect three | 11:45:22 |
| 9 | times.  I don't know the specific dates. | 11:45:2! |
| 10 | Q    Is it fair to say you don't specifically recall | 11:45:27 |
| 11 | meeting with him three times, but you're assuming that you | 11:45:30 |
| 12 | did because that's generally what you do? | 11:45:33 |
| 13 | A    That's how I like to do it, especially with an | 11:45:35 |
| 14 | account executive that's struggling. | 11:45:37 |
| 15 | Q    So you already labeled Mike, as of September 2004, | 11:45:40 |
| 16 | as a struggling account executive? | 11:45:43 |
| 17 | A    I didn't label him that title.  His performance | 11:45:46 |
| 18 | had been zero for business that he developed at that | 11:45:49 |
| 19 | point -- | 11:45:53 |
| 20 | Q    Okay. | 11:45:53 |
| 21 | A    -- so that would -- if you can infer that, okay. | 11:45:54 |
| 22 | Q    We talked about this earlier a little bit.  What | 11:45:58 |
| 23 | percentage of his time did you want to see devoted to the | 11:46:02 |
| 24 | so-called funnel and new sale development? | 11:46:05 |
| 25 | A    A high percentage. | 11:46:09 |

| | | |
|---|---|---|
| 1 | Q    More than -- | 11:46:1: |
| 2 | A    And that was understood because he did have some | 11:46:1: |
| 3 | accounts we gave him, but it was expected that he would | 11:46:1! |
| 4 | bring in new business. | 11:46:1& |
| 5 | Q    You expect him to at least spend 90 percent of his | 11:46:1! |
| 6 | time developing new business? | 11:46:2: |
| 7 | A    I would think 90 would be a high percentage.  I | 11:46:2! |
| 8 | wouldn't expect 90.  I'd say probably over 50, though. | 11:46:2& |
| 9 | Q    What did you expect him to be doing the other | 11:46:3C |
| 10 | 50 percent of the time? | 11:46:3: |
| 11 | A    Servicing existing accounts and then the other | 11:46:34 |
| 12 | back-office things that you need to do such as forecast, | 11:46:37 |
| 13 | filling out forms, helping to process orders, that kind of | 11:46:41 |
| 14 | thing. | 11:46:44 |
| 15 | Q    Okay.  So essentially -- | 11:46:45 |
| 16 | A    Over 50 percent.  I mean especially with him | 11:46:47 |
| 17 | starting with this few accounts. | 11:46:49 |
| 18 | Q    So you expected him to just devote more than | 11:46:52 |
| 19 | 50 percent of his time in developing new business? | 11:46:55 |
| 20 | A    Yes. | 11:46:58 |
| 21 | Q    Do you know of any documents, as you sit here | 11:47:30 |
| 22 | today, that specifically mention to Mike Cava that his | 11:47:33 |
| 23 | compensation and his employment at NetVersant was dependent | 11:47:39 |
| 24 | upon the development of new business as opposed to | 11:47:42 |
| 25 | maintenance of existing clients? | 11:47:45 |

```
 1        A      There's no document that says that.  The          11:47:4

 2   compensation plan says it's based on volume, you know, and     11:47:5

 3   doesn't separate new business from old business or existing    11:47:5

 4   customers.                                                     11:48:0

 5        Q      Okay.                                              11:48:0

 6        A      So there's no document that says that.             11:48:0

 7        That was early in -- discussed, though, in his            11:48:0

 8   interview and afterwards.                                      11:48:0

 9        Q      Move to strike the second part as nonresponsive.   11:48:1

10        At some point in November of '04, did you -- were you     11:48:2

11   advised by someone that Mike Cava's infant son was diagnosed   11:48:2

12   with brain cancer?                                             11:48:3

13        A      I did hear that at some point, yes.                11:48:3

14        Q      Who advised you of that?                           11:48:3

15        A      I don't recall.                                    11:48:3

16        Q      Were you also advised that because of the emergent 11:48:4

17   nature of his son's medical condition that he needed to take   11:48:4

18   some time off of work?                                         11:48:5

19        A      I was told that, yeah.                             11:48:5

20        Q      Did you have any objections to him taking time off 11:48:5

21   of work?                                                       11:48:5

22        A      No.                                                11:48:5

23        Q      Okay.                                              11:48:5

24        A      We all felt bad about his son.                     11:48:5

25        Q      When he took off from work in November, did you    11:49:11
```

| | | |
|---|---|---|
| 1 | don't -- I don't see the -- I don't see the, um, statements | 11:53:18 |
| 2 | per se. | 11:53:22 |
| 3 | Q    Let me be clear.  I'm not trying to go into your | 11:53:23 |
| 4 | compensation.  I'm just trying to determine how your | 11:53:26 |
| 5 | performance -- your division's performance is evaluated by | 11:53:30 |
| 6 | the CEO at the end of the year. | 11:53:32 |
| 7 | A    I never had the CEO evaluate my division's | 11:53:37 |
| 8 | performance.  We're very high-performing one.  I believe we | 11:53:40 |
| 9 | were the best the last few years.  Never had any review of | 11:53:44 |
| 10 | it.  They were very happy with our performance. | 11:53:47 |
| 11 | Q    Is your profitability at all charged with the | 11:53:49 |
| 12 | benefits provided to the employees? | 11:53:53 |
| 13 | A    Negative. | 11:53:55 |
| 14 | Q    Have you ever -- not just limiting it up to | 11:53:59 |
| 15 | January 2004 -- has anybody at NetVersant ever expressed to | 11:54:04 |
| 16 | you any concern about the cost of Mike Cava's son's | 11:54:09 |
| 17 | treatment to NetVersant? | 11:54:12 |
| 18 | A    No. | 11:54:13 |
| 19 | Q    Has anybody at NetVersant relayed to you the | 11:54:14 |
| 20 | self-insured retention of NetVersant on its medical plan? | 11:54:17 |
| 21 | A    I don't understand what "self-insured retention" | 11:54:22 |
| 22 | is, and no. | 11:54:24 |
| 23 | Q    Okay. | 11:54:25 |
| 24 | A    I'm not an H.R. person or benefits person. | 11:54:26 |
| 25 | Q    Has Scott Landis ever discussed with you the cost | 11:54:31 |

ROBERT BARNES ASSOCIATES - (415) 788-7191

| | |
|---|---|
| 1 | of Mike Cava's son's treatment to the company? | 11:54:33 |
| 2 |    A   No. | 11:54:36 |
| 3 |      MR. FOTOUHI:  Let me backtrack here if I may. | 11:54:55 |
| 4 |   Exhibit 4. | 11:54:57 |
| 5 | (Plaintiff's Exhibit No. 4 marked for identification.) | 11:54:59 |
| 6 |    Q   If you would look at that, please, sir.  It's a | 11:55:09 |
| 7 | July 7, 2004, e-mail from you to Mike Cava sent on -- did I | 11:55:12 |
| 8 | say July 7, 2004? | 11:55:17 |
| 9 |      (Whereupon, there was a pause.) | 11:55:21 |
| 10 |   Do you recall sending an e-mail of that sort to Mike | 11:55:28 |
| 11 | Cava? | 11:55:30 |
| 12 |    A   I sent it.  It came from me, so, um, vaguely.  I | 11:55:33 |
| 13 | send, you know, hundred e-mails a day. | 11:55:37 |
| 14 |    Q   Do you recall assigning him accounts in the summer | 11:55:40 |
| 15 | of 2004? | 11:55:43 |
| 16 |    A   Correct.  And this is instruction to the person | 11:55:44 |
| 17 | who handles the system where the account assignment goes | 11:55:48 |
| 18 | into the name assignment, rolls up to the credit form -- | 11:55:52 |
| 19 |    Q   Okay. | 11:55:56 |
| 20 |    A   -- and it indicates some accounts he was given | 11:55:56 |
| 21 | that were existing customers, and the indication at the | 11:55:59 |
| 22 | bottom about Gallo is specific that I was changing the | 11:56:04 |
| 23 | assignment of Gallo to somebody else, because upon letting | 11:56:10 |
| 24 | the customer know that his new rep was not Jennifer Forrest, | 11:56:14 |
| 25 | but was Mike Cava, that customer requested that he not be | 11:56:19 |

| | | |
|---|---|---|
| 1 | of Mike Cava's son's treatment to the company? | 11:54:33 |
| 2 | A    No. | 11:54:36 |
| 3 | MR. FOTOUHI:  Let me backtrack here if I may. | 11:54:55 |
| 4 | Exhibit 4. | 11:54:57 |
| 5 | (Plaintiff's Exhibit No. 4 marked for identification.) | 11:54:59 |
| 6 | Q    If you would look at that, please, sir.  It's a | 11:55:09 |
| 7 | July 7, 2004, e-mail from you to Mike Cava sent on -- did I | 11:55:12 |
| 8 | say July 7, 2004? | 11:55:17 |
| 9 | (Whereupon, there was a pause.) | 11:55:21 |
| 10 | Do you recall sending an e-mail of that sort to Mike | 11:55:28 |
| 11 | Cava? | 11:55:30 |
| 12 | A    I sent it.  It came from me, so, um, vaguely.  I | 11:55:33 |
| 13 | send, you know, hundred e-mails a day. | 11:55:37 |
| 14 | Q    Do you recall assigning him accounts in the summer | 11:55:40 |
| 15 | of 2004? | 11:55:43 |
| 16 | A    Correct.  And this is instruction to the person | 11:55:44 |
| 17 | who handles the system where the account assignment goes | 11:55:48 |
| 18 | into the name assignment, rolls up to the credit form -- | 11:55:52 |
| 19 | Q    Okay. | 11:55:56 |
| 20 | A    -- and it indicates some accounts he was given | 11:55:56 |
| 21 | that were existing customers, and the indication at the | 11:55:59 |
| 22 | bottom about Gallo is specific that I was changing the | 11:56:04 |
| 23 | assignment of Gallo to somebody else, because upon letting | 11:56:10 |
| 24 | the customer know that his new rep was not Jennifer Forrest, | 11:56:14 |
| 25 | but was Mike Cava, that customer requested that he not be | 11:56:19 |

| | | |
|---|---|---|
| 1 | assigned to the account. | 11:56:23 |
| 2 | She had met him at user groups and so on and was not -- | 11:56:25 |
| 3 | did not find him to be somebody that she wanted to be their | 11:56:28 |
| 4 | account manager, so I was asking him in this scenario -- I | 11:56:32 |
| 5 | think I probably did it outside of this e-mail -- but that | 11:56:36 |
| 6 | Gallo be given to another account executive. | 11:56:41 |
| 7 | Q    Who was the person at Gallo that you spoke to? | 11:56:43 |
| 8 | A    That's the customer relationship.  I don't know if | 11:56:46 |
| 9 | I can divulge that.  I have the customer contact who knew | 11:56:51 |
| 10 | him, didn't want to talk to him. | 11:56:55 |
| 11 | Q    Could I have the name of that person? | 11:56:57 |
| 12 | MS. HEVERLY:  He's entitled to the name.  I would | 11:56:59 |
| 13 | just ask that you, before contacting them, you know, go | 11:57:01 |
| 14 | through us. | 11:57:03 |
| 15 | THE WITNESS:  Linda Camarillo is the day-to-day | 11:57:06 |
| 16 | telecom manager. | 11:57:09 |
| 17 | BY MR. FOTOUHI: | 11:57:10 |
| 18 | Q    Is she still employed by them? | 11:57:11 |
| 19 | A    Yes, she is, and they're still our customer | 11:57:13 |
| 20 | because I, upon assignment, I wanted to pass by, of course, | 11:57:15 |
| 21 | "By the way, Jennifer's gone.  I've got a new account | 11:57:22 |
| 22 | manager for you," and she declined. | 11:57:26 |
| 23 | Q    I understand your concern about your ongoing | 11:57:29 |
| 24 | business relationships and I can represent to you here, on | 11:57:31 |
| 25 | the record, I'm not going to contact her outside of your | 11:57:33 |

ROBERT BARNES ASSOCIATES - (415) 788-7191

| | | |
|---|---|---|
| 1 | likelihood was and what the price points were and so on -- | 13:39:07 |
| 2 | these are the ones that he had promised to bring us into -- | 13:39:11 |
| 3 | I was kind of disappointed that it didn't look like very | 13:39:14 |
| 4 | good business from what I could tell. | 13:39:18 |
| 5 | Q    Was the quality of the prospects that he was | 13:39:22 |
| 6 | chasing? | 13:39:25 |
| 7 | A    That would be part of it, yeah.  It's a matter of | 13:39:25 |
| 8 | quality, quantity and also what are you bringing. | 13:39:28 |
| 9 | Q    So your criticism was based on the fact -- again, | 13:39:31 |
| 10 | I -- one, that the accounts, some of the accounts that he | 13:39:35 |
| 11 | was chasing weren't really profitable, right? | 13:39:38 |
| 12 | A    It would be a concern more than a criticism. | 13:39:42 |
| 13 | Criticism would imply, you know, criticizing him to | 13:39:44 |
| 14 | somebody as to opposed to going "Hmm, this is at a dollar | 13:39:49 |
| 15 | and our price is three." | 13:39:53 |
| 16 | Q    And the other criticism was that the number of | 13:39:54 |
| 17 | prospects weren't as high as you wanted to see? | 13:39:57 |
| 18 | A    Right. | 13:40:00 |
| 19 | Q    And the third was that he wasn't closing deals? | 13:40:00 |
| 20 | A    Correct. | 13:40:03 |
| 21 | Q    Okay.  Would you agree that in your -- | 13:40:03 |
| 22 | A    Concern. | 13:40:07 |
| 23 | Q    -- in your business, the bigger the sale, the | 13:40:07 |
| 24 | longer the duration of time from prospect to close? | 13:40:14 |
| 25 | A    Sometimes yes, sometimes no.  I've seen big deals | 13:40:19 |

| | | |
|---|---|---|
| 1 | come in quickly.  I've seen small deals take forever, so I | 13:40:24 |
| 2 | wouldn't say that's an absolute at all. | 13:40:28 |
| 3 | Q    What's a deal gone quickly from start to finish? | 13:40:29 |
| 4 | A    One month. | 13:40:32 |
| 5 | Q    So you've seen products essentially -- initial | 13:40:33 |
| 6 | contact made with potential customer -- | 13:40:37 |
| 7 | A    Um-hum. | 13:40:39 |
| 8 | Q    -- sale done, closed within one more. | 13:40:39 |
| 9 | A    With a big deal.  I have seen big deals come in in | 13:40:45 |
| 10 | approximately a month. | 13:40:49 |
| 11 | Q    Is it fair to say that's not really common for | 13:40:51 |
| 12 | that to happen? | 13:40:53 |
| 13 | A    Less common. | 13:40:54 |
| 14 | Q    It's common for a month, big-deal sale? | 13:40:55 |
| 15 | A    Less common. | 13:40:58 |
| 16 | Q    Less common. | 13:40:59 |
| 17 | And what would you consider a big-deal sale?  Is that | 13:40:59 |
| 18 | in excess of seven figures? | 13:41:02 |
| 19 | A    No.  Six-figure. | 13:41:05 |
| 20 | Q    Six? | 13:41:06 |
| 21 | A    Middle six figures.  400,000, 500,000 that's a | 13:41:07 |
| 22 | nice big deal. | 13:41:11 |
| 23 | Q    Okay.  You closed a sale with AOL sometime in | 13:41:13 |
| 24 | 2005, did you not? | 13:41:22 |
| 25 | A    Could have been 2006. | 13:41:30 |

| | | |
|---|---|---|
| 1 | nothing and then there's some that turns into something.  We | 13:46:31 |
| 2 | act as a subcontractor essentially to them. | 13:46:34 |
| 3 | Q    Do you know whether or not Mike did bid work while | 13:46:37 |
| 4 | he was there from June to November which resulted in a deal | 13:46:40 |
| 5 | in winter of 2004 or spring of 2005? | 13:46:44 |
| 6 | A    He might have.  And could have not been a whole | 13:46:47 |
| 7 | new system.  Could have been some upgrades.  Like I said, | 13:46:52 |
| 8 | there are always add-ons and upgrades to these accounts. | 13:46:54 |
| 9 | One of the accounts we did get, I'm not sure if he was | 13:46:58 |
| 10 | involved at all, but they did some enhancements.  They | 13:47:02 |
| 11 | expanded at sometime in probably late 2005, I'd say, from -- | 13:47:06 |
| 12 | Q    Yeah. | 13:47:12 |
| 13 | A    But I don't know that he did or didn't. | 13:47:13 |
| 14 | Q    All right. | 13:47:16 |
| 15 | So when -- the concerns you had about Mike's abilities | 13:47:16 |
| 16 | had already surfaced in your mind in November 2004, had | 13:47:26 |
| 17 | they? | 13:47:31 |
| 18 | A    The first concern I had about him was when a major | 13:47:34 |
| 19 | account who I was assigning an account to didn't want him as | 13:47:38 |
| 20 | their account manager. | 13:47:43 |
| 21 | Q    That was in July of 2004? | 13:47:44 |
| 22 | A    That wasn't a good start particularly, but not | 13:47:46 |
| 23 | everybody likes everybody.  Move on.  See what he could do. | 13:47:49 |
| 24 | Q    This was according to -- I know you don't know the | 13:47:53 |
| 25 | meaning of it -- but this was during the 90-day, quote, | 13:47:56 |

| | | |
|---|---|---|
| 1 | unquote, introductory period? | 13:47:59 |
| 2 | A    Okay.  Yes. | 13:48:02 |
| 3 | Q    You could have easily shown him the door at that | 13:48:03 |
| 4 | point. | 13:48:06 |
| 5 | A    We could have.  I was giving him a chance. | 13:48:06 |
| 6 | Q    So that was your first concern. | 13:48:10 |
| 7 | You said you had concerns about his sales abilities, | 13:48:12 |
| 8 | and my question is:  Had these concerns essentially evolved | 13:48:15 |
| 9 | in your mind as of November 2004? | 13:48:21 |
| 10 | A    "Concerns evolved" would be the good word because | 13:48:23 |
| 11 | it doesn't happen all at once.  You look at results.  You | 13:48:27 |
| 12 | look at technique.  You look at interactions with customers | 13:48:30 |
| 13 | and you look at funnels.  You look at things like that and | 13:48:34 |
| 14 | that's all cumulative.  That's how you get a concern. | 13:48:37 |
| 15 | Q    Mike was on leave from November, I represent to | 13:48:45 |
| 16 | you, to January 17, 2005. | 13:48:49 |
| 17 | A    Days. | 13:48:52 |
| 18 | Q    Do you know whether or not -- first question is: | 13:48:53 |
| 19 | Do you know whether or not he was paid during that time | 13:48:56 |
| 20 | period? | 13:48:59 |
| 21 | A    I don't know.  Once he went on leave, I hand it | 13:49:00 |
| 22 | off to H.R. | 13:49:04 |
| 23 | Q    It was out of your hands? | 13:49:05 |
| 24 | A    Right. | 13:49:07 |
| 25 | Q    All right. | 13:49:07 |

```
 1        Q    Yes.                                              14:06:58

 2        A    Yeah, I believe he got the ones back that he had  14:06:58

 3   for the first time.                                         14:07:02

 4        He was gone for a short leave, we looked after the     14:07:03

 5   accounts for him and gave them back.                        14:07:06

 6        Q    All right.                                        14:07:08

 7        You say:                                               14:07:09

 8             "As your contributions prior to your family leave 14:07:09

 9             were not tracking with our sales expectations..." 14:07:12

10        A    Um-hum.                                           14:07:16

11        Q    What were your sales expectations?                14:07:18

12        A    To develop new business and bring in new          14:07:21

13   customers.                                                  14:07:23

14        Q    Did you --                                        14:07:24

15        A    And to sell something that would meet his numbers 14:07:25

16   that he brought in himself.                                 14:07:28

17        Q    Did you -- again, I apologize.  I may have asked  14:07:30

18   you this in morning.  Were these sales expectations, in     14:07:34

19   other words, were they ever documented to him before his    14:07:39

20   family leave?                                               14:07:43

21        A    His sales expectations, it was documented in his  14:07:45

22   quota and it was documented in my discussions with him that 14:07:49

23   he needed to bring in business to meet his quota.           14:07:51

24        Q    Would you agree that prior to his family leave    14:07:55

25   that he had met his quota?                                  14:07:57
```

ROBERT BARNES ASSOCIATES - (415) 788-7191

| | | |
|---|---|---|
| 1 | A    I would say prior to his family leave we gave him | 14:08:0C |
| 2 | a deal that made his numbers looks like he had, but he | 14:08:03 |
| 3 | brought in no business that was significant on his own, so | 14:08:06 |
| 4 | we gave him a deal because we're nice guys.  Shame on us. | 14:08:09 |
| 5 | We're being nice guys. | 14:08:13 |
| 6 | Q    But so -- | 14:08:16 |
| 7 | A    I know he's using that against us. | 14:08:17 |
| 8 | Q    Aside from the quota, are there any other | 14:08:20 |
| 9 | documents that document your sales expectations? | 14:08:25 |
| 10 | A    Yes.  We had numerous sales meetings for the group | 14:08:28 |
| 11 | where we went over this exact same formula, the 4 to 1 ratio | 14:08:32 |
| 12 | funnel.  That was Robert Palmer's favorite presentation.  He | 14:08:36 |
| 13 | did it in every meeting. | 14:08:40 |
| 14 | And certainly in my discussions with Mike, it was | 14:08:42 |
| 15 | important -- him being a sales professional, having done it | 14:08:45 |
| 16 | for a while -- that it was very standard in sales to have a | 14:08:48 |
| 17 | funnel and to have good business that exceeds your quota and | 14:08:52 |
| 18 | for you to bring it in. | 14:08:55 |
| 19 | Q    You want to relay to him that you want him "to | 14:08:57 |
| 20 | achieve 'on-track' results in terms of funnel and bookings | 14:09:02 |
| 21 | from this point on." | 14:09:05 |
| 22 | Again, this is per your sales expectations? | 14:09:07 |
| 23 | A    Right.  And they're separate things.  If you have | 14:09:09 |
| 24 | a big funnel and no bookings, that doesn't do it, obviously. | 14:09:12 |
| 25 | Q    You go on to tell him that you expect him to | 14:09:19 |

| | |
|---|---|
| 1 | A     I don't believe so. | 14:12:30 |
| 2 | Q     Did you discuss the performance improvement plan | 14:12:33 |
| 3 | with Robert Palmer before you relayed it to Mike Cava? | 14:12:35 |
| 4 | A     I don't recall. | 14:12:40 |
| 5 | Q     Okay.  But your testimony earlier, it's you do | 14:12:41 |
| 6 | recall that you did meet with Mike in person that same day? | 14:12:45 |
| 7 | A     Yes. | 14:12:50 |
| 8 | Q     All right. | 14:12:51 |
| 9 | And your testimony was that you went through this with | 14:12:52 |
| 10 | him? | 14:12:56 |
| 11 | A     Right. | 14:12:57 |
| 12 | Q     What was his reaction to your going through this | 14:13:00 |
| 13 | with him? | 14:13:05 |
| 14 | A     There wasn't much reaction as I recall. | 14:13:06 |
| 15 | Q     Was he adverse to following the plan?  Was he | 14:13:08 |
| 16 | surprised, or was he -- | 14:13:12 |
| 17 | A     It's pretty much basic one-on-one. | 14:13:14 |
| 18 | It's the same criteria we use for all sales executives. | 14:13:16 |
| 19 | The funnel metrics are the same. | 14:13:21 |
| 20 | He had seen those exact formulas numerous times, either | 14:13:22 |
| 21 | from me or from Robert Palmer, and they were ones that were | 14:13:25 |
| 22 | put out to the whole group -- | 14:13:28 |
| 23 | Q     Fair enough. | 14:13:30 |
| 24 | A     -- so I don't think there's any expectation there. | 14:13:30 |
| 25 | Being put on a plan doesn't make you happy, and he | 14:13:33 |

| | |
|---|---|
| 1 | wasn't -- he wasn't giddy or emotional or crying if that's | 14:13:35 |
| 2 | the question. | 14:13:38 |
| 3 |     Q    Do you recall what his reaction was? | 14:13:39 |
| 4 |     A    There was not much of a reaction.  It was okay. | 14:13:41 |
| 5 |     Q    Did he have any questions for you during that | 14:13:44 |
| 6 | meeting? | 14:13:46 |
| 7 |     A    I don't recall any questions. | 14:13:46 |
| 8 |     It wasn't a very long meeting.  I asked him if he had | 14:13:48 |
| 9 | any questions and I don't recall any. | 14:13:52 |
| 10 |     Q    Did you ask him as to what, if anything, he had, | 14:13:54 |
| 11 | if anything, he had done in the preceding two months to get | 14:13:56 |
| 12 | the funnel going while he was on leave? | 14:14:00 |
| 13 |     A    I didn't ask him anything about that, no. | 14:14:02 |
| 14 |     Q    You assumed that he had done nothing? | 14:14:06 |
| 15 |     A    As any new employee, I mean it's -- yeah, starting | 14:14:07 |
| 16 | from scratch.  You're going to build up a funnel. | 14:14:11 |
| 17 |     Q    So you considered him starting from scratch in | 14:14:16 |
| 18 | January 2005? | 14:14:19 |
| 19 |     A    We actually gave him a running start by leaving | 14:14:20 |
| 20 | some accounts.  He's starting to work those accounts again | 14:14:24 |
| 21 | and it's reasonable to build up an account funnel to that | 14:14:27 |
| 22 | level within a reasonable amount of time.  Give him more | 14:14:35 |
| 23 | than a day for sure.  Give him more time. | 14:14:39 |
| 24 |     Q    At some point after you delivered the performance | 14:14:59 |
| 25 | improvement plan to Mike, were you advised, either directly | 14:15:04 |

| | |
|---|---|
| 1 | this period of time? | 14:35:55 |
| 2 | A    Minimal. | 14:35:58 |
| 3 | Q    And you know that from what? | 14:35:58 |
| 4 | A    Just knowing the reps and having them taking over | 14:36:02 |
| 5 | and not seeing any activity, any e-mails, any discussions, | 14:36:05 |
| 6 | any participation of him, or not being involved in the | 14:36:09 |
| 7 | office, not seeing him.  I didn't -- I wasn't aware of his | 14:36:14 |
| 8 | presence at all. | 14:36:17 |
| 9 | The only -- only awareness I saw were some e-mails | 14:36:18 |
| 10 | that, you know, it was like "Where did you find this?" and | 14:36:22 |
| 11 | there were a handful of them with, you know, two-line | 14:36:25 |
| 12 | responses or one-line response. | 14:36:28 |
| 13 | Q    And did you, after you learned that he was going | 14:36:36 |
| 14 | on disability leave, begin reassigning all of Mike's | 14:36:39 |
| 15 | accounts to other representatives? | 14:36:44 |
| 16 | A    The first time he left or the second time he left? | 14:36:46 |
| 17 | Q    Second time he left. | 14:36:48 |
| 18 | A    Second time he left, um, yes.  We -- I -- that was | 14:36:51 |
| 19 | out of this e-mail train. | 14:36:57 |
| 20 | We needed to have people assigned to the accounts and | 14:36:59 |
| 21 | have them compensated for the work they were doing. | 14:37:01 |
| 22 | Q    Do you recall whether or not you had had any | 14:37:05 |
| 23 | discussions with Mike as to whether these accounts would be | 14:37:06 |
| 24 | reassigned back to him upon his return from disability? | 14:37:10 |
| 25 | A    I don't recall any discussions with Mike. | 14:37:14 |

| | | |
|---|---|---|
| 1 | I believe we were looking at -- by reassigning, we | 14:37:19 |
| 2 | changed it in the system so business could be credited to | 14:37:23 |
| 3 | the people looking after it, and they were fair people, and | 14:37:27 |
| 4 | if he came back in April, a couple months later, they | 14:37:31 |
| 5 | would -- and they hadn't done much work.  They caretake. | 14:37:35 |
| 6 | They should have been paid for what they were selling | 14:37:39 |
| 7 | while he was gone, but after a while it was too long.  It | 14:37:42 |
| 8 | was beyond reasonable for them because they had invested too | 14:37:45 |
| 9 | much in it. | 14:37:50 |
| 10 | I have to be fair to everybody, and you can't be fair | 14:37:52 |
| 11 | to everybody because -- | 14:37:54 |
| 12 | Q    There's two things.  One is an assignment of an | 14:37:55 |
| 13 | account to someone, and two is the payment of the commission | 14:37:58 |
| 14 | to that person, correct? | 14:38:02 |
| 15 | A    Well, assignment of account would imply to me | 14:38:05 |
| 16 | putting them in the system so when business comes in, it | 14:38:09 |
| 17 | goes into their Oracle bucket. | 14:38:13 |
| 18 | Q    So had Mike returned in April of 2005, you might | 14:38:14 |
| 19 | have reassigned those accounts back to him? | 14:38:19 |
| 20 | A    Perhaps, yeah.  I mean there's a likelihood of -- | 14:38:24 |
| 21 | it would partly depend on circumstances of how much work | 14:38:27 |
| 22 | that people had had to do.  If it was trivial and it was | 14:38:31 |
| 23 | more babysitting, yes. | 14:38:34 |
| 24 | And also, something I had promised the reps when I had | 14:38:37 |
| 25 | them look after it is, if you put together a proposal during | 14:38:40 |

| | | |
|---|---|---|
| 1 | this period, even if we do -- if he comes back -- we | 14:38:44 |
| 2 | didn't -- we thought he was coming back in April.  Turns out | 14:38:48 |
| 3 | he didn't, right -- that we would pay you for that work you | 14:38:52 |
| 4 | did. | 14:38:55 |
| 5 | He wouldn't have gotten paid for work that they did. | 14:38:55 |
| 6 | They would have gotten paid for work they did. | 14:38:59 |
| 7 | Q    Understood. | 14:39:03 |
| 8 | But at some point in time, in your mind, Mike was gone | 14:39:03 |
| 9 | for too long for you to consider reassigning those accounts | 14:39:16 |
| 10 | back to him if he'd returned? | 14:39:20 |
| 11 | A    Accounts that we gave him, yes, because other | 14:39:25 |
| 12 | people had put in, you know, what was it, six months of work | 14:39:28 |
| 13 | into it, and the -- I have to look after two things:  One is | 14:39:31 |
| 14 | fairness to the rep who was doing the work and invested the | 14:39:36 |
| 15 | time and the other is I'm responsible for our customers and | 14:39:39 |
| 16 | our total revenue, and if accounts keep having a new rep | 14:39:41 |
| 17 | changing, it's disruptive to it. | 14:39:47 |
| 18 | Like in the Jennifer Forrest accounts case, we had | 14:39:50 |
| 19 | Jennifer, then Cava, and then -- so you'd have to change | 14:39:53 |
| 20 | four times in a year-and-a-half period.  That's disruptive. | 14:39:58 |
| 21 | You lose the flow of relationship and so on. | 14:40:02 |
| 22 | Q    Do you know whether or not Mike had had a | 14:40:08 |
| 23 | relationship with Areco prior to his employment with | 14:40:09 |
| 24 | NetVersant? | 14:40:13 |
| 25 | A    Mike hangs around the user-group meetings and he | 14:40:15 |

| | | |
|---|---|---|
| 1 | what I expected of him. | 14:53:03 |
| 2 |     Q    And you respond back and you say:  "Will do." | 14:53:05 |
| 3 |     A    Right. | 14:53:08 |
| 4 |     Q    So you essentially planned on you were going to | 14:53:08 |
| 5 | remind Mike of what you expected of him -- | 14:53:11 |
| 6 |     A    Right. | 14:53:14 |
| 7 |     Q    -- and work with him? | 14:53:14 |
| 8 |     A    And offer to help and support all I could. | 14:53:15 |
| 9 |     Q    Okay. | 14:53:18 |
| 10 |     A    And hoping, hoping that he would succeed, of | 14:53:21 |
| 11 | course. | 14:53:25 |
| 12 |     MR. FOTOUHI:  Exhibit 15 is August 3, 2005, e-mail | 14:53:42 |
| 13 | from Peter Wainwright to Michael Cava. | 14:53:51 |
| 14 |   (Plaintiff's Exhibit No. 15 marked for identification.) | 14:53:53 |
| 15 |     I should note for the record that there's two e-mails | 14:53:54 |
| 16 | on this page.  Bottom is an August 1, 2005, e-mail from | 14:54:20 |
| 17 | Peter Wainwright to Mike Cava and the top is a August 3, | 14:54:25 |
| 18 | 2005, e-mail from Peter Wainwright to Mike Cava. | 14:54:28 |
| 19 |     THE WITNESS:  Um-hum. | 14:54:33 |
| 20 | BY MR. FOTOUHI: | 14:54:38 |
| 21 |     Q    You drafted both those e-mails? | 14:54:39 |
| 22 |     A    Yeah. | 14:54:41 |
| 23 |     MS. HEVERLY:  Was that a yes?  I'm sorry, I didn't | 14:54:44 |
| 24 | hear. | 14:54:46 |
| 25 |     THE WITNESS:  Yes.  Yes. | 14:54:46 |

| | | |
|---|---|---|
| 1 | part of my responsibility to manage who is | 14:59:42 |
| 2 | assigned to what accounts." | 14:59:44 |
| 3 | A    Right. | 14:59:47 |
| 4 | Q    Did you -- I presume from that that you believe | 14:59:50 |
| 5 | that it was within your power and your decision, not anybody | 14:59:55 |
| 6 | elses, as to what was going to happen at that point in terms | 15:00:00 |
| 7 | of these accounts. | 15:00:03 |
| 8 | A    Right.  I'm the sales manager, V.P. of Sales.  I'm | 15:00:04 |
| 9 | allowed to assign accounts appropriately or take away | 15:00:08 |
| 10 | accounts or give accounts, and I was making myself, in this | 15:00:12 |
| 11 | situation, the bad guy. | 15:00:17 |
| 12 | I didn't want Mike to go and try to hound some other | 15:00:20 |
| 13 | rep and say "give me that account back" or something.  It | 15:00:23 |
| 14 | was like, "Hey, I'm the guy making the decision.  If you | 15:00:25 |
| 15 | have a problem with it, talk to me." | 15:00:29 |
| 16 | Q    All right. | 15:00:32 |
| 17 | You go on to say: | 15:00:33 |
| 18 | "Account assignment is the responsibility of | 15:00:34 |
| 19 | NetVersant management." | 15:00:36 |
| 20 | A    Right.  And I was also looking to, as I indicated | 15:00:37 |
| 21 | before, maintain a account stability in terms of the rep. | 15:00:44 |
| 22 | So we'd had a lot of changes in terms of who was covering | 15:00:50 |
| 23 | those accounts.  I wanted to, you know, at that point, keep | 15:00:54 |
| 24 | it stable, so those were factors:  the fairness to the reps | 15:00:57 |
| 25 | who were looking after it and stability.  Those are the | 15:01:01 |

| | | |
|---|---|---|
| 1 | major decisions I -- the criteria I used. | 15:01:05 |
| 2 | Q    Okay.  You go on to talk about at the time he was | 15:01:08 |
| 3 | hired you made it clear to him that his job was to develop | 15:01:15 |
| 4 | new customers and build a base. | 15:01:20 |
| 5 | A    Right. | 15:01:23 |
| 6 | Q    You say: | 15:01:25 |
| 7 | "You are under the same charter as the other three | 15:01:26 |
| 8 | new people in the region." | 15:01:30 |
| 9 | A    Yeah. | 15:01:32 |
| 10 | Q    Who are those three other new people? | 15:01:33 |
| 11 | A    Rick Pizzoli was one, and I'm not sure who the | 15:01:37 |
| 12 | other two new ones. | 15:01:40 |
| 13 | Frank, Frank Sherfey, I believe, who was assigned some | 15:01:42 |
| 14 | accounts, I believe he's on the list, and I think Rachel | 15:01:46 |
| 15 | Larson, too, during that period was there. | 15:01:49 |
| 16 | I could be wrong.  Could be somebody else. | 15:01:52 |
| 17 | Q    Is it your testimony that all three people started | 15:01:54 |
| 18 | out with a clean slate with no assigned accounts? | 15:01:59 |
| 19 | A    Certainly far less than Cava did.  I mean, if you | 15:02:03 |
| 20 | look at the e-mails, Sherfey obviously was given some | 15:02:08 |
| 21 | accounts that, you know, had been assigned to Cava before he | 15:02:13 |
| 22 | left. | 15:02:16 |
| 23 | Q    So why did you -- going back, you -- I just want | 15:02:19 |
| 24 | to be clear here.  You've got other reps working for you, | 15:02:27 |
| 25 | got some time with you.  You've got other new people.  The | 15:02:30 |

ROBERT BARNES ASSOCIATES - (415) 788-7191

| | | |
|---|---|---|
| 1 | only reason you decided to give Mike the bluebird, I think | 15:02:35 |
| 2 | you testified to, the Maximus account, was because you were | 15:02:38 |
| 3 | being truly a nice guy? | 15:02:43 |
| 4 |     A    That's pretty nice to give somebody that.  That's | 15:02:45 |
| 5 | a very unusual you would pick up an account that big when | 15:02:48 |
| 6 | you start.  It was good timing for him. | 15:02:52 |
| 7 |     Q    It had nothing to do with any relationship you may | 15:02:54 |
| 8 | have had with Areco? | 15:02:58 |
| 9 |     A    No. | 15:03:00 |
| 10 |     Q    Did you -- | 15:03:01 |
| 11 |     A    I knew at that point I didn't have a account | 15:03:03 |
| 12 | manager on that account.  I needed to have somebody look | 15:03:05 |
| 13 | after it and he was the new one at that point in time. | 15:03:08 |
| 14 |     Q    Between the time that Jennifer Forrest left and | 15:03:12 |
| 15 | Mike started, were you holding back assignment of accounts | 15:03:18 |
| 16 | to other reps in anticipation of a new rep starting? | 15:03:23 |
| 17 |     A    I don't have the exact time lines there, but | 15:03:30 |
| 18 | perhaps with Cava coming, being interviewed and he had | 15:03:33 |
| 19 | two-week notice or whatever, yeah, I'd say Maximus would be | 15:03:38 |
| 20 | one that I held for him. | 15:03:43 |
| 21 |     Q    And did you -- | 15:03:45 |
| 22 |     A    And there are some I gave to other people. | 15:03:46 |
| 23 |     Q    And in the interview process, did you let him know | 15:03:48 |
| 24 | that, as sort of an inducement for him to come to you, that | 15:03:53 |
| 25 | he would be handed certain accounts to at least get a | 15:03:58 |

| | | |
|---|---|---|
| 1 | terminate him." | 15:35:50 |
| 2 | Did you, at that point, think that that was the only | 15:35:53 |
| 3 | option? | 15:35:56 |
| 4 | Forget about what Joanna was thinking.  I'm asking what | 15:35:57 |
| 5 | was your thought process on receiving that e-mail. | 15:36:01 |
| 6 | A    Actually, at that point, I -- it's an H.R. issue, | 15:36:04 |
| 7 | and if they asked my opinion if he was a good salesperson or | 15:36:07 |
| 8 | not, my answer was, you know, I haven't been impressed so | 15:36:11 |
| 9 | far.  And did I fight to keep him?  No.  And did I say okay, | 15:36:15 |
| 10 | we're going to terminate him?  No.  Because at that point, | 15:36:20 |
| 11 | it's not my department. | 15:36:23 |
| 12 | I handle sales performance.  I don't handle termination | 15:36:25 |
| 13 | and I don't handle leave, disability, etcetera. | 15:36:29 |
| 14 | Q    Well -- | 15:36:34 |
| 15 | A    I, on purpose, stay out of those categories | 15:36:34 |
| 16 | because I'm not a H.R. | 15:36:38 |
| 17 | Q    Mike was eventually terminated from your company, | 15:36:40 |
| 18 | right? | 15:36:43 |
| 19 | A    If you say so.  I didn't terminate him. | 15:36:44 |
| 20 | Q    Did you come to find out at some point that Mike | 15:36:46 |
| 21 | was terminated from your company? | 15:36:49 |
| 22 | A    He's no longer with our company.  I believe he was | 15:36:51 |
| 23 | given some choices.  I'm not sure what the actual one. | 15:36:54 |
| 24 | They said you could either resign or we'll terminate. | 15:36:58 |
| 25 | I don't know which one he did.  I think -- | 15:37:03 |

| | | |
|---|---|---|
| 1 | A    I really don't know. | 15:44:31 |
| 2 | Q    Was it your understanding the doctor said he was | 15:44:32 |
| 3 | unable to perform his duties and therefore that's why he was | 15:44:35 |
| 4 | fired, for being unable to perform his duties?  Is that your | 15:44:38 |
| 5 | understanding? | 15:44:41 |
| 6 | A    I was not involved with that portion of it.  It's | 15:44:42 |
| 7 | an H.R. issue.  I don't get involved in disability or those | 15:44:44 |
| 8 | type of things.  Specifically avoid being involved in it. | 15:44:49 |
| 9 | Q    Did you believe that he was fired because of his | 15:44:54 |
| 10 | disability? | 15:44:57 |
| 11 | MS. HEVERLY:  Objection, calls for speculation. | 15:44:59 |
| 12 | Been asked and answered about six times. | 15:45:00 |
| 13 | BY MR. FOTOUHI: | 15:45:02 |
| 14 | Q    You can answer the question.  She's not | 15:45:04 |
| 15 | instructing you not to answer the question. | 15:45:06 |
| 16 | A    The question is? | 15:45:08 |
| 17 | Q    Did you believe he was terminated because of his | 15:45:09 |
| 18 | disability? | 15:45:11 |
| 19 | A    I believe that her writing said I -- due to his | 15:45:13 |
| 20 | inability to perform his duties. | 15:45:17 |
| 21 | Is that the same as disability?  I'm not an expert in | 15:45:21 |
| 22 | that category and I was not involved in the definition or | 15:45:23 |
| 23 | determining what a disability was versus not being able to | 15:45:27 |
| 24 | perform. | 15:45:31 |
| 25 | Q    So is it fair to say that Mike wasn't let go | 15:45:33 |

| | |
|---|---|
| 1 | because of your assessment of his capabilities? | 15:45:37 |
| 2 | MS. HEVERLY:  Objection, calls for speculation. | 15:45:42 |
| 3 | THE WITNESS:  I gave input as to whether we should | 15:45:45 |
| 4 | keep him or not.  I could have fought to keep him if I | 15:45:49 |
| 5 | wanted to.  I chose not to. | 15:45:51 |
| 6 | BY MR. FOTOUHI: | 15:45:53 |
| 7 | Q    But you also didn't give any input on whether or | 15:45:54 |
| 8 | not he should be fired.  You say you just chose to remain | 15:45:58 |
| 9 | quiet on the topic, so to speak, right? | 15:46:02 |
| 10 | A    Okay.  You're putting words in my mouth, but okay. | 15:46:05 |
| 11 | Basically, I told you.  It's a sales issue for funnel | 15:46:11 |
| 12 | or pipeline or, you know, line to customers or, you know, | 15:46:15 |
| 13 | something like that.  That's my category. | 15:46:19 |
| 14 | If it's a disability or leave or family leave or | 15:46:23 |
| 15 | whatever, that's out of my category.  I would not make a | 15:46:26 |
| 16 | decision on that. | 15:46:29 |
| 17 | If they asked me is this guy a superstar; should we | 15:46:30 |
| 18 | bend over backwards even more than we have to keep him, then | 15:46:34 |
| 19 | I would have said yes or no, depending on what I believed. | 15:46:38 |
| 20 | As you can see, I didn't believe that he was a | 15:46:41 |
| 21 | superstar. | 15:46:44 |
| 22 | Q    To your understanding, was Mike terminated because | 15:46:47 |
| 23 | of a sales issue? | 15:46:49 |
| 24 | A    No.  He was terminated because of his inability to | 15:46:51 |
| 25 | perform his duties per Joanna.  Like I said, I wasn't | 15:46:56 |

1  STATE OF CALIFORNIA          )

2  COUNTY OF SAN FRANCISCO      )

3          I, the undersigned, hereby certify that the

4  witness in the foregoing deposition was by me duly sworn to

5  tell the truth, the whole truth and nothing but the truth in

6  the within-entitled cause; that said deposition was taken in

7  shorthand by me, a Certified Shorthand Reporter, at the time

8  and place therein stated and that the testimony of said

9  witness was thereafter reduced, by computer, to typewriting

10 under my direction and supervision.

11         I further certify that I am not of counsel or

12 attorney for either or any of the parties in the foregoing

13 deposition and caption named, nor in any way interested in

14 the event or outcome of this cause and that I am not related

15 to any of the parties thereto.

16

17

18                    IN WITNESS WHEREOF, I have

19                    hereunto set my hand this

20                    9th day of December, 2006.

21

22         _____

23         Jennifer L. Yang, CSR No. 12367

24

25

# NetVersant
network solutions for an e-world

## NEW HIRE/REHIRE FORM

**EMPLOYEE INFORMATION: (PLEASE PRINT)**

NAME:_____CAVA_____MICHAEL_____G._____
           LAST NAME          FIRST NAME        MIDDLE INITAL

SSN: ▇▇▇▇▇_ DATE OF BIRTH: ____▇▇▇▇▇▇▇_____

---

**TYPE OF HIRE:**   XREPLACEMENT HIRE     JENNIFER FORREST
                □   NEW POSITION     NAME OF EMPLOYEE BEING REPLACED

**HIRE DATE:** _JUNE 7, 2004_____   **WORK STATUS:**  X   NEW HIRE
                                     □   REHIRE

**COMPANY (eg. 101 – Silicon Valley):** __**SAN FRANCISCO – 121**_____

**DIVISION (eg. 001 – Headquarters):**__**SACRAMENTO – 003**_____

**LOCATION ( Houston):**_____**SACRAMENTO**_____

**DEPARTMENT (eg: 025 – Sales):**_____**SALES – 025**_____

**CLASSIFICATION/JOB TITLE:** _____**ACCOUNT EXECUTIVE**_____

**IMMEDIATE MANAGER'S NAME:** _____**PETER WAINWRIGHT**_____

**CLOCK (DEPARTMENT FOR PAYCHECK LOCATOR):** _____**003 - SACRAMENTO**

**UNION AFFILIATION (IF APPROPRIATE):**

□ IBEW     □ CWA   □ OTHER     LOCAL # _____

**EMPLOYEE TYPE:**   XFULL TIME     **SHIFT:**X  FIRST
                □   PART TIME          □   SECOND
                □   TEMPORARY     □   THIRD

**STARTING SALARY:**   HOURLY_____
                      MONTHLY _____
                      ANNUAL ____$65,000_____

**PAY FREQUENCY:**   X BIWEEKLY    □ SEMI-MONTHLY
                   □ MONTHLY     □ WEEKLY

**FLSA CLASSICATION:**   □   NONEXEMPT HOURLY
                       X   SALARIED EXEMPT

Δ π EXHIBIT___/___
Deponent_____
Date_____ Rptr.____
www.DEPOBOOK.COM

---

**APPROVALS**

RECOMMENDED BY: PETER WAINWRIGHT/SCOTT LANDIS___ DATE: __06/03/2004____

APPROVED BY: _____ DATE: _____

REDACTED

| From: | Peter Wainwright [pwainwright@netversant.com] |
| --- | --- |
| Sent: | Tuesday, January 18, 2005 3:43 PM |
| To: | Michael Cava |
| Cc: | Joanna Cotter; Robert Palmer |
| Subject: | Performance Expectations / Improvement Plan |
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

Michael,

Netversant is looking forward to your renewed sales contributions now that you have rejoined the operation. As your contributions prior to your family leave were not tracking with our sales expectations, this notification is to make it clear what level of performance we are expecting. As you have had several months on the job at Netversant and years in the local business selling the equipment we market, we are going to expect you to achieve "on track" results in terms of funnel and bookings from this point on. As the proven "funnel" is set at 4 X the quota for any given period, we expect that you deliver this ratio of qualified opportunities for the month, quarter and rolling 12 Month window. Based on a required run rate of 50K of GPM per month this will translate to new sales of 150K to 200K per Month on an ongoing basis (depending on job margin)

In order to achieve these results. This 4X1 ration means that a qualified funnel of 200K GPM / 800K +/- sales per month, 600K GM / 2.4M Sales per rolling 3 month period (Quarter) and 2.4 M GPM and 9.6 M Sales for a rolling 12 month period. Booked sales expectations are 50K of GPM per month, 150K per quarter and 600K from now on a rolling 12 month window. Maintenance of these funnel and new booking results are required from this point on for you to continue in your current position.

As Netversant has given you some installed base accounts and they have produced virtually all of your GPM to date, it is important that you understand that our expectation is for the above performance requirements to be achieved by new business that is developed by you.

In order to track your results we will need the following deliverables in hard and soft copy (Via email) delivered to me:

Funnel in attached format delivered and updated by the 15th and 1st of each month

Set appointment with me and review funnel and ongoing status : win/loss/slip/abandon on or around the 1st and 15th of each Month (depending on schedules and weekends)

Using this tool we will track your progress towards meeting the above mandatory funnel development and sales results. Opportunities entered into the funnel need to be realistic in terms of events, volume detailed and close dates. Accuracy of forecast will be tracked and evaluated. Please put a space between each month so we can total the funnel. For deals beyond 6 months in the future please indicate quarter anticipated in the Month column. If there are any questions regarding the format, please let me know. I will go out of my way to make myself available to support your sales efforts, please let me know where I can help. We wish you well in meeting the required performance deliverables indicated in this performance improvement plan.

<<NorCal Oppertunity Work Sheet Review.xls>>

