EXHIBIT – A

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

UNLIMITED JURISDICTION


MICHAEL CAVA,

              Plaintiff(s),

       vs.                CASE NO: CGC-06-453469

NETVERSANT-NATIONAL, INC.,

a Delaware corporation, dba

NETVERSANT-SAN FRANCISCO, aka

NETVERSANT; PETER WAINWRIGHT,

an individual; and DOES 1

through 40, inclusive,

              Defendant(s).

_____/

CERTIFIED COPY


DEPOSITION OF MICHAEL CAVA

VOLUME I


DATE:          Thursday, January 4, 2007

TIME:          10:13 A.M.

LOCATION:      LITTLER MENDELSON
               50 West San Fernando Street
               14th Floor
               San Jose, CA 95113-2303

REPORTER:      Patricia Hope Sales, CRR
               CSR License Number C-4423

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:15:04 | 1 | writing, which means that all of your answers have to |
| 10:15:07 | 2 | be audible.  It's hard for her to take down "uh-huh" or |
| 10:15:12 | 3 | "uh-huh" -- "huh-uh," distinguish them, or to take down |
| 10:15:14 | 4 | nods of the head or you shaking your head. |
| 10:15:18 | 5 | Do you understand that? |
| 10:15:19 | 6 | A.   Yes. |
| 10:15:19 | 7 | Q.   Okay.  You have just been given an oath.  It's |
| 10:15:20 | 8 | the same oath that you'd be given in a court of law if |
| 10:15:23 | 9 | you were testifying before a judge and a jury.  It |
| 10:15:26 | 10 | obligates you to tell the truth. |
| 10:15:27 | 11 | Do you understand that you have taken the |
| 10:15:28 | 12 | oath? |
| 10:15:29 | 13 | A.   Yes. |
| 10:15:29 | 14 | Q.   I'd like you to give your best estimate when |
| 10:15:34 | 15 | possible, but I don't want you to guess.  And if you |
| 10:15:37 | 16 | have any questions about whether I'm asking you to |
| 10:15:39 | 17 | guess or give an estimation, I'd like you to -- to |
| 10:15:42 | 18 | clarify that. |
| 10:15:42 | 19 | Do you understand what the difference is |
| 10:15:43 | 20 | between a guess and an estimation? |
| 10:15:45 | 21 | A.   Yes. |
| 10:15:46 | 22 | Q.   If you answer, I will assume that you |
| 10:15:48 | 23 | understood the question that I asked.  So, again, if |
| 10:15:51 | 24 | you don't understand my question, please ask for |
| 10:15:54 | 25 | clarification. |

Page 8

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  15:54 | 1 | Do you understand that? |
| 10:15:55 | 2 | A.   Yes. |
| 10:15:57 | 3 | Q.   If you need to take a break at any time, just |
| 10:15:59 | 4 | feel free to speak up.  This is not an endurance |
| 10:16:02 | 5 | contest.  I'd only ask that you not take a break when a |
| 10:16:04 | 6 | question is pending, but otherwise we can take a break |
| 10:16:07 | 7 | as often as you'd like.  Okay? |
| 10:16:09 | 8 | A.   Okay. |
| 10:16:09 | 9 | Q.   After the deposition, the court reporter will |
| 10:16:12 | 10 | transcribe everything into a booklet form.  You will |
| 10:16:14 | 11 | have a chance to read it and make corrections. |
| 10:16:16 | 12 | I just want to let you know that if you make |
| 10:16:18 | 13 | any substantive corrections, you change your testimony |
| 1  .6:21 | 14 | in any significant way, I'll be able to comment upon |
| 10:16:24 | 15 | that on trial -- at trial, so I'd ask that you try to |
| 10:16:26 | 16 | give you best answers today. |
| 10:16:28 | 17 | Do you understand that? |
| 10:16:30 | 18 | A.   Yes. |
| 10:16:30 | 19 | Q.   Have you ever had your deposition taken |
| 10:16:30 | 20 | before? |
| 10:16:32 | 21 | A.   No. |
| 10:16:32 | 22 | Q.   All right.  Do you have any questions about the |
| 10:16:33 | 23 | process? |
| 10:16:34 | 24 | A.   No.  Not at this time. |
| 10:16:36 | 25 | Q.   Is there any reason why you should not testify |

Page 9

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:18:28 | 1 | case? |
| 10:18:29 | 2 | A.   No. |
| 10:18:29 | 3 | Q.   Have you ever before been a defendant in a |
| 10:18:31 | 4 | case? |
| 10:18:32 | 5 | A.   No. |
| 10:18:34 | 6 | Q.   When did you first consult an attorney in |
| 10:18:36 | 7 | connection with anything to do with your employment at |
| 10:18:39 | 8 | NetVersant? |
| 10:18:41 | 9 | A.   After I was terminated. |
| 10:18:48 | 10 | Q.   Was Mr. Fotouhi or Mr. Iannitelli the first |
| 10:18:53 | 11 | attorney that you contacted? |
| 10:18:55 | 12 | A.   Yes. |
| 10:19:02 | 13 | Q.   Why did you first contact an attorney? |
| 10:19:06 | 14 | A.   I felt like I had been treated unfairly.  I was |
| 10:19:13 | 15 | disabled, and they knew I was disabled. |
| 10:19:19 | 16 | Q.   Any other reason? |
| 10:19:21 | 17 | A.   Not that I can think of. |
| 10:19:28 | 18 | Q.   At the time of your termination, what was your |
| 10:19:31 | 19 | disability? |
| 10:19:33 | 20 | A.   Anxiety, depression, stress, ADD/ADHD, back |
| 10:19:40 | 21 | pain. |
| 10:19:46 | 22 | Q.   Anything else? |
| 10:19:47 | 23 | A.   Not that I can think of. |
| 10:19:50 | 24 | Q.   At the time of your termination, were you |
| 10:19:52 | 25 | seeing any physicians or health care providers for any |

Page 12

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:43:32 | 1 | A.   Distributes and installs and maintains Nortel |
| 10:43:35 | 2 | equipment. |
| 10:43:40 | 3 | Q.   Where is Telenet located? |
| 10:43:42 | 4 | A.   Cupertino. |
| 10:43:46 | 5 | Q.   What's your job title there? |
| 10:43:48 | 6 | A.   Sales. |
| 10:43:52 | 7 | Q.   So somebody at Telenet asked you about going |
| 10:43:54 | 8 | back to Shared Technologies? |
| 10:43:56 | 9 | A.   Well, he was at Shared Technologies at the |
| 10:43:58 | 10 | time.  He wasn't in a position, but was possibly going |
| 10:44:01 | 11 | to go into management there. |
| 10:44:07 | 12 | Q.   Okay. |
| 10:44:07 | 13 | A.   Nothing ever -- nothing ever serious. |
| 10:44:16 | 14 | Q.   Okay.  So going back to the -- the interview |
| 10:44:18 | 15 | with Mr. Landis or Peter Wainwright, and including the |
| 10:44:24 | 16 | phone calls -- let's sort of lump them together from |
| 10:44:26 | 17 | the interview to the offer period, all the discussions |
| 10:44:29 | 18 | that you had -- during that -- those discussions did |
| 10:44:31 | 19 | they tell you what your job title would be? |
| 10:44:34 | 20 | A.   Yes. |
| 10:44:34 | 21 | Q.   What did they tell you? |
| 10:44:36 | 22 | A.   That I would be in sales; I would be both |
| 10:44:39 | 23 | managing existing accounts and pursuing new accounts. |
| 10:44:48 | 24 | Q.   Did they tell you how much time you should be |
| 10:44:51 | 25 | spending pursuing new accounts versus managing existing |

Page 31

DEPONENT:  MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 1. 54:09 | 1 | from being in the business and talking to many of those |
| 10:54:12 | 2 | customers.  Jennifer had stated it was over a million |
| 10:54:17 | 3 | dollars in recurring maintenance. |
| 10:54:36 | 4 | Q.  Did they tell you how long you would keep those |
| 10:54:38 | 5 | accounts if they were given to you? |
| 10:54:42 | 6 | A.  As long as I was doing a good job was my |
| 10:54:45 | 7 | impression, though they didn't particularly state it. |
| 10:54:47 | 8 | Q.  Did they tell you that they could never be |
| 10:54:49 | 9 | taken away? |
| 10:54:50 | 10 | A.  No.  They didn't say that. |
| 10:54:58 | 11 | Q.  Did they discuss at all the compensation plan |
| 10:55:01 | 12 | other than you said they would -- let me back up. |
| 10:55:03 | 13 | Did they tell you what base salary you'd be |
| 1  55:05 | 14 | getting at NetVersant? |
| 10:55:07 | 15 | A.  They discussed sixty-five thousand. |
| 10:55:09 | 16 | Q.  Did they tell you what the compensation plan |
| 10:55:12 | 17 | would be? |
| 10:55:13 | 18 | A.  Yes. |
| 10:55:13 | 19 | Q.  What did they tell you about the commissions |
| 10:55:15 | 20 | you could earn? |
| 10:55:20 | 21 | A.  They talked about on maintenance that it would |
| 10:55:25 | 22 | be what equaled -- through a complicated formula, what |
| 10:55:28 | 23 | equaled about four point eight percent of the money |
| 10:55:32 | 24 | billed out to the customer on a maintenance account, |
| 10:55:35 | 25 | monthly, for the life of the account. |

Page 35

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  55:40 | 1 | Q.  Okay.  Anything else that they told you about |
| 10:55:42 | 2 | the commission plan? |
| 10:55:44 | 3 | A.  That it was margin based on equipment as well. |
| 10:55:50 | 4 | We discussed that -- because not every company is this |
| 10:55:53 | 5 | way on renewals, that they paid on renewals as well. |
| 10:55:57 | 6 | How quota achievement was attained, that you |
| 10:56:00 | 7 | could -- that you would get gross profit achievement |
| 10:56:04 | 8 | for the -- for the length of the contract that you |
| 10:56:06 | 9 | sold.  If it was a one-year, you'd get one year's |
| 10:56:09 | 10 | revenue credit; if it was five years, you'd get five |
| 10:56:11 | 11 | years' revenue credit.  At the end of the five years |
| 10:56:13 | 12 | when it renewed, you would get the revenue credit all |
| 10:56:16 | 13 | over again. |
| 1  6:19 | 14 | I was very interested.  I wanted to make sure |
| 10:56:21 | 15 | it was achievable. |
| 10:56:22 | 16 | Q.  Did they tell you how much you could earn per |
| 10:56:25 | 17 | year in commissions? |
| 10:56:27 | 18 | A.  Oh, absolutely.  I mean -- well, they -- they |
| 10:56:30 | 19 | had mentioned at one point -- I don't remember when -- |
| 10:56:34 | 20 | that one rep had made over nine hundred thousand |
| 10:56:37 | 21 | dollars in one year. |
| 10:56:45 | 22 | Q.  But did they tell you how much you could expect |
| 10:56:47 | 23 | to earn, say, in your first year there? |
| 10:56:50 | 24 | A.  No, I mean other than the -- I knew that there |
| 10:56:52 | 25 | was a million dollars in recurring maintenance, all of |

Page 36

DEPONENT:   MICHAEL CAVA    1-4-07

```
 59:44    1         MS. HEVERLY:  All right.  Let's mark as Exhibit
10:59:46  2  Number 1 an application for employment dated 5-6-04.
11:00:10  3         (Exhibit marked for identification:
11:00:10  4         Deposition Exhibit Number 1.)
11:00:12  5         THE WITNESS:  Thank you.
11:00:38  6         (Reviewing document(s).)
11:00:38  7  BY MS. HEVERLY:
11:00:38  8    Q.   Have you had a chance to look at this, look
11:00:40  9  this over?
11:00:41 10    A.   Briefly.
11:00:42 11    Q.   Okay.  Is this your handwriting on the
11:00:43 12  document?
11:00:44 13    A.   Yes.
 10:44   14    Q.   And if you flip to page two, at the bottom
11:00:46 15  there is a signature.  Is that your signature?
11:00:49 16    A.   Yes.
11:00:49 17    Q.   And on the -- the last page is a resume.  Did
11:00:54 18  you prepare the resume?
11:00:56 19    A.   Yes.
11:00:56 20    Q.   Did you provide it to NetVersant with the
11:01:00 21  employment application or at the time you applied?
11:01:03 22    A.   I believe I had sent it over before, before
11:01:06 23  then.  I don't remember for sure.
11:01:14 24    Q.   As you look through this application, is
11:01:16 25  everything on here correct?
```

Page 39

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| L  01:22 | 1 | A.   I believe so. |
| 11:01:25 | 2 | Q.   If you look at the second page, there is -- |
| 11:01:28 | 3 | there is a box where it says "Acknowledgment" and some |
| 11:01:30 | 4 | writing.  Did you read it before you signed it? |
| 11:01:34 | 5 | A.   I don't recall. |
| 11:01:39 | 6 | Q.   If you look five paragraphs down, starts with, |
| 11:01:43 | 7 | "I understand that in the absence of a specific |
| 11:01:46 | 8 | contract or agreement," et cetera, "employees are hired |
| 11:01:51 | 9 | on an at-will basis, and either the employee or the |
| 11:01:54 | 10 | company may terminate the employment relationship at |
| 11:01:57 | 11 | any time with or without cause and or without notice." |
| 11:02:01 | 12 | Did anyone tell you that would not apply to |
| 11:02:03 | 13 | you? |
| L  /2:05 | 14 | A.   I have no -- it wasn't discussed.  I may have |
| 11:02:08 | 15 | done this during the interview.  I -- I don't |
| 11:02:11 | 16 | remember. |
| 11:02:11 | 17 | Q.   After you started employment, did anybody |
| 11:02:14 | 18 | discuss the nature of your employment, whether you |
| 11:02:18 | 19 | could be terminated at any time or whether you had a |
| 11:02:20 | 20 | guarantee? |
| 11:02:21 | 21 | A.   I -- I believed the case to be that as long as |
| 11:02:25 | 22 | I achieve my numbers, I would have a job.  I -- it was |
| 11:02:30 | 23 | implied. |
| 11:02:32 | 24 | Q.   It was implied from what? |
| 11:02:36 | 25 | A.   Quota achievement is what you are judged on in |

Page 40

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| J2:39 | 1 | sales. |
| 11:02:41 | 2 | Q.   But no one ever told you anything that led you |
| 11:02:44 | 3 | to believe that; is that correct? |
| 11:02:46 | 4 | A.   I -- from everybody I talked to, it -- it |
| 11:02:49 | 5 | seemed to be fine. |
| 11:02:51 | 6 | Q.   Who did you talk to that told you that? |
| 11:02:54 | 7 | A.   I don't remember. |
| 11:02:55 | 8 | Q.   Did Mr. Wainwright ever tell you that your |
| 11:02:58 | 9 | employment would be anything other than at-will? |
| 11:03:00 | 10 | A.   I didn't discuss that it was at-will or not |
| 11:03:03 | 11 | at-will. |
| 11:03:03 | 12 | Q.   Did Mr. Landis ever tell you anything that |
| 11:03:05 | 13 | would lead you to believe your employment was anything |
| 3:07 | 14 | other than at-will? |
| 11:03:09 | 15 | A.   At-will was never discussed. |
| 11:03:13 | 16 | Q.   Did you ever get any employment agreements that |
| 11:03:17 | 17 | said your employment was not at-will? |
| 11:03:21 | 18 | A.   I -- nothing was done either way on that. |
| 11:03:27 | 19 | MS. HEVERLY:   Mark as Exhibit Number 2 is a |
| 11:03:30 | 20 | two-page offer letter dated May 12th, 2004. |
| 11:03:34 | 21 | MR. IANNITELLI:   Thank you. |
| 11:03:48 | 22 | (Exhibit marked for identification: |
| 11:03:48 | 23 | Deposition Exhibit Number 2.) |
| 11:04:22 | 24 | THE WITNESS:   (Reviewing document(s).) |
| 11:04:22 | 25 | Oh, looking at the dates, I would like to |

Page 41

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1 04:24 | 1 | clarify. |
| 11:04:25 | 2 | I did do that application at the time of the |
| 11:04:27 | 3 | interview. |
| 11:04:28 | 4 | BY MS. HEVERLY: |
| 11:04:28 | 5 | Q.   Okay. |
| 11:04:28 | 6 | A.   So it was in a hurry. |
| 11:04:33 | 7 | Q.   Okay.  Have you had a chance to look at this |
| 11:04:34 | 8 | letter? |
| 11:04:35 | 9 | A.   Briefly. |
| 11:04:39 | 10 | Q.   Okay.  Do you recall receiving it on or around |
| 11:04:40 | 11 | May 12th? |
| 11:04:42 | 12 | A.   Yeah, shortly after that I believe to be the |
| 11:04:45 | 13 | date. |
| 1 04:45 | 14 | Q.   If you flip to the second page, is that your |
| 11:04:48 | 15 | signature on the signature line? |
| 11:04:49 | 16 | A.   Yes. |
| 11:04:50 | 17 | Q.   Did you read the document before you signed |
| 11:04:52 | 18 | it? |
| 11:04:55 | 19 | A.   Yes. |
| 11:04:55 | 20 | Q.   Is there anything in the letter that was not an |
| 11:04:59 | 21 | accurate reflection of what your employment offer was? |
| 11:05:04 | 22 | A.   Not that I can see. |
| 11:05:06 | 23 | Q.   After receiving the letter did you have any |
| 11:05:09 | 24 | conversations with anyone that modified any of the |
| 11:05:11 | 25 | terms of the offer? |

Page 42

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 06:29 | 1 | A.   I glanced through it at a later date. |
| 11:06:36 | 2 | MS. HEVERLY:   Let's mark as Exhibit Number 3 a |
| 11:06:38 | 3 | handbook acknowledgment dated 6-2-04. |
| 11:06:56 | 4 | (Exhibit marked for identification: |
| 11:06:56 | 5 | Deposition Exhibit Number 3.) |
| 11:07:42 | 6 | THE WITNESS:   (Reviewing document(s).) |
| 11:07:42 | 7 | BY MS. HEVERLY: |
| 11:07:42 | 8 | Q.   Is that your signature on the line that says |
| 11:07:44 | 9 | "Employee signature"? |
| 11:07:45 | 10 | A.   Yes. |
| 11:07:45 | 11 | Q.   And is that your printed name below it? |
| 11:07:48 | 12 | A.   Yes. |
| 11:07:48 | 13 | Q.   Did you print your name there? |
| 7:50 | 14 | A.   Yes. |
| 11:07:50 | 15 | Q.   Okay.  Did you review this acknowledgment |
| 11:07:52 | 16 | agreement before signing it? |
| 11:07:55 | 17 | A.   I think so. |
| 11:07:57 | 18 | Q.   Okay.  In the fourth bullet point it says, "I |
| 11:08:01 | 19 | understand that terms and conditions of employment may |
| 11:08:02 | 20 | be modified at the discretion of the company, with or |
| 11:08:06 | 21 | without cause or notice at any time." |
| 11:08:09 | 22 | Did you understand that to be the case? |
| 11:08:10 | 23 | A.   I had a different understanding of at-will -- |
| 11:08:14 | 24 | Q.   Okay. |
| 11:08:14 | 25 | A.   -- but -- |

Page 44

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1 ̣ ̣8:58 | 1 | Q.   During the first few months you worked at |
| 11:39:01 | 2 | NetVersant, from June to November, how many new |
| 11:39:05 | 3 | accounts did you get? |
| 11:39:09 | 4 | A.   Oh, I -- I'm not sure what you mean by "new." |
| 11:39:16 | 5 | Q.   Well, I understand that you were given, and we |
| 11:39:19 | 6 | already talked about the list of accounts that you got |
| 11:39:21 | 7 | when you started working and that you got shortly |
| 11:39:23 | 8 | thereafter in July. |
| 11:39:25 | 9 | A.   I would disagree with the statement "given," |
| 11:39:27 | 10 | but -- |
| 11:39:29 | 11 | Q.   Okay.  However you want to phrase it, you |
| 11:39:30 | 12 | didn't go out and cold call and find the customers; the |
| 11:39:34 | 13 | customers were assigned to you when you started, |
| 1   ̣9:37 | 14 | correct? |
| 11:39:37 | 15 | A.   The customers were assigned some of the |
| 11:39:39 | 16 | business, yes. |
| 11:39:42 | 17 | Q.   Okay. |
| 11:39:42 | 18 | A.   But that -- it wasn't just all assigned.  I |
| 11:39:44 | 19 | mean there was new projects, new applications, new |
| 11:39:49 | 20 | upgrades, new locations for these customers. |
| 11:39:53 | 21 | Q.   Okay.  So I understand that you may have sold |
| 11:39:54 | 22 | some new business to the existing accounts, but what |
| 11:39:57 | 23 | I'm really asking is what new accounts did you bring to |
| 11:40:00 | 24 | the company? |
| 11:40:02 | 25 | A.   I -- I had brought in at least one, and many |

Page 67

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:40:07 | 1 | were getting close to coming in. |
| 11:40:09 | 2 | Q.  What new account did you bring in? |
| 11:40:14 | 3 | A.  I had -- I had signed a small deal with |
| 11:40:16 | 4 | American Red Cross that was supposed to turn into more. |
| 11:40:21 | 5 | Q.  Do you know what the value of the deal with |
| 11:40:22 | 6 | American Red Cross was? |
| 11:40:24 | 7 | A.  Oh, it -- it was -- it was small. |
| 11:40:28 | 8 | Q.  Small -- |
| 11:40:30 | 9 | A.  Hundreds of dollars, probably. |
| 11:40:36 | 10 | Q.  And you said there were several other that were |
| 11:40:38 | 11 | in process? |
| 11:40:40 | 12 | A.  Yes. |
| 11:40:40 | 13 | Q.  Which ones were in process? |
| 11:40:44 | 14 | A.  Millions of dollars in quotes for Maximus; new |
| 11:40:48 | 15 | locations, new locations that NetVersant was not |
| 11:40:51 | 16 | maintaining. |
| 11:40:52 | 17 | Q.  Okay.  And, again, I'm just focusing on new |
| 11:40:54 | 18 | accounts. |
| 11:40:55 | 19 | A.  GC Wallace. |
| 11:41:00 | 20 | Q.  Okay.  Anyone else? |
| 11:41:03 | 21 | A.  I'm sure there was others.  I can't recall |
| 11:41:05 | 22 | right now. |
| 11:41:06 | 23 | Q.  Anything that would refresh your |
| 11:41:12 | 24 | recollection? |
| 11:41:12 | 25 | A.  Oh, a -- a funnel. |

Page 68

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ ,4:40 | 1 | this lawsuit.   Did you review it before it was filed? |
| 11:54:43 | 2 | A.   Yes. |
| 11:54:45 | 3 | Q.   Okay.   I want to ask you a couple questions |
| 11:54:46 | 4 | about some of the claims in it. |
| 11:54:49 | 5 | On page seven, the third cause of action is |
| 11:54:52 | 6 | brought against NetVersant and Peter Wainwright, and |
| 11:54:57 | 7 | it's for harassment. |
| 11:54:58 | 8 | What did Mr. Wainwright do to harass you? |
| 11:55:01 | 9 | A.   Oh, he -- he obviously didn't want me there |
| 11:55:07 | 10 | after I was off and disabled. |
| 11:55:10 | 11 | He made promises to reassign accounts that I |
| 11:55:16 | 12 | had worked out with reps and he told me he would work |
| 11:55:19 | 13 | it out and then didn't. |
| 1   5:20 | 14 | He expected unreasonable funnels right away. |
| 11:55:27 | 15 | He was rude and abusive in private meetings. |
| 11:55:37 | 16 | Q.   Anything else? |
| 11:55:40 | 17 | A.   I -- that's all I'm thinking of right now. |
| 11:55:43 | 18 | Q.   Did anyone else at NetVersant harass you? |
| 11:55:54 | 19 | A.   No. |
| 11:55:54 | 20 | Q.   Did he ever make any comments to you about your |
| 11:55:59 | 21 | disability? |
| 11:56:08 | 22 | A.   Not in particular. |
| 11:56:09 | 23 | Q.   Did he ever make any jokes about being disabled |
| 11:56:13 | 24 | or people with disabilities? |
| 11:56:17 | 25 | A.   Not in front of me. |

Page 72

TALTY COURT REPORTERS, INC.   408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ ᴜ6:20 | 1 | Q.   Did you ever learn about any jokes he made to |
| 11:56:23 | 2 | anyone else outside your presence? |
| 11:56:27 | 3 | A.   Yes. |
| 11:56:27 | 4 | Q.   What did you learn of? |
| 11:56:29 | 5 | A.   He accused me of going off of the deep end, and |
| 11:56:40 | 6 | making a spooky phone call. |
| 11:56:44 | 7 | Q.   When did you learn of that? |
| 11:56:46 | 8 | A.   Recently. |
| 11:56:47 | 9 | Q.   You learned about that in connection with this |
| 11:56:49 | 10 | lawsuit, correct? |
| 11:56:50 | 11 | A.   Yes. |
| 11:56:50 | 12 | Q.   You didn't know that at the time you were |
| 11:56:52 | 13 | employed there? |
| 1  6:53 | 14 | A.   I did not know that at the time. |
| 11:56:55 | 15 | Q.   Okay.   At the time you were employed, there did |
| 11:56:57 | 16 | you learn of any jokes or comments that Mr. Wainwright |
| 11:57:00 | 17 | had made outside your presence about your disability? |
| 11:57:07 | 18 | A.   No. |
| 11:57:07 | 19 | Q.   Okay.   So he -- you said that he made promises |
| 11:57:10 | 20 | to reassign you accounts.   Was that in August when you |
| 11:57:17 | 21 | came back, or in January when you came back, or both? |
| 11:57:20 | 22 | A.   It was in February when I was off, early |
| 11:57:26 | 23 | February.   We discussed transition of accounts, and the |
| 11:57:32 | 24 | agreement that was made on two accounts in particular, |
| 11:57:35 | 25 | Maximus and Hansen, was that if the reps were willing |

Page 73

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ _7:38 | 1 | to, they would be reassigned to me after, which they |
| 11:57:42 | 2 | agreed to.  And I believe they talked to Peter about |
| 11:57:46 | 3 | that after. |
| 11:57:50 | 4 | And then when I came back on August 1st, after |
| 11:57:54 | 5 | receiving the first e-mail that I was not going to |
| 11:57:57 | 6 | receive accounts back, I went and sat down with him, |
| 11:58:01 | 7 | and he made it sound like I might possibly -- that I |
| 11:58:05 | 8 | would receive those back. |
| 11:58:06 | 9 | Q.   In August you are saying? |
| 11:58:08 | 10 | A.   Or Maximus in particular, yes. |
| 11:58:12 | 11 | Q.   And then you also said that he expected an |
| 11:58:15 | 12 | unreasonable funnel; is that correct? |
| 11:58:18 | 13 | A.   Yes. |
| 1  8:18 | 14 | Q.   Was that in -- in January when you came back, |
| 11:58:21 | 15 | or in August, or both? |
| 11:58:22 | 16 | A.   That would have been in August mainly. |
| 11:58:31 | 17 | Not "mainly."  Yes. |
| 11:58:35 | 18 | Q.   Okay.  And you said he was rude and abusive in |
| 11:58:38 | 19 | meetings.  What did you mean by that? |
| 11:58:41 | 20 | A.   Oh, called my performance underwhelming, raised |
| 11:58:48 | 21 | his voice at me, made it clear I couldn't be counted |
| 11:58:58 | 22 | on. |
| 11:58:58 | 23 | Q.   What?  Say that again? |
| 11:59:00 | 24 | A.   I couldn't be counted on because of the time I |
| 11:59:03 | 25 | was off. |

Page 74

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ _9:06 | 1 | Q.   Anything else? |
| 11:59:09 | 2 | A.   That's the main points of it. |
| 11:59:12 | 3 | Q.   Did that all happen in one meeting? |
| 11:59:16 | 4 | A.   Yes.  I mean most of it. |
| 11:59:21 | 5 | Q.   Was there more than one meeting? |
| 11:59:24 | 6 | A.   No, that was -- there was phone conversations, |
| 11:59:26 | 7 | but that would have been the one face to face. |
| 11:59:35 | 8 | Q.   And that -- this all happened in the first |
| 11:59:38 | 9 | couple of days in August of 2005; is that correct? |
| 11:59:41 | 10 | A.   Yes, that would have been either August 1st or |
| 11:59:43 | 11 | August 2nd.  I believe it was August 1st. |
| 11:59:49 | 12 | Q.   So you told me three things that he did to you |
| 11:59:51 | 13 | that you thought were harassment:  He didn't reassign |
| 1   9:54 | 14 | your accounts; he demanded an unreasonable funnel; and |
| 11:59:58 | 15 | he was rude and abusive to you. |
| 12:00:01 | 16 | Can you think of anything else that he did to |
| 12:00:03 | 17 | you that was harassing? |
| 12:00:05 | 18 | A.   It was just the -- that's the bulk of it. |
| 12:00:08 | 19 | Q.   And it's true that all of this conduct, the |
| 12:00:12 | 20 | allegedly harassing conduct, occurred on the 1st or 2nd |
| 12:00:16 | 21 | of August; is that correct? |
| 12:00:24 | 22 | A.   Yes. |
| 12:00:24 | 23 | Also -- well, on August 3rd, also.  He had |
| 12:00:28 | 24 | agreed to consider reassigning Maximus if the rep was |
| 12:00:32 | 25 | willing to.  I had worked it out with the rep that he |

Page 75

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 12:00:34 | 1 | had no objection to it, which was Kevin Bryant.  And |
| 12:00:40 | 2 | then on the -- on August 3rd he ruled that in fact that |
| 12:00:43 | 3 | was not going to happen. |
| 12:00:47 | 4 | Q.   Okay.  So it happened on August 1st, 2nd and |
| 12:00:50 | 5 | 3rd? |
| 12:00:50 | 6 | A.   Yes. |
| 12:00:53 | 7 | Q.   And it sounds like all of the stuff is |
| 12:00:56 | 8 | work-related stuff; is that correct? |
| 12:00:58 | 9 | I mean all of the things that you complain of |
| 12:01:00 | 10 | are work things; is that correct? |
| 12:01:03 | 11 | A.   Yes. |
| 12:01:03 | 12 | Q.   He didn't do anything to you outside of work? |
| 12:01:06 | 13 | A.   No. |
| 1  1:06 | 14 | Q.   He never touched you inappropriately? |
| 12:01:11 | 15 | A.   No. |
| 12:01:11 | 16 | Q.   You already testified he never made any jokes |
| 12:01:13 | 17 | to you or any vulgar or offensive comments? |
| 12:01:17 | 18 | A.   No, just other than being demeaning about my |
| 12:01:20 | 19 | abilities and my performance. |
| 12:01:22 | 20 | Q.   Okay.  Did he say anything to you that was |
| 12:01:24 | 21 | offensive because of your disability? |
| 12:01:28 | 22 | A.   Not at the time. |
| 12:01:30 | 23 | Q.   At any time? |
| 12:01:34 | 24 | A.   I -- I don't know if I'd call it that. |
| 12:01:39 | 25 | Q.   Okay.  And at the time we are talking about, |

Page 76

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1? ?3:52 | 1 | A.    I was having stress and -- and problems coping; |
| 12:04:03 | 2 | that I was -- |
| 12:04:04 | 3 | Q.    You told that to Joanna? |
| 12:04:06 | 4 | A.    Absolutely.  And that I was unable to cope with |
| 12:04:10 | 5 | work at the time. |
| 12:04:17 | 6 | Q.    Okay.  If you flip to page twelve, you have |
| 12:04:33 | 7 | sued Peter Wainwright personally for what's called |
| 12:04:36 | 8 | intentional infliction of emotional distress.  And in |
| 12:04:41 | 9 | this claim you say that they engaged in behavior that |
| 12:04:47 | 10 | intended to cause you emotional distress. |
| 12:04:52 | 11 | What did Mr. Wainwright do that you believe was |
| 12:04:55 | 12 | intentional to cause your emotional distress? |
| 12:04:57 | 13 | A.    He was abusive, he was breaking his promises. |
| 1   5:00 | 14 | It was clear he was not going to let me succeed |
| 12:05:03 | 15 | there. |
| 12:05:04 | 16 | Q.    And is it the same conduct that you just talked |
| 12:05:06 | 17 | about that you believe was harassing? |
| 12:05:08 | 18 | A.    Yes. |
| 12:05:08 | 19 | Q.    Is there anything else? |
| 12:05:13 | 20 | A.    Not that I can think of -- of offhand. |
| 12:05:17 | 21 | Q.    Okay.  And then if you flip the page one more |
| 12:05:19 | 22 | time, there is another claim, which is negligent |
| 12:05:22 | 23 | infliction of emotional distress, which is essentially |
| 12:05:26 | 24 | the same claim that Mr. Wainwright did something to |
| 12:05:28 | 25 | cause you emotional distress. |

Page 79

TALTY COURT REPORTERS, INC.    408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT: MICHAEL CAVA 1-4-07

| | | |
|---|---|---|
| 1~ ~5:31 | 1 | Is it all the same things that you have already |
| 12:05:32 | 2 | testified to, or is there something else that he did? |
| 12:05:35 | 3 | A. Yes, I thought that the company was going to -- |
| 12:05:36 | 4 | was supporting me, and that was just completely pulled |
| 12:05:42 | 5 | out from underneath me, the way I was treated. |
| 12:05:47 | 6 | Q. Okay. But it all relates to those first three |
| 12:05:49 | 7 | days in August and this -- the events that you already |
| 12:05:52 | 8 | testified to; is that correct? |
| 12:05:57 | 9 | A. Yes. |
| 12:05:57 | 10 | Q. So it's not getting your accounts back, |
| 12:05:59 | 11 | demanding an unreasonable funnel, and being rude to you |
| 12:06:02 | 12 | in the meetings? |
| 12:06:05 | 13 | A. Yes. |
| 1  6:05 | 14 | Q. Anything else? |
| 12:06:08 | 15 | A. Not that I can think of. |
| 12:06:16 | 16 | Q. Do you know if Mr. Wainwright ever raised his |
| 12:06:19 | 17 | voice to anyone else? |
| 12:06:21 | 18 | A. Yes. |
| 12:06:21 | 19 | Q. Who did he raise his voice to? |
| 12:06:23 | 20 | A. Oh, he was in shouting matches on more than a |
| 12:06:29 | 21 | few occasions. One time him and Ed Kingen, the VP of |
| 12:06:34 | 22 | operations, were swearing at each other openly in the |
| 12:06:36 | 23 | office. |
| 12:06:37 | 24 | Q. So it was not unusual for Mr. Wainwright to |
| 12:06:40 | 25 | raise his voice? |

Page 80

DEPONENT:   MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 12:10:46 | 1 | sent them to Joanna. |
| 12:10:48 | 2 | Q.   Did you ever tell Mr. Wainwright that you were |
| 12:10:50 | 3 | suffering from a disability? |
| 12:10:53 | 4 | A.   I told him I was -- that my doctor had ordered |
| 12:10:58 | 5 | disability. |
| 12:10:59 | 6 | Q.   When did you tell him that? |
| 12:11:05 | 7 | A.   At some time after January 26th when I went out |
| 12:11:07 | 8 | on disability. |
| 12:11:08 | 9 | Q.   Did you tell him that in a telephone conference |
| 12:11:11 | 10 | or in person? |
| 12:11:12 | 11 | A.   Oh, I'm sure it was a telephone conference. |
| 12:11:17 | 12 | Q.   What was his response when you told him that? |
| 12:11:22 | 13 | A.   He didn't seem unsupportive, and he was |
| 1:  1:28 | 14 | concerned about the accounts that I was assigned, and |
| 12:11:34 | 15 | having those covered. |
| 12:11:36 | 16 | Most of it was surrounded around -- around |
| 12:11:38 | 17 | business.  He really didn't ask much about disability |
| 12:11:43 | 18 | or anything going on with my son. |
| 12:11:45 | 19 | Q.   Did you tell him at the time what your |
| 12:11:47 | 20 | disability was? |
| 12:11:49 | 21 | A.   Just that I was disabled, or I was off on |
| 12:11:52 | 22 | disability. |
| 12:11:55 | 23 | Q.   Did you tell him whether it was for your own |
| 12:11:57 | 24 | disability or to care for your son? |
| 12:12:00 | 25 | A.   I had always expressed that it was my |

Page 84

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1.  7:55 | 1 | Q.   Okay. |
| 12:17:55 | 2 | A.   NetVersant did not respond, as far as I know. |
| 12:18:04 | 3 | Q.   Do you know why NetVersant didn't respond? |
| 12:18:08 | 4 | A.   I'm not sure.  I -- I'm not sure.  I would just |
| 12:18:15 | 5 | be speculating. |
| 12:18:24 | 6 | MS. HEVERLY:  Okay.  Let's mark as number 11 a |
| 12:18:27 | 7 | one-page e-mail dated November 10th, 2004. |
| 12:18:46 | 8 | (Exhibit marked for identification: |
| 12:18:46 | 9 | Deposition Exhibit Number 11.) |
| 12:19:03 | 10 | THE WITNESS:  (Reviewing document(s).) |
| 12:19:03 | 11 | BY MS. HEVERLY: |
| 12:19:03 | 12 | Q.   Again, you produced this document to us in |
| 12:19:05 | 13 | discovery, and I'm just curious what the significance |
| 1   9:08 | 14 | is. |
| 12:19:10 | 15 | A.   I just -- when I had to go out on leave, I |
| 12:19:14 | 16 | continued to work as hard as I could, and tried to make |
| 12:19:19 | 17 | sure there was a transition on the accounts I was |
| 12:19:21 | 18 | working on, had some very good opportunities with these |
| 12:19:25 | 19 | accounts. |
| 12:19:25 | 20 | And Kevin Bryant and Sean Lemoine, who worked |
| 12:19:28 | 21 | for Kevin, were agreeing to work on -- on some of these |
| 12:19:34 | 22 | opportunities, and we would split them when I was back. |
| 12:19:37 | 23 | Q.   And you were out on leave from early November |
| 12:19:39 | 24 | of 2004 to mid January 2005 the first time, correct? |
| 12:19:44 | 25 | A.   Yes. |

Page 89

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1.  .1:34 | 1 | Q.   I just asked you if you thought it violated |
| 12:21:36 | 2 | your employment contract and you said you thought it |
| 12:21:38 | 3 | did. |
| 12:21:38 | 4 | What employment contract did you have with the |
| 12:21:41 | 5 | company? |
| 12:21:42 | 6 | A.   I just had an agreement with -- with Peter and |
| 12:21:44 | 7 | Scott of what I was going to be assigned. |
| 12:21:47 | 8 | Q.   So just the oral agreement that you had made |
| 12:21:49 | 9 | with them during the interview process; is that |
| 12:21:54 | 10 | correct? |
| 12:21:54 | 11 | A.   Yes. |
| 12:21:54 | 12 | Q.   Those terms were never reduced to a writing? |
| 12:21:57 | 13 | A.   No. |
| 1   2:21 | 14 | Q.   So at some point your son became ill, |
| 12:22:25 | 15 | correct? |
| 12:22:25 | 16 | A.   Yes. |
| 12:22:25 | 17 | Q.   When did he first become ill? |
| 12:22:27 | 18 | A.   He was diagnosed with a brain tumor on November |
| 12:22:30 | 19 | 1st, 2004. |
| 12:22:34 | 20 | Q.   And when did you first go out on leave?  Was it |
| 12:22:41 | 21 | the same day? |
| 12:22:42 | 22 | A.   Yeah, that night I -- when I got home from the |
| 12:22:45 | 23 | hospital, I -- I informed everybody I needed to be out. |
| 12:22:52 | 24 | Q.   How did you tell people you needed to be out? |
| 12:22:55 | 25 | A.   It was -- I believe it was 1:00 A.M., |

Page 91

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  .2:58 | 1 | sometime -- or in the early morning.  Nobody was going |
| 12:23:01 | 2 | to be there.  I sent an e-mail. |
| 12:23:03 | 3 | Q.  Did you talk to anyone in person either that |
| 12:23:05 | 4 | day or the next day? |
| 12:23:06 | 5 | A.  The next day I did. |
| 12:23:08 | 6 | Q.  Who did you talk to the next day? |
| 12:23:10 | 7 | A.  Joanna Cotter and a number of other account |
| 12:23:13 | 8 | reps there, people that I worked with.  Everybody was |
| 12:23:21 | 9 | very concerned. |
| 12:23:24 | 10 | Q.  What did they tell you about whether you could |
| 12:23:28 | 11 | take time off? |
| 12:23:30 | 12 | A.  Oh, at that time on -- on the early days, it |
| 12:23:36 | 13 | wasn't even questioned.  I offered to go off on leave |
| 1  3:39 | 14 | right away. |
| 12:23:41 | 15 | Q.  Did anyone ever discourage you from taking |
| 12:23:43 | 16 | leave? |
| 12:23:44 | 17 | A.  Not -- not until a little bit later. |
| 12:23:48 | 18 | Q.  Okay.  But at that time in early November |
| 12:23:50 | 19 | nobody did? |
| 12:23:52 | 20 | A.  No. |
| 12:23:53 | 21 | Q.  Did you ever submit any paperwork for a formal |
| 12:24:00 | 22 | leave of absence? |
| 12:24:00 | 23 | A.  Other than the e-mails at that point?  It was |
| 12:24:03 | 24 | all by e-mail. |
| 12:24:04 | 25 | Q.  Okay. |

Page 92

DEPONENT:  MICHAEL CAVA    1-4-07

1. .4:04    1    A.    And -- and verbal.  But mostly e-mail.

12:24:06    2    Q.    Did anyone ever ask you for verification of

12:24:09    3  your son's illness, from a doctor's note or anything?

12:24:16    4    A.    No.

12:24:16    5    Q.    You were paid your full salary for the first

12:24:19    6  portion of leave, correct?

12:24:21    7    A.    Yes.

12:24:21    8    Q.    Were you paid your full salary from November

12:24:24    9  1st until January 2005 when you came back?

12:24:28   10    A.    Yes, I believe until January 17th.

12:24:41   11        MS. HEVERLY:  This is probably a decent time to

12:24:43   12  break since we are almost out of tape.

12:24:49   13        THE VIDEOGRAPHER:  We are off -- we are off the

1   4:52   14  record at 12:24, and this is the end of media number

12:24:59   15  one.

13:26:41   16        (Lunch recess.)

           17

           18

           19

           20

           21

           22

           23

           24

           25

Page 93

DEPONENT:  MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 1   6:41 | 1 | Afternoon Session                                    1:25 P.M. |
| 13:26:41 | 2 | THE VIDEOGRAPHER:  We are now on the record at |
| 13:26:43 | 3 | 1:25 P.M.  This is the beginning of tape number two in |
| 13:26:47 | 4 | the deposition of Michael Cava on January 4th, 2007. |
| 13:26:54 | 5 | BY MS. HEVERLY: |
| 13:26:54 | 6 | Q.  When you were interviewing with Mr. Landis and |
| 13:26:59 | 7 | Mr. Wainwright, do you recall asking them for a |
| 13:27:01 | 8 | seventy-five-thousand-dollar base compensation? |
| 13:27:03 | 9 | A.  I don't remember that.  I -- I'm not sure.  I |
| 13:27:07 | 10 | don't remember that. |
| 13:27:09 | 11 | Q.  Do you recall asking for any specific dollar |
| 13:27:11 | 12 | amount of base compensation? |
| 13:27:13 | 13 | A.  I remember -- the way I remember it was that |
| 1   7:15 | 14 | they had said it's sixty-five thousand, and I said that |
| 13:27:19 | 15 | was fine, is the way I remember it. |
| 13:27:23 | 16 | Q.  When we broke we were talking about your first |
| 13:27:26 | 17 | period of leave of absence, which was from November 1st |
| 13:27:30 | 18 | through January 15th, 2005, correct? |
| 13:27:33 | 19 | A.  Yes. |
| 13:27:33 | 20 | Q.  And -- |
| 13:27:34 | 21 | A.  January 17th -- |
| 13:27:35 | 22 | Q.  Okay. |
| 13:27:36 | 23 | A.  -- was my first day back. |
| 13:27:37 | 24 | Q.  And nobody told you you couldn't take leave |
| 13:27:42 | 25 | during that period, correct? |

Page 94

TALTY COURT REPORTERS, INC.   408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:   MICHAEL CAVA     1-4-07

| | | |
|---|---|---|
| 1. .7:44 | 1 | A.   No. |
| 13:27:45 | 2 | Q.   And nobody at the company hassled you for |
| 13:27:47 | 3 | taking leave during that period; is that correct? |
| 13:27:52 | 4 | A.   I mean Joanna had told me that -- I mean she |
| 13:27:58 | 5 | had expressed that -- that I could only take a certain |
| 13:28:00 | 6 | amount of time off, that I wasn't eligible for family |
| 13:28:03 | 7 | leave. |
| 13:28:03 | 8 | Q.   How much time did she tell you you could take |
| 13:28:06 | 9 | off? |
| 13:28:07 | 10 | A.   I don't remember exactly.  I was feeling quite |
| 13:28:13 | 11 | a bit of pressure to get back to work myself for |
| 13:28:19 | 12 | the -- (pause). |
| 13:28:20 | 13 | Q.   Did anyone tell you you had to come back on the |
| 1  3:22 | 14 | 17th? |
| 13:28:24 | 15 | A.   I -- I know they had approved through January |
| 13:28:31 | 16 | 15th. |
| 13:28:31 | 17 | Q.   Did you ask to take leave beyond the 15th |
| 13:28:34 | 18 | before you came back? |
| 13:28:36 | 19 | A.   No. |
| 13:28:57 | 20 | MS. HEVERLY:  Let's mark -- what number are we |
| 13:28:59 | 21 | on?  I'm sorry. |
| 13:29:01 | 22 | THE REPORTER:  12. |
| 13:29:01 | 23 | MS. HEVERLY:  -- as number 12 a one-page letter |
| 13:29:04 | 24 | dated December 9th, 2004. |
| 13:29:24 | 25 | (Exhibit marked for identification: |

Page 95

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  9:24 | 1 | Deposition Exhibit Number 12.) |
| 13:29:27 | 2 | THE WITNESS:   (Reviewing document(s).) |
| 13:29:42 | 3 | BY MS. HEVERLY: |
| 13:29:42 | 4 | Q.   Do you recall receiving this letter in early |
| 13:29:43 | 5 | December 2004? |
| 13:29:44 | 6 | A.   I do. |
| 13:29:45 | 7 | Q.   Okay.  And it says in the letter that you |
| 13:29:46 | 8 | requested a personal leave without pay from December |
| 13:29:48 | 9 | 13th to January 12th, 2005. |
| 13:29:51 | 10 | Is that correct that you had requested a |
| 13:29:52 | 11 | personal leave without pay? |
| 13:29:53 | 12 | A.   I did.  I actually had requested to go off |
| 13:29:56 | 13 | without pay from the very beginning.  But, yes, I -- I |
| 1  ):01 | 14 | had requested that. |
| 13:30:02 | 15 | Q.   Okay.  And then it says your request was |
| 13:30:05 | 16 | approved.  Is that also accurate that they approved |
| 13:30:07 | 17 | your request? |
| 13:30:08 | 18 | A.   They had approved it, and then it was modified |
| 13:30:13 | 19 | to -- to be where it was with pay, actually.  That |
| 13:30:18 | 20 | wasn't my decision.  That was -- I believe that was |
| 13:30:21 | 21 | Scott Landis or Rob Macchi or somebody. |
| 13:30:26 | 22 | Q.   Okay.  And then it says that you would have to |
| 13:30:28 | 23 | continue pay (sic) your contribution for your health |
| 13:30:31 | 24 | insurance benefits, and that it was due on December |
| 13:30:33 | 25 | 15th, 2004. |

Page 96

DEPONENT:  MICHAEL CAVA    1-4-07

13:30:34   1        Did you in fact pay that, or because the leave
13:30:36   2   was paid, did you not have to pay it?
13:30:40   3      A.    They informed me not to pay that, that it was
13:30:42   4   just being taken out of the regular paycheck.
13:30:46   5      Q.    And your health insurance benefits were
13:30:49   6   continued through the whole period of the leave; is
13:30:52   7   that correct?
13:30:52   8      A.    They were -- they were interrupted at some
13:30:56   9   points, I don't remember when, but they -- it was at
13:31:00  10   least retroactively covered when -- when there was
13:31:03  11   periods of lapse.
13:31:05  12      Q.    Was it interrupted at all during that first
13:31:07  13   period of leave from December 2004 to January 2005?
13:31:12  14      A.    I don't remember the exact dates.
13:31:14  15      Q.    So you came back to work January 17th; is that
13:31:17  16   correct?
13:31:17  17      A.    Yes.
13:31:17  18      Q.    Did you report back to the South San Francisco
13:31:19  19   office?
13:31:20  20      A.    I did.
13:31:21  21      Q.    Did you meet with anybody when you came back?
13:31:25  22      A.    I did meet with Peter that day.  I had -- I had
13:31:30  23   been talking to a number of other reps in the office
13:31:32  24   that morning.
13:31:33  25      Q.    Did you request the meeting with Mr. Wainwright

Page 97

DEPONENT:  MICHAEL CAVA    1-4-07

```
1   1:35      1  or did he request it?
13:31:37      2      A.   I requested it after I received an e-mail from
13:31:41      3  him.
13:31:43      4      Q.   What did the e-mail say?
13:31:47      5      A.   I'm -- I'm trying to remember.  I'm not a
13:31:50      6  hundred percent sure what was the 17th and the 18th.  I
13:31:53      7  apologize.
13:31:55      8      Q.   Okay.  But you do recall on one of those two
13:31:57      9  days getting an e-mail --
13:31:59     10      A.   Yes.
13:31:59     11      Q.   -- from Mr. Wainwright?
13:32:00     12      A.   Yes.
13:32:00     13      Q.   You don't recall what the e-mail said?
1   2:02     14      A.   Well, there was a performance improvement plan.
13:32:05     15  I -- I don't remember which day it was.  And I was -- I
13:32:08     16  was upset about it and I wanted to go talk to him.
13:32:11     17      Q.   So then the -- the sequence of things as you
13:32:16     18  recall is you came back to work, you received an e-mail
13:32:18     19  from Mr. Wainwright that you saw as a performance
13:32:21     20  improvement plan, and then you met with him
13:32:24     21  afterwards?
13:32:24     22      A.   Yes.
13:32:24     23      Q.   Before receiving the e-mail had you had any
13:32:27     24  meetings with Mr. Wainwright?
13:32:28     25      A.   We had talked casually.
```

Page 98

DEPONENT:  MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 1  2:33 | 1 | Q.  Okay.  Before receiving the e-mail had he told |
| 13:32:35 | 2 | you whether or not you were getting your accounts |
| 13:32:36 | 3 | back? |
| 13:32:42 | 4 | A.  I -- we -- I -- yeah, I was receiving those |
| 13:32:47 | 5 | accounts back.  I don't remember if he said I was, but |
| 13:32:49 | 6 | I didn't -- I didn't have a problem at that point. |
| 13:33:01 | 7 | MS. HEVERLY:  Let's mark as number 13 a |
| 13:33:04 | 8 | multiple-page e-mail dated January 18th, 2005. |
| 13:33:27 | 9 | (Exhibit marked for identification: |
| 13:33:27 | 10 | Deposition Exhibit Number 13.) |
| 13:34:02 | 11 | THE WITNESS:  (Reviewing document(s).) |
| 13:34:02 | 12 | BY MS. HEVERLY: |
| 13:34:02 | 13 | Q.  Is this the e-mail that you just told me that |
| 1  4:04 | 14 | you received on either the 17th or 18th? |
| 13:34:07 | 15 | A.  It looks like it is. |
| 13:34:08 | 16 | Q.  This is the one you were talking about? |
| 13:34:11 | 17 | Before we get into this e-mail, I have one |
| 13:34:13 | 18 | follow-up question from your testimony this morning. |
| 13:34:16 | 19 | When you said that Mr. Wainwright harassed you, |
| 13:34:19 | 20 | one of the things you said he did to harass you was to |
| 13:34:22 | 21 | expect an unreasonable funnel, or something along those |
| 13:34:27 | 22 | lines. |
| 13:34:28 | 23 | He expect- -- was it your testimony that he |
| 13:34:30 | 24 | expected it in a short period of time? |
| 13:34:33 | 25 | A.  That's what I believed it to be. |

Page 99

TALTY COURT REPORTERS, INC.   408.244.1900
2131 The Alameda, Suite D, San Jose, CA 95126

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1   4:36 | 1 | Q.    What period of time did he expect you to get |
| 13:34:38 | 2 | your funnel up? |
| 13:34:40 | 3 | A.    I -- my impression was immediately. |
| 13:34:44 | 4 | MR. IANNITELLI:  Just for clarification, are we |
| 13:34:45 | 5 | talking about August or January? |
| 13:34:48 | 6 | MS. HEVERLY:  Yes, we are talking about August. |
| 13:34:49 | 7 | Sorry if that was confusing. |
| 13:34:52 | 8 | BY MS. HEVERLY: |
| 13:34:52 | 9 | Q.    I'm talking about in August of 2005 when you |
| 13:34:54 | 10 | met with Mr. Wainwright and you said that he was |
| 13:34:57 | 11 | abusive and rude to you; you said that he gave you an |
| 13:35:00 | 12 | unreasonable funnel expectation. |
| 13:35:02 | 13 | So just talking about then, did he tell you at |
| 1   5:05 | 14 | what point he expected your funnel to be fully up to |
| 13:35:09 | 15 | expectation? |
| 13:35:10 | 16 | A.    He expected it to be on track right away was my |
| 13:35:14 | 17 | impression.  And I also had had all my accounts taken |
| 13:35:19 | 18 | away at that point. |
| 13:35:20 | 19 | Q.    Did he tell you that he expected to be on track |
| 13:35:24 | 20 | right away? |
| 13:35:25 | 21 | A.    That was my impression. |
| 13:35:30 | 22 | Q.    What did he say to give you that impression? |
| 13:35:36 | 23 | A.    That, "Your revenue funnel needs to be -- you |
| 13:35:39 | 24 | need to be up to these dollar amounts." |
| 13:35:42 | 25 | I mean he spelled it out, the four times |

Page 100

DEPONENT:   MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 1. 5:46 | 1 | revenue. |
| 13:35:47 | 2 | Q.   But he didn't give you any particular time |
| 13:35:48 | 3 | frame?  He didn't say "next month," "next year," "next |
| 13:35:52 | 4 | week"? |
| 13:35:53 | 5 | A.   It was really clear that I needed to do it |
| 13:35:55 | 6 | right away or I wouldn't have a job. |
| 13:36:01 | 7 | Q.   All right.  Now, going back to January when you |
| 13:36:03 | 8 | came back from your leave, you got this -- this e-mail. |
| 13:36:07 | 9 | What did you do when you received it? |
| 13:36:10 | 10 | A.   I was upset, and I went in and talked to Peter, |
| 13:36:14 | 11 | which at that time we -- we had a closed-door meeting. |
| 13:36:18 | 12 | Q.   What about this e-mail was upsetting to you? |
| 13:36:22 | 13 | A.   I had been doing a good job; I was over quota. |
| 1   5:26 | 14 | And I had been off for a period of time, which I was |
| 13:36:29 | 15 | willing to go off without pay.  I was grateful that the |
| 13:36:32 | 16 | company paid me, but I would have been off without pay. |
| 13:36:36 | 17 | And I was upset that I was being accountable |
| 13:36:39 | 18 | for revenue during that time.  And I just -- I thought |
| 13:36:44 | 19 | it was very unfair.  I had -- it had not been conveyed |
| 13:36:47 | 20 | to me that I was doing a bad job. |
| 13:36:49 | 21 | Q.   What in the e-mail led you to believe that you |
| 13:36:51 | 22 | were being held accountable for revenue during the |
| 13:36:54 | 23 | period you were on leave? |
| 13:36:55 | 24 | A.   I was put on a performance improvement plan |
| 13:36:57 | 25 | based on my 2004 results.  I was off dealing with my |

Page 101

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ _7:01 | 1 | son in 2004. |
| 13:37:04 | 2 | Q.   Prior to going out on leave, so prior to |
| 13:37:07 | 3 | November 1st of 2004, had you been meeting all of the |
| 13:37:11 | 4 | expectations of your job? |
| 13:37:13 | 5 | A.   Yeah, absolutely. |
| 13:37:14 | 6 | Q.   You had a funnel of four times quota at that |
| 13:37:16 | 7 | time? |
| 13:37:16 | 8 | A.   I believe I did. |
| 13:37:22 | 9 | Q.   Okay. |
| 13:37:22 | 10 | A.   I had -- I had millions of dollars in proposals |
| 13:37:25 | 11 | out there. |
| 13:37:30 | 12 | Q.   And did you have new sales of a hundred and |
| 13:37:32 | 13 | fifty to two hundred dollars per month -- two hundred |
| 1   7:34 | 14 | thousand per month? |
| 13:37:36 | 15 | A.   That was a new thing that had never been |
| 13:37:39 | 16 | mentioned to me before, before that day. |
| 13:37:44 | 17 | Q.   In the first paragraph of the e-mail it says, |
| 13:37:46 | 18 | "The required run" -- "run rate of fifty K of GPM per |
| 13:37:51 | 19 | month."  What does that mean to you? |
| 13:37:54 | 20 | A.   That I had to bring in fifty thousand of gross |
| 13:37:57 | 21 | profit per month. |
| 13:37:59 | 22 | Q.   Did you understand before this e-mail that that |
| 13:38:02 | 23 | was an expectation? |
| 13:38:05 | 24 | A.   Yes, and I had been doing it. |
| 13:38:07 | 25 | Q.   So prior to your leave you had been bringing in |

Page 102

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ ⌐9:41 | 1 | itself. |
| 13:39:41 | 2 | THE WITNESS:  It says "new sales." |
| 13:39:47 | 3 | It also mentions further down that he's |
| 13:39:52 | 4 | unhappy -- I mean I'm paraphrasing, but he's unhappy |
| 13:39:55 | 5 | that I have been achieving revenue off of existing |
| 13:39:59 | 6 | accounts. |
| 13:40:02 | 7 | BY MS. HEVERLY: |
| 13:40:02 | 8 | Q.  But you understood that you were supposed to |
| 13:40:04 | 9 | bring in new business as well as get business from |
| 13:40:07 | 10 | existing accounts, didn't you? |
| 13:40:09 | 11 | A.  And I was working very diligently on that. |
| 13:40:11 | 12 | Q.  And as of the time you went out on leave on |
| 13:40:13 | 13 | November 4th, you hadn't gotten any new business other |
| 1  0:15 | 14 | than a very small sale for a couple hundred dollars? |
| 13:40:17 | 15 | A.  I was on track to bring in a good deal of |
| 13:40:21 | 16 | business.  I had quoted a good deal of business. |
| 13:40:23 | 17 | Q.  But all of it was from existing accounts, |
| 13:40:26 | 18 | correct? |
| 13:40:26 | 19 | A.  No, I had quoted much new business; it just |
| 13:40:29 | 20 | hadn't closed yet. |
| 13:40:34 | 21 | Q.  And I apologize if I asked you this before, but |
| 13:40:37 | 22 | I don't recall, what -- what clients or what accounts |
| 13:40:39 | 23 | had you quoted new business for that hadn't closed yet? |
| 13:40:44 | 24 | A.  Oh, I had -- I had met with a number of |
| 13:40:46 | 25 | customers.  I had -- I don't recall when I responded to |

Page 104

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ .0:49 | 1 | the RFP for AOL's maintenance that later resulted in a |
| 13:40:54 | 2 | win for NetVersant. |
| 13:40:58 | 3 | I was -- I was talking with most of my previous |
| 13:41:02 | 4 | customers at Shared Technologies. |
| 13:41:04 | 5 | Q.  But none of them ever translated into business |
| 13:41:07 | 6 | for NetVersant, correct? |
| 13:41:08 | 7 | A.  I -- it would have.  It hadn't yet. |
| 13:41:19 | 8 | Q.  So what in this e-mail was a new expectation |
| 13:41:22 | 9 | that you were -- had -- had not been given before? |
| 13:41:26 | 10 | A.  That it -- that it was unacceptable that I was |
| 13:41:29 | 11 | generating revenue off of existing accounts.  I -- it's |
| 13:41:35 | 12 | never -- it had never been stated to me before that I |
| 13:41:38 | 13 | was expected to bring in that much new business. |
| 1  1:41 | 14 | Q.  Is that the only thing that's a new expectation |
| 13:41:44 | 15 | in this e-mail? |
| 13:41:45 | 16 | A.  It had never been conveyed to me that I was |
| 13:41:47 | 17 | doing a bad job. |
| 13:41:49 | 18 | Q.  Okay.  Anything else that's a new expectation |
| 13:41:51 | 19 | or a new communication? |
| 13:41:55 | 20 | A.  I felt -- I felt singled out.  I -- I was the |
| 13:41:59 | 21 | only person over quota to be put on a plan. |
| 13:42:03 | 22 | Q.  Do you know whether any other account |
| 13:42:05 | 23 | executives were given the same expectations? |
| 13:42:08 | 24 | A.  I don't know, but I would seriously doubt it. |
| 13:42:13 | 25 | I have never heard of that in the business. |

Page 105

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ ,3:21 | 1 | MS. HEVERLY:  All right.  Let's mark as |
| 13:43:22 | 2 | Exhibit -- |
| 13:43:23 | 3 | BY MS. HEVERLY: |
| 13:43:23 | 4 | Q.  Oh, well, let's talk about I guess first the |
| 13:43:25 | 5 | meeting with Mr. Wainwright. |
| 13:43:26 | 6 | So you had a meeting with Mr. Wainwright after |
| 13:43:28 | 7 | receiving the e-mail; is that correct? |
| 13:43:30 | 8 | A.  Yes. |
| 13:43:30 | 9 | Q.  Was it the same day or the next day? |
| 13:43:33 | 10 | A.  I'm pretty sure it was immediately after I |
| 13:43:35 | 11 | received it. |
| 13:43:35 | 12 | Q.  Was it in person? |
| 13:43:38 | 13 | A.  Yes. |
| 1  3:38 | 14 | Q.  What did you discuss? |
| 13:43:39 | 15 | A.  And -- and after seeing this.  So it was the |
| 13:43:41 | 16 | Tuesday, the 18th, that the meeting happened. |
| 13:43:44 | 17 | Q.  Okay.  Was it in Mr. Wainwright's office? |
| 13:43:47 | 18 | A.  Yes. |
| 13:43:47 | 19 | Q.  What did you discuss? |
| 13:43:50 | 20 | A.  That this was unfair; that I had been off; that |
| 13:43:55 | 21 | I had hit my numbers the year before. |
| 13:44:00 | 22 | Q.  What did he say? |
| 13:44:03 | 23 | A.  He expressed that I needed to bring in new |
| 13:44:09 | 24 | revenue, and that it wasn't acceptable that that was |
| 13:44:12 | 25 | coming off of existing accounts, even if it was new |

Page 107

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. .4:16 | 1 | opportunities in existing accounts. |
| 13:44:18 | 2 | He expressed I was doing a poor job, which was |
| 13:44:21 | 3 | shocking to me because I had never been told that |
| 13:44:23 | 4 | before. |
| 13:44:27 | 5 | Q.  But expressing that you needed to bring in new |
| 13:44:31 | 6 | accounts wasn't a new message, was it? |
| 13:44:33 | 7 | A.  I was working on new accounts.  No.  I mean -- |
| 13:44:37 | 8 | (pause). |
| 13:44:37 | 9 | Q.  So you just didn't -- you just hadn't been told |
| 13:44:40 | 10 | that you were doing a poor job; is that correct? |
| 13:44:42 | 11 | A.  That I -- I hadn't been told that I was doing a |
| 13:44:45 | 12 | poor job or that -- yeah, that I was doing anything |
| 13:44:48 | 13 | wrong up until then. |
| 1  1:52 | 14 | Q.  Okay.  What else was discussed during that |
| 13:44:53 | 15 | meeting? |
| 13:45:02 | 16 | A.  I don't know. |
| 13:45:06 | 17 | MS. HEVERLY:  Let me go try to stop that noise. |
| 13:45:08 | 18 | Hold on. |
| 13:45:28 | 19 | (Discussion off the record.) |
| 13:45:28 | 20 | THE VIDEOGRAPHER:  Shall I go off record? |
| 13:45:30 | 21 | MS. HEVERLY:  Yeah. |
| 13:45:30 | 22 | THE VIDEOGRAPHER:  We are off the record at |
| 13:45:32 | 23 | 1:44. |
| 13:46:01 | 24 | (Discussion off the record.) |
| 13:46:02 | 25 | THE VIDEOGRAPHER:  We're back on the record at |

Page 108

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ _0:26 | 1 | me in the office.  You could hear it behind closed |
| 13:50:29 | 2 | doors. |
| 13:50:30 | 3 | Q.    Did you approach her or did she approach you? |
| 13:50:33 | 4 | A.    She approached me. |
| 13:50:34 | 5 | Q.    What did she say? |
| 13:50:37 | 6 | A.    "Don't -- don't be offended by it," you know. |
| 13:50:40 | 7 | "It's" -- you know, "Peter -- Peter is Peter," type of |
| 13:50:46 | 8 | thing. |
| 13:50:47 | 9 | I'm paraphrasing.  I mean it was a, "Hey, look, |
| 13:50:52 | 10 | you know, just don't worry about it.  Let's just work, |
| 13:50:54 | 11 | and we all support you here." |
| 13:50:57 | 12 | Q.    And what did you say to her? |
| 13:50:58 | 13 | A.    I appreciated it.  I didn't realize anybody |
| 1   1:00 | 14 | heard it through the door. |
| 13:51:02 | 15 | Q.    Is that how you took it as well, that it was |
| 13:51:05 | 16 | just Peter being Peter? |
| 13:51:08 | 17 | A.    That's a comment that I had heard before. |
| 13:51:15 | 18 | Q.    Did you talk to anyone else about the meeting |
| 13:51:17 | 19 | the day that it happened? |
| 13:51:18 | 20 | A.    No. |
| 13:51:25 | 21 | Oh, I -- I take that back.  I'm sorry. |
| 13:51:26 | 22 | I did -- when I left the office, I did contact |
| 13:51:30 | 23 | Joanna Cotter, who was copied on the performance |
| 13:51:32 | 24 | improvement plan. |
| 13:51:37 | 25 | Q.    You talked to her over the telephone? |

Page 113

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ _1:38 | 1 | A.   Yes.   I called her from my cell phone on my way |
| 13:51:43 | 2 | home that afternoon. |
| 13:51:45 | 3 | Q.   What did you and Ms. Cotter talk about? |
| 13:51:50 | 4 | A.   I -- I was very upset about this performance |
| 13:51:52 | 5 | improvement plan, and, you know, I wanted to know what |
| 13:51:58 | 6 | to do and why this was happening. |
| 13:52:00 | 7 | Q.   What did she tell you? |
| 13:52:01 | 8 | A.   She had no explanation for it.   She seemed |
| 13:52:06 | 9 | shaken by it, that it didn't seem appropriate.   And she |
| 13:52:10 | 10 | just kept encouraging me to call Scott Landis. |
| 13:52:14 | 11 | Q.   Did she tell you it was inappropriate? |
| 13:52:16 | 12 | A.   No, she -- but she was -- I could tell she was |
| 13:52:19 | 13 | upset. |
| 1  2:22 | 14 | Q.   And she told you to call Mr. Landis? |
| 13:52:29 | 15 | A.   Yes. |
| 13:52:29 | 16 | Q.   How long was your conversation with Ms. Cotter? |
| 13:52:32 | 17 | A.   Maybe ten minutes.   I don't remember. |
| 13:52:37 | 18 | Q.   Anything else that you discussed during that |
| 13:52:39 | 19 | conversation? |
| 13:52:39 | 20 | A.   No.   It was really just all surrounding that. |
| 13:52:44 | 21 | Q.   All right. |
| 13:52:45 | 22 | A.   It was a -- it was a complete shock. |
| 13:52:47 | 23 | Q.   Is your cell phone -- or at the time was your |
| 13:52:49 | 24 | cell phone provided by NetVersant? |
| 13:52:51 | 25 | A.   No.   It's my personal. |

Page 114

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. ,2:53 | 1 | Q.   Did they pay for the phone bills? |
| 13:52:55 | 2 | A.   They -- there was an offer to.  I never |
| 13:52:58 | 3 | submitted any receipts for it. |
| 13:53:08 | 4 | Q.   Why not? |
| 13:53:12 | 5 | A.   I just hadn't gotten around to it when I was |
| 13:53:16 | 6 | there. |
| 13:53:18 | 7 | Q.   Okay.  So you called Ms. Cotter on your way |
| 13:53:21 | 8 | home.  Did you talk to anyone else that evening? |
| 13:53:25 | 9 | A.   I had talked to Scott Landis. |
| 13:53:26 | 10 | Q.   You talked to Scott Landis as you were driving |
| 13:53:29 | 11 | home as well? |
| 13:53:30 | 12 | A.   I believe it was that day.  It could have been |
| 13:53:31 | 13 | the next day.  I believe it was that day. |
| 1  3:33 | 14 | Q.   What did you say to Mr. Landis? |
| 13:53:36 | 15 | A.   "Why is this happening?  I -- I -- this seems |
| 13:53:39 | 16 | unfair.  I hit my numbers last year.  I have -- you |
| 13:53:42 | 17 | know, I want to -- I really want this job to work out; |
| 13:53:46 | 18 | I want to do a good job here.  I feel like you guys |
| 13:53:49 | 19 | were supportive of me through what was going on with my |
| 13:53:53 | 20 | son.  And it just doesn't seem fair." |
| 13:53:58 | 21 | He -- he assured me I had nothing to worry |
| 13:54:01 | 22 | about, that I wasn't on a performance improvement |
| 13:54:04 | 23 | plan. |
| 13:54:06 | 24 | Q.   Was this a telephone conference you had with |
| 13:54:09 | 25 | Mr. Landis? |

Page 115

| | | |
|---|---|---|
| 1  .4:10 | 1 | A.    Yes. |
| 13:54:10 | 2 | Q.    How long did that last? |
| 13:54:12 | 3 | A.    Maybe fifteen minutes. |
| 13:54:22 | 4 | Q.    Okay.  He said you had nothing to worry about. |
| 13:54:24 | 5 | What else did he say? |
| 13:54:26 | 6 | A.    I -- I wanted to get clarification on that.  I |
| 13:54:31 | 7 | wanted something in writing rescinding it because it |
| 13:54:36 | 8 | was -- it was formally in writing.  And he just kept |
| 13:54:39 | 9 | expressing, "Hey, look, you have got nothing to worry |
| 13:54:43 | 10 | about.  Don't worry about it.  You are doing a good |
| 13:54:45 | 11 | job.  And you are not in danger for your job here.  And |
| 13:54:52 | 12 | we want you to be here." |
| 13:54:54 | 13 | Q.    Anything else you can recall him saying? |
| 1  4:56 | 14 | A.    It just kind of kept going back and forth on |
| 13:54:59 | 15 | that issue.  And then finally he said that he was not |
| 13:55:04 | 16 | going to go against his VP of sales, and -- but, you |
| 13:55:07 | 17 | know, so he wasn't going to do something in -- in |
| 13:55:10 | 18 | writing, but that I had nothing to worry about. |
| 13:55:15 | 19 | Q.    Did the plan -- other than upsetting you |
| 13:55:19 | 20 | perhaps, did the plan cause any negative consequences? |
| 13:55:25 | 21 | A.    You know, it was what it was, and I just |
| 13:55:30 | 22 | decided to -- to deal with it, try to do the best job I |
| 13:55:35 | 23 | could like I had done in the past. |
| 13:55:36 | 24 | Q.    Did you lose any pay because of it? |
| 13:55:40 | 25 | A.    No. |

Page 116

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. 5:50 | 1 | Q.  So you talked to Mr. Landis that evening, you |
| 13:55:54 | 2 | think, or perhaps the next day? |
| 13:55:55 | 3 | A.  Yes. |
| 13:55:55 | 4 | Q.  Did you talk to anyone else the next day about |
| 13:55:57 | 5 | the issue? |
| 13:56:00 | 6 | A.  Not that I can recall.  I may have talked to |
| 13:56:02 | 7 | Joanna one more time about the contents of that call. |
| 13:56:05 | 8 | I don't recall. |
| 13:56:06 | 9 | Q.  And then the next day you went out on leave; is |
| 13:56:10 | 10 | that correct? |
| 13:56:10 | 11 | A.  No. |
| 13:56:11 | 12 | Q.  What -- what happened next? |
| 13:56:12 | 13 | A.  I actually went out on leave on January 26th. |
| 1  6:16 | 14 | I continued to try to get back engaged with my |
| 13:56:20 | 15 | customers, work with the other reps that had been |
| 13:56:23 | 16 | filling in on the accounts, get caught up with what was |
| 13:56:25 | 17 | going on.  And -- |
| 13:56:27 | 18 | Q.  So you continued to work until January 26th? |
| 13:56:29 | 19 | A.  Yes.  And I reached out to accounts that I had |
| 13:56:32 | 20 | been working with, new opportunities. |
| 13:56:35 | 21 | MS. HEVERLY:  Let's mark as Exhibit 14 a |
| 13:56:39 | 22 | one-page doctor's note from Neil Okamura. |
| 13:56:59 | 23 | (Exhibit marked for identification: |
| 13:56:59 | 24 | Deposition Exhibit Number 14.) |
| 13:57:14 | 25 | THE WITNESS:  (Reviewing document(s).) |

Page 117

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1⸱ ⸱7:14 | 1 | BY MS. HEVERLY: |
| 13:57:14 | 2 | Q.  Have you seen this note before? |
| 13:57:16 | 3 | A.  Yes. |
| 13:57:16 | 4 | Q.  So this note says -- I think it says |
| 13:57:18 | 5 | "Disability form signed on 1-19-05."  Is that |
| 13:57:21 | 6 | incorrect? |
| 13:57:21 | 7 | A.  It does say that, and I believe -- |
| 13:57:27 | 8 | MR. IANNITELLI:  Just wait until she's asked |
| 13:57:27 | 9 | it. |
| 13:57:27 | 10 | THE WITNESS:  Okay. |
| 13:57:27 | 11 | BY MS. HEVERLY: |
| 13:57:28 | 12 | Q.  Is that incorrect? |
| 13:57:28 | 13 | A.  No, that's -- that's correct. |
| 1  7:29 | 14 | Q.  I see. |
| 13:57:30 | 15 | A.  I don't know if it was issued on 1-19, but it |
| 13:57:34 | 16 | does say that. |
| 13:57:35 | 17 | Q.  You did not go out on leave on the 19th? |
| 13:57:38 | 18 | A.  No, I did not. |
| 13:57:38 | 19 | Q.  You worked until the 26th? |
| 13:57:41 | 20 | A.  Yes. |
| 13:57:41 | 21 | Q.  And then you went out on leave starting the |
| 13:57:42 | 22 | 26th or starting the 27th? |
| 13:57:46 | 23 | A.  I guess technically the 27th.  The 26th I |
| 13:57:52 | 24 | probably -- I mean the afternoon of the 26th is when I |
| 13:57:55 | 25 | had to stop working. |

Page 118

DEPONENT:  MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 1   1:48 | 1 | caused even more stress, right? |
| 14:01:49 | 2 | A.   We had to rush him to the hospital.  He was -- |
| 14:01:52 | 3 | he was admitted to the hospital immediately.  He was |
| 14:01:55 | 4 | vomiting out of control.  His blood counts, his white |
| 14:01:58 | 5 | blood cell counts, had gone zero. |
| 14:02:01 | 6 | Q.   So I thought -- correct me if I'm wrong, and |
| 14:02:03 | 7 | I'm not trying to be difficult, but I thought you said |
| 14:02:05 | 8 | on the 19th he was still in the hospital at Stanford. |
| 14:02:07 | 9 | Did he get out of the hospital then at some |
| 14:02:09 | 10 | point? |
| 14:02:09 | 11 | A.   He got out on the -- I believe it was the |
| 14:02:12 | 12 | 21st. |
| 14:02:14 | 13 | Q.   Okay.  And then on the 26th he had to be |
| 1   2:16 | 14 | readmitted? |
| 14:02:18 | 15 | A.   Yes. |
| 14:02:18 | 16 | Q.   Okay.  And so then starting the 26th you asked |
| 14:02:20 | 17 | for another leave of absence, correct? |
| 14:02:23 | 18 | A.   Yes.  I submitted the -- I believe it was |
| 14:02:26 | 19 | either the 26th or the 27th I submitted the -- the |
| 14:02:29 | 20 | paperwork to Joanna. |
| 14:02:46 | 21 | Q.   How did you submit them? |
| 14:02:50 | 22 | A.   I don't remember if I faxed it or scanned it |
| 14:02:52 | 23 | and e-mailed it. |
| 14:02:54 | 24 | Q.   Okay.  And did you get any response from |
| 14:02:56 | 25 | Ms. Cotter or anyone else? |

Page 122

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 02:58 | 1 | A.    Yes. |
| 14:03:00 | 2 | Q.    What was the response? |
| 14:03:01 | 3 | A.    She inquired to the nature of it.  She was |
| 14:03:06 | 4 | concerned that maybe that it was work-related because |
| 14:03:10 | 5 | of what had happened a week before, and I expressed no, |
| 14:03:16 | 6 | that it wasn't; these are my -- my own personal issues, |
| 14:03:19 | 7 | I'm having trouble coping with what's going on, and my |
| 14:03:25 | 8 | doctor had recommended I go out on disability. |
| 14:03:28 | 9 | Q.    Okay.  And then what else did she say, if |
| 14:03:30 | 10 | anything? |
| 14:03:33 | 11 | A.    She expressed that I wasn't -- I wasn't |
| 14:03:38 | 12 | protected because I wasn't eligible for family leave. |
| 14:03:45 | 13 | Q.    Did you know what that meant? |
| 3:48 | 14 | A.    That -- that it meant that, according to her, |
| 14:03:50 | 15 | that I could lose my job. |
| 14:03:59 | 16 | Q.    Okay.  Did you -- did she say anything else to |
| 14:04:01 | 17 | you at that time? |
| 14:04:02 | 18 | A.    No.  I mean she -- she, you know, expressed |
| 14:04:10 | 19 | sympathy for what I was going through.  She was always |
| 14:04:12 | 20 | very sympathetic. |
| 14:04:17 | 21 | Q.    Did she tell you whether or not NetVersant |
| 14:04:20 | 22 | would grant the leave you requested? |
| 14:04:23 | 23 | A.    I don't remember for sure.  I -- I believe -- I |
| 14:04:27 | 24 | believe she had to check.  I'm not sure. |
| 14:04:30 | 25 | Q.    Okay.  At some point did you find out whether |

Page 123

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  ⌐4:32 | 1 | or not your leave was being granted? |
| 14:04:34 | 2 | A.   Yes, I did find out it was. |
| 14:04:36 | 3 | Q.   Do you recall how you found out it was being |
| 14:04:38 | 4 | granted? |
| 14:04:38 | 5 | A.   I mean it wasn't -- I mean it wasn't a leave. |
| 14:04:41 | 6 | I was off on disability, so -- I was -- I was told that |
| 14:04:44 | 7 | I wasn't going to be terminated. |
| 14:04:48 | 8 | Q.   Okay.  But they gave you a leave of absence to |
| 14:04:49 | 9 | deal with your disability, correct? |
| 14:04:51 | 10 | MR. IANNITELLI:  Calls for speculation. |
| 14:04:53 | 11 | THE WITNESS:  I -- I don't think it was a leave |
| 14:04:57 | 12 | of absence. |
| 14:04:57 | 13 | BY MS. HEVERLY: |
| 1  4:57 | 14 | Q.   What was it, then? |
| 14:05:00 | 15 | A.   I -- I don't know.  I was off on disability. |
| 14:05:04 | 16 | Q.   But it wasn't a disability leave of absence? |
| 14:05:08 | 17 | A.   My doctor recommended I would -- I guess that's |
| 14:05:11 | 18 | what you call it.  I -- I'm not a doctor.  I don't |
| 14:05:14 | 19 | know. |
| 14:05:14 | 20 | Q.   So it was time off from work to take care of |
| 14:05:17 | 21 | your disability, correct? |
| 14:05:19 | 22 | A.   My -- my doctor recommended that I could not |
| 14:05:21 | 23 | work at that time. |
| 14:05:22 | 24 | Q.   And NetVersant allowed you to take the time off |
| 14:05:25 | 25 | work -- from work, correct? |

Page 124

DEPONENT:  MICHAEL CAVA    1-4-07

```
1   5:26    1      A.    They did not terminate me.

14:05:28    2      Q.    Did they stop paying you your salary at that

14:05:33    3  time?

14:05:33    4      A.    Yes.

14:05:33    5      Q.    Did they continue your health insurance

14:05:36    6  benefits?

14:05:37    7      A.    They -- if I recall correctly, they -- yeah, I

14:05:45    8  believe I just had to -- I had to write a check for the

14:05:48    9  part that would be deducted out of my -- my paycheck.

14:05:58   10      Q.    Do you know if that continued for the whole

14:06:00   11  period from January to August, whether they continued

14:06:04   12  to pay the employer's share of the health insurance?

14:06:09   13      A.    Yes, I -- I believe they did.

1   6:23   14      Q.    Did you have any communications with Peter

14:06:26   15  Wain- -- Peter Wainwright about your disability leave

14:06:28   16  in January 2005?

14:06:33   17      A.    Just that I was off on disability leave.

14:06:36   18      Q.    You actually --

14:06:38   19      A.    And --

14:06:37   20      Q.    -- talked to him about that?

14:06:39   21      A.    Yes.  We -- we had to make arrangements for the

14:06:41   22  customers.

14:06:43   23      Q.    Did you tell him what your disability was?

14:06:48   24      A.    Just that it was stress-related surrounding my

14:06:52   25  son.
```

Page 125

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  ,6:56 | 1 | Q.    Anything else? |
| 14:06:58 | 2 | A.    No.  I mean most of the discussion was always |
| 14:07:00 | 3 | just about business, and arrangements for the |
| 14:07:03 | 4 | customers, who was going to cover them. |
| 14:07:07 | 5 | Q.    And the original expectation, as we saw from |
| 14:07:11 | 6 | that note, was that you come back on April 15th, 2005? |
| 14:07:14 | 7 | Or maybe it was April 19th.  April 19th, 2005. |
| 14:07:19 | 8 | Was that your original understanding of how |
| 14:07:21 | 9 | long the leave would be? |
| 14:07:24 | 10 | A.    I -- I -- we didn't know at that point.  My -- |
| 14:07:30 | 11 | my belief is that I think that's all the doctor can |
| 14:07:34 | 12 | write for at that point. |
| 14:07:36 | 13 | Q.    At the time were you seeing any other |
| 1   7:38 | 14 | doctors -- aside from potentially talking to counselors |
| 14:07:41 | 15 | or social workers, or whatever at the hospital, were |
| 14:07:43 | 16 | you seeing any doctors specifically for your |
| 14:07:46 | 17 | condition? |
| 14:07:46 | 18 | A.    No, just Dr. Okamura. |
| 14:07:48 | 19 | Q.    And was Dr. Okamura prescribing any medication |
| 14:07:52 | 20 | to you at that time? |
| 14:07:53 | 21 | A.    Yes, had been, and continued to, and changed |
| 14:07:55 | 22 | that medication over time. |
| 14:08:00 | 23 | Q.    How often did you see Dr. Okamura from January |
| 14:08:04 | 24 | 19th to April 19th, 2005? |
| 14:08:07 | 25 | A.    I don't recall.  Regularly. |

Page 126