DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  ,8:12 | 1 | Q.  Did you return to work on April 19th, 2005? |
| 14:08:16 | 2 | A.  No. |
| 14:08:17 | 3 | Q.  What happened on April 19th? |
| 14:08:21 | 4 | A.  Dr. Okamura extended it. |
| 14:08:24 | 5 | Q.  For how long? |
| 14:08:27 | 6 | A.  I don't recall.  There was a -- there was more |
| 14:08:31 | 7 | than one continuance. |
| 14:08:40 | 8 | MS. HEVERLY:  Are we on 15? |
| 14:08:41 | 9 | Okay.  I'll mark as number 15 a two-page e-mail |
| 14:08:44 | 10 | dated April 11th, 2005. |
| 14:09:02 | 11 | (Exhibit marked for identification: |
| 14:09:02 | 12 | Deposition Exhibit Number 15.) |
| 14:09:21 | 13 | THE WITNESS:  (Reviewing document(s).) |
| 1  9:21 | 14 | BY MS. HEVERLY: |
| 14:09:21 | 15 | Q.  Is this an e-mail you sent to Ms. Cotter on or |
| 14:09:24 | 16 | around April 11th, 2005? |
| 14:09:26 | 17 | A.  Yes. |
| 14:09:28 | 18 | Q.  So I see from the attached note it says he |
| 14:09:32 | 19 | extended it to June 19th, 2005. |
| 14:09:35 | 20 | A.  Yes. |
| 14:09:35 | 21 | Q.  Did you have any discussions with Ms. Cotter |
| 14:09:36 | 22 | around this time about your disability extension? |
| 14:09:42 | 23 | A.  I don't recall exactly the content of it, but, |
| 14:09:45 | 24 | yes, I mean I -- I let her know and we talked about it. |
| 14:09:48 | 25 | Q.  Did she tell you whether or not NetVersant was |

Page 127

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1 | _0:48 | 1 | A.  May 15th -- or May -- sorry.  May -- May 17th, |

1  _0:48    1    A.  May 15th -- or May -- sorry.  May -- May 17th,
14:10:54   2  I think.  I -- I'm not sure.  Sometime in May.
14:11:24   3    Q.  Okay.  And then it's -- I think I just asked
14:11:27   4  you this:  At some point it got extended again,
14:11:30   5  correct?
14:11:30   6    A.  Yes.
14:11:30   7    Q.  To August 1st, 2005; is that correct?
14:11:33   8    A.  I -- that -- that sounds correct.  It could
14:11:36   9  have been July 30th or 31st.
14:11:42  10        MS. HEVERLY:  All right.  Let's mark as number
14:11:43  11  16 a two-page e-mail dated July 29th, 2005.
14:12:05  12        (Exhibit marked for identification:
14:12:05  13        Deposition Exhibit Number 16.)
1  2:07   14        THE WITNESS:  (Reviewing document(s).)
14:12:10  15        (Whereupon, Mr. Wainwright exited
14:12:13  16        the conference room.)
14:12:14  17  BY MS. HEVERLY:
14:12:14  18    Q.  Do you recall seeing Dr. Okamura on or around
14:12:16  19  July 29th, 2005?
14:12:18  20    A.  Yes.
14:12:19  21    Q.  And did he tell you that he thought you were
14:12:21  22  ready to go back to work?
14:12:23  23    A.  He issued a release.  I -- I requested that I
14:12:27  24  needed to.  I was on the last -- yeah, he did sign a
14:12:34  25  release.

Page 129

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  .2:36 | 1 | Q.    You started to say you were on the last -- |
| 14:12:42 | 2 | A.    It -- it wasn't relevant to your question. |
| 14:12:44 | 3 | Sorry. |
| 14:12:51 | 4 | Q.    Okay.  Was there any particular reason why you |
| 14:12:53 | 5 | requested for him to release you to work -- to go back |
| 14:12:55 | 6 | to work on the 29th? |
| 14:12:57 | 7 | A.    In June when it was extended again, Joanna had |
| 14:13:01 | 8 | expressed that if I was gone more than six months, they |
| 14:13:06 | 9 | could terminate me no matter what; that -- and that it |
| 14:13:11 | 10 | said that in the employee handbook. |
| 14:13:23 | 11 | Q.    Is that the first time you had heard that you |
| 14:13:26 | 12 | could be terminated after six months? |
| 14:13:28 | 13 | A.    Yes.  I mean the last time I had heard that I |
| 1    3:31 | 14 | could be terminated was at the beginning. |
| 14:13:35 | 15 | Q.    Can you explain that?  You heard you'd be |
| 14:13:37 | 16 | terminated at the beginning of what? |
| 14:13:39 | 17 | A.    Oh, when I first went out on disability, I was |
| 14:13:42 | 18 | informed by Joanna that I could be terminated because I |
| 14:13:45 | 19 | wasn't eligible for family leave. |
| 14:13:47 | 20 | Q.    Oh, because you didn't have any job |
| 14:13:49 | 21 | protection? |
| 14:13:50 | 22 | A.    Yeah, when I was off on disability, it didn't |
| 14:13:52 | 23 | matter. |
| 14:13:53 | 24 | Q.    Okay.  And then she told you in June when your |
| 14:13:55 | 25 | leave was extended that you -- that the policy was |

Page 130

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1   3:58 | 1 | after six months of leave you could be terminated, |
| 14:14:01 | 2 | correct? |
| 14:14:01 | 3 | A.   That my job was in jeopardy, she was going to |
| 14:14:04 | 4 | check. |
| 14:14:06 | 5 | Q.   Okay.  And did she check and get back to you? |
| 14:14:07 | 6 | A.   Yes.  I was -- at that point we knew when we |
| 14:14:10 | 7 | were going to be back from radiation and -- and |
| 14:14:14 | 8 | treatment at St. Jude, and so I had promised I would |
| 14:14:18 | 9 | get back to work on that -- on -- on August 1st. |
| 14:14:28 | 10 | Q.   And as of August 1st you had already been out |
| 14:14:31 | 11 | on leave for more than six months, correct? |
| 14:14:38 | 12 | A.   I guess, yes, six months.  Would have been a |
| 14:14:40 | 13 | few days past six months. |
| 1   4:48 | 14 | Q.   Plus you had had the leave the three months |
| 14:14:52 | 15 | prior to that? |
| 14:14:53 | 16 | I mean you were out on leave essentially from |
| 14:14:56 | 17 | November 1st of 2004, correct, with only a week or two |
| 14:15:00 | 18 | back at work? |
| 14:15:02 | 19 | MR. IANNITELLI:  Lacks foundation, misstates |
| 14:15:03 | 20 | testimony. |
| 14:15:04 | 21 | Go ahead.  You can answer. |
| 14:15:07 | 22 | THE WITNESS:  Okay. |
| 14:15:07 | 23 | I -- I don't know what you would call it that I |
| 14:15:11 | 24 | was out.  I was on pay.  I was still coordinating with |
| 14:15:16 | 25 | reps, returning some customers calls, providing |

Page 131

DEPONENT:  MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 1  .5:19 | 1 | documentation on quotes that were done along the way, |
| 14:15:22 | 2 | taking phone calls from reps. |
| 14:15:24 | 3 | BY MS. HEVERLY: |
| 14:15:24 | 4 | Q.   So you didn't count that time as being off |
| 14:15:26 | 5 | work? |
| 14:15:30 | 6 | A.   I -- I'm not an expert in what is and what |
| 14:15:33 | 7 | isn't time off work. |
| 14:15:37 | 8 | Q.   Well, it's not real -- doesn't really call for |
| 14:15:39 | 9 | an expert opinion.  Were you working or were you not |
| 14:15:41 | 10 | working? |
| 14:15:43 | 11 | A.   I was supplying information as needed.  I was |
| 14:15:46 | 12 | on call and available when they needed me. |
| 14:15:48 | 13 | Q.   Were you working full time? |
| 1  5:49 | 14 | A.   No. |
| 14:15:49 | 15 | Q.   Were you working fifty percent time? |
| 14:15:51 | 16 | A.   No. |
| 14:15:52 | 17 | Q.   What percent time were you working? |
| 14:15:55 | 18 | MR. IANNITELLI:  I think that's been asked and |
| 14:16:00 | 19 | answered.  He doesn't -- |
| 14:16:00 | 20 | THE WITNESS:  I'm not sure. |
| 14:16:01 | 21 | MR. IANNITELLI:  -- know. |
| 14:16:03 | 22 | BY MS. HEVERLY: |
| 14:16:03 | 23 | Q.   Okay.  So in June she told you you could be |
| 14:16:07 | 24 | terminated after six months, and at that point you |
| 14:16:09 | 25 | promised to come back August 1st, correct? |

Page 132

DEPONENT:  MICHAEL CAVA    1-4-07

1  6:11    1    A.    Yes.

14:16:11    2    Q.    So is it fair to say then you went to your

14:16:16    3  doctor and asked him to release you to return to work?

14:16:20    4    A.    Yes.

14:16:24    5         (Whereupon, Mr. Wainwright returned

14:16:25    6         to the conference room.)

14:16:25    7  BY MS. HEVERLY:

14:16:25    8    Q.    Now, this -- the last part of your leave, from

14:16:27    9  May 17th to August 1st, were you off work to care for

14:16:30   10  your son or were you off work because of your own

14:16:32   11  disability?

14:16:33   12    A.    No, I was still on disability.

14:16:35   13    Q.    And were you receiving disability benefits at

1  6:37   14  the same -- at -- during that period?

14:16:44   15    A.    I was -- I'm trying to remember.  I'm -- I'm

14:16:47   16  sorry.  I don't -- I don't recall the exact dates.

14:16:53   17    Q.    Well, did you get any disability benefits

14:16:55   18  during any part of your leave from January to August?

14:16:58   19    A.    I started getting disability -- I started

14:17:04   20  getting disability on January 26th, and it continued

14:17:08   21  through the end of July.  And then it started again on

14:17:15   22  August 3rd.

14:17:17   23    Q.    And were the disability benefits that you

14:17:20   24  received from the State of California or through a

14:17:23   25  private plan, or both?

Page 133

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1  .7:24 | 1 | A.    Just from the State. |
| 14:17:33 | 2 | Q.    Do you recall how much you were receiving per |
| 14:17:35 | 3 | week or per month in disability benefits? |
| 14:17:40 | 4 | A.    I think it was -- it was eight hundred |
| 14:17:42 | 5 | something dollars a week, I think. |
| 14:17:52 | 6 | Q.    And did you have fill out paperwork to receive |
| 14:17:54 | 7 | those benefits? |
| 14:17:58 | 8 | A.    Yes.  Or my doctor had to fill out paperwork. |
| 14:18:02 | 9 | We both had to fill out paperwork. |
| 14:18:12 | 10 | Q.    Okay.  So you were released to come back to |
| 14:18:14 | 11 | work August 1st.  Did you in fact return to work on |
| 14:18:17 | 12 | August 1st? |
| 14:18:19 | 13 | A.    Yes. |
| 1  8:19 | 14 | Q.    What did you do on your first day back to |
| 14:18:21 | 15 | work? |
| 14:18:22 | 16 | A.    Went to the South San Francisco office. |
| 14:18:27 | 17 | Q.    Did you meet with anybody? |
| 14:18:31 | 18 | A.    Yes.  I -- I had talked to a number of reps |
| 14:18:34 | 19 | around there on my first day back, and had met with |
| 14:18:41 | 20 | Peter at some point during the day. |
| 14:18:45 | 21 | Q.    What did you meet with Peter about? |
| 14:18:47 | 22 | A.    I had been informed that I wasn't receiving any |
| 14:18:50 | 23 | of my accounts back even though he was aware that I had |
| 14:18:54 | 24 | made an arrangement with him back in February, and with |
| 14:18:58 | 25 | the other sales reps, Kevin Bryant and Pat McCarthy. |

Page 134

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1 .2:05 | 1 | A.    Yes. |
| 14:22:05 | 2 | Q.    Was that also a telephone conference? |
| 14:22:08 | 3 | A.    Yes. |
| 14:22:10 | 4 | Q.    Is there anything in writing memorializing this |
| 14:22:13 | 5 | agreement? |
| 14:22:18 | 6 | A.    Other than the e-mail from Peter on August 1st |
| 14:22:21 | 7 | stating that he understands that I had that |
| 14:22:24 | 8 | arrangement, no, I don't think there is anything beyond |
| 14:22:26 | 9 | that. |
| 14:22:30 | 10 | Q.    Okay.  At the time, though, there was no |
| 14:22:31 | 11 | writing? |
| 14:22:34 | 12 | A.    I don't -- I don't know.  I don't believe so. |
| 14:22:36 | 13 | Q.    Did you take any notes of any of these |
| 1  2:39 | 14 | conversations? |
| 14:22:43 | 15 | A.    No. |
| 14:22:43 | 16 | Q.    Did you -- when you talked to Kevin and Pat |
| 14:22:46 | 17 | about helping you out, was there agreement that you |
| 14:22:49 | 18 | would split any revenue during the time that you were |
| 14:22:51 | 19 | out on leave? |
| 14:22:52 | 20 | A.    They were going to take any revenue that came |
| 14:22:54 | 21 | in while I was out, and then when I came back, I would |
| 14:22:58 | 22 | take the accounts back over. |
| 14:23:02 | 23 | Q.    All right.  So August 1st when you came back, |
| 14:23:09 | 24 | you said you had -- you have a meeting with Peter |
| 14:23:13 | 25 | Wainwright about your accounts? |

Page 138

DEPONENT:  MICHAEL CAVA    1-4-07

```
1  .3:15   1     A.   About that, and just my continued employment.
14:23:18   2  I had -- I had gotten an e-mail from him about
14:23:23   3  expectations that it seemed like he wanted me to have
14:23:27   4  immediate results, yet I had no accounts.  I felt like
14:23:33   5  it was unrealistic and that he was trying to get rid of
14:23:36   6  me --
14:23:39   7           MS. HEVERLY:  Let's mark --
14:23:38   8           THE WITNESS:  -- at that point.
14:23:40   9           MS. HEVERLY:  Let's mark as Exhibit 17 a
14:23:42  10  one-page e-mail dated August 3rd, 2005.
14:23:45  11           MR. IANNITELLI:  Michelle, when you have a
14:23:46  12  chance, let me know when -- a good time to break.  I'd
14:23:48  13  like to use the restroom.
1   3:50  14           MS. HEVERLY:  Sure.  We can do it now if you
14:23:51  15  want to.
14:23:51  16           MR. IANNITELLI:  Up to you.  I'd just -- soon
14:23:55  17  I'd like to go.
14:23:56  18           MS. HEVERLY:  Okay.  Let's do it now before we
14:23:58  19  get into this document.
14:23:59  20           MR. IANNITELLI:  Okay.  Thank you.
14:23:59  21           THE VIDEOGRAPHER:  All right.  We are going off
14:24:00  22  the record at 2:23.
14:36:15  23           (Marked question indexed.)
14:36:15  24           (Exhibit marked for identification:
14:36:15  25           Deposition Exhibit Number 17.)
```

Page 139

DEPONENT:  MICHAEL CAVA    1-4-07

1    9:18    1        By the end of the meeting he had -- he had

14:39:20    2   expressed that he would talk to the other reps, and if

14:39:23    3   they were willing to, I might get the accounts back,

14:39:29    4   particularly Maximus; not Hansen, just Maximus.  That's

14:39:33    5   all the discussion was about.  But that he needed to

14:39:38    6   talk to -- to Kevin Bryant about it.

14:39:41    7        Q.   Now, is this meeting that you are talking about

14:39:42    8   now the one that you also told me about earlier where

14:39:45    9   he was rude and abusive, or was that a different

14:39:49   10   meeting?

14:39:50   11        A.   I don't -- I don't recall.

14:39:53   12        Q.   Okay.  Do you recall the first conversation on

14:39:54   13   August 1st, 2005 whether he was rude or abusive?

1    9:59   14        A.   I don't remember whether it was August 1st or

14:40:01   15   August 2nd.

14:40:02   16        Q.   All right.  Do you recall whether in the first

14:40:04   17   conversation on August 1st Mr. Wainwright raised his

14:40:07   18   voice to you?

14:40:10   19        A.   I believe that was the meeting.

14:40:15   20        Q.   Then following the meeting you received the

14:40:16   21   e-mail on the bottom of this page, the one dated August

14:40:18   22   1st at 10:24 A.M.; is that correct?

14:40:21   23        A.   No, that would have been -- the meeting was

14:40:23   24   after 10:24.

14:40:24   25        Q.   Okay.  So you got the e-mail first and then had

Page 143

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. .9:21 | 1 | A.   He expected me to get ramped up quickly. |
| 14:49:26 | 2 | Q.   Did he tell you what "quickly" meant? |
| 14:49:29 | 3 | A.   He didn't define it.  He -- he didn't define |
| 14:49:36 | 4 | it, but it was very clear to me that it was expected |
| 14:49:40 | 5 | immediately. |
| 14:49:41 | 6 | He also expresses in here that I had a clean |
| 14:49:44 | 7 | slate, which I really didn't have. |
| 14:49:46 | 8 | Q.   Why didn't you think you had a clean slate? |
| 14:49:49 | 9 | A.   Well, I thought I did.  That's what Scott |
| 14:49:51 | 10 | Landis has promised me in January.  That's what Peter |
| 14:49:54 | 11 | says in this e-mail.  But I never was really taken off |
| 14:49:59 | 12 | plan. |
| 14:50:01 | 13 | Q.   Why do you say that? |
| 1  0:04 | 14 | A.   I have definitely had that confirmed since this |
| 14:50:07 | 15 | all happened. |
| 14:50:08 | 16 | Q.   Who told you you were still on a plan? |
| 14:50:11 | 17 | A.   If you look at Peter's e-mails internally that |
| 14:50:15 | 18 | have been provided in discovery, it states that I am on |
| 14:50:17 | 19 | a performance improvement plan, when he said that I |
| 14:50:21 | 20 | was -- wasn't doing a good job and that I had left a |
| 14:50:26 | 21 | spooky message for him. |
| 14:50:28 | 22 | Q.   Okay.  At the time, though -- I understand you |
| 14:50:29 | 23 | might have learned something through the progress of |
| 14:50:31 | 24 | the lawsuit, through discovery. |
| 14:50:32 | 25 | At the time did anyone tell you that you were |

Page 152

DEPONENT:  MICHAEL CAVA    1-4-07

1·  0:34    1  still on a performance plan?

14:50:35   2      A.   Well, he said I'm on a -- he said I'm on a

14:50:38   3  clean slate, but at the same time he's coming down on

14:50:40   4  me that I have to provide pretty constant updates on

14:50:44   5  funnels and so on here.  And that's not the -- the

14:50:48   6  usual.

14:50:50   7          That's -- I was singled out because -- and he

14:50:52   8  made it clear, because of my time off.  I was off too

14:50:55   9  long; I couldn't be counted on.

14:50:57  10      Q.   What were you singled out for?

14:50:59  11      A.   For being out for so long on disability.

14:51:01  12      Q.   No, no.  I mean what -- what requirements was

14:51:03  13  he putting on you that were singling you out?

1·  1:07  14      A.   Very constant reporting here, immediate ramp-up

14:51:11  15  on -- on funnel that wasn't expected of anybody else

14:51:14  16  there.

14:51:15  17      Q.   Okay.  But, again, the e-mail doesn't say

14:51:17  18  "immediate."

14:51:17  19      A.   It's -- it's implied.  I mean it was expressed.

14:51:20  20  The intent was very clear in our meetings.

14:51:21  21      Q.   All right.  But you just told me that he didn't

14:51:23  22  tell you that you had to have immediate ramp-up.

14:51:25  23      A.   It was implied that I had to do this as soon as

14:51:29  24  possible.

14:51:37  25      Q.   And then you just said that you had to do

                                                        · Page 153

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| .4:54 | 1 | whether or not you were provided with a compensation |
| 14:54:55 | 2 | plan for 2005? |
| 14:54:56 | 3 | A.   I had -- I have -- I had had a copy at some |
| 14:54:59 | 4 | point.  I mean I had seen it; I don't know when. |
| 14:55:05 | 5 | Q.   Okay.  So you got -- you had that conversation |
| 14:55:07 | 6 | with Kevin Bryant, then you got this e-mail on August |
| 14:55:12 | 7 | 3rd, correct? |
| 14:55:13 | 8 | A.   Yes. |
| 14:55:13 | 9 | Q.   And what was the next conversation you had with |
| 14:55:15 | 10 | anybody about the accounts? |
| 14:55:19 | 11 | A.   I -- at that point I had a complete breakdown. |
| 14:55:24 | 12 | The walls were closing in; I was having trouble |
| 14:55:26 | 13 | breathing.  I left the office at that point. |
| 1  5:28 | 14 | Q.   After receiving this e-mail -- |
| 14:55:30 | 15 | A.   Yes. |
| 14:55:30 | 16 | Q.   -- on August 3rd you left the office? |
| 14:55:32 | 17 | A.   Yes, I -- I -- it was really obvious I was |
| 14:55:35 | 18 | being forced out of there, and that because I had been |
| 14:55:38 | 19 | off for my disability, that I had no place there. |
| 14:55:41 | 20 | Q.   How was it obvious that you were being forced |
| 14:55:44 | 21 | out? |
| 14:55:44 | 22 | A.   I was expected to generate immediate results in |
| 14:55:47 | 23 | a business that takes a long time to generate business. |
| 14:55:51 | 24 | And I wasn't going to get any of the business that I |
| 14:55:53 | 25 | had quoted along the way. |

Page 157

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1_ J0:03 | 1 | Q.    Okay.  That was "did not," right? |
| 15:00:04 | 2 | A.    No, I -- I did. |
| 15:00:04 | 3 | Q.    You did.  Okay.  I thought you were saying |
| 15:00:06 | 4 | "didn't." |
| 15:00:10 | 5 | Okay.  So you went straight to the doctor in |
| 15:00:11 | 6 | the afternoon of the 3rd, correct? |
| 15:00:14 | 7 | A.    Yes. |
| 15:00:18 | 8 | MS. HEVERLY:  Let's mark as number 18 (sic) a |
| 15:00:21 | 9 | two-page e-mail dated August 4th, 2005. |
| 15:00:37 | 10 | THE REPORTER:  That's 19. |
| 15:00:37 | 11 | MS. HEVERLY:  Thank you. |
| 15:00:39 | 12 | (Exhibit marked for identification: |
| 15:00:39 | 13 | Deposition Exhibit Number 19.) |
| 1   0:51 | 14 | THE WITNESS:  (Reviewing document(s).) |
| 15:00:51 | 15 | BY MS. HEVERLY: |
| 15:00:51 | 16 | Q.    So attached to this e-mail is a doctor's note. |
| 15:00:54 | 17 | Is this a note you got from your physician on the 3rd |
| 15:00:57 | 18 | of August? |
| 15:00:58 | 19 | A.    Yes. |
| 15:01:01 | 20 | Q.    At that time did -- did Dr. Okamura tell you |
| 15:01:05 | 21 | how much time you needed off, or is it sort of |
| 15:01:09 | 22 | open-ended?  Did he give you an end date? |
| 15:01:12 | 23 | A.    No, I was having a very severe stress |
| 15:01:13 | 24 | reaction. |
| 15:01:14 | 25 | Q.    All right.  And -- |

Page 161

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 1. 01:15 | 1 | A.   At the time I couldn't think straight.  He -- |
| 15:01:18 | 2 | he -- it was very clear that I was having a really, |
| 15:01:22 | 3 | really big problem at that point. |
| 15:01:25 | 4 | He -- he prescribed a very heavy drug at that |
| 15:01:28 | 5 | point, in fact. |
| 15:01:29 | 6 | Q.   Okay.  And did you have -- personally have any |
| 15:01:32 | 7 | expectation as to how long you'd be off work at that |
| 15:01:35 | 8 | point? |
| 15:01:35 | 9 | A.   No.  I did not know. |
| 15:01:37 | 10 | Q.   So you forwarded the doctor's note to |
| 15:01:39 | 11 | Ms. Cotter via e-mail, correct? |
| 15:01:43 | 12 | A.   Yes. |
| 15:01:43 | 13 | Q.   Did you have any conversations with her? |
| 1  1:45 | 14 | A.   Yes, I -- I did that morning of August 4th.  I |
| 15:01:50 | 15 | had not slept all night the night before because I had |
| 15:01:53 | 16 | had a very bad reaction to the drug they put me on. |
| 15:01:56 | 17 | Q.   What did you talk to Ms. Cotter about on the |
| 15:01:59 | 18 | 4th? |
| 15:02:01 | 19 | A.   That I was still disabled, I wasn't ready to |
| 15:02:06 | 20 | return to work, I had tried.  I needed some more time |
| 15:02:10 | 21 | to deal with my issues with my son. |
| 15:02:12 | 22 | She had inquired, as she had before on a |
| 15:02:15 | 23 | different occasion, she wanted to make sure it wasn't |
| 15:02:17 | 24 | work-related, which I expressed it wasn't.  This was |
| 15:02:21 | 25 | all my issues that I had to deal with surrounding my |

Page 162

| | | |
|---|---|---|
| 1 10:38 | 1 | thousand? |
| 15:20:38 | 2 | A.   Three hundred and forty-one thousand. |
| 15:20:41 | 3 | Q.   Okay.  And so you were only at a hundred and |
| 15:20:43 | 4 | eighteen thousand, correct? |
| 15:20:44 | 5 | A.   Through November 1st, which -- at which time I |
| 15:20:47 | 6 | offered to go off on unpaid leave, but the company |
| 15:20:51 | 7 | declined to take. |
| 15:20:55 | 8 | Q.   How much in commissions did you earn in 2004, |
| 15:20:58 | 9 | do you know? |
| 15:20:58 | 10 | A.   I don't recall. |
| 15:20:59 | 11 | Q.   Approximately? |
| 15:21:01 | 12 | A.   A few thousand dollars, from -- from |
| 15:21:06 | 13 | NetVersant. |
| 1  1:06 | 14 | Q.   So that was significantly less than you had |
| 15:21:09 | 15 | earned at your prior company, correct? |
| 15:21:11 | 16 | A.   Absolutely. |
| 15:21:12 | 17 | Q.   At that time did you take any steps to change |
| 15:21:14 | 18 | employment or find a new job? |
| 15:21:16 | 19 | A.   No.  I was -- I was going to make this job |
| 15:21:19 | 20 | work.  I really wanted to be there.  It was a great |
| 15:21:26 | 21 | opportunity. |
| 15:21:33 | 22 | Q.   I want to go through some of the other |
| 15:21:36 | 23 | allegations in your complaint. |
| 15:21:37 | 24 |      I asked you before who harassed you, and you |
| 15:21:41 | 25 | said Peter Wainwright and nobody else, correct? |

Page 177

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 15:21:45 | 1 | A.    Yes. |
| 15:21:45 | 2 | Q.    And then what I didn't ask you was who at |
| 15:21:50 | 3 | NetVersant beside Peter Wainwright engaged in conduct |
| 15:21:54 | 4 | that you thought was intended to cause you emotional |
| 15:22:01 | 5 | distress, if anyone? |
| 15:22:03 | 6 | A.    I don't feel like anyone. |
| 15:22:10 | 7 | Q.    Okay.  So one of your contentions is that you |
| 15:22:13 | 8 | were discriminated against.  Who do you feel |
| 15:22:16 | 9 | discriminated against you? |
| 15:22:18 | 10 | A.    Peter and -- and other people in the company, |
| 15:22:23 | 11 | by letting me go. |
| 15:22:27 | 12 | Q.    Aside from your termination, is there anything |
| 15:22:29 | 13 | else you thought that was discriminatory? |
| 1  2:35 | 14 | A.    I didn't think it was reasonable to have that |
| 15:22:39 | 15 | six-month limit.  I just needed time.  I wanted to be |
| 15:22:43 | 16 | back there.  I wanted to do a good job. |
| 15:22:47 | 17 | Q.    Do you know whether the six-month limit was |
| 15:22:49 | 18 | applied to employees regardless of the reason for their |
| 15:22:52 | 19 | time off? |
| 15:22:53 | 20 | A.    I'm not aware of what other employees have gone |
| 15:22:56 | 21 | through on that. |
| 15:22:57 | 22 | Q.    Do you know whether any other employee has been |
| 15:22:59 | 23 | terminated for being off for more than six months? |
| 15:23:02 | 24 | A.    I'm not aware. |
| 15:23:06 | 25 | Q.    Okay.  Is there anything else that anyone at |

Page 178

DEPONENT:  MICHAEL CAVA   1-4-07

1                          CERTIFICATE

2        I, Patricia Hope Sales, a Certified Shorthand

3   Reporter, License Number 4423, hereby certify that the

4   witness in the foregoing deposition, MICHAEL CAVA, was

5   duly sworn by me to tell the truth in the

6   above-entitled cause; that said deposition was taken at

7   the time and place therein named; that the testimony of

8   said witness was reported by me, a disinterested

9   person, to the best of my ability, and was thereafter

10  transcribed by means of computer-aided transcription

11  under my direction and supervision.

12       IN WITNESS WHEREOF, I have hereunto set my hand.

13  Date:  January 17, 2007    _Patricia Hope Sales_

14       Signing of the deposition by the deponent was

15  waived by stipulation at the time of the taking of the

16  deposition.          _____

17       The deponent personally appeared on the _____ day

18  of_____, _____ and upon said date read and

19  signed the deposition. _____

20       Upon completion of the transcript of the

21  deposition, the deponent was notified that it was ready

22  for signature, but did not sign said deposition for the

23  following reason:

24  Date: _____    _____

25

                                                  Page 213

EXHIBITS 1-21



DEPOSITION OF MICHAEL CAVA

TAKEN ON JANUARY 4, 2007

MICHAEL CAVA

VS

NETVERSANT-NATIONAL

**TALTY COURT REPORTERS**
2131 The Alameda * Suite D
San Jose, CA 95112
Phone (408) 244-1900 * Fax (408) 244-1374



**NetVersant**
network solutions for an e-world

Application for Employment

PLEASE PRINT

## Personal

| First Name Michael | Middle Initial G. | Last Name Cava | Social Security No. 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 | Date 5/6/04 |

| Address 14 Pinewood Dr. Danville CA | City, State, Zip Danville CA 94506 | Telephone 925-648-3490 |

| Are you less than 18 years of age? If yes, a work permit may be required. ☐ Yes ☒ No | If hired, can you provide proof of identity and legal authorization to work in the U.S.? ☒ Yes ☐ No | Have you ever applied to this organization before? ☐ Yes ☒ No |

| Have you ever been employed by our organization before? ☐ Yes ☒ No | If yes, give dates of employment | Are you available to work overtime, or a flexible work schedule? ☒ Yes ☐ No |

| Have you ever been convicted of a crime, felony or misdemeanor, or are you out on bail or on your own recognizance pending trial for such an offense?** ☐ Yes ☒ No |

If yes, state location, date and description. (An affirmative response or a conviction will not necessarily disqualify you from the position for which you have applied.)

| Has your Driver's License been revoked or suspended in the last three years? ☐ Yes ☒ No | Driver's License No. A1259877 | Expiration Date 8/19/08 |

| In case of emergency, please notify: Suzanne Cava (wife) | Address 14 Pinewood Pl Danville CA 94506 | Telephone 925/648-3490 |

## Employment Interests

| Position desired or area of interest Sales | Date available 2 weeks from offer | Pay expected Negotiable |

| Type of employment you are seeking ☒ Full Time ☐ Part Time ☐ Temporary ☐ Summer | Shifts you can work ☒ Day ☐ Swing ☐ Night |

| How were you referred to NetVersant? Using employees and customers through recruitation | Name of referral source Jerry Peter Forrest, Bill Pavone, Kathleen Forrest |

## Education, Skills, Awards

| Name, city and state of school or institution | Major | Units completed Grade average | Degrees and/or diplomas |
|---|---|---|---|
| High School College Park, Pleasant Hill, CA | | All 3.3 | Yes |
| College CSU Hayward, CA | BS-Business | 2.4 | Yes |
| Other | | | |

| Honors/Awards Received | Professional certificates or licenses held | Are you taking any educational courses presently? ☐ Yes ☒ No | |

Additional Information

PENGAD 800-631-6989

DEPOSITION EXHIBIT
1
1-407 Cava

## References List people we may contact who are qualified to evaluate your capabilities. No relatives please.

| Name | Telephone | Occupation | Years Known |
|---|---|---|---|
| John Carolla | (925) 989-4563 | Sales - Co-worker | 3 |
| Rebel Pallotti | (661) 454-6868 | Sales - former manager | 5 |
| Jennifer Forrest | (707) 74-3143 | Former administrative assistant | |

**A conviction includes a plea, verdict or finding of guilt, regardless of whether sentence was imposed by the court. (You may exclude those convictions which have been judicially sealed, expunged or statutorily eradicated. You may also exclude a misdemeanor conviction for which probation has been successfully completed or otherwise discharged and the case has been judicially dismissed.)

## Employment History

Give employment history, listing current or most recent employer first. Show unemployed or self-employed periods and indicate dates and comment on each period. Include part-time or summer work. You may use extra sheets for additional information. A resume may be used to supplement (but not replace) this information.

| Company Name (Current or Last) | Telephone | Job Title | Dates: From - To |
|---|---|---|---|
| Shared Technologies | (510) 266-6800 | Sales | 10/98 - Current |
| **Address** 20949 Cabot Blvd | **City, State, Zip** Hayward, CA 94545 | | **Rate of Pay** 122-190K (195* for year |
| **Supervisor's Name and Title** Judy Vandorne | | **Reason for Leaving** looking for better Company & opportunity | |
| **Description of duties** Sales | | | |

| Company Name (Current or Last) | Telephone Office Closed | Job Title | Dates: From - To |
|---|---|---|---|
| GTE Communications (Now Verizon) | | Sales | 5/98 - 10/98 |
| **Address** 1111 Broadway | **City, State, Zip** Oakland, CA 94607 | | **Rate of Pay** Avg 6K/mo |
| **Supervisor's Name and Title** John Bustamante | | **Reason for Leaving** Better opportunity | |
| **Description of duties** Sales | | | |

| Company Name (Current or Last) | Telephone (Company Sold) | Job Title | Dates: From - To |
|---|---|---|---|
| Controlled Warehousing | (510) 489-7090 | Manager Business Development | |
| **Address** 30755 Sn Clemente | **City, State, Zip** Hayward CA 94544 | | **Rate of Pay** 4K/mo |
| **Supervisor's Name and Title** Mke Ivancich | | **Reason for Leaving** Better Job | |
| **Description of duties** Business Development, Management | | | |

## Acknowledgement

I give the Employer the right to investigate all references and to secure additional information about me. I also authorize the companies, schools, or persons named above to give any information regarding my employment, character and qualifications. I hereby release said companies, schools, or persons, from all liability for any damage related to issuing this information.

I understand that the Employer is an equal opportunity employer. The Employer does not discriminate in employment and no question on this application is used for the purpose of limiting or excluding my consideration for employment on a basis prohibited by local, state or federal law.

This application is current for only sixty (60) days. At the conclusion of this time, if I have not heard from the Employer and still wish to be considered for employment, it will be necessary for me to fill out a new application.

I also understand that should I be employed by the Employer, I will be required, in accordance with the Immigration Reform Control Act of 1986 (IRCA), to provide on my first day of employment documents providing proof of my identity and employment eligibility status. I acknowledge that this verification is a condition of employment and that failure to comply will void my offer of employment.

I understand that, in the absence of a specific contract or agreement signed by the President of the Company, employees are hired on an at will basis, and either the employee or the Company may terminate the employment relationship at any time with or without cause and with or without notice. The Employer's only obligation upon termination for any reason or no reason will be to pay salary or wages due and owing at that time.

I understand that, should I be employed by the Employer, I may be required to sign an agreement which protects the Employer's confidential information; conflicts of patent disclosures, assignments, and copying; and, other job related acknowledgments. I understand that it is a condition of my employment that I sign such agreements, if I refuse to sign, I acknowledge that the offer of employment to me will be revoked.

I understand that the Employer's place of business is a drug-free environment and that weapons of any kind are strictly prohibited.

I have read and understand the provisions outlined above and affirm that the information is complete and true. I understand that any misrepresentation or omission of fact contained in this application is cause for rejection or immediate termination if I should become employed.

NOTE TO MARYLAND APPLICANTS:

Under Maryland law, an employer may not require or demand, as a condition of employment, prospective employment, or continued employment, that an individual submit to or take a lie detector or similar test. an employer who violates this law is guilty of a misdemeanor and subject to a fine not exceeding $100.

Applicant Signature _____

Date 5/6/04

HR-001 (5/00)

# MICHAEL G. CAVA

14 Pinewood Place, Danville, California  94506 • Home (925) 648-3490 • Cellular (510) 821-3680

## OBJECTIVE

To provide innovative converged enterprise solutions and support services by capitalizing on my extensive marketplace experience as a team member of a leading National Nortel Networks Authorized Partner.

## PROFESSIONAL EXPERIENCE

**Oct 1998-Present**   **Shared Technologies** - Hayward, CA
**NATIONAL ACCOUNT EXECUTIVE**
Developed and managed Mid to Large Enterprise customers converged communications environments.  Personally managed all aspects of the customers experience from account acquisition through ongoing support. Consistent over-achievement of quota including three circle of excellence awards, and was number one through three in California for the sales stack ranking achievement in all five full years of employment.  Branch sales grew by well over 1000% during my tenure of employment.

## EDUCATION

**1989-1994**   **California State University at Hayward** - Hayward, CA
Bachelor of Science Degree in Business Administration with an option in Marketing Management.  Earned 80% of tuition while in college. Completed several Post Graduate level courses in the MBA program.

## CERTIFICATIONS AND MEMBERSHIPS

**2003**   **19 Nortel Networks Qualified Sales Professional Certifications -**
More than double the amount of any other Account Executive within the Shared Technologies organization.  Complete list provided upon request.

**2000 - Present**   **NCINNMUG / INNUA -**
Provided extensive involvement and support of local user group since its re-establishment in 2000. Attended almost all local, regional, and international meetings and conferences.

## REFERENCES

Proudly provided upon request.



**NetVersant**
*network solutions for an e-world*

May 12, 2004

Mr. Michael G. Cava
14 Pinewood Place
Danville, CA 94506



DEPOSITION
EXHIBIT phs
2
1-4-07 Cava

Dear Mr. Cava,

It is our pleasure to extend this employment offer to you for the position of "Account Executive." This letter will briefly outline your compensation and benefits associated with this offer.

Your base pay will be $2,500 per paycheck ($65,000 annually). NetVersant San Francisco's commission is outlined on the Account Manager Compensation Plan attached.

The details of your health, life, and 401(k) benefits, including eligibility requirements, will be offered and available to you as for all employees of NetVersant San Francisco. Company equipment and other necessary tools to assist you in your position will also be available to you upon your projected start date of June 7, 2004.

As a NetVersant San Francisco employee, you will be expected to comply with the Company's policies and procedures, sign and acknowledge in writing that you have read the Company's Handbook, the Business Practices Policy, which among other things prohibits the unauthorized use or disclosure of NetVersant San Francisco's proprietary information. By making this offer, NetVersant San Francisco does not wish to receive or obtain the benefit of any trade secrets or confidential information of any of your former employers. Accordingly, NetVersant San Francisco cautions you not to disclose any trade secrets or confidential information of any former employer to anyone at NetVersant San Francisco, nor to use any such trade secrets or confidential information for the benefit of NetVersant San Francisco. NetVersant San Francisco further cautions you not to bring with you any original or copies of papers, documents, notes, or other materials, whether stored electronically or otherwise, which belong to any former employer or which contain any trade secrets or confidential information of any former employer.

Employment with NetVersant San Francisco has an introductory period of 90 days. This introductory period does not mean that employment can only be terminated for cause. At the end of this period, both parties will evaluate your position at NetVersant San



Mr. Michael G. Cava
May 12, 2004
Page 2

Francisco to either continue or terminate the relationship. Employment with NetVersant San Francisco is at-will. This means that either you or NetVersant San Francisco may, at any time and with or without cause, terminate the employment relationship. The employment terms in this letter supersede any other agreements or promises made to you by anyone, whether oral or written. As required by law, this offer is subject to satisfactory proof of your right to work in the United States, a drug and substance testing, and a satisfactory background check.

Please sign and date this letter, and return it to me at a suitable time if you wish to accept employment at NetVersant San Francisco under the terms described in this letter. This offer of employment will expire at 12:00 a.m. on May 14, 2004.

We look forward to a mutually rewarding working relationship.

Sincerely,

Peter Wainwright
Vice President - Sales
NetVersant

* * *

Agreed and Accepted:

Dated: 5/14/04    Signature: _____
                            MICHAEL G. CAVA

PW:jnt
Attachment – Account Executive Annual Compensation Plan

D00082

# HANDBOOK ACKNOWLEDGMENT AGREEMENT

This Employee Handbook is an important document intended to help you become acquainted with NetVersant. This Handbook will serve as a guide; it is not the final word in all cases. Individual circumstances may call for individual attention.

Because the general business atmosphere of NetVersant and economic conditions are always changing, the contents of this Handbook may be changed at any time at the discretion of the Company. No changes in any benefit, policy or rule will be made without due consideration of the mutual advantages, disadvantages, benefits and responsibilities such changes will have on you as an employee and the Company.

Please read the following statements and sign below to indicate your receipt and acknowledgement of the NetVersant Employee Handbook.

- I have received and read a copy of the Employee Handbook. I understand that the policies, rules and benefits described in it are subject to change at the sole discretion of NetVersant at any time.

- I further understand that my employment and compensation with NetVersant is "at will" and that my employment can be terminated with or without cause, and with or without notice, at any time, either by myself or NetVersant, regardless of the length of my employment.

- I understand that no contract of employment other than "at will" has been expressed or implied, and that no circumstances arising out of my employment will alter my "at will" employment relationship unless expressed in writing, with the understanding specifically set forth and signed by myself and the Chairman and Chief Executive Officer of NetVersant.

- I further understand that with the exception of employment at will, terms and conditions of my employment with the Company may be modified at the sole discretion of the Company with or without cause or notice at any time. No implied contract concerning any employment-related decision or term or condition of employment can be established by any other statement, conduct, policy, or practice. Examples of the types of terms and conditions of employment that are within the sole discretion of the Company include, but are not limited to, the following: promotion; demotion; transfers; hiring decisions; compensation; benefits; qualifications; discipline; layoff or recall; rules; hours and schedules; work assignments; job duties and responsibilities; production standards; subcontracting; reduction, cessation, or expansion of operations; sale, relocation, merger, or consolidation of operations; determinations concerning the use of equipment, methods, or facilities; or any other terms and conditions that the Company may determine to be necessary for the safe, efficient, and economic operation of its business.

- I am aware that during the course of my employment confidential information will be made available to me, i.e., customer lists, pricing policies and other related information. I understand that this information is critical to the success of NetVersant and must not be disseminated or used outside of NetVersant's premises. In the event of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.

- I understand that my signature below indicates that I have read and understand the above statements and have received a copy of the NetVersant Employee Handbook.

_Michl Cava_
**Employee Signature**                             _6/2/04_
                                                    **Date**

_Michael Cava_
**Employee Printed Name**                          _559 - 85 - 2897_
                                                    **Social Security Number**

*Give signed original copy of this acknowledgement form to the Human Resources Department for inclusion in your personnel file.*

HR-012 (05/29/2002)



DEPOSITION
EXHIBIT
3
1-4-07 Cava

D00070



*CP6/10*

### ACCOUNT EXECUTIVE
### 2004 COMPENSATION PLAN

| | |
|---|---|
| Company:  NetVersant - San Francisco | Effective Date: _____ June 1, 2004 |
| Employee Name:  Michael G. Cava | Base Salary: _____ $5,416 / month ✓ |
| Single Signature Bidding Limit: _____ $0 | GOP Quota:# 341,250 ~~$385,000~~ / year |
| Dual Signature Bidding Limit: _____ $0 | GOP Budget: _____ $0 / year |
| Expense Budget: _____ $150 / month | |

This Account Executive 2004 Compensation Plan (the "Plan") is designed to motivate and award your attainment of prescribed sales goals.

**1.** **Definitions.**

"Accrued Sales Commissions" means Sales Commissions calculated based on GOP.

"Approved Jobs" means jobs performed for your Assigned Accounts which (i) have commenced (i.e. products and/or services have been provided for which an invoice may be issued) *during* the Plan Year and (ii) have been designated in writing by the EVP - Sales & Business Development as eligible for you to receive Sales Commissions pursuant to this Plan.

"Assigned Accounts" means customer accounts that have been assigned to you in writing by the EVP - Sales & Business Development.

"Base Salary" means your base compensation as set forth above, which may be adjusted from time to time by the Company at its sole discretion.

"Collected GOP" means GOP generated from *completed* Approved Jobs for which full and final payment has been *received* by the Company (including any retainage amounts) for the Plan Year. GOP generated from Approved Jobs that are completed and/or for which final payment is received following the end of the Plan Year will be included in the calculation of Sales Commissions under this Plan.

"Earned Sales Commissions" means Sales Commissions calculated based on Collected GOP.

"GOP" means Gross Operating Profit, defined as total revenues generated from Approved Jobs, less all direct and indirect operating costs, as allocated to the Approved Jobs by the Company for the Plan Year.

"GOP Budget" means the minimum GOP (in the amount set forth above) that you are expected to generate from Approved Jobs for the Plan Year.

"GOP Margin" means the percentage derived by dividing GOP by revenues generated from Approved Jobs, as recognized in the books and records of the Company for the Plan Year. GOP Margin is calculated in accordance with the Company's standard financial accounting methodology.

"GOP Quota" means the level of GOP (in the amount set forth above) that must be generated from Approved Jobs for the Plan Year in order to trigger increased levels of Sales Commissions as provided herein. The GOP Quota will be prorated in the event your entry into this Plan occurs after the first day of any given Plan Year.



DEPOSITION
EXHIBIT
5
1-14-07  Cava

D00052



"Maintenance Contract" means an agreement between the Company and an Assigned Account to provide maintenance services, on or for a system installed by the Company, for a predetermined fixed lump sum or periodic fee.

"Plan Year" means the period from January 1, 2004 through December 31, 2004.

"Qualified Company Referral Opportunities" means sales opportunities that are referred from one NetVersant company to another, that do not involve competitive pricing and of which the referral recipient was unaware prior to the referral.

"Qualified Service Line Referral Opportunities" means sales opportunities that are referred from one service line to another within the same NetVersant company, that do not involve competitive pricing and of which the referral recipient was unaware prior to the referral.

"Sales Commissions" means the amount derived by multiplying the applicable "GOP Commission Percentage" (set forth in the table below) by the Collected GOP recognized by the Company. The Company reserves the right, at the sole discretion of the EVP - Sales & Business Development, to advance a portion of Sales Commissions that have accrued for jobs that are of extended duration for which progress payments have been received by the Company (see paragraph 3 below). The applicable GOP Commission Percentage is based on (i) the *aggregate* GOP Margin generated by *all* Approved Jobs and (ii) the amount of Collected GOP for the Plan Year. The "Aggregate GOP Margin" shall be calculated by dividing the total amount of GOP by the total amount of revenues recognized in the books and records of the Company for all Approved Jobs for the Plan Year.

| Aggregate GOP Margin | GOP Commission Percentage (% of Collected GOP) | | |
|---|---|---|---|
| | Less than or equal to GOP Quota | Greater than GOP Quota and less than or equal to 110% of GOP Quota | Greater than 110% of GOP Quota |
| Equal to or Greater than 40% | 9% | 22% | 25% |
| 35% to 39% | 8% | 20% | 22% |
| 30% to 34% | 7% | 14% | 16% |
| 25% to 29% | 6% | 12% | 14% |
| 20% to 24% | 4% | 10% | 12% |
| 15% to 19% | 2% | 5% | 7% |
| Less than 15% * | 0% | 0% | 0% |

\*     In the event the Aggregate GOP Margin is less than 15%, Sales Commissions may be paid only when circumstances warrant at the sole discretion of the EVP - Sales & Business Development.

D00053



The GOP Commission Percentage will increase (as set forth in the table above) when the Collected GOP exceeds the GOP Quota and again when the Collected GOP exceeds 110% of the GOP Quota. Such increases will be retroactive to *all* Collected GOP for the Plan Year.

Sales Commissions are subject to increase or reduction based on the number of days invoiced amounts remain outstanding as set forth below:

| Invoice Aging | Commission Adjustment |
|---|---|
| 0 – 45 days | Increases Commission Due by 10% |
| 46 – 60 days | 0% |
| 61 – 90 days | Decreases Commission Due by 10% |
| 91 - 120 days | Decreases Commission Due by 25% |
| 121 - 150 days | Decreases Commission Due by 50% |
| More than 150 days | Decreases Commission Due by 75% |

2.    **Sales Commission Settlements.**  You will be provided a "Commissions Statement" for your Assigned Accounts on a monthly basis, which calculates Earned Sales Commissions from the beginning of the Plan Year through the end of the then-preceding month ("Cumulative Earned Commissions"). The Commissions Statement will also include a calculation of Accrued Sales Commissions for such period. Each month, you will be paid an amount equal to the Cumulative Earned Commissions *minus* all Sales Commission payments previously made to you under this Plan. Earned Sales Commissions are paid monthly following recognition in the books and records of the Company; typically within two payroll cycles following closing of the Company's monthly financial statements. The calculation of Accrued Sales Commissions is provided for informational purposes only; no Sales Commissions will be paid on Accrued Sales Commissions. **Sales Commissions are not Earned and no right to receive such Sales Commissions shall exist until the associated job is completed and the Company has received full and final payment for the associated products and/or services (including any retainage amounts).**

3.    **Commission Advances.**  The Company reserves the right, with the written approval of the EVP - Sales & Business Development, to advance a portion of Accrued Sales Commissions that have not been *earned* (i.e. full and final payment has not been *received* by the Company (including any retainage amounts)) for large jobs (greater than $250,000 in revenues) that are of extended duration (greater than three months) for which progress payments (including nonrefundable deposit amounts) are made by the customers ("Unearned Advances"). Unearned Advances are subject to repayment to the Company in the event the associated Sales Commissions are not subsequently *earned*.  To the extent such Sales Commissions are not earned prior to your termination from employment with the Company, you hereby authorize the Company to deduct from your final paycheck an amount equal to the *lesser* of (i) your Unearned Advances or (ii) the maximum amount permitted by law (see paragraph 15 below).

4.    **Commissions on Customer Financing Leases.**  From time to time customers may elect to finance the purchase of products and/or services utilizing a leasing arrangement established by the Company with one or more leasing companies. You will be paid an amount equal to 50% of any lease origination fees paid by leasing companies to the Company with respect to sales to Approved Jobs (the "Lease Commissions"). Lease Commissions shall be paid on the first full pay period after the Company receives payment of the applicable lease origination fees and shall be in addition to Sales Commissions for which you would be entitled hereunder for the associated sale. The Lease Commission rate of 50% is

- 3 -

D00054



subject to change from time to time, on a prospective basis, at the sole discretion of the Company, with or without notice.

**5.    Commissions on Maintenance Contracts.** Commissions on Maintenance Contracts shall be Earned at the *later* to occur of (i) when the Company receives payment for the applicable products and/or services or (ii) when the revenues and income for the applicable products and/or services are recorded in the books and records of the Company. For example, if the Company receives payment in advance for 12 months of maintenance services, Sales Commissions will be Earned ratably during the 12 month period as the revenues and income are recorded in the books and records of the Company. Sales Commissions for Maintenance Contracts shall be calculated utilizing a predetermined GOP Margin of 40%, subject to change from time to time, on a prospective basis, at the sole discretion of the Company, with or without notice.

**6.    Commission Plan Transition.** Payments received from Assigned Accounts during the Plan Year that are, or have been, included in the calculation of sales commissions or other incentive compensation under a prior plan or arrangement will not be included the calculation of GOP under this Plan.

**7.    Referral Fees.**

    **(a)    Company.** You will be eligible for a referral fee ("Referral Fee") for referring Qualified Company Referral Opportunities to other NetVersant companies who then are awarded the work. The Referral Fee will be equal to up to 1% of the total revenues generated by the each subject job and shall be paid to you after the job has been completed and full and final payment has been received. The maximum Referral Fee for each Qualified Referral Opportunity is $30,000 per year. The Referral Fee percentage shall be determined on a case-by-case basis by the EVP - Sales & Business Development responsible for of the referring company. Sales Commissions for jobs you sell after receiving a Qualified Company Referral Opportunity from another NetVersant company will be reduced by the Referral Fee paid to the applicable sales representative from the referring company. An Inter-Company Referral Form, in the form of Exhibit A hereto, must be completed for all Qualified Company Referral Opportunities and must be signed by both the referring and accepting sales representatives and respective company Presidents.

    **(b)    Service Line.** You will be eligible for a Referral Fee for referring Qualified Service Line Referral Opportunities from one service line to other with the Company who then is awarded the work. The Referral Fee will be equal to up to 1% of the total revenues generated by the each subject job and shall be paid to you after the job has been completed and full and final payment has been received. The maximum Referral Fee for each Qualified Service Line Referral Opportunity is $30,000 per year. The Referral Fee percentage shall be determined on a case-by-case basis by the Company President. Sales Commissions for jobs you sell after receiving a Qualified Service Line Referral Opportunity will be reduced by the Referral Fee paid to the referring sales representative. A Service Line Referral Form, in the form of Exhibit B hereto, must be completed for all Qualified Service Line Referral Opportunities and must be signed by both the referring and accepting sales representatives and the Company President.

**8.    Minimum Performance Standards.** You are required to maintain a minimum performance standard equal to your assigned GOP Budget. Your GOP Budget attainment will be reviewed on a monthly basis. which may be the basis for adjustment to Base Salary.

**9.    Top Performer Recognition.** In addition to any Sales Commissions payable under this Plan. you are eligible to receive a benefit reserved for the highest producing Account Executives of the NetVersant Solutions' affiliated companies during the Plan Year, pursuant to a program established by NetVersant Solutions. at its sole discretion.

D00055



**10.    Auto Expenses.**  Unless modified by the EVP - Sales & Business Development in writing, it is the policy of the Company to provide reimbursement for on-the-job use of your personal (i.e. non Company-provided) vehicle on a per mile basis at the rate established by Internal Revenue Service guidelines.  No additional reimbursement of vehicle-related expenses is permitted (e.g. fuel, maintenance and repair).  Vehicle mileage must be documented in an Expense Report submitted on a monthly basis in accordance with Company policy.

**11.    Expense Budget.**  Your monthly Expense Budget is shown above.  The Expense Budget is used to cover customer development business expenses such as meals, entertainment, and outings.  You are required to submit a monthly Expense Report itemizing all current expenses.  You are expected to manage your selling expenses within this assigned budget to achieve the greatest positive impact at the least cost.

**12.    Signature Bidding Limits.**  You are authorized to sign quotations up to the Single Signature Bidding Limit ("SSBL") listed above.  All quotations in excess of your SSBL and up to the Dual Signature Bidding Limit ("DSBL") listed above require a second signature from your Sales Manager prior to the quotation being presented or communicated to the customer.  All quotations in excess of the DSBL require the signature of the EVP – Sales & Business Development.

**13.    Errors or Omissions.**  If as a result of your errors or omissions an Approved Job is negatively financially impacted, the amount of such negative financial impact may be deducted from your Sales Commission, Lease Commission and/or Referral Fee otherwise payable to you under this Plan.  The determination of errors or omissions and associated negative financial impact will be made at the sole discretion of the Company.

**14.    At Will Employment;**  The Company is an at-will employer, which therefore allows either you or the Company the right to terminate your employment at any time, with or without cause.  This Plan is not an employment agreement or a promise of future employment.

**15.    Termination of Employment.**  In the event your employment is terminated for any reason by you or the Company, your final Commission Settlement will be from the first day of the then-current month through the date of your termination of employment.  **Only Sales Commissions that have been *Earned* (i.e. GOP generated from *completed* Approved Jobs for which full and final payment has been *received* by the Company (including any retainage amounts)) through the date of termination will be paid to you.**  You will not be entitled to, and will not be paid *any* Sales Commissions, Lease Commissions or Referral Fees with respect to outstanding quotations, proposals, contracts or sales that are booked, completed, invoiced or paid *after* the termination date of your employment.  In the event Unearned Advances are outstanding on the date of termination of your employment, you hereby authorize the Company to deduct from your final paycheck an amount equal to the *lesser* of (i) your Unearned Advances or (ii) the maximum amount permitted by law.

**16.    Confidential Relationship.**  You understand and acknowledge that in conjunction with your employment with the Company you will be exposed to confidential and proprietary information of the Company, including, but not limited to, customer lists, pricing methodology, technical data, sales materials and financial information.  You agree that while you are employed by the Company and for a period of 12 months thereafter you will not disclose any such information to any third party without the express written consent of the President of the Company or otherwise use such information except on behalf of and pursuant to your employment with the Company.  Because of the difficulty of measuring economic losses to the Company as a result of a breach of the foregoing, and because of the immediate and irreparable damage that could be caused to the Company for which it would have no other adequate

- 5 -

D00056



remedy, you agree that the foregoing may be enforced by the Company in the event of your breach, by appropriate injunctions and restraining orders.

17.    **Nonsolicitation.** As an express condition to your participation in this Plan, you agree to not, during the period of your employment with the Company, and for a period of 12 months immediately following the termination of your employment, directly or indirectly, for yourself or on behalf of or in conjunction with any other person, company, partnership, corporation or business of whatever nature (a) call upon any person who is, at that time, an employee of the Company for the purpose or with the intent of enticing such employee away from or out of the employ of the Company; or (b) call upon any person or entity which is, at that time, or which has been, within the 12-month period prior to that time, a customer of the Company for the purpose of soliciting or selling products or services in direct competition with the Company. Because of the difficulty of measuring economic losses to the Company as a result of a breach of the foregoing covenants, and because of the immediate and irreparable damage that could be caused to the Company for which it would have no other adequate remedy, you agree that the foregoing covenants may be enforced by the Company by appropriate injunctions and restraining orders.

18.    **Plan Subject to Change.** This Plan is subject to change from time to time at the sole discretion of the Company, with or without notice.

19.    **Complete Agreement.** This Plan sets forth the entire agreement of the parties hereto relating to your compensation and supersedes any other agreements or understandings, written or oral, between the Company and you with respect to this Plan. By signing below, you acknowledge that there are no oral representations, understandings or agreements between you and the Company or any of its officers, directors or representatives covering the subject matter of this Plan. This is the final, complete and exclusive statement and expression of the agreement between you and the Company with respect to this Plan, and it cannot be varied, contradicted or supplemented by evidence of any prior or contemporaneous oral or written agreements.

Reviewed and Accepted as of the Effective Date shown above:

**Company:**

By: _____    By: _____
William L. Fiedler                        Robert E. (Rob) Macchi
Secretary & General Counsel              EVP – Sales & Business Development


**Employee:**

Name: Michael G. Cava

- 6 -

D00057


**NetVersant**
network solutions for an e-world

**ADDENDUM 1 TO THE**
**ACCOUNT EXECUTIVE 2004 COMPENSATION PLAN**
**\* \* \* \***
**MAINTENANCE CONTRACTS**

This Addendum 1 ("Addendum 1") to the Account Executive 2004 Compensation Plan agreement between NetVersant – San Francisco, Inc. (the "Company") and the undersigned employee (the "Agreement") is executed effective as of the Effective Date of the Agreement. Capitalized terms not defined herein shall have the meaning given to them in the Agreement.

1. All GOP generated from Maintenance Contracts that commence (i.e. products and /or services have been provided for which an invoice may be issued) *during* the 2004 Plan Year will be credited to the GOP Quota and GOP Budget for the 2004 Plan Year, notwithstanding when the GOP is recorded on the books and records of the Company. For example: If a three-year Maintenance Contract commences during 2004, all GOP generated by such contract during its three-year term will be credited to the GOP Quota and GOP Budget for the *2004 Plan Year* as and when it is recorded on the books and records of the Company.

2. All GOP generated from Maintenance Contracts that commence *prior* to the 2004 Plan Year (i.e. prior to January 1, 2004) will be credited to the GOP Quota and GOP Budget for the 2003 Plan Year, notwithstanding when the GOP is recorded on the books and records of the Company. Sales Commissions associated with such prior year Maintenance Contracts will be calculated and paid in accordance with the compensation plan applicable to such Maintenance Contracts.

3. GOP Commission Percentage for Maintenance Contracts is fixed at 12% of Collected GOP for the 2004 Plan Year, notwithstanding the level of GOP generated for the 2004 Plan Year. Sales Commissions will be Earned in accordance with paragraph 5 of the Agreement and be payable in accordance with paragraph 2 of the Agreement. Provision in the Agreement for increase or reduction of Sales Commissions based on the number of days invoiced amounts remain outstanding shall not apply to Maintenance Contracts.

4. Except as otherwise provided herein, this Addendum 1 is subject to all of the other terms and conditions of the Agreement, which are incorporated into this Addendum 1 by this reference.

Reviewed and Accepted as of the Effective Date:

**Company:**
By: _____          By: _____
William L. Fiedler                        Robert E. (Rob) Macchi
Secretary & General Counsel               EVP – Sales & Business Development

**Employee:**
_____

Name: Michael G. Cava

AcctEx 2004 Addendum1 01                                    Rev 1-04

D00051