# EXHIBIT – B

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                     COUNTY OF SAN FRANCISCO

 3                   UNLIMITED CIVIL JURISDICTION

 4

 5   MICHAEL CAVA,                  )
                                    )
 6                  Plaintiff,      )
     vs.                            ) Case No.:  CGC-06-453469
 7                                  )
     NETVERSANT-NATIONAL, INC., a   )
 8   Delaware corporation, dba      )
     NETVERSANT-SAN FRANCISCO aka   )
 9   NETVERSANT; PETER WAINWRIGHT,  )
     an individual; and DOES 1      )
10   through 40, inclusive,         )
                                    )
11                  Defendants.     )
     _____)
12

13

14

15            **DEPOSITION OF PETER WAINWRIGHT**

16              Tuesday, November 28, 2006

17

18

19                     CERTIFIED
                          COPY
20

21

22

23                            ROBERT BARNES ASSOCIATES
                           CERTIFIED SHORTHAND REPORTERS
24   Reported by:          760 Market Street, Suite 844
     Jennifer L. Yang          San Francisco, CA 94102
25   CSR No. 12367                (415) 788-7191
```

ROBERT BARNES ASSOCIATES - (415) 788-7191

| | | |
|---|---|---|
| 1 | Communications, which was a company out of Tulsa -- so | 10:19:34 |
| 2 | natural gas company -- purchased Nortel's direct sales group | 10:19:38 |
| 3 | out here and I retained my position as regional sales | 10:19:46 |
| 4 | manager and the company was called Williams Communications | 10:19:50 |
| 5 | Systems, and in the year 2000 I went from Williams to become | 10:19:56 |
| 6 | the Vice President of Sales for NetVersant, so I've been | 10:20:07 |
| 7 | there for six years or so. | 10:20:12 |
| 8 | Q   You've had that same title since 2000 at | 10:20:14 |
| 9 | NetVersant? | 10:20:18 |
| 10 | A   Correct. | 10:20:19 |
| 11 | Q   Okay. | 10:20:20 |
| 12 | A   They were called United Telecom when I went to | 10:20:21 |
| 13 | work for them, but they were acquired fairly shortly | 10:20:24 |
| 14 | afterwards by NetVersant.  But I had -- I was hired by | 10:20:27 |
| 15 | United Telecom as the Vice President of Sales.  I retained | 10:20:32 |
| 16 | that title when NetVersant acquired us. | 10:20:36 |
| 17 | Q   If you can clarify something for me -- I'll try to | 10:20:48 |
| 18 | do it with the documents.  Maybe you can be of some | 10:20:50 |
| 19 | assistance -- in reviewing some of the documents there's | 10:20:54 |
| 20 | references to, for example, various NetVersant entities. | 10:20:56 |
| 21 | Who is your employer? | 10:21:00 |
| 22 | A   The enterprise is my employer at part of | 10:21:02 |
| 23 | NetVersant.  They're called NetVersant National dba | 10:21:07 |
| 24 | NetVersant San Francisco, which is the group that handles | 10:21:12 |
| 25 | the Nortel telephony sales. | 10:21:18 |

| | | |
|---|---|---|
| 1 | get involved in marketing, vendor management, a few other | 10:25:52 |
| 2 | things, so I do a variety of things. | 10:25:56 |
| 3 | Q    Going back to sales management, are there | 10:25:59 |
| 4 | intermediaries between you and the salespeople? | 10:26:02 |
| 5 | A    There are parallel people and, as we're growing | 10:26:07 |
| 6 | the business, there is a intermediary now who is becoming | 10:26:13 |
| 7 | the sales manager in Southern California.  She was a sales | 10:26:18 |
| 8 | rep, now she's taking over sales management responsibility | 10:26:23 |
| 9 | and building a team of sales reps. | 10:26:27 |
| 10 | Over the past few years there have been times when I | 10:26:29 |
| 11 | had a sales manager in Southern California with reps | 10:26:33 |
| 12 | directly reporting to them, so I was second level. | 10:26:36 |
| 13 | Q    They, in turn, would report to you? | 10:26:40 |
| 14 | A    Correct. | 10:26:42 |
| 15 | Q    When you say there are parallels, referring to | 10:26:42 |
| 16 | other regions of the country? | 10:26:45 |
| 17 | A    No.  NetVersant sells a variety of products -- | 10:26:48 |
| 18 | cabling, security products for door badge readers, door | 10:26:52 |
| 19 | access, that kind of thing -- and in each region they have | 10:26:58 |
| 20 | something called a marketing sales director -- MSD -- and | 10:27:01 |
| 21 | they're responsible for all lines of business and | 10:27:07 |
| 22 | encouraging cross-selling between the various reps who | 10:27:09 |
| 23 | handle the lines of business. | 10:27:14 |
| 24 | My people handle telephony equipment.  My people | 10:27:15 |
| 25 | generally don't sell cabling or security products, and the | 10:27:21 |

| | | |
|---|---|---|
| 1 | MSD for each region that they're in, they're responsible for | 10:27:24 |
| 2 | promoting the sales of all of those, and the reps in each | 10:27:27 |
| 3 | region have a dotted-line report to them. | 10:27:30 |
| 4 | Q   But in the telephony department, you're | 10:27:34 |
| 5 | essentially the sales manager, so to speak? | 10:27:36 |
| 6 | A   Functionally, yes.  Although if you go to other | 10:27:39 |
| 7 | parts of the country, because of my role as the V.P. of | 10:27:41 |
| 8 | Sales for the national group, there are a quite a number of | 10:27:45 |
| 9 | reps who sell the equipment that I would be functionally | 10:27:49 |
| 10 | supporting, but they would be reporting to somebody else, | 10:27:53 |
| 11 | so -- so it depends on the region. | 10:27:55 |
| 12 | Like I said, I wear a number of hats. | 10:27:59 |
| 13 | Q   Your region is, again, Northern California, | 10:28:01 |
| 14 | Southern California and Nevada? | 10:28:02 |
| 15 | A   I handle the whole country for the Nortel | 10:28:06 |
| 16 | Telephony Group, but in those regions you just mentioned, I | 10:28:08 |
| 17 | have sales reps that directly report to me or through a | 10:28:13 |
| 18 | sales manager. | 10:28:17 |
| 19 | Q   And the other regions there are sales managers? | 10:28:18 |
| 20 | A   Yes, there are, or MSDs, the marketing sales | 10:28:21 |
| 21 | directors, and those people may be selling other things, | 10:28:24 |
| 22 | like security, but if they run into a opportunity for the | 10:28:28 |
| 23 | products that I handle, I specialize in, I would be tasked | 10:28:32 |
| 24 | with supporting them.  Eager to do it.  Would get credit for | 10:28:35 |
| 25 | their sales, etcetera. | 10:28:39 |

```
1   so I can't comment on the details -- but he was tasked with          10:31:31
2   getting all products sold within his region, and his region         10:31:34
3   was Southern and Northern California, but he was down in            10:31:38
4   Southern California and he was up here now and then.                10:31:41
5       Q   Did you -- again, just trying to understand.  I'm           10:31:44
6   not trying to argue with you -- did you consider Palmer to          10:31:46
7   be, in part, Cava's supervisor?                                     10:31:49
8       A   No.  That was -- he was reporting to me when he             10:31:53
9   was hired and it continued that way.  I was considered his         10:31:57
10  direct supervisor.                                                  10:32:01
11      Q   You were considered and you considered yourself             10:32:02
12  his direct supervisor throughout his employment at the              10:32:03
13  company?                                                            10:32:06
14      A   That's correct.                                             10:32:07
15      Q   Have you -- let's focus on NetVersant alone --              10:32:10
16  have you previously been involved in litigation involving           10:32:13
17  employment matter?                                                  10:32:18
18      A   Never.  In the last 28 years, and 24 years in               10:32:20
19  sales management, this is my first time, and I've had               10:32:23
20  literally dozens of salespeople work for me.  Never had a           10:32:25
21  complaint or any litigation.                                        10:32:29
22      Q   Okay.  Do you recall at some point in time                  10:32:31
23  conducting an interview of Mike Cava?                               10:32:43
24      A   Yes, I did.                                                 10:32:46
25      Q   Do you recall -- again, I know time's passed and            10:32:48
```

| | | |
|---|---|---|
| 1 | (Plaintiff's Exhibit No. 1 marked for identification.) | 10:52:33 |
| 2 | Q   Here you go, sir. | 10:52:34 |
| 3 | A   Great. | 10:52:36 |
| 4 | Q   I've put in front of you a document entitled | 10:52:36 |
| 5 | "NetVersant New Hire/Rehire Form." | 10:52:39 |
| 6 | Have you seen that document before? | 10:52:42 |
| 7 | A   No, I haven't actually seen this document. Looks | 10:52:44 |
| 8 | like an H.R. form. | 10:52:47 |
| 9 | Q   Have you ever -- you've never seen this form? | 10:52:48 |
| 10 | A   I don't recall seeing it, but, you know, it looks | 10:52:51 |
| 11 | like one of our forms. | 10:52:54 |
| 12 | Q   Okay. It's got Michael's Cava's name on there as | 10:52:55 |
| 13 | the employee information, correct, at the top? | 10:53:00 |
| 14 | A   Says Michael Cava, correct. | 10:53:04 |
| 15 | Q   Type of hire. The "X" mark replacement hire has | 10:53:06 |
| 16 | been checked. Do you see that? | 10:53:11 |
| 17 | A   I see that, yeah. | 10:53:13 |
| 18 | Q   And the replacement employee is listed as Jennifer | 10:53:14 |
| 19 | Forrest, correct? | 10:53:16 |
| 20 | A   Replace the slot as opposed to replace managing | 10:53:19 |
| 21 | her accounts. It doesn't say that, but yeah. | 10:53:24 |
| 22 | Q   Says the name of employee being replaced, correct? | 10:53:26 |
| 23 | A   Right. We authorized so many employees, and that | 10:53:29 |
| 24 | slot was being filled by Mr. Cava. | 10:53:33 |
| 25 | Q   And the hire date is listed as June 7, 2004? | 10:53:36 |

```
 1    A    That's what it says.                                    10:53:40
 2    Q    So sometime -- would it be fair to say sometime         10:53:42
 3  within a month of June 7, 2004, you interviewed Mr. Cava?      10:53:45
 4       Again, I'm not trying to put words in your mouth.         10:53:50
 5    A    I don't recall.  That's about right, I suppose.         10:53:52
 6    Q    Fair estimation?                                        10:53:55
 7    A    Fair.  I mean I don't recall if he had some delay       10:53:57
 8  between the time, you know, we had said "Hey, do you want a    10:54:01
 9  job here?" and he could start or something.                    10:54:05
10       He probably had to give some notice.  I don't know.       10:54:06
11  Within a few months, you know?                                 10:54:09
12    Q    And his classification or job title is listed as        10:54:11
13  Account Executive, correct?                                    10:54:16
14    A    That's what it says, yeah.  That's our normal           10:54:18
15  title.                                                         10:54:20
16    Q    The rest of the form provides for his pay and his       10:54:20
17  employee type?                                                 10:54:25
18    A    Correct.                                                10:54:26
19    Q    You expected him to be a full-time employee,            10:54:27
20  correct?                                                       10:54:29
21    A    Right.  All the salespeople are full-time               10:54:30
22  employees.                                                     10:54:32
23    Q    Starting salary of $65,000 a year?                      10:54:33
24    A    Correct.                                                10:54:36
25    Q    Plus commission?                                        10:54:36
```

| | | |
|---|---|---|
| 1 | A    Correct. | 10:54:37 |
| 2 | Q    And see at the bottom, says "Recommended by Peter | 10:54:42 |
| 3 | Wainwright, Scott Landis."  So do you recall at some point | 10:54:46 |
| 4 | prior to June 3, 2004, relaying to H.R. that this is an | 10:54:50 |
| 5 | employee you wanted to hire? | 10:54:54 |
| 6 | A    Yes, I did. | 10:54:55 |
| 7 | Q    Okay, thanks. | 10:54:56 |
| 8 | A    And the reason I wouldn't see that form is H.R., | 10:55:01 |
| 9 | Joanna Cotter, is in Sacramento.  This type of form she'd be | 10:55:03 |
| 10 | processing in the back office without me necessarily seeing | 10:55:08 |
| 11 | it. | 10:55:11 |
| 12 | Q    Fair enough. | 10:55:12 |
| 13 | Where was your office physically in? | 10:55:13 |
| 14 | A    South San Francisco. | 10:55:16 |
| 15 | Q    Did you also have an office in Sacramento? | 10:55:17 |
| 16 | A    Personally, no.  I did go there occasionally. | 10:55:19 |
| 17 | NetVersant has an office there, which is where H.R. was. | 10:55:21 |
| 18 | Q    Okay. | 10:55:27 |
| 19 | MR. FOTOUHI:  Exhibit 2. | 10:55:31 |
| 20 | (Plaintiff's Exhibit No. 2 marked for identification.) | 10:55:32 |
| 21 | Q    Let me show you a document that's been marked as | 10:55:45 |
| 22 | Exhibit 2. | 10:55:47 |
| 23 | A    Uh-huh. | 10:55:48 |
| 24 | Q    For the record, it's a May 12, 2004, letter -- | 10:55:49 |
| 25 | A    Um-hum. | 10:55:52 |

| | | |
|---|---|---|
| 1 | administrator, and it was signed, I believe, by the same | 11:39:46 |
| 2 | person who signed the original agreement, and actually, | 11:39:50 |
| 3 | Kathleen started with Maximus, I believe, after we had sold | 11:39:52 |
| 4 | the system, so she came from another customer of ours. | 11:39:58 |
| 5 | Q  Now, from June to November, do you recall having | 11:40:04 |
| 6 | any one-on-one meetings with Mike about your concerns in | 11:40:08 |
| 7 | terms of his new sales? | 11:40:12 |
| 8 | A  Yes.  We discussed concerns about new sales when | 11:40:14 |
| 9 | we went over forecasts. | 11:40:16 |
| 10 | Q  When is the first time you recall, subsequent to | 11:40:18 |
| 11 | June of 2004, that you had a one-on-one meeting with Mike | 11:40:21 |
| 12 | Cava in which your concern as to his new sales was an issue? | 11:40:26 |
| 13 | A  That would have been starting about month four | 11:40:33 |
| 14 | because you give people some lead time to get things going, | 11:40:36 |
| 15 | and when I saw nothing coming in, starting with month four, | 11:40:41 |
| 16 | I was starting to review the funnel, which is, because we | 11:40:45 |
| 17 | hadn't seen any business, "Okay, you haven't brought any | 11:40:49 |
| 18 | business in in addition to what we gave you, so let's see | 11:40:51 |
| 19 | what you have going.  What are you working on?  When's it | 11:40:55 |
| 20 | going to happen?  What's the qualities of it, etcetera," and | 11:40:59 |
| 21 | I participated in a number of calls with prospects that he | 11:41:00 |
| 22 | was hoping that might produce some business. | 11:41:06 |
| 23 | Q  So is it your -- | 11:41:09 |
| 24 | A  I was familiar with the accounts. | 11:41:11 |
| 25 | Q  All right. | 11:41:12 |

```
 1        But you say you started month four.  Is it because you     11:41:13
 2   wanted to give him an opportunity the first three months to     11:41:18
 3   get comfortable and essentially pursue some leads?              11:41:20
 4        A    Sure.                                                 11:41:23
 5        Q    And you expected new sales to come in the door        11:41:23
 6   month four?                                                     11:41:26
 7        A    That's typical.  I've seen very good reps bring in    11:41:28
 8   business sooner, especially who brought in business from        11:41:31
 9   elsewhere, but for the first 90 days in sales, that's a good    11:41:34
10   period to let them get ramped up.  You want to start seeing     11:41:38
11   some business coming in or a good backlog of strong             11:41:44
12   prospects or both.                                              11:41:48
13        Q    And --                                                11:41:50
14        A    Preferably both.                                      11:41:50
15        Q    And it is customarily and traditionally been your     11:41:52
16   practice that if a sales representative has not brought in      11:41:56
17   new sales or does not have prospects of new sales in month      11:42:00
18   four, that raises a concern for you?                            11:42:05
19        A    That would raise a concern.                           11:42:06
20        Q    So again, so it's your recollection that the first   11:42:08
21   time that you raised your concerns about new sales to Mike      11:42:14
22   Cava was in month four of his employment with NetVersant?       11:42:18
23        A    That sounds about right, yeah.                        11:42:22
24        Q    If he started in June -- June, July, August -- so     11:42:24
25   you would have had -- expressed your concerns in September      11:42:27
```

| | | |
|---|---|---|
| 1 | '04? | 11:42:29 |
| 2 |     A    September/October, yes, that time frame. | 11:42:30 |
| 3 |     Q    Do you specifically, as you sit here today, recall | 11:42:33 |
| 4 | having a one-on-one meeting with him in September or October | 11:42:35 |
| 5 | of '04, expressing your concern about new sales? | 11:42:38 |
| 6 |     A    We do a, generally, a monthly review of prospects. | 11:42:43 |
| 7 | I like to get my prospects for the month early in that | 11:42:47 |
| 8 | month, and I was on a continuous review of, at that point, | 11:42:51 |
| 9 | of "Hey, what do you have going? We need to get some | 11:42:56 |
| 10 | business in. That's your job." | 11:43:00 |
| 11 |     Q    My question is: Do you, as you sit here today, do | 11:43:01 |
| 12 | you specifically recall having a one-on-one meeting with | 11:43:04 |
| 13 | Mike Cava in September or October of '04 in which you | 11:43:07 |
| 14 | expressed your concern about his prospect? | 11:43:11 |
| 15 |     A    We discussed his funnel and -- yes. | 11:43:14 |
| 16 |     Q    Okay. Do you recall whether was that in September | 11:43:17 |
| 17 | or October? | 11:43:19 |
| 18 |     A    I would expect both because we review prospects | 11:43:20 |
| 19 | monthly. | 11:43:23 |
| 20 |     Q    And what was discussed at that meeting? | 11:43:24 |
| 21 |     A    Discussed the quality of the prospects and the | 11:43:28 |
| 22 | need to get business. | 11:43:30 |
| 23 |     Q    And did you give Mike any guidance in that | 11:43:32 |
| 24 | meeting? | 11:43:36 |
| 25 |     A    I try to give ongoing guidance to where to go, | 11:43:36 |

| | | |
|---|---|---|
| 1 | MR. FOTOUHI: With Mike Cava. | 11:45:07 |
| 2 | THE WITNESS: Like I said, when we review the | 11:45:09 |
| 3 | funnel, that's when I had those discussions. | 11:45:11 |
| 4 | BY MR. FOTOUHI: | 11:45:13 |
| 5 | Q   All right. Let me ask you another way. | 11:45:13 |
| 6 | How many times do you recall reviewing the funnel with | 11:45:15 |
| 7 | Mike Cava between September and November of '04? | 11:45:18 |
| 8 | A   Generally do it monthly, so I would expect three | 11:45:22 |
| 9 | times. I don't know the specific dates. | 11:45:25 |
| 10 | Q   Is it fair to say you don't specifically recall | 11:45:27 |
| 11 | meeting with him three times, but you're assuming that you | 11:45:30 |
| 12 | did because that's generally what you do? | 11:45:33 |
| 13 | A   That's how I like to do it, especially with an | 11:45:35 |
| 14 | account executive that's struggling. | 11:45:37 |
| 15 | Q   So you already labeled Mike, as of September 2004, | 11:45:40 |
| 16 | as a struggling account executive? | 11:45:43 |
| 17 | A   I didn't label him that title. His performance | 11:45:46 |
| 18 | had been zero for business that he developed at that | 11:45:49 |
| 19 | point -- | 11:45:53 |
| 20 | Q   Okay. | 11:45:53 |
| 21 | A   -- so that would -- if you can infer that, okay. | 11:45:54 |
| 22 | Q   We talked about this earlier a little bit. What | 11:45:58 |
| 23 | percentage of his time did you want to see devoted to the | 11:46:02 |
| 24 | so-called funnel and new sale development? | 11:46:05 |
| 25 | A   A high percentage. | 11:46:09 |

| | | |
|---|---|---|
| 1 | likelihood was and what the price points were and so on -- | 13:39:07 |
| 2 | these are the ones that he had promised to bring us into -- | 13:39:11 |
| 3 | I was kind of disappointed that it didn't look like very | 13:39:14 |
| 4 | good business from what I could tell. | 13:39:18 |
| 5 | Q    Was the quality of the prospects that he was | 13:39:22 |
| 6 | chasing? | 13:39:25 |
| 7 | A    That would be part of it, yeah.  It's a matter of | 13:39:25 |
| 8 | quality, quantity and also what are you bringing. | 13:39:28 |
| 9 | Q    So your criticism was based on the fact -- again, | 13:39:31 |
| 10 | I -- one, that the accounts, some of the accounts that he | 13:39:35 |
| 11 | was chasing weren't really profitable, right? | 13:39:38 |
| 12 | A    It would be a concern more than a criticism. | 13:39:42 |
| 13 | Criticism would imply, you know, criticizing him to | 13:39:44 |
| 14 | somebody as to opposed to going "Hmm, this is at a dollar | 13:39:49 |
| 15 | and our price is three." | 13:39:53 |
| 16 | Q    And the other criticism was that the number of | 13:39:54 |
| 17 | prospects weren't as high as you wanted to see? | 13:39:57 |
| 18 | A    Right. | 13:40:00 |
| 19 | Q    And the third was that he wasn't closing deals? | 13:40:00 |
| 20 | A    Correct. | 13:40:03 |
| 21 | Q    Okay.  Would you agree that in your -- | 13:40:03 |
| 22 | A    Concern. | 13:40:07 |
| 23 | Q    -- in your business, the bigger the sale, the | 13:40:07 |
| 24 | longer the duration of time from prospect to close? | 13:40:14 |
| 25 | A    Sometimes yes, sometimes no.  I've seen big deals | 13:40:19 |

| | | |
|---|---|---|
| 1 | come in quickly.  I've seen small deals take forever, so I | 13:40:24 |
| 2 | wouldn't say that's an absolute at all. | 13:40:28 |
| 3 | Q    What's a deal gone quickly from start to finish? | 13:40:29 |
| 4 | A    One month. | 13:40:32 |
| 5 | Q    So you've seen products essentially -- initial | 13:40:33 |
| 6 | contact made with potential customer -- | 13:40:37 |
| 7 | A    Um-hum. | 13:40:39 |
| 8 | Q    -- sale done, closed within one more. | 13:40:39 |
| 9 | A    With a big deal.  I have seen big deals come in in | 13:40:45 |
| 10 | approximately a month. | 13:40:49 |
| 11 | Q    Is it fair to say that's not really common for | 13:40:51 |
| 12 | that to happen? | 13:40:53 |
| 13 | A    Less common. | 13:40:54 |
| 14 | Q    It's common for a month, big-deal sale? | 13:40:55 |
| 15 | A    Less common. | 13:40:58 |
| 16 | Q    Less common. | 13:40:59 |
| 17 | And what would you consider a big-deal sale?  Is that | 13:40:59 |
| 18 | in excess of seven figures? | 13:41:02 |
| 19 | A    No.  Six-figure. | 13:41:05 |
| 20 | Q    Six? | 13:41:06 |
| 21 | A    Middle six figures.  400,000, 500,000 that's a | 13:41:07 |
| 22 | nice big deal. | 13:41:11 |
| 23 | Q    Okay.  You closed a sale with AOL sometime in | 13:41:13 |
| 24 | 2005, did you not? | 13:41:22 |
| 25 | A    Could have been 2006. | 13:41:30 |

ROBERT BARNES ASSOCIATES - (415) 788-7191

104

| | | |
|---|---|---|
| 1 | nothing and then there's some that turns into something. We | 13:46:31 |
| 2 | act as a subcontractor essentially to them. | 13:46:34 |
| 3 | Q   Do you know whether or not Mike did bid work while | 13:46:37 |
| 4 | he was there from June to November which resulted in a deal | 13:46:40 |
| 5 | in winter of 2004 or spring of 2005? | 13:46:44 |
| 6 | A   He might have. And could have not been a whole | 13:46:47 |
| 7 | new system. Could have been some upgrades. Like I said, | 13:46:52 |
| 8 | there are always add-ons and upgrades to these accounts. | 13:46:54 |
| 9 | One of the accounts we did get, I'm not sure if he was | 13:46:58 |
| 10 | involved at all, but they did some enhancements. They | 13:47:02 |
| 11 | expanded at sometime in probably late 2005, I'd say, from -- | 13:47:06 |
| 12 | Q   Yeah. | 13:47:12 |
| 13 | A   But I don't know that he did or didn't. | 13:47:13 |
| 14 | Q   All right. | 13:47:16 |
| 15 | So when -- the concerns you had about Mike's abilities | 13:47:16 |
| 16 | had already surfaced in your mind in November 2004, had | 13:47:26 |
| 17 | they? | 13:47:31 |
| 18 | A   The first concern I had about him was when a major | 13:47:34 |
| 19 | account who I was assigning an account to didn't want him as | 13:47:38 |
| 20 | their account manager. | 13:47:43 |
| 21 | Q   That was in July of 2004? | 13:47:44 |
| 22 | A   That wasn't a good start particularly, but not | 13:47:46 |
| 23 | everybody likes everybody. Move on. See what he could do. | 13:47:49 |
| 24 | Q   This was according to -- I know you don't know the | 13:47:53 |
| 25 | meaning of it -- but this was during the 90-day, quote, | 13:47:56 |

```
 1   unquote, introductory period?                                    13:47:59
 2       A    Okay.  Yes.                                             13:48:02
 3       Q    You could have easily shown him the door at that        13:48:03
 4   point.                                                           13:48:06
 5       A    We could have.  I was giving him a chance.              13:48:06
 6       Q    So that was your first concern.                         13:48:10
 7       You said you had concerns about his sales abilities,         13:48:12
 8   and my question is:  Had these concerns essentially evolved      13:48:15
 9   in your mind as of November 2004?                                13:48:21
10       A    "Concerns evolved" would be the good word because       13:48:23
11   it doesn't happen all at once.  You look at results.  You        13:48:27
12   look at technique.  You look at interactions with customers      13:48:30
13   and you look at funnels.  You look at things like that and       13:48:34
14   that's all cumulative.  That's how you get a concern.            13:48:37
15       Q    Mike was on leave from November, I represent to         13:48:45
16   you, to January 17, 2005.                                        13:48:49
17       A    Days.                                                   13:48:52
18       Q    Do you know whether or not -- first question is:        13:48:53
19   Do you know whether or not he was paid during that time          13:48:56
20   period?                                                          13:48:59
21       A    I don't know.  Once he went on leave, I hand it         13:49:00
22   off to H.R.                                                      13:49:04
23       Q    It was out of your hands?                               13:49:05
24       A    Right.                                                  13:49:07
25       Q    All right.                                              13:49:07
```

```
1   STATE OF CALIFORNIA              )
2   COUNTY OF SAN FRANCISCO          )
3              I, the undersigned, hereby certify that the
4   witness in the foregoing deposition was by me duly sworn to
5   tell the truth, the whole truth and nothing but the truth in
6   the within-entitled cause; that said deposition was taken in
7   shorthand by me, a Certified Shorthand Reporter, at the time
8   and place therein stated and that the testimony of said
9   witness was thereafter reduced, by computer, to typewriting
10  under my direction and supervision.
11             I further certify that I am not of counsel or
12  attorney for either or any of the parties in the foregoing
13  deposition and caption named, nor in any way interested in
14  the event or outcome of this cause and that I am not related
15  to any of the parties thereto.
16
17
18                         IN WITNESS WHEREOF, I have
19                         hereunto set my hand this
20                         9th day of December, 2006.
21
22                         _____
23                         Jennifer L. Yang, CSR No. 12367
24
25
```



# NEW HIRE/REHIRE FORM

---

**EMPLOYEE INFORMATION: (PLEASE PRINT)**

NAME: ____CAVA_____ ____MICHAEL_____ ____G.____
              LAST NAME                              FIRST NAME                         MIDDLE INITAL

SSN: ███████   DATE OF BIRTH: ████████████

---

**TYPE OF HIRE:**   X REPLACEMENT HIRE         JENNIFER FORREST
                                                                              NAME OF EMPLOYEE BEING REPLACED
                    ☐ NEW POSITION

**HIRE DATE:** __JUNE 7, 2004__          **WORK STATUS:**   X  NEW HIRE
                                                                                            ☐  REHIRE

**COMPANY** (eg. 101 – Silicon Valley): __SAN FRANCISCO – 121__

**DIVISION** (eg. 001 – Headquarters): __SACRAMENTO – 003__

**LOCATION** ( Houston): __SACRAMENTO__

**DEPARTMENT** (eg: 025 – Sales): __SALES – 025__

**CLASSIFICATION/JOB TITLE:** __ACCOUNT EXECUTIVE__

**IMMEDIATE MANAGER'S NAME:** __PETER WAINWRIGHT__

**CLOCK (DEPARTMENT FOR PAYCHECK LOCATOR):** __003 - SACRAMENTO__

**UNION AFFILIATION (IF APPROPRIATE):**

☐ IBEW        ☐ CWA        ☐ OTHER        LOCAL # _____

**EMPLOYEE TYPE:**   X FULL TIME              **SHIFT:** X  FIRST
                                    ☐ PART TIME                            ☐  SECOND
                                    ☐ TEMPORARY                         ☐  THIRD

**STARTING SALARY:**   HOURLY _____
                                        MONTHLY _____
                                        ANNUAL   $65,000

**PAY FREQUENCY:**    X BIWEEKLY        ☐ SEMI-MONTHLY
                                        ☐ MONTHLY          ☐ WEEKLY

**FLSA CLASSICATION:**   ☐  NONEXEMPT HOURLY
                                              X  SALARIED EXEMPT

Δ π EXHIBIT __1__
Deponent _Wainwright_
Date _2/8/__ Rptr. ___
www.depobook.com

---

**APPROVALS**

RECOMMENDED BY:   PETER WAINWRIGHT/SCOTT LANDIS___ DATE: __06/03/2004__

APPROVED BY: _____   DATE: _____