EXHIBIT -21

1 | **Shahab E. Fotouhi - 168301**
**Daniel P. Iannitelli -  203388**
2 | FOTOUHI • EPPS • HILLGER • GILROY LLP
160 Pine Street, Suite 710
3 | San Francisco, CA 94111
Tel: 415.362.9300
4 | Fax: 415.358.5521

5 | Attorneys for Plaintiffs
MICHAEL CAVA

6

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

10 | MICHAEL CAVA,                                  ) Case No.  CGC-06-453469
                                                   )
11 |          Plaintiff,                            ) **PLAINTIFF'S MEMORANDUM OF POINTS**
                                                   ) **AND AUTHORITIES IN OPPOSITION TO**
12 | vs.                                            ) **DEFENDANT PETER WAINWRIGHT AND**
                                                   ) **NETVERSANT'S - NATIONAL, INC.'S**
13 | NETVERSANT - NATIONAL, INC., a Delaware )     **MOTION FOR SUMMARY JUDGMENT**
    corporation, dba NETVERSANT - SAN             ) **OR, IN THE ALTERNATIVE, MOTION FOR**
14 | FRANCISCO, aka NETVERSANT; PETER              ) **SUMMARY ADJUDICATION**
    WAINWRIGHT, an individual; and DOES 1         )
15 | through 40, inclusive,                        )
                                                   ) Date:   May 23, 2007
16 |          Defendants.                          ) Time:   9:30 a.m.
                                                   ) Dept:   31
17 | _____ )     Judge: Hon. Peter Busch

18 |          Plaintiff Michael Cava hereby submits the following Memorandum of Points and Authorities

19 | in Opposition to Defendant Peter Wainwright and Netversant-National, Inc.'s Motion for Summary

20 | Judgement or, in the Alternative, Motion for Summary Adjudication.

21 |                                    **I.  INTRODUCTION**

22 |          Defendants Netversant and Peter Wainwright engaged in systematic harassment of plaintiff

23 | Michael Cava ("Mr. Cava") based on his mental disabilities.  This harassment caused severe

24 | emotional distress to Mr. Cava, and leaving him anxious, severely depressed, and being a major

25 | contributor to causing a mental breakdown.  This pattern of harassment began shortly after

26 | defendants learned that plaintiff Michael Cava's infant child was diagnosed with a rare form of brain

27 | cancer requiring extensive medical treatment.  After Mr. Cava returned from personal leave for

28 | tending to his son, Peter Wainwright refused to credit Mr. Cava work performed and placed him on

1   a performance improvement plan, even though no basis existed for such treatment.

2       Following, Mr. Cava, unfortunately, lapsed into an acute mental disarray exacerbated by the

3   circumstances surrounding his son's illness.  Mr. Cava's physician determined that his condition was

4   in a critical state and restricted his ability to work.  Mr. Cava was on prescribed disability for six

5   months.  Upon advising Wainwright and Netversant about his disability leave, Wainwright began to

6   harass plaintiff.  First, Wainwright advised him that he would have to forfeit all accounts if he went

7   on leave, where Mr. Cava was able to save two accounts by making arrangements with co-workers.

8       The next action by Mr. Wainwright was immediately upon his return from leave where he

9   took the two remaining accounts away, even though his co-workers would have given them back, or

10   at least split the accounts.  Mr. Wainwright refused Mr. Cava the common practice of splitting

11   accounts.  Wainwright then created a unreasonable development expectation for Mr. Cava,

12   ensuring his failure, and again treated Mr. Cava in a disparate manner from his co-workers.

13   ## II.  BACKGROUND FACTS

14       [See Plaintiff's Memorandum of Points & Authorities in Support of Opposition to Netversant-

15   National, Inc.'s Motion For Summary Judgment, or in the Alternative, Summary Adjudication, filed

16   concurrently with this Opposition, for a detailed factual background.]

17       Mr. Cava began his employment with Netversant on June 7, 2004. [Id.]  As condition of

18   being a new hire, Mr. Cava was placed on a 90 day probationary period where, at the end of the

19   period, both parties could evaluate whether to continue the employment relationship. [Cava Depo.,

20   Ex. 2.] In early September 2004, the 90 day probationary period expired.  At no time during or near

21   the end of the probationary period had Mr. Cava received any indication from Peter Wainwright, or

22   anyone at Netversant, that his performance was substandard or that his position with Netversant was

23   in jeopardy. [Cava Decl., ¶ 12.].  By the end of October 2004, **only five months into his**

24   **employment**, Mr. Cava had booked over $414,000.00 in quota achievement, or 121% of his

25   total quota requirement. [Cava Decl., ¶ 14, Ex. D.]

26       Mr. Cava had received no indication that he was performing unsatisfactorily and nothing

27   was said to him after his initial 90 day probationary period.  In fact, by all indications, Mr. Cava was

28   well on his way to a stellar first year at Netversant. [Cava Decl., ¶¶ 13, 14.]  Tragically, on

1   November 2, 2004, Mr. Cava's 12 month old son, Ryan, suddenly fell ill and was diagnosed with

2   ependymoma, an extremely rare brain tumor which affects only a handful of children each year.

3   [Cava Decl., ¶15.]

4           Over the following 10 weeks, Mr. Cava and his wife remained at Ryan's side as he

5   underwent emergency procedures and treatments, while consulting with specialists, evaluating

6   treatment options and providers.  Ryan's initial diagnosis and treatment was a very difficult period of

7   dire prognoses, changing treatments and adjustment to a new reality.  The intensity and extent of

8   Ryan treatment is reflected in the fact that his medical bills exceed $500,000 in during the first few

9   weeks. [Cava Decl., ¶19.]  After several weeks of intensive and constant focus on Ryan's condition,

10  Mr. Cava was looking forward to returning to work.  [Cava Decl., ¶15.]

11          Unexpectedly and quite surprisingly, upon his return to work in January 2005, Mr. Cava was

12  informed by Peter Wainwright that he was being placed on a performance improvement plan (PIP).

13  This was a absolute shock to Mr. Cava, as well as others at Netversant. [Cava Decl., ¶ 17.][Landis

14  Depo., 79:6-9.]  There was nothing about his performance during those first five months that would

15  justify this treatment or his placement on a PIP. [Cava Decl., ¶ 14, Ex. A-D.]  As discussed more fully

16  below, Mr. Cava's performance was, at a minimum, on par with reasonable expectations on his

17  quota performance. [Id.] In other words, he performed no worse than other account executive in

18  similar situations.  According to Mr. Wainwright, however, Mr. Cava suddenly was not meeting

19  expectations because Mr. Cava did not bring in "new" business.

20          Despite this unnerving, unwarranted set-back, Mr. Cava was committed to succeeding at

21  Netversant.  Mr. Cava quickly returned to working on his accounts.  He also learned that a deal

22  which he quoted and performed nearly all the work on had closed while he was caring for his son.

23  [Cava Decl., ¶16, Ex. E.]  Typically, when such an issue arises, the account executive who did most

24  of the work gets the credit and will share with the person who helped. [Id.] [Landis Depo., 75:21-

25  76:22.]  Mr. Wainwright, however, unilaterally and without consulting with Mr. Cava and the other

26  account executive, gave the entire credit to the other account executive. [Cava Decl., ¶¶16-17, Ex.

27  E.]  Such actions served to make Mr. Cava's hard sales numbers and quota achievement appear

28

1    lower than reality and not accurately reflect his work product before his son's illness[1].

2        Shortly after Mr. Cava returned to work, he lapsed into an acute mental impairment

3    prompting his physician to place him on disability. [Cava Decl., ¶ 20.]  With Netversant's consent,

4    because it admits is was required to in light of his physicians's order, Mr. Cava went on disability

5    leave. [Cotter Depo., 30:12-31:10.]  Although Netversant offered Mr. Cava to apply for disability

6    benefits through its disability insurance carrier, Mr. Cava, instead, sought on unpaid leave and

7    obtained benefits through the State Disability Insurance program. [Cava Dec., ¶ 20.][Cotter Decl., ¶

8    31:20-35:6, Ex. 9 & 10.]

9        Naturally, an extended leave would require that certain arrangements be made with respect

10    to Mr. Cava's active accounts.  Although Mr. Wainwright initially decided to permanently reassign

11    all of Plaintiff's account, by arrangement with other account executives, Mr. Cava permanently

12    forfeited most of his accounts to other account representatives.  [Cava Decl., ¶20.] [ Cava Depo.,

13    Ex. 17]  Under the arrangement, however, Mr. Cava was promised that he would resume his

14    management over two accounts upon his return, including the Maximus account. [Id.] During the

15    course of his disability leave, Mr. Cava continued to support the accounts taken over by other

16    account representatives, assisting them in every way possible when he could. [Cava Decl., ¶ 20.]

17        Although still suffering from his disability, Mr. Cava was released by his physician to return to

18    work on August 1, 2005 and he was looking forward to continuing his career at Netversant. [Cava

19    Depo, Ex. 16.] Mr. Cava was ready to get back to work, but know that the transition back would be

20    a little difficult[2].  Immediately upon his return, however, Mr. Cava was advised by Mr. Wainwright

21    that he would not be allowed to take back the accounts which were promised to him before his

22    disability leave commenced and again placed Mr. Cava on a performance improvement plan.

23 ———————————

24       [1] There were many potential sales which Mr. Cava had quoted and worked before his son's illness.
Many of these leads were dropped by Peter Wainwright and others while Mr. Cava was out, further diminishing
25    the hard numbers on his sales. [Cava Decl., ¶ 18.]

26       [2] Netversant was fully aware of his condition and that his full return would take a little time.
In fact, Netversant's human resource director reminded Peter Wainwright about the ordeal Mr. Cava
27    had gone through and to be sensitive in dealing with his return. [Cotter Depo., Ex. 16.] Mr. Cava
returned on August 1, 2005, in part, because he was previously informed her would be terminated if
28    he did not. [Cava Depo., p. 95:2-7, 130:4-14.]

1    [Cava Depo, Ex. 17.] This time, Mr. Wainwright placed additional pressure on Mr. Cava, expecting

2    immediate results, with no assigned accounts, and to have an full funnel within his first 30 days. [Id.]

3         Mr. Cava objected that his accounts were being taken away against the agreements made

4    before his leave. [Cava Depo., p.100:9-101:6.]  He tried to resolve this issue with Mr. Wainwright,

5    to no avail.  The account executive that Mr. Wainwright assigned the Maximus account was willing

6    to permanently split the account  – a typical arrangement made between account executives and

7    routinely approved. [Cava Depo., 146:2-148:10.]  Mr. Wainwright, however, refused to allow this

8    and instead explained to Mr. Cava that he would have to start "fresh" without any accounts.  Mr.

9    Wainwright even refused to allow Mr. Cava an accommodation routinely provided to account

10   representatives to split accounts.  Despite this setback, Mr. Cava was committed to succeeding at

11   Netversant.  Unfortunately, the return to work and the additional stresses imposed by Mr.

12   Wainwright's actions took a toll on his condition.  [Cava Depo., p. 157:9-19, 161:16-24.]

13        On August 3, 2005, Mr. Cava's physician determined that it was too early for him to have

14   returned to work. [Cava Depo, Ex. 19.] He was again placed on disability with a work restriction, the

15   anticipation that he would return to work after a short leave. [Id.]  Mr. Cava provided to Netversant

16   the necessary information from his physician, who expressly invited Netversant to contact him if they

17   had any questions. [Id.]  Netversant's human resource director, in response to the notification, and

18   after consultation with Peter Wainwright and Scott Landis, declined to obtain additional information

19   from Mr. Cava or his doctor concerning the details of the requested leave and informed Mr. Cava

20   that they would not allow him to go back on disability leave and that if he did, they would terminate

21   him. [Cotter Depo., 44:5-48:4, 49:12-23.]

22        Mr. Cava immediately tried to discuss the matter with his superiors. They did not want to

23   discuss the matter and told him that he could either resign or be terminated. [Cava Depo., 162:11-

24   165:18.]  Mr. Cava pleaded that he needed the job and would do anything and work with them to

25   find an accommodation which would allow him to keep his job. His pleas fell on deaf ears and he

26   was told that the only option was for him not to go on disability leave. [Cava Depo., 183:5-184:5.]

27        On August 5, 2005, Mr. Cava received a letter from Netversant stating that he was being

28   terminated because he was "unable to perform [his] duties as an Account Executive". [Cotter Depo.,

1  Ex. 23. ]  According to the human resources director and the President of the Division, who made

2  the decision to terminated him, the reason was because of his disability. [Cotter Depo., p. 46:4-

3  48:3, 49:12-23; 50:19-52:18]  Scott Landis confirmed the termination was not performance based.

4  [Landis Depo, p. 121:11-16.]

### III.  LEGAL ARGUMENT

**A.    Plaintiff Has Established a Prima Facie Case of Disability Harassment**

**1.    Proving Disability Harassment in the Workplace**

The FEHA states that "it shall be unlawful employment practice... [f]or an employer...or any other person, because of... mental disability, [or] mental condition,... to harass an employee." [Section 12940, subd. (J) (1).]  An employee claiming harassment based on a hostile work environment must demonstrate that the conduct complained of was severe enough **or** sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their mental disability.  Whether an environment qualifies as hostile or abusive depends on a totality of circumstances, including: frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Roby v. McKesson Corp. (2006) 146 Cal.App.4th 63, 73-74.  As the U.S. Supreme Court indicated, the "severe or pervasive" standard "is not a mathematically precise test," but an evaluation of the circumstances. Harris v. Forklift Systems, Inc. (1993) 510 U.S. 17, 22-23.  In addition, plaintiff must also prove that defendants' conduct "would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that [he] was actually offended." Fisher v. San Pedro Peninsula Hospital (1989) 214 Cal.App.3d 590, 609-610.

**2.    Defendants' Conduct was Severe and Sufficiently Pervasive**

Mr. Cava has proved actionable workplace harassment.  Based on a totality of circumstances, defendants' conduct towards plaintiff from the moment he returned from a medical leave in January 2005, was threatening, and unreasonably interfered with plaintiff's work performance.  Beginning with the unjustified placement on a performance improvement plan in

1    January 2005, Mr. Wainwright's reneging on a promise to reassign prior sales accounts in August

2    2005, unreasonable sales requirements, and Mr. Wainwright's verbal abuse during private

3    meetings, defendants' conduct was a concerted pattern of harassment designed to drive Mr. Cava

4    out of Netversant. Defendants' behavior was more than a few isolated incidents. "A hostile working

5    environment is shown when incidents of harassment occur in concert or with a regularity that can

6    reasonably be termed pervasive." Etter v. Veriflo Corp. (1998) 67 Cal.App..4th 457, 463.

7    Defendants' conduct towards plaintiff began as soon as he returned from medical leave in January

8    2005, and continued through out the duration of his employment. As supported by case law below,

9    it was both severe and/or sufficiently pervasive to meet the requirements of harassment in the

10    workplace.

11           **(a).**     **Roby Distinguished**

12       In their Motion for Summary Judgment, defendants' rely heavily on both the above-

13    referenced Roby case, and sexual harassment in the workplace case law, to refute plaintiff's

14    harassment claim. As discussed below, defendants misinterpret Roby, and narrowly apply sexual

15    harassment case law to this disability harassment context.

16       Roby concerns a long-time employee who's sudden development of panic disorder caused

17    her to miss substantial time at work, and ultimately leads to her unlawful firing. At trial, the jury

18    awarded millions of dollars in compensatory damages for wrongful discharge in violation of public

19    policy, as well as harassment, disparate treatment, and discrimination/failure to accommodate

20    under the California Fair Employment and Housing Act (FEHA) [Gov.Code Section 12900 et seq.]

21    In addition, the jury levied a $15 million punitive damage award. On appeal, the defendant

22    employer challenged only the harassment claim, which the court reversed for insufficiency of

23    evidence. Roby at 66-67.

24       Admittedly, strong similarities exist between Roby and the case at hand. Both circumstances

25    concern employees who were fired by their employers after missing substantial time at work as a

26    result of mental disabilities. In addition, both Roby and plaintiff assert claims that they were

27    harassed by their supervisors about their disability. However, as the court in Roby made clear in its

28    decision, a major distinction exists. Namely, the court said that the employer's conduct, "no matter

1  how unpleasant, could not be deemed harassment unless it was based on and directed towards the

2  employee's mental disability.  The conduct must not only be severe or pervasive, it must also be

3  tinged with *discriminatory animus.*" <u>Roby</u> at 76.  The court found no evidence that the Roby's

4  employer ever referred to her panic disorder "in derogatory terms, interfered with the breaks she

5  needed when she experienced attacks, or engaged in a regular pervasive pattern of conduct

6  tormenting her on account of her mental disability." <u>Roby</u> at 77.

7      In stark contrast to <u>Roby</u>, clear evidence exists that defendant Peter Wainright, as an

8  employee for NETVERSANT, referred to plaintiff's mental disability in derogatory terms.  Wainwright

9  states in an email that plaintiff had "gone off the deep end."  Furthermore, Wainwright deliberately

10  interfered with Mr. Cava on account of his mental disability.  Aware of Mr. Cava's mental condition,

11  Wainwright reassigned work accounts, and placed unreasonable pressure and expectations on Mr.

12  Cava.  These unwarranted actions, together with Wainwright's "rude and abusive" behavior to

13  plaintiff during their private meetings, clearly demonstrates the severe and pervasive harassment that

14  Mr. Cava was subjected to.

### (b).    Defendants' Conduct was Subjectively and Objectively Offensive

16

17      As stated above, to be actionable, a claim for harassment at the workplace must be both

18  objectively and subjectively offensive, one that a reasonable person would find hostile or abusive,

19  and one that the victim did in fact perceive to be so." <u>Roby</u> at 74.  Here, there is no doubt that Mr.

20  Cava found Mr. Wainwright's and Netversant's conduct towards him as hostile.  From the moment

21  he returned to work following leave to care of his son, he was met with derision and unfair criticism.

22  Defendants harassment was aimed at forcing Mr. Cava to resign.  His sales accounts had been

23  taken from him, and he immediately faced unreasonable sales related expectations.  This combined

24  with the abusive comments made to him by Mr. Wainwright, and the added pressure of his sick

25  child, all seriously affected the well-psychological well-being of plaintiff.  Mr. Cava has suffered

26  severe emotional distress, including anxiety, depression, and debilitating work-related stress. In view

27  of a totality of circumstances, a reasonable person also would have found these persistent methods

28  harassing.

1       **2.**    **Alternatively, Defendants' Conduct was Harassing, and Outside the Scope of Necessary Job Performance.**

2

3       Defendants' alternatively argue that even if their conduct was severe and persuasive, it does

4  not constitute actionable harassment because it arises out of the performance of necessary

5  personnel management duties.    Janken v. Hughes Electronics (1996) 46 Cal.App.4th 55, 64-65.

6  In *Janken*, the court highlights the fundamental distinction between harassment and discrimination,

7  both prohibited by the FEHA.  There, the court employed the concept of delegable authority as a test

8  to distinguish conduct actionable as discrimination as from conduct actionable as harassment.

9  Specifically, the court stated that harassment consists of a type of conduct that is avoidable and

10 unnecessary for performance of a supervisory job.  "No supervisory employee needs to use slurs or

11 derogatory drawings, to physically interfere with freedom of movement, to engage in unwanted

12 sexual advances, etc. in order to carry out the legitimate objectives of personnel management."

13 [Janken at pg. 64].  Here, the conduct performed by Netversant, and in particular Peter Wainwright,

14 was not the type that was necessary for a performance of a supervisory job.  It was overt harassment.

15 Berating Mr. Cava at private meetings, setting punitive and unreasonable sales objectives, and

16 mocking him in email correspondences about his mental disabilities, is clearly not part of the

17 legitimate objectives of personnel management.

18 **B.**    **Plaintiff's Cause of Actions for Intentional and Negligent Infliction of Emotional Distress Are Valid**

19

20      **1.**    **Defendants' Conduct was Outside the Normal Employment Relationship and not Preempted by the CA Workers' Compensation Act.**

21

22      Intentional infliction of emotional distress is committed when defendant's conduct is

23 intentionally intrusive and outrageous and has a severe and traumatic effect on the plaintiff's

24 emotional tranquility. Agarwal v. Johnson (1979) 25 Cal.3d. 932.  Defendants argue that

25 plaintiff's intentional infliction claims are barred by the exclusive remedy provisions of the California

26 Workers' Compensation Act.  However, the proper test is whether the acts alleged were part of the

27 normal employment relationship. Hart v. National Mortgage & Land Co. (1987) 187 Cal.App.3d

28 1420, 1429.  In <u>Hart</u>, the court said "when employers step out of their roles as such and commit

1  acts which do not fall within the reasonably anticipated conditions of work, they may not then hide

2  behind the shield of workers' compensation. Id at 1431.

3          Here, defendants are attempting to "hide behind the shield of workers' compensation."

4  Defendants' conduct towards Mr. Cava was both outside of the normal employment relationship

5  and outrageous.   Defendants knew of plaintiff's mental disability and his son's ongoing treatment

6  for cancer, and intentionally created a hostile environment of verbal abuse and unfair sales

7  expectations. Defendants' acts simply do not fall within the reasonable anticipated conditions or

8  work, and therefore are not preempted by the California Workers' Compensation Act.

9          **2.      Defendants' Conduct was Outrageous.**

10         Defendants' alternatively argue that plaintiff's claims for intentional infliction of emotional

11 distress fail because defendants' conduct was not outrageous.  However, as supported by case law,

12 defendant Wainwright's verbal insults and abuse of his position of power over Mr. Cava clearly meet

13 the standard of outrageous conduct under the circumstances.

14         "The modern rule is that there is liability for conduct exceeding all bounds usually tolerated

15 by a decent society, of a nature which is especially calculated to cause, and does cause, mental

16 distress. See Prosser, Law of Torts (4th ed.1971) p. 54.)  Behavior may be considered outrageous if

17 a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's

18 interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts

19 intentionally or unreasonably with the recognition that the acts are likely to result in illness through

20 mental distress. Prosser, Law of Torts, supra, at pp. 57-58; Rest.2d Torts, § 46 (e), (f) as cited in

21 Agarwal supra at 932.  In Agarwal, the court upheld an employee's claim for intentional infliction of

22 emotional distress based on the supervisor's use of a racial epithet, and evidence that the employer

23 acted knowingly and unreasonably with the intention to inflict mental distress and abused his

24 position to humiliate the plaintiff.  Agarwal at 947.  In the present context, defendants made

25 derogatory comments regarding plaintiff's mental's disability, and abused their position of authority

26 over Mr. Cava by stripping him of his promised sales accounts, and setting unreasonable

27 expectations. These acts were outrageous, intentionally intrusive, and caused severe anxiety,

28 depression, and stress on Mr. Cava.

1    As such, Mr. Cava's claims for intentional infliction of emotional distress are valid and

2    supported by the evidence.

3    **2.    Defendants' Claim for Negligent Infliction of Emotional Distress is Valid.**

4

5    Negligent infliction of emotional distress requires proof of the usual elements of negligence:

6    duty, breach of a duty, causation, and damages. Semore v. Pool (1990) 217 Cal.App.3d 1087,

7    1103. Defendants assert that plaintiff's claim fails because defendant's actions towards plaintiff

8    were inherently "intentional" and thus not cannot support a cause of action for negligent infliction of

9    emotional distress.   However, defendant's conduct towards plaintiff was not solely limited to

10   intentional acts. Having knowledge of Mr. Cava's mental disability, defendants' owed a duty to

11   treat him with special consideration, in light of the very foreseeable risk of harm of to his emotional

12   health.  Defendants' breached this duty with their negligent behavior towards plaintiff.

13   Furthermore, defendants' reliance on Semore v. Pool (1990) 217 Cal.App.3d 1087 does

14   not match our present situation.  In Semore, the Court of Appeal affirmed a dismissal of a cause of

15   action for negligent infliction of emotional distress based upon an employee's refusal to submit to a

16   pupillary eye reaction test designed to measure drug influence.  Unlike the present case, the

17   defendant employer had no knowledge of any disability affecting the plaintiff employee, because

18   there simply was no disability was alleged.  Here, defendants had actual knowledge of Mr. Cava's

19   mental disability, and owed him a duty to treat him accordingly.  In treating Mr. Cava with callous

20   disdain, they breached this duty and negligently caused him emotional distress.

21                              **IV. CONCLUSION**

22   For the reasons above, summary judgment and/or summary adjudication must be denied.

23   Dated: May 9, 2007                    FOTOUHI • EPPS • HILLGER • GILROY LLP

24

25                                        By:

26                                            Daniel P. Iannitelli
                                              Attorneys for Plaintiff

27

28

1 | **Shahab E. Fotouhi - 168301**
**Daniel P. Iannitelli -  203388**
2 | FOTOUHI • EPPS • HILLGER • GILROY LLP
160 Pine Street, Suite 710
3 | San Francisco, CA 94111
Tel: 415.362.9300
4 | Fax: 415.358.5521

5 | Attorneys for Plaintiffs
MICHAEL CAVA

6

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

10 | MICHAEL CAVA,           Case No.  CGC-06-453469

11 |         Plaintiff,       )    **PLAINTIFF'S MEMORANDUM OF POINTS**
                            **AND AUTHORITIES IN OPPOSITION TO**
12 | vs.                     )    **DEFENDANT NETVERSANT - NATIONAL,**
                            **INC.'S MOTION FOR SUMMARY**
13 | NETVERSANT - NATIONAL, INC., a Delaware )    **JUDGMENT OR, IN THE ALTERNATIVE,**
corporation, dba NETVERSANT - SAN     )    **MOTION FOR SUMMARY ADJUDICATION**
FRANCISCO, aka NETVERSANT; PETER    )
14 | WAINWRIGHT, an individual; and DOES 1    )
through 40, inclusive,            )    Date:   May 23, 2007
15 |                               )    Time:   9:30 a.m.
        Defendants.       )    Dept:   31
16 | _____ )    Judge: Hon. Peter Busch

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   BACKGROUND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    DISABILITY DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
                  1.    Plaintiff Has Established a Prima Facie Case
                        for Disability Discrimination . . . . . . . . . . . . . . . . . . . . 9

                  2.    Netversant's After-the-fact Proffered Reason for
                        Termination Can only be Described as Pretext . . . . . . . . . . . 11

                  3.    Plaintiff Has Established a Prima Facie Case for
                        Failure to Accommodate and Netversant Has Failed
                        To Provide Facts to Show Undue Burden . . . . . . . . . . . . . . . 13

                  4.    Plaintiff Has Established a Prima Facie Case for
                        Failure to Engage in the Interactive Process . . . . . . . . . . . . . 15

      B.    WRONGFUL TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      C.    PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE FOR RETALIATION . . . . . . . . . . . . 16

      D.    BREACH OF CONTRACT AND BREACH OF THE COVENANT
            OF GOOD FAITH AND FAIR DEALING . . . . . . . . . . . . . . . . . . . . . . . . . 18

      E.    INTENTIONAL AND NEGLIGENT MISREPRESENTATION . . . . . . . . . . . . . . . . 19

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1

<u>**TABLE OF AUTHORITIES**</u>

2

3

**California Statutes:**
California Govt. Code § 12940(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
4   California Govt. Code § 12940(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

5

6   **California Cases:**
<u>Jensen v. Wells Fargo Bank</u>
7   (2000) 85 Cal.App.4th 245 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

8   <u>Le Bourgeois v. Fireplace Mfrs., Inc.</u>
    (1998) 68 Cal.App. 4th 1049 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
9
    <u>Hanson v. Lucky Stores, Inc.</u>
10  (1999) 74 Cal.App.4th 215 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12,13, 14

11  <u>Flait v. North American Watch Corp.</u>
    (1992) 3 Cal.App.4th 467 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17, 18
12
    <u>Colarossi v. Coty US, Inc.</u>
13  (2002) 97 Cal.App.4th 1142) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18

14  <u>County of Fresno v. Fair Employment & Housing Com.</u>
    (1991) 226 Cal.App.3d 1541, 1553 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
15
    <u>Bagatti v. Department of Rehabilitation</u>
16  (2002) 97 Cal.App.4th 344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

17  <u>Yanowitz v. L'Oreal USA, Inc.</u>
    (2005) 36 Cal.4th 1028 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
18
    <u>Chen v. County of Orange</u>
19  (2002) 96 Cal.App.4th 926 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

20  <u>California Fair Employment & Housing Comm v.</u>
    <u>Gemini Aluminum Corporation</u>
21  (2004) 122 Cal.App.4th 1004, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

22  <u>Guz v. Bechtel National, Inc.</u>
    (2000) 24 Cal.4th 317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18
23
    <u>Foley v. Interactive Data Corp.</u>
24  (1988) 47 Cal.3d 654 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

25  <u>Church of the Merciful Saviour v.Volunteers</u>
    <u>of America</u> (1960) 184 Cal.App.2d 851 654 . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
26
    <u>Slivinsky v. Watkins-Johnson</u>
27  (1990) 221 Cal.App.3d 799 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

28

Rochlis v. Walt Disney Co.
19 Cal.App4th 201 799 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Neu-Visions Sports, Inc. v. Soren/McAdams/Bartells
(2000) 86 Cal.App.4th 303 799 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Tarman v. State Farm Mut. Auto Ins. Co.
(1991) 2 Cal.App.4th 153 799 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21


**Federal Cases:**
Byrne v. Avon Products
(7th Cir. 2003) 328 F.3d 379 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Humphrey v. Memorial Hospitals Assoc.
(9th Cir. 2001) 239 F.3d 1128, 1135-36 . . . . . . . . . . . . . . . . . . . . . . . . . 10

Nunes v. Wal-Mart Stores, Inc.
(9th Cir. 1999) 164 F.3d 1243 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Norris v. Allied Sysco Food Service, Inc.
(N.D. Cal. 1996) 948 F. Supp 1418 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Walker v. Elmore County Board of Education
(11th Cir. 2004) 379 F.3d 1249 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Villiarimo v. Aloha Island Air, Inc.
281 F.3d 1054, 1065 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Passantino v. Johnson Consumer Prods., Inc.
212 F.3d 493 (9th Cir. 2000) ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Plaintiff Michael Cava hereby submits the following Memorandum of Points and Authorities in Opposition to Defendant Netversant-National, Inc.'s Motion for Summary Judgement or, in the Alternative, Motion for Summary Adjudication.

## I.  INTRODUCTION

No good deed goes unpunished – so goes the theme of defendant Netversant-National, Inc.'s ("Netversant") Motion for Summary Judgment.  The reality, however, is that Netversant chose to kick a man when he was down.  Shortly after learning that plaintiff Michael Cava's infant child was diagnosed with a rare form of brain cancer requiring extensive medical treatment, Netversant placed him on a performance  improvement plan, even though no basis existed for such treatment. For what reason?  The decision to place him on the performance improvement plan coincided with the staggering costs being realized for treatment of Mr. Cava's son.  Curiously, Netversant's employee group health benefits plan is self-funded[1].

The story continues.  Mr. Cava, unfortunately, lapsed into an acute mental disarray exacerbated by the circumstances surrounding his son's illness.  Mr. Cava's physician determined that his condition was in a critical state and restricted his ability to work.  Mr. Cava was on prescribed disability for six months.  Shortly after returning to work from disability, his doctor determined that he required additional time on leave.  Mr. Cava advised Netversant about the additional time ordered by his physician and Netversant  immediately decided to terminate Mr. Cava.   Despite his pleas for an accommodation, Netversant refused to discuss his prognosis, contact his physician or seek alternative methods to accommodate his disability.

Although Netversant now claims that it terminated Mr. Cava because of poor performance, the facts are clear that Mr. Cava performed as expected during the time he was at Netversant and his performance exceeded that of other similarly situated Account Executives.  More importantly, Netversant has repeatedly admitted that its reason for terminating Plaintiff was because of his need for disability leave.  Netversant's defense of poor performance is <u>pretext</u> for their <u>admitted</u> reason for terminating him – his disability.

---

[1]  While not at issue in the instant motion Mr. Cava's claim for wrongful termination on the basis that he was terminated because of the medical costs is indicative of Netversant's motives.

## II.  BACKGROUND FACTS

Since completing his undergraduate degree in 1994, Michael Cava has worked in sales.  In 1999, beginning at Shared Technologies, Inc., Mr. Cava entered the voice equipment/telephony systems industry where he sold related equipment, installation and services. [Cava Decl., ¶ 3.] Defendant Netversant is a national provider for such systems and operates in California.  Telephony sales is a fairly specialized sales field with limited players in the industry.  Over the years, Mr. Cava integrated himself into the niche market, gaining valuable experience and insight in the business.  By early 2004, Mr. Cava had developed substantial high end business and proved to be a top producer at Shared Technologies, Inc. [Id.]

In the Spring of 2004, Mr. Cava was encouraged to explore working for Netversant by an industry friend who was also a client representative for a large Netversant account, Maximus. [Cava Decl., ¶ 4.]  The Maximus representative encouraged Mr. Cava to seek the position because Netversant's then sales executive on the Maximus account, Jennifer Forrest, was leaving.  [Id.] Jennifer Forrest was a very successful account executive at Netversant and had developed a large client base at Netversant. [Id.]  Although Mr. Cava had a substantial recurring base at Shared Technologies, he considered this a great opportunity as the Maximus account representative wanted him there and he believed that Netversant would provide him the opportunity to further advance his career.  [Id.]

Mr. Cava subsequently interviewed with the President of Netversant's Voice division and the Vice President of Sales, defendant Peter Wainwright.  The fit was desirable for both parties.  Mr. Cava enjoyed a good reputation and history in the industry and a proven earner with a large revolving base of accounts at Shared Technologies.  Mr. Cava's client base was also attractive to Netversant and discussions were made about working to bring, over time, his clients to Netversant. [Cava Decl., ¶¶4, 5.]  He also had the backing of one of Netversant's larger customers.

Mr. Cava, of course, was concerned about leaving the commissions base he developed at Shared Technologies and specifically discussed with Peter Wainwright and the President of the Voice division accounts that would be assigned to him if he ultimately worked for Netversant. [Cava Decl., ¶ 4.][Landis Depo., p. 52:2-11.]  In addition to the Maximus account, Mr. Cava was promised that

1  he would inherit <u>most</u> of Jennifer Forrest's accounts; in particular <u>all</u> of her accounts based out of

2  the Sacramento office, except for the Octel account. [Cava Decl., ¶4][Landis Depo., p. 52:2-11.]  In

3  light of the large recurring base of business promised, Mr. Cava accepted the position with

4  Netversant. [Cava Decl., ¶ 6.]

5      Mr. Cava began his employment with Netversant on June 7, 2004. [Id.]  As condition of

6  being a new hire, Mr. Cava was placed on a 90 day probationary period where, at the end of the

7  period, both parties could evaluate whether to continue the employment relationship. [Cava Depo.,

8  Ex. 2.]  The amount of business expected from sales executives at Netverasnt and their commissions

9  for 2004 were reflected in the 2004 Account Executive Compensation Plan.  Under the plan,

10  account executives are given a quota number which serves as the "target" amount of sales to

11  generate.  As Mr. Cava was starting midway through the year, his quota achievement was pro-rated

12  for the total amount of $341,250.  [Cava Depo., Ex. 5]

13      Contrary to the promises made, Mr. Cava was only assigned a few of Jennifer Forrest's

14  accounts. [Cava Depo., Ex 6.][Cava Dec., ¶6.]   Mr. Cava was upset with the broken promise, but

15  was nevertheless determined to succeed at Netversant. Id.  Although the accounts assigned to him

16  did not result in the same amount in recurring business that he had while at Shared Technologies,

17  the Maximus account and the few others assigned constituted a base from which he could build.

18  Hoping to keep a good working relationship with his superiors, Mr. Cava did not immediately

19  complain about the broken promise. [Id.]

20      Mr. Cava immediately went to work on managing the assigned accounts and developing

21  new business, while adapting to his new employment.  [Cava Decl., ¶ 7.]  Management of the

22  Maximus account proved to quite extensive, requiring Mr. Cava to provide many quotes, obtain and

23  process large segments of information, attend meetings and consulted extensively with the client.

24  [Id.] Peter Wainwright himself describes the account a "very high maintenance account". [Cotter

25  Depo., Ex. 8.]   In addition to Maximus, Mr. Cava was actively servicing other accounts, working on

26  new business and making the inroads to bring to Netversant some of his old clients, including

27  America On-Line. [Cava Decl., ¶ 7.]  Mr. Cava worked hard and was beginning to get "ramped-

28  up" to meet and exceed all expectations. [Cava Decl., ¶¶  7, 8, 9, 10, 11, 12, 13, & 14.]

1       In early September 2004, the 90 day probationary period expired.  At no time during or

2   near the end of the probationary period had Mr. Cava received any indication from Peter

3   Wainwright, or anyone at Netversant, that his performance was substandard or that his position with

4   Netversant was in jeopardy. [Cava Decl., ¶ 12.].  By the end of October 2004, **only five months**

5   **into his employment**, Mr. Cava had booked over $414,000.00 in quota achievement, or 121%

6   of his total quota requirement. [Cava Decl., ¶ 14, Ex. D.]

7       (Netversant likes to stress that roughly $290,000 of the quota achievement came from a

8   renewal contract completed before Mr. Cava began with Netversant.  Early on, he was tasked by

9   Peter Wainwright to get the renewal contract with Maximus.  During Mr. Cava's review of the files,

10  he discovered the executed renewal contract which neither Netversant nor the client had previously

11  discovered. [Cava Decl., ¶ 8.] Had Mr. Cava not found the contract, it is likely it would have been

12  lost.  After the discovery, Peter Wainwright was happy with the find and decided to credit Mr. Cava

13  for the contract.  Now he refers to it as a gift. Id.)

14      Notwithstanding the "gift", Mr. Cava's performance during his first five months was, at the

15  very least, equal to that of many other account executives at Netversant.  [Cava Decl., ¶ ¶ 13 & 14,

16  Ex. A-D.]  It certainly was not any worse than other long-time account executives at Netversant;

17  particularly in consideration that Mr. Cava was still in his ramp-up period. [Id.][Landis Depo., p.

18  63:15-22, 69:22-71:7.]   In fact, the President of the Voice Division, Scott Landis, has testified that,

19  at the end of his first five months, Mr. Cava was still in his ramp-up period. [Landis Depo., p. 34:12-

20  35:23.]  As any account executive in the industry will testify to, it takes up several months to

21  adequately ramp-up and get business that is quoted to come through the door, as well bring clients

22  from a former business. [Landis Depo., p. 63:15-22, 69:22-71:7.]

23      As discussed above, Mr. Cava had received no indication that he was performing

24  unsatisfactorily and nothing was said to him after his initial 90 day probationary period.  In fact, by

25  all indications, Mr. Cava was well on his way to a stellar first year at Netversant. [Cava Decl., ¶¶ 13,

26  14.] Discussed in greater detail below, consideration of his performance as compared to other

27  account executives, his "funnel" of business at the end of his first five months, his management of a

28  major account and other facts show that Mr. Cava was not a poor performer as now claimed. [Cava

1  Decl., 9, 10, 11, 12, 13 & 14.]

2         Tragically, on November 2, 2004, Mr. Cava's 12 month old son, Ryan, suddenly fell ill and

3  was diagnosed with ependymoma, an extremely rare brain tumor which affects only a handful of

4  children each year. [Cava Decl., ¶15.]  Over the proceeding 10 weeks, Mr. Cava and his wife

5  devoted all of their resources, efforts and prayers attending to Ryan's medical needs.  Netversant

6  was initially supportive of Mr. Cava, as he and his wife focused on obtaining the best possible

7  medical care and treatment for Ryan. [Id.] Other account representatives looked after and worked

8  on Mr. Cava's accounts and, despite Mr. Cava's offer to go on unpaid leave, Netversant continued

9  to pay him his base salary. [Id.]

10         Over the following 10 weeks, Mr. Cava and his wife remained at Ryan's side as he

11  underwent emergency procedures and treatments, while consulting with specialists, evaluating

12  treatment options and providers.  Ryan's initial diagnosis and treatment was a very difficult period of

13  dire prognoses, changing treatments and adjustment to a new reality.  The intensity and extent of

14  Ryan treatment is reflected in the fact that his medical bills exceed $500,000 in during the first few

15  weeks. [Cava Decl., ¶19.]  After several weeks of intensive and constant focus on Ryan's condition,

16  Mr. Cava was looking forward to returning to work.  [Cava Decl., ¶15.]

17         Unexpectedly and quite surprisingly, upon his return to work in January 2005, Mr. Cava was

18  informed by Peter Wainwright that he was being placed on a performance improvement plan (PIP).

19  This was a absolute shock to Mr. Cava, as well as others at Netversant. [Cava Decl., ¶ 17.][Landis

20  Depo., 79:6-9.]  There was nothing about his performance during those first five months that would

21  justify this treatment or his placement on a PIP. [Cava Decl., ¶ 14, Ex. A-D.]  As discussed more fully

22  below, Mr. Cava's performance was, at a minimum, on par with reasonable expectations on his

23  quota performance. [Id.] In other words, he performed no worse than other account executive in

24  similar situations.  According to Mr. Wainwright, however, Mr. Cava suddenly was not meeting

25  expectations because Mr. Cava did not bring in "new" business.

26         Despite this unnerving, unwarranted set-back, Mr. Cava was committed to succeeding at

27  Netversant.  Mr. Cava quickly returned to working on his accounts.  He also learned that a deal

28  which he quoted and performed nearly all the work on had closed while he was caring for his son.

1   [Cava Decl., ¶16, Ex. E.]  Typically, when such an issue arises, the account executive who did most

2   of the work gets the credit and will share with the person who helped. [Id.] [Landis Depo., 75:21-

3   76:22.]  Mr. Wainwright, however, unilaterally and without consulting with Mr. Cava and the other

4   account executive, gave the entire credit to the other account executive. [Cava Decl., ¶¶16-17, Ex.

5   E.]  Such actions served to make Mr. Cava's hard sales numbers and quota achievement appear

6   lower than reality and not accurately reflect his work product before his son's illness[2].

7           Shortly after Mr. Cava returned to work, he lapsed into an acute mental impairment

8   prompting his physician to place him on disability. [Cava Decl., ¶ 20.]  With Netversant's consent,

9   because it admits is was required to in light of his physicians's order, Mr. Cava went on disability

10  leave. [Cotter Depo., 30:12-31:10.]  Although Netversant offered Mr. Cava to apply for disability

11  benefits through its disability insurance carrier, Mr. Cava, instead, sought on unpaid leave and

12  obtained benefits through the State Disability Insurance program. [Cava Dec., ¶ 20.][Cotter Decl., ¶

13  31:20-35:6, Ex. 9 & 10.]

14          Naturally, an extended leave would require that certain arrangements be made with respect

15  to Mr. Cava's active accounts.  By agreement with Mr. Wainwright and other account executives,

16  Mr. Cava permanently forfeited most of his accounts to other account representatives.  [Cava Decl.,

17  ¶20.] [ Cava Depo., Ex. 17]  Under the arrangement, however, Mr. Cava was promised that he

18  would resume his management over two accounts upon his return, including the Maximus account.

19  [Id.] During the course of his disability leave, Mr. Cava continued to support the accounts taken over

20  by other account representatives, assisting them in every way possible when he could. [Cava Decl., ¶

21  20.]

22          Although still suffering from his disability, Mr. Cava was released by his physician to return to

23  work on August 1, 2005 and he was looking forward to continuing his career at Netversant. [Cava

24  Depo. Ex. 16.] Mr. Cava was ready to get back to work, but know that the transition back would be

25

26

---

27      [2]  There were many potential sales which Mr. Cava had quoted and worked before his son's illness.

28  Many of these leads were dropped by Peter Wainwright and others while Mr. Cava was out, further diminishing
    the hard numbers on his sales. [Cava Decl., ¶ 18.]

1    a little difficult[3].  Immediately upon his return, however, Mr. Cava was advised by Mr. Wainwright

2    that he would not be allowed to take back the accounts which were promised to him before his

3    disability leave commenced and again placed Mr. Cava on a performance improvement plan.

4    [Cava Depo, Ex. 17.] This time, Mr. Wainwright placed additional pressure on Mr. Cava, expecting

5    immediate results, with no assigned accounts, and to have an full funnel within his first 30 days. [Id.]

6          Mr. Cava objected that his accounts were being taken away against the agreements made

7    before his leave. [Cava Depo., p.100:9-101:6.]  He tried to resolve this issue with Mr. Wainwright,

8    to no avail.  The account executive that Mr. Wainwright assigned the Maximus account was willing

9    to permanently split the account – a typical arrangement made between account executives and

10   routinely approved. [Cava Depo., 146:2-148:10.]  Mr. Wainwright, however, refused to allow this

11   and instead explained to Mr. Cava that he would have to start "fresh" without any accounts.  Mr.

12   Wainwright even refused to allow Mr. Cava an accommodation routinely provided to account

13   representatives to split accounts.  Despite this setback, Mr. Cava was committed to succeeding at

14   Netversant.  Unfortunately, the return to work and the additional stresses imposed by Mr.

15   Wainwright's actions took a toll on his condition.  [Cava Depo., p. 157:9-19, 161:16-24.]

16         On August 3, 2005, Mr. Cava's physician determined that it was too early for him to have

17   returned to work. [Cava Depo, Ex. 19.] He was again placed on disability with a work restriction, the

18   anticipation that he would return to work after a short leave. [Id.]  Mr. Cava provided to Netversant

19   the necessary information from his physician, who expressly invited Netversant to contact him if they

20   had any questions. [Id.]  Netversant's human resource director, in response to the notification,

21   declined to obtain additional information from Mr. Cava or his doctor concerning the details of the

22   requested leave and informed Mr. Cava that they would not allow him to go back on disability leave

23   and that if he did, they would terminate him. [Cotter Depo., 44:5-48:4, 49:12-23.]

24         Mr. Cava immediately tried to discuss the matter with his superiors. They did not want to

25

26          [3] Netversant was fully aware of his condition and that his full return would take a little time.
     In fact, Netversant's human resource director reminded Peter Wainwright about the ordeal Mr. Cava
27   had gone through and to be sensitive in dealing with his return. [Cotter Depo., Ex. 16.] Mr. Cava
     returned on August 1, 2005, in part, because he was previously informed her would be terminated if
28   he did not. [Cava Depo., p. 95:2-7, 130:4-14.]

PLAINTIFF'S OPPOSITION TO NETVERSANT'S MOTION FOR SUMMARY JUDGMENT / SUMMARY ADJUDICATION

1  discuss the matter and told him that he could either resign or be terminated. [Cava Depo., 162:11-

2  165:18.]  Mr. Cava pleaded that he needed the job and would do anything and work with them to

3  find an accommodation which would allow him to keep his job. His pleas fell on deaf ears and he

4  was told that the only option was for him not to go on disability leave. [Cava Depo., 183:5-184:5.]

5          On August 5, 2005, Mr. Cava received a letter from Netversant stating that he was being

6  terminated because he was "unable to perform [his] duties as an Account Executive". [Cotter Depo.,

7  Ex. 23. ]  According to the human resources director and the President of the Division, who made

8  the decision to terminated him, the reason was because of his disability. [Cotter Depo., p. 46:4-

9  48:3, 49:12-23; 50:19-52:18]  Scott Landis confirmed the termination was not performance based.

10  [Landis Depo, p. 121:11-16.]

11                          **III.  LEGAL ARGUMENT**

12          Netversant's motion does not address Mr. Cava's harassment and infliction of emotional

13  distress claims.  (These are addressed in a separate motion for summary judgment filed on behalf of

14  defendants Netversant-National, Inc. and Peter Wainwright.)  The instant motion also omits two

15  separate and distinct causes of action falling within the claims for disability discrimination and

16  wrongful termination against public policy.  Specifically, the motion does not address Mr. Cava's

17  disability discrimination claim for failure to engage in the "interactive process" and his wrongful

18  termination claim based on Netversant's decision to terminate him to reduce their losses related to

19  his son's medical care.  Accordingly, Netversant's motion for summary judgment <u>must</u> be denied as

20  it does not address each cause of action alleged by Mr. Cava. C.C.P. §437c (a) and (f).

21  **A.      Disability Discrimination Claim**

22          Mr. Cava asserts several claims under the umbrella of the disability discrimination cause of

23  action.  Specifically, Mr. Cava alleges that: (1) accounts were taken away from him upon his return

24  from disability leave because he was disabled, (2) he was terminated because of his disability, (3)

25  Netversant failed to provide a reasonable accommodation for his disability, and (4) Netversant

26  refused to engage in the required interactive process to find a suitable accommodation.  (As noted

27  above, the failure to engage in the interactive process is not at issue in this motion.)

28          Netversant nevertheless avers that Mr. Cava cannot establish a case for discrimination

1   because he was "totally disabled", as a consequence of his extended disability leave, and therefore

2   not "qualified" under the disability statutes.  Netversant also claims that, in any event, it fulfilled its

3   obligations by not terminating him upon his initial request for disability leave.  As discussed below,

4   Netversant's motion with respect to the discrimination claims must fail because of the existence of

5   disputed material facts and because of Netversant's misapplication of the law.

6       **1.      Plaintiff Has Established a Prima Facie Case for Disability**
           **Discrimination**

7

8       A plaintiff can establish a prima facie case of disability discrimination by showing that: (1)

9   plaintiff suffers from a disability, (2) plaintiff is a qualified individual in that he could perform his job

10  duties with or without a reasonable accommodation, and (3) plaintiff was subjected to an adverse

11  employment action because of his disability.  Jensen v. Wells Fargo Bank (2000) 85 Cal.App.4th

12  245, 224-25.  Morever, a plaintiff need not prove a casual connection between the disability and

13  the adverse employment action by direct evidence[4].  Id.  (Although Mr. Cava has direct evidence of

14  the causal connection, he need not establish it, as contended by Netversant, to avoid summary

15  judgment.)

16      Mr. Cava has established a prima facie case of discrimination.  First, he was determined by

17  his physician to be disabled.  This is a fact Netversant was aware of and acknowledged.  Netversant

18  has presented no evidence in support of its motion which suggests that Mr. Cava was not disabled.

19  Second, Mr. Cava was subjected to adverse employment actions because of his disability - having

20  accounts taken away from him and termination.  In addition to the documentary evidence,

21  Netversant's Human Resources Manager and President of the Voice Division both admitted at

22  deposition that Mr. Cava was terminated because of his disability.  As discussed below, Netversant's

23  after-the-fact assertion that he was terminated for poor performance is pretext for its stated and

24  admitted reason.

25

26  _____

27      [4]   Defendant's motion purposefully misstates the to the extent it claims that a plaintiff must
    show "that intentional discrimination was the determinative factor in the adverse employment action".

28  [Netversant MPA, 7:18-19.]  Not one of the cases Netversant confusingly cites to actually supports
    this proposition.

1    The only element of the prima facie case argued by Netversant in its motion is whether Mr.

2    Cava is a "qualified individual" within the meaning of FEHA.  Defendant's motion simply states that

3    because he was disabled and required disability leave, Mr. Cava was not a qualified individual.

4    This rather unimpressive argument is based on two cases cited which concern entirely distinct issues

5    and are not applicable here.  Reliance on Le Bourgeois v. Fireplace Mfrs., Inc. (1998) 68 Cal.App.

6    4th 1049, is unfounded as the court in that case expressly stated it was not considering whether the

7    plaintiff established its prima facie case.  Id. at 1058 (Fn. 11).  Moreover, there is absolutely no

8    discussion or analysis of the issue of "qualified individual" in the opinion.  Similarly, reliance on

9    Byrne v. Avon Products (7th Cir. 2003) 328 F.3d 379, is also misplaced as the court's decision was

10    based on other factors, including misconduct and the employers' motivation, while also admitting

11    that a leave can be an accommodation.

12    Simply stated, there is no support for the claim that requiring leave to treat or recover from

13    the disability automatically renders the employee an "unqualified" individual.   This is necessarily

14    admitted in Netverasant's motion as it cites to a California case which addresses this issue.

15    Netversant is cognizant of the fact that under both FEHA and the ADA, providing an **extended**

16    **unpaid leave for recovery is itself a form of reasonable accommodation _and_ the fact that an**

17    **employee is disabled and requires leave does not make the employee "unqualified"**.  Humphrey v.

18    Memorial Hospitals Assoc. (9th Cir. 2001) 239 F.3d 1128, 1135-36 ("where a leave of absence

19    would reasonably accommodate an employee's disability and permit him, upon his return, to

20    perform the essential functions of the job, that employee is otherwise qualified under the ADA");

21    Nunes v. Wal-Mart Stores, Inc. (9th Cir. 1999) 164 F.3d 1243 (employee with stress related

22    disability on extended leave for 8 months not unqualified);  Norris v. Allied Sysco Food Service, Inc.

23    (N.D. Cal. 1996) 948 F. Supp 1418 (disabled employee's one-year leave, which included multiple

24    extensions of leaves, was not "unqualified").

25    Indeed, the case Netversant relies upon in its motion, Hanson v. Lucky Stores, Inc. (1999) 74

26    Cal.App.4th 215, affirms the proposition that an extended leave is a form of reasonable

27    accommodation under FEHA.  Tthe Hanson decision does not address whether the plaintiff had

28    stated a prima facie case of employment discrimination.  Rather, the court in Hanson decided, in the

1  unpublished portion of the opinion, that the employer carried its burden by demonstrating that it had

2  a legitimate, non-discriminatory reason for terminating the plaintiff. Id. at 221. In the published

3  portion of the opinion, the court also found that the employer offered two reasonable

4  accommodations which the employee refused. Id.

5      In addition to the lack of evidence to support summary adjudication of this issue, the cases

6  Netversant cites for the proposition that Mr. Cava has not met his initial burden are inapplicable.

7  Accordingly, Mr. Cava was a "qualified individual" and has established a prima facie case for

8  disability discrimination. The burden now falls upon on Netversant to establish that it had a

9  legitimate basis for the adverse employment action.

10   **2.    Netversant's After-the-Fact Proffered Reason for Termination Can only be Defined as Pretext**
11

12     The facts relating to Mr. Cava's termination are clear - he was terminated because he was

13  disabled and required an accommodation. At the time of his termination, there was absolutely no

14  discussion that his past performance as an Account Executive was a basis for his termination. The

15  termination letter make no reference to the quality of his work, past performance problems or

16  reference any past disciplinary action. As noted above, both Netversant's Human Resources

17  Director and President of the Telephony Division confirmed at deposition that the reason Mr. Cava

18  was terminated was because of his extended disability leave and denied that performance had

19  anything to do with the decision.

20     Netversant's after-the-fact attempt to create a legitimate basis for his termination is dubious

21  as the facts show Mr. Cava's performance was not substandard. This stated reason is clearly pretext

22  for its other motives. The timing alone of the decision to terminate him demonstrates pretext[5]. In

23  light of the fact that Mr. Cava was terminated within 24 hours of his request for an extended leave, it

24  is disingenuous for Netversat to claim he was terminated for cause.

25

26   _____

   [5] While an employee must produce evidence that the proffered justifications for termination are pretext,
27  it can be inferred from the **timing** of the discharge and/or by the performance before the termination. Hanson,
   supra, at 224, citing Flait v. North American Watch Corp. (1992) 3 Cal.App.4th 467 (pretext can be inferred
28  from the timing of the company's termination decision ); Colarossi v. Coty US, Inc. (2002) 97 Cal.App.4th
   1142, 1152 (either direct or circumstantial evidence can be used prove causation).

1    Furthermore, "pretext may be demonstrated by showing that the proffered reason has no

2    basis in fact, did not actually motivate the discharge or the reason was insufficient to motivate

3    discharge". Hanson at 224.   Here, there is sufficient evidence for a trier of fact to conclude that the

4    timing of Mr. Cava's termination, the reasons initially provided to him for termination and his actual

5    performance show pretext.

6    As noted above, the Account Executive Compensation Plan is a benchmark of the expected

7    performance.  According to Netversant's own statistics and documents relating to Quota

8    Achievement, Mr. Cava had accrued $413,243 of his $341,250 quota (or 121% of quota) by

9    November 2004, with two months left in the term.  Even taking into account the "gift" Netversant

10.  claims it provided to Mr. Cava, he met over 30% of quota, with 2 months left in the sales term[6].

11    In any event, the important analysis here is not whether Mr. Cava met the quota as reflected

12    in the hard numbers and Compensation Agreement, rather it is his performance judged against

13    other Account Executives in similar positions.  Mr. Cava was only five months into his employment at

14    Netversant. As other account executives will testify, it takes several months to ramp-up getting

15    business booked and closing contracts.  Netversant is well aware of this and did not impose a strict

16    adherence to Compensation Plan by its account executive.  Moreover, Mr. Cava's funnel was more

17    than adequate and business which he quoted and worked-up ultimately closed, but Mr. Wainwright

18    refused to give any credit to Mr. Cava.

19    Any attempt by Netversant to claim Mr. Cava was terminated because he only met 30% of

20    quota in his first five months will fail.  There is substantial evidence that account executives who were

21    at Netversant for much longer than Mr. Cava, including those who had been there multiple years,

22    were neither terminated nor placed on a PIP where they only met 30% of quota for a year.  This is

23    true whether the account executive was new or had been there many years.  Netversant's attempt to

24    hold Mr. Cava to a higher standard than other Account Executives is not acceptable and indicative

25

26    [6] At the time Ryan was diagnosed with cancer, Mr. Cava had over $4 million in his "funnel" (the amount of business quoted which has not closed as a contract for the company). [Cava Decl., ¶ 9.] While Mr.

27    Cava was out on leave, as note above, business which he quoted closed.  Peter Wainwright, however, bucking the standard practice for account executives at Netversant, refused to assign any credit to Mr. Cava even though

28    he did most of the work.  Had Mr. Cava's son not been diagnosed with cancer, he would have likely met the hard quota numbers without counting the supposed "gift".

PLAINTIFF'S OPPOSITION TO NETVERSANT'S MOTION FOR SUMMARY JUDGMENT / SUMMARY ADJUDICATION

1  of its motives.

2    **3.    Plaintiff Has Established a Prima Facie Case for Failure to**
       **Accommodate and Netversant Has Failed to Provide Sufficient**
3      **Facts to Show an Undue Burden**

4       Pursuant to Cal. Govt. Code § 12940 (m), it is unlawful for an employer to fail to make a

5  reasonable accommodation for an employee's disability, unless it can affirmatively establish that

6  providing an accommodation is an undue burden on the employer. County of Fresno v. Fair

7  Employment & Housing Com. (1991) 226 Cal.App.3d 1541, 1553 (burden on employer to show

8  an undue hardship); see also Bagatti v. Department of Rehabilitation (2002) 97 Cal.App.4th 344,

9  360-361 (a claim for failure to accommodate is a separate and distinct cause of action which does

10  not require a plaintiff to establish she is a "qualified individual"). As discussed in detail above, an

11  unpaid leave can be a reasonable accommodation. The appropriate analysis here, accordingly, is

12  whether an extended leave for Mr. Cava was unreasonable because it created an undue hardship

13  on Netversant.

14       **(A)    The Hanson Case**

15       Netversant relies on Hanson v. Lucky Stores, Inc. (1999) 74 Cal.App.4th 215, for the

16  proposition that it was not required to wait "indefinitely" for Mr. Cava's condition to be corrected.

17  Its reliance on Hanson is misplaced, as the case itself demonstrates that an extended unpaid leave

18  can be a reasonable accommodation and that full consideration of various factors must be made

19  before an employer can determine that it cannot provide further accommodation. More importantly,

20  the plaintiff in Hanson refused reasonable accommodations.

21       In Hanson, the plaintiff was journeyman meat-cutter for Lucky Stores and injured his hand

22  while on the job. After an initial leave of 3 weeks to recover, the plaintiff returned to work for a

23  period of time but continued to feel pain. He took an another leave of absence to undergo therapy.

24  After seven months of leave, he underwent surgery to fuse his hand and was not released by his

25  doctor to work for another 6 months. When he returned, after 13 months of leave, his doctor's

26  release contained a limitation where he could not engage in heavy lifting. As the duties of a meat-

27  cutter require heavy lifting, he could not immediately return to his position and continued his leave

28  of absence.

PLAINTIFF'S OPPOSITION TO NETVERSANT'S MOTION FOR SUMMARY JUDGMENT / SUMMARY ADJUDICATION

1    Approximately 15 months into his leave, his doctor again released him to work, but with the

2    same limitations. The plaintiff also began vocational rehabilitation and began considering

3    employment elsewhere. In the 16th month of his leave, Lucky consulted with the vocational

4    rehabilitation provider about his limitations and attempted to determine what work he could

5    perform. Lucky learned that the plaintiff's disability and limitation was, at that point, considered

6    permanent. After this inquiry, Lucky offered the plaintiff another position, as a meat clerk, which he

7    refused. After not reporting to work as a meat clerk, he was terminated.

8    The facts and issues raised in Hanson are clearly distinguishable from the instant case. As a

9    preliminary matter, Mr. Cava was on disability leave for only 6 months – not 9 months as argued by

10   Netversant. The plaintiff in Hanson was on disability leave for 16 months and refused an actual

11   accommodation proposed by Lucky after it evaluated his condition. The most significant issue in

12   Hanson, which clearly distinguishes it from the instant facts, is that there was no indication that the

13   employee's condition would change. Fifteen months into his leave, there was medical evidence

14   suggesting that he could not return to his former position.

15   There is no such evidence presented by Netversant here. There is no question that Mr. Cava

16   would have returned to work with no restriction. And his performance as an Account Executive after

17   his work restriction was lifted demonstrates that he would have been successful at Netversant.

18   Unlike Hanson, Netversant never attempted to determine the duration of Mr. Cava leave or if other

19   arrangements could be made. Netversant even refused an invitation from Mr. Cava's physician to

20   discuss his case.

21          **(B)    Netversant Has Not Carried its Burden to Establish Undue Hardship**

22   In support of its motion, Netversant **proffers only one reason** as to why it would be an undue

23   hardship to accommodate Mr. Cava's request for leave. Specifically, Netversant claims that during

24   his initial leave, other Account Executives were able to "fill-in" for Mr. Cava, but "requiring them to

25   do so on an extended basis created a hardship for the company." [Netversant MPA, 9:5-8.] This

26   claim is without merit or factual basis since at the time of his discharge, the entirety of Mr. Cava's

27   accounts had been taken away from him and assigned to other sales representatives.

28   The reality is that Nevtersant cannot establish an undue burden or that the requested leave

1   was unreasonable. Mr. Cava was unpaid for the time he was on disability leave and, therefore,

2   there was little to no cost to Netversant to keep him employed. Netversant is a large company with

3   extensive resources and was capable of accommodating Mr. Cava's need for an extended leave.

4   Netversant does not claim that it had any difficulty in managing Mr. Cava's accounts while he was

5   on leave. Indeed, at the time he was terminated, all his accounts had been reassigned.

6   Furthermore, there was no vacancy which Netversant was holding because of his leave. As admitted

7   to by Netversant, it did not hire anyone to replace Mr. Cava and it had hired several new account

8   executives at the time Mr. Cava returned in August 2005. Finally, Mr. Cava was paying for his

9   family's medical insurance out of his own pocket. [Cotter Depo., Ex. 12.]

10  **4.    Plaintiff Has Established a Prima Facie Case for Failure to Engage in**
    **Interactive Process**

11

12  As noted above, Netversant's motion fails to specifically address Mr. Cava's separate and

13  distinct cause of action for failure to engage in the interactive process. As such, it is not entitled to

14  summary adjudication on the issue. However, since Netversant makes a fleeting reference to its

15  position that it had no duty to engage in the interactive process, Plaintiff addresses this issue.

16  [Netversant MPA, 11:7-10.]   Similar to the claim for failure to accommodate, a separate and

17  independently actionable unlawful practice under FEHA lies for Netversant's failure to engage in an

18  interactive process with Mr. Cava to determine effective reasonable accommodations. Cal. Govt.

19  Code § 12940(n); Bagatti v. Department of Rehabilitation (2002) 97 Cal.App.4th 344, 357.

20  When Mr. Cava was advised that he was being terminated due his extended disability leave,

21  Mr. Cava attempted to engage Netversant in such an interactive process. Mr. Cava pleaded with

22  Netversant managers that he desperately wanted to keep his job and wanted to find a way to make

23  it work. As testified to by Netversant's human resource manager, they did not feel that they needed

24  to work with Mr. Cava and could immediately terminate him because they had no obligation to do

25  so. As such, Netversant sent Mr. Cava a termination letter explaining that he was being let go

26  because of his "inability to perform [his] duties as an Account Executive".

27  The fact that Netversant refused to even discuss options with Mr. Cava is indicative of its

28  intentions. There were available options for accommodation which Netversant could have explored.

1    In addition to continuing with the leave, other accommodations could have included the ability to

2    work from home, a lower quota achievement requirement with a corresponding reduction in salary,

3    part-time employment or transfer to a different position that could have allowed Mr. Cava to work

4    notwithstanding his disability.  In fact, Netversant's Human Resource Director, at the time of Mr.

5    Cava's initial leave, filled out a form for its disability insurance carrier that noted that a potential

6    accommodation for him Mr. Cava would be to allow him to work from home.  Unfortunately,

7    Netversant later determined it was better to simply terminate Mr. Cava without trying to

8    accommodate his disability.

9    **B.    Wrongful Termination**

10        Mr. Cava's wrongful termination claim is based on two violations of public policy. The first

11    basis is that he was terminated because of his disability.  For the same reasons stated above, it is

12    clear that Mr. Cava was unlawfully terminated because of his disability.  Netversant provides no facts

13    to suggest that an extended leave for Mr. Cava was an undue burden and its claimed legitimate,

14    nondiscriminatory reason is pretext.

15        The other violation of public policy on which Mr. Cava's wrongful termination claims are

16    based is that Netversant terminated him because it desired to cut-off his medical benefits.  As

17    Netversant's motion does not address this issue, summary adjudication of this claim is not available.

18    **C.    Plaintiff Has Established a Prima Facie Case of Unlawful Retaliation**

19        Mr. Cava's retaliation claims are based on the facts that his accounts were taken away from

20    him because he was out on disability leave _and_ Netversant terminated him because he required

21    additional leave.   Netversant correctly notes that in order to establish a prima facie case of

22    retaliation under FEHA, a plaintiff must show (1) he or she engaged in a protected activity, (2) the

23    employer subjected the employee to an adverse employment action, and (3) a causal link existed

24    between the protected activity and the employer's action.  Yanowitz v. L'Oreal USA, Inc. (2005) 36

25    Cal.4th 1028, 1042.  Thereafter, an employer is required to show a legitimate, non-retaliatory

26    reason for the adverse employment actions. Id.

27        Netversant avers that Mr. Cava was not engaged in a protected activity when it terminated

28    him and offers a single opinion for the proposition.  The decision in Walker v. Elmore County Board

1    of Education (11th Cir. 2004) 379 F.3d 1249, is of no relevance to this matter as it concerns a

2    request for pregnancy leave where no leave was available and does not address a request for leave

3    based on a disability covered by discrimination laws.  Unlike the facts in Walker, Mr. Cava was a

4    "qualified individual" with a disability and protected under FEHA.  Accordingly, he was engaged in

5    protected activities, taking leave and requesting additional leave, when he suffered the adverse

6    employment actions.

7         Contrary to Netversant's assertions, the causal connection between Mr. Cava's leave and his

8    termination **can be inferred by timing alone**.  The case cited in its motion does not, as claimed,

9    make clear that timing alone is not enough.  In Chen v. County of Orange (2002) 96 Cal.App.4th

10   926, the court held only that timing was insufficient under the facts of the case because the plaintiff

11   had failed to prove that the employer's legitimate reasons were pretext[7].  Causation can be inferred

12   from timing alone where the two actions are separated by less than three months.  See Villiarimo v.

13   Aloha Island Air, Inc. 281 F.3d 1054, 1065 (9th Cir. 2001) ("causation can be inferred from timing

14   alone where an adverse employment action follows on the heels of protected activity"); Passantino v.

15   Johnson Consumer Prods., Inc. 212 F.3d 493 (9th Cir. 2000) (causation can be inferred by timing

16   alone).

17        The timing of Netversant's actions against Mr. Cava clearly creates an inference of causal

18   connection.  Mr. Cava's accounts were taken away from him immediately upon return from his leave

19   and he was thereafter terminated within 24 hours of his request, based on his physician's order, to

20   go on disability leave again.  Moreover, direct evidence of the causal connection exists — the

21   reason provided by Netversant to Mr. Cava for his termination was his request for extended disability

22   leave.

23        Netversant's assertion of having a legitimate non-discriminatory reason for terminating Mr.

24   Cava, as explored in detail above, is pretext.  There was no performance-based reason to terminate

25   him and the timing of the adverse actions and termination are highly indicative of pretext. Flait v.

26

27        [7] Netversant's position that the Chen opinion precludes finding a causal connection based on timing
     alone was soundly rejected in California Fair Employment & Housing Comm v. Gemini Aluminum Corporation
28   (2004) 122 Cal.App.4th 1004, 1020.

1   North Am. Watch Corp. (1992) 3 Cal.App.4th 467, 479 (pretext can be inferred from the timing of

2   the company's termination decision ); Colarossi v. Coty US, Inc. (2002) 97 Cal.App.4th 1142,

3   1152 (either direct or circumstantial evidence can be used prove causation).

4   **D.      Breach of Contract and Breach of Covenant of Good Faith & Fair Dealing**

5           Netversant's attempt to confuse Mr. Cava's express contract claims with "at will"

6   employment issues and notions of "implied contracts" is improper.  There are no allegations of any

7   implied contracts.  Mr. Cava was promised all of Jennifer Forest's Sacramento area accounts,

8   except for Octel.  This was an express promise.  Mr. Cava was promised that certain accounts would

9   be returned to him after his leave.  Each of the cases cited by defendant are inapplicable to this

10  issue.  In Guz v. Bechtel National, Inc. (2000) 24 Cal.4th 317, the court only decided the issue if

11  there was an "implied" provision to terminate for cause only and did not address separate contract

12  issues.  Moreover, the Guz opinion holds that an employer's express statements in handbooks and

13  other materials are not necessarily controlling and an evaluation of the totality of the circumstances

14  is necessary.  Id. at 339.

15          The agreements referred to by Netversant in support of this argument do not preclude oral

16  contracts, rather they preclude only **implied** contracts.  Accordingly, the oral promises, not

17  contradicted by a written contract provision, are enforceable.  Also, the assertion that assigned

18  accounts had to be in writing only is inapplicable as Netversant did not follow its own rule, as

19  established by the fact that it actually assigned accounts without written notice.  Finaly, Netversant did

20  in fact notify Mr. Cava of accounts in writing, by way of emails and commission statements.

21          Contrary to Netversant's argument, the agreements are not too vague to be enforceable.

22  There is nothing vague about "all Sacramento area accounts except for Octel."  Similarly, there is

23  nothing vague about the agreement to return two of Mr. Cava's accounts after his return from leave.

24  These agreements were supported by adequate consideration since Mr. Cava left his prior

25  employment based on the representations.

26          Finally, because the breach of contact claims are supported by the evidence, Plaintiff's claim

27  for breach of the covenant of good faith and fair dealing must also survive.  Netversant's reliance on

28  Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654 is misplaced since plaintiff is not claiming

1    termination as the basis for the claim and therefore, the at-will provision does not come into play.

2    Rather, Plaintiff's contract claims are for certain benefits promised while plaintiff is an employee,

3    namely the assignment of accounts. This issue is outside the concern of at-will employment.

4    **E.      Intentional and Negligent Misrepresentation**

5          Defendant avers that Mr. Cava's claims for intentional and negligent misrepresentation must

6    fail because plaintiff (1) has not identified specific misrepresentations, (2) had no evidence of

7    intentional falsity, (3) he cannot establish reasonable reliance, and (4) he remained employed

8    despite the falsity of the representation.  In addition to misrepresenting the case law on the issue,

9    defendant fails to establish the necessary facts on all three points.

10         Mr. Cava has identified specific misrepresentations.  Specifically, Mr. Wainwright promised

11   Mr. Cava that he would inherit most of Jennifer Forrest's accounts, including all in the Sacramento

12   area except for the Octel account.  In the context of Mr. Cava's interview for the position, the

13   representation was specific enough.   Mr. Cava has testified that he discussed with Mr. Wainwright

14   the fact that he would be leaving a large recurring base of business at former employment and that,

15   before he joined Netversant, he needed to be assured he would receive a substantial number of

16   accounts.  Mr. Wainwright assured him he would receive most of Ms. Forrest's accounts, including

17   all of the one in the Sacramento area.   At the very least, he was promised all of her accounts in the

18   Sacramento area.  This promise was never kept.

19         Like the misrepresentation made to Mr. Cava at the interview, Netversant's motion

20   intentionally misrepresents the case it cites for the proposition that a plaintiff must prove by, in order

21   to survive summary judgment, the *intention* of the defendant.  In Church of the Merciful Saviour v.

22   Volunteers of America (1960) 184 Cal.App.2d 851, the Plaintiff appealed a **verdict reached after**

23   **trial** on the grounds that there were insufficient facts to support the verdict that there was not

24   misrepresentation.  In fact, the evidence the plaintiff presented at trial in that case was almost exactly

25   the evidence presented here by Mr. Cava.  The opinion, in affirming the trial court's **finding of fact**,

26   held that "any inference based on evidence of nonperformance which is adverse to the findings

27   merely created a conflict with other evidence which supports the findings.   Under these

28   circumstances, the determination of the trial court is final." Id. at 860.

1    Netversant's contention that Mr. Cava did not reasonably rely on the misrepresentation is

2    entirely without merit as Mr. Cava agreed to take a position with defendant at the cost of leaving his

3    lucrative base of customers at his prior employer.  This is textbook detrimental reliance. The cases

4    cited by Neversant are inapplicable to the current case as they deal directly with breach of contract

5    claims.  And the one case addressing claims for fraud does not stand for the principal for which it is

6    proffered and distinguishable from the instant case. In <u>Slivinsky v. Watkins-Johnson</u> (1990) 221

7    Cal.App.3d 799, the court primarily addressed the dispute between an alleged contract for an

8    "indefinite" term and signed at-will provisions in relation to a mass lay-off.   The court, as to the

9    claim for fraud, found that the at-will provision negated the fraud claim because, having repeatedly

10    signed documents that her employment was at-will, she could not have detrimentally relied on the

11    representation.  More importantly, as to her fraud claim for failing to assign her to a certain project,

12    the facts established that she was in-fact assigned to the project until it was cancelled (prompting the

13    lay-off). <u>Id</u>. at 807.

14    Netversant again misrepresents the law which it cites for the proposition that Mr. Cava's

15    fraud claim must fail because he remained employed after not receiving the accounts promises.

16    This position fails on logic alone.  Was Mr. Cava required to immediately quit and bring a breach of

17    contract claim against his new employer, particularly after having left his sole source of income?

18    This position is untenable.  In <u>Rochlis v. Walt Disney Co.</u>, at the time the employee knew of certain

19    falsities on which he sued, he had stayed for ***9 months beyond the <u>expiration</u>*** of his contractual

20    commitment to the defendant and was negotiating a separate contract, on which he was suing, with

21    another of the defendant's entities. 19 Cal.App4th 201,at 215 (emphasis added).  This case has no

22    application in to the instant case.

23    Defendant's contention that Mr. Cava cannot state a cause of action for **negligent**

24    **misrepresentation** on the grounds that the alleged misrepresentation was an "opinion" as to a

25    "proposal that about something that might happen in the future" is unsupported by the facts and the

26    law.   Although the case law relied upon by Netversant correctly note that matters of opinion are not

27    actionable claims for misrepresentation, the application of the opinions are out of context and

28    inapplicable.  <u>Neu-Visions Sports, Inc. v. Soren/McAdams/Bartells</u> (2000) 86 Cal.App.4th 303

1   (plaintiff's claim for negligent misrepresentation could not be stated based on an accountant's

2   opinion as to the value of property); <u>Tarman v. State Farm Mut. Auto Ins. Co.</u> (1991) 2 Cal.App.4th

3   153 (the court refused to uphold a fraud claim because the plaintiff failed to allege the person who

4   made the promise and found that facts stated a "negligent" promise because the representation

5   contained a future promise to pay the claim "immediately").

6                                        **IV. CONCLUSION**

7        For the reasons above, summary judgment and/or summary adjudication must be denied.

8

9   Dated:  May 9, 2007                          FOTOUHI • EPPS • HILLGER • GILROY LLP

10

11                                        By:

12                                              Daniel P. Iannitelli
                                                Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO NETVERSANT'S MOTION FOR SUMMARY JUDGMENT / SUMMARY ADJUDICATION

1  **Shahab E. Fotouhi - 168301**
   **Daniel P. Iannitelli - 203388**
2  FOTOUHI • EPPS • HILLGER • GILROY LLP
   160 Pine Street, Suite 710
3  San Francisco, CA 94111
   Tel: 415.362.9300
4  Fax: 415.358.5521

5  Attorneys for Plaintiffs
   MICHAEL CAVA
6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

10 | MICHAEL CAVA,                        )   Case No.  CGC-06-453469
   |                                      )
11 |          Plaintiff,                  )   **PLAINTIFF'S SEPARATE STATEMENT OF**
   |                                      )   **UNDISPUTED MATERIAL FACTS IN**
12 | vs.                                  )   **SUPPORT OF OPPOSITIONS TO**
   |                                      )   **DEFENDANTS WAINWRIGHT AND**
13 | NETVERSANT - NATIONAL, INC., a Delaware )  **NETVERSANT'S MOTION FOR SUMMARY**
   | corporation, dba NETVERSANT - SAN    )   **JUDGMENT OR, IN THE ALTERNATIVE,**
14 | FRANCISCO, aka NETVERSANT; PETER     )   **SUMMARY ADJUDICATION**
   | WAINWRIGHT, an individual; and DOES 1 )
15 | through 40, inclusive,               )
   |                                      )   Date:  May 23, 2007
16 |          Defendants.                 )   Time:  9:30 a.m.
   | _____ )   Dept:  31
17 |                                          Judge: Hon. Peter Busch

18

19        Pursuant to California Code of Civil Procedure § 437c and California Rule of Court 3.1350,

20 Plaintiff MICHAEL CAVA submits this separate statement of undisputed and disputed material facts,

21 together with references to supporting evidence in support of Plaintiff's Opposition to Defendants

22 Peter Wainwright and Netversant-National, Inc.'s, Motion for Summary Judgment or, in the

23 Alternative, Summary Adjudication.

24 //

25 //

26 //

27 //

28 //
   //

---

1

**PLAINTIFF'S THIRD CAUSE OF ACTION
HARASSMENT**

ISSUE 1:    Plaintiff's claim for disability harassment is subject to summary adjudication because the conduct alleged is neither severe nor pervasive.

| UNDISPUTED MATERIAL FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 1. Plaintiff claims that he was harassed by Defendant Peter Wainwright, and only Mr. Wainwright.<br><br>Complaint ("Comp."), ¶¶ 36-37; Cava Depo., p. 72:18-19; 177:24-178:1. | Undisputed. |
| 2. Plaintiff claims that Mr. Wainwright harassed him when he: (1) refused to reassign Plaintiff accounts following his leave of absence; (2) set unreasonably high sales expectations for Plaintiff; and (3) raised his voice at Plaintiff, called Plaintiff's performance "underwhelming," told Plaintiff that he "couldn't be counted on," and generally talked to Plaintiff in a rude and abusive manner.<br><br>Cava Depo., p. 72:5-17; 73:19-76:6; 99:19-101:6; Exh. 9, ¶¶ 13 and 14. | *Disputed.* The conduct of Peter Wainwright intentionally singled Plaintiff out because of his disability, taking accounts away, placing him on plan, intimidating him and causing his termination because of his disability has caused plaintiff severe emotional distress. Mr. Wainwright intentional harassment of plaintiff on account of his disability is apparent from his referring to plaintiff as "spooky" and going "off the deep end."<br><br>Cava. Decl., ¶25; Cotter Depo., Ex 19. |
| 3. All of the conduct about which Plaintiff complains occurred in the first three days of August 2005.<br><br>Cava Depo., p. 72:5-17; 73:19-76:6; 99:19-101:6; Exh. 9, ¶¶ 13 and 14. | *Disputed.* The misconduct of Peter Wainwright relating to plaintiff's disability began from the moment Mr. Wainwright learned of the disability<br><br>Compl., ¶ 36. |
| 4. Plaintiff admits that Mr. Wainwright never made any comments or jokes about his alleged disabilities or about disabled individuals in general.<br><br>Cava Depo., p. 72:20-25; 73:15-18; 76:16-24. | *Disputed.* Mr. Wainwright intentional harassment of plaintiff on account of his disability is apparent from his referring to plaintiff as "spooky" and going "off the deep end.<br><br>Cava. Decl., ¶25; Cotter Depo., Ex 19. |

ISSUE 2:    Alternatively, Plaintiff's claim for harassment fails because the conduct complained of is commonly necessary personnel management activity.

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 5. Plaintiff claims that he was harassed by Mr. Wainwright, and only Mr. Wainwright.<br><br>Comp., ¶¶ 36-37; Cava Depo., p. 72:18-19; 177:24-178:1. | Undisputed. |
| 6. Plaintiff claims that Mr. Wainwright harassed him when he: (1) refused to reassign Plaintiff accounts following his leave of absence; (2) set unreasonably high sales expectations for Plaintiff; and (3) raised his voice at Plaintiff, called Plaintiff's performance "underwhelming," told Plaintiff that he "couldn't be counted on," and generally talked to Plaintiff in a rude and abusive manner.<br><br>Cava Depo., p. 72:5-17; 73:19-76:6; 99:19-101:6; Exh. 9, ¶¶ 13 and 14. | *Disputed.* Additionally, the conduct of Peter Wainwright intentionally singled Plaintiff out because of his disability, taking accounts away, placing him on plan, intimidating him and causing his termination because of his disability has caused plaintiff severe emotional distress. Mr. Wainwright intentional harassment of plaintiff on account of his disability is apparent from his referring to plaintiff as "spooky" and going "off the deep end."<br><br>Cava. Decl., ¶25; Cotter Depo., Ex 19. |
| 7. All of the conduct about which Plaintiff complains occurred in the first three days of August 2005.<br><br>Cava Depo., p. 72:5-17; 73:19-76:6; 99:19-101:6; Exh. 9, ¶¶ 13 and 14. | *Disputed.* The misconduct of Peter Wainwright relating to plaintiff's disability began from the moment Mr. Wainwright learned of the disability<br><br>Compl., ¶ 36. |
| 8. Plaintiff admits that Mr. Wainwright never made any comments or jokes about his alleged disabilities or about disabled individuals in general.<br><br>Cava Depo., p. 72:20-25; 73:15-18; 76:16-24. | *Disputed.* Mr. Wainwright intentional harassment of plaintiff on account of his disability is apparent from his referring to plaintiff as "spooky" and going "off the deep end.<br><br>Cava. Decl., ¶25; Cotter Depo., Ex 19. |
| 9. Plaintiff admits that the events of August 1-3, 2006 all amounted to work related comments that were a "demeaning of [Plaintiff's] abilities and performance."<br><br>Cava Depo., p. 76:7-19. | *Disputed.* The conduct of Peter Wainwright, and others involved in plaintiff's termination, and Wainwright's demeaning manner in which he singled Plaintiff out because of his disability, taking accounts away, placing him on plan, intimidating him and causing his termination because of his disability has caused plaintiff severe emotional distress. Mr. Wainwright intentional ill will toward plaintiff and his disability is apparent from his referring to plaintiff as "spooky" and going "off the deep end."<br><br>Cava. Decl., ¶25; Cotter Depo., Ex 19. |

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF OPPOSITION TO MSJ

## PLAINTIFF'S NINTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

**ISSUE 3:**  Plaintiff's claim for intentional infliction of emotional distress is subject to summary adjudication because it is preempted by the California Workers' Compensation Act.

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 10. Plaintiff contends that Defendant Peter Wainwright engaged in conduct that was intended to cause him emotional distress.<br><br>Comp., ¶ 77; Cava Depo., p. 79:6-80:15; 178:2-6; Exh. 9. | *Disputed*. Plaintiff also alleges that other individuals at Netversant caused plaintiff severe emotional distress, including all who were responsible for discriminating and terminating plaintiff for unlawful reasons and in violation of public policy. This claim is supported by both the allegations<br><br>Comp. ¶77; Cava Decl., ¶25. |
| 11. Plaintiff claims that Mr. Wainwright engaged in conduct that was intended to cause him emotional distress when Mr. Wainwright: (1) refused to reassign Plaintiff's accounts following his leave of absence; (2) set unreasonably high sales expectations for Plaintiff; and (3) raised his voice at Plaintiff, called Plaintiff's performance "underwhelming," told Plaintiff that he "couldn't be counted on," and generally talked to Plaintiff in a rude and abusive manner.<br><br>Cava Depo., p. 72:5-17; 73:19-76:6; 99:19-101:6; Exh. 9, ¶¶ 13 and 14. | *Disputed*. The conduct of Peter Wainwright, and others involved in plaintiff's termination, and Wainwright's demeaning manner in which he singled Plaintiff out because of his disability, taking accounts away, placing him on plan, intimidating him and causing his termination because of his disability has caused plaintiff severe emotional distress. Mr. Wainwright intentional ill will toward plaintiff and his disability is apparent from his referring to plaintiff as "spooky" and going "off the deep end."<br><br>Cava. Decl., ¶25; Cotter Depo., Ex 19. |

**ISSUE 4:**  Alternatively, Plaintiff's claim for intentional infliction of emotional distress is subject to summary adjudication because only personnel management activities have been alleged.

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 12. Plaintiff contends that Defendant Peter Wainwright engaged in conduct that was intended to cause him emotional distress.<br><br>Comp., ¶ 77; Cava Depo., p. 79:6-80:15; 178:2-6; Exh. 9. | *Disputed*.<br>Further, Plaintiff's Complaint specifically alleges, as a basis for this claim, his wrongful termination in violation of public policy.<br><br>Comp., ¶77; Cava. Decl., ¶25. |

| | |
|---|---|
| 13. Plaintiff claims that Mr. Wainwright engaged in conduct that was intended to cause him emotional distress when Mr. Wainwright: (1) refused to reassign Plaintiff's accounts following his leave of absence; (2) set unreasonably high sales expectations for Plaintiff; and (3) raised his voice at Plaintiff, called Plaintiff's performance "underwhelming," told Plaintiff that he "couldn't be counted on," and generally talked to Plaintiff in a rude and abusive manner.<br><br>Cava Depo., p. 72:5-17; 73:19-76:6; 99:19-101:6; Exh. 9, ¶¶ 13 and 14. | *Disputed*. The conduct of Peter Wainwright, and others involved in plaintiff's termination, and Wainwright's demeaning manner in which he singled Plaintiff out because of his disability, taking accounts away, placing him on plan, intimidating him and causing his termination because of his disability has caused me severe emotional distress. Mr. Wainwright intentional ill will toward plaintiff and his disability is apparent from his referring to plaintiff as "spooky" and going "off the deep end."<br><br>Cava. Decl., ¶25; Cotter Depo., Ex 19. |

### PLAINTIFF'S TENTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

ISSUE 5:       Plaintiff's claim for negligent infliction of emotional distress is subject to summary adjudication because it is preempted by the California Workers' Compensation Act.

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 14. Plaintiff contends that Defendant Peter Wainwright engaged in conduct that was done "with reckless disregard of the probability of causing him emotional distress."<br><br>Comp., ¶ 83; Cava Depo., p. 79:6-80:15; 178:2-6; Exh. 9. | *Disputed*.<br>Further, Plaintiff's Complaint specifically alleges, as a basis for this claim, his wrongful termination in violation of public policy.<br><br>Comp., ¶83; Cava. Decl., ¶25. |
| 15. Plaintiff claims that Mr. Wainwright engaged in conduct with reckless disregard for causing him emotional distress when Mr. Wainwright: (1) refused to reassign Plaintiff's accounts following his leave of absence; (2) set unreasonably high sales expectations for Plaintiff; and (3) raised his voice at Plaintiff, called Plaintiff's performance "underwhelming," told Plaintiff that he "couldn't be counted on," and generally talked to Plaintiff in a rude and abusive manner.<br><br>Cava Depo., p. 72:5-17; 73:19-76:6; 99:19-101:6; Exh. 9, ¶¶ 13 and 14. | *Disputed*. The conduct of Peter Wainwright, and others involved in plaintiff's termination, and Wainwright's demeaning manner in which he singled Plaintiff out because of his disability, taking accounts away, placing him on plan, intimidating him and causing his termination because of his disability has caused him severe emotional distress. Mr. Wainwright intentional ill will toward plaintiff and his disability is apparent from his referring to plaintiff as "spooky" and going "off the deep end."<br><br>Comp., ¶83; Cava. Decl., ¶25; Cotter Depo., Ex 19. |

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF OPPOSITION TO MSJ

**ISSUE 6:**    Alternatively, Plaintiff's claim for negligent infliction of emotional distress is subject to summary adjudication because only personnel management activities have been alleged.

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 16. Plaintiff contends that Defendant Peter Wainwright engaged in conduct that was done "with reckless disregard of the probability of causing him emotional distress." <br><br> Comp., ¶ 83; Cava Depo., p. 79:6-80:15; 178:2-6; Exh. 9. | *Disputed.* Further, Plaintiff's Complaint specifically alleges, as a basis for this claim, his wrongful termination in violation of public policy. <br><br> Comp., ¶83; Cava. Decl., ¶25. |
| 17. Plaintiff claims that Mr. Wainwright engaged in conduct with reckless disregard for causing him emotional distress when Mr. Wainwright: (1) refused to reassign Plaintiff's accounts following his leave of absence; (2) set unreasonably high sales expectations for Plaintiff; and (3) raised his voice at Plaintiff, called Plaintiff's performance "underwhelming," told Plaintiff that he "couldn't be counted on," and generally talked to Plaintiff in a rude and abusive manner. <br><br> Cava Depo., p. 72:5-17; 73:19-76:6; 99:19-101:6; Exh. 9, ¶¶ 13 and 14. | *Disputed.* The conduct of Peter Wainwright, and others involved in plaintiff's termination, and Wainwright's demeaning manner in which he singled Plaintiff out because of his disability, taking accounts away, placing him on plan, intimidating him and causing his termination because of his disability has caused him severe emotional distress. Mr. Wainwright intentional ill will toward plaintiff and his disability is apparent from his referring to plaintiff as "spooky" and going "off the deep end." <br><br> Comp., ¶ 83; Cava. Decl., ¶25; Cotter Depo., Ex 19. |

**ISSUE 7:**    Alternatively, Plaintiff's claim for negligent infliction of emotional distress is subject to summary adjudication because the conduct alleged is inherently intentional.

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 18. Plaintiff contends that Defendant Peter Wainwright engaged in conduct that was done "with reckless disregard of the probability of causing him emotional distress." <br><br> Comp., ¶ 83; Cava Depo., p. 79:6-80:15; 178:2-6; Exh. 9. | *Disputed.* Further, Plaintiff's Complaint specifically alleges, as a basis for this claim, his wrongful termination in violation of public policy. <br><br> Comp., ¶83; Cava. Decl., ¶25. |

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF OPPOSITION TO MSJ

| | |
|---|---|
| 19. Plaintiff claims that Mr. Wainwright engaged in conduct with reckless disregard for causing him emotional distress when Mr. Wainwright: (1) refused to reassign Plaintiff's accounts following his leave of absence; (2) set unreasonably high sales expectations for Plaintiff; and (3) raised his voice at Plaintiff, called Plaintiff's performance "underwhelming," told Plaintiff that he "couldn't be counted on," and generally talked to Plaintiff in a rude and abusive manner.<br><br>Cava Depo., p. 72:5-17; 73:19-76:6; 99:19-101:6; Exh. 9, ¶¶ 13 and 14. | **Disputed.** The conduct of Peter Wainwright, and others involved in plaintiff's termination, and Wainwright's demeaning manner in which he singled Plaintiff out because of his disability, taking accounts away, placing him on plan, intimidating him and causing his termination because of his disability has caused plaintiff severe emotional distress. Mr. Wainwright intentional ill will toward plaintiff and his disability is apparent from his referring to plaintiff as "spooky" and going "off the deep end."<br><br>Cava. Decl., ¶25; Cotter Depo., Ex 19; |

Dated:  May 9, 2007

FOTOUHI • EPPS • HILLGER • GILROY LLP

By: _____
        Daniel P. Iannitelli
        Attorneys for Plaintiff

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF OPPOSITION TO MSJ

1  **Shahab E. Fotouhi - 168301**
   **Daniel P. Iannitelli - 203388**
2  FOTOUHI • EPPS • HILLGER • GILROY LLP
   160 Pine Street, Suite 710
3  San Francisco, CA 94111
   Tel: 415.362.9300
4  Fax: 415.358.5521

5  Attorneys for Plaintiffs
   MICHAEL CAVA
6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

10 | MICHAEL CAVA,                          )  Case No.  CGC-06-453469
                                          )
11 |            Plaintiff,                 )  **PLAINTIFF'S SEPARATE STATEMENT OF**
                                          )  **UNDISPUTED MATERIAL FACTS IN**
12 | vs.                                   )  **SUPPORT OF OPPOSITION TO MOTION**
                                          )  **FOR SUMMARY JUDGMENT OR, IN THE**
13 | NETVERSANT - NATIONAL, INC., a Delaware )  **ALTERNATIVE, SUMMARY**
   | corporation, dba NETVERSANT - SAN     )  **ADJUDICATION**
   | FRANCISCO, aka NETVERSANT; PETER      )
14 | WAINWRIGHT, an individual; and DOES 1 )
   | through 40, inclusive,                )  Date:   May 23, 2007
15 |                                        )  Time:   9:30 a.m.
   |            Defendants.                )  Dept:   31
16 | _____ )  Judge:  Hon. Peter Busch

17

18          Pursuant to California Code of Civil Procedure § 437c and California Rule of Court 3.1350,

19  Plaintiff MICHAEL CAVA submits this separate statement of undisputed and disputed material facts,

20  together with references to supporting evidence in support of Plaintiff's Opposition to Defendant

21  Netversant-National, Inc.'s, Motion for Summary Judgment or, in the Alternative, Summary

22  Adjudication

23  //

24  //

25  //

26  //

27  //

28  //

PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF OPPOSITION TO MSJ

# I. PLAINTIFF'S FIRST CAUSE OF ACTION

## DISABILITY DISCRIMINATION

ISSUE 1:    Plaintiff's claim for disability discrimination is subject to summary adjudication because Plaintiff cannot establish a *prima facie case.*

| UNDISPUTED MATERIAL FACTS | PLAINTIFF'S RESPONSE |
|---|---|
| 1. Plaintiff contends that he was discriminated against when Defendant placed a sixth month limit on his leave of absence and terminated his employment.<br><br>Comp., ¶ 18, 20, 21; Cava Depo., p. 178:7-179:3. | *Disputed.* In addition to the termination, Plaintiff also alleges that he was treated differently than other account executives and accounts were taken away from him.<br><br>Comp. ¶ 18, 20 & 21. |
| 2. Plaintiff began his employment with Defendant in June 2004, and thereafter went on a leave of absence to care for his son on November 1, 2004.<br><br>Cava Depo., p. 35:13-36:13; 43:8-11; 91:14-23; 94:16-95:1; Exh. 12. | Undisputed. |
| 3. Plaintiff initially remained on leave until January 17, 2005.<br><br>Cava Depo., p. 89:23-25; 93:5-10; 96:7-97:17. | Undisputed. |
| 4. On January 26, 2005, Plaintiff again asked for time off, this time for his own disability.<br><br>Cava Depo., p. 97:15-17; 117:9-19; 118:4-25; Exh. 14. | Undisputed. |
| 5. From January 26, 2005 through August 1, 2005, Plaintiff was totally disabled and unable to perform any part of his job.<br><br>Cava Depo. p. 179:14-180:4. | *Disputed.* Plaintiff did not commence his disability leave until January 28, 2005 and released for work on July 29, 2005. Although plaintiff's physician medically prescribed disability leave, plaintiff did perform some of his duties while on leave. Netversant admits that it could have accommodated plaintiff in other ways during his initial leave.<br><br>Cava Decl. ¶ 20, 21; Cotter Depo, p.33:16-34:21, Ex.10. |