| | |
|---|---|
| 6. Plaintiff returned to work on August 1, 2005 and then again requested time off from work for his disability on August 3, 2005.<br><br>Cava Depo., p. 86:11-21; 134:10-20; 157:14-19; 161:5-24; 162:10-12; Exh. 19. | Undisputed. |
| 7. The doctor's note Plaintiff provided to Defendant to support his request for leave stated only that Plaintiff "needs time off work," and did not specify the duration of Plaintiff's condition.<br><br>Cava Depo., Exh. 19. | ***Disputed***. The doctor's note specifically requests interested parties to contact him if they had questions.<br><br>Cava Depo., Exh. 19. |
| 8. Plaintiff was disabled from August 3, 2005 to approximately December 26, 2005, during which he could not have done any part of his job for Defendant.<br><br>Cava Depo., p. 180:5-13. | ***Disputed***. Although plaintiff was ordered disabled by his physician, he believes yhe could have performed his duties with a reasonable accommodation. Defendant refused to discuss any options with plaintiff.<br><br>Cava Depo, 183:5-184:5; Cotter Depo, p.33:16-34:21, Ex.10; Cava Decl., ¶ 20. |
| 9. Plaintiff's employment was terminated on August 5, 2005.<br><br>Cava Depo., p. 168:11-169:15; Exh. 20. | Undisputed. |

ISSUE 2: **Alternatively, Plaintiffs claim for disability discrimination fails because Defendant has articulated a legitimate, non-discriminatory reason for his termination and Plaintiff has no proof of pretext.**

| **NETVERSANT'S STATEMENT** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 10. Plaintiff contends that he was discriminated against when Defendant placed a sixth month limit on his leave of absence and terminated his employment.<br><br>Comp., ¶ 18, 20, 21; Cava Depo., p. 178:7-179:3. | ***Disputed***. In addition to the termination, Plaintiff also alleges that he was treated differently than other account executives and accounts were taken away from him.<br><br>Comp. ¶ 18, 20 & 21. |
| 11. At the time of his hire, Plaintiff was given a sales compensation agreement which outlined a prorated annual sales quota of $341,250.<br><br>Cava Depo., p. 48:8-49:14; Exh. 5. | Undisputed. |

| | |
|---|---|
| 12. At the time of his hire in June 2004, Plaintiff received and signed for a copy of Defendant's employee handbook, which contained a policy limiting leaves of absence to six months in duration.<br><br>Cava Dep., p. 39:11-15; 43:12-14; Exhs. 1, 2, 3; Wainwright Decl., ¶ 3, Exh., 1, p. 13. | ***Disputed***. The employee handbook limits leaves of absence to six months, but expresses that it is subject to legal provisions to the contrary. Also, plaintiff's initial leave was less than six months.<br><br>Wainwright Decl., ¶ 3, Exh., 1, p. 13.; Cava Decl., ¶ 20. |
| 13. On November 1, 2004, Plaintiff took a emergency leave of absence to care for his son, and Plaintiff remained on paid leave through January 17, 2005.<br><br>Cava Depo., p. 35:13-36:13; 43:8-11; 89:23-25; 91:14-23; 93:5-10; 94:16-95:1; 96:7-97:17; Exh. 12. | Undisputed. |
| 14. At the time Plaintiff first went out on leave, Plaintiff had sold no product to any new accounts other than one "few hundred" dollar sale.<br><br>Cava Depo., p. 67:21-68:9; 104:8-105:7. | ***Disputed***. Plaintiff quoted projects on "new" accounts which closed while he was out on leave. These sales should have been credited to plaintiff, but defendant Wainwright refused to give him credit in order to make his numbers look less than the would have. Furthermore, this point is irrelevant as the compensation plan does not distinguish between sales from existing clients and new accounts. Also, Plaintiff was in the middle of his ramp-up period.<br><br>Cava Decl., ¶16, Ex. E.; Landis Depo., pp. 63:15-22, 69:22-71:7, 34:12-35:22. |
| 15. At the time Plaintiff first went out on leave, he had been credited with $413,000 in "sales," but approximately $295,000 of this amount came from a sale that had actually been made in 2003, before the time of his hire.<br><br>Cava Depo., p. 175:8-12; 176:20-177:7; Exh. 5, 21; Wainwright Depo., p. 176:4-11; Wainwright Decl., ¶¶ 5-6. | ***Disputed***. Although the contract was signed in 2003, it would not have been discovered, but for plaintiff's efforts. Prior to the find, Plaintiff was tasked by Wainwright to get the renewal contact, which he would have obtained on his own.<br><br>Cava Decl., ¶ 8. |
| 16. Plaintiff admits that probably more than 75% of the sales for which he initially received credit came from work done by other sales representatives.<br><br>Cava Depo., p. 65:7-18; Exh. 7. | ***Disputed***. Not "over" 75%, the true number is roughly 70%.<br><br>Cava Decl., ¶ 22. |

| | |
|---|---|
| 17. When Plaintiff again went out on leave in on January 26, 2005, he was told that he did not have any job protection and that his employment could be terminated, and also that Company policy allowed a maximum of six month's leave.<br><br>Cava Dep., p. 123:2-15; 130:4-131:13; 132:23-133:1. | Undisputed. |
| 18. Although other sales representatives were available to cover for Plaintiff's accounts for a short period of time, doing so for an extended period was difficult on the representatives, the customers and the Company.<br><br>Wainwright Depo., p. 141:20-24; 142:18-143:21; 156:16-157:5; Wainwright Decl., ¶¶ 5-7. | ***Disputed***. Other representatives were being compensated for covering the accounts, which were only two during Plaintiff's disability leave. Furthermore, this fact is irrelevant to plaintiff's discrimination claims in that his accounts already taken away at the time of his termination.<br><br>Cava Decl., ¶ 23; Cotter Depo., Ex 16. |
| 19. At least one customer had previously complained about having to transition through multiple sales representatives.<br><br>Cava Depo., p. 52:16-53:9. | ***Disputed***. The one customer who noted this, was only concerned about transition at a certain point in the project.<br><br>Cava Decl., ¶24, Ex F. |
| 20. Plaintiff returned to work on August 1, 2005 and then again requested time off from work for his disability on August 3, 2005.<br><br>Cava Depo., p. 86:11-21; 134:10-20; 157:14-19; 161:5-24; 162:10-12; Exh. 19. | Undisputed. |
| 21. The doctor's note Plaintiff provided to Defendant to support his request for leave stated only that Plaintiff "needs time off work," and did not specify the duration of Plaintiff's condition.<br><br>Cava Depo., Exh. 19. | ***Disputed***. The doctor's note specifically requests interested parties to contact him if they had questions.<br><br>Cava Depo., Exh. 19. |
| 22. Plaintiff's employment was terminated on August 5, 2005.<br><br>Cava Depo., p. 168:11-169:15; Exh. 20. | Undisputed. |
| 23. Plaintiff admits that Mr. Wainwright made no comments to him about his disability, and never made jokes about being disabled or about people with disabilities.<br><br>Cava Depo., p. 72:20-25; 73:15-18. | ***Disputed***. Although did not make direct jokes about disability, Wainwright took accounts away, rules against plaintiff on credits, screamed at plaintiff and made comments to others about plaintiff "going off the deep end".<br><br>Cotter Depo., ¶19; Cava Depo., 75:12-25, 79:13-18. |

**ISSUE 3: Alternatively, Plaintiff's claim for disability discrimination fails because Defendant accommodated his disability to the extent required by law.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 24. Plaintiff contends that he was discriminated against when Defendant failed to accommodate his "mental disability."<br><br>Comp., ¶ 18, 20, 21. | ***Disputed***. In addition to the termination, Plaintiff also alleges that he was treated differently than other account executives and accounts were taken away from him. Plaintiff also alleges that Netversant failed to engage in the interactive process.<br><br>Comp., ¶ 18, 20, 21. |
| 25. Plaintiff began his employment with Defendant in June 2004, and thereafter went on a leave of absence to care for his son on November 1, 2004, remaining on leave until January 17, 2005.<br><br>Cava Depo., p. 35:13-36:13; 43:8-11; 89:23-25; 91:14-23; 93:5-10; 94:16-95:1; 96:7-97:17; Exh. 12. | Undisputed. |
| 26. At the time of his hire, Plaintiff received and signed for a copy of Defendant's employee handbook, which contained a policy limiting leaves of absence to six months in duration.<br><br>Cava Dep., p. 39:11-15; 43:12-14; Exhs. 1, 2, 3; Wainwright Decl., 3, Exh., 1, p. 13. | ***Disputed***. The employee handbook limits leaves of absence to six months, but expresses that it is subject to legal provisions to the contrary. Also, plaintiff's initial leave was less than six months.<br><br>Wainwright Decl., ¶ 3, Exh., 1, p. 13. |
| 27. On January 26, 2005, Plaintiff again asked for time off, this time for his own disability.<br><br>Cava Depo., p. 97:15-17; 117:9-19; 118:4-25; Exh. 14. | Undisputed. |
| 28. When Plaintiff again went out on leave on January 26, 2005, he was told that he did not have any job protection and that his employment could be terminated, and also that Company policy allowed a maximum of six month's leave.<br><br>Cava Dep., p. 123:2-15; 130:4-131:13; 132:23-133:1. | Undisputed. |
| 29. From January 26, 2005 through August 1, 2005, Plaintiff was totally disabled and unable to perform any part of his job.<br><br>Cava Depo. p. 179:14-180:4. | ***Disputed***. Plaintiff did not commence his disability leave until January 28, 2005 and released for work on July 29, 2005. Although plaintiff's physician medically prescribed disability leave, plaintiff did perform some of his duties while on leave. Netversant admits that it could have accommodated plaintiff in other ways during his initial leave.<br><br>Cava Decl. ¶ 20, 21; Cotter Depo, p.33:16-34:21, Ex.10. |

| | |
|---|---|
| 30. Plaintiff returned to work on August 1, 2005 and then again requested time off from work for his disability on August 3, 2005.<br><br>Cava Depo., p. 86:11-21; 134:10-20; 157:14-19; 161:5-24; 162:10-12; Exh. 19. | Undisputed. |
| 31. The doctor's note Plaintiff provided to Defendant to support his request for leave stated only that Plaintiff "needs time off work," and did not specify the duration of Plaintiff's condition.<br><br>Cava Depo., Exh. 19. | ***Disputed***. The doctor's note specifically requests interested parties to contact him if they had questions.<br><br>Cava Depo., Exh. 19. |
| 32. Plaintiff was disabled from August 3, 2005 to approximately December 26, 2005, during which he could not have done any part of his job for Defendant.<br><br>Cava Depo., p. 180:5-13. | ***Disputed***. Although plaintiff was ordered disabled by his physician, he could have performed his duties with a reasonable accommodation. Defendant refused to discuss any options with plaintiff.<br><br>Cava Depo, 183:5-184:5; Cotter Depo, p.33:16-34:21, Ex 10. |
| 33. Plaintiff admits that at the time he was terminated on August 5, 2005, he could not have worked even with an accommodation.<br><br>Cava Depo., p. 182:2-183:22. | ***Disputed***. Plaintiff could have returned to work if he had been accommodated by be given time necessary for his leave and recovery.<br><br>Cava Depo., 183:5-184:5; 162:19-165:18 |

**PLAINTIFF'S SECOND CAUSE OF ACTION**

**Wrongful Termination In Violation Of Public Policy**

ISSUE 4: **Plaintiff's claim for wrongful termination fails for the same reasons his claim for disability discrimination fails.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 34. Plaintiff contends that his termination was wrongful and in violation of public policy as he believes that Defendant terminated him "because of" his mental disability.<br><br>Comp., ¶ 29. | ***Disputed***. In addition to being terminated because of his disability, Plaintiff also expressly alleges that he terminated because of the costs for the treatment of his son's cancer.<br><br>Comp. ¶ 29, ¶30. |
| 35. At the time of his hire in June 2004, Plaintiff was given a sales compensation agreement which outlined a prorated annual sales quota of $341,250.<br><br>Cava Depo., p. 48:8-49:14; Exh. 5. | Undisputed. |

| | |
|---|---|
| 36. At the time of his hire in June 2004, Plaintiff received and signed for a copy of Defendant's employee handbook, which contained a policy limiting leaves of absence to six months in duration.<br><br>Cava Dep., p. 39:11-15; 43:12-14; Exhs. 1, 2, 3; Wainwright Decl., ¶ 3, Exh., 1, p. 13. | ***Disputed***. The employee handbook limits leaves of absence to six months, but expresses that it is subject to legal provisions to the contrary. Also, plaintiff's initial leave was less than six months.<br><br>Wainwright Decl., ¶ 3, Exh., 1, p. 13. |
| 37. On November 1, 2004, Plaintiff took a emergency leave of absence to care for his son, and Plaintiff remained on paid leave through January 17, 2005.<br><br>Cava Depo., p. 35:13-36:13; 43:8-11; 89:23-25; 91:14-23; 93:5-10; 94:16-95:1; 96:7-97:17; Exh. 12. | Undisputed. |
| 38. At the time Plaintiff first went out on leave, he had sold no product to any new accounts other than one "few hundred" dollar sale.<br><br>Cava Depo., p. 67:21-68:9; 104:8-105:7. | ***Disputed***. Plaintiff quoted projects on "new" accounts which closed while he was out on leave. These sales should have been credited to plaintiff, but defendant Wainwright refused to give him credit in order to make his numbers look less than the would have. Furthermore, this point is irrelevant as the compensation plan does not distinguish between sales from existing clients and new accounts.<br><br>Cava Decl., ¶16, Ex. E. |
| 39. At the time Plaintiff first went out on leave, he had been credited with $413,000 in "sales," but approximately $295,000 of this amount came from a sale that had actually been made in 2003, before the time of his hire.<br><br>Cava Depo., p. 175:8-12; 176:20-177:7; Exh. 5, 21; Wainwright Depo., p. 176:4-11; Wainwright Decl., ¶¶ 5-6. | ***Disputed***. Although the contract was signed in 2003, it would not have been discovered, but for plaintiff's efforts. Prior to the find, Plaintiff was tasked by Wainwright to get the renewal contact, which he would have obtained on his own.<br><br>Cava Decl., ¶ 8. |
| 40. Plaintiff admits that probably more than 75% of the sales for which he initially received credit came from work done by other sales representatives.<br><br>Cava Depo., p. 65:7-18; Exh. 7. | ***Disputed***. Not "over" 75%, the true number is roughly 70%.<br><br>Cava Decl., ¶ 22. |
| 41. On January 26, 2005, Plaintiff again asked for time off, this time for his own disability.<br><br>Cava Depo., p. 97:15-17; 117:9-19; 118:4-25; Exh. 14. | Undisputed. |

| | |
|---|---|
| 42. When Plaintiff again went out on leave in on January 26, 2005, he was told that he did not have any job protection and that his employment could be terminated, and also that Company policy allowed a maximum of six month's leave.<br><br>Cava Dep., p. 123:2-15; 130:4-131:13; 132:23-133:1. | Undisputed. |
| 43. From January 26, 2005 through August 1, 2005, Plaintiff was totally disabled and unable to perform any part of his job.<br><br>Cava Depo. p. 179:14-180:4. | ***Disputed***. Plaintiff did not commence his disability leave until January 28, 2005 and released for work on July 29, 2005. Although plaintiff's physician medically prescribed disability leave, plaintiff did perform some of his duties while on leave. Netversant admits that it could have accommodated plaintiff in other ways during his initial leave.<br><br>Cava Decl. ¶ 20, 21; Cotter Depo, p.33:16-34:21, Ex.10. |
| 44. Although other sales representatives were available to cover for Plaintiff's accounts for a short period of time, doing so for an extended period was difficult on the representatives, the customers and the Company.<br><br>Wainwright Depo., p. 141:20-24; 142:18-143:21; 156:16-157:5; Wainwright Decl., ¶¶ 5-7. | ***Disputed***. Other representatives were being compensated for covering the accounts, which were only two during Plaintiff's disability leave. Furthermore, this fact is irrelevant to plaintiff's discrimination claims in that his accounts already taken away at the time of his termination.<br><br>Cava Decl., ¶ 23; Cotter Depo., Ex 16. |
| 45. At least one customer had previously complained about having to transition through multiple sales representatives.<br><br>Cava Depo., p. 52:16-53:9. | ***Disputed***. The one customer who noted this, was only concerned about transition at a certain point in the project.<br><br>Cava Decl., ¶24, Ex F. |
| 46. Plaintiff returned to work on August 1, 2005 and then again requested time off from work for his disability on August 3, 2005.<br><br>Cava Depo., p. 86:11-21; 134:10-20; 157:14-19; 161:5-24; 162:10-12; Exh. 19. | ***Disputed***. Plaintiff requested further leave on August 4, 2005.<br><br>Cotter Depo., Ex. 18. |
| 47. The doctor's note Plaintiff provided to Defendant to support his request for leave stated only that Plaintiff "needs time off work," and did not specify the duration of Plaintiff's condition.<br><br>Cava Depo., Exh. 19. | ***Disputed***. The doctor's note specifically requests interested parties to contact him if they had questions.<br><br>Cava Depo., Exh. 19. |

| | |
|---|---|
| 48. Plaintiff was disabled from August 3, 2005 to approximately December 26, 2005, during which he could not have done any part of his job for Defendant.<br><br>Cava Depo., p. 180:5-13. | ***Disputed***. Although plaintiff was ordered disabled by his physician, he could have performed his duties with a reasonable accommodation. Defendant refused to discuss any options with plaintiff.<br><br>Cava Depo, 180:5-184:5; Cotter Depo, p.33:16-34:21, Ex 10. |
| 49. Plaintiff admits that at the time he went out on leave on August 5, 2005, he could not have worked even with an accommodation.<br><br>Cava Depo., p. 182:2-183:22. | ***Disputed***. Plaintiff could have returned to work if he had been accommodated by be given time necessary for his leave.<br><br>Cava Depo., p. 183:5-184:5, 162:19-165.18. |
| 50. Plaintiff's employment was terminated on August 5, 2005.<br><br>Cava Depo., p. 168:11-169:15; Exh. 20. | Undisputed. |
| 51. Plaintiff admits that Mr. Wainwright made no comments to him about his disability, and never made jokes about being disabled or about people with disabilities.<br><br>Cava Depo., p. 72:20-25; 73:15-18. | ***Disputed***. Although did not make direct jokes about disability, Wainwright took accounts away, rules against plaintiff on credits, screamed at plaintiff and made comments to others about plaintiff "going off the deep end".<br><br>Cotter Depo., ¶19; Cava Depo., 75:12-25, 79:13-18. |

## PLAINTIFF'S FOURTH CAUSE OF ACTION

## Retaliation

ISSUE 5: **Plaintiff's claim for retaliation fails because he has not engaged in any legally protected activity.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 52. Plaintiff contends that Defendant retaliated against him for taking a leave of absence.<br><br>*Complaint* ¶ 43. | Undisputed. |
| 53. Plaintiff began his employment with Defendant in June 2004, and thereafter went on a leave of absence to care for his son from November 1, 2004 through January 17, 2005.<br><br>Cava Depo., p. 35:13-36:13; 43:8-11; 89:23-25; 91:14-23; 93:5-10; 94:16-95:1; 96:7-97:17; Exh. 12. | Undisputed. |

| | |
|---|---|
| 54. Plaintiff took additional time off from January 26, 2005 through August 1, 2005, during which he was allegedly disabled and unable to perform any part of his job.<br><br>Cava Depo., p. 97:15-17; 117:9-19; 118:4-25; 179:14-180:4; Exh. 14. | ***Disputed***. Plaintiff did not commence his disability leave until January 28, 2005 and released for work on July 29, 2005. Although plaintiff's physician medically prescribed disability leave, plaintiff did perform some of his duties while on leave and, with a further accommodation, could have returned to his full his job duties. Netversant admits that it could have accommodated plaintiff in other ways during his initial leave.<br><br>Cava Decl. ¶ 20, 21; Cotter Depo, p.33:16-34:21, Ex.10. |
| 55. Plaintiff returned to work on August 1, 2005 and then again requested time off from work for his disability on August 3, 2005.<br><br>Cava Depo., p. 86:11-21; 134:10-20; 157:14-19; 161:5-24; 162:10-12; Exh. 19. | ***Disputed.*** Plaintiff requested further leave on August 4, 2005.<br><br>Cotter Depo, Ex. 8 |
| 56. The doctor's note Plaintiff provided to Defendant to support his request for leave stated only that Plaintiff "needs time off work," and did not specify the duration of Plaintiff's condition.<br><br>Cava Depo., Exh. 19. | ***Disputed***. The doctor's note specifically requests interested parties to contact him if they had questions.<br><br>Cava Depo., Exh. 19. |
| 57. Plaintiff was disabled from August 3, 2005 to approximately December 26, 2005, during which he could not have done any part of his job for Defendant.<br><br>Cava Depo., p. 180:5-13. | ***Disputed***. Although plaintiff was ordered disabled by his physician, he could have performed his duties with a reasonable accommodation. Defendant refused to discuss any options with plaintiff.<br><br>Cava Depo, 183:5-184:5; Cotter Depo, p.33:16-34:21, Ex 10. |
| 58. Plaintiff's employment was terminated on August 5, 2005.<br><br>Cava Depo., p. 168:11-169:15; Exh. 20. | Undisputed. |
| 59. Plaintiff admits that at the time he was terminated August 5, 2005, he could not have worked even with an accommodation.<br><br>Cava Depo., p. 182:2-183:22. | ***Disputed***. Plaintiff could have returned to work if he had been accommodated by be given time necessary for his leave.<br><br>Cava Decl., ¶21; Cava Depo., p. 183:5-184:5, 162:19-165:18 |

ISSUE 6: **Alternatively, Plaintiff's claim for retaliation fails because he has no evidence to establish a causal nexus between the alleged protected activity and the adverse action.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 60. Plaintiff contends that Defendant retaliated against him for taking a leave of absence.<br><br>Complaint ¶ 43. | Undisputed. |
| 61. Plaintiff began his employment with Defendant in June 2004, and thereafter went on a leave of absence to care for his son from November 1, 2004 through January 17, 2005.<br><br>Cava Depo., p. 35:13-36:13; 43:8-11; 89:23-25; 91:14-23; 93:5-10; 94:16-95:1; 96:7-97:17; Exh. 12. | Undisputed. |
| 62. Plaintiff took additional time off from January 26, 2005 through August 1, 2005, during which he was allegedly disabled and unable to perform any part of his job.<br><br>Cava Depo., p. 97:15-17; 117:9-19; 118:4-25; 179:14-180:4; Exh. 14. | ***Disputed***. Plaintiff did not commence his disability leave until January 28, 2005 and released for work on July 29, 2005. Although plaintiff's physician medically prescribed disability leave, plaintiff did perform some of his duties while on leave and, with a further accommodation, could have returned to his full his job duties. Netversant admits that it could have accommodated plaintiff in other ways during his initial leave.<br><br>Cava Decl. ¶ 20, 21; Cotter Depo, p.33:16-34:21, Ex.10. |
| 63. Plaintiff returned to work on August 1, 2005 and then again requested time off from work for his disability on August 3, 2005.<br><br>Cava Depo., p. 86:11-21; 134:10-20; 157:14-19; 161:5-24; 162:10-12; Exh. 19. | Undisputed. |
| 64. At the time of his hire, Plaintiff was given a sales compensation agreement which outlined a prorated annual sales quota of $341,250.<br><br>Cava Depo., p. 48:8-49:14; Exh. 5. | Undisputed. |

| | |
|---|---|
| 65. At the time Plaintiff first went out on leave, he had sold no product to any new accounts other than one "few hundred" dollar sale.<br><br>Cava Depo., p. 67:21-68:9; 104:8-105:7. | ***Disputed***. Plaintiff quoted projects on "new" accounts which closed while he was out on leave. These sales should have been credited to plaintiff, but defendant Wainwright refused to give him credit in order to make his numbers look less than the would have. Furthermore, this point is irrelevant as the compensation plan does not distinguish between sales from existing clients and new accounts.<br><br>Cava Decl., ¶16, Ex. E. |
| 66. At the time Plaintiff first went out on leave, he had been credited with $413,000 in "sales," but approximately $295,000 of this amount came from a sale that had actually been made in 2003, before the time of his hire.<br><br>Cava Depo., p. 175:8-12; 176:20-177:7; Exh. 5, 21; Wainwright Depo., p. 176:4-11; Wainwright Decl., ¶¶ 5-6. | ***Disputed***. Although the contract was signed in 2003, it would not have been discovered, but for plaintiff's efforts. Prior to the find, Plaintiff was tasked by Wainwright to get the renewal contact, which he would have obtained on his own.<br><br>Cava Decl., ¶ 8. |
| 67. The doctor's note Plaintiff provided to Defendant to support his request for leave stated only that Plaintiff "needs time off work," and did not specify the duration of Plaintiff's condition.<br><br>Cava Depo., Exh. 19. | ***Disputed***. The doctor's note specifically requests interested parties to contact him if they had questions.<br><br>Cava Depo., Exh. 19. |
| 68. Plaintiff was disabled from August 3, 2005 to approximately December 26, 2005, during which he could not have done any part of his job for Defendant.<br><br>Cava Depo., p. 180:5-13. | ***Disputed***. Although plaintiff was ordered disabled by his physician, he could have performed his duties with a reasonable accommodation. Defendant refused to discuss any options with plaintiff.<br><br>Cava Depo, 183:5-184:5; Cotter Depo, p.33:16-34:21, Ex 10 |
| 69. Plaintiff's employment was terminated on August 5, 2005.<br><br>Cava Depo., p. 168:11-169:15; Exh. 20. | Undisputed. |
| 70. Plaintiff admits that Mr. Wainwright made no comments to him about his disability, and never made jokes about being disabled or about people with disabilities.<br><br>Cava Depo., p. 72:20-25; 73:15-18. | ***Disputed***. Although did not make direct jokes about disability, Wainwright took accounts away, rules against plaintiff on credits, screamed at plaintiff and made comments to others about plaintiff "going off the deep end".<br><br>Cotter Depo., ¶19; Cava Depo., 75:12-25, 79:13-18. |

ISSUE 7: **Alternatively, Plaintiff's claim for retaliation fails because he cannot rebut the legitimate business reason provided for his termination and Plaintiff has no proof of pretext.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 71. At the time of his hire, Plaintiff was given a sales compensation agreement which outlined a prorated annual sales quota of $341,250, he also received and signed for a copy of Defendant's employee handbook, which contained a policy limiting leaves of absence to six months in duration.<br><br>Cava Depo., p. 48:8-49:14; 39:11-15; 43:12-14; Exhs. 1, 2, 3, 5; Wainwright Decl., ¶ 3, Exh., 1, p. 13. | *Disputed*. The employee handbook limits leaves of absence to six months, but expresses that it is subject to legal provisions to the contrary. Also, plaintiff's initial leave was less than six months.<br><br>Wainwright Decl., ¶ 3, Exh., 1, p. 13.; |
| 72. On November 1, 2004, Plaintiff took a emergency leave of absence to care for his son, and Plaintiff remained on paid leave through January 17, 2005.<br><br>Cava Depo., p. 35:13-36:13; 43:8-11; 89:23-25; 91:14-23; 93:5-10; 94:16-95:1; 96:7-97:17; Exh. 12. | Undisputed. |
| 73. At the time Plaintiff first went out on leave, Plaintiff had sold no product to any new accounts other than one "few hundred" dollar sale.<br><br>Cava Depo., p. 67:21-68:9; 104:8-105:7. | *Disputed*. Plaintiff quoted projects on "new" accounts which closed while he was out on leave. These sales should have been credited to plaintiff, but defendant Wainwright refused to give him credit in order to make his numbers look less than the would have. Furthermore, this point is irrelevant as the compensation plan does not distinguish between sales from existing clients and new accounts.<br><br>Cava Decl., ¶16, Ex. E. |
| 74. At the time Plaintiff first went out on leave, he had been credited with $413,000 in "sales," but approximately $295,000 of this amount came from a sale that had actually been made in 2003, before the time of his hire.<br><br>Cava Depo., p. 175:8-12; 176:20-177:7; Exh. 5, 21; Wainwright Depo., p. 176:4-11; Wainwright Decl., ¶¶ 5-6. | *Disputed*. Although the contract was signed in 2003, it would not have been discovered, but for plaintiff's efforts. Prior to the find, Plaintiff was tasked by Wainwright to get the renewal contact, which he would have obtained on his own.<br><br>Cava Decl., ¶ 8. |

| | |
|---|---|
| 75. Plaintiff admits that probably more than 75% of the sales for which he initially received credit came from work done by other sales representatives.<br><br>Cava Depo., p. 65:7-18; Exh. 7. | ***Disputed***. Not "over" 75%, the true number is roughly 70%.<br><br>Cava Decl., ¶ 22. |
| 76. When Plaintiff again went out on leave in on January 26, 2005, he was told that he did not have any job protection and that his employment could be terminated, and also that Company policy allowed a maximum of six month's leave.<br><br>Cava Dep., p. 123:2-15; 130:4-131:13; 132:23-133:1. | Undisputed. |
| 77. Although other sales representatives were available to cover for Plaintiff's accounts for a short period of time, doing so for an extended period was difficult on the representatives, the customers and the Company.<br><br>Wainwright Depo., p. 141:20-24; 142:18-143:21; 156:16-157:5; Wainwright Decl., ¶¶ 5-7. | ***Disputed***. Other representatives were being compensated for covering the accounts, which were only two during Plaintiff's disability leave. Furthermore, this fact is irrelevant to plaintiff's discrimination claims in that his accounts already taken away at the time of his termination.<br><br>Cava Decl., ¶ 23; Cotter Depo., Ex 16. |
| 78. At least one customer had previously complained about having to transition through multiple sales representatives.<br><br>Cava Depo., p. 52:16-53:9. | ***Disputed***. The one customer who noted this, was only concerned about transition at a certain point in the project.<br><br>Cava Decl., ¶24, Ex F. |
| 79. Plaintiff returned to work on August 1, 2005 and then again requested time off from work for his disability on August 3, 2005.<br><br>Cava Depo., p. 86:11-21; 134:10-20; 157:14-19; 161:5-24; 162:10-12; Exh. 19. | Undisputed. |
| 80. The doctor's note Plaintiff provided to Defendant to support his request for leave stated only that Plaintiff "needs time off work," and did not specify the duration of Plaintiff's condition.<br><br>Cava Depo., Exh. 19. | ***Disputed***. The doctor's note specifically requests interested parties to contact him if they had questions.<br><br>Cava Depo., Exh. 19. |
| 81. Plaintiff's employment was terminated on August 5, 2005.<br><br>Cava Depo., p. 168:11-169:15; Exh. 20. | Undisputed. |

| 82. Plaintiff admits that Mr. Wainwright made no comments to him about his disability, and never made jokes about being disabled or about people with disabilities.<br><br>Cava Depo., p. 72:20-25; 73:15-18. | *Disputed*. Although did not make direct jokes about disability, Wainwright took accounts away, rules against plaintiff on credits, screamed at plaintiff and made comments to others about plaintiff "going off the deep end".<br><br>Cotter Depo., ¶19; Cava Depo., 75:12-25, 79:13-18. |
|---|---|

**PLAINTIFF'S FIFTH CAUSE OF ACTION**

**Breach Of Contract**

ISSUE 8: **Plaintiff's claim for breach of contract fails because he cannot establish an oral or implied contract contradictory to the terms of the written agreements singed by Plaintiff.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 83. Plaintiff contends that he had an employment agreement with Defendant that provided that he would receive "most" of Jennifer Forrest's prior accounts upon his hire, and further contends that Defendant breached this agreement by "failing to assign all the accounts as promised."<br><br>Comp., ¶¶ 49, 51; Cava Depo., p. 189:6-191:1. | *Disputed*. Plaintiff's claim from breach of contract includes a claim that Netversant breached its agreement to return accounts after Plaintiff returned from disability leave. Plaintiff also alleges that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Comp., ¶ 49; Cava Decl., ¶ 4, 23. |
| 84. Plaintiff received and signed for several employment documents at the time of his hire that contained language stating that he was employed at will and that no contract could be created by any other "statement, conduct or practice."<br><br>Cava Dep., p. 39:11-15; 43:12-14; Exhs. 1, 2, 3. | ***Disputed.*** The documents only state that no <u>implied</u> contract can be created through statement, conduct or practice. There is no such limitation on oral contracts.<br><br>Cava Depo., Ex. 1-3. |
| 85. At the time of his hire, Plaintiff received and signed for a written compensation agreement, which states that assigned accounts are those assigned "in writing."<br><br>Cava Depo., 45:11-46:19; 48:8-20; 49:8-18; Exh. 5. | Undisputed. |

| | |
|---|---|
| 86. Plaintiff has no evidence to establish that the accounts about which he now complains (Maximus, Hansen and HealthNet) were ever assigned to him in writing.<br><br>Cava Depo., p. 50:12-22. | *Disputed*. Plaintiff has evidence in the form of commissions statements which identify accounts assigned to him.<br><br>Cava Depo., Ex. 21. |

ISSUE 9: **Alternatively, Plaintiff's claim for breach of contract fails because the promises upon which Plaintiff claims the contract is based are too vague to be enforceable.**

| **NETVERSANT'S STATEMENT** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 87. Plaintiff contends that he had an employment agreement with Defendant that provided that he would receive "most" of Jennifer Forrest's prior accounts upon his hire.<br><br>Comp., ¶¶ 49, 51; Cava Depo., p. 189:6-191:1. | *Disputed*. Plaintiff's claim from breach of contract includes a claim that Netversant breached its agreement to return accounts after Plaintiff returned from disability leave. Plaintiff also alleges that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Comp., ¶ 41,51; Cava Decl., ¶ 4. |
| 88. Plaintiff admits that he was never told what specific accounts he was to receive, nor was he told what percentage of Ms. Forrest's accounts would be given to him.<br><br>Cava Dep., p. 26:7-12; 27:8-16; 32:6-33:11; 33:24-34:5; 35:4-10. | Undisputed. |
| 89. Plaintiff also claims that Defendant promised that he would be able to "work on" accounts such as Maximus, Hansen and HeatlhNet.<br><br>Comp., ¶¶ 49, 51; Cava Depo., p. 189:6-191:1. | *Disputed*. Plaintiff was promised and actually was assigned on Jennifer Forrest's Sacramento area accounts, except for Octel and including Maximus, Hansen & Healthnet and other accounts.<br><br>Cava Depo., Ex.21. |

ISSUE 10: **Alternatively, Plaintiff's claim for breach of contract fails for lack of consideration.**

| **NETVERSANT'S STATEMENT** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 90. Plaintiff claims that Defendant promised that he would be able to "work on" accounts such as Maximus, Hansen and HeatlhNet, which created a binding contractual agreement.<br><br>Comp., ¶¶ 49, 51; Cava Depo., p. 189:6-191:1. | *Disputed*. Plaintiff was promised and actually was assigned on Jennifer Forrest's Sacramento area accounts, except for Octel and including Maximus, Hansen & Healthnet.<br><br>Cava Decl., ¶ 4, Cava Depo., Ex. 21. |

| | |
|---|---|
| 91. Plaintiff has no evidence that this alleged agreement was supported by consideration.<br><br>Comp., ¶¶ 49. 51; Cava Depo., p. 189:6-191:1; *passim*. | ***Disputed.*** Plaintiff agreed to accept employment with Netversant in light of the promises made.<br><br>Cave Decl., ¶ 4. |

ISSUE 11: **Alternatively, Plaintiff's claim for breach of contract fails because he was employed at will.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 92. Plaintiff contends that he had an employment agreement with Defendant that provided that he would receive "most" of Jennifer Forrest's prior accounts upon his hire, and further contends that Defendant breached this agreement by "failing to assign all the accounts as promised."<br><br>Comp., ¶¶ 49. 51; Cava Depo., p. 189:6-191:1. | Undisputed. But irrelevant (see MPA) |
| 93. At the time of his hire, Plaintiff signed various documents, including an employment application, offer letter and employee handbook acknowledgment, all of which specifically state that Plaintiff's employment can be terminated at will.<br><br>Cava Dep., p. 39:1-15, 40:6-16; 41:8-22; 42:14-22; 44:1-17; Exhs. 1, 2, 3. | Undisputed. But irrelevant (see MPA) |

## PLAINTIFF'S SIXTH CAUSE OF ACTION

**<u>Breach Of Implied Covenant of Good Faith And Fair Dealing</u>**

ISSUE 12: **Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails because he cannot establish an oral or implied contract contradictory to the terms of the written agreements singed by Plaintiff.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 94. Plaintiff contends that he had an employment agreement and a companion implied covenant of good faith and fair dealing with Defendant that provided that he would receive "most" of Jennifer Forrest's prior accounts upon his hire, and further contends that Defendant breached the implied covenant by "failing to assign all the accounts as promised."<br><br>Comp., ¶¶ 49. 51; Cava Depo., p. 189:6-191:1. | ***Disputed.*** Plaintiff's claim from breach of contract includes a claim that Netversant breached its agreement to return accounts after Plaintiff returned from disability leave. Plaintiff also alleges that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Cava Decl. ¶ 4, Cava Depo., Ex. 21 |

| | |
|---|---|
| 95. Plaintiff received and signed for several employment documents at the time of his hire that contained language stating that he was employed at will and that no contract could be created by any other "statement, conduct or practice."<br><br>Cava Dep., p. 39:11-15; 43:12-14; Exhs. 1, 2, 3. | ***Disputed.*** The documents only state that no implied contract can be created through statement, conduct or practice. There is no such limitation on oral contracts.<br><br>Cava Depo., Ex. 1-3. |
| 96. At the time of his hire, Plaintiff received and signed for a written compensation agreement, which states that assigned accounts are those assigned "in writing."<br><br>Cava Depo., 45:11-46:19; 48:8-20; 49:8-18; Exh. 5. | Undisputed. |
| 97. Plaintiff has no evidence to establish that the accounts about which he now complains (Maximus, Hansen and HealthNet) were ever assigned to him in writing.<br><br>Cava Depo., p. 50:12-22. | ***Disputed***. Plaintiff has evidence in the form of commissions statements which identify accounts assigned to him.<br><br>Cava Depo., Ex. 21. |

**ISSUE 13: Alternatively, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails because the promises upon which Plaintiff claims the underlying contract is based are too vague to be enforceable.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 98. Plaintiff contends that he had an employment agreement and companion implied covenant of good faith and fair dealing with Defendant that provided that he would receive "most" of Jennifer Forrest's prior accounts upon his hire.<br><br>Comp., ¶¶ 49. 51; Cava Depo., p. 189:6-191:1. | ***Disputed***. Plaintiff's claim from breach of contract includes a claim that Netversant breached its agreement to return accounts after Plaintiff returned from disability leave. Plaintiff also alleges that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Comp., ¶ 55; Cava Decl., ¶ 4, 23_; Cava Depo, Ex. 21. |
| 99. Plaintiff admits that he was never told what specific accounts he was to receive, nor was he told what percentage of Ms. Forrest's accounts would be given to him.<br><br>Cava Dep., p. 26:7-12; 27:8-16; 32:6-33:11; 33:24-34:5; 35:4-10. | Undisputed. |

| | |
|---|---|
| 100. Plaintiff also claims that Defendant promised that he would be able to "work on" accounts such as Maximus, Hansen and HeatlhNet.<br><br>Comp., ¶¶ 49. 51; Cava Depo., p. 189:6-191:1. | *Disputed*. Plaintiff was promised and actually was assigned on Jennifer Forrest's Sacramento area accounts, except for Octel and including Maximus, Hansen & Healthnet and other accounts.<br><br>Cava Depo., Ex.21. |

ISSUE 14: **Alternatively, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails because the underlying contract for lack of consideration.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 101. Plaintiff claims that Defendant promised that he would be able to "work on" accounts such as Maximus, Hansen and HeatlhNet, which created a binding agreement and a companion covenant of good faith and fair dealing.<br><br>Comp., ¶¶ 49. 51; Cava Depo., p. 189:6-191:1. | *Disputed*. Plaintiff was promised and actually was assigned on Jennifer Forrest's Sacramento area accounts, except for Octel and including Maximus, Hansen & Healthnet and other accounts.<br><br>Cava Depo., Ex.21. |
| 102. Plaintiff has no evidence that this alleged agreement was supported by consideration.<br><br>Comp., ¶¶ 49. 51; Cava Depo., p. 189:6-191:1; *passim*. | ***Disputed.*** Plaintiff agreed to accept employment with Netversant in light of the promises made.<br><br>Cave Decl., ¶ 4. |

ISSUE 15: **Alternatively, Plaintiff's claim for breach of the covenant of good faith and fair dealing fails because he was employed at will.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 103. Plaintiff contends that he had an employment agreement and a companion implied covenant of good faith and fair dealing with Defendant that provided that he would receive "most" of Jennifer Forrest's prior accounts upon his hire, and further contends that Defendant breached this agreement by "failing to assign all the accounts as promised."<br><br>Comp., ¶¶ 49. 51; Cava Depo., p. 189:6-191:1. | *Disputed*. Plaintiff's claim from breach of contract includes a claim that Netversant breached its agreement to return accounts after Plaintiff returned from disability leave. Plaintiff also alleges that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Cava Decl., ¶ 4, 23 |

| | |
|---|---|
| 104. At the time of his hire, Plaintiff signed various documents, including an employment application, offer letter and employee handbook acknowledgment, all of which specifically state that Plaintiff's employment can be terminated at will.<br><br>Cava Dep., p. 39:1-15, 40:6-16; 41:8-22; 42:14-22; 44:1-17; Exhs. 1, 2, 3. | Undisputed. |

**PLAINTIFF'S SEVENTH CAUSE OF ACTION**

**Intentional Misrepresentation**

ISSUE 16: **Plaintiff's claim for intentional misrepresentation fails because Plaintiff has not identified a specifically enforceable misrepresentation.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 105. Plaintiff claims that he was defrauded during the interview process when Defendant allegedly told him that he would get "most" of Jennifer Forrest's accounts.<br><br>Comp., ¶¶ 55-56; Cava Dep., p. 26:7-12; 27:8-16; 32:6-9; 33:24-34:5; 35:4-10. | *Disputed*. Plaintiff's claim fraud includes Plaintiff claim that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Comp., ¶ 55; Cava Decl., ¶4 |
| 106. Plaintiff admits that he was never told what specific accounts he was to receive, nor was he told what percentage of Ms. Forrest's accounts would be given to him.<br><br>Cava Dep., p. 26:7-12; 27:8-16; 32:6-33:11; 33:24-34:5; 35:4-10. | Undisputed. |

ISSUE 17: **Alternatively, Plaintiff's claim intentional misrepresentation fails because he has no evidence of falsity.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 107. Plaintiff claims that he was defrauded during the interview process when Defendant allegedly told him that he would get "most" of Jennifer Forrest's accounts.<br><br>Comp., ¶¶ 55-56; Cava Dep., p. 26:7-12; 27:8-16; 32:6-9; 33:24-34:5; 35:4-10. | *Disputed*. Plaintiff's claim fraud includes Plaintiff claim that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Comp., ¶ 55; Cava Decl., ¶4 |

| | |
|---|---|
| 108. Plaintiff admits he has "no indication" that the alleged promises were false at the time they were made to him.<br><br>Cava Depo. p. 196:23-197:5. | Undisputed. |

ISSUE 18: **Alternatively, Plaintiff's claim for intentional misrepresentation fails because he cannot prove reasonable reliance.**

| **NETVERSANT'S STATEMENT** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 109. Plaintiff claims that he was defrauded during the interview process when Defendant allegedly told him that he would get "most" of Jennifer Forrest's accounts.<br><br>Comp., ¶¶ 55-56; Cava Dep., p. 26:7-12; 27:8-16; 32:6-9; 33:24-34:5; 35:4-10. | ***Disputed***. Plaintiff's claim fraud includes Plaintiff claim that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Comp., ¶ 55; Cava Decl., ¶4 |
| 110. Before Plaintiff started working he received and signed for a written offer letter, which identified no specific accounts that were assigned to Plaintiff.<br><br>Cava Depo., Exh. 2. | Undisputed. |
| 111. At the time of his hire, Plaintiff received and signed for a written compensation plan, which stated that "assigned accounts" would be given in writing and mentioned no specific accounts that were assigned to Plaintiff.<br><br>Cava Depo., Exh. 5. | Undisputed. |

ISSUE 19: **Alternatively, Plaintiff's claim for intentional misrepresentation fails because he remained employed even after he became aware of the alleged falsity of the promises.**

| **NETVERSANT'S STATEMENT** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 112. Plaintiff claims that he was defrauded during the interview process when Defendant allegedly told him that he would get "most" of Jennifer Forrest's accounts.<br><br>Comp., ¶¶ 55-56; Cava Dep., p. 26:7-12; 27:8-16; 32:6-9; 33:24-34:5; 35:4-10. | ***Disputed***. Plaintiff's claim fraud includes Plaintiff claim that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Comp., ¶ 55; Cava Decl., ¶4 |

| | |
|---|---|
| 113. Plaintiff knew that he was not going to be getting "most" of Jennifer Forrest's accounts within a month of his hire, yet remained employed for more than year.<br><br>Cava Depo., p. 50:6-22. | Undisputed. |

**PLAINTIFF'S SEVENTH CAUSE OF ACTION**

**Negligent Misrepresentation**

ISSUE 20: **Plaintiff's claim for negligent misrepresentation fails because Plaintiff has not identified a specifically enforceable misrepresentation.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 114. Plaintiff claims that he was defrauded during the interview process when Defendant allegedly told him that he would get "most" of Jennifer Forrest's accounts.<br><br>Comp., ¶¶ 62-63; Cava Dep., p. 26:7-12; 27:8-16; 32:6-9; 33:24-34:5; 35:4-10. | ***Disputed***. Plaintiff's claim fraud includes Plaintiff claim that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Comp., ¶ 55; Cava Decl., ¶4 |
| 115. Plaintiff admits that he was never told what specific accounts he was to receive, nor was he told what percentage of Ms. Forrest's accounts would be given to him.<br><br>Cava Dep., p. 26:7-12; 27:8-16; 32:6-33:11; 33:24-34:5; 35:4-10. | Undisputed. |

ISSUE 21: **Alternatively, Plaintiff's claim negligent misrepresentation fails because he has no evidence of falsity.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 116. Plaintiff claims that he was defrauded during the interview process when Defendant allegedly told him that he would get "most" of Jennifer Forrest's accounts.<br><br>Comp., ¶¶ 62-63; Cava Dep., p. 26:7-12; 27:8-16; 32:6-9; 33:24-34:5; 35:4-10. | ***Disputed***. Plaintiff's claim fraud includes Plaintiff claim that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Comp., ¶ 63; Cava Decl., ¶ 4. |
| 117. Plaintiff admits he has "no indication" that the alleged promises were false at the time they were made to him.<br><br>Cava Depo. p. 196:23-197:5. | Undisputed. |

**ISSUE 22: Alternatively, Plaintiff's claim for negligent misrepresentation fails because he cannot prove reasonable reliance.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 118. Plaintiff claims that he was defrauded during the interview process when Defendant allegedly told him that he would get "most" of Jennifer Forrest's accounts.<br><br>Comp., ¶¶ 62-63; Cava Dep., p. 26:7-12; 27:8-16; 32:6-9; 33:24-34:5; 35:4-10. | *Disputed*. Plaintiff's claim fraud includes Plaintiff claim that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Comp., ¶ 62; Cava Decl., ¶4 |
| 119. Before Plaintiff started working he received and signed for a written offer letter, which identified no specific accounts that were assigned to Plaintiff.<br><br>Cava Depo., Exh. 2. | Undisputed. |
| 120. At the time of his hire, Plaintiff received and signed for a written compensation plan, which stated that "assigned accounts" would be given in writing and mentioned no specific accounts that were assigned to Plaintiff.<br><br>Cava Depo., Exh. 5. | Undisputed. |

**ISSUE 23: Alternatively, Plaintiff's claim for negligent misrepresentation fails because he remained employed even after he became aware of the alleged falsity of the promises.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 121. Plaintiff claims that he was defrauded during the interview process when Defendant allegedly told him that he would get "most" of Jennifer Forrest's accounts.<br><br>Comp., ¶¶ 62-63; Cava Dep., p. 26:7-12; 27:8-16; 32:6-9; 33:24-34:5; 35:4-10. | *Disputed*. Plaintiff's claim fraud includes Plaintiff claim that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Comp., ¶ 62; Cava Decl., ¶4 |
| 122. Plaintiff knew that he was not going to be getting "most" of Jennifer Forrest's accounts within a month of his hire, yet remained employed for more than year.<br><br>Cava Depo., p. 50:6-22. | Undisputed. |

**ISSUE 24: Alternatively, Plaintiff's claim for negligent misrepresentation fails because Plaintiff alleges no misrepresentations of past or existing material fact.**

| NETVERSANT'S STATEMENT | PLAINTIFF'S RESPONSE |
|---|---|
| 123. Plaintiff claims that he was defrauded during the interview process when Defendant allegedly told him that when he started work he would get "most" of Jennifer Forrest's accounts.<br><br>Comp., ¶¶ 62-63; Cava Dep., p. 26:7-12; 27:8-16; 32:6-9; 33:24-34:5; 35:4-10. | ***Disputed***. Plaintiff's claim fraud includes Plaintiff claim that he was promised all of Jennifer Forrest's accounted from the Sacrament area except for Octel.<br><br>Comp., ¶ 62; Cava Decl., ¶4 |

Dated: May 9, 2007

FOTOUHI • EPPS • HILLGER • GILROY LLP

By: ______________________

Daniel P. Iannitelli
Attorneys for Plaintiff

**Shahab E. Fotouhi - 168301**
**Daniel P. Iannitelli - 203388**
FOTOUHI • EPPS • HILLGER • GILROY LLP
160 Pine Street, Suite 710
San Francisco, CA 94111
Tel: 415.362.9300
Fax: 415.358.5521

Attorneys for Plaintiffs
MICHAEL CAVA

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

| | |
|---|---|
| MICHAEL CAVA,<br><br>Plaintiff,<br><br>vs.<br><br>NETVERSANT - NATIONAL, INC., a Delaware corporation, dba NETVERSANT - SAN FRANCISCO, aka NETVERSANT; PETER WAINWRIGHT, an individual; and DOES 1 through 40, inclusive,<br><br>Defendants. | Case No. CGC-06-453469<br><br>**DECLARATION OF PLAINTIFF MICHAEL CAVA** |

I, Michael Cava, hereby declare:

1. I am the plaintiff in this action and have personal knowledge of all matters stated herein and if called upon as a witness I could competently testify thereto.

2. I was employee of Netversant National, Inc., from approximately June 2004 to August 5, 2005. During my tenure at Netversant, I was an Account Executive in the Telephony Division.

3. Since completing my undergraduate degree in 1994, I have worked in sales. In 1999, beginning at Shared Technologies, Inc., I entered the voice equipment/telephony systems industry where I sold related equipment, installation and services. Telephony sales is a fairly specialized sales field with limited players in the industry. Over the years, I integrated into the niche market, gaining valuable experience and insight in the business. By early 2004, I had developed

substantial high end business and proved to be a top producer at Shared Technologies, Inc.

4. I was encouraged, by Kathleen Arceo of Maximus, to seek employment Netversant, because Netversant's then sales executive on the Maximus account, Jennifer Forrest, was leaving. Jennifer Forrest was a very successful account executive at Netversant and had developed a large client base at Netversant. At the time of my interview with Peter Wainwright of Netversant, I expressed to him that I was concerned about leaving my base of recurring business and commissions at Shared Technologies and specifically discussed taking over Jennifer Forrest's accounts. Peter Wainwright told me that I would receive <u>most</u> of Ms. Forrest's accounts, which included all of her accounts in the Sacramento area except for the Octel account and accounts in the San Francisco Bay Area. In light of the promise that I would receive Ms. Forrest's accounts, I was not concerned about leaving behind the commission base I developed at Shared Technologies.

5. At the time of my interview, I also discussed with Mr. Wainwright the possibility of brining some of my clients at Shared Technologies to Netversant. It was agreed that if I took the position with Netversant, I would work to bring the clients Netversant. During the interview, no discussions were made as to a time-line for getting my old accounts to Netversant.

6. In May 2004, I received and accepted an offer of employment with Netversant, which commenced on June 7, 2004. I did not receive the accounts I was promised. Initially, I was only given the Maximus account. A month later, several additional accounts were assigned to me. I raised the issue with Mr. Wainwright, who advised he was assigning the accounts to others. I was upset by his decision, but did not complain further as I did not want to get into a dispute at the beginning of my employment.

7. I immediately went to work on managing the assigned accounts and trying developing new business, while adapting to my new employment. Management of the Maximus account proved to quite extensive, requiring me to provide constant quotes, obtain and process large segments of information, attend meetings and consulted extensively with the client. In addition to Maximus, I was actively servicing other accounts, working on new business and making the inroads to bring to Netversant some of my old clients, including America On-Line.

8. During my first few weeks at Netversant, I was tasked by Peter Wainwright to get the

renewal contract with Maximus. During my review of the files, I discovered an executed renewal contract which neither Netversant nor the client had previously discovered. Had I not found the contract, it would have never been discovered and I would have obtained the renewal contract on my own. After the discovery, Peter Wainwright was happy with the find and I was for the contract.

9. By the end of October 2004, I booked over $414,000 in quota achievement, or 121% of my total quota requirement for the year – with two months left in the sales term for additional sales.

10. At the end of October 2004, there were numerous quotes and prospects in my "funnel" or "pipeline", with a value in excess of $4 million. These included projects which were "new" business opportunities for Netversant.

11. On or about October 19, 2004, I was tasked by Peter Wainwright to go after a $1,000,000 contract for the City of Stockton. Because of the size of the project, I asked another Account Executive to partner or "split" the account and she agreed.

12. By November 1, 2004, I never received any information from Peter Wainwright, or anyone at Netversant, that my performance was substandard or that my position was in jeopardy. And, in light of my quota achievement to date, the long hours I was working and the number of potential sales in my funnel, I objectively found my performance to be more than adequate.

13. Comparing my quota achievement, during my first five months, to other Netversant Account Executives who were employed there much longer, I was performing far above expectations. *Attached as Exhibit A is a true and correct copy of a Netversant Account Executive Ranking Report for October 2001; Attached as Exhibit B is a true and correct copy of a Netversant Account Executive Ranking Report for October 2002; Attached as Exhibit C is a true and correct copy of a Netversant Account Executive Ranking Report for December 2003; and Attached as Exhibit D is a true and correct copy of a Netversant Account Executive Ranking Report for October 2004.*

14. Based on the Executive Ranking Reports attached as exhibits A - D, including the December 2003 report which provides the date of hire for the Account Executives, the following charts reflect certain Account Executives' performance, as compared to my performance, based on the duration of employment, number of months into a specified term and the year of the ranking

report from which the numbers are obtained:

**Comparison to Others Account Executives within first 6 Months**

| Account Executive | Date of Hire | Date of Report | Months Employed | Year to Date Margin |
|---|---|---|---|---|
| Michael Cava | 06/07/04 | 10/31/04 | 5 | 121% or $414,000.00 |
| Michelle Campbell | 07/16/01 | 10/31/01 | 4 | 0% or $393.00 |
| Jason Fuller | 07/09/01 | 10/31/01 | 4 | 0% or $730.02 |
| Nick Joshi | 08/06/01 | 10/31/01 | 3 | 6% or $12,602.17 |
| Pat McCarthy | 05/01/03 | 12/31/03 | 7 | 15% or $52,139.00 |
| Mike Pizzoli | 09/02/03 | 12/31/03 | 3 | 3% or $5,484.00 |

**Comparison to Others Account Executives on Longer Sales Term in 2002**

| Account Executive | Date of Hire | Date of Report | Months into Term | Year to Date Margin |
|---|---|---|---|---|
| Michael Cava | 06/07/04 | 10/31/04 | 5 (2004) | 121% or $414,000.00 |
| Michelle Campbell | 07/16/01 | 10/31/02 | 10 (2002) | 42% or $237,567.36 |
| Jason Fuller | 07/09/01 | 10/31/02 | 10 (2002) | 55% or $241,865.37 |
| Bill Anderson | 10/10/01 | 10/31/02 | 10 (2002) | 33% or $169,572.09 |
| Thomas Low | 09/04/01 | 10/31/02 | 10 (2002) | 37% or$208,085.42 |

**Comparison to Others Account Executives on Longer Sales Term in 2003**

| Account Executive | Date of Hire | Date of Report | Months into Term | Year to Date Margin |
|---|---|---|---|---|
| Michael Cava | 06/07/04 | 10/31/04 | 5 (2004) | %121 or $414,000.00 |
| Jason Fuller | 07/09/01 | 12/31/03 | 12 (2003) | 52% or $262,238.00 |
| Bill Anderson | 10/10/01 | 12/31/03 | 12 (2003) | 32% or $160,836.0 |
| Marcy Kawadler | 01/06/03 | 12/31/03 | 12 (2003) | 48% or $240,919.00 |

**Comparison to Others Account Executives for 2004**

| Account Executive | Date of Hire | Date of Report | Months into Term | Year to Date Margin |
|---|---|---|---|---|
| Michael Cava | 06/07/04 | 10/31/04 | 5 (2004) | $414,000.00 |
| Marcy Kawadler | 01/06/03 | 10/31/04 | 10 (2004) | $489,888.00 |
| Pat McCarthy | 05/01/03 | 10/31/04 | 10 (2004) | $436,804.00 |
| Karen Waarvik | Unknown | 10/31/04 | 10 (2004) | $106,502.00 |
| Mike Pizzoli | 09/02/03 | 10/31/04 | 10 (2004) | $89,914.00 |

15. On November 2, 2004, my infant child, Ryan, was diagnosed with suddenly fell ill and was diagnosed with ependymoma, an extremely rare brain tumor which affects only a handful of children each year. Over the proceeding 10 weeks, my wife and I devoted all of our resources, efforts and prayers attending to Ryan's medical needs. Netversant was initially supportive and other account representatives looked after and worked on my accounts and, despite my offer to go on unpaid leave, Netversant continued to pay my based salary. Ryan's initial diagnosis and treatment was a very difficult period of dire prognoses, changing treatments and adjustment to a new reality. After several weeks of intensive and constant focus on Ryan's condition, I was looking forward to returning to work.

16. While out on personal leave to care for my son during his cancer treatments, various projects which I had worked-up and bid had closed, including a project entitle CG Wallace. I performed most of the work to obtain the CG Wallace account (which was a new business opportunity for Netversant) when I left to go on leave on November 2, 2004. When I returned from leave, I learned that another Account Executive assisted and "took" the client's order on the project. I asked Peter Wainwright if I could receive some credit for my work. Without a rational basis, Mr. Wainwright refused to equitably "split" the credit. This was a very unusual decision, as it was the custom and practice at Netversant to split the credit for projects in proportion to work performed. *Attached hereto as Exhibit E is a true a correct copy of the January 17, 2005 email exchange between myself and Peter Wainwright.*

17. The day after I requested a share of the credit for CG Wallace account, Peter Wainwright placed me on a performance improvement plan. I was shocked when I was placed on the performance improvement plan since there had been no previous indication from Peter Wainwright or anyone else that I was not performing satisfactorily.

18. There were many potential sales which I had quoted and worked-up before my son's illness. Many of these bids were dropped by Peter Wainwright and others while I was out.

19. While I was employed at Netversant, my family was covered under its self-funded employee group health benefits plan. During the first two months of my son's illness, the costs of his medical treatment exceeded well-over $500,000.00.

20. Shortly after I returned to work after my personal leave to care for my son, I lapsed into an acute mental impairment prompting my physician to place me on disability. I commenced my disability leave on January 28, 2005 and was released to work on July 29, 2005. The total time of my disability leave was just under six months. Netversant offered me to go on their short-term disability insurance, but I declined an instead opted for state disability benefits. The arrangement made with my accounts while I was on disability leave was for me to forfeit all my accounts except for Maximus and Hanson. While I was out during the six months, I was assisting on the accounts as much as I could by responding to emails, providing information and assisting with the accounts which I was promised to get back after my leave.

21. I believe that I could have returned to work, without restrictions, shortly after requesting additional leave in August 2005. Had Netversant provided me further accommodation or, at least, discuss other options, a suitable arrangement could be made.

22. At my deposition, I was put on the spot to calculate the percentage of quota achievement I would have had at the end of October 2004 had I not received credit on the Maximus renewal contract. I incorrectly calculated 75%, when in reality it was less than 70%.

23. While I was on disability leave, I had two accounts which, under specific arrangements I made with other Account Executives and Mr. Wainwright, were to be returned to me on my return from leave. The Account Executives managing the accounts were being compensated for the work the performed, did not object to returning the accounts to me or, ultimately, splitting the accounts.

24. Attached hereto as Exhibit F is a true and correct copy June 3, 2004 email from Linda Camarillo of EJ Gallo who was concerned about changing account managers at that particular time in that specific project.

25. The conduct of Peter Wainwright, and others involved in my termination, in demeaning me, singling me out because of my disability, taking accounts away, placing me in plan, intimidating me, setting me up to fail and causing me to be terminated because of my disability has caused me severe emotional distress. Mr. Wainwright intentional ill will toward me and my disability is apparent from his referring to me as "spooky" and going "off the deep end."

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and my own personal knowledge and this declaration was executed on May 8th 2007.

Michael Cava

# EXHIBIT A

**NetVersant**
**Ranking Report 2001**
**OCTOBER**

| Salesperson Name | Annual Margin Quota | Month % of Margin | % of Annual Margin | %of YTD Margin | YTD Margin Perf. | |
|---|---|---|---|---|---|---|
| Sean Dublin | $ 600,000.00 | 53% | 80% | 96% | $ 479,670.44 | 1 |
| Eric Brandenberger | $ 700,000.00 | 23% | 56% | 67% | $ 389,169.36 | 2 |
| Kevin Bryant | $ 900,000.00 | 142% | 45% | 53% | $ 400,761.64 | 3 |
| Tom Preble | $ 900,000.00 | 23% | 44% | 53% | $ 395,407.21 | 4 |
| Allison West | $ 600,000.00 | 22% | 35% | 42% | $ 211,659.49 | 5 |
| Mike Planas | $ 800,000.00 | 28% | 34% | 41% | $ 270,209.83 | 6 |
| Stephen Anderson | $ 800,000.00 | 21% | 21% | 25% | $ 165,563.22 | 7 |
| Jennifer Forrest | $ 800,000.00 | 117% | 19% | 22% | $ 148,766.70 | 8 |
| John Cubiburu | $ 900,000.00 | 25% | 12% | 14% | $ 107,178.50 | 9 |
| Chad Kerlegan | $ 300,000.00 | 6% | 8% | 11% | $ 23,050.92 | 10 |
| Jeff Kurey | $ 500,000.00 | 30% | 6% | 8% | $ 31,637.17 | 11 |
| Thomas Low | $ 200,000.00 | 16% | 4% | 6% | $ 8,761.28 | 12 |
| Nick Joshi | $ 300,000.00 | 50% | 4% | 6% | $ 12,602.17 | 13 |
| Jason Fuller | $ 200,000.00 | 4% | 0% | 0% | $ 730.02 | 14 |
| Michelle Campbell | $ 600,000.00 | 1% | 0% | 0% | $ 393.00 | 15 |

# EXHIBIT B

**NetVersant**
**Ranking Report 2002**
**October**

| Salesperson Name | Sales Annual Margin Quota | Month % of Margin | % of Annual Margin | %of YTD Margin | YTD Margin Perf. |
|---|---|---|---|---|---|
| Nick Joshi | $ 525,000.00 | 242% | 72% | 87% | $ 380,575.78 |
| Kevin Bryant | $ 525,000.00 | 89% | 57% | 68% | $ 298,971.92 |
| John Cubiburu | $ 525,000.00 | 34% | 47% | 56% | $ 245,997.19 |
| Jason Fuller | $ 425,000.00 | 7% | 44% | 53% | $ 186,183.72 |
| Jennifer Forrest | $ 525,000.00 | 304% | 43% | 52% | $ 225,469.58 |
| Michelle Campbell | $ 525,000.00 | 4% | 36% | 43% | $ 187,304.23 |
| Stephen Anderson | $ 525,000.00 | 3% | 33% | 40% | $ 173,226.28 |
| Mike Planas | $ 525,000.00 | 36% | 26% | 31% | $ 136,049.02 |
| Thomas Low | $ 525,000.00 | 14% | 21% | 25% | $ 108,335.14 |
| Bill Anderson | $ 525,000.00 | 152% | 32% | 38% | $ 167,581.29 |
| Don Kerkow | $ 525,000.00 | 1% | 17% | 20% | $ 88,778.12 |
| Dick Meiggs | $ 306,250.00 | 0% | 0% | 0% | $ 923.41 |
| Toni Graci | $ 262,500.00 | 0% | 0% | 0% | $ - |

| Salesperson Name | Maintenance Annual Margin Quota | Month % of Margin | % of Annual Margin | %of YTD Margin | YTD Margin Perf. |
|---|---|---|---|---|---|
| Kevin Bryant | $ 150,000.00 | 388% | 231% | 277% | $ 346,364.13 |
| Jennifer Forrest | $ 150,000.00 | 168% | 140% | 167% | $ 209,338.97 |
| Mike Planas | $ 150,000.00 | 167% | 123% | 148% | $ 185,101.71 |
| John Cubiburu | $ 150,000.00 | 145% | 91% | 109% | $ 136,139.82 |
| Thomas Low | $ 150,000.00 | 150% | 67% | 80% | $ 99,750.27 |
| Stephen Anderson | $ 150,000.00 | 95% | 57% | 69% | $ 85,685.03 |
| Jason Fuller | $ 100,000.00 | 108% | 56% | 67% | $ 55,681.65 |
| Michelle Campbell | $ 150,000.00 | 45% | 34% | 40% | $ 50,263.12 |
| Nick Joshi | $ 150,000.00 | 34% | 23% | 28% | $ 35,111.18 |
| Dick Meiggs | $ 87,500.00 | 56% | 19% | 26% | $ 16,262.89 |
| Don Kerkow | $ 150,000.00 | 8% | 10% | 12% | $ 15,339.45 |
| Bill Anderson | $ 100,000.00 | 3% | 2% | 2% | $ 1,990.80 |
| Toni Graci | $ 75,000.00 | 0% | 0% | 0% | $ - |

| Salesperson Name | Overall Annual Margin Quota | Month % of Margin | % of Annual Margin | %of YTD Margin | YTD Margin Perf. |
|---|---|---|---|---|---|
| Kevin Bryant | $ 675,000.00 | 155% | 96% | 115% | $ 645,336.05 |
| Jennifer Forrest | $ 675,000.00 | 273% | 64% | 77% | $ 434,808.55 |
| John Cubiburu | $ 675,000.00 | 59% | 57% | 68% | $ 382,137.01 |
| Nick Joshi | $ 675,000.00 | 195% | 62% | 74% | $ 415,686.97 |
| Mike Planas | $ 675,000.00 | 65% | 48% | 57% | $ 321,150.73 |
| Jason Fuller | $ 525,000.00 | 27% | 46% | 55% | $ 241,865.37 |
| Michelle Campbell | $ 675,000.00 | 13% | 35% | 42% | $ 237,567.36 |
| Stephen Anderson | $ 675,000.00 | 23% | 38% | 46% | $ 258,911.32 |
| Thomas Low | $ 675,000.00 | 44% | 31% | 37% | $ 208,085.42 |
| Bill Anderson | $ 625,000.00 | 128% | 27% | 33% | $ 169,572.09 |
| Don Kerkow | $ 675,000.00 | 2% | 15% | 19% | $ 104,117.57 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Dick Meiggs** | $ | 393,750.00 | 13% | 4% | 6% | $ | 17,186.30 |
| **Toni Graci** | $ | 337,500.00 | 0% | 0% | 0% | $ | - |

# EXHIBIT C

**NetVersant**
**Ranking Report 2003**
**DECEMBER**

| Salesperson Name | Division | Hire Date | Sales Annual Margin Quota | Month % of Margin | % of Annual Margin | %of YTD Margin | YTD Margin Pe |
|---|---|---|---|---|---|---|---|
| John Cubiburu | SSF | 8/25/1999 | $ 300,000.00 | 49% | 237% | 237% | $ 709,778. |
| Mike Planas | SSF | 1/3/2000 | $ 300,000.00 | 33% | 224% | 224% | $ 671,838. |
| Jennifer Forrest | SAC | 8/2/2000 | $ 300,000.00 | 300% | 222% | 222% | $ 665,044. |
| Kevin Bryant | SSF | 3/1/1998 | $ 300,000.00 | 59% | 217% | 217% | $ 650,753. |
| Nick Joshi | SSF | 8/6/2001 | $ 300,000.00 | 144% | 180% | 180% | $ 540,427. |
| Thomas Low | SSF | 9/4/2001 | $ 300,000.00 | 35% | 121% | 121% | $ 363,324. |
| Michelle Campbell | LA | 7/16/2001 | $ 300,000.00 | 176% | 100% | 100% | $ 300,836. |
| Marcy Kawadler | SSF | 1/6/2003 | $ 300,000.00 | 73% | 74% | 74% | $ 222,793. |
| Bill Anderson | SAC | 10/10/2001 | $ 300,000.00 | 11% | 40% | 40% | $ 119,209. |
| Don Kerkow | SEATTLE | 12/4/2001 | $ 300,000.00 | 3% | 34% | 34% | $ 100,741. |
| Jason Fuller | SSF | 7/9/2001 | $ 300,000.00 | 11% | 27% | 27% | $ 81,148. |
| Dick Meiggs | PORTLAND | 6/3/2002 | $ 300,000.00 | 0% | 21% | 21% | $ 64,015. |
| Pat McCarthy | SAC | 5/1/2003 | $ 200,000.00 | 16% | 21% | 21% | $ 41,647. |
| Marion Candia | LA | 1/6/2003 | $ 300,000.00 | 3% | 11% | 11% | $ 31,991. |
| Michael Pizzoli | SSF | 9/2/2003 | $ 300,000.00 | 0% | 3% | 3% | $ 3,871. |

| Salesperson Name | | | Maintenance Annual Margin Quota | Month % of Margin | % of Annual Margin | %of YTD Margin | YTD Margin Pe |
|---|---|---|---|---|---|---|---|
| Jennifer Forrest | SAC | 8/2/2000 | $ 317,729.02 | 103% | 120% | 120% | $ 380,335. |
| Thomas Low | SSF | 9/4/2001 | $ 370,876.85 | 125% | 115% | 115% | $ 425,587. |
| John Cubiburu | SSF | 8/25/1999 | $ 391,753.58 | 101% | 101% | 101% | $ 396,721. |
| Mike Planas | SSF | 1/3/2000 | $ 399,189.63 | 103% | 101% | 101% | $ 404,200. |
| Kevin Bryant | SSF | 3/1/1998 | $ 696,801.00 | 79% | 96% | 96% | $ 668,342. |
| Jason Fuller | SSF | 7/9/2001 | $ 200,000.00 | 89% | 91% | 91% | $ 181,090. |
| Nick Joshi | SSF | 8/6/2001 | $ 200,000.00 | 95% | 79% | 79% | $ 158,917. |
| Michelle Campbell | LA | 7/16/2001 | $ 200,000.00 | 90% | 74% | 74% | $ 148,917. |
| Dick Meiggs | PORTLAND | 6/3/2002 | $ 200,000.00 | 16% | 38% | 38% | $ 75,906. |
| Don Kerkow | SEATTLE | 12/4/2001 | $ 200,000.00 | 36% | 25% | 25% | $ 50,819. |
| Bill Anderson | SAC | 10/10/2001 | $ 200,000.00 | 30% | 21% | 21% | $ 41,627. |
| Marcy Kawadler | SSF | 1/6/2003 | $ 200,000.00 | 29% | 9% | 9% | $ 18,126. |
| Pat McCarthy | SAC | 5/1/2003 | $ 150,000.00 | 18% | 7% | 7% | $ 10,492. |
| Marion Candia | LA | 1/6/2003 | $ 200,000.00 | 2% | 3% | 3% | $ 5,018. |
| Michael Pizzoli | SSF | 9/2/2003 | $ 200,000.00 | 6% | 2% | 2% | $ 1,613. |

| Salesperson Name | | | Overall Annual Margin Quota | Month % of Margin | % of Annual Margin | %of YTD Margin | YTD Margin Pe |
|---|---|---|---|---|---|---|---|
| Jennifer Forrest | SAC | 8/2/2000 | $ 617,729.02 | 199% | 169% | 169% | $ 1,045,380. |
| John Cubiburu | SSF | 8/25/1999 | $ 691,753.58 | 78% | 160% | 160% | $ 1,106,499. |
| Mike Planas | SSF | 1/3/2000 | $ 699,189.63 | 73% | 154% | 154% | $ 1,076,038. |
| Nick Joshi | SSF | 8/6/2001 | $ 500,000.00 | 124% | 140% | 140% | $ 699,344. |
| Thomas Low | SSF | 9/4/2001 | $ 670,876.85 | 84% | 118% | 118% | $ 788,912. |
| Michelle Campbell | LA | 7/16/2001 | $ 500,000.00 | 142% | 90% | 90% | $ 449,753. |
| Jason Fuller | SSF | 7/9/2001 | $ 500,000.00 | 42% | 52% | 52% | $ 262,238. |
| Marcy Kawadler | SSF | 1/6/2003 | $ 500,000.00 | 55% | 48% | 48% | $ 240,919. |
| Bill Anderson | SAC | 10/10/2001 | $ 500,000.00 | 19% | 32% | 32% | $ 160,836. |
| Don Kerkow | SEATTLE | 12/4/2001 | $ 500,000.00 | 16% | 30% | 30% | $ 151,560. |
| Dick Meiggs | PORTLAND | 6/3/2002 | $ 500,000.00 | 6% | 28% | 28% | $ 139,922. |
| Pat McCarthy | SAC | 5/1/2003 | $ 350,000.00 | 179% | 15% | 15% | $ 52,139. |
| Marion Candia | LA | 1/6/2003 | $ 500,000.00 | 89% | 7% | 7% | $ 37,010. |
| Michael Pizzoli | SSF | 9/2/2003 | $ 208,333.33 | 32% | 3% | 3% | $ 5,484. |

# EXHIBIT D

**Account I**
**Rank**
**Octob**

Current Month Booked GOP

| AE | Location | MSD | Booked GOP | |
|---|---|---|---|---|
| Smith, Mr. David M. | So Cal | Palmer | 424,845 | 1 |
| Bartholow, Mr. Raymond | Chesapeake | Castillo | 278,623 | 2 |
| Bryant, Mr. Kevin | San Fran | Palmer | 218,486 | 3 |
| Piechota, Mr. Steve | Silicon Valley | Palmer | 207,493 | 4 |
| Edens, Mr. Bob | Denver | Weiss | 183,357 | 5 |
| Simmons, Mr. Kenneth M | Chesapeake | Castillo | 175,743 | 6 |
| Cubiburu, Mr. John | San Fran | Palmer | 158,985 | 7 |
| Barman, Mr. Robert T. | So Cal | Palmer | 133,181 | 8 |
| Callaway, Mr. Gary Wayne | Texas | Castillo | 121,936 | 9 |
| Joshi, Mr. Nick | San Fran | Palmer | 120,381 | 10 |
| Claeys, Mrs. Michelle M | San Fran | Palmer | 116,030 | 11 |
| Johnson, Mr. Warren D | Cascades | Davis | 99,792 | 12 |
| Benjamin, Mr. Steven | No Cal | Palmer | 83,107 | 13 |
| Nguyen, Mr. Vu D | New England | Feldman | 63,419 | 14 |
| Allen, Mr. George A | Washington | Davis | 62,250 | 15 |
| Voss, Mr. Darry | Philly | Alger | 61,450 | 16 |
| Saitta, Mr. John | No Cal | Palmer | 60,918 | 17 |
| Pacheco, Mr. Joseph M. | New England | Feldman | 56,865 | 18 |
| Young, Mr. Timothy V. | Chesapeake | Castillo | 52,876 | 19 |
| Holmes, Mr. Daniel J | New York | Alger | 52,571 | 20 |
| Bailey, Mr. Stewart D | No Cal | Palmer | 49,380 | 21 |
| Maxwell, Mr. Keith D | Philly | Alger | 45,199 | 22 |
| Leverton, Ms. Heidi E | Washington | Davis | 39,395 | 23 |
| Best, Mr. Dave | Minneapolis | Weiss | 34,719 | 24 |
| Hazel, Mr. Greg B | No Cal | Palmer | 34,550 | 25 |
| Hammers, Mr. David A. | So Cal | Palmer | 28,231 | 26 |
| Perkins, Mr. Donald E | Chesapeake | Castillo | 28,072 | 27 |
| Aubee, Mr. Jason | New England | Feldman | 27,596 | 28 |
| Kendall, Mr. Jerry W | Texas | Castillo | 26,592 | 29 |
| Malone, Mr. James P | Washington | Davis | 20,110 | 30 |
| Hoops, Mr. Bryan J. | Denver | Weiss | 20,044 | 31 |
| Baker, Mr. John L. | Denver | Weiss | 19,858 | 32 |
| Ferguson, Mr. John H. | Nevada | Palmer | 18,934 | 33 |

| | | | | |
|---|---|---|---|---|
| Shortt, Mr. Eric M. | Chesapeake | Castillo | 18,320 | 34 |
| Low, Mr. Thomas | San Fran | Palmer | 17,350 | 35 |
| Garza, Mr. Gustavo A | Texas | Castillo | 16,677 | 36 |
| Anschutz, Mr. Allen | No Cal | Palmer | 16,676 | 37 |
| Tolbert, Mr. David | So Cal | Palmer | 15,380 | 39 |
| Sierra, Mr. David M | Silicon Valley | Palmer | 13,888 | 40 |
| Koller, Mr. Kevin M | Denver | Weiss | 11,648 | 41 |
| McCarthy, Ms. Kathryn Patricia | San Fran | Palmer | 11,231 | 42 |
| Pedersen, Mr. Allan | Nevada | Palmer | 10,901 | 43 |
| Otis, Mr. Hugh | Atlanta | Castillo | 10,088 | 44 |
| Planas, Mr. Mike | San Fran | Palmer | 9,799 | 45 |
| Kawadler, Mrs. Marcy A | San Fran | Palmer | 8,972 | 46 |
| Genes, Mr. Michael J | Nova | Castillo | 8,901 | 47 |
| Clark, Mr. Phillip | Atlanta | Castillo | 8,761 | 49 |
| Cava, Mr. Michael G | San Fran | Palmer | 8,540 | 51 |
| Freeman, Ms. Carole F | Denver | Weiss | 7,998 | 52 |
| Waarvik, Ms. Karen M | San Fran | Palmer | 6,690 | 53 |
| Handler, Ms. Miriam | Washington | Davis | 6,323 | 54 |
| Fanelli, Mr. Giovanni V. | Nevada | Palmer | 6,175 | 55 |
| Harris, Mr. Raphael K | No Cal | Palmer | 6,114 | 56 |
| Allen, Mr. Paul H | Washington | Davis | 5,351 | 57 |
| Roxson, Mr. Dale A | Denver | Weiss | 5,190 | 58 |
| Stroh, Mr. Michael J | Chesapeake | Castillo | 4,845 | 59 |
| Lawrence, Mr. John M. | Texas | Castillo | 4,826 | 60 |
| Raduziner, Ms. Amber N | Nevada | Palmer | 3,385 | 61 |
| Mailman, Mr. Brian D. | Atlanta | Castillo | 3,298 | 62 |
| Trimarchi, Mr. Joseph N | Nevada | Palmer | 3,211 | 63 |
| Williams, Mr. Clifford F. | Texas | Castillo | 2,779 | 64 |
| Settle, Mr. Leonard Gordon | Texas | Castillo | 2,467 | 65 |
| Savely, Ms. Hope A | San Fran | Palmer | 2,297 | 66 |
| Esposito, Mr. Guy | New England | Feldman | 2,106 | 67 |
| Candia, Mrs. Marion V | San Fran | Palmer | 1,201 | 68 |
| Karlen, Mrs. Pamela B | Denver | Weiss | 1,056 | 69 |
| Pizzoli, Mr. Michael P | San Fran | Palmer | 996 | 70 |
| Varesi, Mr. Richard J | New York | Alger | 994 | 71 |
| Benson, Mr. Daniel Peter | Minneapolis | Weiss | 916 | 72 |
| Alvizu, Mr. Anthony | Denver | Weiss | 265 | 73 |
| Ryan, Mr. John B | Minneapolis | Weiss | 180 | 74 |
| Culgin, Ms. Virginia | New England | Feldman | 45 | 76 |
| Reid, Mr. Kelvin | Atlanta | Castillo | - | 77 |

First day of employment with NetVersant was subsequent to July 1, 2

Executive
‹ings
›er-04

Year-to-Date Booked GOP

| AE | Location | MSD | Booked GOP |
|---|---|---|---|
| Piechota, Mr. Steve | Silicon Valley | Palmer | 1,838,880 |
| Bryant, Mr. Kevin | San Fran | Palmer | 1,357,037 |
| Smith, Mr. David M. | So Cal | Palmer | 1,309,580 |
| Pedersen, Mr. Allan | Nevada | Palmer | 1,197,093 |
| Low, Mr. Thomas | San Fran | Palmer | 1,067,080 |
| Joshi, Mr. Nick | San Fran | Palmer | 1,050,336 |
| Aubee, Mr. Jason | New England | Feldman | 904,604 |
| Barman, Mr. Robert T. | So Cal | Palmer | 847,465 |
| Hammers, Mr. David A. | So Cal | Palmer | 716,746 |
| Planas, Mr. Mike | San Fran | Palmer | 703,765 |
| Harris, Mr. Raphael K | No Cal | Palmer | 637,660 |
| Simmons, Mr. Kenneth M | Texas | Castillo | 588,668 |
| Edens, Mr. Bob | Denver | Weiss | 580,391 |
| Claeys, Mrs. Michelle M | San Fran | Palmer | 563,569 |
| Cubiburu, Mr. John | San Fran | Palmer | 563,569 |
| Esposito, Mr. Guy | New England | Feldman | 525,840 |
| Anschutz, Mr. Allen | No Cal | Palmer | 504,536 |
| Kawadler, Mrs. Marcy A | San Fran | Palmer | 489,888 |
| Stroh, Mr. Michael J | Chesapeake | Castillo | 485,766 |
| Leverton, Ms. Heidi E | Washington | Davis | 477,290 |
| Allen, Mr. George A | Washington | Davis | 454,987 |
| McCarthy, Ms. Kathryn Patricia | San Fran | Palmer | 436,804 |
| Maxwell, Mr. Keith D | Philly | Alger | 400,200 |
| Kendall, Mr. Jerry W | Texas | Castillo | 398,260 |
| Callaway, Mr. Gary Wayne | Texas | Castillo | 367,564 |
| Cava, Mr. Michael G | San Fran | Palmer | 358,895 |
| Benjamin, Mr. Steven | No Cal | Palmer | 344,616 |
| Bartholow, Mr. Raymond | Chesapeake | Castillo | 324,533 |
| Culgin, Ms. Virginia | New England | Feldman | 314,527 |
| Nguyen, Mr. Vu D | New England | Feldman | 294,940 |
| Koller, Mr. Kevin M | Denver | Weiss | 284,849 |
| Saitta, Mr. John | No Cal | Palmer | 281,953 |
| Candia, Mrs. Marion V | San Fran | Palmer | 276,142 |

| | | | |
|---|---|---|---|
| Best, Mr. Dave | Minneapolis | Weiss | 274,262 |
| Young, Mr. Timothy V. | Chesapeake | Castillo | 263,428 |
| Hoops, Mr. Bryan J. | Denver | Weiss | 259,524 |
| Hazel, Mr. Greg B | No Cal | Palmer | 253,316 |
| Johnson, Mr. Warren D | Cascades | Davis | 241,990 |
| Ferguson, Mr. John H. | Nevada | Palmer | 226,089 |
| Savely, Ms. Hope A | San Fran | Palmer | 223,269 |
| Voss, Mr. Darry | Philly | Alger | 222,179 |
| Clark, Mr. Phillip | Atlanta | Castillo | 209,237 |
| Allen, Mr. Paul H | Washington | Davis | 207,128 |
| Garza, Mr. Gustavo A | Texas | Castillo | 206,549 |
| Bailey, Mr. Stewart D | No Cal | Palmer | 203,194 |
| Freeman, Ms. Carole F | Denver | Weiss | 191,360 |
| Malone, Mr. James P | Washington | Davis | 180,288 |
| Pacheco, Mr. Joseph M. | New England | Feldman | 178,652 |
| Tolbert, Mr. David | So Cal | Palmer | 173,223 |
| Benson, Mr. Daniel Peter | Minneapolis | Weiss | 171,128 |
| Sierra, Mr. David M. | Silicon Valley | Palmer | 156,307 |
| Roxson, Mr. Dale A | Denver | Weiss | 152,918 |
| Perkins, Mr. Donald E | Chesapeake | Castillo | 129,970 |
| Varesi, Mr. Richard J | New York | Alger | 112,814 |
| Waarvik, Ms. Karen M | San Fran | Palmer | 106,502 |
| Otis, Mr. Hugh | Atlanta | Castillo | 96,408 |
| Pizzoli, Mr. Michael P | San Fran | Palmer | 89,914 |
| Genes, Mr. Michael J | Nova | Castillo | 74,824 |
| Shortt, Mr. Eric M. | Chesapeake | Castillo | 62,094 |
| Baker, Mr. John L. | Denver | Weiss | 58,934 |
| Holmes, Mr. Daniel J | New York | Alger | 49,769 |
| Handler, Ms. Miriam | Washington | Davis | 45,931 |
| Reid, Mr. Kelvin | Atlanta | Castillo | 45,844 |
| Mailman, Mr. Brian D. | Atlanta | Castillo | 40,790 |
| Lawrence, Mr. John M. | Texas | Castillo | 26,274 |
| Fanelli, Mr. Giovanni V. | Nevada | Palmer | 25,311 |
| Trimarchi, Mr. Joseph N. | Nevada | Palmer | 7,702 |
| Settle, Mr. Leonard Gordon | Texas | Castillo | 6,425 |
| Raduziner, Ms. Amber N | Nevada | Palmer | 5,193 |
| Williams, Mr. Clifford F. | Texas | Castillo | 3,902 |
| Ryan, Mr. John B. | Minneapolis | Weiss | 2,321 |
| Karlen, Mrs. Pamela B | Denver | Weiss | 1,056 |
| Alvizu, Mr. Anthony | Denver | Weiss | 265 |

2004.

**Michael Cava**

**From:** Peter Wainwright
**Sent:** Monday, January 17, 2005 4:27 PM
**To:** Michael Cava
**Subject:** RE: GC Wallace Sacramento new project request

As we have been paying you while you were out and this was worked and closed by Matt and you did not even think it was happening soon, this looks like a Matt deal, referral to Raphael is fine. Let Matt know that he originated it and should fill out the form for the 1%

-----Original Message-----
**From:** Michael Cava
**Sent:** Monday, January 17, 2005 3:18 PM
**To:** Peter Wainwright
**Subject:** FW: GC Wallace Sacramento new project request

Peter,

I am hoping to talk to you about this project, and how it should be handled.

I had worked on quoting this, meeting with customer multple times, and arranging a demo. The customer called and ordered it while I was out through Matt Compton. I am fine with it all going under him if you think that is fair.

This was a referral from Raphael Harris (Sacto cable rep). I did not turn in the referral paperwork, because I thought this was a longshot. They shopped a number of vendors... I do need to get him at least the 1% referral fee.

Thank you,

Michael Cava
Account Executive
***NetVersant, San Francisco***
916-286-3309 Phone Direct
916-286-3399 Fax
510-821-3680 Cellular
mcava@netversant.com

---

**From:** Rey Torres
**Sent:** Monday, January 17, 2005 3:01 PM
**To:** Michael Cava
**Subject:** FW: GC Wallace Sacramento new project request

-----Original Message-----
**From:** Lenny Moss
**Sent:** Friday, January 14, 2005 12:44 PM
**To:** Rey Torres
**Cc:** Matthew Compton
**Subject:** FW: GC Wallace Sacramento new project request

Hello Rey,
Below is a project setup form provided from NV Seattle for a new Avaya customer sold by Matthew Compton here in Sacramento. Will this format be acceptable to set up a project for this new customer? Or does this information need to be transported to the SF Project setup form?

Also, is there additional information that you will need from Matt to open the project?

Lenny

**From:** Mike Bradley
**Sent:** Thursday, January 13, 2005 8:35 AM
**To:** Lenny Moss
**Cc:** Matthew Compton
**Subject:** GC Wallace Sacramento.xls

Lenny,

Please call me about this spreadsheet if you have questions.

Mike

<< File: GC Wallace Sacramento.xls >>

# EXHIBIT F

**Administrator 2**

**From:** Camarillo, Linda [Linda.Camarillo@ejgallo.com]
**Sent:** Thursday, June 03, 2004 9:34 AM
**To:** Jeff Cotter
**Cc:** Sandra Cheer; Cindy Giertych; Michael Cava
**Subject:** RE: Status - Symposium Call Center Server Installation

Jeff - And All - I will be out all of next week - June 7 through 14. Back June 15. I had hoped to line this up before I leave. I am very concerned about changing Account Management mid-stream on this project. We could do this the week of June 28 if that would work better.

*Linda Camarillo*
*Telecom Project Leader*
*E. & J. Gallo Winery*
*209 341-3761 Fax 209 341-1526*

-----Original Message-----
**From:** Jeff Cotter [mailto:jcotter@netversant.com]
**Sent:** Thursday, June 03, 2004 9:03 AM
**To:** Camarillo, Linda
**Cc:** Sandra Cheer; Cindy Giertych; Michael Cava
**Subject:** RE: Status - Symposium Call Center Server Installation

Hello, Linda I am scheduled to be on vacation the week of the 21st, however I will work with your new account manager Michael Cava to see if he can accommodate the week of the 21st. You will receive a call from one of us early next week to confirm a date. Thanks.

Jeff

-----Original Message-----
**From:** Camarillo, Linda [mailto:Linda.Camarillo@ejgallo.com]
**Sent:** Wednesday, June 02, 2004 10:34 AM
**To:** Jeff Cotter
**Cc:** Sandra Cheer; Cindy Giertych
**Subject:** FW: Status - Symposium Call Center Server Installation

Jeff - Customer Servier (our 29-person new call center), would like a Symposium presentation for their VP's so they understand the capabilities and have a good overview of the design. Cindy and I were talking about the progress on the project and feel the week of June 21 would work into that schedule pretty well. Please let me know what can work, and I'll get a room and people scheduled. Cindy should probably be involved so she can relate to any questions concerning the actual design. Thanks

*Linda Camarillo*
*Telecom Project Leader*
*E. & J. Gallo Winery*

*209 341-3761 Fax 209 341-1526*

-----Original Message-----
**From:** Kenitzer, Sandi
**Sent:** Monday, May 24, 2004 12:01 PM
**To:** Camarillo, Linda
**Subject:** RE: Status - Symposium Call Center Server Installation

Linda - Where are we with setting up a demo of the tool for Ernie and Doug? They would just like to see the functionality and features. Doesn't have to be fancy.

-----Original Message-----
**From:** Camarillo, Linda
**Sent:** Monday, May 24, 2004 10:13 AM
**To:** Zelones, Norm; Nobuhata, Steve; O'Donnell, Sean; O'Neill, Tom; Pastenieks, John; Saraiva, Mike; Takeshita, Hayata; Wolgamot, Ross; Zacharias, Linda; Acuna, Matt; Compton, Deanne; Grijalva, Dannete; Kenitzer, Sandi; Leavitt, Barbara; Lee, Dwight; Maan, Tony; Rivera-O'Herin, Elizabeth; Shubin, Marie
**Cc:** Sandi Cheer (scheer@netversant.com); Cindy Giertych (cgiertych@netversant.com)
**Subject:** Status - Symposium Call Center Server Installation

- **Phone System Upgrade: As you know from our previous meeting, we will be installing the upgrade (Succession 3.0) to our phone system (Opetion 81C) prior to activating Symposium. That upgrade is now scheduled for Saturday, June 12.**
- **Call Center Designs: We are following up on the data collected, and will fine tune over the phone during the next couple of weeks. We will schedule a final face to face before setting this design in concrete. Our date for freezing the design is now June 18.**
- **System Cutover: We have pushed this date out to July 21 to allow adequate time for a smooth phone system upgrade, data collection, and hardware installation.**

**Please call if you have any questions.**

*Linda Camarillo*
*Telecom Project Leader*
*E. & J. Gallo Winery*
*209 341-3761 Fax 209 341-1526*

**Shahab E. Fotouhi - 168301**
**Daniel P. Iannitelli - 203388**
FOTOUHI • EPPS • HILLGER • GILROY LLP
160 Pine Street, Suite 710
San Francisco, CA 94111
Tel: 415.362.9300
Fax: 415.358.5521

Attorneys for Plaintiffs
MICHAEL CAVA

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

| | |
|---|---|
| MICHAEL CAVA,<br><br>Plaintiff,<br><br>vs.<br><br>NETVERSANT - NATIONAL, INC., a Delaware corporation, dba NETVERSANT - SAN FRANCISCO, aka NETVERSANT; PETER WAINWRIGHT, an individual; and DOES 1 through 40, inclusive,<br><br>Defendants. | Case No. CGC-06-453469<br><br>**DECLARATION OF DANIEL P. IANNITELLI IN SUPPORT OF PLAINTIFF'S OPPOSITION TO (1) DEFENDANT NETVERSANT'S MOTION FOR SUMMARY JUDGMENT and (2) DEFENDANTS NETVERSANT and WAINWRIGHT's** |

I, Daniel P. Iannitelli, declare:

1. I am an attorney duly licensed to practice law in the State of California and am a partner in the law firm FOTOUHI • EPPS • HILLGER • GILROY LLP, attorneys of record herein for Plaintiff Michael Cava in the above-captioned case.

2. I have personal knowledge of the matters set forth herein, and if called upon as a witness could competently testify thereto.

3. Attached hereto as Exhibit "A" are true and correct copies of relevant excerpts from the deposition of Joanna Cotter, taken on February 22, 2007.

4. Attached hereto as Exhibit "B" are true and correct copies of relevant excerpts from the deposition of Scott Landis, taken on April 17, 2007.

//

5. Attached hereto as Exhibit "C" are true and correct copies of relevant excerpts from the deposition of Michael Cava, taken on January 4, 2007.

6. Attached hereto as Exhibit "D" are true and correct copies of relevant excerpts from the deposition of Michael Mead, taken on May 22, 2006.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 7 day of May, 2007, at San Francisco, California.

Daniel P. Iannitelli