# EXHIBIT A

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    FOR THE COUNTY OF SAN FRANCISCO

3

   MICHAEL CAVA,                     )

4                                    )

                 Plaintiffs,         )

5                                    )

   vs.                               )

6                                    )  NO. CGC

   NETVERSANT-NATIONAL, INC.,   a    )  06-453469

7  Delaware corporation, dba         )

   NETVERSANT- San Francisco,        )

8  etc., et al.,                     )

                                     )

9                Defendants.

10

11

12

13                     DEPOSITION OF

14                    JOANNA COTTER

15                  FEBRUARY 22, 2007

16

17

18 Reported by:    Jodie Barringer Myers CSR #3820

   Ref. 68881

19

20

21

22

23

24

25

                                                          1

1    correct?

2    A.      Yes.

3    Q.      And presumably it was approved, correct?

4    A.      Yes.

5    Q.      You say in your e-mail, "Unfortunately, Mike

6    has not been here long enough to qualify for any

7    protected leave, either federal or state."

8            What did you mean by that?

9    A.      FMLA leave.

10   Q.      What -- FMLA is the federal one.  What is

11   the state one you're referring to there?

12   A.      Um, I'm drawing a blank.

13   Q.      If you don't recall right now, that is okay.

14   A.      I don't recall.

15   Q.      Why were you worrying about Mike qualifying

16   for protective leave at this juncture?

17   A.      Protection of his employment.

18   Q.      Did anybody indicate to you that when he

19   returns, if he returns in January, that his job may

20   be in jeopardy?

21   A.      Say that again.

22   Q.      Did anybody communicate to you -- let's

23   back-track here.

24           You get this e-mail from Mike asking for

25   unpaid leave for 30 days.  I presume he communicated

                                                    19

1    that to you to care for his son?

2    A.    Yes.

3    Q.    You clear it with somebody, although we can

4    assume it's somebody, either Peter or Scott, who

5    approved the unpaid leave?

6    A.    Well, I don't -- Peter doesn't usually

7    approve anything.  It's usually Scott.

8    Q.    So let's assume, so we can assume here,

9    because you wouldn't have done it yourself you just

10   said, that you obtained Scott's approval?

11   A.    Correct.  Yes.

12   Q.    Did Scott indicate to you on that

13   conversation, if you recall, that when and if Mike

14   returned, his job may not be there?

15   A.    If Scott mentioned that?

16   Q.    Right.

17   A.    No.

18   Q.    So at this point, neither you, and

19   presumably neither Mike, had been advised by anybody

20   that his job may be in jeopardy when he returns?

21   A.    You mean managers?

22   Q.    Correct.

23   A.    Correct.

24   Q.    The next e-mail is from Carol Parmer.  Who

25   is that?

                                                    20

1  2005 about this performance improvement plan?

2  A.      This one in this e-mail?

3  Q.      Correct.  The one in Exhibit 7.

4  A.      I don't recall if I did or not.

5  Q.      Did you have any understanding as to what

6  would happen to Mike if he didn't meet the plan?

7  A.      Did I understand?

8  Q.      Did you have any understanding?

9  A.      Yes.

10  Q.      What was your understanding?

11  A.      That he needed to improve his sales.

12  Q.      And my question is, did you have an

13  understanding as to what would happen to him if he

14  didn't improve his sales?

15  A.      Yes.

16  Q.      What was that?

17  A.      Either the plan would either be extended or

18  more discussions were made.

19  Q.      What was -- you can look at this again.  I'm

20  not done with it yet.

21          In reading this e-mail, can you gather from

22  it what the duration of this plan was?

23  A.      Let's see.

24          Can you repeat the question?

25  Q.      Sure.

28

1    And Rob Macchi on the next e-mail on the

2  28th of January, 2005, at 9:42 a.m., says, "Also, are

3  these customers established by other departed reps (

4  Jennifer Forrest?) Also, I would not assign at full

5  credit.  Other thoughts?"

6    And you say, "Are we in agreement that we

7  will put Mike on disability leave without pay?

8  Please advise."

9    Was there -- the question you had was

10  whether he was going to be paid or not; correct?

11  A.    Correct.

12  Q.    The question wasn't whether or not you were

13  going to let him go on disability; correct?

14  A.    Without pay.

15  Q.    Understood.  But two distinctions I think

16  we're making here.  I just want to be clear.  Mike

17  essentially says to you, gets a note from a doctor

18  that says he's disabled.  First of all, did the

19  doctor or Mike ever explain to you the nature of his

20  disability?

21  A.    No.

22  Q.    Did you inquire?

23  A.    No.

24  Q.    Was there an issue as to whether or not --

25  forget about getting paid or not.  Was there an issue

30

1  about whether or not you were going to allow Mike,

2  the company was going to recognize Mike as being on

3  disability leave?

4  A.     We were going to grant that anyway.

5  Q.     So your inquiry was -- how did you know you

6  were going to grant that anyway?

7  A.     I wasn't going to disallow his doctor's

8  note.  The doctor's basically telling his employer

9  that Mike needs to be put on leave.  So we're obeying

10  what the doctor is telling us.

11  Q.     Didn't you -- I'm not trying to argue with

12  you or ask for a legal conclusion.  Didn't you also

13  have the option of firing Mike at the time?

14  A.     I didn't -- it didn't come to my mind.

15  Q.     So Rob Macchi chimes in to you and says that

16  he is in agreement that Mike will be put on leave,

17  disability leave, without pay?

18  A.     Correct.

19              (Plaintiff's Exhibit 9 marked.)

20  Q.     MR. FOTOUHI:  Exhibit 9.

21          Again, if you need to take a break.  I'm

22  just trying to get through this.

23  A.     That is okay.

24  Q.     So is it fair to say, this is a January

25  31st, 2005 letter from you to Mike Cava?

31

1   A.      Yes.

2   Q.      The first sentence is, "Attached is the

3   Hartford STD documentation we spoke about today."

4   A.      Yes.

5   Q.      What is STD?

6   A.      Short-term disability.

7   Q.      So you had -- does that refresh your

8   recollection you had a discussion with Mike Cava on

9   or about January 31st, 2005?

10  A.      Does it refresh?

11  Q.      Refresh your recollection.

12  A.      No.

13  Q.      That is what it says?

14  A.      Yeah.

15  Q.      You have no reason to question yourself as

16  to whether or not you spoke to him.  Do you recall

17  whether or not you spoke to him in person or on the

18  phone?

19  A.      Probably on the phone.

20  Q.      Did he at that time describe to you his

21  disability?

22  A.      No.

23  Q.      Did he tell you anything about whether or

24  not the stress and strain of having to care for his

25  infant during the last three or four months while the

                                                      32

1  child was undergoing various brain surgeries had had

2  a toll on him?

3  A.      No.

4  Q.      Never said that?

5  A.      No.

6  Q.      Did you ever ask him whether or not his

7  disability was work-related?

8  A.      No.

9  Q.      You say, closing out the letter, you say,

10  "As a reminder, I will need your physician's release

11  in order for you to return to work."

12  A.      Standard procedure.

13  Q.      Is this a standard form you used?

14  A.      Yes.

15          (Plaintiff's Exhibit 10 marked.)

16  Q.      MR. FOTOUHI:  Let me give you a package

17  marked as Exhibit 10.  I presume this was the

18  enclosure that was referred to in Exhibit 9; correct?

19  A.      Yes.

20  Q.      Now looking at the second page Bate's

21  stamped D00104, would you have filled this out?

22  A.      Yes.

23  Q.      So going through this, you put in Mike's

24  name, Social Security number, his date of birth?

25  A.      Employer information.

33

1  Q.      Okay.

2         And then it says, "Why did employee stop

3  working?"

4         You say, "Doctor prescribed disability."

5         On the second page of the application, under

6  subset G, it says, "Can the job be modified to

7  accommodate the disability either temporarily or

8  permanently?"  And you say yes.

9         "If yes, explain."

10         You say, "Employee can work from home."

11  A.      Yes.

12  Q.      So you understood whatever disability Mike

13  had, that the job could be modified by allowing him

14  to work from home?

15  A.      Yes.

16  Q.      It says, "Is it possible to offer the

17  employee assistance in doing the job?"  And you say

18  yes.  And, "If yes, explain."

19         You say, "Remote access is already available

20  to employee."

21  A.      Correct.

22  Q.      Again, do you recall why you believe that

23  Mike's disability could be accommodated at the time,

24  with him working from home?

25  A.      I don't understand your question.

                                                    34

1   Q.      Sure.  You say in here, in the application,

2   that the job, Mike's job, could have been modified to

3   accommodate his disability.  You don't know what the

4   disability was.  Your explanation is, he could work

5   from home.

6   A.      Yes.

7   Q.      Why did you write -- what is it about coming

8   to work that affected his disability?

9   A.      He would be away from his child.

10  Q.      So you understood that his -- that in order

11  -- in order to address his disability, that he could

12  work from home, to be close to his child?

13  A.      Care for his child, yes.

14  Q.      But you didn't know what his disability was?

15  A.      No, I don't.

16  Q.      The balance of it was to be prepared by the

17  employee; correct?

18  A.      Yes.

19  Q.      Did anybody make a request of Mike during

20  this -- we'll call it the initial disability leave --

21  to continue working his job from home, to your

22  knowledge?

23  A.      I'm sorry.  Repeat that.

24  Q.      Sure.

25          Did anybody at NetVersant request or require

                                                      35

1  Mike to work from home during this disability period?

2  A.      No.

3          (Plaintiff's Exhibit 11 marked.)

4  Q.      MR. FOTOUHI:  Exhibit 11.  It's just a --

5  it's an e-mail from you dated April 6, 2005 to Mike

6  Cava, and to Mike's home.  The subject was, "Please

7  call me", and the importance was high.

8          Do you recall why you needed to talk to

9  Mike?

10  A.      Because I remember sending that out,

11  thinking, I haven't heard from Mike for a while.

12  Q.      You do that from a personal perspective, or

13  were you wondering whether or not he was -- he had

14  been placed on disability through mid-April, had he

15  not?

16  A.      I believe so.

17  Q.      Going back, I was reading that e-mail, which

18  was Exhibit 8.  You say in here that, "I just

19  received the faxed notification from the doctor

20  putting him on disability leave until April 19th,

21  2005."

22  A.      Okay.

23  Q.      Do you know why you -- there was a high

24  priority for you to speak with him in early April?

25  A.      No.

                                                      36

1    Q.       Did he call you; do you know?

2    A.       I don't remember.

3             (Plaintiff's Exhibit 12 marked.)

4    Q.       MR. FOTOUHI:  Exhibit 12 is an April 18th,

5    2005 correspondence, Esther Gloria to Mike Cava.  I

6    want to direct your attention to the middle of the

7    first paragraph, which says, "We were notified by our

8    HR department that your leave has been extended due

9    to your serious medical health condition until June

10   19th, 2005.  Therefore, an update from your physician

11   will need to be provided no later than April 22nd,

12   2005."

13            At some point between April 6th, this e-mail

14   you asked Mike to call you, and April 18th, were you

15   notified by Mike or his physician that due to a

16   serious medical health condition, that his leave was

17   going to be -- needed to be extended until June 19,

18   2005?

19   A.       If I received a notification?

20   Q.       Right.

21   A.       I don't recall.

22   Q.       Okay.

23   A.       It's possible.

24   Q.       Again, this is not -- if Esther is saying --

25   A.       I told her -- I probably did.

                                                        37

1    other reps.  They will not be returned.  Prior to his

2    departure, he was put on a performance improvement

3    program.  Let me know if you see any issues.

4    Thanks."

5           So when Mike returned to work, he was going

6    to start out with a complete clean and zero slate;

7    right?

8    A.      Apparently so.

9    Q.      He's -- apparently he hadn't developed any

10   accounts, so zero there, and then the accounts that

11   had been assigned to him referred to other reps.  So

12   he was going to have no accounts when he returned to

13   work, correct?

14   A.      Yes.

15           (Plaintiff's Exhibit 16 marked.)

16   Q.      MR. FOTOUHI:  Exhibit 16 is a string of

17   e-mails, D00124, D00125.  This is again continuing

18   with the string of e-mails we talked about in Exhibit

19   15.

20           The addition here is your e-mail of July

21   29th, and Peter's e-mail of the same date, top two on

22   page 1.  You say to Peter in your July 29th, 2005

23   e-mail at 10:57, you say, "Be sure you are clear and

24   remind Mike of what you expect of him with a little

25   sensitivity along with it.  Mike's been through an

41

1   ordeal.  I believe if you work with him a bit he can

2   turn around and be the salesperson we want, or not,

3   but you should give him some guidance."

4        And he responds back and says, "Will do.

5   Thanks."

6        So are you saying there essentially that

7   Peter should put some effort and work with Mike in

8   his developmental skills?

9   A.     I know how Peter is.  So I'm just reminding

10  him to be a little more sensitive and clear.  Mike is

11  the type of person that needs a little more

12  hand-holding, more guidance.

13  Q.     That was your assessment of it?

14  A.     Yes.

15  Q.     Did you not think it was insensitive of

16  Peter to have Mike return from having cared for his

17  son and whatever disability he had to zero accounts?

18  A.     Repeat that.

19  Q.     Sure.

20       Did you not believe that it was insensitive

21  of Peter to have Mike return to work from his

22  disability without a single account?

23  A.     Are you asking me if I feel that it was

24  insensitive of Peter for not giving him accounts

25  back?

                                                    42

1  attempts to work with Mike?

2  A.      Do I know?

3  Q.      Yes.

4  A.      No, I don't know.

5  Q.      Exhibit 17 is a doctor's note, again from

6  Dr. Okamura, that says -- to the best of my ability

7  to read a doctor's hand writing -- it says, "To whom

8  it may concern:  Michael needs time off work.  If

9  questions, please call."

10         Did you receive a copy of this note on or

11  about August 3rd, 2005?

12  A.      Yes.

13  Q.      Did you understand that Mike was again going

14  back on disability?

15  A.      Yes.

16  Q.      Then according to his doctor, that he was

17  disabled and couldn't work?

18  A.      Yes.

19              (Plaintiff's Exhibit 18 marked.)

20  Q.      MR. FOTOUHI:  Exhibit 18 is an e-mail from

21  Mike at his AOL address, dated August 4th, 2005, to

22  you.  Subject line:  Continued leave.

23         He says, "Joanna:  After returning to work

24  for the last few days, I have realized that I was not

25  quite ready to return to work, and my physician

                                                        44

1  agreed.

2          "Please do call with any questions or

3  concerns so we can discuss this further.  I plan on

4  talking to Scott Landis this afternoon as well when

5  he gets back in the office after 1:00.

6          "I truly appreciate all of the help and

7  support you have provided."

8          Did you call or e-mail Mike in response to

9  this e-mail?

10  A.      I believe I did.

11  Q.      And what -- did you e-mail or call him?

12  A.      I believe I called him.

13  Q.      Do you recall what the nature of the

14  discussion was?

15  A.      To ask him how he was, what is going on.

16  Q.      Did he tell you what was going on?

17  A.      Just repeated what he said in the e-mail,

18  that he wasn't ready to go back to work.

19  Q.      And that his physician had agreed?

20  A.      From his notes.

21  Q.      Did he give you any more specifics as to why

22  he wasn't ready to come back to work?

23  A.      No.

24  Q.      But you certainly knew that he was again

25  disabled and couldn't work, return to work, according

                                                        45

1   to his physician and him?

2   A.      Correct.

3              (Plaintiff's Exhibit 19 marked.)

4   Q.      MR. FOTOUHI:   Exhibit 19.  Again, just let

5   us know; I'm trying to power through.

6        Exhibit 19 is a two-page string e-mail,

7   D00127, D00128.  And on the second page, essentially

8   Mike's e-mail to you.

9           On the first page, the first e-mail is

10  August 4th, 2005, at 8:12 a.m. from you to Scott

11  Landis and Peter Wainwright.

12        You say, "Gentlemen:  I'm not certain what

13  you wish to do at this point. Joanna."

14        What guidance were you seeking there?

15  A.      To continue his disability or to discuss,

16  you know, what to do.

17  Q.      Did you accommodate -- first of all, did

18  determining the nature of his disability and

19  accommodating that disability, was that an option

20  that was discussed at the time?

21  A.      To accommodate his current request?

22  Q.      No. My question is, as one of the options

23  here, was the option discussed of determining the

24  nature of Mike's disability and accommodating that

25  disability?

                                                    46

1          MR. WARREN:  Objection as to vague as to

2   discussed with who.

3   Q.      MR. FOTOUHI:  Anyone.  Did you discuss that

4   with anyone at the time, in this August time frame?

5   A.      Did I have discussions with anyone about it?

6   I spoke to Scott Landis.

7   Q.      Did you discuss with Scott Landis the

8   possibility of accommodating Mike's disability?

9   A.      There was nothing we could accommodate.  He

10  could not work.

11  Q.      Did you inquire as to the nature of Mike's

12  disability?

13  A.      Did I inquire?

14  Q.      Right.

15  A.      No.

16  Q.      Did you ever ask Mike whether or not with

17  certain accommodations, whether he could work?

18  A.      Again, his doctor was saying he could not

19  work.

20  Q.      But did you ever ask Mike whether or not

21  regardless of what his doctor said, whether or not

22  this was anything the company could do to accommodate

23  his disability?

24  A.      Did I ask Mike?

25  Q.      Yes.

                                                    47

1    A.        No.

2    Q.        Do you know whether anybody from NetVersant

3    did?

4    A.        I don't know.

5    Q.        Peter e-mails back on August 4th at 11:21

6    and says, "He's a bad fit for this position.  He

7    brought in zero business in his first eight months on

8    the job.  We all feel for his family situation, but I

9    don't believe he can succeed in his position after

10   watching him in action.  He is expecting that he be

11   given accounts, and it was clearly indicated prior to

12   his hiring that his job was to find new customers.

13        "Also, FYI, I was left a very spooky message

14   on my voicemail on Monday night that I saved and

15   suspect it was from him.  I'm concerned that he may

16   have gone off the deep end."

17        Did you ever -- did you know whether Peter

18   ever determined whether or not that "spooky" e-mail

19   was from Mike?

20   A.        No.

21   Q.        Did he ever play that spooky voicemail for

22   you?

23   A.        No.

24   Q.        Did you ever have the impression, talking

25   with Mike, that he had gone off the deep end?

                                                    48

1  A.      From speaking with Mike?

2  Q.      Right.

3  A.      No.

4  Q.      So you then e-mailed.  Between this 11:21

5  e-mail from Peter to you and Scott, and the top

6  e-mail from you at 12:31, did you have any telephonic

7  discussions or face-to-face discussions with either

8  Peter or Scott about Mike Cava?

9  A.      Just with Peter -- I mean Scott.

10  Q.      You had a face --

11  A.      By phone.

12  Q.      What did you and Scott talk about on the

13  phone?

14  A.      Basically what we should do.  Discussed, you

15  know, his -- I mean, we couldn't accommodate him.  We

16  didn't know what to do at this point.

17  Q.      Okay.

18  A.      We had to make some decisions.

19  Q.      You couldn't accommodate him.  You didn't

20  know what to do.  A decision needed to be made.  Now

21  the decision that was made was to fire him; right?

22  A.      The decision was to fire him.

23  Q.      Right?

24  A.      The decision was to offer him to resign or

25  we can terminate him.

49

1    Q.       So, you say in this e-mail, "As an FYI, Mike

2    is not protected under any leave, and our policy does

3    state that if an employee is off of work more than

4    six months for any reason (with legal provisions)..."

5    What do you mean there?

6    A.       I was just getting it from the handbook.

7    Q.       "...that they can be terminated.  Mike was

8    never qualified for any type of leave since he

9    started and left after only five months of service."

10        Well, I thought down here -- Peter said

11    eight months on the job.

12    A.       I don't think Peter knew.

13    Q.       Mike had only been on the job for five

14    months?

15    A.       Yes.

16    Q.       So he hadn't brought business in in Peter's

17    expectations in five months of service; correct?

18    A.       Yes.

19    Q.       "Therefore, we can ask him to resign or

20    terminate him."  That's the decision you made, or was

21    that the decision that Scott Landis made?

22    A.       It was a collective decision.

23    Q.       Again, my -- going back to this question.

24    Why wasn't the option of working with Mike as a

25    possibility of accommodating his disability

                                                          50

1    discussed?

2    A.       Because he couldn't work anymore.   There was

3    an open end note.   It didn't tell us when he was

4    coming back.

5    Q.       But again, not to argue with you, certainly

6    the option was of either asking Mike to get further

7    clarification, or seeking further clarification from

8    Mike; correct?

9    A.       Say that again.

10   Q.       Sure.

11           But you had the option at the time of either

12   contacting Mike or his doctor, with Mike's

13   permission, to seek further clarification as to the

14   nature of his disability and the duration of the

15   leave; correct?

16   A.       I respect their privacy.   I just go by what

17   the doctor tells us in his notes.   I'm not going to

18   go pry into the medical history.   I don't typically

19   do that.

20   Q.       I understand that.   Again, I'm not going to

21   beat this too far.

22           But my question is, you say we decided to

23   ask him to resign or terminate because he couldn't

24   work at all.   And you gather that from a two-line

25   note from his doctor?

                                                        51

1    A.        We have accommodated him throughout the time

2    he was here.  I mean, what he was asked -- he was

3    asked to go on leave several times.  Every time it

4    was granted.  Never denied or questioned.

5    Q.        But now you know he has a disability, my

6    question was, why wasn't there efforts made to

7    accommodate -- to determine what the nature of the

8    disability is, and to accommodate that disability, as

9    opposed to the end-all option of asking him to resign

10   or terminate him?

11   A.        Because we had accommodated him.

12   Q.        So in your mind, you already accommodated

13   him sufficiently that there was no need to further

14   accommodate him?

15   A.        It wasn't my decision.  But that is what we

16   decided.

17   Q.        That was management's sentiment, right?

18   A.        Yes.

19             (Plaintiff's Exhibit 20 marked.)

20   Q.        MR. FOTOUHI:  Two e-mails, both dated August

21   4th, 2005. Appear to be later in the day than the

22   e-mails that were sent on Exhibit 19.

23             So you say, "Scott:  Initially I was going

24   to ask Bill's advice..."  That is Fiedler?

25   A.        Yes.

                                                        52

1  Q.       "...if I should write a letter on behalf of

2  Mike."  You mean to write a letter to Mike, right, on

3  behalf of Mike, stating that if he didn't resign,

4  that we would have terminated?

5  A.       Um, Mike had asked me to write a letter.  I

6  was going to ask Bill about that.  I decided not to

7  call Bill on that.

8  Q.       Is it fair to say that sometime between 12:30

9  on the 4th and 3:43 on the 4th, you had had a

10 discussion with Mike?

11 A.       Yes, I believe I did.

12 Q.       And in that telephone conversation, were you

13 the one who essentially communicated to him that he

14 had the option of either resigning or being

15 terminated?

16 A.       No.

17 Q.       You say, "Initially I was going to ask

18 Bill's advice on if I should write a letter on behalf

19 of Mike stating that if he didn't resign that NV

20 would have terminated him.  I'm recanting this and am

21 giving him until tomorrow morning to decide what he

22 wants to do.  If I don't hear back from Mike, say

23 about noon or the end of business tomorrow, I will

24 terminate him due to his inability to perform his

25 duties, and arrange for his return of his laptop and

53

1    his cell phone."

2         Do you know whether or not by this point you

3    had given Mike the option of resigning or being

4    terminated?

5    A.    I did not give him that option.

6    Q.    Who communicated that option to him?

7    A.    Scott did.

8         Where you're getting confused, Mike had

9    asked -- I believe he had spoken to Scott, and Mike

10   wanted me to write a letter stating -- to write a

11   letter on his behalf stating that NetVersant forced

12   him to resign.

13   Q.    Okay.  Do you know whether or not between

14   12:30 on the 4th and 3:40 -- is that the time --

15   between that time period where Mike and Scott had

16   spoken?

17   A.    I believe so.

18   Q.    And what were the options given Mike, to

19   your understanding?

20   A.    I believe Scott offered him to either resign

21   or we can terminate him.  It was up to him.  It was

22   his decision.

23   Q.    Mike had essentially asked you to document

24   that?

25   A.    In a formal letter.  Then I asked him why.

54

1  A.      I don't recall.  Salespeople, their files

2  are kept at their location typically.

3  Q.      So what does that mean?

4  A.      So any papers generated could be generated

5  either at my end or their end.  Like I said, there

6  was a lot of change going on, so I don't remember if

7  I did it or not.

8              (Plaintiff's Exhibit 23 marked.)

9  Q.      MR. FOTOUHI:  Exhibit 23.  It's a letter you

10  sent to Mike on or about August 5th 2005, advising

11  him of his termination.

12  A.      Yes.

13             (Plaintiff's Exhibit 24 marked.)

14  Q.      MR. FOTOUHI:  Let me back-track here for a

15  second.

16         You said earlier that the decision to ask

17  Mike to resign or to terminate him -- you used the

18  word -- was a collective decision.  Who was a

19  participant in that collective?

20  A.      Scott and I had had discussions.

21  Q.      When you said collective, it was an --

22  A.      Just a discussion we had.  Just a

23  discussion.

24  Q.      So it was you and Scott?

25  A.      Yes.

                                            58

1  could return to work?

2  A.      No.

3  Q.      August 4th, 2005.  "Called Mike to ask if he

4  was okay, and he indicated that with the ordeal he

5  went through, he didn't have time for himself to

6  recover.  I indicated to him that his leave may

7  jeopardize his employment with NV."

8          Why would you have indicated that to him?

9  A.      Well, more of a reminder that the leave he

10  was taking had been unprotected leave.

11  Q.      You're saying that if he leaves, he may

12  jeopardize his employment with the company?

13  A.      It does jeopardize, yes.

14  Q.      In your history of working for NetVersant,

15  has the company ever fired or asked somebody to

16  resign for taking an extended leave?

17  A.      I'm not aware.  I don't know.

18  Q.      Did anybody express to you during the

19  discussions about asking Mike to be terminated or to

20  resign, did anybody express to you an immediate need

21  for replacement for Mike?

22  A.      An immediate need?

23  Q.      To replace Mike.

24  A.      Not that I recall.

25  Q.      In the discussion leading up to Mike's

                                                    62

1  termination or resignation, did anyone indicate to

2  you that the other salespeople were complaining about

3  having to work harder given Mike's absence?

4  A.      Did other salespeople complain?

5  Q.      Right.

6  A.      I don't know. I haven't heard.

7  Q.      On August 4th, going down, you say, "I spoke

8  with Mike, and Mike was quite upset and requested

9  that I prepare a letter or statement indicating if

10  Mike was forced to resign." You said, "I stated that

11  I would not prepare such a document."

12          August 4th, again you say, "I contacted

13  management and advised that I would terminate Mike by

14  close of business on August 5th if he did not call

15  back with a decision."

16          Again, that decision was whether or not he

17  was going to be terminated or he was going to resign;

18  correct?

19  A.      Yes.

20          (Plaintiff's Exhibits 25 and 26 marked.)

21  Q.      MR. FOTOUHI: When Ryan, Mike's son, was in

22  the hospital and undergoing various treatments, do

23  you recall that a friend of the family set up a

24  website? In other words --

25  A.      Yes.

                                                    63

1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2          I, JODIE BARRINGER MYERS, a Certified Shorthand

3     Reporter, licensed by the State of California, being

4     empowered to administer oaths and affirmations pursuant

5     to Section 2093(b) of the Code of Civil Procedure, do

6     hereby certify:

7          That the witness named in the foregoing

8     deposition was present at the time and place specified;

9          That the witness was by me sworn to testify to

10    the truth, the whole truth and nothing but the truth;

11         That the said proceeding was taken before me, in

12    shorthand writing, and was thereafter transcribed, under

13    my direction, by computer-assisted transcription;

14         That the foregoing transcript constitutes a full,

15    true, and correct report of the proceedings which then

16    and there took place;

17         That I am a disinterested person to the said

18    action;

19         IN WITNESS WHEREOF, I have hereunto subscribed my

20    signature on this 27th day of February , 2007.

21

22

23    JODIE BARRINGER MYERS

24    Certified Shorthand Reporter

25    California License #3820


*network solutions for an e-world*

December 9, 2004

Mr. Michael Cava
14 Pinewood Place
Danville, CA 94506

Dear Michael:

On December 8, 2004, you requested a Personal Leave without pay beginning December 13, 2004 with a return date of January 12, 2005. Your request was approved. As with other requested leaves, you are required to continue your current contribution to the payment of benefits. Your payment of $535.84 ($267.92 x 2 pay periods = $535.84) is due on or about December 15, 2004. Please send the payment directly to me for processing.

If you have any questions. please contact me. We look forward to you return.

Regards,

Joanna Cotter
NetVersant San Francisco

JTC/dbh
cc:    Scott Landis
        Peter Wainwright
        File

EXHIBIT ___6___
DATE _7/02/07_
WITNESS _____
JODIE BARRINGER MYERS

**Joanna Cotter**

| | |
|---|---|
| **From:** | Rob Macchi |
| **Sent:** | Friday, January 28, 2005 10:46 AM |
| **To:** | Joanna Cotter |
| **Subject:** | RE: Michael Cava - Disability |

yes.


-----Original Message-----
From: Joanna Cotter
Sent: Fri 1/28/2005 10:24 AM
To:    Rob Macchi; Peter Wainwright; Robert Palmer; Scott Landis; Ken Watler
Cc:    Carol Parmer
Subject:    RE: Michael Cava - Disability

Are we in agreement that we will put Mike on disability leave without pay?  Please advise.

Joanna

-----Original Message-----
From: Rob Macchi
Sent: Friday, January 28, 2005 9:42 AM
To: Peter Wainwright; Joanna Cotter; Robert Palmer; Scott Landis
Cc: Carol Parmer
Subject: RE: Michael Cava - Disability

What/who are the accounts?  Also, are these customers established be other departed reps (jennifer forrest??).  Also, I would not assign at full credit.

Other thoughts?


-----Original Message-----
From: Peter Wainwright
Sent:  Fri 1/28/2005 9:25 AM
To:    Joanna Cotter; Robert Palmer; Rob Macchi; Scott Landis
Cc:    Carol Parmer
Subject:    RE: Michael Cava - Disability

FYI, Mike was given some accounts when he started. At least one of them is of substantial size and ongoing revenue. I have been covering it myself with the help of another rep who has been working it "pro bono". It is a very high maintenance account and it is not appropriate that the rep continues to do it for free and I don't have the bandwidth. I need to reassign this to somebody that can cover it properly and they need to be paid. Are there any issues with me reassigning the accounts?

-----Original Message-----
From: Joanna Cotter
Sent: Thursday, January 27, 2005 12:43 PM
To: Robert Palmer; Rob Macchi; Scott Landis; Peter Wainwright

EXHIBIT _____
DATE _____
WITNESS _____
JODIE BARRINGER HYERS

1

D00083

Cc: Carol Parmer
Subject: Michael Cava - Disability
Importance: High


Gentlemen,

I just received a faxed notification from Dr. Okamura, Mike's doctor, putting him on disability leave until April 19, 2005 and I am requesting your guidance.

Thanks,

_____

Joanna Cotter
NetVersant San Francisco
Direct:  916-286-3301
Fax:     916-286-3394 (Confidential)
E-Mail:  joanna.cotter@netversant.com

2

D00084

**NetVersant**
*network solutions for an e-world*

January 31, 2005

Mr. Michael Cava
14 Pinewood Place
Danville, CA 94506

Dear Mike:

Attached is the Hartford STD documentation we spoke about today. I have completed the Employer's Statement, Section I of the application. Please ensure that you and your physician complete all applicable sections fully to avoid any delays. Once the Hartford application is completed, you (or have your physician) submit the entire packet to the following address:

Hartford – Benefit Management Services
Northland Plaza
3800 W 80th Street
Bloomington, MN 55431
Attention: STD Claims

As a reminder, I will need your physician's release in order for you to return to work. If you have any questions, please feel free to call me.

Regards,

Joanna Cotter
Human Resources Director
NetVersant San Francisco
Direct:        916.286.3301
Facsimile:    916.286.3399
Email: joanna.cotter@netversant.com

Enclosure

EXHIBIT 9
DATE 3/22/07
WITNESS Cotter
JODIE BARRINGER MYERS

NetVersant - Sacramento
1820 Tribute Road. Suite A • Sacramento. CA 95815 • 916-286-3300 • Fax 916-286-3399

D00102



# THE HARTFORD

## HARTFORD LIFE INSURANCE COMPANY
## HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY

## APPLICATION FOR SHORT TERM DISABILITY INCOME BENEFITS

This application package is divided into four sections, as follows:

**Section    I**    **Employer's Statement** - to be completed by the **employer's** authorized representative

**Section    II**    **Employee's Statement** - to be completed by the **employee** who is applying for Short Term Disability benefits.

**Section    III**    **Authorization to Obtain Information** - to be signed by the **employee**.

**Section    IV**    **Attending Physician's Statement** - to be completed by the physician who is treating the **employee**.

EXHIBIT _10_
DATE _____
WITNESS _____
JODIE BARRINGER MYERS

**PLEASE SEE THAT ALL SECTIONS ARE FULLY COMPLETED AND SIGNED. FORWARD THE COMPLETED APPLICATION TO YOUR HARTFORD BENEFIT MANAGEMENT SERVICE CENTER.**

LC-5180-17   Rev 09/02 (Printed in U.S.A.)

D00103

**THE HARTFORD**

APPLICA N FOR SHORT TERM DISABILITY INCOME *BENEFITS*    Section I
HARTFORD LIFE INSURANCE COMPANY
HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY    **Employer's Statement**

To Be Completed by the Employer

| This claim is for *(Employee's Name)* | Social Security Number | Date of Birth |
|---|---|---|
| MICHAEL CAVA | ▬▬▬▬ | ▬▬▬▬ |

Employee's Address *(Street, City, State, Zip)*

14 PINEWOOD PLACE, DANVILLE, CA 94056

**A. Information About the Employer**

| Company's Name | Group Policy Number |
|---|---|
| NETVERSANT | GRH-673843 |

Address *(Street, City, State, Zip)*

1820 TRIBUTE ROAD, SUITE A, SACRAMENTO, CALIFORNIA 95815

Name and Address of Division Where Employee Works *(if different from above)*

1820 TRIBUTE ROAD, SUITE A, SACRAMENTO, CALIFORNIA 95815

**B. Information About the Employee**

| Date employee was hired | What was the employee's regularly scheduled work week? |
|---|---|
| 6/7/2004 | Hours per Week  40.00 |
| Date employee became insured under this plan 1/1/2004 | Scheduled workdays M - F   M - F     Other _____ |

IS  EMPLOYEE ENROLLED IN THE HARTFORD'S LONG TERM DISABILITY PLAN ?   [X] YES   [ ] NO
IF "YES," EFFECTIVE DATE  1/1/2005

Was the employee's STD insurance issued on the basis of a Personal Health Statement?   [ ] Yes  [X] No   If "Yes," attach copy.

Was the employee insured under your prior STD policy?   [ ] Yes  [X] No
If "Yes," please provide the inclusive date of coverage.  From _____  Through _____

Was the employee on Qualifed Family Leave when disability began?   [ ] Yes  [X] No
Did STD & LTD insurance continue while on Family Leave?   [ ] Yes   [ ] No
Date Leave of Absence started under Family  Leave Act _____

**C. Information Needed  for Withholding and Reporting Taxes**

Based on the employer/employee premium contributions made over the last 3 years, what percentage of the STD  100.00 %
LTD _____ % benefit is considered taxable?  *(See Section 7 of IRS Publication 15-A for information on determining the taxable percentage.)*

**D. Information About the Claim**
What was the employee's permanent job on his or her last day at work? *(Please attach a copy of the employee's job description.)*

ACCOUNT EXECUTIVE

| Last day employee actually worked | On that day, did the employee work a full day? |
|---|---|
| 1/27/2005 | [X] Yes  [ ] No  If "No," how many hours were worked? _____ |
| Why did employee stop working? DOCTOR PRESCRIBED DISABILITY | Is the employee's condition work related? [ ] Yes  [X] No |

| Has a claim  been filed with Workers' Compensation? | Date employee is expected/did return to work?  4/19/2005 |
|---|---|
| [ ] Yes  [X] No | Full time ?  [X] Yes  [ ] No |
| If "Yes," send initial report of illness or injury or award notice. | |

LC-5180-17 Rev 09/02    (1)

D00104

## E. Information About Salary

Employee's weekly/hourly rate of pay  $ 31.25

Is employee receiving Salary Continuance or Sick Leave?  ☐ Yes  ☒ No

Weekly Amount $ _____  Date Payments Start _____  Date Payments Will End _____

Will/Is Employee receive(ing) Workers' Compensation Payments? ☐ Yes  ☒ No

Weekly Amount $ _____  Date Payments Start _____  Date Payments Will End _____

## F. Information About the Physical Aspects of the Employee's Job

Check the items below that relate to the employee's job and complete the information requested.  Use these definitions for the frequency of occurrence.
**Not Applicable** means the person does not perform this activity.
**Occasionally** means the person does the activity up to 33% of the time.
**Frequently** means the person does the activity 34% to 66% of the time.
**Continuously** means the person does the activity 67% to 100% of the time.

**Activity**

| Activity | N/A | Occasionally | Frequently | Continuously |
|---|---|---|---|---|
| Standing | ☐ | ☒ | ☐ | ☐ |
| Walking | ☐ | ☒ | ☐ | ☐ |
| Sitting | ☐ | ☒ | ☐ | ☐ |
| Balancing | ☒ | ☐ | ☐ | ☐ |
| Stooping | ☒ | ☐ | ☐ | ☐ |
| Kneeling | ☒ | ☐ | ☐ | ☐ |
| Crouching | ☒ | ☐ | ☐ | ☐ |
| Crawling | ☒ | ☐ | ☐ | ☐ |
| Reaching/Working Overhead | ☒ | ☐ | ☐ | ☐ |
| Keyboard Use/Repetitive Hand Motion | ☐ | ☐ | ☒ | ☐ |
| Climbing | ☒ | ☐ | ☐ | ☐ |

| Activity | Description | Frequency | Weight |
|---|---|---|---|
| ☐ Pushing | _____ | _____ | _____ lbs. |
| ☐ Pulling | _____ | _____ | _____ lbs. |
| ☐ Lifting | _____ | _____ | _____ lbs. |
| ☐ Carrying | _____ | _____ | _____ lbs. |

Can the job be performed by alternating sitting and standing?  ☒ Yes  ☐ No

What are the major tasks requiring the use of one or both hands?  Indicate the percentage of the employee's workday that is spent on each of these tasks.

_____ _____ %
_____ _____ %
_____ _____ %

## G. Information About the Job as it Relates to the Disability

Can the job be modified to accommodate the disability either temporarily or permanently?  ☒ Yes  ☐ No  If "Yes," explain.
Employee can work from home.

Is it possible to offer the employee assistance in doing the job *(e.g., through the use of technology or personal assistance)?*  ☒ Yes  ☐ No
If "Yes," explain. Remote access is already available to employee.

## H. Signature

Joanna Cotter
_____
Name *(Please print or type)*

Human Resources Director
_____
Title

[signature]
Signature

January 31, 2005
Date

( 916 ) 286-3301
Area Code  Telephone Number

( 916 ) 286-3394
Area Code  Fax Number

D00105


**THE HARTFORD**

**APPLICATION FOR SHORT TERM DISABILITY INCOME BENEFITS**
**HARTFORD LIFE INSURANCE COMPANY**
**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**

Section II

**Employee's Statement**

To Be Completed by the Employee  ( BE SURE TO ANSWER ALL QUESTIONS — FAILURE TO DO SO MAY DELAY YOUR CLAIM )

**A. Information About You**

| Last name | First | Middle Initial | Social Security Number |
|---|---|---|---|
| | | | ▮▮▮▮ |

| Address (Street) | City | State/Province | Zip |
|---|---|---|---|

| Telephone Number ( ) Area Code | Date of Birth (Month, Day, Year) | ☐ Male ☐ Female | ☐ Single ☐ Married | ☐ Widowed ☐ Divorced |
|---|---|---|---|---|

Your Employer (include division, if applicable)

NETVERSANT

**B. For an Injury, answer the following questions**

When (i.e., date/time), where and how did the injury occur?

**C. For Illness, Injury or Pregnancy, answer the following questions**

| Date you were first treated by a physician | Name of Physician _____ |
|---|---|
| | Address of Physician _____ |
| ____ (Month) ____ (Day) ____ (Year) | Telephone Number ( ) |

Before you stopped working, did your condition require you to change your job, or the way you did your job?   ☐ Yes  ☐ No
If "Yes," explain.

What aspect of your condition made you unable to work?

Are you receiving or eligible for  ☐ Workers' Compensation  ☐ State Disability  ☐ No Fault Disability  ☐ Other _____

If "Yes," show policy number _____ and name and address of insurer

Weekly Amount $ _____   Date Payments Start _____   Date Payments Will End _____

Is your condition related to your occupation?  ☐ Yes  ☐ No  If "Yes," explain.

Have you filed, or do you intend to file a Workers' Compensation claim?  ☐ Yes  ☐ No  If "No," explain.

**D. Information About the Disability**

| Last day you worked before the disability | Did you work a full day?  ☐ Yes  ☐ No | Date you were first unable to work |
|---|---|---|
| ____ (Month) ____ (Day) ____ (Year) | If "No," explain. | ____ (Month) ____ (Day) ____ (Year) |

| Since that date, have you done any work?  ☐ Yes  ☐ No If "Yes," please indicate dates worked, name of employer and amount earned. | If you have not returned to work, do you expect to?  ☐ Yes  Part time (date) _____  Full time (date) _____  ☐ No |
|---|---|

**E. Information About Tax Withholding**

Federal law requires us to withhold federal income tax from your check *if you request us to do so*. We are also required to send a report to your employer at the end of each calendar year showing your name, total amount of benefits paid to you, total amount withheld, if any, and your social security number. If you want us to withhold tax, please indicate on the line below the dollar amount to be withheld per benefit check. Whole dollars only (minimum is $20.00 per week): $ _____ .00.

D00106

APPLICATION FOR SHORT TERM DISABILITY INCOME BENEFITS

## F. Signature

With the exception of any source(s) of income reported above in Section D of this form, I certify by my signature that I have not received and am not eligible to receive any source of income, except for my Hartford Disability Income. Further, I understand that should I receive income of any kind or perform work of any kind during any period The Hartford has approved my disability claim, I must report all details to The Hartford, immediately.

If I receive disability benefits greater than those which should have been paid, I understand that I will be required to provide a lump sum repayment to the insurance company. The insurance company has the option to reduce or eliminate future disability payments in order to recover any overpayment balance that is not reimbursed.

**For residents of all states *EXCEPT* California, Florida, New Jersey, Colorado, Pennsylvania, Arkansas, New Mexico, Louisiana, Oregon, and Virginia:** A person commits a fraudulent insurance act if that person knowingly, and with intent to defraud any insurance company or other person, either: (a) files an application for insurance or statement of claim containing any materially false information, or (b) conceals information concerning any material fact in order to obtain an insurance policy or a benefit under an insurance policy. **A fraudulent insurance act is a crime.** The Hartford shall pursue prosecution of any fraudulent insurance act to the fullest extent of the law.

**For residents of Florida:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony of the third degree.

**For residents of New Jersey, Arkansas, New Mexico, and Louisiana:** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties. Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**For residents of Colorado:** It is unlawful to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or its agent who knowingly provides false, incomplete, or misleading information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to an insurance settlement or award shall be reported to the Colorado Division of Insurance.

**For residents of Pennsylvania:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects a person to criminal and civil penalties.

**For residents of California: For your protection, California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.**

The statements contained in this form are true and complete to the best of my knowledge and belief.

X _____          X _____
   *SIGNATURE OF THE EMPLOYEE*                           *DATE*

LC-5180-17 Rev 09/02                              (4)

D00107



**APPLICATION FOR SHORT TERM DISABILITY INCOME BENEFITS**          Section III

### Authorization to Obtain and Release Information

TO: Any physician, medical practitioner, hospital, pharmacy, clinic or other medical or medically-related facility or provider of medical or dental services or supplies;

any employer, group policyholder, contract holder or insurer, benefit plan administrator, administrator, The Index System, business entities, financial institutions, consumer reporting agencies, educational institutions, or

any Federal, State or Local Government Agency, including Social Security Administration and Veterans Administration.

I authorize you to release and send to: (i) Hartford Fire Insurance Company, Hartford Life Insurance Company, Hartford Life and Accident Insurance Company, and any affiliate of one or more of these three companies, known collectively as The Hartford; or (ii) The Hartford's representatives, a complete copy of any and all of the following information, records or documents relative to

_____ Insured's Name *(Please print.)*

_____ (Date of Birth)  _____ (Social Security Number)

1. Any and all medical information, including x-ray films, photocopies of medical records, medical histories, physical, mental or diagnostic examinations, and treatment notes. For purposes of this authorization, medical information specifically includes confidential information regarding HIV/AIDS, communicable diseases, alcohol or drug abuse, and mental health, as such information may relate to my claim for benefits.

2. Work information and history, including, but not limited to, job duties, earnings and personnel records, client lists, and and all other work-related information for contractual work performed; information on any insurance coverage and claims filed, including all records and information related to such coverage and claims; credit information, including, but not limited to, credit reports and credit applications; other financial information, e.g., Pension Benefits, bank records; business transactions of any kind or description, including billing, invoices or payment records of any kind; and academic transcripts.

3. Information concerning Social Security benefits, including, but not limited to, monthly benefit amounts, monthly payment amounts, entitlement dates, and information from my Master Beneficiary Record.

I understand that the information obtained by use of the Authorization will be used for the purpose of evaluating and administering a claim for benefits. Any information obtained will not be released by The Hartford to any person or organization EXCEPT to reinsuring companies or their representatives, The Index System, physicians who have treated me, or other persons or organizations performing business or legal services in connection with my Claim, or as may be otherwise lawfully required, or as I may further authorize, or as may be necessary to prevent or to detect the perpetration of a fraud.

I know that I may request to receive a copy of this Authorization.

This Authorization is given in connection with a claim for benefits. I intend that it be valid for the duration of the claim.

A photocopy or facsimile of this authorization shall be valid as the original.

_____
      Signature of Insured  or Guardian

_____
      Relationship to Insured *(if signed by Guardian)*

_____
      Date

LC-5180-17 Rev 09/02                    (5)

D00108

PLICATION FOR SHORT TERM DISABILITY INCOME *BENEFITS*                    Section IV

**Attending Physician's Statement**

## HISTORY

Patient's Name _____ SSN _____ D.O.B. _____ Height _____ Weight _____

Patient's condition is the result of    ☐ Illness    ☐ Injury    ☐ Pregnancy    ☐ Mental/Nervous Condition

If pregnancy, what is the expected date of delivery?  Month _____ Day _____ Year _____ LMP Date _____

Is condition due to an illness or an injury that is work related?    ☐ Yes    ☐ No

## DIAGNOSIS

Diagnosis *(including any complications)* _____

ICD9 Codes _____

Subjective Symptoms _____

Physical Findings *(list all test results, or enclose test)*

Test _____ Date _____ Results _____
Test _____ Date _____ Results _____

Blood Pressure   (Systolic) _____ (Diastolic) _____ (Date) _____

Remarks: _____

## TREATMENT

Date of onset of this condition? _____ List all dates of treatment for this condition since patient ceased work _____

_____ Date of next office visit _____

Has patient been referred to any other physician? ☐ Yes ☐ No  Date(s) _____

If "Yes," name and address _____ Specialty _____

Nature of treatment for this condition *(including surgery/medications)* _____

_____

Was patient hospitalized for this condition? ☐ Yes ☐ No  If "Yes," date(s) admitted _____ date(s) discharged _____

Name and Address of Hospital(s) _____

Was surgery performed? ☐ Yes ☐ No  If "Yes," Date _____ Procedure _____ CPT Code _____

Progress *(please check one)*  ☐ Recovered  ☐ Improved  ☐ Unchanged  ☐ Retrogressed

## IMPAIRMENT

What are the patient's current physical limitations and restrictions?

☐ No limitation of functional capacity; capable of heavy work, no restrictions.
(Lifting 100 lbs. maximum with frequent lifting and/or carrying objects weighing up to 50 lbs.)

☐ Medium manual activity
Lifting 50 lbs. maximum with frequent lifting and/or carrying of objects weighing up to 25 lbs.)

☐ Slight limitation of functional capacity; capable of light work
Lifting 20 lbs. maximum with frequent lifting and/or carrying of objects weighing up to 10 lbs. Even though the weight lifted may be only a negligible amount, a job is in this category when it involves sitting most of the time with a degree of pushing and pulling of arm and/or leg controls, or when it requires walking or standing to a significant degree.)

☐ Moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity
(Lifting 10 lbs. maximum and occasionally lifting and/or carrying articles. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.)

☐ Severe limitation of functional capacity; incapable of minimal (sedentary) activity

What is the psychiatric impairment *(if applicable)*?

☐ Inadequate information to make assessment.
☐ Essentially good functioning in all areas. Occupationally and socially effective.
☐ Slight difficulty in occupational functioning, but generally functioning well. Has some meaningful interpersonal relationships.
☐ Moderate impairment in occupational functioning. Limited in performing some occupational duties.
☐ Major impairment in several areas--work, family relations. Avoidant behavior, neglects family, is unable to work.
☐ Inability to function in almost all areas.

Date patient ceased work due to this impairment: _____ _____ _____
                                                (Month)   (Day)    (Year)

If physical or psychiatric limitations exist, indicate the date limitations have lasted, or will last through: _____ _____ _____
                                                                                                        (Month)  (Day)   (Year)

Attending Physician's Name _____ Telephone #: ( _____ ) _____ Fax # ( _____ ) _____
                                                          Area Code                  Area Code

SS# or E.I.N. # _____ Degree _____ Specialty _____

Street Address _____ City _____ State _____ Zip Code _____

Signature _____                                              Date Signed _____

I-C-5180-17   Rev 09/02                              (6)

D00109



NetVersant
network solutions for an e-world

777 Post Oak Blvd., Suite

Houston, Texas 77056

phone: 713.403.3800

fax: 713.403.3801

April 18, 2005

Michael Cava
14 Pinewood Place
Danville, CA 94506

Dear Michael:

This letter will confirm the continuation of your NetVersant Solutions employee benefits during your leave of absence and confirm your return to work date. Accordingly to the the State of California Disability Insurance, your leave commenced on January 28, 2005. Your estimated return to full duty is April 15, 2005. We were notified by your HR department that your leave has been extended due to your serious medical health condition until June 19, 2005 therefore, an update from your physician will need to be provided no later than April 22, 2005. If you have been released to full duty, a return-to-work release form must be provided from your physician. Finally, you will need to contact your Human Resources Department every 30 days if you will be continue to absence from work due to your disability.

**Once you are on unpaid leave, you have a minimum 30-day grace period in which to make premium payments.** *If payment is not made timely, your group health insurance may be canceled, provided we notify you in writing at least 15 days before the date that your health coverage will lapse.* Therefore, attached please find a 2005 Benefits Enrollment Confirmation Statement, which details your monthly rates. **To provide you with medical benefits for the month of February 2005 through April 2005 you must submit a monthly premium of $2,486.13.** Please make your check payable to NetVersant Solutions and mail it to 777 Post Oak Blvd. Ste 400, Houston, Texas 77056, Attn: Esther Gloria - Human Resources Department.

Should you have any questions regarding this memorandum, please contact me at 713-403-3883. My fax number is 713-403-3811.

Regards,

Esther Gloria

Esther Gloria
Human Resources – NRC

Enclosures
(copy of 2005 Benefits Confirmation Statement)

EXHIBIT __12__
DATE __2/22/07__
__Cotter__
JODIE GARRINGER MYERS

MC 0057

REDACTED

**From:** Peter Wainwright
**Sent:** Friday, July 29, 2005 11:01 AM
**To:** Joanna Cotter
**Subject:** RE: Mike Cava

Will do. thanks

**From:** Joanna Cotter
**Sent:** Friday, July 29, 2005 10:57 AM
**To:** Peter Wainwright
**Subject:** RE: Mike Cava

Peter,

Be sure that you are clear and remind Mike of what you expect of him with a little sensitivity along with it.   Mike's been through an ordeal.  I believe if you work with him a bit he can turn around and be the sales person we want, or not - but you should give him some guidance.

Joanna

**From:** Peter Wainwright
**Sent:** Friday, July 29, 2005 8:56 AM
**To:** Joanna Cotter; Scott Landis; Ken Watler
**Subject:** RE: Mike Cava

FYI, when he returns, I will be returning any accounts that he developed and signed himself (Zero). For the accounts that we gave him when he joined, these have been reassigned and  worked by other reps, they will not be returned. Prior to his departure he was put on a performance improvement program. Let me know if you see any issues. Thanks

**From:** Joanna Cotter
**Sent:** Thursday, July 28, 2005 11:19 AM
**To:** Peter Wainwright; Scott Landis; Ken Watler; Esther Gloria
**Subject:** Mike Cava

Gentlemen and Esther,

I just received a phone call from Mike confirming that he will be returning back to work on Monday, August 1st as scheduled.  I've requested Mike to report to the SSF office to re-acquaint himself with everyone and to work with Peter on any new information he may need to be updated on.

EXHIBIT 16
DATE 7-22-07
WITNESS _____ Cotter
JODIE BARRINGER MYERS

D00124

Esther, Mike has an appointment with his doctor and will be obtaining a return to work release to send to me.  I'll let you know when I receive it.  Let me know if you need a copy.

Thanks,

_____

Joanna Cotter
NetVersant
Direct:  916-286-3301
Fax:     916-286-3394 (Confidential)



EXHIBIT
DATE
WITNESS
JODIE RAPPUBGER MYERS

# REDACTED

---

| | |
|---|---|
| **From:** | Cava02@aol.com |
| **Sent:** | Thursday, August 04, 2005 8:09 AM |
| **To:** | Joanna Cotter |
| **Subject:** | Continued Leave |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Joanna,

After returning to work for the last few days, I have realized that I was not quite ready to return to work, and my physician agreed.

Please do call with any questions or concerns so we can discuss this further. I plan on talking to Scott Landis this afternoon as well when he gets back in the office after 1 PM.

I truly appreciate all the help and support you have provided.

Thank you,

Michael Cava
925-648-3490 Home

EXHIBIT 18
DATE 2-22-10
WITNESS J Cotter
JODIE BARRINGER MYERS

D00118

REDACTED

**From:** Joanna Cotter
**Sent:** Thursday, August 04, 2005 12:31 PM
**To:** Peter Wainwright; Scott Landis
**Subject:** RE: Continued Leave

Scott/Peter,

As an FYI, Mike is not protected under any leave and our policy does state that if an employee is off work more than six months for any reason (with legal provisions) that they can be terminated (Handbook, page 3). Mike was never qualified for any type of leave since he started and left after only 5 months of service. Therefore, we can ask him to resign or terminate him.

Joanna

---

**From:** Peter Wainwright
**Sent:** Thursday, August 04, 2005 11:21 AM
**To:** Joanna Cotter; Scott Landis
**Subject:** RE: Continued Leave

He is a bad fit for this position. He brought in zero business in his first 8 months on the job. We all feel for his family situation but I don't believe he can succeed in his position after watching him in action. He is expecting that he be given accounts and it was clearly indicated prior to his hiring that his job was to find new customers.

Also FYI, I was left a very "spooky" message on my voicemail on Monday Night that I saved and suspect it was from him. I am concerned that he may have gone off the "deep end".

---

**From:** Joanna Cotter
**Sent:** Thursday, August 04, 2005 8:12 AM
**To:** Scott Landis; Peter Wainwright
**Subject:** FW: Continued Leave

Gentlemen,

I'm not certain what you wish to do at this point.

Joanna

---

**From:** Cava02@aol.com [mailto:Cava02@aol.com]
**Sent:** Thursday, August 04, 2005 8:09 AM
**To:** Joanna Cotter

EXHIBIT
_____ 2-22-07 _____
JODIE SARRINGER MYERS

D00127

REDACTED

**From:** Peter Wainwright
**Sent:** Thursday, August 04, 2005 3:53 PM
**To:** Joanna Cotter
**Cc:** Scott Landis
**Subject:** RE: Cava

Agree with your plan. Sad situation, don't know what else we can do.

**From:** Joanna Cotter
**Sent:** Thursday, August 04, 2005 3:43 PM
**To:** Scott Landis; Peter Wainwright
**Subject:** Cava

Scott,

Initially I was going to ask Bill's advice on if I should write a letter on behalf of Mike stating that if he didn't resign that NV would have terminated him. I'm recanting this and am giving him to tomorrow morning to decide what he wants to do. If I don't hear back from Mike, say about noon or the end of business tomorrow, I will terminate him due to his inability to perform his duties and arrange for his return of his laptop, he has his own cell phone.

As a FYI, Mike continued and still continues to contend that he was allegedly treated unfairly because Peter would not return "his" accounts that he worked on with other reps and that promises were broken. I did not want to go to any further in discussion as we've already had a long discussion about it earlier in the morning.

If you believe we should go another route, please let me know as soon as possible. I've already left a message for Mike to call me back.

Thanks,

Joanna Cotter
NetVersant
Direct: 916-286-3301
Fax:   916-286-3394 (Confidential)

D00126

**Subject:** Continued Leave

Joanna,

After returning to work for the last few days, I have realized that I was not quite ready to return to work, and my physician agreed.

Please do call with any questions or concerns so we can discuss this further.  I plan on talking to Scott Landis this afternoon as well when he gets back in the office after 1 PM.

I truly appreciate all the help and support you have provided.

Thank you,

Michael Cava
925-648-3490 Home

D00128



**NetVersant** sm
network solutions for an e-world

August 5, 2005

Mr. Michael Cava
14 Pinewood Place
Danville, CA 94506

Dear Mr. Cava:

The letter is to inform you of your separation with NetVersant as of August 5, 2005. The cause for your termination is due to your inability to perform your duties as an Account Executive.

You will have received your final check for wages paid from August 1 through August 3, 2005. You do not have any vacation accrued and therefore no further pay is due to you. Under federal and state guidelines, COBRA will be mailed to you in a separate cover.

Should you have any questions, please call me at (916) 286-3301.

Sincerely,

Joanna Cotter
Human Resources Director

Cc:    Personnel File
       Peter Wainwright – VP Sales

EXHIBIT 23
DATE 2/20/07
WITNESS COTTER
JODIE BARRINGER MYERS