# EXHIBIT B

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION


MICHAEL CAVA,                          )
                                       )
                Plaintiff,             )
                                       )
       VS.                             )    NO.  CGC-06-453469
                                       )
NETVERSANT - NATIONAL, INC. a          )
Delaware corporation, dba             )
NETVERSANT - SAN FRANCISCO, aka        )
NETVERSANT; PETER WAINWRIGHT, an       )
individual; and DOES 1 through 40,     )
inclusive,                             )
                                       )
                Defendants.            )
_____)


DEPOSITION OF

SCOTT LANDIS

Tuesday, April 17, 2007

---oOo---


CERTIFIED
COPY

REPORTED BY:
MAYA MOROHOSHI, CSR #9564


ROBERT BARNES ASSOCIATES
760 Market Street, Suite 844
San Francisco, California  94102
(415) 788-7191

1       Q.    During the time that you were at NetVersant, was

2   there ever a policy if an account executive failed to

3   achieve the quota as expected for that year, that that

4   account executive would be terminated?

5           MS. HEVERLY:  Objection:  Calls for speculation.

6   Lacks foundation.

7           THE WITNESS:  Could you rephrase that?

8           MR. IANNITELLI:  Q.   Sure.  Was there ever a

9   policy in place during the time you were at NetVersant

10  where if an account executive failed to meet the quota

11  goal for that year, that that account executive would be

12  terminated?

13      A.    There was not a specific policy that said if they

14  don't hit 100 percent of quota that they have to be

15  terminated.  But they were definitely managed against

16  their quota and/or pipeline activity levels.

17      Q.    It's multiple considerations.

18           Do you recall any instances during the time you

19  were at NetVersant in which an account executive in the

20  course of a full 12 months only achieved 30 percent of

21  their quota and still remained employed?

22      A.    I don't recall.

23      Q.    Okay.  Would there ever be a situation where an

24  account executive, using the same example, over the

25  course of one year only achieved 35 percent of their

1    quota and then would be placed on a Performance

2    Improvement Plan because of that?

3        A.    Potentially, yes.

4        Q.    Potentially.  Do you recall during the time you

5    were at NetVersant how many account executives that you

6    were aware were placed on a Performance Improvement Plan?

7        A.    I don't specifically recall.

8        Q.    Was it more than three?

9        A.    Potentially.  But I really can't recall a

10   specific person that was put on the plan, to be honest

11   with you.

12       Q.    Okay.  With a new hire, someone who just joined

13   NetVersant, whether they have experience in telephony

14   sales or no experience in telephony sales, would there be

15   considered a period of time in which they had to ramp up

16   and get going in generating business?  I mean, you know,

17   whether it be a written rule or just an understanding.

18       A.    Yes.  There obviously is ramp-up time for any

19   salespeople.  And the way that a salesperson was measured

20   up through that period of time was through their pipeline

21   and activity levels, number of appointments that they've

22   set, et cetera.

23       Q.    So you understand that it takes a while before,

24   you know, perhaps quotes and bids and work that account

25   executives had been doing for the money to start coming

34

1    in --

2    A.    Correct.

3    Q.    -- or contracts to come in?

4    A.    Correct.

5    Q.    And during those initial ramp-up periods, you

6    understand that they are waiting for such opportunities

7    to come in, but you are looking at how they are

8    performing otherwise, that they've got sufficient bids

9    out there in their pipeline and their forecast. Correct?

10    A.    Exactly.

11    Q.    Now, a ramp-up period, generally, do you have a

12    general understanding of how long a period of time that

13    ramp-up period might be?

14    A.    It generally takes a month or two before you

15    start seeing any production or much production.  And it

16    could be about six months before there's consistent

17    production.

18    Q.    But within those six months, you also noticed

19    that that account executive isn't really doing much out

20    there, doesn't have anything in the pipeline, not

21    quoting, not actively seeking business, then you might

22    see a problem.  Correct?

23    A.    Exactly.

24    Q.    Otherwise, you understand that there's a ramp-up

25    period?

1    Q.    Did you ever recall an experience while you were

2    at NetVersant where someone who had done the majority of

3    work on obtaining a particular contract yet wasn't there

4    to close it and might have been out for a few weeks from

5    which that person got absolutely no credit for it?

6    A.    I don't recall any.

7    Q.    Okay.  You've had a chance to review the Account

8    Executive 2004 Compensation Plan, which has been marked

9    as Exhibit 1.

10    A.    Yes.

11    Q.    Have you seen this document before?

12    A.    It looks familiar.

13    Q.    Okay.  It's not specifically the one as signed by

14    Mr. Cava, which is in front of you.  But do you recall

15    seeing the General Compensation Plan of 2004?

16    A.    Yes.

17    Q.    And do you recall this being the account

18    executive compensation plan for that time?

19    A.    Yes.

20    Q.    And within this plan, as you see it set up, what

21    are the most controlling factors as to expectations of

22    account executives?

23         MS. HEVERLY:  Objection:  Vague and ambiguous.

24         THE WITNESS:  Could you ask it more specifically?

25         MR. IANNITELLI:  Q.  Sure.  What provisions in

1    this plan do you feel that are most instructive as to

2    what is expected from an account executive?

3           MS. HEVERLY:  Objection.  Again, vague and

4    ambiguous.

5           MR. IANNITELLI:  Q.  And if you still have a hard

6    time, please let me know, and I will try to rephrase it.

7      A.    I believe attainment of their quota.

8      Q.    Anywhere in this plan, is there a distinction

9    made between sales that would apply to the quota that

10   come from existing accounts versus new accounts brought

11   in by the account executive?

12          MS. HEVERLY:  Objection.  The document speaks for

13   itself.

14          THE WITNESS:  Could you repeat that?

15          MR. IANNITELLI:  Q.  Sure.  Let's back up a

16   little bit.  GOP quota is basically the amount -- I don't

17   want to get into the complicated ways in which GOP is

18   calculated.  But the GOP quota number, which is reflected

19   up here at the top of the document, is 341,250 for

20   Michael for that year.

21     A.    Okay.

22     Q.    Does it matter what types of sales contributed to

23   that GOP amount?

24          MS. HEVERLY:  I'm going to object again.  The

25   document speaks for itself.  It says "approved jobs."

1   "Approved jobs" is defined.

2        MR. IANNITELLI:  Q.  Okay.  If you can answer the

3   question.

4        A.  Generally, yes.

5        Q.  So it didn't matter if it was a renewal contract

6   or if it was from an existing business or new business?

7        A.  No.

8        Q.  Okay.  And this addendum that was added to it,

9   was this an addendum that was added, if you know,

10  specifically for Michael, or was this an addendum that

11  all account executives under the 2004 plan also had, if

12  you recall?

13       A.  There would not have been a specific addendum for

14  Michael.

15       Q.  Okay.

16       A.  So I'm sure there was an addendum for all account

17  executives.

18       Q.  Okay.  Let's get to the heart of these questions.

19  Do you need a break?

20       A.  No.  Thanks.

21       Q.  All right.  I'm going to ask about some

22  information.  I'm going to go in a chronological order

23  basically from when Michael was there, beginning to end.

24       A.  Okay.

25       Q.  We'll go through this as quickly as possible.

1    hiring him?

2        A.    Yeah.   I don't specifically recall our

3    conversation.   But generally, we would have conversations

4    prior to him bringing somebody on board.

5        Q.    You don't remember any specifics of his

6    discussions with Michael?

7        A.    No.

8        Q.    Okay.   Was Michael, if you recall, being brought

9    in to replace anyone?

10       A.    I don't know if she was -- or he was brought in

11   to specifically replace anybody.   But a salesperson,

12   Jennifer Forrest, was transitioning out of the company or

13   had just recently left the company, so that could have

14   been the open head count that he was replacing.

15       Q.    Okay.   Do you know if anyone had made any

16   specific recommendations about Michael to Peter?

17       A.    I believe Jennifer Forrest did, and had a

18   previous relationship with Michael and had good things to

19   say about him to Peter.   And that may have been how they

20   were contacted.

21       Q.    Contacted.   Do you have any understanding that

22   Kathleen Arceo of Maximus had in any way recommended

23   Michael?

24       A.    No.

25       Q.    Now, you said you mentioned earlier something

1    about a head count.  So Jennifer was transitioning.  Was

2    there a set number of account executives that you guys

3    tried to maintain?

4        A.    That would change from time to time.

5        Q.    Okay.

6        A.    If Peter and management felt that we needed

7    another salesperson in a particular territory, they would

8    open a requisition with Human Resources, which would need

9    to get approved through the chain of command in order to

10   hire additional people.

11       Q.    In the 2004, 2005 time frame, do you recall how

12   many account executives for the San Francisco, Sacramento

13   region NetVersant maintained on average?

14       A.    For the telephony line of business, I would say

15   approximately eight.

16       Q.    But that was not a hard, fast number.  Right?

17       A.    No.

18       Q.    Was the turnover rate for account executives

19   fairly high?

20            MS. HEVERLY:  Objection:  Vague and ambiguous.

21   Calls for speculation.

22            MR. IANNITELLI:  Q.  During the 2004 and 2005

23   period, if you recall.

24       A.    I don't specifically recall.

25       Q.    Does NetVersant maintain, to your knowledge,

1    A.    I don't.

2    Q.    Okay.  Did you have an understanding from Peter

3  or anyone else that he would be assigned several accounts

4  that had belonged to Jennifer Forrest?

5    A.    I believe as part of the interview process in a

6  general conversation that, you know, Michael obviously

7  knew that Jennifer was leaving, and I think part of the

8  intrigue in this position was that there were potentially

9  some accounts that would be assigned to him because we

10  new there was a hole that needed to be filled in the

11  Sacramento market.

12    Q.    Okay.  And that wasn't what you discussed

13  yourself with Peter in front of Michael.  It was

14  something you obtained from Peter?

15    A.    Yeah, I don't recall having any specific

16  conversations with Michael related to that.  I believe

17  that Peter had mentioned that in a conversation just with

18  him and I after the fact.

19        MR. IANNITELLI:  I'm going to need a break.

20  There's a document I need to find.

21        (Recess taken.)

22        MR. IANNITELLI:  Back on the record.

23        I'm going to show you what we are going to have

24  marked as Exhibit 2.

25                        (Plaintiff's Exhibit No. 2

1    I don't recall any specific conversations related to it,

2    I do believe that he had some concerns that the

3    productivity that was expected wasn't quite there.

4        Q.    Do you recall when that was?  Would that have

5    been Mike's first five months?

6        A.    Yeah.  I believe so.

7        Q.    Was this a conversation that you had just with

8    Peter, or would it have involved others?

9        A.    It potentially came up on some of those financial

10   calls.  Although I don't recall specifics, I do know that

11   he expressed that to me a couple of times.

12       Q.    Couple of times.  And that's during the first

13   five months that Michael was there.  Correct?

14       A.    Yeah.

15       Q.    Did he tell you what the concerns were?

16       A.    Again, I don't recall specifics, but the general

17   feeling was that he was spending, you know, his time on

18   an account that was handed to him, and he wasn't spending

19   enough time prospecting and recruiting additional new

20   business opportunities.

21       Q.    Was it inappropriate for Michael to, in your

22   view, spend time working on accounts that were assigned

23   as ongoing?

24       A.    Of course not.

25       Q.    Okay.  And when Peter expressed these concerns to

1    you, did it translate into a concern for you?

2      A.   Not that I recall.  We had -- you know, we would

3    have conversations about sales in general.  And

4    typically, I liked Mike.  I believe that he was going to

5    be a good asset to the team was my feeling.  And although

6    I don't recall specifics of what I said to Peter,

7    essentially, it was probably along the lines of:  Maybe

8    he needs more time to get ramped up, you know.  Of

9    course, he's spending time on this Maximus account, so

10   just talk to him and let him know that he needs to --

11   what your expectations are essentially.

12     Q.   This you recall being discussions you had before

13   his son was diagnosed with cancer?

14     A.   Yes.

15     Q.   Was there anything else that Peter expressed to

16   you about Michael?

17     A.   (Shakes head.)

18     Q.   No?  Other than his concern about not getting new

19   prospects or working on new prospects?

20     A.   Essentially, yeah.

21     Q.   Okay.  Did Peter say anything about Michael's

22   quota achievement progress through that time?

23     A.   Again, it's hard to remember specifics.  I

24   believe that there were conversations that came up on

25   these calls when we would go over the percentage of quota

1    was handed.

2        Q.    And did Peter specifically discuss anything about

3    Michael's pipeline that was deficient in any way?

4        A.    The pipelines were available on each of these

5    calls, so we certainly had them in front of us, and we

6    went over them.  I don't recall any real specifics other

7    than what I just mentioned.

8        Q.    Okay.  Was there anybody else other than Peter

9    who might have commented to you about Michael's

10   performance at NetVersant in any way?

11       A.    It would have been Robert Palmer and/or

12   Rob Macchi on those calls.  And typically, that would be

13   a question directed to Peter:  How do you feel about

14   these sales reps?  You know, I don't recall specifics,

15   but generally this is how those calls would go:  How are

16   the sales people doing?  Any concerns about any of them?

17   Any new hires, like Michael Cava, for example, what

18   you're feeling on him?  How are things working out?

19   And...

20       Q.    Those conversations in which Peter expressed

21   concerns about Mike's production at that time, was there

22   any discussion about how to handle that with Michael?

23   Were discussions of putting Michael on a Performance

24   Improvement Plan made?

25       A.    I don't recall.

1    Q.   Okay.  Would that have been an option that would

2    have normally been applied --

3    A.   Yes.

4    Q.   -- to an account executive?

5    A.   Generally, there would be a conversation or a

6    number of conversations between the sales manager and the

7    account executive.  And if there were no signs of

8    improvement then, typically, there would be a written

9    document addressing that.

10    Q.   Outside of telephone conferences, was there

11    anybody else that had ever -- either other account

12    executives or anybody else in the office -- made any

13    comment to you or any comments that you might have heard

14    about Michael's performance?

15    A.   Not that I recall.

16    Q.   Okay.  You mentioned a few minutes ago about a

17    large contract which Michael was given credit for which

18    Peter didn't feel adequately reflected work done by

19    Michael.  Do you recall what specific contract this might

20    have been?

21    A.   Maximus.

22    Q.   It was a Maximus account contract?

23    A.   Yes.

24    Q.   Do you remember the specifics of it, what

25    occurred?

1    A.    I don't.

2    Q.    Okay.

3    A.    I believe it was a maintenance contract, and I'm

4    not sure what else was involved.

5    Q.    Did you have an understanding that Michael was

6    tasked to go after that maintenance contract by Peter

7    when he first started?

8    A.    I would assume so.

9    Q.    Okay.  Did you learn that Michael had in his

10    review in preparing to go back to that contract found an

11    actual contract that had been completed while Jennifer

12    was there but neither NetVersant nor Maximus was aware of

13    it?

14    A.    I don't recall that.

15    Q.    At the end of October of 2004, which was

16    basically Michael's first five months, did you personally

17    have any complaints about his work, his performance?

18    A.    No.  Again, I really like Michael, and I believe

19    my attitude for the most part in conversations with Peter

20    was:  Hey, give him some more time and let him get ramped

21    up.  And just communicate what the expectations are and,

22    you know, hopefully this will work out.

23          MR. IANNITELLI:  Okay.  I'm going to show you

24    what's going to be marked as Exhibit 3.

25                          (Plaintiff's Exhibit No. 3

1        A.    For Robert Palmer's region.

2        Q.    Do you recall ever seeing the actual attachment,

3    the Year End Booked GOP?

4        A.    I don't recall, no.  I've seen a number of

5    similar looking documents.

6        Q.    This is something that's generally, regularly

7    produced by NetVersant.  Correct?

8        A.    Yeah, I believe.

9             MS. HEVERLY:  Objection:  Calls for speculation.

10            THE WITNESS:  I believe they were attempting to

11    get this out on a monthly basis at that period of time.

12            MR. IANNITELLI:  Q.  All right.  If you look on

13    the first page of this -- I'm sorry.  I didn't have this

14    one, the one that was Bates stamped.  It's this first

15    page.  At the bottom, it lists Michael Cava; correct?

16       A.    Yes.

17       Q.    As him having 414,658 booked?

18       A.    Correct.

19       Q.    And for 2004, as we earlier discussed, Mike began

20    in June 2004?

21       A.    Okay.

22       Q.    And then worked through the end of October 2004.

23    I'm going to represent to you, in the beginning of

24    November through December, he was out on personal leave

25    because of this son's illness.  Okay.  So Michael was

1    there for five months, and he managed to book 415,658?

2        A.    Correct.

3        Q.    And you discussed, Peter felt that at least one

4    of the contracts he was working and he didn't actually

5    perform. Based on this number and considering he still

6    had roughly two months to go, based on this number here

7    of $414,658, would you consider Mike to be performing

8    poorly, in your opinion?

9        A.    Under normal circumstances, that well exceeds his

10   budget for the year. So that can be a tremendous amount

11   that was booked, yes.

12       Q.    I'm going to represent to you, if we take out

13   this large Maximus contract that Peter has mentioned

14   before and that you mentioned, that Mike would have

15   booked roughly -- and this is just something that I'm

16   providing to you, hopefully 120-, $130,000 outside of

17   that contract, which would have been significantly lower

18   than that. Correct?

19       A.    Uh-huh (nods head).

20       Q.    I'm going to represent to you that's roughly 121

21   percent of his quota, that number right there, the

22   415,658?

23       A.    Okay.

24       Q.    If you take out that large contract that's been

25   represented by Peter to be roughly 209,000, he would have

1    booked with five months into it, two months to go,

2    roughly 36 percent of his quota.  Obviously, that's not

3    quite as good as the 414; correct?

4        A.   Correct.

5        Q.   But 36 percent after five months kind of at a new

6    job just starting, is that considered bad performance?

7        A.   No.

8            MS. HEVERLY:  I'm going to object to that

9    question.  It's an incomplete hypothetical.  You have

10   misrepresented that the quota is only based on five

11   months.  It's not like he was performing five months out

12   of twelve.  His quotas are already prorated for the five

13   months, so the whole hypothetical has been

14   misrepresented.

15           MR. IANNITELLI:  I'm going to comment to that

16   that is not his whole quota for five months.  His quota

17   was for seven months.  He just wasn't there for two of

18   those months.  So he achieved roughly, I'm representing,

19   roughly 30 of this quota in those five months.

20       Q.   Would you in your estimation consider that poor

21   performance?

22       A.   No.  Now, I have to say that, typically, when a

23   salesperson starts, they're not handed any accounts

24   whatsoever.  I believe -- although I can only recall

25   Maximus as being the largest account.  I believe that he

1    Q.   Did you have any conversation with Peter about

2  Michael's son's care?

3    A.   I'm sure we discussed it, yeah.

4    Q.   Does anything in particular stick in your mind

5  what Peter might have told you?

6    A.   No.

7    Q.   Were you involved at all in the arrangements made

8  for Michael to -- or mainly arrangements made for other

9  account executives to handle Michael's account while he

10  was gone on leave?

11    A.   No.  That would have been Peter.

12    Q.   Did Peter talk about that to you in any way,

13  discuss how that was done?

14    A.   I don't recall any specifics related to it.

15    Q.   Okay.  I just want to -- so you have a reference

16  of a time line, Michael was out on personal leave from, I

17  believe, November 2nd through January 17th, 2005 is when

18  he returned.  So you have that frame of reference of

19  where I'm going next.

20    A.   Okay.

21    Q.   Now, if Michael had worked and quoted and worked

22  up some potential contracts in the months before his

23  son's diagnosis and someone who was handling the account

24  for Michael had actually closed one of those accounts and

25  contracts, would you expect that Michael would be

1   provided some credit for that account?

2        MS. HEVERLY:  Objection:  Calls for speculation.

3   Incomplete hypothetical.

4        THE WITNESS:  I would think that they would come

5   up with a fair arrangement based on the circumstances.

6   That's typically how...

7        MR. IANNITELLI:  Q.  I'm sorry.  So let's say

8   Mike for an example -- it's a hypothetical -- did 95

9   percent of all the work or 90 percent of all the work on

10  trying to get one of the contracts, and while he was out,

11  did a little bit of work to get it closed.  In that

12  circumstance, would there be some sort of sharing?

13       MS. HEVERLY:  Objection:  Calls for speculation.

14  Incomplete hypothetical.

15       MR. IANNITELLI:  Q.  You can answer.  You've been

16  at NetVersant for seven years.

17    A.    I would speculate that if someone did 95 percent

18  of the work, they would get at least 95 percent of the

19  credit for it.

20    Q.    Would it be unusual or harsh in any way for them

21  to get no credit for it?

22    A.    I believe so, yes.

23       MR. IANNITELLI:  I want to show you what would be

24  Exhibit No. 5.  And this is an email exchange beginning

25  on January 13th, and the last exchange would be on

1    January 17th from Peter to Michael.

2                         (Plaintiff's Exhibit No. 5

3                         was marked for identification.)

4         MS. HEVERLY:  I'm going to pose an objection.

5    This is not Bates stamped, and I don't have any knowledge

6    whether it was ever produced.

7         MR. IANNITELLI:  Okay.

8         MS. HEVERLY:  Do you know if it has been?

9         MR. IANNITELLI:  I'm not sure.  I can quickly

10   check it if you want.  Hang on.  Let's take a look at

11   that.

12        (Mr. Iannitelli exits and returns.)

13        MR. IANNITELLI:  That was produced as MC 0077.

14        MS. HEVERLY:  0077?

15        MR. IANNITELLI:  Yes.

16   Q.   You had a chance to review this.  Correct?

17   A.   Yes.

18   Q.   I note that you weren't cc'd on any of these

19   emails.  Correct?

20   A.   No.

21   Q.   But this is just following up on the last

22   hypothetical I posed.  And I'm going to represent to you

23   that this GC Wallace Sacramento project was one that

24   Michael had quoted, did a lot of work or did the majority

25   of the work, and according to Michael he did 90 percent

1    of the work.  When he returned in 2005, he had a request

2    from Peter whether or not he would receive any credit for

3    this.  And I'll state that Peter determined that this was

4    a deal from Matt and that he would not get any credit.

5    Correct?

6         A.    Yes.

7         Q.    Does that seem kind of out of the ordinary?

8         MS. HEVERLY:  I'm going to object because the

9    document doesn't say anything about him doing 90 percent

10   of the work.  In fact, it says he's happy with the

11   commission going to someone else.  So you've added to

12   facts that aren't in the document and don't have any

13   foundation.

14        MR. IANNITELLI:  I presented to him that Michael

15   said he had done 90 percent of the work.

16        MS. HEVERLY:  I'll object that it's an incomplete

17   hypothetical and lacks foundation.

18        THE WITNESS:  Hypothetically speaking, as I

19   mentioned before, if someone does 90 percent of the work

20   on anything, then my personal feeling is that they should

21   receive that credit.

22        MR. IANNITELLI:  Q.  Okay.  Thank you.  That's

23   the only thing I really wanted to discuss on that.

24        As I stated earlier, Michael returned on or about

25   January 17th, 2005 to go back to work.  Before he

1   returned, had you had any conversations with Peter about

2   Michael specifically?

3      A.   Not that I recall.  Most of the conversation was

4   information coming from Joanna Cotter as to just an

5   update on how his son was doing.

6      Q.   At any time before Michael returned, did Peter

7   mention to you that he was going to place Michael on a

8   Performance Improvement Plan?

9      A.   No.

10         MR. IANNITELLI:  Okay.  I'm going to have marked

11   as Exhibit 6 -- and I apologize if this is not Bates

12   stamped.  I promise you, it was produced.

13         It's an email chain with the last -- it would be

14   at the top, email between you and Michael Cava on

15   January 19th.  Please take a moment and review this

16   document.

17                        (Plaintiff's Exhibit No. 6

18                        was marked for identification.)

19         THE WITNESS:  Okay.

20         MR. IANNITELLI:  Q.  Do you recall receiving this

21   email from Michael?

22      A.   Yes.

23      Q.   Okay.  And did you and Michael actually have a

24   discussion concerning this email?

25      A.   We had a discussion after this email was

1    in turn called me and told me that.

2       Q.   Okay.  So did Mike stop working as of a certain

3    date?

4       A.   Well, when he walked out the door, you know, that

5    was...

6       Q.   I'm just trying to know if you recall whether or

7    not he worked through the 26th or 27th.

8       A.   No.  I don't think so.  I believe that his

9    last -- I don't know specifically what his last day of

10   employment was but, essentially, he wasn't working from

11   the day that he left.

12      Q.   Okay.

13      A.   You know.

14      Q.   But you're certain that he left after this email

15   (indicating)?

16      A.   That's my recollection is that he had -- he

17   received this email, he had a conversation with Peter and

18   then immediately left, went straight to the doctor.

19   That's how it was communicated to me.

20      Q.   Okay.  Let's move on.

21           In your opinion, were there sufficient reasons

22   and bases to place Michael on a Performance Improvement

23   Plan on January 18th, 2005 based on his first five months

24   of work?

25           MS. HEVERLY:  Objection:  Calls for speculation.

1      THE WITNESS:  In my opinion, given the

2  circumstances of everything that was going on with him,

3  to receive this virtually the day that he came back was

4  not something that I would advise.

5      MR. IANNITELLI:  Q.  Have you ever heard of

6  any -- or do you recall any account executive being

7  placed on a Performance Improvement Plan after their

8  first five months at NetVersant and hitting at least 36

9  percent of their quota?

10     A.    I don't recall that, no.

11     Q.    Do you recall anyone being terminated --

12     A.    No.

13     Q.    -- for that same reason?

14     A.    No.  I don't recall that.

15     Q.    Did Joanna state anything specifically to you

16  about the Performance Improvement Plan?

17     A.    She mentioned that she was copied on this, and

18  then subsequently sent me a copy of it.

19     Q.    Okay.

20     A.    Yes.

21     Q.    Did she express any concern as to why he was

22  being placed on a Performance Improvement Plan?

23     A.    I don't think that was discussed as much as it

24  just was poor timing from both me and Joanna's

25  perspective.

1       A.   I believe she's in --

2       Q.   HR?

3       A.   She's in HR.

4       Q.   It's spelled like that (indicating).

5       A.   Gloria was Human Resources.  LaShonda, I don't

6    quite recall, but she was at Corporate.

7            MR. IANNITELLI:  Let me show you what is going to

8    be Exhibit 14.  It's an email from Joanna Cotter on

9    August 5th to Scott Landis, Peter Wainwright and

10   Ed Kingen, Bates stamp D0085.

11                           (Plaintiff's Exhibit No. 14

12                           was marked for identification.)

13           MR. IANNITELLI:  Q.  Do you recall receiving

14   that --

15      A.   Uh-huh.

16      Q.   -- email?  Now, if you look at the first

17   paragraph from Joanna, the last sentence:  He asked if he

18   could send a letter stating the cause of his termination,

19   which he agreed to do, which was due to his inability to

20   perform his duties.  Do you recall if Joanna said this

21   was something Mike specifically requested in his letter?

22      A.   Can you say that again?

23      Q.   What's in quotes, "Due to his inability to

24   perform his duties," is that something Mike requested, or

25   that was decided amongst yourself, Peter, whoever this

1  email was to?

2       MS. HEVERLY:  I'm going to object.  The document

3  speaks for itself.

4       If you have any independent recollection other

5  than what's in the document.

6       MR. IANNITELLI:  I asked if he recalled in the

7  conversation as to whether Michael asked for that

8  specific quote in there.

9       THE WITNESS:  I don't recall.

10      MR. IANNITELLI:  Q.  Okay.  Do you know what

11 "inability to perform his duties" meant?  Do you know?

12    A.    I mean, it's pretty straightforward, isn't it?

13    Q.    Well, okay, straightforward.  What does that

14 mean?

15      MS. HEVERLY:  I'm going to object.  Vague and

16 ambiguous.  Are you asking in this particular context, or

17 generally what do those words mean?

18      MR. IANNITELLI:  In this context, if he has an

19 understanding what that meant.

20      THE WITNESS:  That he's unable to perform his

21 duties.  I mean...

22      MR. IANNITELLI:  Q.  Here's another question:  In

23 your understanding of that, does that mean that his

24 performance was poor, and that's why he was being

25 terminated?

1    A.    I believe that this last time when he showed up

2    to work and had that meeting with Peter and the

3    subsequent conversations that I had with him, he said:    I

4    thought that I was ready to return to work, but I

5    realized that, you know, I'm not.  So in that context, if

6    he's out -- inability to perform his duties, he's just

7    not in a state of mind, based on his family and

8    everything else that's going on, to come back and work.

9          MR. IANNITELLI:  Okay.  I'm going to show you

10   Exhibit 15, which is an August 5th letter from

11   Joanna Cotter to Michael Cava.

12                          (Plaintiff's Exhibit No. 15

13                          was marked for identification.)

14          MR. IANNITELLI:  Q.  Did you ever see this

15   document before?

16    A.    I don't specifically remember seeing this.

17    Q.    Okay.  And the second sentence says:  "The cause

18   of your termination is due to your inability to perform

19   your duties as an Account Executive."  It's the same

20   statement that was referenced in the email in the

21   preceding exhibit.

22          It's your belief that Michael, the reason for his

23   termination was because he wasn't available to be at

24   NetVersant to work.  Correct?

25          MS. HEVERLY:  Objection:  Calls for speculation.

1    Lacks foundation.

2          THE WITNESS:   Yeah, this letter reads differently

3    than that email.

4          MR. IANNITELLI:   Q.   We're back to a little bit

5    of my last question.   The second sentence that, "the

6    cause of your termination is due to your inability to

7    perform your duties as an Account Executive," given the

8    circumstances of that period of time and your

9    understanding of what was going on, what do you take the

10   reason for his termination in that letter to mean, what

11   "inability to perform your duties as an account

12   executive" meant?

13     A.   I mean, I can tell you what my opinion of how

14   this all came down, which I think I already have, which

15   was, he came back, said that he wasn't in a position to

16   continue to work.

17     Q.   At that time.

18     A.   We looked into what the potential options were

19   that was researched with Corporate.   We had conversations

20   with him where he asked to be terminated for reasons, you

21   know, so he could collect unemployment, or something like

22   that.   We tried to accommodate what was best for him from

23   my perspective.   And that, you know, he was -- those

24   options were discussed with him, and he gave feedback to

25   myself and Joanna on how he wanted this to, you know,

1    what I asked her.  You know, I said -- my initial

2    assumption was that he would just go back out on some

3    sort of leave.  So I said, "You need to talk to

4    Corporate, understand what the options are."  She came

5    back, and that was not an option based on those

6    conversations that she had apparently.

7        Q.   With Corporate?

8        A.   With Corporate.  And based on my conversations

9    with Michael, I felt like it was -- that was the

10   direction that we....

11       Q.   At the time when you terminated, when Michael was

12   terminated, other than the fact that he was going on

13   disability leave, or leave, however you want to phrase

14   it, or requested to go back on leave, were there any

15   other reasons for his termination that you're aware of?

16       A.   No.

17            MR. IANNITELLI:  I'll have this marked as

18   Exhibit 16.

19                           (Plaintiff's Exhibit No. 16

20                           was marked for identification.)

21            MR. IANNITELLI:  If you could take a quick look

22   at that for me, I'd appreciate it.

23            MS. HEVERLY:  I notice this doesn't have a date

24   on it.  Do you know what the date is?

25            MR. IANNITELLI:  I have no idea.  It was produced