# EXHIBIT C

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

UNLIMITED JURISDICTION


MICHAEL CAVA,

              Plaintiff(s),

       vs.                CASE NO: CGC-06-453469

NETVERSANT-NATIONAL, INC.,

a Delaware corporation, dba

NETVERSANT-SAN FRANCISCO, aka

NETVERSANT; PETER WAINWRIGHT,

an individual; and DOES 1

through 40, inclusive,

              Defendant(s).

_____/

**CERTIFIED COPY**


DEPOSITION OF MICHAEL CAVA

VOLUME I


DATE:          Thursday, January 4, 2007

TIME:          10:13 A.M.

LOCATION:     LITTLER MENDELSON
                50 West San Fernando Street
                14th Floor
                San Jose, CA 95113-2303

REPORTER:     Patricia Hope Sales, CRR
                CSR License Number C-4423


EXHIBITS BOUND SEPARATELY

DEPONENT:   MICHAEL CAVA   1-4-07

| | | |
|---|---|---|
| 10:37:36 | 1 | A.   Scott Landis and Peter Wainwright. |
| 10:37:39 | 2 | Q.   And you said that was at the NetVersant offices |
| 10:37:42 | 3 | in South San Francisco? |
| 10:37:43 | 4 | A.   Yes. |
| 10:37:46 | 5 | Q.   How long did the interview last? |
| 10:37:49 | 6 | A.   Maybe an hour or two. |
| 10:38:01 | 7 | Q.   Tell me what you can remember from that |
| 10:38:03 | 8 | interview. |
| 10:38:07 | 9 | A.   They expressed to me that Jennifer had left, |
| 10:38:11 | 10 | and that her accounts needed to be covered. |
| 10:38:17 | 11 | I was told I would be taking over most of the |
| 10:38:19 | 12 | Sacramento area accounts that she had handled. |
| 10:38:25 | 13 | MR. IANNITELLI:  Excuse me, Counsel.  Can you |
| 10:38:27 | 14 | ask your client not to mouth out words?  You know, my |
| 10:38:32 | 15 | client is nervous enough as it is. |
| 10:38:35 | 16 | MS. HEVERLY:  Okay. |
| 10:38:35 | 17 | MR. IANNITELLI:  Thank you. |
| 10:38:36 | 18 | MS. HEVERLY:  I didn't know he was mouthing out |
| 10:38:38 | 19 | words. |
| 10:38:39 | 20 | THE WITNESS:  Yes, he has been. |
| 10:38:42 | 21 | MR. WAINWRIGHT:  I'm just stretching my mouth |
| 10:38:43 | 22 | here. |
| 10:38:43 | 23 | BY MS. HEVERLY: |
| 10:38:43 | 24 | Q.   Okay.  Sorry.  Go on. |
| 10:38:45 | 25 | What -- I was asking what you could recall that |

Page 26

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:40:09 | 1 | it was coming before the letter came. |
| 10:40:11 | 2 | Q.   You said you may have had a second interview. |
| 10:40:14 | 3 | Do you recall now having had the second interview? |
| 10:40:18 | 4 | A.   I don't remember. |
| 10:40:19 | 5 | Q.   And you also said that you had some follow-up |
| 10:40:21 | 6 | telephone calls.  Do you remember how many telephone |
| 10:40:24 | 7 | calls you had after the interview, before you got the |
| 10:40:27 | 8 | offer? |
| 10:40:28 | 9 | A.   At least two or three. |
| 10:40:29 | 10 | Q.   Who did you have the calls with? |
| 10:40:30 | 11 | A.   With Peter. |
| 10:40:31 | 12 | Q.   What did you discuss during the calls? |
| 10:40:35 | 13 | A.   Mainly compensation.  I wanted to make sure |
| 10:40:39 | 14 | that the quota was achievable there. |
| 10:40:41 | 15 | I was leaving a very good position with a very |
| 10:40:44 | 16 | large base of customers that were built up.  It's very |
| 10:40:47 | 17 | hard to leave accounts -- or to leave companies in my |
| 10:40:51 | 18 | business.  You have no show stability.  I expressed |
| 10:40:55 | 19 | this. |
| 10:40:55 | 20 | I expressed that it takes a while to build up |
| 10:40:58 | 21 | accounts. |
| 10:41:02 | 22 | Q.   What did Mr. Wainwright say when you expressed |
| 10:41:05 | 23 | your concern that it would take a while to build up |
| 10:41:09 | 24 | accounts? |
| 10:41:10 | 25 | A.   Understood -- I think Peter has a good |

Page 28

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:44:55 | 1 | accounts? |
| 10:45:00 | 2 | A.   No. |
| 10:45:00 | 3 | Q.   Did they tell you how many new accounts they |
| 10:45:04 | 4 | expected you to bring in? |
| 10:45:07 | 5 | A.   No. |
| 10:45:07 | 6 | Q.   Did they tell you how many existing accounts |
| 10:45:11 | 7 | they would be giving you? |
| 10:45:13 | 8 | A.   Most of Jennifer Forrest's Sacramento |
| 10:45:16 | 9 | accounts. |
| 10:45:24 | 10 | Q.   Did they tell you which specific accounts |
| 10:45:26 | 11 | they'd be giving you? |
| 10:45:28 | 12 | A.   No, they didn't, but I was aware of what most |
| 10:45:30 | 13 | of those were. |
| 10:45:39 | 14 | Q.   Now, you said they told you they would be |
| 10:45:41 | 15 | giving you "most."  Did you have any idea what |
| 10:45:43 | 16 | percentage?  Fifty percent?  Seventy-five percent? |
| 10:45:46 | 17 | A.   They expressed that the only other sales rep up |
| 10:45:48 | 18 | there was extremely busy already. |
| 10:45:53 | 19 | Q.   Did they ever define it in a percentage? |
| 10:45:55 | 20 | A.   Every account I named they answered "yes" to. |
| 10:46:00 | 21 | Q.   What accounts did you name? |
| 10:46:05 | 22 | A.   Gallo and Maximus for sure. |
| 10:46:09 | 23 | Q.   Any others? |
| 10:46:11 | 24 | A.   VSP. |
| 10:46:16 | 25 | Q.   Anyone else? |

Page 32

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 10:58:08 | 1 | add on to that for equipment sales, new sales. |
| 10:58:16 | 2 | Q.   So how much did you expect to earn in your |
| 10:58:18 | 3 | first full year at NetVersant? |
| 10:58:20 | 4 | A.   I had hoped to achieve two hundred thousand.   I |
| 10:58:27 | 5 | wouldn't have gone there for less money. |
| 10:58:33 | 6 | Q.   No one promised you that you would make two |
| 10:58:36 | 7 | hundred thousand, did they? |
| 10:58:37 | 8 | A.   Nobody ever promises what you are going to earn |
| 10:58:40 | 9 | in sales. |
| 10:58:53 | 10 | Q.   When you started at NetVersant did you |
| 10:58:55 | 11 | understand your employment was -- would be at-will? |
| 10:59:00 | 12 | A.   That wasn't discussed. |
| 10:59:05 | 13 | Q.   Wasn't discussed during the interviews? |
| 10:59:08 | 14 | A.   No. |
| 10:59:08 | 15 | Q.   Do you understand what "at-will employment" |
| 10:59:09 | 16 | is? |
| 10:59:10 | 17 | A.   I do now.   At the time I thought it was |
| 10:59:13 | 18 | something entirely different. |
| 10:59:16 | 19 | Q.   What did you think it was at the time? |
| 10:59:19 | 20 | A.   At the time I thought it was that you can leave |
| 10:59:24 | 21 | at any time, you are not tied in where you have to be |
| 10:59:29 | 22 | there for two years; as long as you are doing your job, |
| 10:59:31 | 23 | you don't do something illegal, or you are achieving |
| 10:59:34 | 24 | your numbers, that you have a job, is the way I thought |
| 10:59:37 | 25 | it worked. |

Page 38

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:14:50 | 1 | been different -- did anybody modify the 2004 plan? |
| 11:14:54 | 2 | A.   Not that I'm aware of. |
| 11:14:59 | 3 | Q.   Okay. |
| 11:14:59 | 4 | A.   Other than that addendum on the back, and I |
| 11:15:01 | 5 | believe I signed that in the beginning. |
| 11:15:02 | 6 | Q.   In the "Definition" sections at the top, there |
| 11:15:06 | 7 | is one that says "Assigned accounts."  It says, |
| 11:15:08 | 8 | "Customer accounts that have been assigned to you in |
| 11:15:10 | 9 | writing by the EVP of sales and business development." |
| 11:15:14 | 10 | Did you ever receive any assigned accounts? |
| 11:15:17 | 11 | A.   Yes. |
| 11:15:17 | 12 | Q.   What accounts did you receive? |
| 11:15:20 | 13 | A.   Maximus and Gallo in the beginning. |
| 11:15:23 | 14 | Q.   Any others? |
| 11:15:25 | 15 | A.   At some point Gallo was taken away and I was |
| 11:15:29 | 16 | assigned some others. |
| 11:15:33 | 17 | Q.   So when you first started, the only two |
| 11:15:35 | 18 | accounts that were assigned to you were Maximus and |
| 11:15:39 | 19 | Gallo? |
| 11:15:39 | 20 | A.   To my dismay, yes. |
| 11:15:46 | 21 | Q.   Were they assigned to you in writing? |
| 11:15:58 | 22 | A.   No. |
| 11:15:58 | 23 | Q.   Okay.  You said to your dismay.  What did you |
| 11:16:00 | 24 | mean by that? |
| 11:16:01 | 25 | A.   I was expecting to get many more accounts like |

Page 50

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:16:06 | 1 | I had been promised during the interview. |
| 11:16:13 | 2 | Q.   So when you only got two, what did you do? |
| 11:16:18 | 3 | A.   I tried to bring it up with Peter. |
| 11:16:25 | 4 | Q.   What did you say to him? |
| 11:16:29 | 5 | A.   "Why am I not handling more accounts?" |
| 11:16:33 | 6 | Q.   What did -- what was his response? |
| 11:16:38 | 7 | A.   "I'm assigning them to other reps." |
| 11:16:42 | 8 | Q.   Did you bring it up to anyone other than |
| 11:16:45 | 9 | Peter? |
| 11:16:46 | 10 | A.   Not at that time. |
| 11:16:47 | 11 | Q.   Why not? |
| 11:16:48 | 12 | A.   Peter was my manager. |
| 11:16:54 | 13 | Q.   At the time when you brought it up to Peter, |
| 11:16:56 | 14 | did you say, "Hey, you promised me more accounts"? |
| 11:17:00 | 15 | A.   I -- I -- yeah, exactly. |
| 11:17:03 | 16 | Q.   And what was his response? |
| 11:17:07 | 17 | A.   "I'm assigning them to other -- other reps." |
| 11:17:10 | 18 | Q.   Did he deny having made you the promise? |
| 11:17:13 | 19 | A.   It -- it -- it was a very brief conversation. |
| 11:17:17 | 20 | Q.   Was it an in-person conversation? |
| 11:17:19 | 21 | A.   Yes. |
| 11:17:26 | 22 | Q.   And then you said later Gallo was taken away, |
| 11:17:29 | 23 | correct? |
| 11:17:29 | 24 | A.   Yes. |
| 11:17:32 | 25 | Q.   Who took it away from you? |

Page 51

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:17:34 | 1 | A.   Peter. |
| 11:17:35 | 2 | Q.   Did he tell you why? |
| 11:17:42 | 3 | A.   At the time, a little background on it -- |
| 11:17:48 | 4 | MR. IANNITELLI:  Mike, just answer the |
| 11:17:49 | 5 | question -- |
| 11:17:51 | 6 | THE WITNESS:  Okay. |
| 11:17:51 | 7 | MR. IANNITELLI:  -- as posed. |
| 11:17:53 | 8 | THE WITNESS:  Not -- not really.  I never got a |
| 11:17:55 | 9 | full explanation. |
| 11:17:56 | 10 | BY MS. HEVERLY: |
| 11:17:56 | 11 | Q.   Did he give you a partial explanation, or what |
| 11:17:59 | 12 | did he say? |
| 11:18:00 | 13 | A.   Assigning it to another rep. |
| 11:18:05 | 14 | Q.   That's it? |
| 11:18:07 | 15 | A.   Pretty much. |
| 11:18:09 | 16 | Q.   Did you have any understanding of why it was |
| 11:18:11 | 17 | being taken away? |
| 11:18:14 | 18 | A.   The customer had been working with Jeff Cotter, |
| 11:18:20 | 19 | the sales engineer, on some major projects, including a |
| 11:18:25 | 20 | call center, upgrade and redesign; very involved, |
| 11:18:30 | 21 | complicated project.  They had been working with Jeff |
| 11:18:34 | 22 | for months on it.  And he was going to be going off on |
| 11:18:37 | 23 | vacation and had sent an e-mail saying, "Hey, Mike is |
| 11:18:42 | 24 | your rep and -- and, you know, coordinate with him." |
| 11:18:45 | 25 | They were concerned that there was not a proper |

Page 52

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:18:47 | 1 | transition, that I was just being thrown into it |
| 11:18:51 | 2 | without having the full history. |
| 11:18:56 | 3 | Q.  So was it your understanding that they asked to |
| 11:18:58 | 4 | keep Jeff Cotter as their rep? |
| 11:19:00 | 5 | A.  They just -- my understanding is they just |
| 11:19:02 | 6 | wanted a transition. |
| 11:19:06 | 7 | Q.  What did that mean? |
| 11:19:08 | 8 | A.  That Jeff would still be involved because he |
| 11:19:12 | 9 | had so much history on this project. |
| 11:19:22 | 10 | Q.  Do you know if that's what happened, that Jeff |
| 11:19:24 | 11 | kept the account? |
| 11:19:28 | 12 | A.  No. |
| 11:19:28 | 13 | Q.  Who took the account over, to your knowledge? |
| 11:19:29 | 14 | A.  Peter assigned it to I believe John Cubiburu. |
| 11:19:41 | 15 | Q.  Did you ever question why? |
| 11:19:43 | 16 | A.  Yes. |
| 11:19:43 | 17 | Q.  Who did you ask? |
| 11:19:45 | 18 | A.  Peter. |
| 11:19:45 | 19 | Q.  And what did he say? |
| 11:19:48 | 20 | A.  "It's my decision." |
| 11:19:52 | 21 | Q.  Did you ever complain to anyone else? |
| 11:19:55 | 22 | A.  No.  I -- at a later date. |
| 11:20:01 | 23 | Q.  When? |
| 11:20:03 | 24 | A.  In August of -- |
| 11:20:05 | 25 | Q.  August of -- |

Page 53

DEPONENT:    MICHAEL CAVA    1-4-07

11:29:13  1     Q.   And what's your understanding of what a sales
11:29:16  2  funnel is?
11:29:16  3     A.   That would be opportunities you are working on
11:29:18  4  with both new and existing customers, both maintenance
11:29:23  5  and -- and projects.
11:29:30  6     Q.   Did you have any understanding of what the size
11:29:31  7  of your sales funnel should be?
11:29:35  8     A.   Yes.
11:29:35  9     Q.   What was that?
11:29:37 10     A.   There was various statements made along the
11:29:39 11  way.  I -- I don't remember.  If you showed me
11:29:48 12  something, I'm sure I could verify it.
11:29:51 13     Q.   Do you recall ever being told that your sales
11:29:53 14  funnel should be four times your quota?
11:29:56 15     A.   That -- that sounds right.
11:29:59 16     Q.   Do you recall who told you that?
11:30:03 17     A.   Either Peter or Robert Palmer, or both.
11:30:15 18     Q.   Did you understand fairly shortly after you
11:30:17 19  started that that should be what your funnel is -- that
11:30:20 20  that is what your funnel should be?
11:30:21 21     A.   I understood that that's what I needed to work
11:30:24 22  towards.  There was no expectation that that would
11:30:27 23  happen immediately.
11:30:37 24     Q.   Did you have any expectation of how long it
11:30:40 25  would take you to get there?

Page 61

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:30:42 | 1 | A.   No. |
| 11:30:44 | 2 | Q.   Did anybody ever tell you how long it would |
| 11:30:46 | 3 | take you to get fully ramped up? |
| 11:30:49 | 4 | A.   No. |
| 11:30:57 | 5 | Q.   During the period of June to November when you |
| 11:31:01 | 6 | first started working at NetVersant, did anybody tell |
| 11:31:04 | 7 | you that you weren't at the required funnel number? |
| 11:31:13 | 8 | A.   No. |
| 11:31:14 | 9 | Q.   At any time during those first few months of |
| 11:31:17 | 10 | employment did your funnel number ever reach four times |
| 11:31:20 | 11 | quota? |
| 11:31:22 | 12 | A.   I'm not sure.  I know there was millions of |
| 11:31:29 | 13 | dollars in there. |
| 11:31:34 | 14 | Q.   Did you ever do reports, weekly or monthly |
| 11:31:38 | 15 | reports, indicating what your funnel was? |
| 11:31:40 | 16 | A.   They were required, yes. |
| 11:31:41 | 17 | Q.   How often? |
| 11:31:44 | 18 | A.   At least once a month. |
| 11:31:48 | 19 | Q.   Who did you submit the reports to? |
| 11:31:51 | 20 | A.   To Peter or to Megan Riordan, or to Robert, or |
| 11:31:58 | 21 | to all three at times. |
| 11:32:13 | 22 | Q.   Did any of the three of them ever tell you that |
| 11:32:15 | 23 | your report wasn't good enough or you needed to work on |
| 11:32:18 | 24 | improving it? |
| 11:32:19 | 25 | A.   No, not -- not before November.  Not before |

Page 62

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:41:21 | 1 | Q.   And you told me earlier that you had some |
| 11:41:23 | 2 | accounts at Shared Technologies.  Were you able to |
| 11:41:26 | 3 | bring any of them over? |
| 11:41:28 | 4 | A.   One came over after I was let go from |
| 11:41:32 | 5 | NetVersant. |
| 11:41:32 | 6 | Q.   What was that? |
| 11:41:34 | 7 | A.   AOL. |
| 11:41:38 | 8 | Q.   During the first few months you worked there, |
| 11:41:41 | 9 | again, June to November, did you bring over any of the |
| 11:41:44 | 10 | accounts? |
| 11:41:44 | 11 | A.   Not yet.  I had provided quotes to some; I had |
| 11:41:48 | 12 | met with some.  None of them had closed yet. |
| 11:41:53 | 13 | Q.   Why not? |
| 11:41:55 | 14 | A.   It's time-consuming to bring on accounts.  The |
| 11:41:58 | 15 | base I had built up at Shared Technologies was over six |
| 11:42:02 | 16 | years. |
| 11:42:05 | 17 | Q.   Is there a normal length of time that it takes |
| 11:42:08 | 18 | to close a deal in your business? |
| 11:42:10 | 19 | A.   Oh, it varies by size of deal and customer. |
| 11:42:17 | 20 | Q.   What's the shortest amount of time that it |
| 11:42:19 | 21 | takes?  Are you ever able to go out in one visit and |
| 11:42:22 | 22 | sign up somebody? |
| 11:42:24 | 23 | A.   Probably not that easy.  Maybe -- I mean I have |
| 11:42:27 | 24 | had deals that were a month, I have had deals that were |
| 11:42:30 | 25 | three years. |

Page 69

DEPONENT:  MICHAEL CAVA  1-4-07

| | | |
|---|---|---|
| 11:54:40 | 1 | this lawsuit.  Did you review it before it was filed? |
| 11:54:43 | 2 | A.  Yes. |
| 11:54:45 | 3 | Q.  Okay.  I want to ask you a couple questions |
| 11:54:46 | 4 | about some of the claims in it. |
| 11:54:49 | 5 | On page seven, the third cause of action is |
| 11:54:52 | 6 | brought against NetVersant and Peter Wainwright, and |
| 11:54:57 | 7 | it's for harassment. |
| 11:54:58 | 8 | What did Mr. Wainwright do to harass you? |
| 11:55:01 | 9 | A.  Oh, he -- he obviously didn't want me there |
| 11:55:07 | 10 | after I was off and disabled. |
| 11:55:10 | 11 | He made promises to reassign accounts that I |
| 11:55:16 | 12 | had worked out with reps and he told me he would work |
| 11:55:19 | 13 | it out and then didn't. |
| 11:55:20 | 14 | He expected unreasonable funnels right away. |
| 11:55:27 | 15 | He was rude and abusive in private meetings. |
| 11:55:37 | 16 | Q.  Anything else? |
| 11:55:40 | 17 | A.  I -- that's all I'm thinking of right now. |
| 11:55:43 | 18 | Q.  Did anyone else at NetVersant harass you? |
| 11:55:54 | 19 | A.  No. |
| 11:55:54 | 20 | Q.  Did he ever make any comments to you about your |
| 11:55:59 | 21 | disability? |
| 11:56:08 | 22 | A.  Not in particular. |
| 11:56:09 | 23 | Q.  Did he ever make any jokes about being disabled |
| 11:56:13 | 24 | or people with disabilities? |
| 11:56:17 | 25 | A.  Not in front of me. |

Page 72

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:56:20 | 1 | Q.   Did you ever learn about any jokes he made to |
| 11:56:23 | 2 | anyone else outside your presence? |
| 11:56:27 | 3 | A.   Yes. |
| 11:56:27 | 4 | Q.   What did you learn of? |
| 11:56:29 | 5 | A.   He accused me of going off of the deep end, and |
| 11:56:40 | 6 | making a spooky phone call. |
| 11:56:44 | 7 | Q.   When did you learn of that? |
| 11:56:46 | 8 | A.   Recently. |
| 11:56:47 | 9 | Q.   You learned about that in connection with this |
| 11:56:49 | 10 | lawsuit, correct? |
| 11:56:50 | 11 | A.   Yes. |
| 11:56:50 | 12 | Q.   You didn't know that at the time you were |
| 11:56:52 | 13 | employed there? |
| 11:56:53 | 14 | A.   I did not know that at the time. |
| 11:56:55 | 15 | Q.   Okay.  At the time you were employed, there did |
| 11:56:57 | 16 | you learn of any jokes or comments that Mr. Wainwright |
| 11:57:00 | 17 | had made outside your presence about your disability? |
| 11:57:07 | 18 | A.   No. |
| 11:57:07 | 19 | Q.   Okay.  So he -- you said that he made promises |
| 11:57:10 | 20 | to reassign you accounts.  Was that in August when you |
| 11:57:17 | 21 | came back, or in January when you came back, or both? |
| 11:57:20 | 22 | A.   It was in February when I was off, early |
| 11:57:26 | 23 | February.  We discussed transition of accounts, and the |
| 11:57:32 | 24 | agreement that was made on two accounts in particular, |
| 11:57:35 | 25 | Maximus and Hansen, was that if the reps were willing |

Page 73

DEPONENT:  MICHAEL CAVA    1-4-07

11:57:38  1  to, they would be reassigned to me after, which they

11:57:42  2  agreed to.  And I believe they talked to Peter about

11:57:46  3  that after.

11:57:50  4      And then when I came back on August 1st, after

11:57:54  5  receiving the first e-mail that I was not going to

11:57:57  6  receive accounts back, I went and sat down with him,

11:58:01  7  and he made it sound like I might possibly -- that I

11:58:05  8  would receive those back.

11:58:06  9      Q.  In August you are saying?

11:58:08  10     A.  Or Maximus in particular, yes.

11:58:12  11     Q.  And then you also said that he expected an

11:58:15  12  unreasonable funnel; is that correct?

11:58:18  13     A.  Yes.

11:58:18  14     Q.  Was that in -- in January when you came back,

11:58:21  15  or in August, or both?

11:58:22  16     A.  That would have been in August mainly.

11:58:31  17         Not "mainly."  Yes.

11:58:35  18     Q.  Okay.  And you said he was rude and abusive in

11:58:38  19  meetings.  What did you mean by that?

11:58:41  20     A.  Oh, called my performance underwhelming, raised

11:58:48  21  his voice at me, made it clear I couldn't be counted

11:58:58  22  on.

11:58:58  23     Q.  What?  Say that again?

11:59:00  24     A.  I couldn't be counted on because of the time I

11:59:03  25  was off.

Page 74

DEPONENT:  MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 11:59:06 | 1 | Q.   Anything else? |
| 11:59:09 | 2 | A.   That's the main points of it. |
| 11:59:12 | 3 | Q.   Did that all happen in one meeting? |
| 11:59:16 | 4 | A.   Yes.  I mean most of it. |
| 11:59:21 | 5 | Q.   Was there more than one meeting? |
| 11:59:24 | 6 | A.   No, that was -- there was phone conversations, |
| 11:59:26 | 7 | but that would have been the one face to face. |
| 11:59:35 | 8 | Q.   And that -- this all happened in the first |
| 11:59:38 | 9 | couple of days in August of 2005; is that correct? |
| 11:59:41 | 10 | A.   Yes, that would have been either August 1st or |
| 11:59:43 | 11 | August 2nd.  I believe it was August 1st. |
| 11:59:49 | 12 | Q.   So you told me three things that he did to you |
| 11:59:51 | 13 | that you thought were harassment:  He didn't reassign |
| 11:59:54 | 14 | your accounts; he demanded an unreasonable funnel; and |
| 11:59:58 | 15 | he was rude and abusive to you. |
| 12:00:01 | 16 | Can you think of anything else that he did to |
| 12:00:03 | 17 | you that was harassing? |
| 12:00:05 | 18 | A.   It was just the -- that's the bulk of it. |
| 12:00:08 | 19 | Q.   And it's true that all of this conduct, the |
| 12:00:12 | 20 | allegedly harassing conduct, occurred on the 1st or 2nd |
| 12:00:16 | 21 | of August; is that correct? |
| 12:00:24 | 22 | A.   Yes. |
| 12:00:24 | 23 | Also -- well, on August 3rd, also.  He had |
| 12:00:28 | 24 | agreed to consider reassigning Maximus if the rep was |
| 12:00:32 | 25 | willing to.  I had worked it out with the rep that he |

Page 75

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 12:03:52 | 1 | A.   I was having stress and -- and problems coping; |
| 12:04:03 | 2 | that I was -- |
| 12:04:04 | 3 | Q.   You told that to Joanna? |
| 12:04:06 | 4 | A.   Absolutely.  And that I was unable to cope with |
| 12:04:10 | 5 | work at the time. |
| 12:04:17 | 6 | Q.   Okay.  If you flip to page twelve, you have |
| 12:04:33 | 7 | sued Peter Wainwright personally for what's called |
| 12:04:36 | 8 | intentional infliction of emotional distress.  And in |
| 12:04:41 | 9 | this claim you say that they engaged in behavior that |
| 12:04:47 | 10 | intended to cause you emotional distress. |
| 12:04:52 | 11 | What did Mr. Wainwright do that you believe was |
| 12:04:55 | 12 | intentional to cause your emotional distress? |
| 12:04:57 | 13 | A.   He was abusive, he was breaking his promises. |
| 12:05:00 | 14 | It was clear he was not going to let me succeed |
| 12:05:03 | 15 | there. |
| 12:05:04 | 16 | Q.   And is it the same conduct that you just talked |
| 12:05:06 | 17 | about that you believe was harassing? |
| 12:05:08 | 18 | A.   Yes. |
| 12:05:08 | 19 | Q.   Is there anything else? |
| 12:05:13 | 20 | A.   Not that I can think of -- of offhand. |
| 12:05:17 | 21 | Q.   Okay.  And then if you flip the page one more |
| 12:05:19 | 22 | time, there is another claim, which is negligent |
| 12:05:22 | 23 | infliction of emotional distress, which is essentially |
| 12:05:26 | 24 | the same claim that Mr. Wainwright did something to |
| 12:05:28 | 25 | cause you emotional distress. |

Page 79

DEPONENT:   MICHAEL CAVA    1-4-07

| | | |
|---|---|---|
| 13:27:44 | 1 | A.    No. |
| 13:27:45 | 2 | Q.    And nobody at the company hassled you for |
| 13:27:47 | 3 | taking leave during that period; is that correct? |
| 13:27:52 | 4 | A.    I mean Joanna had told me that -- I mean she |
| 13:27:58 | 5 | had expressed that -- that I could only take a certain |
| 13:28:00 | 6 | amount of time off, that I wasn't eligible for family |
| 13:28:03 | 7 | leave. |
| 13:28:03 | 8 | Q.    How much time did she tell you you could take |
| 13:28:06 | 9 | off? |
| 13:28:07 | 10 | A.    I don't remember exactly.  I was feeling quite |
| 13:28:13 | 11 | a bit of pressure to get back to work myself for |
| 13:28:19 | 12 | the -- (pause). |
| 13:28:20 | 13 | Q.    Did anyone tell you you had to come back on the |
| 13:28:22 | 14 | 17th? |
| 13:28:24 | 15 | A.    I -- I know they had approved through January |
| 13:28:31 | 16 | 15th. |
| 13:28:31 | 17 | Q.    Did you ask to take leave beyond the 15th |
| 13:28:34 | 18 | before you came back? |
| 13:28:36 | 19 | A.    No. |
| 13:28:57 | 20 | MS. HEVERLY:  Let's mark -- what number are we |
| 13:28:59 | 21 | on?  I'm sorry. |
| 13:29:01 | 22 | THE REPORTER:  12. |
| 13:29:01 | 23 | MS. HEVERLY:  -- as number 12 a one-page letter |
| 13:29:04 | 24 | dated December 9th, 2004. |
| 13:29:24 | 25 | (Exhibit marked for identification: |

Page 95

| | | |
|---|---|---|
| 13:34:36 | 1 | Q.   What period of time did he expect you to get |
| 13:34:38 | 2 | your funnel up? |
| 13:34:40 | 3 | A.   I -- my impression was immediately. |
| 13:34:44 | 4 | MR. IANNITELLI:  Just for clarification, are we |
| 13:34:45 | 5 | talking about August or January? |
| 13:34:48 | 6 | MS. HEVERLY:  Yes, we are talking about August. |
| 13:34:49 | 7 | Sorry if that was confusing. |
| 13:34:52 | 8 | BY MS. HEVERLY: |
| 13:34:52 | 9 | Q.   I'm talking about in August of 2005 when you |
| 13:34:54 | 10 | met with Mr. Wainwright and you said that he was |
| 13:34:57 | 11 | abusive and rude to you; you said that he gave you an |
| 13:35:00 | 12 | unreasonable funnel expectation. |
| 13:35:02 | 13 | So just talking about then, did he tell you at |
| 13:35:05 | 14 | what point he expected your funnel to be fully up to |
| 13:35:09 | 15 | expectation? |
| 13:35:10 | 16 | A.   He expected it to be on track right away was my |
| 13:35:14 | 17 | impression.  And I also had had all my accounts taken |
| 13:35:19 | 18 | away at that point. |
| 13:35:20 | 19 | Q.   Did he tell you that he expected to be on track |
| 13:35:24 | 20 | right away? |
| 13:35:25 | 21 | A.   That was my impression. |
| 13:35:30 | 22 | Q.   What did he say to give you that impression? |
| 13:35:36 | 23 | A.   That, "Your revenue funnel needs to be -- you |
| 13:35:39 | 24 | need to be up to these dollar amounts." |
| 13:35:42 | 25 | I mean he spelled it out, the four times |

Page 100

DEPONENT:  MICHAEL CAVA    1-4-07

13:35:46  1 | revenue.

13:35:47  2 |    Q.  But he didn't give you any particular time

13:35:48  3 | frame?  He didn't say "next month," "next year," "next

13:35:52  4 | week"?

13:35:53  5 |    A.  It was really clear that I needed to do it

13:35:55  6 | right away or I wouldn't have a job.

13:36:01  7 |    Q.  All right.  Now, going back to January when you

13:36:03  8 | came back from your leave, you got this -- this e-mail.

13:36:07  9 | What did you do when you received it?

13:36:10 10 |    A.  I was upset, and I went in and talked to Peter,

13:36:14 11 | which at that time we -- we had a closed-door meeting.

13:36:18 12 |    Q.  What about this e-mail was upsetting to you?

13:36:22 13 |    A.  I had been doing a good job; I was over quota.

13:36:26 14 | And I had been off for a period of time, which I was

13:36:29 15 | willing to go off without pay.  I was grateful that the

13:36:32 16 | company paid me, but I would have been off without pay.

13:36:36 17 |       And I was upset that I was being accountable

13:36:39 18 | for revenue during that time.  And I just -- I thought

13:36:44 19 | it was very unfair.  I had -- it had not been conveyed

13:36:47 20 | to me that I was doing a bad job.

13:36:49 21 |    Q.  What in the e-mail led you to believe that you

13:36:51 22 | were being held accountable for revenue during the

13:36:54 23 | period you were on leave?

13:36:55 24 |    A.  I was put on a performance improvement plan

13:36:57 25 | based on my 2004 results.  I was off dealing with my

Page 101

DEPONENT:   MICHAEL CAVA    1-4-07

13:37:01  1 | son in 2004.

13:37:04  2 |     Q.   Prior to going out on leave, so prior to

13:37:07  3 | November 1st of 2004, had you been meeting all of the

13:37:11  4 | expectations of your job?

13:37:13  5 |     A.   Yeah, absolutely.

13:37:14  6 |     Q.   You had a funnel of four times quota at that

13:37:16  7 | time?

13:37:16  8 |     A.   I believe I did.

13:37:22  9 |     Q.   Okay.

13:37:22 10 |     A.   I had -- I had millions of dollars in proposals

13:37:25 11 | out there.

13:37:30 12 |     Q.   And did you have new sales of a hundred and

13:37:32 13 | fifty to two hundred dollars per month -- two hundred

13:37:34 14 | thousand per month?

13:37:36 15 |     A.   That was a new thing that had never been

13:37:39 16 | mentioned to me before, before that day.

13:37:44 17 |     Q.   In the first paragraph of the e-mail it says,

13:37:46 18 | "The required run" -- "run rate of fifty K of GPM per

13:37:51 19 | month."  What does that mean to you?

13:37:54 20 |     A.   That I had to bring in fifty thousand of gross

13:37:57 21 | profit per month.

13:37:59 22 |     Q.   Did you understand before this e-mail that that

13:38:02 23 | was an expectation?

13:38:05 24 |     A.   Yes, and I had been doing it.

13:38:07 25 |     Q.   So prior to your leave you had been bringing in

Page 102

13:38:10  1  the fifty thousand of gross profit per month?

13:38:13  2       A.   Far in excess of that.

13:38:14  3       Q.   And then the last part of that sentence says

13:38:17  4  "this will translate to new sales of a hundred and

13:38:19  5  fifty to two hundred per month."  What did you

13:38:23  6  understand that to mean?

13:38:23  7       A.   That the total revenue would be that much, and

13:38:26  8  the gross profit would be based on that revenue.

13:38:30  9       Q.   So that wasn't a new expectation; is that

13:38:35  10 correct?

13:38:35  11      A.   To have it come off of all new business and not

13:38:38  12 off of existing accounts, that was brand new, had never

13:38:41  13 been mentioned before.

13:38:47  14      Q.   Where in this e-mail does it say "new

13:38:50  15 accounts"?

13:38:52  16      A.   New revenue is the way I take it.

13:38:54  17      Q.   Where do you see "new revenue"?  Maybe I'm just

13:38:57  18 not seeing it.

13:39:03  19      A.   Well, I was hitting new revenue -- I mean I was

13:39:05  20 hitting revenue before that.  Obviously that wasn't

13:39:08  21 acceptable based on this e-mail.  So I would have to

13:39:12  22 anticipate that it was supposed to be new revenue.

13:39:19  23      Q.   All right.  But it doesn't say "new revenue"

13:39:21  24 anywhere in here.

13:39:30  25           MR. IANNITELLI:  The document speaks for

                                                        Page 103

1    **Shahab E. Fotouhi - 168301**
     **Daniel P. Iannitelli -  203388**
2    FOTOUHI • EPPS • HILLGER • GILROY LLP
     160 Pine Street, Suite 710
3    San Francisco, CA 94111
     Tel: 415.362.9300
4    Fax: 415.358.5521

5    Attorneys for Plaintiffs
     MICHAEL CAVA
6

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9             COUNTY OF SAN FRANCISCO - UNLIMITED JURISDICTION

10   MICHAEL CAVA,                        )   Case No.  CGC-06-453469
                                          )
11            Plaintiff,                  )
                                          )   **PROOF OF SERVICE**
     vs.                                  )
12                                        )
     NETVERSANT - NATIONAL, INC., a Delaware )
13   corporation, dba NETVERSANT - SAN    )
     FRANCISCO, aka NETVERSANT; PETER     )
14   WAINWRIGHT, an individual; and DOES 1 )
     through 40, inclusive,               )
15                                        )
              Defendants.                 )
16   _____)

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**PROOF OF SERVICE BY FEDEX**

3

*Cava v. Netversant-National, Inc., et al.*
San Francisco County Superior Court Case No. CGC 06-453469

4

5   I, the undersigned, declare:

6       That I am employed in the City of San Francisco, County of San Francisco, State of California; that I

7

am over the age of eighteen years and not a party to the within cause; that my business address is

8   160 Pine

9   Street, Suite 710, San Francisco, California 94111.

10       That on **May 9, 2007**, I served the within:

11   **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT NETVERSANT - NATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT**
12   **OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION**

13   **PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF OPPOSITION TO NETVERSANT-NATIONALS'S MOTION FOR SUMMARY**
14   **JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**

15   **DECLARATION OF DANIEL P. IANNITELLI IN SUPPORT OF PLAINTIFF'S OPPOSITION TO (1) DEFENDANT NETVERSANT'S MOTION FOR SUMMARY JUDGMENT and (2)**
16   **DEFENDANTS NETVERSANT and WAINWRIGHT's**

17   **DECLARATION OF PLAINTIFF MICHAEL CAVA**

18   **PLAINTIFF'S SEPARATE STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS IN SUPPORT OF OPPOSITIONS TO MOTIONS FOR SUMMARY JUDGMENT**

19

**PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT**
20   **OF OPPOSITIONS TO DEFENDANTS WAINWRIGHT AND NETVERSANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**

21

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
22   **DEFENDANT PETER WAINWRIGHT AND NETVERSANT'S - NATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR**
23   **SUMMARY ADJUDICATION**

24   on the parties listed in said cause by placing a true copy thereof enclosed in a sealed FedEx

25   envelope with postage thereon fully prepaid, and handed to a FedEx employee located at 120 Bush

26   Street, San Francisco, California 94104:

27       TO:

28   //

---

2
PROOF OF SERVICE

1

2  **Michelle B. Heaverly**
   **Michael W. Warren**
3  LITTLER MENDELSON, P.C.
   50 West San Fernando Street, 14th Floor
4  San Jose, CA 95113-2131
   T: 408-998-4150
5  F: 408-288-5686
   *Attorneys for defendants Netversant; Peter Wainwright*

6

7

       I declare under penalty of perjury under the laws of the State of California that the foregoing

8  is

9  true and correct.  Executed on **May 9, 2007**, at San Francisco, California.

10

11

12                                                    L. Kate Cowan

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28