EXHIBIT – F

Westlaw.

239 F.3d 1128                                                                          Page 1
239 F.3d 1128, 11 A.D. Cases 765, 20 NDLR P 2, 01 Cal. Daily Op. Serv. 1295, 2001 Daily Journal D.A.R. 1631
**(Cite as: 239 F.3d 1128)**

▷

United States Court of Appeals,
Ninth Circuit.
Carolyn HUMPHREY, Plaintiff-Appellant,
v.
MEMORIAL HOSPITALS ASSOCIATION,
Defendant-Appellee.
No. 98-15404.

Argued and Submitted Feb. 10, 1999.
Submission vacated Dec. 8, 1999.
Resubmitted Feb. 7, 2001.
Filed Feb. 13, 2001.

Medical transcriptionist with obsessive compulsive disorder (OCD) brought action against former employer alleging she was terminated in violation of the Americans with Disabilities Act (ADA) and the California Fair Employment and Housing Act (FEHA). The United States District Court for the Eastern District of California, Robert E. Coyle, J., granted summary judgment for employer, and transcriptionist appealed. The Court of Appeals, Reinhardt, Circuit Judge, held that: (1) genuine issues of material fact precluded summary judgment on ADA and FEHA claims, and (2) employer had affirmative duty to explore further arrangements to offer a reasonable accommodation.

Reversed and remanded.

West Headnotes

**[1] Federal Courts** 🔑776
170Bk776 Most Cited Cases
In ADA cases, as in all appeals, Court of Appeals reviews a grant of summary judgment de novo. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[2] Civil Rights** 🔑1225(2)
78k1225(2) Most Cited Cases
        (Formerly 78k173.1)
Americans with Disabilities Act (ADA) does not require an employee to show that a leave of absence is certain or even likely to be successful to prove that it is a reasonable accommodation under the ADA. Americans with Disabilities Act of 1990, § 101(8), 42 U.S.C.A. § 12111(8).

**[3] Federal Civil Procedure** 🔑2497.1

170Ak2497.1 Most Cited Cases
Genuine issues of material fact as to whether medical transcriptionist with obsessive compulsive disorder (OCD) would have been qualified for her position if employer had allowed her a leave-of-absence or a work-at-home position, precluded summary judgment for employer on transcriptionist's claims under the ADA and the California Fair Employment and Housing Act (FEHA). Americans with Disabilities Act of 1990, § 101(8), 42 U.S.C.A. § 12111(8); West's Ann.Cal.Gov.Code § 12921 et seq.; 29 C.F.R. § 1630.2(o); Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[4] Civil Rights** 🔑1225(4)
78k1225(4) Most Cited Cases
        (Formerly 78k173.1)
Once an employer becomes aware of the need for an accommodation of employee's disability, the employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[5] Civil Rights** 🔑1225(4)
78k1225(4) Most Cited Cases
        (Formerly 78k173.1)
Employers who fail to engage in the interactive process with disabled employee to identify and implement appropriate reasonable accommodations in good faith face liability for the remedies imposed by the ADA if a reasonable accommodation would have been possible. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[6] Civil Rights** 🔑1225(4)
78k1225(4) Most Cited Cases
        (Formerly 78k173.1)
Former employer had an affirmative duty under the ADA and the California Fair Employment and Housing Act (FEHA) to explore further arrangements to offer a
reasonable accommodation for medical transcriptionist with obsessive compulsive disorder (OCD) before terminating her; although employer had already allowed transcriptionist a flexible start time, the accommodation was ineffective and transcriptionist had requested a work-at-home position or a leave-of-absence. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

239 F.3d 1128                                                        Page 2
239 F.3d 1128, 11 A.D. Cases 765, 20 NDLR P 2, 01 Cal. Daily Op. Serv. 1295, 2001 Daily Journal D.A.R. 1631
(Cite as: 239 F.3d 1128)

12101 et seq.

**[7] Civil Rights** 🔑1217
78k1217 Most Cited Cases
        (Formerly 78k173.1)
Unlawful discharge claim under the ADA requires a showing that the employer terminated the employee because of his disability. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[8] Federal Civil Procedure** 🔑2497.1
170Ak2497.1 Most Cited Cases
Genuine issues of material fact as to whether former employer terminated hospital transcriptionist with obsessive compulsive disorder (OCD) because of her disability, precluded summary judgment for employer on transcriptionist's claims under the ADA and the California Fair Employment and Housing Act (FEHA). Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; West's Ann.Cal.Gov.Code § 12921 et seq.; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.
 *1129 Jerry Budin, Green & Azevedo, Modesto, California, for the plaintiff-appellant.

John Edward Fischer, James Francis Curran, and Rhonda Canby of Diepenbrock, Wulff, Plant, and Hannegan LLP, Sacramento, California, for the defendant-appellee.

Appeal from the United States District Court for the Eastern District of California;  *1130 Robert E. Coyle, District Judge, Presiding.  D.C. No. CV-96-06025-REC.

Before:  KRAVITCH, [FN1] REINHARDT, and T.G. NELSON, Circuit Judges.

> FN1. The Honorable Phyllis A. Kravitch, Senior Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

REINHARDT, Circuit Judge:

Carolyn Humphrey brought suit against her former employer, Memorial Hospitals Association (MHA), under the Americans with Disabilities Act (ADA) and its California counterpart, the Fair Employment and Housing Act (FEHA) for failure to reasonably accommodate her disability and wrongful termination.  We reverse the district court's grant of summary judgment in favor of MHA.

## I. BACKGROUND
Humphrey worked for MHA as a medical transcriptionist from 1986 until her termination in 1995.  At the time of her termination, she was earning approximately $11.00 per hour.  Throughout her employment at MHA, Humphrey's transcription performance was excellent and consistently exceeded MHA's standards for speed, accuracy, and productivity.

In 1989, Humphrey began to experience problems getting to work on time, or at all.  She engaged in a series of obsessive rituals that hindered her ability to arrive at work on time.  She felt compelled to rinse her hair for up to an hour, and if, after brushing her hair, it didn't "feel right," she would return to the shower to wash it again.  This process of washing and preparing her hair could take up to three hours.  She would also feel compelled to dress very slowly, to repeatedly check and recheck for papers she needed, and to pull out strands of her hair and examine them closely because she felt as though something was crawling on her scalp.  She testified that these obsessive thoughts and rituals made it very difficult to get to work on time.  Once she realized that she was late, she would panic and become embarrassed, making it even more difficult for her to leave her house and get to work.

Due to Humphrey's difficulties with tardiness and absenteeism, MHA gave her a "Level I" disciplinary warning in June 1994.  This warning required her to call her supervisor before the time she was due to be at work if she was going to be late or absent.  Humphrey's mental obsessions and peculiar rituals only grew worse after the warning, and her attendance record did not improve; nor did her call-in rate.  In December 1994, she received a "Level III" warning, which documented four tardy days and one unreported absence over a two week period.

When MHA gave Humphrey the Level III warning, she was told that she was expected to schedule and keep counseling appointments with the Employee Assistance Program (EAP).  This counseling consisted of "tips," helpful hints such as getting up earlier and laying out clothes the night before.  Humphrey found this somewhat helpful and attended several sessions, but her efforts to follow the "tips" were not particularly successful.  After watching an episode of the Oprah Winfrey show devoted to attention deficit disorder, Humphrey began to suspect that her debilitating symptoms and inability to get to work on time might be related to a medical condition.  In May, 1995, she asked MHA's EAP nurse,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

239 F.3d 1128                                                                                      Page 3
239 F.3d 1128, 11 A.D. Cases 765, 20 NDLR P 2, 01 Cal. Daily Op. Serv. 1295, 2001 Daily Journal D.A.R. 1631
(Cite as: 239 F.3d 1128)

Elizabeth Pierson, if she could see a psychiatrist for an evaluation. Pierson agreed, and set up an appointment for a diagnostic evaluation and psychological testing with Dr. John Jacisin. MHA paid for the consultation through its EAP program.

Humphrey first saw Dr. Jacisin on May 12, 1995. Dr. Jacisin diagnosed her with obsessive compulsive disorder (OCD). [FN2] He *1131 sent a letter explaining that diagnosis to Pierson on May 18, 1995, telling her that Humphrey's OCD "is directly contributing to her problems with lateness." In addition, the letter stated:

> FN2. Individuals with obsessive compulsive disorder experience obsessions or compulsions or both. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 417 (4th ed.1994). Obsessions are recurring or persistent thoughts, images, or impulses that, rather than being voluntarily produced, seem to invade a person's consciousness despite his attempts to ignore, suppress, or control them. See id. at 418. Compulsions are urges or impulses to commit repetitive acts that are apparently meaningless, stereotyped, or ritualistic. See id. The disorder was recently made famous by Jack Nicholson's Oscar-winning portrayal of a man with OCD in the 1998 film As Good As it Gets.

I believe that we can treat this, although, the treatment may take a while. I do believe that she would qualify under the Americans with Disability Act, although, I would like to see her continue to work, but if it is proving to be a major personnel problem, she may have to take some time off until we can get the symptoms better under control.

Humphrey sought treatment from Dr. Jacisin and from a psychologist, Dr. Litynsky. Dr. Litynsky, like Dr. Jacisin, diagnosed Humphrey with OCD and concluded that it was probable that the OCD caused her absenteeism and tardiness. Humphrey had difficulty paying for the necessary services, however, because her insurance did not cover the treatment. In addition, due to the severe symptoms of her ailment, Humphrey had great difficulty showing up for appointments. Both doctors considered her inconsistency in treatment in 1995 and 1996 to be the result of the disorder as well as her financial problems. [FN3]

> FN3. Dr. Litynsky testified, "[h]er obsessive compulsive disorder was certainly the

primary factor in her inability to appear for most of her missed sessions with me. If the same set of events were occurring while she was employed, I would believe that it was very likely a major factor in her nonappearance at work."

On June 7, 1995, Humphrey met with Pierson and Humphrey's supervisor, Carol Evans-Bowlsby, to review Dr. Jacisin's letter. What happened at this meeting is disputed. MHA contends that Humphrey rejected the leave of absence alluded to in the doctor's letter. Humphrey says that she was never offered a leave of absence and never rejected one. Instead, she testified that "they asked if I would like to keep working. And I said yes." She did not remember anyone using the term "leave of absence." (As it turns out, this factual dispute is not material to our ruling on appeal.)

Humphrey did want to try to keep working, if possible, and Pierson told her that she could have an "accommodation" that would allow her to do so. Pierson suggested, as an accommodation, that Humphrey have a friend or family member drive her to work every day. Humphrey said that this suggestion would not be feasible. Pierson next offered a flexible start-time arrangement in which Humphrey could begin work any time within a 24 hour period on days on which she was scheduled to work. Pierson asked her to think about whether this would help her and whether any other accommodation would be desirable, and asked her to submit any additional requests for accommodation in writing. A few days later, Humphrey sent Pierson a letter accepting the flexible start time arrangement, and saying that she "would still do my best to be at my work station at the earliest possible hour."

Nevertheless, Humphrey continued to miss work. It is disputed whether Humphrey's supervisor warned her about her conduct during the remainder of that summer. It is undisputed, however, that no one from MHA broached the subject of modifying the accommodation during that period. On September 18, 1995, Humphrey, upset about her continuing problems, sent Pierson an e-mail message asking for a new accommodation because the then-current one seemed to be failing:

Dear Liz:
It has now been a few months since I sent you a memo regarding how my disability would best be accommodated as far as my job performance. I have since come to the conclusion that I would be able to put in considerable *1132 more hours [sic]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

239 F.3d 1128                                                                                                    Page 4
239 F.3d 1128, 11 A.D. Cases 765, 20 NDLR P 2, 01 Cal. Daily Op. Serv. 1295, 2001 Daily Journal D.A.R. 1631
(Cite as: 239 F.3d 1128)

and be much more productive if I were able to work from my home as a lot of other transcriptionists are doing.... I think this would be the ideal way to accommodate my diagnosed disability.

MHA allows certain medical transcriptionists to work out of their homes. Dr. Jacisin was not asked by anyone at MHA for his opinion on the work-at-home request. After Humphrey's termination, Jacisin said that working at home "might accommodate some of her work issues" but might be "anti-therapeutic." He testified, in his deposition in this lawsuit, that he felt working at home was an accommodation which would have been worth trying because it was necessary for Humphrey to earn money and increase her self-confidence.

In any event, Humphrey's request was summarily denied. In an e-mail message, Pierson denied her request for work-at-home accommodation on the ground of Humphrey's disciplinary warnings for tardiness and absenteeism. Pierson did not suggest an alternative accommodation or indicate that MHA would be receptive to reassessing its arrangements to accommodate Humphrey in light of the apparent failure of the flexible work schedule arrangement. Instead, she wrote:

> It is departmental policy that if you are involved in any disciplinary action you are ineligible to be a home based transcriptionist as per the AT HOME ARRANGEMENT FOR TRANSCRIPTIONISTS. Since you are currently involved in the discipline process, you are ineligible for being based at home. During our 6/7/95 meeting, you requested to be accommodated for your disability by having a flexible start time, stating that you would have no problems staying for a full shift once you arrived. You were given this flexible start time accommodation which continues to remain in effect. As for your productivity, your manager indicated that you consistently meet your hourly productivity requirements when you are at work.

Pierson's comment regarding Humphrey's productivity at work was typical of Humphrey's performance evaluations, which recognized her high level of competence but were tarnished by the problems caused by her disability. For example, in her annual performance review completed on September 26, 1995-- approximately two weeks before she was terminated--Humphrey exceeded expectations in minutes typed per shift and in errors per 130 lines checked. She was one of the only transcriptionists who could accurately transcribe the comments of a particular group of physicians. Her

review noted that this was "a very difficult task as the majority of physicians speak with very pronounced accents. You have done this very well as you have learned the accents and have become familiar with the styles." She was regarded as very cordial, considerate, honest, and tactful.

Humphrey's evaluation indicates that were it not for her ailment, she would have been a model employee. The only negative ratings she received were in relation to the problems caused by the interference of her symptoms and the accommodation of flexible start time. [FN4] Her evaluation stated that her recent unscheduled absences were "unacceptable," and advised that correcting her attendance problem was "a major goal for the upcoming year." During a meeting with her supervisor, Julie Vieira, to discuss her evaluation, Humphrey again raised the issue of working at home, but was told that she would have to be free of attendance problems for a year before she could be considered for an at-home transcriptionist position. Neither *1133 Humphrey nor her supervisor suggested a medical leave of absence at this meeting.

> FN4. For example, she was criticized because she was "not able to learn and transcribe Pathology because of your inconsistent work hours. You are scheduled to start work at 10:00 a.m. but do not come to work before 4:00 p.m. which is after the deadline FOR Pathology." However, at this time Humphrey had been given permission to arrive at work after 4:00 p.m. in accordance with the flexible start-time accommodation.

Humphrey was absent two more times, and on October 10, 1995, Vieira fired her. MHA's stated reason for the termination was Humphrey's history of tardiness and absenteeism. Humphrey testified that after learning of her termination, she went across the hall to Pierson's office and asked if she might take a leave of absence instead of lose her job, but that Pierson refused and told her that she had had her chance at accommodation. Pierson denies that Humphrey requested a leave of absence on the day of her discharge. MHA concedes that it would have granted the request if Humphrey had asked for a leave of absence prior to her termination, as MHA had a policy of permitting medical leaves of absence to employees with disabilities.

On September 6, 1996, Humphrey brought suit against MHA for violation of the ADA and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

239 F.3d 1128                                                          Page 5
239 F.3d 1128, 11 A.D. Cases 765, 20 NDLR P 2, 01 Cal. Daily Op. Serv. 1295, 2001 Daily Journal D.A.R. 1631
(Cite as: 239 F.3d 1128)

FEHA. [FN5] The district court granted MHA's motion for summary judgment on the theory that MHA had satisfied its duty to reasonably accommodate Humphrey's disability. The district court found it "dispositive ... that Plaintiff was initially offered a leave of absence and rejected it, and then failed to request a leave of absence subsequently." Humphrey appeals the judgment entered in favor of MHA.

> FN5. Humphrey also brought claims for violation of the Family and Medical Leave Act, 29 U.S.C. § § 2601-2654, and the California Family Rights Act, Cal. Govt.Code § 12945.2. However, Humphrey does not appeal the adverse judgment on those claims.

## II. DISCUSSION

Humphrey contends that MHA violated the ADA and the FEHA by failing to reasonably accommodate her disability and by terminating her because of that disability. The ADA [FN6] provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability...." 42 U.S.C. § 12112(a). Title I of the ADA insures full opportunities for people with disabilities in the workplace by requiring reasonable accommodation of employees' disabilities by their employers. Under the ADA, the term "discriminate" is defined as including "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). To prevail in a case of unlawful discharge under the ADA, the plaintiff must establish that he is a qualified individual with a disability and that the employer terminated him because of his disability. Cooper v. Neiman Marcus Group, 125 F.3d 786, 790 (1997). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." [FN7] 42 U.S.C. § 12102(2)(a).

> FN6. Because the FEHA provisions relating to disability discrimination are based on the

ADA, decisions interpreting federal anti-discrimination laws are relevant in interpreting the FEHA's similar provisions. See Brundage v. Hahn, 57 Cal.App.4th 228, 235, 66 Cal.Rptr.2d 830 (Cal.Ct.App.1997). We analyze Humphrey's state and federal disability claims together, relying on federal authority in the absence of contrary or differing state law. See id.

> FN7. The statute's definition also includes "having a record of such an impairment," 42 U.S.C. § 12102(2)(B), or "being regarded as having such an impairment," 42 U.S.C. § 12102(2)(C). Humphrey argues only that she has an actual impairment under § 12102(2)(A).

[1] In ADA cases, as in all appeals, we review a grant of summary judgment de novo. *1134McAlindin v. County of San Diego, 192 F.3d 1226, 1232 (9th Cir.), amended 201 F.3d 1211, and cert. denied, 530 U.S. 1243, 120 S.Ct. 2689, 147 L.Ed.2d 961 (2000).

## A. QUALIFIED INDIVIDUAL WITH A DISABILITY

Because the district court granted summary judgment to MHA on the ground that it reasonably accommodated Humphrey, the court did not address whether Humphrey is a qualified individual with a disability. However, MHA asks us to uphold the judgment on the alternate ground that Humphrey is not disabled and that she is not a "qualified individual" for purposes of the ADA. Because we reject MHA's reasonable accommodation argument, we consider its alternate ground here.

Most of the issues relating to Humphrey's status as a qualified individual with a disability are legal. The primary factual dispute arises out of an equivocal report and declaration by defense expert Dr. Weissman. The report raises some question regarding the testimony of Drs. Jacisin and Litynsky that Humphrey suffered from OCD and that her condition caused her attendance problems. Dr. Weissman declares that although Humphrey may have suffered from OCD with psychotic features while employed by MHA, it is also possible that she was suffering from brief psychotic delusional episodes rather than OCD. He continues in his report: "It is a mistake to assume that the only explanation for her tardiness (or of anyone's) was obsessive compulsive disorder. There are lots of other problems

239 F.3d 1128                                                                                     Page 6
239 F.3d 1128, 11 A.D. Cases 765, 20 NDLR P 2, 01 Cal. Daily Op. Serv. 1295, 2001 Daily Journal D.A.R. 1631
(Cite as: 239 F.3d 1128)

that can result in chronic tardiness. And alternate sources of stress were operating in 1994 in Ms. Humphrey's life." If, as Dr. Weissman suggests, Humphrey's difficulties getting to work may not have stemmed from OCD but may have been attributable to other "problems," it is possible that Humphrey might not be a qualified individual with a disability under the ADA. Because Humphrey does not seek summary judgment, we need not determine whether the conclusory and somewhat ambiguous statements of Dr. Weissman are sufficient to create a triable issue of fact as to whether she is a qualified individual with a disability (OCD or otherwise). Rather, for purposes of this appeal, we will assume without deciding that MHA has presented sufficient evidence to survive summary judgment on this point.

MHA also argues that Humphrey is not disabled for purposes of the ADA because she is not substantially limited in one or more of her major life activities. The EEOC regulations provide that "caring for oneself" is a major life activity. 29 C.F.R. § 1630.2(i). According to the EEOC, "[a]n impairment substantially limits an individual's ability to care for him/herself if, due to the impairment, an individual is significantly restricted as compared to the average person in the general population in performing basic activities such as getting up in the morning, bathing, dressing, and preparing and obtaining food." EEOC Enforcement Guidance: Psychiatric Disabilities and the ADA, FEP (BNA) 405:7461, at 7467 (March 25, 1997) [hereinafter EEOC Enforcement Guidance on Psychiatric Disabilities]. [FN8]

> FN8. By contrast, the legislative definition of a "mental disability" in the FEHA does not require that the disability substantially limit a major life activity, but merely that it "limit" a major life activity. See Cal. Govt.Code § 12926(1). Because a triable issue of fact exists as to whether Humphrey is disabled under the ADA, a fortiori an issue of fact also exists as to whether she is disabled under the FEHA.

The facts are undisputed with regard to Humphrey's ability to care for herself. [FN9] The testimony of Humphrey and Dr. Jacisin, her mental health provider, reflects that it took Humphrey significantly more time than the average person to accomplish *1135 the basic tasks of washing and dressing. According to Humphrey, the process of washing and brushing her hair alone could take several hours, and she at times would prepare for work from eight

o'clock in the morning until five or six o'clock in the evening. Dr. Jacisin testified that, on one OCD screening test, she was rated as taking three times as long as most people to shower, wash her hands, dress, and handle or cook food. MHA argues that even if Humphrey's ritualistic behaviors caused her to take more time to complete basic activities than the average person, she is not disabled under the ADA because her OCD did not prevent her from accomplishing those activities. As the Supreme Court has noted, however, "[t]he [Americans with Disabilities] Act addresses substantial limitations on major life activities, not utter inabilities." Bragdon v. Abbott, 524 U.S. 624, 641, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). An impairment "substantially limits" one's ability to carry out a major life activity if, because of the impairment, the individual is "[s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). An individual who has a physical or mental impairment that causes him to take inordinately more time than others to complete a major life activity is substantially limited as to that activity under the ADA. There is no dispute on the record before us that Humphrey falls within that category. Accordingly, in determining whether Humphrey is disabled for purposes of the ADA, the question is not whether she is substantially limited in her ability to care for herself, but whether she had OCD, and, if so, whether her OCD was the cause of her limitation.

> FN9. We need not address whether Humphrey is substantially limited in working. See McAlindin, 192 F.3d at 1233; EEOC Enforcement Guidance on Psychiatric Disabilities, at 7463 ("The first question is whether an individual is substantially limited in a major life activity other than working (e.g. sleeping, concentrating, caring for oneself). Working should be analyzed only if no other major life activity is substantially limited by an impairment.").

MHA next argues that Humphrey was not "qualified" for the medical transcriptionist position within the meaning of the ADA. A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

239 F.3d 1128                                                                    Page 7
239 F.3d 1128, 11 A.D. Cases 765, 20 NDLR P 2, 01 Cal. Daily Op. Serv. 1295, 2001 Daily Journal D.A.R. 1631
(Cite as: 239 F.3d 1128)

U.S.C. § 12111(8). It is undisputed that Humphrey had the skills, training, and experience to transcribe medical records. MHA contends that Humphrey's inability to show up for work and to notify her employer when she would be absent renders her not otherwise qualified under the ADA [FN10] because regular and predictable attendance is an essential function of the position. [FN11] However, Humphrey is a "qualified individual" under the ADA so long as she is able to perform the essential functions of her job "with or without reasonable accommodation." 42 U.S.C. § 12111(8). Either of two potential reasonable accommodations might have made it possible for Humphrey to perform the essential functions of her job: granting her a leave of absence or allowing her to become a "home-based transcriptionist."

> FN10. MHA also argues that Humphrey's inability to perform her job duties extended beyond her attendance difficulties. However, the only negative comments on her evaluations are related to attendance. For example, she was unable to learn and transcribe pathology because she was unable to arrive at work consistently before the pathology department's four o'clock deadline. Her poor scores for attendance and attendance-related activities and policies resulted in a "below average" overall rating.

> FN11. Humphrey concedes that regular and predictable job performance is an essential function of the MHA medical transcriptionist position. We note that although excessive or unscheduled absences may prevent an employee from performing the essential functions of his job and thereby render him not otherwise qualified for purposes of the ADA, regular and predictable attendance is not per se an essential function of all jobs.

A leave of absence for medical treatment may be a reasonable accommodation under the ADA. See 29 C.F.R. 1630 app. § 1630.2(o). We have held that where a leave of absence would reasonably accommodate an employee's disability and permit him, upon his return, to perform the *1136 essential functions of the job, that employee is otherwise qualified under the ADA. See Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1247 (9th Cir.1999).

[2][3] MHA contends that Humphrey is not otherwise qualified because the results of the leave of absence were speculative. However, the ADA does not require an employee to show that a leave of absence is certain or even likely to be successful to prove that it is a reasonable accommodation. In Kimbro v. Atlantic Richfield Co., 889 F.2d 869 (9th Cir.), cert. denied, 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 28 (1990), we held that a leave of absence was a reasonable accommodation for an employee whose cluster migraine headaches, a condition for which there was no specific treatment program, caused him sporadically to miss work. [FN12] We noted that

> FN12. Kimbro involved the Washington state handicap laws, which are similar to the ADA and the FEHA. See Schmidt v. Safeway, Inc., 864 F.Supp. 991, 996 (D.Or.1994); Prilliman v. United Air Lines, Inc., 53 Cal.App.4th 935, 949 n. 3, 62 Cal.Rptr.2d 142 (Cal.Ct.App.1997); see also Sanders v. Arneson Prod. Inc., 91 F.3d 1351, 1354 (9th Cir.), cert. denied, 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997) (relying on Kimbro when construing the ADA).

[w]hile it is altogether possible that Kimbro's migraine episodes may have recurred upon his return to work following a leave of absence, such a possibility does not foreclose a finding of liability for failure to accommodate Kimbro's migraines.... As long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform his job, an employer is liable for failing to attempt that accommodation.

Id. at 879. The statements in Dr. Jacisin's letter that Humphrey's condition was treatable and that "she may have to take some time off until we can get the symptoms better under control" are sufficient to satisfy the minimal requirement that a leave of absence could plausibly have enabled Humphrey adequately to perform her job. [FN13] We discuss in Section C below MHA's contention that it was not required to offer Humphrey a leave of absence or other accommodation unless she specifically requested it. [FN14]

> FN13. Of course, the requirement to grant a leave where there are plausible reasons to believe that it would accommodate the employee's disability can not be repeatedly invoked, thus permitting an unqualified employee to avoid termination by requesting a leave of absence each time he is about to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

239 F.3d 1128                                                          Page 8
239 F.3d 1128, 11 A.D. Cases 765, 20 NDLR P 2, 01 Cal. Daily Op. Serv. 1295, 2001 Daily Journal D.A.R. 1631
(Cite as: 239 F.3d 1128)

be fired. As we noted in *Kimbro*, the fact that a prior leave was granted and was unsuccessful may be a relevant consideration in determining whether additional leave would be a reasonable accommodation. *Kimbro, 889 F.2d at 879 n. 10.*

FN14. We also note that an employer need not make an accommodation, including granting a leave of absence, if it poses an undue hardship. 42 U.S.C. § 12112(b)(5)(A). However, MHA makes no such contention here.

There is another reasonable accommodation that could also serve to render Humphrey a "qualified individual." There is at least a triable issue of fact as to whether Humphrey would have been able to perform the essential duties of her job with the accommodation of a work-at-home position. Working at home is a reasonable accommodation when the essential functions of the position can be performed at home and a work-at-home arrangement would not cause undue hardship for the employer. EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, FEP (BNA) 405:7601, at 7626 (March 1, 1999) [hereinafter EEOC Enforcement Guidance on Reasonable Accommodation]. [FN15] Humphrey does not dispute *1137 that regular and predictable performance of the job is an essential part of the transcriptionist position because many of the medical records must be transcribed within twenty-four hours, and frequent and unscheduled absences would prevent the department from meeting its deadlines. However, physical attendance at the MHA offices is not an essential job duty; in fact, the record makes it clear that MHA permits some of its medical transcriptionists to work at home.

FN15. Courts have taken differing approaches toward working at home as an accommodation. Compare *Vande Zande v. Wisconsin Dept. of Admin.,* 44 F.3d 538, 544-45 (7th Cir.1995) (holding that an employer is not required to allow disabled workers to work at home except in extraordinary circumstances), *with Langon v. Department of Health and Human Servs.,* 959 F.2d 1053, 1060-61 (D.C.Cir.1992) (holding that an employer must consider requested accommodation of working at home), *cited with approval in Buckingham*

*v. United States,* 998 F.2d 735, 740 (9th Cir.1993). We see no reason not to follow the approach taken by the EEOC in its Enforcement Guidance.

MHA denied Humphrey's application for a work-at-home position because of her disciplinary record, which consisted of Level I and Level III warnings for tardiness and absenteeism prior to her diagnosis of OCD. It would be inconsistent with the purposes of the ADA to permit an employer to deny an otherwise reasonable accommodation because of past disciplinary action taken due to the disability sought to be accommodated. Thus, Humphrey's disciplinary record does not constitute an appropriate basis for denying her a work-at-home accommodation.

Although Dr. Jacisin was less optimistic about Humphrey's working at home than he was about a leave of absence, Humphrey has submitted sufficient evidence to raise an issue of fact as to whether she could perform the job with the accommodation of a work-at-home position. She testified that her ailment interfered primarily with her ability to leave her house in the morning. Dr. Jacisin stated that working at home "might accommodate some of her work issues," and later testified that he felt working at home would have been worth trying because "her OCD really didn't interfere necessarily with her ability to do the work, that is to actually do the typing and transcription." A reasonable jury could conclude that if Humphrey was relieved of the stress of having to leave the house, she could perform her transcriptionist duties and thus was "qualified" under the ADA.

Accordingly, we hold that MHA is not entitled to summary judgment on the issue of whether Humphrey is a "qualified individual with a disability" for purposes of the ADA.

B. BREAKDOWN OF THE INTERACTIVE PROCESS

The remaining question with respect to the duty to accommodate is a purely a legal one: was MHA obligated to suggest a leave of absence or to explore other alternatives in response to Humphrey's request for a work-at-home position, or was it Humphrey's burden to make an express request for a leave of absence before she was terminated? We conclude, as a matter of law, that (assuming Humphrey was a qualified individual with a disability) MHA had an affirmative duty under the ADA to explore further methods of accommodation before terminating

Humphrey.

[4][5] Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations. *Barnett v. U.S. Air*, 228 F.3d 1105, 1114 (9th Cir.2000). "An appropriate reasonable accommodation must be effective, in enabling the employee to perform the duties of the position." *Id.* at 1115. The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process. *Id.* at 1114-15; *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996) ("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."). Employers, who fail to engage in the interactive process in good faith, face liability for the remedies *1138 imposed by the statute if a reasonable accommodation would have been possible. *Barnett*, 228 F.3d at 1116.

Moreover, we have held that the duty to accommodate "is a 'continuing' duty that is 'not exhausted by one effort.' " *McAlindin*, 192 F.3d at 1237. The EEOC Enforcement Guidance notes that "an employer must consider each request for reasonable accommodation," and that "[i]f a reasonable accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function, the employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue hardship." EEOC Enforcement Guidance on Reasonable Accommodation, at 7625. Thus, the employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. This rule fosters the framework of cooperative problem-solving contemplated by the ADA, by encouraging employers to seek to find accommodations that really work, and by avoiding the creation of a perverse incentive for employees to request the most drastic and burdensome accommodation possible out of fear that a lesser accommodation might be ineffective.

When MHA received Dr. Jacisin's letter diagnosing Humphrey with OCD, MHA properly initiated the interactive process by arranging a meeting to discuss possible accommodations. Dr. Jacisin's statement "I would like to see her continue to work, but if it is proving to be a major personnel problem, she may have to take some time off until we can get the symptoms better under control" alerted MHA to the possibility that any initial arrangement that kept Humphrey on the job might not be effective and that a leave of absence might ultimately be necessary to accommodate her disability. In fact, it is MHA's position, disputed by Humphrey, that MHA explicitly offered her a leave at the June 7 meeting, and that it was Humphrey who decided that flexible scheduling was the better choice. Even if we assume that Humphrey turned down the leave of absence in June in favor of a flexible start-time arrangement, her attempt to perform her job functions by means of a less drastic accommodation does not forfeit her right to a more substantial one upon the failure of the initial effort.

[6] By the time of her annual performance review in September, it was abundantly clear to MHA that the flexible start time accommodation was not succeeding; Humphrey had accumulated six unreported absences in each of the months of August and September, and her evaluation stated that her attendance record was "unacceptable." At this point, MHA had a duty to explore further arrangements to reasonably accommodate Humphrey's disability.

Humphrey also realized that the accommodation was not working, and requested a work at home position. When it received that request, MHA could have either granted it or initiated discussions with Humphrey regarding other alternatives.  [FN16] Instead, MHA denied her request without suggesting any alternative solutions, or exploring with her the possibility of other accommodations. Rather than fulfill its obligation to engage in a cooperative dialogue with Humphrey, Pierson's e-mail suggested that the matter was closed: "During our 6/7/95 meeting, you requested *1139 to be accommodated for your disability by having a flexible start time, stating that you would have no problems staying for a full shift once you arrived. You were given this flexible start time accommodation which continues to remain in effect." We held in *Barnett* that an employer fails to engage in the interactive process as a matter of law where it rejects the employee's proposed accommodations by letter and offers no practical alternatives. *See Barnett*, 228 F.3d at 1116-17. Similarly, MHA's rejection of Humphrey's work-at-home request and its failure to explore with Humphrey the possibility of other accommodations,

239 F.3d 1128                                                                                                   Page 10
239 F.3d 1128, 11 A.D. Cases 765, 20 NDLR P 2, 01 Cal. Daily Op. Serv. 1295, 2001 Daily Journal D.A.R. 1631
(Cite as: 239 F.3d 1128)

once it was aware that the initial arrangement was not effective, constitutes a violation of its duty regarding the mandatory interactive process.

> FN16. As we have discussed, working at home is a reasonable accommodation when the essential functions of the position can be performed at home and a work-at-home arrangement would not cause an undue hardship for the employer. EEOC Enforcement Guidance on Reasonable Accommodation, at 7626. Although MHA may have violated the ADA by refusing her request for a work at home accommodation, we do not reach this issue because on appeal Humphrey argues only the failure to grant a leave of absence as a violation of the duty to accommodate.

Given MHA's failure to engage in the interactive process, liability is appropriate if a reasonable accommodation without undue hardship to the employer would otherwise have been possible. *See id.* at 1117. As we have already discussed, a leave of absence was a reasonable accommodation for Humphrey's disability. [FN17] Ordinarily, whether an accommodation would pose an undue hardship on the employer is a factual question. Here, however, MHA has conceded that granting a leave of absence would not have posed an undue hardship. MHA had a policy of granting leaves to disabled employees, and admits that it would have given Humphrey a leave had she asked for one at any time before her termination. MHA's ultimate position, therefore, is simply that Humphrey is not entitled to a leave of absence because she failed to ask for one before she was fired. As we have explained, however, MHA was under a continuing duty to offer a reasonable accommodation. Accordingly, we hold as a matter of law (again, assuming that Humphrey is a qualified individual with a disability) that MHA violated the ADA's reasonable accommodation requirement.

FN17. *See* Section IIA *supra.*

C. REASON FOR TERMINATION

[7][8] Unlike a simple failure to accommodate claim, an unlawful discharge claim requires a showing that the employer terminated the employee because of his disability. *See Cooper v. Neiman Marcus Group, 125 F.3d 786, 790 (1997).* Often the two claims are, from a practical standpoint, the same. For the consequence of the failure to accommodate is, as here, frequently an unlawful termination. In this case, MHA's stated reason for Humphrey's termination was absenteeism and tardiness. For purposes of the ADA, with a few exceptions, [FN18] conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for *1140 termination. *See Hartog v. Wasatch Academy, 129 F.3d 1076, 1086 (10th Cir.1997).* The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability. *See Borkowski v. Valley Central Sch. Dist., 63 F.3d 131, 143 (2d Cir.1995).* In *Kimbro,* for example, we found that there was a sufficient causal connection between the employee's disability and termination where the employee was discharged for excessive absenteeism caused by migraine-related absences. *See Kimbro, 889 F.2d at 875.* Similarly, Humphrey has presented sufficient evidence to create a triable issue of fact as to whether her attendance problems were caused by OCD. In sum, a jury could reasonably find the requisite causal link between a disability of OCD and Humphrey's absenteeism and conclude that MHA fired Humphrey because of her disability.

> FN18. The text of the ADA authorizes discharges for misconduct or inadequate performance that may be caused by a "disability" in only one category of cases-alcoholism and illegal drug use: "[An employer] may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee." 42 U.S.C. § 12114(c)(4). In line with this provision, we have applied a distinction between disability-caused conduct and disability itself as a cause for termination only in cases involving illegal drug use or alcoholism. *See Newland v. Dalton, 81 F.3d 904, 906 (9th Cir.1996)* (holding that an employer may fire an employee who went on a "drunken rampage" and attempted to fire an assault rifle at individuals in a bar); *Collings v. Longview Fibre Co., 63 F.3d 828, 832 (9th Cir.), cert. denied, 516 U.S. 1048, 116 S.Ct. 711, 133 L.Ed.2d 666 (1996)* (employees discharged for drug-related misconduct at the workplace); *see also Hartog, 129 F.3d*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

239 F.3d 1128                                                                                    Page 11
239 F.3d 1128, 11 A.D. Cases 765, 20 NDLR P 2, 01 Cal. Daily Op. Serv. 1295, 2001 Daily Journal D.A.R. 1631
(Cite as: 239 F.3d 1128)

at 1085-88 (reviewing cases in all circuits and finding that "the disability vs. disability-caused conduct dichotomy seems to be unique to alcoholism and drugs."). In *Newland*, however, we suggested that an additional exception might apply in the case of "egregious and criminal conduct" regardless of whether the disability is alcohol- or drug-related. *See Newland*, 81 F.3d at 906 ("Attempting to fire a weapon at individuals is the kind of egregious and criminal conduct which employees are responsible for regardless of any disability."). Any such exception would not be applicable to Humphrey's absences or tardiness.

### III. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment to MHA on Humphrey's ADA and FEHA claims is hereby REVERSED and the case is REMANDED for proceedings consistent with this opinion.

•Carolyn HUMPHREY, Plaintiff and Appellant, v. MEMORIAL HOSPITALS ASSOCIATION, Defendant and Appellee., 1998 WL 34089626 (Appellate Brief) (C.A.9 July 10, 1998), Appellant's Opening Brief

•Carolyn HUMPHREY, Plaintiff and Appellant, v. MEMORIAL HOSPITALS ASSOCIATION, Defendant and Appellee., 1998 WL 34089878 (Appellate Brief) (C.A.9 July 10, 1998), Appellant's Opening Brief

•Carolyn HUMPHREY, Plaintiff and Appellant, v. MEMORIAL HOSPITALS ASSOCIATION, Defendant and Appellee., 1998 WL 34089627 (Appellate Brief) (C.A.9 October 8, 1998), Appellant's Reply Brief

•Carolyn HUMPHREY, Plaintiff and Appellant, v. MEMORIAL HOSPITALS ASSOCIATION, Defendant and Appellee., 1998 WL 34089879 (Appellate Brief) (C.A.9 October 8, 1998), Appellant's Reply Brief

239 F.3d 1128, 11 A.D. Cases 765, 20 NDLR P 2, 01 Cal. Daily Op. Serv. 1295, 2001 Daily Journal D.A.R. 1631

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT – G

Westlaw.

889 F.2d 869                                                                    Page 1
889 F.2d 869, 57 Fair Empl.Prac.Cas. (BNA) 363, 52 Empl. Prac. Dec. P 39,495, 1 A.D. Cases 1537
**(Cite as: 889 F.2d 869)**

▷

United States Court of Appeals,
Ninth Circuit.
Daniel KIMBRO, Plaintiff-Appellant/Cross-
Appellee,
v.
ATLANTIC RICHFIELD COMPANY, Defendant-
Appellee/Cross-Appellant.
Nos. 87-3903, 87-4007.

Argued and Submitted May 1, 1989.
Decided Nov. 14, 1989.

Machinist who was dismissed for excessive absenteeism allegedly resulting from cluster migraine condition brought suit against former employer for handicap discrimination, breach of contract, and violations of ERISA. The United States District Court for the Western District of Washington, Carolyn R. Dimmick, J., entered judgment in favor of employer, and machinist appealed. The Court of Appeals, Ferguson, Circuit Judge, held that: (1) machinist's cluster migraine condition qualified as "handicap" under Washington's handicap discrimination law; (2) supervisor's knowledge of employee's condition could be imputed to management, which could be held responsible for any failure to make reasonable accommodation; but (3) machinist failed to establish that he was terminated in retaliation for prior use of ERISA-protected sick leave benefits in violation of ERISA.

Affirmed in part and reversed in part.

West Headnotes

**[1] Federal Courts** ⛆776
170Bk776 Most Cited Cases
District court's interpretation of state law is reviewed under same independent de novo standard as are court's federal law conclusions.

**[2] Civil Rights** ⛆1218(3)
78k1218(3) Most Cited Cases
(Formerly 78k107(1))
Medically-documented cluster migraine condition from which employee suffered qualified as "handicap," under Washington's handicap discrimination law. West's RCWA 49.60.180.

**[3] Civil Rights** ⛆1736

78k1736 Most Cited Cases
(Formerly 78k451)
Supervisor's knowledge of cluster migraine condition from which machinist suffered could be imputed to corporate management, which could be held liable under Washington's handicap discrimination law for any failure to make reasonable accommodation, where corporation's personnel policies required that employees raise all personnel-related matters with supervisor, and management relied on supervisor as conduit for precisely this type of critical information. West's RCWA 49.60.180.

**[4] Civil Rights** ⛆1225(1)
78k1225(1) Most Cited Cases
(Formerly 78k173.1, 78k173)
Employer may be liable under Washington's handicap discrimination law for failing to make reasonable accommodation for serious medical condition of which it is on notice, regardless of whether employer in good faith believes that medical condition qualifies as "handicap." West's RCWA 49.60.180.

**[5] Civil Rights** ⛆1225(4)
78k1225(4) Most Cited Cases
(Formerly 78k173.1, 78k173)
Under Washington's handicap discrimination law, employee's failure to formally request an accommodation does not absolve employer of its obligation to reasonably accommodate its employees' disabilities. West's RCWA 49.60.180.

**[6] Civil Rights** ⛆1749
78k1749 Most Cited Cases
(Formerly 78k448.1, 78k448)
Whether particular accommodation would have imposed undue hardship on employer's business is question of fact, in action brought by handicapped employee under Washington's handicap discrimination law. West's RCWA 49.60.180.

**[7] Administrative Law and Procedure** ⛆416.1
15Ak416.1 Most Cited Cases
(Formerly 15Ak416)

**[7] Civil Rights** ⛆1225(2)
78k1225(2) Most Cited Cases
(Formerly 78k442.1, 78k442)
Regulation promulgated by Washington Human Rights Commission, as to when particular

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

889 F.2d 869                                                                 Page 2
889 F.2d 869, 57 Fair Empl.Prac.Cas. (BNA) 363, 52 Empl. Prac. Dec. P 39,495, 1 A.D. Cases 1537
**(Cite as: 889 F.2d 869)**

accommodation would impose undue hardship on employer's business, was entitled to great weight in action brought by handicapped employee under Washington's handicap discrimination law. West's RCWA 49.60.180.

**[8] Civil Rights** 🗝1744
78k1744 Most Cited Cases
          (Formerly 78k453)
District court's finding, that accommodations suggested by machinist would impose undue hardship on employer's business, was sufficiently supported by evidence presented in handicap discrimination action under Washington law, including evidence that employer's need to schedule all machinist projects in advance prevented it from allowing machinist to use his unexhausted sick leave days intermittently on days or hours when his migraine condition prevented him from working. West's RCWA 49.60.180.

**[9] Civil Rights** 🗝1744
78k1744 Most Cited Cases
          (Formerly 78k453)
Finding that employer could reasonably accommodate machinist's cluster migraine condition by granting him leave of absence was sufficiently supported by evidence presented in handicap discrimination action under Washington law, where no evidence was presented as to how this accommodation would impose undue hardship on employer, and employee's condition was characterized by acute periods of migraines lasting no longer than a few months, followed by long periods of relative remission. West's RCWA 49.60.180.

**[10] Civil Rights** 🗝1225(3)
78k1225(3) Most Cited Cases
          (Formerly 78k173.1, 78k173)
Mere fact that machinist's migraines might recur even after he was granted leave of absence did not preclude finding that leave of absence was "reasonable accommodation" that employer was required to make under Washington's handicap discrimination law, where employee's migraine condition was characterized by acute periods of migraines lasting for no longer than a few months, followed by long periods of relative remission.

**[11] Labor and Employment** 🗝40(3)
231Hk40(3) Most Cited Cases
          (Formerly 255k7 Master and Servant)
Under Washington law, sick leave plan adopted by employer was not sufficient to change at-will nature

of machinist's employment, or to prevent employee from discharging machinist for excessive absences as long as he retained unexhausted sick leave days to cover such absences, where evidence showed that employees were generally aware that they could be disciplined for excessive absenteeism even if their sick pay allowance had not been exhausted; machinist failed to show any "reasonable reliance" on plan.

**[12] Labor and Employment** 🗝51
231Hk51 Most Cited Cases
          (Formerly 255k7 Master and Servant)
Under Washington law, attendance policy promulgated by employer did not change at-will nature of machinist's employment, or prevent employer from terminating
him for his alleged excessive absenteeism, where police did not contain specificity necessary to creat binding contract but merely provided that "the reasons for each absence must be evaluated.".

**[13] Labor and Employment** 🗝795
231Hk795 Most Cited Cases
          (Formerly 255k40(4) Master and Servant)
Machinist failed to establish that he was dismissed, not for excessive absenteeism, but in retaliation for prior use of ERISA-protected sick leave benefits, where machinist had used benefits over sustained period five years prior to discharge and use of benefits immediately prior to dismissal was not at significantly greater rate than his use during previous periods. Employee Retirement Income Security Act of 1974, § 510, 29 U.S.C.A. § 1140.

**[14] Labor and Employment** 🗝861
231Hk861 Most Cited Cases
          (Formerly 255k40(1) Master and Servant)
Timing of employee's discharge may, in certain situations, create inference that he was wrongfully discharged in retaliation for exercising rights to which he was entitled under ERISA-qualified employee benefit plan. Employee Retirement Income Security Act of 1974, § 510, 29 U.S.C.A. § 1140.

**[15] Labor and Employment** 🗝880
231Hk880 Most Cited Cases
          (Formerly 255k46 Master and Servant)
Employer was not entitled to award of attorney fees under ERISA, notwithstanding that it ultimately prevailed on that portion of former employee's complaint stating an unlawful retaliation claim under ERISA, where employee prevailed on civil rights

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

889 F.2d 869                                                                                                Page 3
889 F.2d 869, 57 Fair Empl.Prac.Cas. (BNA) 363, 52 Empl. Prac. Dec. P 39,495, 1 A.D. Cases 1537
(Cite as: 889 F.2d 869)

claim, ERISA claim was not brought in bad faith, employer was clearly able to pay its own fees and employee was essentially without resources. Employee Retirement Income Security Act of 1974, § § 502(g), 510, 29 U.S.C.A. § § 1132(g), 1140.

**\*871** Deborra E. Garrett, Raas, Johnsen, Garrett & Stuen, Bellingham, Wash., for plaintiff-appellant/cross-appellee.

Clemens H. Barnes, Graham & Dunn, Seattle, Wash., for defendant-appellee/cross-appellant.

Appeal from the United States District Court for the Western District of Washington.

Before ALARCON, FERGUSON and THOMPSON, Circuit Judges.

**\*872** FERGUSON, Circuit Judge:

Appellant Daniel Kimbro appeals the district court's judgment in favor of Atlantic Richfield (ARCO) in his action alleging handicap discrimination, breach of contract, and violations of the Employee Retirement Income Security Act (ERISA). Kimbro, a machinist at an ARCO refinery, was discharged after ten years of employment with the company for excessive absenteeism and tardiness. Kimbro contends that ARCO failed to make reasonable accommodations to his physical impairments and thus violated Washington's statutory provision forbidding discrimination against the disabled in the workplace. He also claims that ARCO breached their employment contract by discharging him before he had an opportunity to use all of his sick leave benefits, and by not considering the proper factors in its decision to terminate him. Finally, Kimbro alleges that his discharge was in retaliation for his past use of ERISA-protected employee sick leave benefits. ARCO appeals the district court's denial of its request for attorneys' fees. We affirm in part and reverse in part.

I.

Plaintiff Daniel Kimbro was hired as a machinist by ARCO in 1971 to work in the Cherry Point, Washington, oil refinery. Since beginning operations in 1971, ARCO's Cherry Point refinery has maintained a personnel policy self-described as a "union-free environment policy." Pursuant to this policy, ARCO offers wages and benefits comparable to those offered at unionized oil refineries in an effort to maintain a loyal group of employees who feel no need to elect a union to represent their interests. Among these benefits are a sick leave plan

[hereinafter Sick Leave Plan], two disability plans, a retirement plan, and various types of unpaid leaves of absence. The Sick Leave Plan, which is relevant to this litigation, allows a worker to collect his salary during absences attributable to non-occupational illness or injury.  [FN1]

> FN1. Benefits under the Sick Leave Plan will hereinafter be referred to as sick leave days.

ARCO also maintains a written policy describing its attendance requirements. ARCO's attendance policy sets forth an attendance goal which includes substantially fewer days absence from work than the number of sick leave days which would accrue to a 10-year employee. This policy requires ARCO to follow a three-step process before discharging an employee for unsatisfactory attendance. As a first step, the employee is to receive informal counseling from his immediate supervisor. If attendance continues to be a problem, the policy calls on the supervisor to provide additional counseling and to place a written memorandum in the employee's file. The policy requires ARCO to issue a final warning before discharging an employee for attendance problems.

Kimbro maintained a satisfactory attendance record during his first five years at ARCO. Although Kimbro missed intermittent days for various illnesses and used sick leave days for those absences, he had no major illness or injury which required him to miss work over an extended period. In 1976, however, Kimbro was diagnosed as suffering from a condition known as "cluster migraine." This condition is characterized by sporadic and debilitating episodes of migraines. Each migraine lasts up to an hour and the headaches occur in clusters of several per day over a period of weeks or months. During acute episodes, Kimbro is unable to work, sleep, or perform any meaningful task. Between clusters, which can be months or even years apart, normal activity is unimpaired. Kimbro began taking medication and receiving treatment for his condition in 1976. He missed several weeks of work in late 1976 as a result of cluster migraines.

Kimbro also missed a substantial amount of work between 1977 and 1980, primarily as a result of back surgery in 1977. While Kimbro experienced some occasional migraines during this period, he was forced to miss work only a few times on account of his migraine condition.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

889 F.2d 869                                                                                                    Page 4
889 F.2d 869, 57 Fair Empl.Prac.Cas. (BNA) 363, 52 Empl. Prac. Dec. P 39,495, 1 A.D. Cases 1537
(Cite as: 889 F.2d 869)

In 1979, Kimbro received an oral reprimand from his supervisor, Jack Jackson, because his attendance record was unsatisfactory. *873 In August 1980, in accordance with the attendance policy, Jackson counseled Kimbro again on his poor attendance and placed a memorandum in Kimbro's personnel file.

In early 1981, Kimbro's cluster migraine condition recurred. As a result, he was absent and tardy several times during this period. He was also absent twice for other non-migraine related illness during early 1981. In March 1981, ARCO issued a final warning to Kimbro regarding his poor attendance. He was warned that he would be discharged if he were tardy or absent again in the foreseeable future. Kimbro was tardy as a result of his migraine condition three times after receiving this final warning. On June 10, the date of his third late arrival to work, Kimbro was discharged for excessive absenteeism.

At the time of his discharge, Kimbro carried an unexhausted sick leave equivalent to ten weeks of full salary and at least 36 weeks of half salary. While Kimbro used his sick leave days intermittently on the days he was absent from work because of a migraine or other illness, and occasionally compensated for hours missed on those days he arrived late to work by staying after regular operating hours to perform repair work, he did not formally request that he be permitted to continue either of these practices as an alternative to discharge. Nor did he request that any other accommodation be made to his migraine condition upon receiving either the final warning or the final termination notice.

Kimbro continued to experience acute cluster migraines after his discharge from ARCO and continued to seek treatment and medication for his condition. In late 1985, however, he began to receive treatment from a psychologist which enables him to exert some control over his migraines. He claims that this current treatment allows him to work full-time without substantial interference.

Kimbro filed this action against ARCO in February 1986, alleging, among other things, that ARCO (1) violated Washington's law against discrimination, Wash.Rev.Code § 49.60, by failing to attempt a reasonable accommodation to his migraine condition, that it (2) breached its employment contract with Kimbro, and (3) violated ERISA, 29 U.S.C. § 1140, by discharging him in retaliation for use of his federally-protected benefits. [FN2] The district court held a bench trial and rendered judgment in favor of

ARCO on all claims. It denied, however, ARCO's request for attorneys' fees under ERISA, 29 U.S.C. § 1132(g).

> FN2. Kimbro also alleged in his lawsuit that ARCO violated ERISA, 29 U.S.C. § 1022, by failing to inform him about or assist him in obtaining ERISA-protected benefits. The district court found in favor of ARCO on this issue as well. Kimbro has abandoned this claim on appeal.

## II.

[1] A district court's findings of fact are reviewed under the clearly erroneous standard. _LaDuke v. Nelson,_ 762 F.2d 1318, 1321 (9th Cir.1985); Fed.R.Civ.P. 52(a). Questions of law are, of course, reviewed _de novo. United States v. McConney,_ 728 F.2d 1195, 1201 (9th Cir.) (en banc), _cert. denied,_ 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). A district court's interpretation of state law is reviewed under the same independent _de novo_ standard as are questions of federal law. _Matter of McLinn,_ 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).

## III.

In recognition of the significant impediments that confront the disabled in the workplace, the Washington legislature amended the state's employment discrimination law in 1973 to include a prohibition against discrimination based on physical, mental or sensory handicaps. _See_ Wash.Rev.Code § 49.60.180. [FN3] The Washington *874 Supreme Court has held that an employer commits an unfair employment practice under § 49.60.180 when it discharges an employee without attempting to make reasonable accommodations to the employee's physical, mental, or sensory limitations. _Reese v. Sears, Roebuck & Co.,_ 107 Wash.2d 563, 578-80, 731 P.2d 497, 506 (1987); _Dean v. Municipality of Metropolitan Seattle,_ 104 Wash.2d 627, 632-33, 708 P.2d 393, 396-400 (1985); _Holland v. Boeing,_ 90 Wash.2d 384, 389, 583 P.2d 621, 623- 24 (1978); Wash.Admin.Code § 162-22-080(1).

> FN3. It is an unfair practice for any employer:
> (1) To refuse to hire any person because of such person's age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical handicap, unless based upon a bona fide occupational qualification: _Provided,_ That the prohibition against discrimination

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

because of such handicap shall not apply if the particular disability prevents the proper performance of the particular worker involved.

(2) To discharge or bar any person from employment because of such person's age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical handicap.

(3) To discriminate against any person in compensation or in other terms or conditions of employment because of such person's age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical handicap. *Id.* (emphasis in original).

Kimbro contends that ARCO's failure to attempt to reasonably accommodate his migraine condition prior to discharge constitutes a breach of ARCO's statutory duty under Washington's handicap discrimination law. The district court found that while Kimbro's condition indeed qualified as a handicap under Washington law, ARCO could not be held liable for failing to attempt a reasonable accommodation since the ARCO management personnel who made the decision to terminate Kimbro were not personally aware that many of Kimbro's absences throughout his period of employment, including those immediately prior to his discharge in 1981, were attributable to his cluster migraine condition. Thus, the district court concluded that the ARCO management's lack of personal knowledge precluded the imposition of liability on ARCO for failing to make a reasonable accommodation.

While we find no error in the district court's finding that Kimbro suffered from a handicap within the meaning of Wash.Rev.Code § 49.60.180, we believe that the district court erred in finding that ARCO management's lack of personal knowledge of Kimbro's migraine condition insulates the company from liability; ARCO was in fact on notice of Kimbro's condition as a result of Kimbro's supervisor's full awareness of his condition and thus must be held responsible for any failure to attempt a reasonable accommodation. Since the district court's findings and the record demonstrate that ARCO could have attempted a reasonable accommodation of Kimbro's condition but failed to do so, ARCO's conduct in this case constitutes an unfair employment practice under Washington's statutory prohibition against handicap discrimination.

A.

[2] As an initial matter, we note that the district court clearly did not err in finding that Kimbro's cluster migraine condition constituted a handicap within the meaning of Wash.Rev.Code § 49.60.180. In *Phillips v. City of Seattle*, 111 Wash.2d 903, 766 P.2d 1099, 1101-02 (1989), the Supreme Court of Washington adopted Wash.Admin.Code § 162-22-040 as the applicable definition for "handicap" in unfair practice cases brought under Wash.Rev.Code § 49.60.180. [FN4]

> FN4. Wash.Admin.Code § 162-22-040 provides:
>
> (1) For the purpose of determining whether an unfair practice under RCW 49.60.180, 49.60.190, or 49.60.200 has occurred:
>
> (a) A condition is a "sensory, mental, or physical handicap" if it is an abnormality and is a reason why the person having the condition did not get or keep the job in question.... In other words, for enforcement purposes a person will be considered to be *handicapped* by a sensory, mental, or physical condition if he or she is *discriminated against because of the condition* and the condition is abnormal.
>
> (b) "The presence of a sensory, mental, or physical handicap" includes, but is not limited to, circumstances where a sensory, mental, or physical condition:
>
> (i) Is medically cognizable or diagnosable;
>
> (ii) Exists as a record or history; or
>
> (iii) Is perceived to exist, whether or not it exists in fact.
>
> (2) An example of subsection (1)(b)(ii) is a medical record showing that the worker had a heart attack five years ago. An example of subsection (1)(b)(iii) is rejection of a person for employment because he had a florid face and the employer thought that he had high blood pressure, but in fact he did not have high blood pressure. (Emphasis in original).

**\*875** First, the record strongly suggests that Kimbro's attendance record from 1976 to 1981 would not have been substandard but for his migraine-related absences. More importantly, his final warning and ultimate discharge for excessive absenteeism were precipitated by his migraine-related absences. Thus, the record clearly demonstrates a sufficient causal connection between Kimbro's termination and his migraine condition to satisfy § 162-22- 040(1)(a).

Kimbro's condition also falls well within the second prong of the applicable standard. Kimbro has been diagnosed as suffering from a recognized medical condition known as cluster migraines. His medical record indicates that he has been plagued by cluster migraines, with varying levels of intensity and frequency, since 1976. Accordingly, Kimbro's cluster migraine condition is both medically cognizable and exists as a matter of record. *See* § 162-22- 040(b)(i)(ii), (iii). Consequently, Kimbro clearly was handicapped under Washington antidiscrimination law. [FN5]

> FN5. It should be noted that *Phillips'* adoption of Wash.Admin.Code § 162-22-040 as the appropriate handicap definition for unfair employment practice cases overturned *Reese,* 107 Wash.2d at 579, 731 P.2d at 506. *Reese* had approved of Wash.Admin.Code § 162-22-030 as the proper handicap standard, *see id,* a far narrower standard than that set forth in *Phillips. See* Wash.Admin.Code § 162-22-030 (to qualify as a handicap, "impairments must be material rather than slight; static and permanent in that they are seldom fully corrected by medical replacement, therapy, or surgical means"). However, the district court apparently applied the *Reese* definition to determine whether Kimbro's condition qualified as a handicap, since the supreme court had not yet announced its decision in *Phillips* at the time of Kimbro's trial. In light of the fact that the district court found that Kimbro's condition qualified as a handicap even under the narrower *Reese* test, and that the record clearly supports a finding of the existence of a handicap under *Phillips,* we believe it is proper to affirm the district court's conclusion on this issue.

### B.

[3] As noted above, the district court reasoned that because ARCO management did not have sufficient knowledge of Kimbro's migraine condition, ARCO could not be held responsible for any failure to attempt a reasonable accommodation. While the district court committed no error in concluding that ARCO management personnel were unaware of Kimbro's condition, the district court erred as a matter of law in finding that ARCO could not be held liable in this case for failing to accommodate Kimbro's condition.

There is substantial evidence in the record to support the finding that ARCO management personnel who made the final decision to discharge Kimbro were personally unaware of Kimbro's migraine condition and its significant causative effect on Kimbro's absenteeism and tardiness. While testimony at trial revealed that management personnel were aware of the fact that Kimbro had been missing work because of headaches and that Jack Jackson, Kimbro's supervisor, had discussed Kimbro's headache difficulties with some of the management, there is no evidence which clearly demonstrates that any of the management personnel knew or believed that Kimbro suffered from a severe diagnosable medical condition.

The record does demonstrate, however, that Jackson was fully aware of the fact that Kimbro's headaches were a manifestation of a serious medical condition. The record reveals that Kimbro frequently discussed his condition with Jackson, Jackson knew Kimbro was receiving medication and treatment for the condition, and Jackson personally witnessed the debilitating effects of the headaches. ARCO's liability for failure to attempt reasonable accommodations thus turns on the extent to which Jackson's knowledge of the severity of Kimbro's migraine condition can be imputed to ARCO.

Since reasonable accommodation cases rarely involve a dispute over whether the employee actually had notice of the physical disability at issue, there is a dearth of authority on the propriety of imputing knowledge from an employee-supervisor to *876 the employer in this type of action. Consequently, we must turn to traditional agency/employer-employee principles to determine whether ARCO should be charged with knowledge of Kimbro's condition in this case. *Cf. Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986) (courts should look to agency principles for guidance in determining employer liability under Title VII for sexual harassment by their supervisors).

It is well settled under Washington law that " 'the principal is chargeable with, and bound by, the knowledge of or notice to his agent received while the agent is acting as such within the scope of his authority and in reference to a matter over which his authority extends.' " *Zwink v. Burlington Northern, Inc.,* 13 Wash.App. 560, 566, 536 P.2d 13, 17 (1975) (quoting 3 Am.Jur.2d *Agency* § 273 at 635 (1962)); *Pilling v. Eastern & Pacific Enterprises,* 41 Wash.App. 158, 163, 702 P.2d 1232, 1236 (1985) ("Knowledge of the agent is imputed by law to the principal."); *Roderick Timber Co. v. Willapa Harbor*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

889 F.2d 869                                                                                    Page 7
889 F.2d 869, 57 Fair Empl.Prac.Cas. (BNA) 363, 52 Empl. Prac. Dec. P 39,495, 1 A.D. Cases 1537
(Cite as: 889 F.2d 869)

*Cedar Products, Inc.,* 29 Wash.App. 311, 316-17, 627 P.2d 1352, 1355 (1981) ("As a general rule, the knowledge of the agent will be imputed to the principal only where it is relevant to the agency and the matters entrusted to the agent."); *Rocky Mountain Fire & Casualty Co. v. Rose,* 62 Wash.2d 896, 903, 385 P.2d 45, 49 (1963) (same); Restatement (Second) of Agency § 272 (1958). More specifically, if notification is given to an agent who has, or appears to have authority " 'either to receive it, to take action upon it, or to inform the principal or some other agent who has duties in regard to it,' " then such notice is chargeable to the principal. *Roderick Timber,* 29 Wash.App. at 317, 627 P.2d at 1355 (quoting Restatement (Second) of Agency § 268, comment c (1958)).

Moreover, as the court in *Zwink* recognized, these traditional agency principles are fully applicable in the employment context. 13 Wash.App. at 566, 536 P.2d at 17 ("[a]lthough [the imputation of knowledge] rule is stated in the context of principal-agent relationship, it is at least equally applicable to the master-servant or employer-employee relationship"; *see also* Restatement (Second) of Agency § 283 (1958). Indeed, in *Zwink* the court found that, as a matter of law, a defendant railroad company had notice of any malfunctioning or nonfunctioning of a railroad crossing signaling device when an employee crossing guard was stationed at the crossing and in immediate charge of it at the time of the accident. 13 Wash.App.2d at 566-67, 536 P.2d at 16-18.

Applying the foregoing principles to this case, it is clear that ARCO is bound by Jackson's knowledge of Kimbro's medical condition. The district court's findings and Jackson's testimony at trial clearly establish that Jackson not only had authority to receive information regarding Kimbro's medical condition, but also had a responsibility to disclose the nature and severity of ARCO's serious medical condition to ARCO management.

The district court explicitly found that ARCO's "personnel policies, including those related to attendance, are administered through its working supervisors. ARCO's personnel administration policies require employees to bring scheduling problems ... and other personnel-related matters to their supervisors." The district court further found that Jackson "maintained an attendance log upon which was recorded the absences of employees and the reasons for those absences." Moreover, Jackson testified at trial that when ARCO considered taking

disciplinary action against an employee, it was customary to hold a meeting with the employee's supervisor and other ARCO management personnel responsible for making a final decision with regard to the particular employee. Jackson explained that at a meeting addressing an employee's attendance record, the attendance log and the reasons for absences are discussed in some detail.

[4] Since ARCO personnel policies require that employees raise all personnel-related matters with the supervisor, both the employee and management rely on the supervisor to serve as a conduit for precisely *877 the type of critical information that was evidently not fully communicated to management in this case. As the imputation of knowledge rule indicates, when an employee-supervisor fails to carry out his responsibilities to both a third person and his employer, the employer must bear the ultimate burden of its employee's error. *See Roderick Timber,* 29 Wash.App. at 317, 627 P.2d at 1355. Thus, since Jackson clearly acquired knowledge of Kimbro's migraine condition while serving in his supervisory function and had a duty to communicate such knowledge to management, ARCO, as a matter of law, was on notice of Kimbro's migraine condition. Accordingly, ARCO should be held responsible for any failure to make a reasonable accommodation. [FN6]

> FN6. ARCO neither disputes the fact that Jackson knew Kimbro suffered from a severe migraine condition nor that such knowledge is imputable to ARCO. It contends, however, that since Jackson did not know that Kimbro actually suffered from a "handicap," within the meaning of § 49.60.180, ARCO cannot be liable even if ARCO is chargeable with Jackson's knowledge. ARCO's argument is clearly frivolous.
>
> Under ARCO's proposed construction of § 49.60.180, an employer's liability for handicap discrimination in any particular case would turn on the employer's good faith determination of whether an employee's condition constituted a handicap in light of the applicable regulations and decisional law. Needless to say, such a construction would turn the handicap discrimination law on its head as it would permit the employer to the serve as factfinder under a statute that was enacted to regulate the employer's conduct. It is the domain of the jury or judge, not the employer, to determine

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether a condition constitutes a handicap. As long as the employer is on notice that an employee suffers from a serious medical condition, it may be liable under the handicap discrimination law.

### C.

Throughout this proceeding, Kimbro has maintained that ARCO could have reasonably accommodated his disability in one of three ways: (1) by continuing to allow him to use his accumulated sick leave for those days or hours in which his migraine prevented him from working; (2) by continuing to permit him to work after normal operating hours to compensate for any time missed as a result of his headaches; (3) by granting a leave of absence in June 1981 to provide him with an opportunity to make it through the 1981 episode of cluster migraines and to seek long-term effective treatment for his migraine condition.

[5] ARCO contends that, notwithstanding its notice of Kimbro's migraine condition, its failure to make any of the proposed accommodations does not constitute an unfair employment practice under § 49.60.180. While ARCO appeared to concede at oral argument that § 49.60.180 places an affirmative obligation on an employer to come forward with reasonable accommodations even in the absence of a formal request from a handicapped employee, [FN7] it maintains nonetheless that liability should not be imposed since (1) the first two accommodations would have imposed an undue hardship on ARCO and (2) the statute does not obligate an employer to offer a leave of absence to a handicapped employee when there is no established treatment program available for the employee's condition. We shall consider each of ARCO's contentions in turn.

> FN7. We note that ARCO is correct in recognizing that § 49.60.180 "requires that the employer affirmatively assist the employee who becomes handicapped while employed." _Dean_, 104 Wash.2d at 638-39, 708 P.2d at 397-98 (employer liable for failing to make alternative job opportunities known to disabled employee and for failing to assist employee in applying for such positions). Thus, an employee's failure to formally request an accommodation--as occurred in this case--does not absolve the employer of its obligation to reasonably accommodate its employees' disabilities. _See id._

[6][7] As an initial matter, we note that whether a

particular accommodation would have imposed an undue hardship on the employer is a question of fact. _Phillips, 111 Wash.2d at 911 766 P.2d at 1103; Reese v. Sears, Roebuck & Co., 107 Wash.2d 563, 580, 731 P.2d 497, 506-07 (1987)._ Wash.Admin.Code § 162-22-080(3) sets forth the standard for determining whether a proposed accommodation in fact places undue hardship on the employer. The regulation provides:

> **\*878** The cost of accommodating an able handicapped worker will be considered to be an undue hardship on the conduct of the employer's business only if it is unreasonably high in view of the size of the employer's business, the value of the employee's work, whether the cost can be included in planned remodeling or maintenance, the requirements of other laws and contracts, and other appropriate considerations.

Wash.Admin.Code § 162-22-080(3). This regulation, promulgated by the Washington Human Rights Commission, the agency charged with administering Washington's employment discrimination law, is entitled to great weight. _Holland, 90 Wash.2d at 389, 583 P.2d at 623; Hama Hama Co. v. Shorelines Hearings Bd., 85 Wash.2d 441, 448, 536 P.2d 157, 161 (1975)._ An employer bears the burden of establishing that a proposed accommodation " 'would impose an undue hardship on the conduct of [its] business.' " _Phillips, 111 Wash.2d at 911 766 P.2d at 1103_ (quoting Wash.Admin.Code § 162-22-080(1)); _Clarke v. Shoreline School Dist. No. 412, 106 Wash.2d 102, 118, 720 P.2d 793, 802 (1986)._

[8][9] The district court found that the first two proposed accommodations would have imposed an undue hardship on ARCO's ability to effectively operate its refinery. We find clear support in the record for these findings. [FN8] As to the option of granting a leave of absence in 1981, the district court, in its post-trial oral remarks, declared that such an accommodation would have been reasonable. We also find no error in this conclusion, _see supra_ n. 8 (appellate court may consider oral findings as long as they are consistent with formal findings), as no evidence in the record even remotely suggests that offering Kimbro a leave of absence in 1981 would have placed an undue hardship on ARCO.

> FN8. With respect to the first proposed accommodation, the district court, in its post-trial oral remarks, found that ARCO's legitimate need to schedule all machinist projects in advance made it unreasonable to require ARCO to permit a disabled

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

889 F.2d 869                                                                                  Page 9
889 F.2d 869, 57 Fair Empl.Prac.Cas. (BNA) 363, 52 Empl. Prac. Dec. P 39,495, 1 A.D. Cases 1537
(Cite as: 889 F.2d 869)

employee such as Kimbro to use unexhausted sick leave days intermittently on days or hours when his migraine condition precluded his ability to work. Though not incorporated into the formal findings, we may properly consider this district court finding since it is consistent with the court's formal findings and merely serves to supplement them. *Southern Pacific Land Co. v. United States,* 367 F.2d 161, 162 n. 1 (9th Cir.1966); C. Wright & A. Miller, *Federal Practice & Procedure,* Civil § 2580 (1971).

As to the second proposed accommodation of compensating for absent time by working after regular hours, the district court found safety considerations counselled against regularly allowing an individual machinist to work by himself after hours.

Indeed, ARCO does not take exception to this finding; instead, ARCO argues that it cannot be held liable for failing to grant a leave of absence when at the time of Kimbro's recurrence of cluster migraines in 1981, no specific treatment program was then available for Kimbro's condition. The absence of a specific treatment program, however, clearly does not preclude the imposition of liability for failing to offer a leave of absence in this case. As long as at the time of Kimbro's termination, there were "plausible reasons to believe that the handicap [could have been] accommodated" by the a leave of absence, ARCO is responsible for its failure to offer such a leave. *See Prewitt v. United States Postal Service,* 662 F.2d 292, 310 (5th Cir.1981). [FN9]

> FN9. *Prewitt* involved a claim brought under the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.,* the federal counterpart to § 49.60.180 in the handicap discrimination context. The supreme court of Washington has clearly held that it is appropriate to look to federal decisions interpreting the Rehabilitation Act to determine the proper construction of the state's law prohibiting handicap discrimination. *Clarke,* 106 Wash.2d at 118, 720 P.2d at 803; *see generally Fahn v. Cowlitz County,* 93 Wash.2d 368, 376, 610 P.2d 857, 861 (1980) (when Washington statutes have the same purpose as federal counterparts, federal decisions may be instructive in construing state law).

[10] Here, Kimbro's cluster migraine condition

during the relevant period was characterized by acute periods of migraines lasting no longer than a few months, followed by long periods of relative remission in which Kimbro would only experience occasional migraines. Thus, it was clearly plausible that a leave of absence in 1981 *879 would have provided Kimbro with an opportunity to endure the 1981 acute episode and then return to work unimpaired for the foreseeable future. Moreover, at the time of his discharge, it was also plausible that a prolonged leave from work would have given Kimbro and his physicians an opportunity to design an effective treatment program. While it is altogether possible that Kimbro's migraine episodes may have recurred upon his return to work following a leave of absence, such a possibility does not foreclose a finding of liability for failure to accommodate Kimbro's migraines in 1981. As long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform his job, an employer is liable for failing to attempt that accommodation. Accordingly, ARCO's failure to offer a leave of absence to Kimbro constitutes a violation of Washington's handicap discrimination law. [FN10]

> FN10. This is not to say that ARCO would necessarily have been obligated to grant a second leave if the migraine condition recurred after return from the initial leave. Indeed, the fact that an accommodation has been attempted and was unsuccessful is a relevant consideration for the factfinder and may in fact prove dispositive in determining whether failure to permit subsequent leave constituted failure to make a reasonable accommodation.

### IV.

Kimbro's complaint also sets forth a breach of contract claim. Kimbro alleges that ARCO's Sick Leave Plan modified his employment-at-will status to the extent that the Plan constituted a binding promise that ARCO employees could not be terminated for excessive absences as a result of non-occupational illness or injury as long as the employee retained unexhausted sick leave days to cover such absences. Thus, Kimbro claims that ARCO breached its contractual obligation by terminating him for excessive absenteeism resulting from his migraine and back conditions when he still had several months of unexhausted sick leave at the time of his discharge. Kimbro also contends that ARCO's written attendance employment policy altered his

889 F.2d 869                                                                                                Page 10
889 F.2d 869, 57 Fair Empl.Prac.Cas. (BNA) 363, 52 Empl. Prac. Dec. P 39,495, 1 A.D. Cases 1537
(Cite as: 889 F.2d 869)

terminable-at-will contract by contractually obligating ARCO to explicitly consider medical reasons underlying an employee's poor attendance before taking any disciplinary action. ARCO's failure to make such an inquiry and give due weight to his migraine condition prior to his termination, Kimbro argues, constituted a breach of this contractual duty.

The district court rejected Kimbro's breach of contract claim, finding that neither the Sick Leave Plan nor the written attendance policy modified or altered the parties' employment-at-will relationship. We affirm the district court's judgment on these claims.

In *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081 (1984), the Supreme Court of Washington held that a terminable-at-will employment relationship may be modified, and the employer contractually bound, by "promises *of specific treatment in specific situations*" made in employee manuals or handbooks issued by employers to their employees. *Id.* at 230, 685 P.2d at 1088 (emphasis in original). The employer will be bound, however, only by those specific promises upon which the employee justifiably relies. *Id.; Stewart v. Chevron Chemical Co.,* 111 Wash.2d 609, 762 P.2d 1143, 1146 (1988). Specifically, the employee must show that the promise induced him to remain on the job or not seek other employment. *See id.*

[11] Kimbro's evidence at trial failed to meet this evidentiary burden. With respect to the Sick Leave Plan, Kimbro introduced no evidence that his interpretation of the Plan--an unconditional entitlement to the use of all accumulated sick leave days--actually induced him to remain as a machinist at ARCO. Thus, he failed to show the requisite degree of reliance to establish that the Plan contractually obligated ARCO to take no disciplinary action against an employee retaining sick leave days. *See Stewart,* 111 Wash.2d at 614, 762 P.2d at 1146. Moreover, even assuming Kimbro had made a sufficient showing of subjective reliance, his claim still must fail as the district court's finding demonstrates that such reliance was not objectively justified. *880 See Thompson,* 102 Wash.2d at 233, 685 P.2d at 1087-88. The district court concluded, based on the testimony of several ARCO employees, that employees at the ARCO refinery were generally aware that they could be subject to discipline, including discharge, for excessive absenteeism, even if their sick pay allowance had not been exhausted. This finding is clearly supported by the record.

Accordingly, under *Thompson* and its progeny, Kimbro's employment-at-will relationship was not modified by the Sick Leave Plan.

[12] Kimbro's contention that ARCO's written attendance policy constitutes a binding promise also lacks merit. [FN11] First, it is highly questionable whether ARCO's attendance policy is the type of written policy statement that falls within the *Thompson* contract modification doctrine. The policy is neither part of an employee handbook, nor generally distributed to employees; rather, the policy is contained in a supervisor's manual for the supervisors' use in administering ARCO's personnel policy. The employees are permitted to review the supervisor's manual, however, if they request to do so.

> FN11. The relevant section of ARCO's attendance policy states:
> It should be noted that each absence record must be evaluated on its own merit. The reasons for each absence must be evaluated. For example:
> 1. Has a serious illness, major personal problem or urgent personal problem necessitated the employee to lose time from work?
> 2. Is the record showing a tendency of absences on Fridays or Mondays (attempting to create long weekends)?
> 3. Do the absences follow or precede scheduled or worked overtime? 4. Are the absence dates on the same days as scheduled major sporting events or immediately prior to or following scheduled vacations or holidays?
> 5. Has the employee been absent due to sickness more than five (5) days during the year?
> 6. Does the absence record include any absence without leave (AWOL)?
> 7. Have the absences for personal business been given prior approval by supervision?

*Thompson* and its progeny seem to contemplate that an at-will relationship is subject to modification only by policies contained in a personnel manual or, at the very least, statements of policy actually distributed to employees. *See Thompson,* 102 Wash.2d at 233, 685 P.2d at 1088 (employee manual); *Brady v. Daily World,* 105 Wash.2d 770, 772-73, 718 P.2d 785, 786 (1986) (personnel handbook distributed to employees); *Stewart,* 111 Wash.2d at 612-13, 762 P.2d at 1145 (Regulating Manual distributed to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

889 F.2d 869                                                                                                    Page 11
889 F.2d 869, 57 Fair Empl.Prac.Cas. (BNA) 363, 52 Empl. Prac. Dec. P 39,495, 1 A.D. Cases 1537
(Cite as: 889 F.2d 869)

employees). We need not determine the extent to which employment policies must be made available to employees in order to fall within the ambit of *Thompson,* however, since, in any case, ARCO's attendance policy does contain the specificity necessary to create a binding contract.

ARCO's attendance policy states only that "the reasons for each absence must be evaluated," and then lists specific questions that may be relevant in the evaluation of individual attendance records and to the ultimate determination of whether to take disciplinary action. The policy neither discusses how much weight should be placed on the fact that a serious illness is the underlying cause of an attendance problem nor does it provide any indication of the relative importance of the other factors. Accordingly, the policy cannot be held to modify the at-will relationship. *See Stewart,* 111 Wash.2d at 614 762 P.2d at 1146 (where policy only requires company to consider particular factors in lay-off decisions, but assigns no relative weight or value to any of the criteria, policy lacks sufficient specificity to create a binding promise). Thus the district court properly entered judgment in favor of ARCO on the breach of contract claims.

### V.

[13] Kimbro also claims that the district court erred in finding that he was not terminated in retaliation for prior use of ERISA-protected sick leave benefits in violation of ERISA. We find no error in the district court's rejection of Kimbro's ERISA claim.

Section 510 of ERISA, 29 U.S.C. § 1140, prohibits an employer from taking any adverse employment action against an employee "for exercising any right to which **881 he is entitled under the provisions of an employee benefit plan...." [FN12]

> FN12. "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan...."
> 29 U.S.C. § 1140.

Generally speaking, an "[u]nlawful reprisal occurs when (1) an employee participates in a statutorily protected activity, (2) an adverse employment action is taken against him or her, and (3) a causal

connection existed between the two." *McKinney v. Dole,* 765 F.2d 1129, 1143 (D.C.Cir.1985). This general reprisal standard clearly applies in the ERISA context. *See Baker v. Kaiser Aluminum & Chemical Corp.,* 608 F.Supp. 1315, 1318 (D.C.Cal.1984) ("To recover under § 1140, plaintiff must show that defendant terminated him with the 'specific intent' to interfere with his rights under defendant's benefits plans."); *Watkinson v. Great Atlantic & Pacific Tea Co., Inc.,* 585 F.Supp. 879, 882-83 (E.D.Pa.1984).

[14] Thus, to establish a violation under § 1140, a plaintiff-employee must show that his prior use of sick leave benefits was the motivating force behind his discharge. Kimbro, however, failed to adduce at trial any evidence from which one could reasonably infer that his discharge was in reprisal for his prior use of sick leave benefits. While the timing of a discharge may in certain situations create the inference of reprisal, *see Hochstadt v. Worcester Foundation for Experimental Biology, Inc.,* 425 F.Supp. 318, 324 (D.Mass.1976), *aff'd* 545 F.2d 222 (1st Cir.1976) (plaintiff may establish unfair reprisal under Title VII by showing "[his] discharge followed [his] protected activities within such period of time that the court can infer retaliatory motivation"), there is nothing in the record which raises any suspicion regarding the timing of Kimbro's termination. Kimbro's back surgery, which required the continuous use of sick leave days over a sustained period occurred five years before his discharge. Moreover, his use of benefits immediately prior to his termination was not at a significantly greater rate than his use during previous periods in which he was suffering from migraines or having difficulty with his back. [FN13] Accordingly, Kimbro has failed to establish a prima facie case of unfair reprisal for use of ERISA-protected benefits.

> FN13. While Kimbro also argued at trial that he was discharged to prevent his use of company disability benefits, he has abandoned this claim on appeal.

### VI.

[15] Having disposed of Kimbro's claim on appeal, we next turn to ARCO's contention that the district court abused its discretion in refusing to award it attorneys' fees under ERISA, 29 U.S.C. § 1132(g). Specifically, ARCO claims that since it had already pared down its fee request to only those fees attributable to the defense of Kimbro's ERISA claim, it was improper for the district court to weigh the fact the ERISA claims were collateral to the main thrust of the lawsuit when determining the propriety of a fee

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

889 F.2d 869                                                                      Page 12
889 F.2d 869, 57 Fair Empl.Prac.Cas. (BNA) 363, 52 Empl. Prac. Dec. P 39,495, 1 A.D. Cases 1537
(Cite as: 889 F.2d 869)

award. Finding no abuse of discretion in the district court's refusal to award ARCO its ERISA-related fees, we affirm the district court order. *See Hummel v. S.E. Rykoff & Co.,* 634 F.2d 446, 452 (9th Cir.1980) (a district court's determination regarding the award of attorneys' fees under ERISA, 29 U.S.C. § 1132(g), should be reversed only for abuse of discretion).

In *Hummell, supra,* the Ninth Circuit set forth several factors that should be considered in deciding whether to award attorneys' fees under § 1132(g):

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding *882 ERISA; and (5) the relative merits of the parties' positions.

*Id.* at 453.

In this case, the district court applied several of the *Hummell* factors and found it inappropriate to award attorneys' fees. Specifically, it concluded that the lawsuit had not been brought in bad faith, that ARCO was clearly able to pay its own fees while Kimbro was essentially without resources, and that an assessment of attorneys' fees against Kimbro might "dissuade similarly situated plaintiffs from bringing suit." In making its decision, the court also emphasized that Kimbro's ERISA claim was collateral to the main issues of the lawsuit.

We find no error in the district court's treatment of ARCO's request for fees. The district court found the first three *Hummel* factors all counseled against awarding ARCO fees. Although the court also apparently considered the fact that the ERISA claim was a collateral issue of the lawsuit, a factor not suggested in *Hummel,* ARCO fails to provide any authority which suggests that it is impermissible to consider such a factor in making a fee award determination. Moreover, even assuming the district court should not have considered the collateral nature of the ERISA claim, its decision to deny fees still cannot be deemed an abuse of discretion since the district found that several of the *Hummell* criteria weighed against a fee award as well. Accordingly, the district court did not abuse it discretion in denying ARCO's motion for attorneys' fees under ERISA.

## VII.

The district court judgment should be affirmed with respect to Kimbro's breach of contract and ERISA claims. The district court's denial of ARCO's request for attorneys' fees should also be affirmed. However, the district court erred in finding that ARCO had not engaged in unlawful handicap discrimination. Since ARCO failed to make a reasonable accommodation to Kimbro's migraine condition, we reverse the judgment of the district court on the handicap discrimination claim and remand for a determination of damages. Plaintiff is entitled to costs.

AFFIRMED IN PART AND REVERSED IN PART.

889 F.2d 869, 57 Fair Empl.Prac.Cas. (BNA) 363, 52 Empl. Prac. Dec. P 39,495, 1 A.D. Cases 1537

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT – H

**Westlaw.**

353 F.3d 588                                                    Page 1
353 F.3d 588, 15 A.D. Cases 21, 27 NDLR P 67
(Cite as: 353 F.3d 588)

**C**

United States Court of Appeals,
Eighth Circuit.
Dennis EPPS, Appellant,
v.
THE CITY OF PINE LAWN, Appellee.
No. 02-3064.

Submitted: June 13, 2003.
Filed: Dec. 19, 2003.

**Background:** Employee, a former police officer, sued city alleging his termination violated Americans with Disabilities Act (ADA) and Missouri Human Rights Act (MHRA) and that it constituted unlawful retaliation under Missouri statute for filing workers' compensation claim and amounted to intentional infliction of emotional distress (IIED) under Missouri common law. The United States District Court for the Eastern District of Missouri, Jean C. Hamilton, J., granted summary judgment for city. Employee appealed.

**Holdings:** The Court of Appeals, Smith, Circuit Judge, held that:
(1) officer failed to establish that city regarded him as disabled within meaning of ADA or MHRA;
(2) Missouri's discretionary immunity doctrine barred employee's retaliatory discharge claim; and
(3) city did not waive its sovereign immunity by purchase of insurance policy through Missouri Public Entity Risk Management Fund (MOPERM).
Affirmed.

West Headnotes

**[1] Federal Courts** ☞776
170Bk776 Most Cited Cases
Court of Appeals reviews district court's grant of summary judgment de novo.    Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[2] Civil Rights** ☞1217
78k1217 Most Cited Cases
To establish prima facie case of disability discrimination in employment under ADA and Missouri Human Rights Act, employee must show (1) that he has disability within meaning of ADA, (2) that he is qualified to perform essential functions of job, with or without reasonable accommodation, and (3) that he suffered adverse employment action

because of his disability.  Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; V.A.M.S. § 213.010 et seq.

**[3] Civil Rights** ☞1218(6)
78k1218(6) Most Cited Cases
Police officer failed to establish that Missouri city perceived him to be disabled within meaning of ADA or Missouri Human Rights Act (MHRA); city's conclusion that, due to neck and back injuries in automobile accident and degenerative disk disease, he could not perform particular job was insufficient, and medical evidence in form of doctor's treatment notes indicating he should be given job of detective instead of patrolman and that he might be better suited for another type of job within department did not prove he could not perform broad range of work. Americans with Disabilities Act of 1990, § 3(2)(C), 42 U.S.C.A. § 12102(2)(C); V.A.M.S. § 213.010 et seq.; 29 C.F.R. § 1630.2(j)(3)(i).

**[4] Civil Rights** ☞1218(4)
78k1218(4) Most Cited Cases
Attendance at work is necessary job function, for purposes of ADA requirement that employee be qualified to perform essential functions of job, with or without accommodations.    Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[5] Civil Rights** ☞1225(2)
78k1225(2) Most Cited Cases
Employer is not required, as part of duty of reasonable accommodation under ADA, to hire additional people or assign tasks to other employees to reallocate essential functions that employee must perform. Americans with Disabilities Act of 1990, § § 101(9), 102(b)(5)(A), 42 U.S.C.A. § § 12111(9), 12112(b)(5)(A).

**[6] Municipal Corporations** ☞728
268k728 Most Cited Cases
Under Missouri's "discretionary immunity" doctrine, city is not liable for manner in which it performs discretionary duties, such as official's exercise of reason in adaption of means to end and discretion in determining how or whether act should be done or course pursued.

**[7] Municipal Corporations** ☞723
268k723 Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

353 F.3d 588                                                                      Page 2
353 F.3d 588, 15 A.D. Cases 21, 27 NDLR P 67
**(Cite as: 353 F.3d 588)**

Under Missouri law, whether sovereign immunity is waived in particular case through public entity's purchase of insurance for tort claims depends on whether claim falls within purposes covered by policy. V.A.M.S. § 537.610, subd. 1.

**[8] Municipal Corporations** ☞742(4)
268k742(4) Most Cited Cases
Because Missouri public entity's liability for torts based on purchase of insurance is exception to general rule of sovereign immunity, plaintiff must specifically plead facts demonstrating that claim is within this exception. V.A.M.S. § 537.610, subd. 1.

**[9] Municipal Corporations** ☞723
268k723 Most Cited Cases
Missouri city did not waive its sovereign immunity from claim of retaliatory discharge for filing of workers' compensation claim by purchase of insurance policy through Missouri Public Entity Risk Management Fund (MOPERM); "Public Officials Errors and Omissions" clause spoke to inadvertent or accidental "errors" or "mistakes" rather than deliberate act such as retaliation and policy specifically provided when and for what type of injury it would pay, consistently maintained it did not waive sovereign immunity beyond those areas specified by statute or for claims arising under workers' compensation or other disability laws, and specifically cited sovereign immunity statutes naming exceptions thereto including purchase of insurance and noted that liability would not be broadened beyond limitations thereof. V.A.M.S. § § 287.780, 537.600, 537.610, subd. 1,537.700, 537.745, subd. 1.
**\*589** Allthea P. Johns, argued, St. Louis, Missouri, for appellant.

Priscilla F. Gunn, argued, St. Louis, Missouri (Brain D. Kennedy, on the brief), for appellee.

Before MELLOY, BEAM, and SMITH, Circuit Judges.

SMITH, Circuit Judge.

Dennis Epps appeals the district court's [FN1] summary judgment in favor of the City of Pine Lawn, Missouri ("Pine Lawn"), in Epps's discrimination and workers' compensation claims. We affirm.

> FN1. The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

*I. Background*
Epps served the City of Pine Lawn as a police officer for over thirteen years. Epps suffered numerous injuries during his employment. Epps filed workers' compensation claims for at least two of the injuries. Eventually, Epps's injuries left him unable to perform his job duties. Thereafter, Pine Lawn terminated him. [FN2]

> FN2. Epps served as a Pine Lawn police officer from March 14, 1987, to March 20, 2000. As a Pine Lawn police officer, Epps, who reached the rank of sergeant, performed standard police duties in the field and in an administrative capacity.

**\*590** Epps's first pertinent injury occurred August 1, 1998, when he was involved in an automobile accident while on duty. Epps injured his neck and back. Pine Lawn's workers' compensation insurance covered the injuries, and Epps received benefits. The injuries prevented Epps from performing his duties as a police officer, and he was placed on leave from August 26, 1998, to November 15, 1998. Dr. Peter Mirkin, Pine Lawn's designated workers' compensation physician, released Epps to return to work on November 9, 1998, without restrictions, but recommended that he work not as a patrolman but "as a detective."

Epps's next relevant injury occurred on April 13, 1999, when he aggravated the earlier injuries to his neck and back. However, Epps did not immediately seek medical attention. Instead, several months later, he visited Dr. Mirkin and complained of back and neck pain. He described that bending, stooping, or squatting aggravated the pain. Epps also complained that he had difficulty carrying his gun belt. According to the record, Epps paid for this visit and subsequent treatment with private health insurance.

Dr. Mirkin diagnosed Epps as having degenerative disk disease, and he concluded that Epps would very likely need to seek a different type of occupation. Initially, Dr. Mirkin prescribed conservative medical treatment, and he did not initially recommend surgery. However, in November 1999, Dr. Mirkin operated on Epps's neck. According to his reports, Dr. Mirkin did not consider Epps's complaints work-related, and consequently Pine Lawn's workers' compensation carrier denied liability for the treatment and surgery.

Donald Hardy became Chief of Police in July 1999. When he started work, he reviewed the personnel

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

353 F.3d 588                                                                                                    Page 3
353 F.3d 588, 15 A.D. Cases 21, 27 NDLR P 67
**(Cite as: 353 F.3d 588)**

files of his officers and noticed that Epps "had filed quite a few workers' compensation claims, and that he missed a lot of work." He also reviewed Dr. Mirkin's note that Epps had degenerative disk disease, and that he would likely need to seek a different occupation. On September 29, 1999, Hardy wrote a memorandum to the Mayor and Board of Aldermen recommending Epps's termination. Hardy referred to Dr. Mirkin's note, the extensive amount of sick time used by Epps, and the number of workers' compensation claims Epps filed in concluding that Epps was unable to perform his duties. The Mayor and Board of Aldermen did not accept Hardy's recommendation, and Epps remained employed with Pine Lawn. Epps never returned to work after late September 1999.

After Epps's neck surgery in November 1999, Hardy prepared a second memorandum to the Mayor and Board of Alderman on March 17, 2000. In this memorandum, Hardy again recommended termination after noting that there were no light-duty assignments available, and that the department's officers were required as part of their full duties to bend, squat, and run. Hardy again referred to Dr. Mirkin's note before concluding that Epps would never be able to function as a regular officer. On March 21, 2000, the Mayor and Board of Aldermen voted to accept Hardy's recommendation to terminate Epps and then dismissed him. Epps appealed the termination under the Pine Lawn Municipal Code. Following a hearing, the Board denied the appeal.

On February 27, 2001, Epps sued Pine Lawn alleging four separate claims. Specifically, he claimed that his termination in May of 2000 violated the Americans with **\*591** Disabilities Act ("ADA") and the Missouri Human Rights Act ("MHRA"). He also claimed that the termination constituted unlawful retaliation under Missouri Revised Statutes § 287.780 for filing a workers' compensation claim, and amounted to the intentional infliction of emotional distress under Missouri common law. Pine Lawn moved for summary judgment on all counts. In granting Pine Lawn's motion, the district court ruled that Epps could not prevail on his ADA and MHRA claims because he could not establish that Pine Lawn regarded him as disabled. The district court also held that Missouri's sovereign immunity statute barred Epps's workers' compensation retaliation and intentional infliction of emotional distress claims.

## II. *Standard of Review*
[1] We review the district court's grant of summary judgment de novo. *Dropinski v. Douglas County, Neb.*, 298 F.3d 704, 706 (8th Cir.2002); *Harder v. Acands*, 179 F.3d 609, 611 (8th Cir.1999). In doing so, we apply the same standard as the district court, viewing the evidence in the light most favorable to the nonmoving party and giving that party the benefit of all inferences that may reasonably be drawn. *Wallace v. Dorsey Trailers Southeast, Inc.*, 849 F.2d 341, 342 (8th Cir.1988). A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## III. *Discussion*
Epps argues that the district court erred in finding that he did not establish a prima facie case of discrimination under the ADA and MHRA. Specifically, the court found that Epps failed to prove that Pine Lawn perceived him to be disabled. [FN3] In addition, Epps argues that the court erred in determining that Pine Lawn enjoys discretionary immunity, a more restrictive type of sovereign immunity recognized in Missouri, from Epps's retaliatory-discharge claim.

> FN3. Epps's claims under the ADA and the MHRA are governed by the same standards. *Mathews v. Trilogy Communications, Inc.*, 143 F.3d 1160, 1164 n. 5 (8th Cir.1998) (citing *Tart v. Hill Behan Lumber Co.*, 31 F.3d 668, 671 (8th Cir.1994) (federal employment discrimination decisions apply to MHRA)); Mo. Rev. St. § 213.055.

### A. *ADA and MHRA Claims*
[2] Epps first argues that the facts showed that Pine Lawn perceived him to be disabled, thus establishing that particular element of his prima facie case under the ADA and MHRA. To establish a prima facie case of employment discrimination under the ADA and MHRA, we use the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802- 04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, Epps must show (1) that he has a disability within the meaning of the ADA, (2) that he is qualified to perform the essential functions of the job, with or without reasonable accommodation, and (3) that he suffered an adverse employment action because of his disability. *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 711 (8th Cir.2003); *Cooper v. Olin Corp., Winchester Div.*, 246 F.3d 1083, 1087 (8th Cir.2001).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Within the meaning of the ADA, the term "disability" includes, among other things, "being regarded as having," 42 U.S.C. § 12102(2)(C) (1994), "a physical or mental impairment that substantially limits one or more of the major life activities" *592 of the individual. 42 U.S.C. § 12102(2)(A). Thus, individuals who are "regarded as" having a disability, but who are not actually disabled, can still fall within the protection of the ADA. _Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); Conant v. City of Hibbing, 271 F.3d 782, 784-785 (8th Cir.2001)._ "Major life activities" include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); accord, 45 C.F.R. § 84.3(j)(2)(ii) (regulation interpreting the Rehabilitation Act of 1973, 29 U.S.C. § 790). [FN4]

> FN4. The ADA does not define the term "major life activities," but there are two potential sources of guidance for interpreting that and other terms: the Rehabilitation Act of 1973 and the Equal Employment Opportunity Commission ("EEOC") regulations interpreting the ADA. _Fenney, 327 F.3d at 714_ (citing _Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 193, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002))._ While regulations interpreting the Rehabilitation Act of 1973 receive a high degree of deference, the level of deference accorded EEOC regulations is yet unknown. _Fenney, 327 F.3d at 713-714_ (citing _Toyota, 534 U.S. at 194, 122 S.Ct. 681)._ However, neither party challenges the reasonableness of the EEOC regulations or their application to this case; therefore, we need not address this issue.

An individual is substantially limited in performing a major life activity where that individual is "[u]nable to perform" or is "[s]ignificantly restricted as to the condition, manner or duration under which" he can perform a particular major life activity. _Id._ § 1630.2(j)(1)(i), (ii). A substantial limitation on the major life activity of working means that an individual must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." _Id._ § 1630.2(j)(3)(i). In "regarded as" actions, the plaintiff must show that the employer or potential employer "entertain[ed] misperceptions about the individual-it must [have] believe[d] either that one ha[d] a

substantially limiting impairment that one [did] not have or that one ha[d] a substantially limiting impairment when, in fact, the impairment [was] not so limiting." _Conant, 271 F.3d at 785_ (quoting _Sutton, 527 U.S. at 489, 119 S.Ct. 2139)._

[3] Summary judgment is proper if a plaintiff fails to establish any element of his prima facie case. _Nesser v. Trans World Airlines, Inc., 160 F.3d 442, 445 (8th Cir.1998)._ We hold that the district court properly granted summary judgment to Pine Lawn because Epps failed to establish that Pine Lawn perceived him to be disabled within the meaning of the ADA or MHRA. Pine Lawn concluded that Epps could not perform the particular job of a Pine Lawn police officer. This, however, is insufficient to establish an ADA or MHRA claim. "The inability to perform a single, particular job does not constitute a substantial limitation on the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). "There is a distinction between being regarded as an individual unqualified for a particular job because of a limiting physical impairment and being regarded as 'disabled' within the meaning of the ADA." _Conant, 271 F.3d at 785._ "Accordingly, an employer is free to decide that ... some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job." _Id._ (quoting _Sutton, 527 U.S. at 490-91, 119 S.Ct. 2139)._

[4][5] In this case, Hardy and the Board of Alderman relied on Dr. Mirkin's treatment notes that indicated that Epps should be given the job of a "detective" rather than that of patrolman and that Epps might be better suited for another *593 type of job within the department. This medical evidence did not provide that Epps could not perform a broad range of work, nor does other evidence indicate that Hardy and the Board of Alderman concluded as much. Rather, the evidence only shows that Hardy and the Board of Alderman believed that Epps could no longer perform as a policeman for Pine Lawn based on the particular demands of a Pine Lawn patrolman. [FN5] We affirm the district court's summary judgment on Epps's ADA and MHRA claims.

> FN5. In addition, Epps failed to establish that he was qualified to perform the essential functions of the job, with or without accommodations. His excessive absenteeism from work rendered him unable to perform the job, and time off of work was not a reasonable accommodation in this instance. Attendance at work is a necessary job function. _Nesser, 160 F.3d at 445._ "An

353 F.3d 588
353 F.3d 588, 15 A.D. Cases 21, 27 NDLR P 67
(Cite as: 353 F.3d 588)

employee who is 'unable to come to work on a regular basis [is] unable to satisfy any of the functions of the job in question, much less the essential ones.' " *Id.* (quoting *Moore v. Payless Shoe Source, Inc.,* 139 F.3d 1210, 1213 (8th Cir.1998)). Even though attendance is an essential function of the job, the ADA requires employers to reasonably accommodate the disability, unless the accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A). The employee must show that a reasonable accommodation was available. *Nesser,* 160 F.3d at 446. Epps, however, failed to show that a reasonable accommodation existed. Epps asserts that the six-month leave of absence was reasonable; however, Pine Lawn, a small municipality, could not reallocate Epps's job duties among its small staff of fifteen to twenty-two police officers. An employer is not required to hire additional people or assign tasks to other employees to reallocate essential functions that an employee must perform. *Hatchett v. Philander Smith Coll.,* 251 F.3d 670, 675 (8th Cir.2001).

**B. Retaliatory Discharge and Sovereign Immunity**
[6] Epps next argues that Pine Lawn unlawfully retaliated against him because he filed a workers' compensation claim. Epps's claim, however, is barred by the doctrine of sovereign immunity. Pine Lawn, as a municipality, is protected by discretionary immunity, a more restrictive type of sovereign immunity recognized in Missouri. *Jungerman v. City of Raytown,* 925 S.W.2d 202, 204 (Mo.1996). Under Missouri's discretionary immunity doctrine, a city is not liable for the manner in which it performs discretionary duties, such as an official's "exercise of reason in the adaption of means to an end and discretion in determining how or whether an act should be done or course pursued." *Id.* at 205 (internal quotations omitted). The parties here agree that Pine Lawn generally enjoys this level of immunity.

Sovereign immunity has existed by statute in Missouri since 1977, with certain exceptions that the Missouri courts construe narrowly. *See* Mo.Rev.Stat. § § 537.600, .610. Rather than argue that immunity does not apply, Epps contends that Pine Lawn waived its immunity by purchasing an insurance policy through the Missouri Public Entity Risk Management Fund (MOPERM), a statutory entity through which subscriber public entities are covered by insurance.

*See* Mo.Rev.Stat. § § 537.700, .745.1.

[7] Despite the statutory language maintaining sovereign immunity for subscriber entities, sovereign immunity can still be waived in certain instances. Under section 537.600, sovereign immunity is waived in automobile cases and cases involving injury caused by a dangerous condition of public property. Additionally, section 537.610.1 provides that sovereign immunity can be waived by the purchase of insurance covering tort claims. [FN6] Section *594 537.610.1 provides an "independent basis for waiving sovereign immunity-a basis cemented in the existence of coverage for the damage or injury at issue under the language of the insurance policy." *Hummel v. St. Charles City R-3 School Dist.,* 114 S.W.3d 282, 2003 WL 21262853, *2 (Mo.Ct.App.2003) (quoting *State ex rel. Cass Med. Ctr. v. Mason,* 796 S.W.2d 621, 624 (Mo.1990)); *State ex rel. Bd. of Trs. of City of North Kansas City Mem. Hosp. v. Russell,* 843 S.W.2d 353, 360 (Mo.1992). Whether sovereign immunity is waived in a particular case depends on whether the plaintiff's claim falls within the purposes covered by the defendant's policy. *Casey v. Chung,* 989 S.W.2d 592, 593 (Mo.Ct.App.1998); *Fantasma v. Kansas City Board of Police Comm'rs,* 913 S.W.2d 388, 391 (Mo.Ct.App.1996); *Fields v. Curators of the Univ. of Missouri,* 848 S.W.2d 589, 592 (Mo.Ct.App.1993); *Russell,* 843 S.W.2d at 360; *Cass Med. Ctr.,* 796 S.W.2d at 623.

> FN6. Missouri Revised Statute § 537.610.1 provides:
> [E]ach political subdivision of this state ... may purchase liability insurance for tort claims, made against the state or the political subdivision .... Sovereign immunity for the state of Missouri and its political subdivisions is waived only to the maximum amount of and only for the purposes covered by such policy of insurance purchased pursuant to the provisions of this section and in such amount and for such purposes provided in any self-insurance plan duly adopted by the governing body of any political subdivision of the state.

[8] To penetrate a claim of immunity under section 537.610.1, a plaintiff is required to demonstrate the existence of insurance that covered the plaintiff's claim. *Brennan By and Through Brennan v. Curators of the Univ. of Missouri,* 942 S.W.2d 432, 436 (Mo.Ct.App.1997). Because a public entity's liability for torts is the exception to the general rule

353 F.3d 588
353 F.3d 588, 15 A.D. Cases 21, 27 NDLR P 67
(Cite as: 353 F.3d 588)

of sovereign immunity, a plaintiff must specifically plead facts demonstrating that the claim is within this exception to sovereign immunity. *See Burke v. City of St. Louis,* 349 S.W.2d 930 (Mo.1961); *see also, e.g., Martin v. City of Washington,* 848 S.W.2d 487, 490-91 (Mo.1993) (discussing pleading requirements for dangerous condition exception in section 537.600).

[9] Epps argues that the MOPERM policy contains language in the "Public Officials Errors and Omissions" clause that qualifies as a waiver of immunity. For support, Epps cites *Amick v. Pattonville-Bridgeton Terrace Fire Prot. Dist.,* 91 S.W.3d 603 (Mo.2002). In *Amick,* the plaintiff sued the Fire Protection District for retaliatory discharge after the plaintiff filed a workers' compensation claim. The Missouri Supreme Court determined that the Fire Protection District's insurance policy waived sovereign immunity because a clause in the policy provided that the District would pay for amounts to which the insured "becomes legally obligated to pay as monetary damages because of a 'wrongful act' to which this insurance applies." *Id.* at 604. Epps argues that the "Public Officials Errors and Omission" definition in the MOPERM policy similarly waives immunity. This definition provides:

Public Officials Errors and Omissions means any and all breaches of duty by the Covered Party arising from negligent action or inaction, mistake, misstatement, error, neglect, inadvertence, or omission by the Covered Party in the discharge of duties with the Member Agency.

Appendix at 348. After comparing the policy provision in *Amick* with the MOPERM provision, we disagree with Epps's assertion that the MOPERM policy provision waives Pine Lawn's sovereign immunity. The MOPERM "Public Officials Errors *595 and Omissions" clause clearly speaks to inadvertent or accidental "errors" or "mistakes" rather than a deliberate act, such as retaliation, as was involved in *Amick.* The MOPERM policy here is more restrictive than the policy in *Amick,* and it does not contain the broad language from *Amick* relating to any "wrongful acts" committed by Pine Lawn. Rather, it specifically provides when and for what type of injury it will pay, and consistently maintains that it does not waive sovereign immunity beyond those areas specified by statute or for claims arising under workers' compensation or other disability laws.

Furthermore, the MOPERM policy specifically cites Missouri's sovereign-immunity statutes at § § 537.600 and 537.610 that name the exceptions to sovereign immunity, including the purchase of insurance. The policy notes that liability will not be broadened beyond the limitations of those statutes. The policy also notes that MOPERM will not cover any obligation to which Pine Lawn "may be held liable under any workers' compensation, unemployment compensation or disability benefits law or under any similar law." Appellant's App. at 344. The wrongful discharge statute under which Epps makes his claim is in the Missouri Workers Compensation Act. As such, we find that Pine Lawn is protected by sovereign immunity. [FN7]

FN7. Because we find that the doctrine of sovereign immunity disposes of this matter, we do not reach the merits of Epps's retaliatory-discharge claim.

### IV. *Conclusion*

Accordingly, for the foregoing reasons, we affirm the district court's summary judgment in favor of Pine Lawn on Epps's ADA, MHRA, and retaliatory-discharge claims.

•Dennis EPPS, Plaintiff/Appellant, v. CITY OF PINE LAWN, Defendant/Appellee., 2002 WL 32375255 (Appellate Brief) (C.A.8 2002), Brief of Appellee

353 F.3d 588, 15 A.D. Cases 21, 27 NDLR P 67

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.